UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 0:20-cv-60416-RS

TOCMAIL INC., a Florida corporation,
      Plaintiff,

v.

MICROSOFT CORPORATION, a Washington
corporation,
      Defendant.

## MICROSOFT CORPORATION'S MOTION TO DISMISS COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendant, Microsoft Corporation ("Microsoft") hereby moves to dismiss the Complaint [ECF No. 1] filed by Plaintiff, TocMail, Inc. ("TocMail"), for lack of standing and failure to state any actionable claim against Microsoft.[1]

### INTRODUCTION

This action should be dismissed in its entirety because TocMail lacks standing to bring claims against Microsoft under the Lanham Act. Separate and independent from that threshold issue, TocMail's Lanham Act claims for false and misleading advertising and contributory false and misleading advertising also fail because neither states an actionable claim against Microsoft. The first claim is based upon five alleged "deceptive statements" allegedly made by Microsoft – none of which constitute false advertising because each misconstrues the statements actually made by Microsoft or is a statement that constitutes non-actionable puffery as a matter of law. The

---

[1] Microsoft filed an unopposed motion seeking leave for an additional 5 pages beyond the 20-page limitation for memoranda of law set forth in Local Rule 7.1(c)(2) to file a combined motion to dismiss the Complaint or alternatively transfer the case to the Western District of Washington [ECF No. 12]. This motion was filed under the premise that Local Rule 5.1(a)(4) permits filings with 1.5 spaces between lines. The Court granted Microsoft's request [ECF No. 13] but also declared that "every motion, response and reply filed in this case" must be double-spaced. To comply with the Court's directives and the applicable Local Rules, Microsoft files its motion to dismiss separately from its alternative motion to transfer.

second claim likewise fails because there are no allegations of wrongful misrepresentations made by third-parties with the knowledge and participation of Microsoft.

TocMail's claims are unusual, to say the least. TocMail does not allege that it is a viable business that has sold any products or services, nor does it allege that it has been the target of any Microsoft advertising. Rather, TocMail's claims are based on the dubious premise that because it purportedly holds a patent for technology that allegedly prevents a type of cyberattack accomplished through "IP cloaking," Microsoft's non-infringing cybersecurity protection feature is somehow by definition ineffective and advertising about its effectiveness is by definition false. TocMail asserts it is "destined" to be the only provider of this type of cybersecurity protection until its alleged patent expires in the year 2035, and therefore seeks billions of dollars in profits from the sale of Microsoft software packages that include its allegedly ineffective security feature.

Through this lawsuit, TocMail seeks to leverage its supposedly patented technology into a multi-billion-dollar payday without ever having to invest substantially in a business to develop, promote or sell it. For the reasons set forth herein, this attempt to substitute litigation for a business plan must fail. TocMail can allege no business activity, no customers, and no sales; it can only allege that it is a purported patent holder of a wholly-unproven technology. TocMail also cannot allege causation. As a mere alleged patent holder, with no other "skin in the game," it must resort to mere conclusions and assumptions in an attempt to seek speculative damages. Indeed, TocMail goes so far as to assume – with literally no foundation – that as many as 1 billion professionals would purchase its technology were it not for Microsoft's marketing of its own cybersecurity features. In other words, the injury forming the basis for TocMail's Complaint rests on the assumption that every single Microsoft customers, and hundreds of millions of additional

customers, would be TocMail's customers if not for Microsoft's advertisements.  This goes far beyond speculation into the realm of the entirely implausible.

## MEMORANDUM OF LAW

### I.        Summary of Facts Alleged in the Complaint[2]

Since 1975, Microsoft has developed and supported software, services, devices, and solutions that deliver value for customers. Compl. Ex. 33 at 3. Cybersecurity is important to Microsoft and its customers, and Microsoft invests heavily in research and development, including security and compliance, in which it is a leader. *Id*. at ¶ 102; Ex. 33 at 10-11.  TocMail is a Florida corporation doing business within this District (*id.* at ¶ 9) but does not identify any particular "business" activity beyond pursuing this action, which it purportedly filed because its C.E.O. "currently offers a patented solution to the most common, most effective cloud-based hacking attack … [and TocMail] is hindered from selling its patented solution because Microsoft falsely claims to have solved this same issue four years ago."  *Id.* at ¶¶ 2, 17, 121.

As alleged in the Complaint, one type of cloud-based hacking attack is done through "emails with a certain type of malicious link [] delivered to inboxes." Compl. ¶ 8.  Sophisticated computer attackers can create links that appear benign, but the destination of the link is later altered to direct the computer user to a malicious website.  *Id.* at ¶ 26.  Sometimes these links are "IP cloaked" – a tactic referred to in the Complaint as a "malicious dynamic link." *Id.* at ¶ 23.  IP cloaking allows hackers to bypass cloud-based security without detection by sending benign links to security scanners that check for malicious sites (recognizable by an IP address that is different than that of the end user), while sending a malicious link to the end user. *Id.* at ¶¶ 18-19.

