**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-60416-CIV- SMITH/VALLE**

TOCMAIL INC, a Florida corporation,

        Plaintiff,

v.

MICROSOFT CORPORATION, a
Washington corporation,

        Defendant.

_____/

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, TOCMAIL INC ("Plaintiff" or "TocMail"), by and through undersigned counsel,

sues Defendant, MICROSOFT CORPORATION ("Defendant" or "Microsoft"), and alleges as

follows:

**NATURE OF ACTION**

1.     This is an action for damages, disgorgement of profits, and injunctive relief under

the Lanham Act for harm suffered by Plaintiff and from future harm Plaintiff will suffer due to

Microsoft's dissemination of deceptive promotions regarding the security of its Office 365 email

service and Safe Links' supposed capabilities.

2.     Microsoft has known that its cloud-based email security is defenseless against the

most-common hacking attack - an attack vector used by the vast majority of malicious sites.

Microsoft promoted its Safe Links as Microsoft's solution to this specific attack vector, knowing

that Safe Links does not offer any additional protection against this attack.  Consumers trust

Microsoft's false advertising, wrongly believing that they are protected from this specific attack

1

while they actually remain defenseless.

3.      Plaintiff currently offers a patented, cloud-based, time-of-click, redirect service that protects users from the most common hacking attack. However, Plaintiff is hindered from selling its patented solution because Microsoft has convinced companies that it has already solved this issue. More specifically, Microsoft has falsely convinced companies that its Safe Links service has already solved this issue. Safe Links is Microsoft's cloud-based, time-of-click, redirect service which Microsoft falsely promotes as keeping users safe from the most-common hacking attack, causing Plaintiff's offering to appear to have no value to the very consumers who need it most.

4.      As a result of Plaintiff's patent, Plaintiff is the sole provider of that which millions of consumers wrongly believed they have been purchasing from Microsoft. Plaintiff is seeking damages against Microsoft based on these consumers withholding trade from Plaintiff over the lifetime of its patent.

5.      Before migrating to Office 365's cloud, companies used on-premise scanners for email security. These on-premise scanners were practically immune to the attack that Microsoft's Office 365's email security service is defenseless against. Given that Microsoft knowingly stripped hundreds of millions of consumers of the protection they once had by migrating consumers to Office 365's cloud, Plaintiff is seeking disgorgement of profits. There is great public interest in making this misconduct unprofitable.

## THE PARTIES

6.      Plaintiff, TocMail, is a Florida corporation doing business within this District.

7.      Defendant, Microsoft, is a Washington corporation with, upon information and belief, its principal place of business in Redmond, Washington doing business throughout the United States, including within this District.  Microsoft is registered to do business in the State of

Florida, and has one of its corporate headquarters located within this District as well.

## JURISDICTION AND VENUE

8.      This is a civil action for damages in excess of $15 billion, disgorgement of profits and injunctive relief for false and misleading advertising under 15 U.S.C. §1125(a)(1)(B). Plaintiff is seeking judgement for three times Defendant's profits made as a result of Defendant's wrongful actions and three times Plaintiff's damages pursuant to 15 U.S.C. § 1117(a).

9.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because TocMail's claims arise under federal law, as well as pursuant to 15 U.S.C. § 1121 because TocMail's claims arise under the Lanham Act.

10.      This Court has personal jurisdiction over Microsoft because it is registered to do business in Florida, operates, conducts, engages in and carries on a business in Florida, including within this judicial district, has offices in Florida, and committed a tortious act within Florida, including within this judicial district. Thus, this Court's exercise of personal jurisdiction over Microsoft is consistent with the Constitution of the United States and Fla. Stat. § 48.193.

11.      Venue is proper in the United States District Court for the Southern District of Florida pursuant to at least 28 U.S.C. §§ 1391.

## GENERAL ALLEGATIONS

I.      **Background of Cloaking and Microsoft's Awareness.**

A.      **The Most Common Hacking Attack.**

12.      Upon information and belief, the majority of malicious websites use an attack called *cloaking*. Cloaking typically involves the hacker's link sending benign content to security scanners and sending malicious content to everyone else.  Through cloaking, the security scanner never sees the harmful content and, therefore, sends users to the site where they are subsequently

hacked by the content that the scanner never sees.

13.     For example, based on a report by Google, it appears that the majority of malicious websites were using cloaking as early as approximately 2011. Additionally, a recent study of 2,313 web server configuration files used on live phishing sites found that over 95% of the files were using cloaking. Cloaking as the most-common hacking attack is consistent with other studies as well.

**B.     Microsoft's Knowledge of this Attack.**

14.     In January 13, 2012, in the Bing webmaster's blog, Microsoft defined cloaking as follows: "Cloaking is the process where you determine who the visitor is coming to your website, then show content depending on who that visitor is."

15.     Microsoft has been aware of the widespread use of cloaking for more than a decade. In 2006, Microsoft researchers wrote that cloaking had already become "popular," "commonly used," and "well-known."

16.     In 2006, Microsoft researchers wrote: "We have also shown that malicious website operators are using cloaking techniques as well, so it is important for automated exploit detection systems… to adopt anti-cloaking techniques in their scanning . . . ." This was written by Microsoft's Cybersecurity & Systems Management Group. Hence, from 2006 onward, Microsoft knew that "malicious websites operators" are using cloaking to hide their malware, and therefore it is "important" for "exploit detection systems" to "adopt anti-cloaking techniques in their scanning."

**C.     Types of Cloaking.**

17.     Per Microsoft's definition of cloaking, the first step for the malicious website is to "determine who the visitor is." Microsoft lists three different traits that websites can use to

determine who the visitor is, and then redirect the visitor accordingly: "When a web client visits a website, certain traits can be used to identify the user and redirect them to a different page. These include, but are not limited to, redirects based on the referral code, the user agent (bot or human), and IP address." Microsoft lists three traits that can be used to identify who the visitor is: referral code, user agent, and IP address.