---

[2] Solely for purposes of this motion, the factual allegations in TocMail's Complaint are assumed to be true but "mere 'labels and conclusions' and other 'threadbare recitals' of a claim" must be disregarded." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

TocMail alleges it has been assigned the patent rights[3] to a "technology that enables a cloud-based redirection service to consistently thwart malicious use of dynamic links" (Compl. ¶ 121), an alleged fact which TocMail claims makes it the ***only*** provider of "a cloud-based redirection service to consistently thwart malicious use of dynamic links." *Id.* at ¶¶ 4, 5, 121, 131, 136, 140. TocMail's Complaint does not contain a single transaction or business activity that it conducted using this alleged "patented solution." Instead, TocMail alleges that it is "false for Microsoft to promote [its product,] Safe Links[,]" as "an effective solution to thwarting the malicious use of dynamic links." *Id.* at ¶¶ 37, 40. TocMail accuses Microsoft of having "falsely claimed to have solved this problem in order to convince companies to move their e-mail security to Microsoft's cloud" and thereby "knowingly made these companies *defenseless* against the very attack it promises protection from." *Id.* at ¶¶ 3, 22.

### A.    *Alleged False Advertising by Microsoft.*

The focus of TocMail's Complaint is on Microsoft's proprietary technology, Safe Links, which is a "cloud-based cybersecurity service [that] Microsoft promotes as a solution to malicious dynamic links [and that] Microsoft offers within its Advanced Threat Protection ("ATP") service, which operates inside Microsoft's cloud-based Exchange Online Protection ("EOP") servers." Compl. ¶¶ 4, 24. TocMail alleges that "[o]ver a four-year period, Microsoft engaged in a sustained marketing campaign to falsely promote the narrative that Safe Links solves the cloud security flaw of IP cloaked links and, therefore, companies can safely move to Microsoft's service" (*Id.* at ¶ 25) and did so knowing that Safe Links offered no such protection. *Id.* at ¶¶ 3, 6, 25. Putting aside the

---

[3] The supposed patent was issued on February 25, 2020, just one day before TocMail filed the operative Complaint against Microsoft and issued a press release to announce the filing of this lawsuit. *See* USPTO Patent Database, Patent No. 10,574,628; *see also* "TocMail Inc. Announces New Bring-Your-Own-Server Program," PR NEWSWIRE, https://www.prnewswire.com/news-releases/tocmail-inc-announces-new-bring-your-own-server-program-301011066.html (last visited April 24, 2020).

conclusory and preposterous accusations that Microsoft enriched itself by deceiving an entire industry, TocMail's false advertising claim against Microsoft (Count I) consists of the five purportedly "Deceptive Messages" set forth in the Complaint.  *Id.* at ¶¶ 25-91.

"Deceptive Message #1" alleged in the Complaint consists of this excerpt from the transcript of a 2019 Microsoft ATP Product Video:

> So, let me break this down by starting with the core of all prevention: detection. Now, we invest at least a billion in this area annually ... Sophisticated attackers will plan to **ensure links pass through the first round of security filters by making the links benign, only to weaponize them once the message is delivered. Meaning that the destination of that link is altered later to point to a malicious site.**  Time is important when **thwarting this type of attack.**  20% of all clicks happen within just five minutes of when an email is received, and **with Safe Links, we're able to protect users right at the point of click** by checking the link for reputation and triggering detonation if necessary.

Compl. ¶ 26, Ex. 8.  TocMail contends that in this excerpt, "Microsoft unambiguously states that Safe Links protects users by thwarting the malicious use of dynamic links" (*Id.* at ¶¶ 30-31) despite knowing that Safe Links is defenseless against malicious IP-cloaked links. *Id.* at ¶¶ 32-39. TocMail also claims that the term "sophisticated attackers" is misleading because of how "simple it is for an attacker to elude Safe Links with IP-cloaked dynamic links."  *Id.* at ¶¶ 43-56.

Supposed "Deceptive Message #2" stems from Microsoft's ATP Product Guide:

> ... attackers **sometimes try to hide malicious URLs within seemingly safe links that are redirected to unsafe sites** *by a forwarding service* after the message has been received.  The ATP Safe Links feature proactively protects your users if they click such a link.  That protection remains every time they click the link, so malicious links are dynamically blocked while good links can be accessed.

Compl. ¶ 57, Ex. 3, 4, 12, 13.  TocMail alleges that Microsoft "unambiguously promises that Safe Links protects against dynamic links in the context of forwarding services" (*Id.* at ¶ 62) and "promising that all malicious links are dynamically blocked while all good links can be accessed" (*Id.* at ¶¶ 63-65) both of which are false or misleading. *Id.* at ¶¶ 62, 67.