18.     When a user clicks on a search result from Google, Yahoo, and others, the browser automatically adds a referral code to the connection request to identify which site referred the user to the link. Likewise, when a user clicks a link on a webpage, the browser automatically adds that webpage URL to the referral code so that the link can know which webpage referred the user to the link. Websites can redirect users to different pages and sites based on the referral code. The industry-standard term for doing so is *Referrer Cloaking*.

19.     The term "user agent" refers to the type of software being used to access the link. For example, users typically access links using browsers such as Firefox and Chrome. Browsers identify themselves to links by setting the user-agent field when connecting to the link. By looking at the user-agent field, the website can determine which browser is being used, and redirect the user accordingly. Likewise, the scanners run by Google, Microsoft, and Yahoo can set the user-agent field to identify that it is their software that is accessing the link. By looking at the user-agent field, the website can redirect security scanners to a benign site, and redirect human visitors (browser users) to a malicious site. The industry-standard term for doing so is *User-Agent Cloaking*.

20.     Cloaking can also be performed based on the visitor's IP address. For example, if a malicious website detects that the visitor's IP address belongs to a security scanner, the malicious website can redirect the security scanner to a benign site (hiding malicious content from the

security scanner with 100% efficacy). However, when the website detects that the visitor's IP address is not a security scanner, it can redirect the visitor to a malicious site where the victim's device is successfully hacked.  The industry standard term for IP-based cloaking is *IP Cloaking*. This has been the industry standard term for approximately twenty years.

      **D.**     **Cloud-Based Scanners Cannot Reliably Detect IP Cloaking.**

      21.     Over 90% of successful data breaches begin with an email - typically an email containing a malicious link.  Companies rely on link scanners to protect them from such links. Link scanners can either be run on the company network (on-premise) or in the cloud.

      22.     Cloud-based scanners have a security defect that on-premise scanners do not have. Specifically, cloud-based scanners cannot reliably detect IP Cloaking. Microsoft convinced many companies to abandon their on-premise scanners to move to Office 365's cloud-based scanners anyway.

      23.     Cloud-based scanners easily detect both Referrer Cloaking and User-Agent Cloaking simply by setting the referral code and user-agent field to whatever they want. For example, a cloud-based scanner can mimic a Google search referral simply by setting the referral code to the same value that Google does. Likewise, if a cloud-based scanner wants to know where a website redirects Firefox users to, the cloud scanner simply mimics a Firefox browser by setting the user-agent field to the same thing that Firefox does. Because referral codes and user-agent fields are so easily mimicked, cloud-based scanners are not particularly vulnerable to such cloaking techniques.

      24.     However, there is one trait that cloud-based scanners cannot mimic: the user's IP address, which is why IP Cloaking (cloaking based on IP address) is impossible for a cloud-based scanner to reliably detect.

25.     Indeed, a study co-authored by Dr. Wenke Lee, Director of the Institute for Information Security & Privacy at Georgia Tech, explicitly states the following regarding cloud-based scanners: "First, they cannot detect IP cloaking. This is because these systems use centralized servers to collect user views." The study explains why IP Cloaking "cannot" be detected by cloud-based scanners, and therefore proposes an on-premise solution.

26.     To understand the severity of Microsoft's deception, it is essential to understand that on-premise scanners are practically immune to IP Cloaking. On-premise scanners share the same IP address as the company devices. Thus, on-premise scanners inherently mimic the user's IP address. In other words, while cloud-based scanners *cannot* mimic the user's IP address, on-premise scanners *inherently* do so, making cloud-based scanners virtually defenseless against detecting IP Cloaking, an attack that on-premise scanners are practically immune to. When a company moves its email security off premise to Microsoft's cloud, in that very moment the company becomes defenseless to IP Cloaking, an attack vector used by the majority of malicious sites.

27.     Because traditional cloud-based scanners are especially vulnerable to IP Cloaking, some security professionals use the term "cloaking" in reference to "IP Cloaking" itself.  For example, a study guide for the Certified Ethical Hacker exam defined website cloaking as follows: "Website Cloaking is the ability of a web server to display different web pages based on the user's IP address."

E.     **Microsoft's Knowledge that Cloud-Based Scanners Cannot Reliably Detect IP Cloaking.**

28.     Upon information and belief, it is apparent that Microsoft has been aware of the attack vector of IP-based cloaking for more than a decade.  For example, in 2009, Microsoft noted that hackers were redirecting Microsoft's IP addresses to benign content in order to hide their

malware from Microsoft's scanners.

29.     Additionally, in 2013, Microsoft wrote about "several common challenges that crawlers have."  According to Microsoft, one of the common challenges that cloud-based scanners have is as follows: "Attackers can identify the crawler (e.g., by knowing the IP addresses from which it operates . . .), and evade detection. . . ."  In other words, one of the common challenges that cloud-based scanners have is their vulnerability to IP Cloaking.  In fact, in that report, Microsoft wrote that IP-based cloaking "may affect our system" (the cloud-based scanning system that Microsoft researchers were proposing).

30.     In that very same study, Microsoft wrote that when cloud-based scanners "operate from easily-identified blocks of IP addresses[,]" "it is simple to offer them different content from regular web users" and the malicious website "has no difficulty showing an innocent face to any crawler that finds it."  When a malicious website knows all of the scanners' IP addresses, it can always redirect the scanner to a benign site 100% of the time, rendering the scanner defenseless to IP Cloaking.  Moreover, as Microsoft acknowledges, "it is simple" to do so.

   **F.     Microsoft's Initial Deception.**

31.     Despite knowing that cloud-based scanners cannot reliably detect IP Cloaking, Microsoft announced the general availability of Office 365 in 2011, promising "the benefits of cloud computing with the enterprise-grade security you require, whatever the size of your organization."  Microsoft even proclaimed that "many organizations discover that Office 365 can provide a higher standard of security at lower cost than they are capable of maintaining with on-premises productivity servers."  Due to the stark contrast between on-premise security as compared to Office 365's ability to defend against the ubiquitous use of IP Cloaking, those proclamations were false.

32.     Nevertheless, Microsoft continued promoting security as a material reason to move email security off premise to Microsoft's cloud-based Office 365.   In fact, Microsoft even promoted security as a main reason to move to Office 365. For example, Computer Weekly reported that Microsoft's Trustworthy Computing Group stated that out of all of Office 365's features "it is Office 365's security credentials that really sets it apart."