TocMail concedes that "Deceptive Message #3" is not a statement made by Microsoft, but a quote from a Microsoft customer that "[w]e no longer have to worry about what security product we'll use.  With Microsoft 365 we're covered." Compl. ¶ 71, Ex. 25.  TocMail alleges that Microsoft use of this statement "promotes the message that no other security products are needed" which is false or misleading. *Id.* at ¶¶ 73, 74.

 "Deceptive Message #4" is simply "the very name Safe Links."  Compl. ¶ 76.  TocMail argues "the name 'Safe Links' as a service that <u>guarantees</u> hyperlinks are harmless: *i.e.*, 'ensure hyperlinks in documents are harmless with ATP Safe Links.'"  *Id.* at ¶¶ 77-80, Ex. 5, 6, 14.  TocMail alleges that Microsoft has "engaged in a highly successful deceptive advertising campaign regarding the core quality of 'safety' in its Safe Links service … that has produced a false association between the name 'Safe Links' and the false claims of safety."  *Id.* at ¶¶ 81-82.

Alleged "Deceptive Message # 5" appears to be a slide from a Microsoft presentation that reads "Ensure hyperlinks in documents are harmless with ATP Safe Links."  Compl. ¶ 86, Ex. 5, 6, 14.  TocMail contends that this messaging was approved by Microsoft to be given in presentations to customers and was false or misleading because "Safe Links can be easily bypassed by IP cloaking and, thus, Safe Links does not <u>ensure</u> that hyperlinks are harmless."  *Id.* at ¶ 87.

### B.    *Alleged Contributory False Advertising by Microsoft.*

TocMail also accuses Microsoft of contributory false advertising (Count II) based on misrepresentations allegedly made by Microsoft third-party vendors Symantec, Mimecast, Proofpoint, Sophos, Barracuda and Vade Secure regarding the capabilities of their own ATP products and security services to address IP-cloaking attacks.  Compl. ¶¶ 8, 142-184.  In summary, TocMail alleges that each Microsoft third-party vendor listed in the Complaint falsely promises that its ATP security service can protect cloud-based customers against IP-cloaking attacks despite

being knowingly defenseless to do so, and that TocMail is damaged as a result. *Id.* at ¶¶ 8, 147-149, 151-158, 161-165, 166-171, 173, 176-181. Although TocMail recognizes that these alleged deceptive representations were not Microsoft's, it insists that Microsoft benefits from these statements if they result in customers subscribing to Microsoft's cloud-based applications, such as Office 365, through its third-party vendors. *Id.* at ¶¶ 8, 143-146, 150, 172, 174, 175, 183.

### C.   *Absence of Consumer Surveys, Market Research or Case Studies Regarding Deceptive Messaging to Consumers.*

In its Complaint, TocMail does not identify a single consumer who supposedly relied upon or even received a "Deceptive Message" from Microsoft or any of the alleged false advertisements from any of the Microsoft vendors identified in the Complaint. TocMail simply alleges that Microsoft knowingly misled customers to believe that they were safe from IP cloaking attacks in order to procure billions of dollars in sales. Compl. ¶ 101. TocMail cites a customer survey and market research suggesting that in 2015, IP cloaking was the most commonly used means of bypassing cloud-base security and was thus the biggest challenge for consumers to move to the cloud. *Id.* at ¶¶ 95, 97, Ex. 28, 29. Microsoft allegedly began promoting Safe Links at around that time and "by 2017, the consumer perception had completely reversed" such that "security [had become] a key reason that businesses choose cloud solutions." *Id.* at ¶¶ 96, 98. TocMail states that by 2019, over 98% of Microsoft's cloud-based customers considered Microsoft's security sufficient and that the "majority of cloud growth from 2015-2019 was driven specifically by the adoption of Microsoft's cloud-based Office 365." *Id.* at ¶¶ 99-100, Ex. 31, 32.

TocMail concludes that Microsoft knowingly misled customers to believe that they were safe from IP cloaking attacks to procure billions of dollars in sales, without identifying a single instance where this occurred. Compl. ¶ 101. Yet, the case studies offered by TocMail in support of its conclusory assertion do not address this alleged consumer confusion. *Id*. at Exs. 34-36. There

are no allegations of any specific Microsoft customer that was deceived with respect to Safe Links or was the victim of any "by-design weakness" or other deficiency in Safe Links.

> **D.     TocMail's Asserted Claims Against Microsoft.**

The Complaint states that TocMail's C.E.O. "invented a solution and obtained a patent on the first technology that enables a cloud-based redirection service to consistently thwart malicious use of dynamic links" and that "for more than a decade" before that, no company provided a "redirect security service capable of thwarting IP-cloaked dynamic links."  Compl. ¶¶ 3, 120-125, 140.  This alleged patented technology is alleged to have "finally resolved the central issue of cloud security (IP cloaked redirects)" thereby making TocMail "the sole provider of a cloud-based URL redirect security service that thwarts malicious use of dynamic redirects" to the exclusion of all competitors until May 7, 2035.  *Id.* at ¶¶ 126-130, 140.  TocMail claims that it "cannot sell its service to those that already expressed billions of dollars of intent on purchasing this service because they wrongly believe they are already getting this service from Microsoft."  *Id.* at ¶ 136. From this *non sequitur,* TocMail extrapolates that that "Microsoft causes approximately 1 billion professionals to withhold their trade from [TocMail]," which "represents an annual lost revenue of over $3 billion to [TocMail] ($43 billion over the lifetime of the patent)." *Id.* at ¶¶ 138, 185.