33.     Companies began trusting Microsoft's security claims and began migrating to Microsoft's cloud-based Office 365.

**G.     Microsoft's Second Deception.**

34.     Gartner, Inc. ("Gartner") is "the leading research and advisory company" with nearly 17,000 associates, $4.2 billion in revenue, and serving 77% of the Global 500 companies. Gartner provides advice and guidance to assist companies around the world with their technology purchase decisions. Gartner has been repeatedly included in Fortune's annual list of "The World's Most Admired Companies."

35.     Gartner's opinions appear to be very important to Microsoft, as evidenced by the fact that a Google search indicates that Microsoft references Gartner approximately 16,300 times throughout various pages and documents comprising Microsoft's *microsoft.com* website.

36.     In 2012, Gartner squarely depicted Microsoft in the "Leaders" quadrant in its annual *Magic Quadrant for Secure Email Gateways*.

37.     In 2013, Gartner squarely depicted Microsoft in the "Leaders" quadrant in its annual *Magic Quadrant for Secure Email Gateways*.

38.     However, in 2014, Gartner demoted Microsoft out of the "Leaders" quadrant. Gartner stated: "Lack of target phishing protections forced Microsoft back into the Challengers quadrant this year."   Gartner cautioned that Microsoft "lags behind in advanced targeted attack

detection."   In fact, the subheading for the July 2014 edition declared that "[t]he secure email gateway market" had "fractured" into two categories: "providers of basic protection" and providers of "*advanced attack* and information *protection*" (emphasis added).  Gartner characterized Microsoft as a company "lag[ging] behind" in terms of advanced attack detection.  A true and correct copy of Gartner's July 1, 2014 "Magic Quadrant for Secure Email Gateways" is attached hereto as **Exhibit "1."**

39.     In 2014, Gartner only squarely depicted two "Leaders": Cisco Systems, Inc. ("Cisco") (for its on-premise systems) and Proofpoint, Inc. ("Proofpoint") (for its cloud-based systems). Hence, from July 2014 to June 2015, Proofpoint was Gartner's only cloud-based email security "Leader," moving Proofpoint to the center of the world's attention in regards to cloud-based email security, while attention was also drawn to Microsoft's lack of "advanced targeted attack protection."

40.     In October 2014, Proofpoint seized this moment, reporting that it is "common practice" for cybercriminals to use forwarding servers that implement "IP Cloaking" to evade "security scanner[s]" and "circumvent detection." Proofpoint's report concluded that basic protection is "no longer sufficient" and that "advanced threat detection capabilities" (the very category Microsoft was declared lacking in by Gartner) was essential.

41.     On October 15, 2014, just two weeks after Proofpoint's IP Cloaking report, Microsoft announced on its Office 365 blog that Microsoft was going to make investments over the next 6-12 months in "Advanced threat protection, such as 'Time of Click.'"

42.     On April 8, 2015, Microsoft announced on its Office 365 blog the availability of its new time-of-click service: Safe Links. Right from the launch, Microsoft promoted Safe Links as supposedly protecting against links that use a forwarding service to redirect to an unsafe site after

the message has been delivered. In other words, Microsoft promoted Safe Links as its solution to IP Cloaking.

43.     Microsoft's cloud-based email security service is Exchange Online Protection (EOP). Microsoft markets Safe Links as its solution for defeating cloaked links that bypass EOP's time-of-delivery scanning. Microsoft promises that by checking the link's reputation at the time the user clicks the link, Safe Links is able to keep the user safe. However, Safe Links is literally defenseless against IP Cloaking; defenseless in the manner described as follows.

44.     As Microsoft acknowledges, when a user clicks on the link, Safe Links "redirects to EOP web servers." In other words, the very same EOP IP addresses that were evaded via IP Cloaking are the IP addresses being used to recheck the link. Given that Safe Links uses the exact same IP addresses as EOP itself, it does not offer any additional protection against IP Cloaking - the form of cloaking that hackers use en masse because that is the form of cloaking that cloud-based scanners cannot reliably detect.

45.     Safe Links and EOP do not merely use the same IP addresses, but they use the same publicly available IP addresses. Microsoft makes these IP addresses publicly available online. Therefore, it is trivial for hackers to redirect Safe Links/EOP IP addresses to benign sites 100% of the time, and in this manner both EOP and Safe Links are literally defenseless to IP Cloaking (the term "defenseless" used throughout herein refers to the fact that it is trivial for hackers to redirect Safe Links/EOP IP addresses to benign sites 100% of the time).

46.     Microsoft knows that Safe Links uses the same publicly available IP addresses as EOP itself.  Therefore, it is apparent that Microsoft has knowledge regarding the security weakness of its design and is knowingly deceiving companies about an issue that places these companies at severe risk. Also, as discussed above, Microsoft itself wrote how simple it is for websites to use

cloaking to evade cloud-based scanners when the website knows the scanners' IP addresses. Microsoft designed Safe Links with publicly available IP addresses nevertheless.

47.     Microsoft itself labels cloaking as an attack vector.  For example, Microsoft states: "A very common vector used by attackers is to weaponize a link after delivery of an email. With Office 365 ATP Safe Links protection, we can detect such attacks . . . ."

48.     As for the effectiveness of IP Cloaking, and the ease in which hackers use it, Google has labeled IP Cloaking "arguably the most simple and effective approach" since it "thwarts any sort of detection" by cloud-based scanners.

49.     Hence, Microsoft's EOP and Safe Links are literally defenseless against the most-common, most-effective hacking attack.

**H.      Microsoft Was Notified Regarding Safe Link's Weakness and Safe Link's Weakness Confirmed in Multiple Tests with Publicly Disclosed Results.**

50.     In 2017, security researcher Mikail Tunç notified Microsoft in writing that hackers can use IP Cloaking to fully bypass its cloud-based Safe Links scanner. Tunç further publicly disclosed this on his website.  Microsoft, through its Security Response Center (MSRC), acknowledged receipt of Mikail Tunc's notice and opened an MSRC case but ultimately informed him that MSRC had completed its investigation and anticipated not taking further action to correct the issue.