## II.    Argument

This action should be dismissed altogether for lack of standing because TocMail's claimed injuries were not proximately caused by Microsoft's alleged false advertising and its injuries are speculative, at best.  In addition, Counts I and II of TocMail's Complaint, for false advertising and contributory false advertising under the Lanham Act, should be dismissed for failure to state a claim against Microsoft.  TocMail's false advertising claim fails because the so-called "deceptive messages" that underlie these claims do not constitute false advertising by Microsoft, and

TocMail's contributory false advertising claim fails because it is based entirely on statements allegedly made by third parties about their own products, without Microsoft's participation.  If the Court does not dismiss TocMail's Complaint, the action should be transferred to the Western District of Washington because relevant information and witnesses are located there.

### A.   Standard on Motion to Dismiss.

"[W]hen the allegations of the complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  "Only a complaint that states a plausible claim for relief survives a motion to dismiss" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  To state a plausible claim, a complaint must "raise a right to relief above a speculative level" and a complaint that merely "tenders naked assertions devoid of further factual enhancement" cannot survive a motion to dismiss.  *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  While well-pleaded factual allegations in a complaint are accepted as true, "mere 'labels and conclusions'" must be disregarded, and while reasonable inferences may be drawn in favor of the plaintiff, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

### B.   This Action Should be Dismissed Because TocMail Lacks Standing to Bring Claims Against Microsoft Under § 1125(a) of the Lanham Act.

To state a claim under the Lanham Act, a plaintiff must establish that it has standing to file such a suit in accordance with the parameters set forth by the United States Supreme Court in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).[4]  The *Lexmark*

---

[4] The Court's determination of whether TocMail has standing under the Lanham Act, like its consideration of TocMail's inability to otherwise state a claim against Microsoft, entails application of the pleading standards of *Iqbal* and *Twombly* under the scope of Rule 12(b)(6). *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332 (11th Cir. 2008).

decision established a two-pronged test to determine whether a defendant has standing to sue under Section 1125(a) of the Lanham Act. *Id.* at 129.  A plaintiff must first demonstrate that its claim falls within the "zone of interests" protected by the Lanham Act, and second, that its injuries were proximately caused by a defendant's conduct in violation thereof.  *Id*. at 137–38.

"[T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales," and to establish the requisite proximate cause, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id*. at 131–32.  Importantly, "the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id*. at 133.  This is precisely the case with TocMail.

1.   **TocMail cannot allege that the false advertising proximately caused it any reputational or economic injury.**

Instead of providing factual support to demonstrate that the alleged false advertising outlined in the Complaint directly caused it economic and reputational harm, TocMail rests on its assertion that it is "destined to remain the only provider of a cloud-based redirect service immune to [an IP cloaking] attack until [its] patent expires on May 7, 2035" and that "proximate causation of harm inherently exists when a competitor uses false or misleading advertising to influence purchase decisions regarding an offering that a plaintiff alone provides."[5]  Compl. ¶¶ 140-141. Along similar lines, TocMail contends "there is no need to speculate" regarding: i) the number of professionals who would subscribe to TocMail's cloud-based redirect service that offers protection against malicious use of dynamic links; ii) how many of these professionals would have chosen

---

[5] Although TocMail generally states in paragraph 17 of the Complaint that it "sells cloud-based security with the solution to such attacks," it does not identify or name any product that it actually sells using this technology.

Microsoft if they thought it could not protect against IP-cloaking, as opposed to TocMail, as the sole provider of such protection; or iii) the amount of money these professionals would spend to purchase this service.  *Id*. at ¶¶ 131-134.  Of course, all of this is by definition pure speculation.

Further, TocMail fails to account for any number of intervening causes that may have led consumers to purchase Safe Links that have nothing to do with TocMail's unidentified product, such as: i) Safe Links is included with license subscriptions such as Microsoft 365 Enterprise, Microsoft 365 Business, Office 365, and Enterprise E5, and entails no additional cost or additional application or plugin in order to function; ii) Microsoft's larger ATP system, which includes Safe Links, also includes other security programs and features; iii) Microsoft provides additional resources and unparalleled customer service; and iv) Microsoft provides frequent, automatic updates to its software, including Safe Links, free of charge.  The case studies, consumer surveys, and research attached to the Complaint confirm that these facts do influence whether consumers choose to license software from Microsoft, including the integration of multiple security features and cost-effectiveness of consolidating various services and the efficacy of Microsoft's broader security package.  Compl. ¶¶ 104-112, 114, Ex. 34-36, Ex. 37 at 6-8.  Unsupported speculation of this sort does not reach the level of proximate causation required for TocMail to have standing under the Lanham Act.  *ThermoLife Int'l LLC v. Sparta Nutrition LLC*, No. CV-19-01715-PHX-SMB, 2020 WL 248164, at *9 (D. Ariz. Jan. 16, 2020) (holding that "vague and speculative allegations do not show [d]efendant's false advertising caused [p]laintiff's harm" and that "there could be any number of intervening reasons for why [p]laintiff's sales decreased").