51.     In 2018, testing by Cryptron Security GmbH ("Crypton Security") confirmed that Microsoft did indeed take no further action, as Cryptron's testing showed that hackers can still use IP Cloaking to bypass Microsoft's cloud-based ATP Safe Links scanner. Cryptron publicly disclosed this on its website.

52.     In 2019, testing by Rhino Security Labs, Inc ("Rhino Security Labs") confirmed that hackers cans still use IP Cloaking to bypass Microsoft's cloud-based ATP Safe Links scanner.

Rhino Security Labs also reported that hackers can use IP Cloaking to bypass all known cloud-based, redirect services that existed at the time of testing.  Rhino Security labs publicly disclosed this on its website.

53.     In 2020, TocMail's CEO conducted a test in conjunction with Tunç. This test confirmed that ATP Safe Links' cloud-based scanners are presently bypassed using IP Cloaking, which results have been disclosed to Microsoft.

54.     Despite warnings about Safe Links' inability to protect against the ubiquitous use of IP Cloaking, Microsoft continued to falsely portray Safe Links as its solution to cloaked links. Microsoft's willful deception regarding a severe security issue for many years warrants treble disgorgement of profits.

## II.     Microsoft's False and Misleading Advertisements.

55.     Over a five-year period, Microsoft engaged in a sustained marketing campaign to falsely promote the narrative that Safe Links solves the cloud security flaw of IP Cloaked links and, therefore, companies can safely move to Microsoft's cloud service.  Despite Microsoft's Office 365 being literally defenseless against IP Cloaking, Microsoft has promoted and advertised that its Safe Links is the solution to this specific attack vector even though it is apparent that Microsoft knows that Safe Links does not offer any additional protection against IP Cloaking.

56.     Examples of Microsoft's false and misleading advertising include the following widely-disseminated, false messages:

### 1.     Deceptive Message #1: Safe Links Protects Users Right at the Point of Click.

57.     Microsoft's Advanced Threat Protection for Office 365 (recently renamed as Microsoft Defender for Office 365) contains ATP Safe Links and ATP Safe Attachments.

58.     Microsoft makes the following deceptive message in its *Office 365 Essentials:*

*Advanced Threat Protection* brochure that was posted to Microsoft's official Advanced Threat

Protection purchase page:

> Sophisticated attackers will plan to ensure links pass through the first round of
> security filters. They do this by making the links benign, only to weaponize them
> after the message is delivered, altering the destination of the links to a malicious
> site. . . . With Safe Links, we are able to protect users right at the point of click by
> checking the link for reputation and triggering detonation if necessary.

A true and correct copy of the *Office 365 Essentials: Advanced Threat Protection* brochure is

attached hereto as **Exhibit "2."**

59.     Microsoft's *time-of-delivery* service, i.e., "the first round of security" in the above

message, is called Exchange Online Protection (EOP). Microsoft acknowledges in its promotion

that sophisticated attackers will plan to ensure that links bypass that first round of security.  On the

other hand, Safe Links is Microsoft's *time-of-click* service. Microsoft promises that Safe Links

will protect users from the cloaked links that bypass EOP, i.e., "first round of security," "right at

the point of click by checking the link for reputation and triggering detonation if necessary."

60.     However, the statement that "With Safe Links, we are able to protect users right at

the point of click by checking the link for reputation and triggering detonation if necessary" is

literally false as a result of the ubiquitous use and effectiveness of IP Cloaking, as explained in

detail above.  Alternatively, at a very minimum, this message is misleading, confusing and/or

deceiving.

61.     In fact, despite Microsoft claiming that Safe Links can protect users against

attackers that "pass through the first round of security filters" (EOP), ATP Safe Links runs on EOP

servers. In other words, ATP Safe Links has the exact same IP addresses as EOP, and therefore,

Safe Links offers no added protection to detect IP Cloaking compared to EOP despite Microsoft's

claim.

62.     The same *Office 365 Essentials: Advanced Threat Protection* brochure states: "Our average malware catch rate for Office 365 email is the highest in the industry at 99.9%. . . Office 365 Advanced Threat Protection catches threats before they disrupt your organization."  However, it is literally false to state a 99.9% malware catch rate via "the first round of security filters" (EOP), or "with Safe Links… at the point of click," or even with Safe Links combined with EOP, given the ubiquitous use of IP Cloaked malware that bypasses the shared IP addresses of EOP and ATP Safe Links.  Hence, even the statement of catching 99.9% of malware is false itself.  Moreover, it is literally false to portray Safe Links as protecting users at the time of click within the context of supposedly catching 99.9% of all malware.  Alternatively, at a very minimum, this message is misleading, confusing and/or deceiving.

**2.      Deceptive Message #2:  Attackers Redirect to Unsafe Sites via a Forwarding Service After the Message Has Been Received; But with Safe Links, Malicious Links are Dynamically Blocked while Good Links Remain Accessible.**

63.     Microsoft markets, promotes and advertises ATP and Safe Links with the following statement:

> ...attackers sometimes try to hide malicious URLs within seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received. The ATP Safe Links feature proactively protects your users if they click such a link. That protection remains every time they click the link, so malicious links are dynamically blocked while good links can be accessed. (emphasis added)

A true and correct copy of the 2015 ATP Product Guide is attached hereto as **Exhibit "3"**; a true and correct copy of the 2016 ATP Product Guide is attached hereto **Exhibit "4";** a true and correct copy of the 2017 Office 365: Everything You Wanted to Know is attached hereto as **Exhibit "5"**; a true and correct copy of the 2019 ATP Partner Datasheet is attached hereto as **Exhibit "6"**; and a true and correct screenshot of a 2020 webpage from Microsoft's website is attached hereto as **Exhibit "7."**

64.     Microsoft has been delivering this message for five years from the launch of ATP in 2015 (Ex. 3), 2016 (Ex. 4), 2017 (Ex. 5), 2019 (Ex. 6), up to the present (Ex. 7). Specifically, for five years, Microsoft has promised Safe Links' protection against dynamic links whose malicious content is cloaked "by a forwarding service." The exhibits contained herein are all representative samples. Microsoft has promoted these same words in other materials as well over the last five years.