Thus, any alleged causal connection between Microsoft's advertising and TocMail's injury is remote, at best, and insufficient to satisfy the proximate causation requirement for standing under the Lanham Act.  *See Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, No.

617CV1542ORL78DCI, 2019 WL 7423517, at *14 (M.D. Fla. Oct. 4, 2019) (noting plaintiff alleged "too remote a connection to satisfy the Lanham Act's proximate causation requirement … [p]laintiffs' injuries do not flow directly from the deception attributable to the advertisements.  As such, [p]laintiff has not proven that standing and proximate cause exists to bring a Lanham Act claim…"); *see also Warren Tech., Inc. v. UL LLC*, No. 1:18-CV-21019-UU, 2018 WL 10550930, at *10, n.3 (S.D. Fla. Oct. 31, 2018); *Twombly*, 550 U.S. at 570.

### 2.  TocMail cannot allege it has suffered any reputational or economic injury.

TocMail does not allege that Microsoft made any statements whatsoever about TocMail or its technology.  Rather, TocMail asserts that its "business reputation has been injured by Microsoft's false and misleading advertising … [because] as the sole provider of that which Microsoft falsely claims to offer, … every dollar gained by Microsoft … [sic] is being withheld from [TocMail]." Compl. ¶¶ 196-197.  TocMail concludes that "this deception causes … [Microsoft's] 100 million [users] to withhold trade from [it] because [a]lthough [TocMail] has solved the single biggest issue in cloud security, Microsoft's misrepresentations have caused it to appear as if [TocMail] claims only to have solved a non-existent problem." *Id*. at ¶ 198.  TocMail seeks redress for past and future harm in the amount of over $43 billion on the unsupported assumptions that its technology and Microsoft's Safe Links feature will be in existence until the year 2035 and that all consumers who use Safe Links would not do so but for Microsoft's alleged deceptive advertising. *Id*. at ¶¶ 1, 4-7, 137-138, 198-199.  TocMail also conclusively asserts that its reputation has been harmed by Microsoft but provides no facts to support this contention other than its claim to a technology patent.[6] *Id*. at ¶¶ 7, 197.  TocMail simply concludes that it "has been damaged by Microsoft's contributory false advertising" without offering support.  *Id.* at ¶ 211.

---

[6] TocMail also seeks damages for **future** injury in the amount of $43 billion over the life of its patent, which assumes its services and Microsoft's will be in existence and sold through 2035. *Id*. at ¶¶ 138, 140,

These unsupported conclusions depend on multiple assumptions, including that: i) customers were aware that Safe Links is a feature included when they purchase a Microsoft 365 license; ii) customers chose to license software from Microsoft because it includes Safe Links; iii) customers were aware of TocMail's supposed "patented solution" (which was not identified in the Complaint) at the time of purchasing the Microsoft 365[7]; iv) TocMail's technology was on the market and available for purchase at the time that consumers were purchasing Microsoft 365; v) customers were willing to pay the price of TocMail's technology; vi) consumers would have chosen to purchase something other than Microsoft 365 if they believed that Safe Links did not perform as advertised by Microsoft; and vii) customers would have chosen to purchase TocMail's technology over other offerings by third party vendors identified in the Complaint.

TocMail is unable to allege that its "injury flow[s] directly from" Microsoft's advertising because it "might instead have resulted from any number of other reasons." *Lexmark*, 572 U.S. at 133, 139. Therefore, its allegations are "too remote" to show proximate causality and it lacks standing under the Lanham Act. *Id*. at 133.  The entire Complaint should therefore be dismissed.

### C.    TocMail's False Advertising Claim (Count I) Fails Because it is Based Upon So-called "Deceptive Messages" that do not Constitute False Advertising.

Separate and apart from TocMail's lack of standing to assert its claims under § 1125(a) of the Lanham Act, Count I of the Complaint fails to state a claim against Microsoft for false advertising and on that separate basis, should be dismissed.  To state a claim under Section 1125 of the Lanham Act for false or misleading advertising, a plaintiff must allege that: (1) the

---

199.  Where, like here, a plaintiff's Lanham Act damages are based on future injuries supported by "pure speculation" and "at the pleading stage, [requires the court] to presume … too much conjecture," it is appropriate to dismiss the complaint for lack of standing. *See Nature's Earth Prod., Inc. v. Planetwise Prod., Inc.*, No. 09-80770-CIV, 2010 WL 4384218, at *5 (S.D. Fla. Oct. 28, 2010); *see also*. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019).