65.     Upon information and belief, IP Cloaking is the most commonly used tactic of malicious users of forwarding services. As correctly explained by Proofpoint, these forwarding services use IP Cloaking to redirect to unsafe sites after the message has been received, the type of attack that Safe Links is defenseless against (see above). Safe Links does not protect users if they click the described links sent by attackers. Hence, to unambiguously promise that Safe Links protects against cloaked links in the context of forwarding services is literally false. In other words, to unambiguously promise that Safe Links protects against "links that are redirected to unsafe sites by a forwarding service after the message has been received" is literally false. Alternatively, at a very minimum, it is misleading, confusing and/or deceiving.

66.     Microsoft's promotion also contains a categorical promise of protection. Specifically, Microsoft promises protection every time a user clicks a link so that [category 1] malicious links are dynamically blocked while [category 2] good links can be accessed. Microsoft's promotion promises specific outcomes based on two categories: malicious links vs. good links.

67.     By presenting the protection categorically, Microsoft is promising that all malicious links are dynamically blocked while all good links can be accessed.

68.     This categorical assertion of Safe Links' protection is literally false. Alternatively,

16

at a very minimum, it is misleading, confusing and/or deceiving.

69.     Alternatively, this categorical assertion within the context of forwarding services is literally false.  Alternatively, at a very minimum, this categorical assertion within the context of forwarding services is misleading, confusing, and/or deceiving.

### 3.     Deceptive Message #3:  ATP Safe Links ensures hyperlinks are harmless.

#### a.     False Advertising 3a:

70.     Microsoft created power point presentations that are to be used for the marketing and promotion of ATP.  True and correct copies of reduced images from slides of PowerPoint presentations of Microsoft's Office 365 ProPlus Pitch Deck are attached hereto as **Exhibit "8"** and a true and correct copy of Microsoft's Office 365 ProPlus Mac Pitch Deck is attached hereto as **Exhibit "9."**

71.     All slides are intended to be shown to customers except for slide 1. Slide 1 indicates that these PowerPoint presentations are to be used when presenting to Business Decision Makers, Technology Decision Makers, and IT Decision Makers ("Audience: BDM, TDM, ITDM"), the "CORE content" is "slides 2-28," the presentations contain "approved messaging," and "Messages and wording have been reviewed by stakeholders."

72.     In the "CORE content" of the power point presentations, Microsoft provides approved messaging to promote and market to decision makers that its security "ensure[s] hyperlinks in documents are harmless with ATP Safe Links."

73.     However, the statement that Safe Links ensures hyperlinks in documents are harmless is literally false. Alternatively, at a very minimum, it is misleading, confusing and/or deceiving. As discussed in detail above, Safe Links can be trivially bypassed by IP cloaking and, thus, Safe Links does not ensure that hyperlinks are harmless.

74.     A Google search result demonstrates that both PowerPoint presentations were publicly retrievable from the following site: https://o365pp.blob.core.windows.net. Azure's cloud storage system uses the following URL convention: https://mystorageaccount.blob.core.windows.net.

        **b.      False Advertising 3b:**

75.     Microsoft also makes nearly the identical representation in its 2019 "Exchange Online Business Class Email System" brochure: "Ensure document hyperlinks are harmless with ATP Safe Links." A true and correct copy of the brochure is attached hereto as **Exhibit "10."** For the reasons discussed, this statement is literally false. Alternatively, at a very minimum, this message is misleading, confusing and/or deceiving.

**III.   Additional Allegations Concerning Microsoft's False Advertising.**

        **A.     Materiality**

76.     Security is material to the purchase of Office 365, as it is an important feature consumers consider when purchasing software.

77.     Indeed, according to Microsoft's own statements, security is material to the purchase decision of Office 365. Coinciding with the launch of Office 365, Microsoft explicitly stated: "When allowing an external service provider to store and manage their data, companies and other organizations *must consider security*." (emphasis added).

78.     In fact, Microsoft's CEO correctly acknowledges that "Businesses and users are going to embrace technology only if they can trust it."

79.     Such trust in Microsoft's security is material to the purchase decision of Office 365: "When moving your organization to cloud services, security concerns add another layer of consideration; one of trust. You have to be able to trust your service provider . . . Microsoft is

recognized as an industry leader in cloud security. . . . Office 365 provides robust email protection against spam, viruses and malware with Exchange Online Protection (EOP)."

80.     Moreover, Microsoft expressly acknowledged in its Form 10-K for fiscal year ending in June 30, 2020, that "The security of our products and services is important in our customers' decisions to purchase or use our products or services."

81.     According to Microsoft, being perceived as a leader in security is necessary to convince enterprise customers to move to Office 365. As reported in a 2019 CollabTalk research study co-commissioned by Microsoft: "Microsoft is making tremendous investments in data security and compliance... because they understand that to convince enterprise customers... the company needs to be a leader in security."

82.     Security is material to purchase decisions. Therefore, any false advertising and promotions regarding the security of Office 365 is material to the purchase decision of Office 365.

83.     All false advertising identified herein by Microsoft relates to the security of Office 365 and is therefore material to purchase decisions of Office 365.

84.     All false advertising identified herein regarding Safe Links is material to the purchase decision of Microsoft's Office 365 Advanced Threat Protection (recently renamed to Microsoft Defender for Office 365) as well as purchase decisions for Office 365 itself.

**B.     Deception**

85.     The advertisements identified herein from Microsoft deceived a substantial portion of the target audience. These false advertisements were delivered in the most prominent documents and webpages that Microsoft offered to prospective customers of Office 365, including product guides, partner datasheets, dedicated product webpages, sales collateral, and more. In the alternative, these false advertisements had the tendency to deceive a substantial portion of the

target audience.

## C.    Interstate Commerce

86.    Microsoft's advertisements and products identified herein are both primarily delivered over the internet throughout the United States and, upon information and belief, other locations. Hence, both the advertised products and the advertisements themselves traveled in interstate commerce, and involve interstate commerce.