[7] Indeed, because TocMail's claimed technology patent was not supposedly issued until February 25, 2020 and is not alleged to have been incorporated into a product, consumers likely were not aware of its existence.

defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) the plaintiff has been, or likely will be, injured as a result of the false or misleading statement." *Sovereign Military Hospitaller Order of St. John of Rhodes and of Malta v. Fla. Priory of Knights Hospitallers et al.*, 702 F.3d 1279, 1294 (11th Cir. 2012).  As set forth below, TocMail cannot satisfy these elements.

### 1. Microsoft's alleged statements were not false or misleading and did not have the capacity to deceive consumers.

TocMail fails to state a claim under the Lanham Act because the alleged deceptive statements it has identified are not false or misleading and did not have the capacity to deceive customers.  "[T]o determine if an advertisement is false or misleading, a court 'must analyze the message conveyed in full context' and 'must view the face of the statement in its entirety.'" *Wyndham Vacation Ownership v. Reed Hein & Assocs., LLC*, No. 618CV02171GAPDCI, 2019 WL 3934468, at *6 (M.D. Fla. Aug. 20, 2019) (citing *Osmose, Inc. v. Viance*, LLC, 612 F.3d 1298, 1308 (11th Cir. 2010)).  Each of the five purportedly "Deceptive Messages" that comprise the alleged false advertising that caused Microsoft customers to purchase from Microsoft instead of TocMail (Compl. ¶¶ 24-89) are either not statements made by Microsoft or are TocMail's mischaracterization of Microsoft's actual statements.

TocMail alleges that in "Deceptive Message #1" Microsoft unambiguously misrepresented that Safe Links protects users by thwarting the malicious use of dynamic links and that it is only sophisticated attackers who use IP-cloaked dynamic links to elude Safe Links.  Compl. ¶¶ 26-56. The referenced excerpt contains a statement that "time is important when thwarting this type of attack" involving IP-cloaked dynamic links and a separate statement that Safe Links "protect[s] users at the point of click by checking the link for reputation and triggering detonation if

necessary." *Id.* at ¶ 26, Ex. 8.  The reference therein to "sophisticated attackers" simply indicates that these individuals "will plan to ensure links pass through the first round of security filters by making the links benign, only to weaponize them once the message is delivered" but it does not say that only sophisticated attackers use dynamic links to bypass Safe Links or anything  regarding the level of sophistication or computer expertise required to implement this tactic.  *Id.*

TocMail claims that in "Deceptive Message #2," Microsoft unambiguously promises that Safe Links protects against dynamic links in the context of forwarding services and that all malicious links are blocked while good links are not.  Compl. ¶¶ 57-67.  This excerpt explains how hackers hide malicious links and how Safe Links takes proactive steps to protect users, without making any promises, guarantees or other representations.  *Id.* at ¶ 57, Ex. 3, 4, 12, 13.

There is no question that "[i]f the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).  When viewed in context and in their entirety, Microsoft's statements in the excerpts labeled "Deceptive Message #1" and "Deceptive Message #2" are not false or misleading nor are they likely to deceive a consumer.  Accordingly, these statements do not constitute false advertising as a matter of law.

"Deceptive Message #3" consists solely of a statement, admittedly made by a Microsoft 365 *customer* in a case study, that "[w]e no longer have to worry about what security product we'll use.  With Microsoft 365 we're covered."  Compl. ¶¶ 71-72, Ex. 25.  In addition to not being a statement made by Microsoft, it is a customer's opinion, which means it cannot be false or misleading as a matter of law. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1251 (11th Cir. 2002) (holding letter to customers citing customer preference for lenses made by manufacturer's competitor was not literally false under Lanham Act).

In "Deceptive Message #4" TocMail accuses Microsoft of promoting the name "Safe Links" as a service that guarantees that hyperlinks are harmless and to produce "misleading advertising regarding the material quality of safety." Compl. ¶¶ 80-82, Ex. 5, 6, 14.  This contains no guarantee about the performance of Safe Links, and "[s]tatements of opinion and puffery (*i.e.*, exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely) are not actionable under the Lanham Act." *Wyndham Vacation Ownership*, 2019 WL 3934468 at *6. It is well-settled that the word "safe" falls into this category of non-actionable statements.  *See, e.g. City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1121 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ("safe and sound" is immaterial puffery); *Tylka v. Gerber Prod. Co.*, No. 96–1647, 1999 WL 495126, at *8 (N.D. Ill. July 1, 1999) ("safe" is "meaningless sales patter").  Because no reasonable consumer would be misled by the name "Safe Links," TocMail cannot state a claim under the Lanham Act on this basis.