## IV.    TocMail's Patent Solution and Damages.

## A.    TocMail's Patented Solution.

87.    IP Cloaking was the single unsolved security issue that prevented cloud-based scanners from achieving a level of security equal to, or greater than, on-premise scanners. In other words, solving the issue of IP Cloaking is solving the larger problem of making cloud-based scanners just as secure as on-premise scanners. It was the only issue that needed to be solved before companies could safely move their email security off premise to the cloud.

88.    Link scanning technology has existed for more than fifteen years. During this time, link scanning vendors have been trying to solve the impossible problem of reliably detecting IP Cloaked redirects via cloud-based scanners. TocMail's CEO had a novel, outside-the-box epiphany that uses IP Cloaking *avoidance* instead of IP Cloaking *detection*. In short, TocMail's technology keeps users safe from IP Cloaked links without even trying to detect if the link is using cloaking or not. Through this ingenious approach, companies can now have the benefits of cloud-based email scanners without sacrificing security.

## B.    Reputational and Economic Injury

89.    Microsoft's cloud-based scanners have been defenseless against IP Cloaking from their launch until today.  If Microsoft's customers knew that Microsoft's cloud-based scanners

were defenseless against the attack vector used by the majority of malicious sites, they would have kept their servers on-premise, as no company would give up the majority of its malware protection to move to cloud-based Office 365. Microsoft's customers were safe from IP Cloaking when using their on-premise email scanners.

90.     TocMail released the first cloud-based, redirect service that keeps users safe from IP Cloaking in late 2019. This service is named TocMail, and is accessible at *https://tocmail.net*. TocMail began advertising its TocMail service in December 2019.

91.     TocMail's technology was designed by Michael Wood, an inventor who created a prior internet technology sold to Micromuse in exchange for stock, the value of which exceeded $95 million by the time the stock lockup expired. Michael Wood serves as TocMail's CEO, and serves as the software developer for TocMail's current and pending products.

92.     The TocMail service rewrites links in emails so that users are taken to TocMail's cloud-based redirect service each time they click on the link. TocMail's patented service is the only cloud-based redirect service that keeps users safe from IP Cloaking.

93.     But for Microsoft's misdeeds, TocMail would be introducing the first cloud-based redirect service capable of keeping users safe from IP Cloaking to a world that had been waiting for such an invention to be made. Instead, as explained below, TocMail is introducing the first cloud-based redirect service capable of keeping users safe from IP Cloaking to a world that believes the problem was already solved many years ago. Therefore, instead of reaping the benefits of the entire world safely moving to the cloud using TocMail's technology, TocMail's offering appears useless to the very companies that need it the most, as they prematurely moved to the cloud due to Microsoft's false advertising and promotions.

94.     Instead of being rightly perceived as finding a solution to the attack vector used in

the majority of successful data breaches, Microsoft's false advertisements cause TocMail to be perceived as useless instead (useless to those who falsely believe they are already subscribing to a solution to the very same problem). Hence, Microsoft's false advertisements cause significant reputational damage to TocMail.

95.    Based on information and belief, TocMail estimates that there are approximately 100 million subscriptions to Microsoft's Safe Links' service. Given that TocMail is the sole provider of a cloud-based, time-of-click redirect service capable of keeping users safe from IP Cloaking, all 100 million subscriptions would have subscribed to TocMail as TocMail is their only option. None of these companies would willingly remain defenseless against the most-common hacking attack, yet these consumers remain loyal to Microsoft out of trusting Microsoft's false advertisements and promotions. Hence, Microsoft's false and misleading advertising causes significant economic harm to TocMail by causing millions of consumers to withhold trade from TocMail.

**C.    Damages**

96.    In solving the issue of IP Cloaking, Plaintiff's CEO has solved the attack vector used in the majority of successful data breaches. TocMail Inc sells its namesake service TocMail. TocMail is a cloud-based, time-of-click, redirect service that keeps users safe from cloaked links.

97.    Microsoft offers ATP Safe Links. Microsoft promotes ATP Safe Links as a cloud-based, time-of-click, redirect service that keeps users safe from cloaked links. Hence, TocMail and Safe Links compete for the exact same customers (those who wish to purchase a cloud-based, time-of-click, redirect service that keeps them safe from cloaked links). TocMail Inc and Microsoft Corp. are competitors.

98.    TocMail's service is protected by United States Patent No. 10,574,628 ("'628

Patent"). TocMail's patent solves the design flaw found in all competing cloud-based time-of-click redirect services - the design flaw that makes TocMail's competitors vulnerable to IP Cloaking. TocMail's patent prevents its competitors from being able to fix their design flaw until the patent expires. Hence, TocMail anticipates that prior to its patent expiration, TocMail will remain the sole provider of a cloud-based, time-of-click redirect service capable of keeping users safe from IP Cloaking - the attack vector used for the majority of data breaches.

99.     Microsoft, Mimecast, Proofpoint, and other cloud-based, time-of-click, redirect services have the exact same design flaw. This design flaw is best explained by way of example. Consider an email with a link to *CloakedLink.com*. *CloakedLink.com* sends security scanners to *BenignLink.com* and it sends everyone else to *MaliciousLink.com*. In other words, Microsoft's Safe Links gets redirected to *BenignLink.com*. Therefore, since *BenignLink.com* appears to be safe, Safe Links redirects the user to the original link (*CloakedLink.com*). *CloakedLink.com* redirects the user's device to *MaliciousLink.com* - a site that installs malware on the user's device. The user is now hacked.

100.     The design flaw shared by all of TocMail's competitors is that they send users to the original URL when the links are deemed safe. This is how cloud-based, time-of-click, redirect services have been designed for the last fifteen years. TocMail's CEO had an epiphany - a very elegant solution to a seemingly intractable problem. When TocMail determines that the final destination is approved, TocMail sends the user device straight to the final destination (not the original link). The original link (*CloakedLink.com*) cannot harm the user because the user is never sent there.

101.     By patenting this approach, TocMail's competitors are forced to always send their users to the original link (*CloakedLink.com*), which can then send their users anywhere it wants.