Finally, "Deceptive Message #5" alleges that the portion of a Microsoft presentation reading "Ensure hyperlinks in documents are harmless with ATP Safe Links" is misleading because Safe Links does not ensure that hyperlinks are harmless.  Compl. ¶¶ 86-87, Ex. 5, 6, 14. The referenced Exhibits, however, reveal that this was not a stand-alone statement, but rather a heading in a presentation accompanied by a guide for the presenter to further explain the protections against harmful links and other cybersecurity concerns offered by Safe Links.  *See Id*. at Exs. 5, 14, 16.  Read in context with the entire exhibit, this excerpt is not false or misleading or likely to deceive a customer and is thus not actionable. *Hoefling*, 811 F.3d at 1277.

### 2. Microsoft's alleged statements did not have a deceptively material effect on consumers' purchasing decisions resulting in injury to TocMail.

TocMail fails to allege that Microsoft's alleged misrepresentations materially affected consumer's purchasing decisions.  "To succeed on a claim of false advertising, the plaintiff must

establish that the defendant's deception is likely to influence the purchasing decision. A plaintiff may establish this materiality requirement [which] is based on the premise that not all deceptions affect consumer decisions." *Johnson & Johnson Vision Care*, 299 F.3d at 1250.

Here, TocMail asserts, in conclusory fashion, that "Microsoft's actions … may influence … consumers to purchase Microsoft's service rather than [TocMail's]," and "as a result, Microsoft's actions have had and continue to have a material effect on purchase decisions."[8] Compl. ¶ 193.  In support, TocMail points to market research, consumer surveys certain third-party vendors and case studies that allegedly "document that Microsoft's deceptive misrepresentations…had a material effect on purchase decisions not only for the ATP security service itself, but also for [Microsoft's] Office 365." *Id*. at ¶ 194.  Contrary to TocMail's allegations, these materials do not state that consumers purchase Safe Links because they believe Microsoft promised it would prevent cyberattacks from dynamic links, but instead at most provide insight into consumers' purchasing decisions – none of which are based upon any of the Complaint's five alleged "Deceptive Messages" from Microsoft.

For starters, TocMail admits that customers do not buy Safe Links on its own and  instead choose to license Microsoft software packages, like Office 365, that incorporate Safe Links as a part of a more comprehensive ATP security service.[9]  The case studies TocMail references in support of its theory at most show that customers like using Microsoft 365 because: 1) of "its integrated solutions" that include security and compliance tools and cost-effective capabilities (Compl. Ex. 34); 2) it includes services and effective ATP tools that add value (*Id*. at ¶¶ 106-107; Ex 35); and 3) it offers lower prices for functional security tools (*Id*. at ¶ 110; Ex. 36).  Plaintiff

---

[8] Of course, this assumes that TocMail's patented technology is available in a product for sale.
[9] Safe Links is one feature of Microsoft's comprehensive ATP service that is included in Microsoft software such as Office 365 (Compl. at Ex. 7), which means that consumers do not choose to buy Safe Links, but rather, choose to license a software package that includes Safe Links.

admits that Office 365 E5 allows organizations to consolidate their security solutions onto a single platform, providing a more cost-effective solution to third-parties. *Id*. at ¶ 114. The consumer survey also at most shows that customers' beliefs about the sufficiency of Microsoft Office 365 are related to customers' personal experiences with data breaches and lack of education in security. *Id*. at ¶ 99; Ex 31 at 16-17. Nowhere is Safe Links even mentioned in these materials, and nowhere were Microsoft's advertisements of Safe Links shown to influence consumers' purchasing decisions. The reality is that not one of the five alleged "Deceptive Messages" were shown to influence consumers, which means that TocMail cannot allege that these alleged deceptive advertisements materially influenced consumers to choose Microsoft Safe Links over TocMail's technology.

Without alleging materiality, TocMail cannot "plead (and ultimately prove) an injury to a commercial interest in sales or business reputation was proximately caused by [Microsoft's] misrepresentation." *Lexmark*, 572 U.S. at 140. Indeed, it is completely speculative as to whether TocMail suffered any "commercial or competitive injury," or whether it could "have lost any customers or potential consumers." *Nat. Answers, Inc*, 529 F.3d at 1331; *see supra*, Section III(B)(2). "Instead of 'connecting the dots,' the Complaint blankly alleges, without supporting allegations, that [d]efendant's purported false advertising *must have* caused [p]laintiff's injuries because the two compete. Such an artificial and attenuated link between [d]efendant's purported false advertising and [p]laintiff's harm, *inter alia*, defies the reality of business." *ThermoLife Int'l LLC*, 2020 WL 248164 at *9. Indeed, TocMail has not, and cannot, allege that it competes with Microsoft – it can only allege that the two simultaneously exist, and that *must* cause TocMail harm.