Hence, as long as the competitors must send their users to the original links, TocMail will remain the sole provider of a cloud-based, time-of-click, redirect service that keeps users safe from IP Cloaking.

102.    Microsoft's false advertising has a substantial influence over consumers, even though consumers has been warned about vulnerability to IP Cloaking by at least cybersecurity researcher Mikail Tunç, Cryptron Security, and Rhino Security Labs. Rhino Security Labs' warning was penned by Hector Monsegur - one of the world's most famous hackers who turned FBI informant. Despite his strongly worded warning, companies continue to trust Microsoft's Safe Links anyway.  As a result, TocMail does not anticipate that it will be able to break through in the market and, therefore, is seeking damages up through the time of its patent expiration. Thus, TocMail is seeking damages based on loss of approximately 100 million subscriptions at an approximate rate of $2.50 profit per user per month over the lifetime of the patent (which expires May 7, 2035).

103.    To put this into perspective, TocMail is the sole provider of the only cloud-based, time-of-click, redirect service that thwarts the attack used in the majority of data breaches. Moreover, for the next fifteen years, TocMail anticipates remaining the sole provider of the only cloud-based, time-of-click, redirect service that thwarts the attack used in the majority of data breaches. TocMail is seeking damages and disgorgement of profits commensurate with the magnitude of its patented technology.

### D.    Disgorgement of Profits

104.    Microsoft has knowingly, willfully, and intentionally deceived companies over a sustained period of almost ten years. Moreover, Microsoft's deceit affects the very safety of these companies. Such outright knowing deceit warrants treble disgorgement of Microsoft's profits. In

the alternative, such unjust enrichment warrants treble disgorgement of Microsoft's profits. In the alternative, deterring Microsoft from doing the same in the future warrants treble disgorgement of Microsoft's profits.

**COUNT I**
**False and Misleading Advertising under 15 U.S.C. § 1125(a)(1)(B)**

105.    Plaintiff re-alleges and re-avers paragraphs 1-104 as though fully set forth herein.

106.    This is an action for false and misleading advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

107.    Microsoft has misrepresented the nature, characteristics and/or qualities of its cloud-based email security service, including its ATP Safe Links service, in commercial advertising and/or promotion resulting in Plaintiff being damaged and/or likely to be damaged by such acts.  Microsoft continues to misrepresent the nature, characteristics and/or qualities of its cloud-based email security service, including its ATP Safe Links service, in commercial advertising and/or promotion resulting in Plaintiff being damaged and/or likely to be damaged by such act.

108.    More specifically, Microsoft's misrepresentations are in regards to the safety of its cloud-based email security service, including its ATP Safe Links service, as described in significant detail above.  A claim that a seller falsely represents the safety of its product or service is a traditional claim of consumer misrepresentation.

109.    As discussed at length above, Microsoft has made statements of fact in commercial promotion, advertising and marketing that are literally false.  Alternatively, at a very minimum, Microsoft has made statements of fact in commercial promotion, advertising and marketing that are misleading, confusing and/or deceiving.  All such statements of fact are found in, among other things, Microsoft's primary promotional materials, including but not limited to:

i.       the official *Exchange Online Advanced Threat Protection Product Guide*;

ii.      the official *Office 365 Advanced Threat Protection Product Guide*;

iii.     the *Office 365 Essentials: Advanced Threat Protection* brochure downloadable from Microsoft's previous primary promotional webpage for ATP

iv.      the PowerPoint presentations designed to be given to key decision makers

v.       approved promotional materials to be used by Microsoft Partners

110.    Microsoft's actions deceive or have a tendency to deceive the target audience, including consumers and purchasers of its cloud services, and may influence and/or have influenced consumers to refrain from purchasing Plaintiff's service.  Additionally, such actions may influence and/or have influenced consumers to purchase Microsoft's service rather than Plaintiff's service.  No evidence of deception is required for literally false statements.  For misleading, confusing and/or deceiving statements, consumer surveys, market research and other evidence demonstrate that Microsoft's statements are misleading, confusing and/or deceiving.

111.    As a result, Microsoft's actions have had and continue to have a material effect on purchase decisions. Microsoft explicitly states that security is material to purchase decisions in its Form 10-K for fiscal year ending in June 30, 2020: "The security of our products and services is important in our customers' decisions to purchase or use our products or services."

112.    Microsoft has used the subject promotional and advertising materials identified herein to deceptively market its Office 365 and ATP service to millions of consumers in all fifty states, across state lines - a service that is also delivered to all fifty states, across state lines.  Thus, Microsoft's deceptive advertising and promotion affects interstate commerce.

113.    Plaintiff is a competitor of Microsoft and has suffered injury to a commercial interest in sales or business reputation proximately caused by Microsoft's misrepresentations.

Among other things, Plaintiff has been injured by Microsoft's false and misleading advertising by consumers withholding trade from Plaintiff, presently and in the future due to trusting Microsoft's false advertising.  In the alternative, Plaintiff is likely to be injured by Microsoft's false advertising by consumers withholding trade from Plaintiff due to trusting Microsoft's false advertising.

114.    Additionally, Plaintiff's business reputation has been injured by Microsoft's false and misleading advertising due to consumers believing that Plaintiff offers nothing of value to them due to their trusting Microsoft's false claims to already be providing the service that Plaintiff provides.  Specifically, Plaintiff is the sole provider of that which Microsoft falsely claims to offer, making every dollar gained by Microsoft trade that is being withheld from Plaintiff.

115.    Upon information and belief, Microsoft has procured roughly 100 million subscriptions for protection against links that appear to be benign, only to change destination when clicked. Yet, Microsoft's ATP Safe Links does not keep users safe from such links.  This deception causes these users to withhold trade from Plaintiff. These users also wrongly perceive Plaintiff's security offering as holding no value to them, which irreparably harms Plaintiff's commercial interest and business reputation.  Although Plaintiff has solved what is arguably the single biggest issue in cloud security, Microsoft's misrepresentations have caused it to appear as if Plaintiff claims only to have solved a non-existent problem.