Because TocMail has failed to plausibly plead that Microsoft's allegedly false and misleading statements had a material effect on consumers' purchasing decisions that has, or likely

will, cause TocMail injury, TocMail cannot state a false advertising claim under the Lanham Act, and Count I should be dismissed. *Hospitaller Order of St. John of Rhodes*, 702 F.3d at 1294.

### D. TocMail Cannot State a Claim for Contributory False Advertising (Count II) Because it had no Active Knowledge or Involvement in the Deceptive Statements Allegedly Made by Third Parties About Their Own Products.

Like TocMail's claim for false advertising, Count II of the Complaint fails to state a claim and should therefore be dismissed. To state a claim under the Lanham Act for contributory false or misleading advertising, a plaintiff must allege that "a third party in fact directly engaged in false advertising that injured the plaintiff. Second, the plaintiff must allege that the defendant contributed to the conduct either by knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free Am., Inc. v. Estee Lauder Co., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015). To establish the defendant contributed to the conduct, "the plaintiff must allege that the defendant had the necessary state of mind – in other words that it 'intended to participate in' or 'actually knew about' the false advertising" and "actively and materially furthered the unlawful conduct – either by inducing it, causing it, or in some other way working to bring it about." *Id.*

TocMail's second cause of action is based on statements allegedly made certain third-party vendors about their own products or services, not about Safe Links. Compl. ¶¶ 147-149, 151-153, 161-164, 167, 169, 171, 173, 176, 181, 208, Ex. 38-50. TocMail alleges that Microsoft "provides these third parties access to its customers' accounts" without which the third parties cannot provide their services to consumers, and otherwise benefits when consumers use cloud-based apps like Office 365, even when consumers use third-party security services. *Id*. at ¶¶ 8, 143-145, 159, 174, 184, 207, 209-210. Stated differently, TocMail seeks to hold Microsoft liable for the statements made by third parties concerning their own products and services. *Id*. at ¶¶ 142-184, Ex. 38-50. TocMail cannot allege Microsoft knew that these third-party advertisements were allegedly

deceptive or that Microsoft otherwise participated or actively and materially furthered this conduct, which is necessary for TocMail state a claim. *See Duty Free Am.*, 797 F.3d at 1277.

Even if Microsoft were to have a relationship with the third-parties or benefit from its cloud users using third-party security services, this does not establish the necessary causal connection between Microsoft's actions and consumers' decisions to not purchase TocMail's technology based on third-parties' alleged false advertising. *Id*. at 1278–79; Compl. ¶¶ 8, 143-145, 159, 174, 184, 207, 209-210. This is because "[t]he mere sale of products in the course of an ordinary business relationship, without more, cannot justify a finding that a defendant induced, encouraged, caused, procured, or brought about false advertising . . . [A] plaintiff must allege more than an ordinary business relationship between the defendant and the direct false advertiser in order to plausibly plead its claim." *Duty Free Am.*, 797 F.3d at 1279. Since the relationship between Microsoft and these alleged third-party vendors was nothing more than an ordinary business relationship, TocMail has no claim for contributory false advertising against Microsoft. *See Phoenix Entm't Partners, LLC v. Orlando Beer Garden, Inc.*, No. 6:16-CV-80-ORL-31DAB, 2016 WL 8669878, at *9 (M.D. Fla. Sept. 16, 2016) (dismissing contributory false advertising count because "merely doing business with one who is committing infringing acts is not sufficient" to allege contributory false advertising). Count II should therefore be dismissed as well.[10]

## CONCLUSION

Based on the foregoing, Microsoft requests that the Court enter an Order dismissing TocMail's Complaint and granting any other or additional relief deemed just and proper.

---

[10]   TocMail's   failure   to   state   a   claim   for false advertising   require   that   its   claim for contributory false advertising also fail. *Wyndham Vacation Ownership*, 2019 WL 2232241 at *4.

Dated: April 30, 2020

Respectfully submitted,

*/s/ Mary-Olga Lovett*
MARY-OLGA LOVETT (admitted *pro hac vice*)

**GREENBERG TRAURIG LLC**
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile:  (713) 374-3505
Email: lovettm@gtlaw.com

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile:  (305) 579-0717
FRANCISCO O. SANCHEZ
Florida Bar No. 598445
Email: sanchezo@gtlaw.com
          orizondol@gtlaw.com
EVELYN A. COBOS
Florida Bar No. 106937
Email: cobose@gtlaw.com
          FLService@gtlaw.com

***Attorneys for Defendant***,
MICROSOFT CORPORATION

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of April, 2020, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Francisco O. Sanchez*
FRANCISCO O. SANCHEZ


## SERVICE LIST

JOHNSON & MARTIN, P.A.
Joshua D. Martin
500 W. Cypress Creek Rd., Suite 430
Ft. Lauderdale, FL 33602
Tel: (954) 790-6699
Fax: (954) 206-0017
Email: josh.martin@johnsonmartinlaw.com

*Attorneys for Plaintiff*