116.    The withholding of trade by millions of users has resulted in substantial damages to Plaintiff and will continue to result in substantial damages to Plaintiff over the lifetime of Plaintiff's '628 Patent.  The mere cessation of false advertising by Microsoft will not prevent future injury to Plaintiff because Microsoft has already convinced purchasers to trust its security and does not need to continue the false advertising campaign to retain them. Such damages are in addition to the injury to Plaintiff's business reputation.

117.    Plaintiff is also seeking an award of Microsoft's profits from both the direct sale of Microsoft's ATP security service and from the sale of Office 365 derived from purchasers trusting Microsoft's deceptive ATP security claims.  Consumers would not have moved to Microsoft's cloud-based Office 365 if they knew they were not protected from a hacking attack used by the majority of malicious sites - an attack they were previously protected from.  Disgorgement of ill-gotten profits is separate from and independent of actual damages and is necessary here to deter future conduct and to prevent Microsoft from being unjustly enriched.  Among other things, companies were safe from IP Cloaking with their on-premise security, but Microsoft knowingly made companies defenseless against this widely used attack in order to procure billions in profit. The very severe harm inflicted on companies, governmental institutions, and more necessitates future deterrence. There is great public interest in making the misconduct unprofitable.

118.    Microsoft's actions described herein have been and continue to be willful, deliberate and intentional.  Among other things, as discussed above, in 2017, Microsoft was officially notified that its ATP security can be bypassed via IP Cloaking, which is the most commonly used evasion technique.  Nevertheless, Microsoft continued and still continues to promote ATP Safe Links as effective protection against the very attack that hackers use to thwart ATP Safe Links itself.

119.    Microsoft's misrepresentations are causing and will continue to cause damage to Plaintiff including, but not limited to, irreparable harm.  Irreparable harm includes the loss of customers and goodwill.

120.    Plaintiff is entitled to a temporary and permanent injunction against Microsoft, as well as all other remedies available including, but not limited to, compensatory damages, disgorgement of profits, treble damages and treble disgorgement of profits, and costs and

attorneys' fees. Plaintiff seeks all available remedies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, TOCMAIL INC, prays for judgment against Defendant, MICROSOFT CORPORATION, as follows:

A.      Finding Defendant liable for the actions described herein;

B.      For temporary and permanent injunctive relief enjoining Defendant and its respective officers, employees, and agents, and all persons or entities in active concert or participation with Defendant, from misrepresenting the safety, nature, characteristics and qualities of its Advanced Threat Protection (Microsoft Defender for Office 365) service and/or Safe Links service and requiring Defendant to take corrective action regarding Defendant's past actions, including Ordering that:

1) Defendant immediately cease promoting Advanced Threat Protection (Microsoft Defender for Office 365) and/or Safe Links as offering effective protection against cloaked links;

2) Defendant immediately cease claiming that its Advanced Threat Protection (Microsoft Defender for Office 365) and/or Safe Links or any of its security services ensure that hyperlinks are harmless;

3) Defendant immediately cease promoting Advanced Threat Protection (Microsoft Defender for Office 365) and/or Safe Links as offering effective protection against forwarding services that redirect to unsafe sites after email messages have been delivered;

C.      Ordering Defendant to pay Plaintiff monetary relief under 15 U.S.C. § 1117(a) in an amount equal to Defendant's profits as a result of Defendant's wrongful actions;

D.     For damages, including ordering Defendant to pay Plaintiff monetary relief under 15 U.S.C. § 1117(a) for damages sustained by Plaintiff in excess of $15 billion, as a result of Defendant's wrongful actions;

E.     Ordering Defendant to pay Plaintiff three times Defendant's profits made as a result of Defendant's wrongful actions and three times Plaintiff's damages;

F.     Finding that this case is exceptional pursuant to 15 U.S.C. §§ 1117(a) due to Defendant's willful and intentional acts described herein and, accordingly, award Plaintiff its reasonable attorneys' fees;

G.     Finding that Plaintiff is entitled to recover its costs of Court;

H.     Finding that Plaintiff is entitled to prejudgment and post-judgment interest; and

I.     For such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues so triable.

Dated: November 13, 2020                    Respectfully submitted,

                                            By: _/s/Joshua D. Martin_____
                                            Joshua D. Martin
                                            Florida Bar No. 028100
                                            josh.martin@johnsonmartinlaw.com
                                            JOHNSON & MARTIN, P.A.
                                            500 W. Cypress Creek Rd., Suite 430
                                            Fort Lauderdale, Florida  33309
                                            Telephone:  (954) 790-6699
                                            Facsimile:  (954) 206-0017

                                            *Attorney for Plaintiff, TocMail Inc*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 13th day of November 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing

document is being served this day on all counsel of record on the attached service list via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:    /s/ Joshua D. Martin
           Joshua D. Martin

## SERVICE LIST

*TOCMAIL INC. v. MICROSOFT CORPORATION*
**20-60416-CIV- SMITH/VALLE**

| | |
|---|---|
| **Joshua D. Martin**<br>E-Mail:<br>josh.martin@johnsonmartinlaw.com<br>JOHNSON & MARTIN, P.A.<br>500 W. Cypress Creek Rd.<br>Suite 430<br>Fort Lauderdale, Florida 33309<br>Telephone: (954) 790-6699<br>Facsimile: (954) 206-0017 | **Francisco O. Sanchez**<br>E-Mail: sanchezo@gtlaw.com<br>       orizondol@gtlaw.com<br>**Evelyn A. Cobos**<br>E-Mail: cobose@gtlaw.com<br>       MiaLitDock@gtlaw.com<br>GREENBERG TRAURIG, P.A.<br>333 S.E. 2nd Avenue, Suite 4400<br>Miami, Florida 33131<br>Telephone: (305) 579-0500<br>Facsimile: (305) 579-0717<br><br>**Mary-Olga Lovett** *(admitted pro hac vice)*<br>E-Mail: lovettm@gtlaw.com<br>GREENBERG TRAURIG LLC<br>1000 Louisiana Street, Suite 1700<br>Houston, Texas 77002<br>Telephone: (713) 374-3541<br>Facsimile: (713) 374-3505 |