UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 0:20-cv-60416-CANNON/HUNT

TOCMAIL, INC., a Florida corporation,

      Plaintiff,

v.

MICROSOFT CORPORATION, a Washington
corporation,

      Defendant.

**DEFENDANT MICROSOFT CORPORATION'S *DAUBERT* MOTION
TO EXCLUDE THE OPINIONS AND TESTIMONY OF PLAINTIFF TOCMAIL, INC.'S
<u>EXPERTS MICHAEL WOOD AND MARCIE D. BOUR</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     LEGAL STANDARD............................................................................................. 3

III.    WOOD'S OPINIONS SHOULD BE EXCLUDED ............................................. 4

        A.      Wood is Unqualified to Opine as an Expert Because He Lacks Relevant
                Expertise and is Inextricably Conflicted and Biased as TocMail's CEO. .............. 4

        B.      Wood's Opinions are Unhelpful to the Jury Because they are Merely
                Inadmissible Narrative Testimony and Advocacy for TocMail. ........................... 8

        C.      Wood Fails to Use Any Methodology, Let Alone a Reliable Methodology
                to Reach His Opinions. ........................................................................................ 12

IV.     BOUR'S OPINIONS SHOULD BE EXCLUDED ............................................. 16

        A.      Bour Did Not Use a Reliable Methodology to Establish a Disgorgement
                Figure that Fits TocMail's Theory of the Case..................................................... 16

        B.      Bour's Disgorgement and Lost Profits Calculations Are Unreliable and
                Unhelpful Because They Were Not Reached by Applying Any Scientific
                Methodology or Causation Analysis..................................................................... 20

        C.      Bour Relies on Unsupported Assumptions and Unrealistic Market
                Conditions to Reach an Unreliable and Unscientific Lost Profits Figure............. 22

V.      CONCLUSION...................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
   No. 3:19MD2885, 2021 WL 948839 (N.D. Fla. Mar. 13, 2021) ................................... 5, 9, 14

*Accrued Fin. Svcs., Inc. v. Prime Retail, Inc.*,
   298 F.3d 291 (4th Cir. 2002) .................................................................................. 6

*All-Tag Corp. v. Checkpoint Sys., Inc.*, No. 9:17-CV-81261, 2019 WL 5073499,
   (S.D. Fla. Oct. 9, 2019) .......................................................................................... 2

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
   432 F. Supp. 2d 1319 (S.D. Fla. 2006),
   *aff'd*, 294 F. App'x 501 (11th Cir. 2008) ............................................................... 27

*BGW Design Ltd., Inc. v. Serv. Am. Corp.*,
   No. 10-20730-CIV, 2011 WL 13172487 (S.D. Fla. Nov. 30, 2011) ....................... 27

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
   582 F.3d 1227 (11th Cir. 2009) ............................................................................. 19

*Companhia Energetica Potiguar v. Caterpillar Inc.*,
   No. 14-CV-24277, 2016 WL 3102225 (S.D. Fla. June 2, 2016) ............................. 2

*Companhia Energetica Potiguar v. Caterpillar Inc.*,
   No. 14-CV-24277, 2016 WL 7507848 (S.D. Fla. Aug. 1, 2016) ..................... 10, 24

*Cordoves v. Miami-Dade Cty.*,
   104 F. Supp. 3d 1350 (S.D. Fla. 2015) .................................................................. 10

*Corwin v. Walt Disney Co.*,
   475 F.3d 1239 (11th Cir. 2007) ............................................................................... 2

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ................................................................................................. 4

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ................................................................................... 4

*Davis on Behalf of J.D.D. v. Carroll*,
   329 F.R.D. 435 (M.D. Fla. 2018) ........................................................................... 15

*Edwards v. Shanley*,
   580 F. App'x 816 (11th Cir. 2014) ................................................................... 10, 12

*Cochran v. Brinkmann Corp.*,
   No. 1:08-CV-1790-WSD, 2009 WL 4823858 (N.D. Ga. Dec. 9, 2009),
   *aff'd sub nom.*, 381 F. App'x 968 (11th Cir. 2010) ................................................. 2

*Cook v. Royal Caribbean Cruise, Ltd.*,
   No. 11-20723-civ, 2012 WL 2319089 (S.D. Fla. June 15, 2012) ........................... 2

*Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*,
   402 F.3d 1092 (11th Cir. 2005) .......................................................................4, 16

*Finestone v. Fla. Power & Light Co.*,
   No. 03-14040-CIV, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006),
   *aff'd*, 272 F. App'x 761 (11th Cir. 2008)...............................................................10

*First Premium Servs., Inc. v. Best W. Int'l, Inc.*,
   No. 95-1466-CIV, 2004 WL 7203535 (S.D. Fla. Jan. 8, 2004)........................18, 26

*Gastaldi v. Sunvest Resort Communities, LC*,
   709 F. Supp. 2d 1299 (S.D. Fla. 2010) ...................................................................19

*General Elec. Co. v. Joiner*
   522 U.S. 136 (1997)..................................................................................................16

*Guinn v. AstraZeneca Pharms. LP*,
   602 F.3d 1245 (11th Cir. 2010) ...............................................................................18

*Haller v. AstraZeneca Pharm. LP*,
   598 F. Supp. 2d 1271 (M.D. Fla. 2009)......................................................................6

*Hughes v. Kia Motors Corp.*,
   766 F.3d 1317 (11th Cir. 2014) ...............................................................................16

*Kumho Tire Co. Ltd. v. Carmichael*,
   526 U.S. 137 (1999)...............................................................................................4, 19

*Lancaster v. Harrow*,
   No. 8:17-CV-634-T-33JSS, 2018 WL 3650119 (M.D. Fla. Mar. 28, 2018) ..........25

*Lincoln Rock, LLC v. City of Tampa*,
   No. 8:15-CV-1374-T-30JSS, 2016 WL 6818959 (M.D. Fla. Nov. 18, 2016)........25

*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003)..................................................................................11

*Loeffel Steel Prods. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) .......................................................................10

*Marine Travelift, Inc. v. Marine Lift Sys., Inc.*,
   No. 10-C-1046, 2013 WL 3289076 (E.D. Wis. June 28, 2013) ...............................10

*McCorvey v. Baxter Healthcare Corp.*,
   298 F.3d 1253 (11th Cir. 2002) .................................................................................4

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004) ...............................................................................16

*Montgomery v. Aetna Cas. & Sur. Co.*,
   898 F.2d 1537 (11th Cir. 1990) .................................................................................9

*Omar v. Babcock*,
   177 F. App'x 59 (11th Cir. 2006) ..........................................................................9, 10

*Perfect 10, Inc. v. Giganews, Inc.*,
   No. CV 11-07098-AB, 2014 WL 10894452 (C.D. Cal. Oct. 31, 2014) ...............6, 7, 8

*R & R Int'l, Inc. v. Manzen, LLC,*
   No. 09-60545-CIV, 2010 WL 3605234 (S.D. Fla. Sept. 12, 2010)...........................................25

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.,*
   282 F.R.D. 655 (M.D. Fla. 2012), *aff'd*, 725 F.3d 1377 (Fed. Cir. 2013)...............................13

*Rink v. Cheminova, Inc.,*
   400 F.3d 1286 (11th Cir. 2005) ...............................................................................................4

*Royale Green Condo. Ass'nn, Inc. v. Aspen Specialty Ins. Co.,*
   No. 07-CIV-21404, 2009 WL 2208166 (S.D. Fla. July 24, 2009) ..........................................14

*Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.,*
   254 F. Supp. 2d 1239 (M.D. Fla. 2003)..............................................................................22, 27

*In re Trasylol Prod. Liab. Litig.,*
   709 F. Supp. 2d 1323 (S.D. Fla. 2010) ........................................................................9, 10, 11

*U.S. v. Frazier,*
   387 F.3d 1244 (11th Cir. 2004) ........................................................................................10, 13

*Ulysse v. Waste Mgmt. Inc. of Fla.,*
   No. 11-CV-80723, 2013 WL 12177854 (S.D. Fla. Oct. 29, 2013)..........................................11

*Umana-Fowler v. NCL (Bahamas) Ltd.,*
   49 F. Supp. 3d 1120 (S.D. Fla. 2014)......................................................................................22

*Williamson Oil Co. v. Philip Morris USA,*
   346 F.3d 1287 (11th Cir. 2003) ................................................................................................2

**Statutes**

115 U.S.C. § 1117(a) .......................................................................................................................16

**Other Authorities**

Fed. R. Evid. 702 ....................................................................................................3, 4, 14, 16

Fed. R. Evid. 801 ..........................................................................................................................14

Fed. R. Evid. 802 ..........................................................................................................................14

## I.    **INTRODUCTION**

Plaintiff TocMail, Inc. ("TocMail") has designated its own CEO, Michael Wood ("Wood"), as a purported "expert" on liability. Wood seeks to provide expert opinions on the history of phishing and IP Cloaking, Microsoft's purported false advertising of its Safe Links feature, and the efficacy of Safe Links, among other topics. But Wood lacks the experience or qualifications to render these opinions, and more importantly, because Wood is TocMail's CEO, he has an inherent and irresolvable conflict given his financial and reputational stake in the outcome of this case. He cannot render an objective opinion in light of that conflict, and for that reason alone he must be stricken as an expert. Even if he were not conflicted, however, his report is not reliable because it is not based on any methodology.

Not surprisingly, Wood's report consists of multiple self-serving negative opinions regarding Microsoft's advertising and products, and a narrative that closely tracks TocMail's theory of the case as set forth in TocMail's Amended Complaint. To the extent that Wood's report summarizes the evidence and makes legal arguments, it improperly usurps the role of counsel. To the extent that the report describes the history of phishing and IP Cloaking, such information is available from direct sources and does not require "expert" interpretation. Finally, Wood uses no methodology to arrive at his conclusions and opinions, which are based entirely on his own assumptions and beliefs, or on inadmissible hearsay.

TocMail has also designated Marcie D. Bour ("Bour") as its expert on damages, to calculate the disgorgement of profits and lost profits claimed by TocMail.[1] Bour's disgorgement

---

[1] On May 21, 2021, TocMail served a "Supplemented Expert Report" by Marcie D. Bour. Bour's supplemental report is not the subject of this *Daubert* motion as it was untimely served and is inadmissible. Expert discovery closed on March 30, 2021, nearly two months before TocMail served its supplemental report. *See* Paperless Order [ECF No. 55]. "[The Eleventh Circuit] [has] held that a supplemental expert report may be excluded pursuant to Federal Rule of Civil Procedure

analysis is unreliable and grossly overinflated because, in determining disgorgement profits, she

used the revenues for Microsoft's full suite of security resources (originally known as "Advanced

Threat Protection" but recently renamed to "Defender for Microsoft 365," referred to as "ATP" or

"Defender" herein) as well as all revenues from the sale of Office 365, which includes Microsoft's

full suite of business software. These robust products include Safe Links as a feature, among many

---

37(c) if a party fails to file it prior to the deadline imposed. *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007) (citing *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003)); *All-Tag Corp. v. Checkpoint Sys., Inc.*, No. 9:17-CV-81261, 2019 WL 5073499, at *3 (S.D. Fla. Oct. 9, 2019). Bour admits on page 4 of her supplemental report that she "made substantive changes" to her original report and that discovery closed after her deposition, at which time she had all additional information included in her supplemental report yet failed to supplement prior to the discovery deadline. Further, Bour's supplemental report is extremely prejudicial to Microsoft, as she has attempted to correct deficiencies in her initial report after having been apprised of them in Microsoft's rebuttal expert, Dr. Ugone's, rebuttal report and his deposition. Such an untimely supplemental report is not the kind contemplated under Rule 26(e) and is not permitted because it was served "not to correct any existing information, but rather to bolster the existing opinion and include impermissible opinions after the expert disclosures deadline." *All-Tag Corp.*, 2019 WL 5073499, at *3; *see Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225, at *6-7 (S.D. Fla. June 2, 2016) (striking an expert declaration submitted after the discovery cutoff; *see also Cook v. Royal Caribbean Cruise, Ltd.*, No. 11-20723-civ, 2012 WL 2319089, at *1-2 (S.D. Fla. June 15, 2012) (rejecting plaintiff's argument that she was "following the duty-to-supplement rule" by serving an untimely supplemental report); *Cochran v. Brinkmann Corp.*, No. 1:08-CV-1790-WSD, 2009 WL 4823858, at *7 (N.D. Ga. Dec. 9, 2009), *aff'd sub nom.*, 381 F. App'x 968 (11th Cir. 2010) (finding "Plaintiff's failure to conduct the testing and to offer the opinions based on the testing before the deadline for expert reports was not substantially justified nor… harmless"). In an end-run around the Court's scheduling orders, TocMail also failed to obtain an extension of the Court's expert discovery deadline, failed to seek leave from the Court to file an untimely supplemental report, and failed to raise its intention with the Court at the April 30, 2021 status conference. TocMail also failed to raise its supplemental report with Microsoft. Egregiously, on May 18, 2021, when counsel for the parties conferred regarding the substance of Microsoft's *Daubert* motion, Microsoft's Motion to File Under Seal Exhibits to its *Daubert* motion [ECF No. 63], and the parties' motion to exceed page limits for this Motion [ECF No. 65]—at which point TocMail knew Microsoft would be filing its *Daubert* motion—counsel for TocMail withheld the fact that TocMail would be serving a supplemental report and ambushed Microsoft with it 3 days later. Should TocMail not withdraw its Supplemented Expert Report and seek to rely on it at trial, despite TocMail being made aware by Microsoft that it is in violation of Federal Rules of Civil Procedure 16, 26, 37, and Local Rule 16.1, Microsoft will address the supplemental report in a separate motion to strike TocMail's improper supplemental report and seek appropriate sanctions for TocMail's willful tactics.

other features and services. Bour failed to assess a value attributable to the Safe Links feature and failed to conduct a necessary apportionment analysis to determine what percentage of Microsoft's sales of the Defender and Office 365 suites is attributable to the Safe Links feature at issue. Further, neither of Bour's proposed measures of disgorgement and lost profits is tied to, or is attributable to, the alleged false advertising of Safe Links, and thus they do not fit TocMail's theory of the case. Indeed, Bour's opinions are unreliable because they leave the trier of fact with a measure of damages that is neither attributable to Safe Links nor tied to the three purportedly false advertisements at issue. Moreover, Bour fatally relies on various unsupported and unverified assumptions supplied by TocMail, including that all Defender and Office 365 customers read the advertisements, were misled by them, and chose to purchase Microsoft's product and not TocMail's because of those advertisements. Without a causation analysis or other scientific methodology to support her calculations, Bour's purported damages figures are unhelpful, unreliable, and speculative.

Because there is no basis for permitting that either purported expert's opinions or anticipated testimony reach the jury consistent with Rules 401, 402, or 702 of the Federal Rules of Evidence, the Court should grant this motion, strike the Wood and Bour reports, and preclude both Wood and Bour from testifying at trial.

## II.   <u>LEGAL STANDARD</u>

Rule 702 permits an expert to testify at trial only if that testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert opinions may be considered only if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.* at 702(b)-(d).

To ensure that these threshold requirements are satisfied, district courts are tasked with the role of "gatekeeper" over all proffered expert or scientific testimony. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 138 (1999). As the gatekeeper, the Court must "admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). It is also the Court's responsibility "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

The proponent of the expert testimony bears the burden under Rule 702 of establishing that the proffered expert (1) is qualified to testify competently, (2) that his opinions are based on sound methodology, and (3) that his testimony will be helpful to the trier of fact. *See Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*") ("[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology."). TocMail cannot meet this burden for either of its proffered experts.

III.   **WOOD'S OPINIONS SHOULD BE EXCLUDED**

**A. Wood is Unqualified to Opine as an Expert Because He Lacks Relevant Expertise and is Inextricably Conflicted and Biased as TocMail's CEO.**

To render an expert opinion, the witness must have the requisite knowledge, skill, experience, training or education relevant to such evidence or fact in issue. Fed. R. Evid. 702. Wood does not. Wood is a businessman and inventor whose experience entails holding executive and managerial positions at companies that develop products he purportedly created, including Cryptech Inc., Calvin Alexander Networking, Micromuse, and TocMail. *See* Expert Report of Michael Wood, attached as "**Exhibit 1**" ("Wood Report") at App'x 195. Based on his alleged

capabilities as a network engineer and web developer in the late 1980s and 1990s, Wood purportedly developed—more than 20 years ago—the technology for an automated reconnaissance and scanning tool that he sold to Micromuse but which became obsolete by the time it was acquired and therefore was never used. Wood Report at 91; Deposition of Michael Wood dated March 18, 2021, attached as "**Exhibit 2**" ("Wood Trs. Vol. 1") at 76:14-20; Deposition of Michael Wood as TocMail's Corporate Representative dated March 19, 2021, attached as "**Exhibit 3**" ("Wood Trs. Vol. 2") at 41:1-42:9.

Since then, Wood has been issued several patents for his "freelance" endeavors, including cybersecurity-related patents, which he claims give him "cybersecurity credentials in general and specialized expertise in IP Cloaking specifically." Wood Report at 91, App'x 195, 196. Wood claims his "passion" for "problem solving through programming" is what led him to design several software applications for various industries including healthcare and network communications. *Id.* at App'x 195. Wood further states that his "passion" for digital security and his role as a business executive have led him to "*keep[] abreast* of both cybersecurity capabilities and cybersecurity vulnerabilities." *Id.* at 91 (emphasis added). Yet, Wood's patents (which are largely unrelated to the services Microsoft's Safe Links offers), interest in the cybersecurity field, and "business experience," alone, are not enough to qualify him as an expert to opine on Safe Links' efficacy, Microsoft's advertising of Safe Links, or even cybersecurity and IP Cloaking, more generally. *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 948839, at *3 (N.D. Fla. Mar. 13, 2021) (noting expert does not "explain *how* [his] experience leads to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (citation omitted).

Further, Wood has never served as an expert witness before (Wood Report at 13; Wood Trs. Vol. 1 at 25:24-26:2); has not published any books or peer-reviewed articles on any relevant topics at issue in this action[2]; admits his expert report was the first time he prepared any product of the sort (Wood Report at App'x 196-97; Wood Trs. Vol. 1 at 25:24-26:2); has no relevant academic or technical training (Wood Report at App'x 195); and has no understanding of the technology behind Microsoft's Safe Links and how it works beyond what can be researched—he has not reviewed its source code or used a reliable methodology to test the feature himself. Wood Trs. Vol. 1 at 45:19-46:1; *see infra* Section III(C) (discussing "testing" performed by Mikail Tunc). Thus, Wood lacks the requisite qualifications to provide his "expert" opinions. *See Haller v. AstraZeneca Pharm. LP*, 598 F. Supp. 2d 1271, 1300 (M.D. Fla. 2009) (finding proffered expert's "education, training and experience simply do not render him qualified to express [an] opinion in [this] case.").

In addition to lacking the bare minimal qualifications to testify as an expert in this matter, Wood is unqualified to testify because he admitted that he has an inextricable personal stake (financially, professionally, and reputationally) in the outcome of this litigation. Wood Trs. Vol. 1 at 20:5-21:7. "As the Fourth Circuit has held, testimony from experts who have a *direct financial stake* in the outcome of litigation is 'against public policy....'" *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB, 2014 WL 10894452, at *4 (C.D. Cal. Oct. 31, 2014) (quoting *Accrued Fin.*

---

[2] Appendix 196 to the Wood Report lists Wood's "cybersecurity publications." The first is a book on cryptography, which is not at issue here, and the remaining "publications" are patents and two URLs to blog websites, and not to Wood's specific blog posts. Appendix 197 lists Wood's "unrelated publications," which include a patent to relieve stress, a book on homosexuality, and various books on Christianity.

*Svcs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002)) (emphasis added). Indeed, "public policy has long made a distinction between paid experts who have an *indirect incentive* to win the approval of their employers (the client and attorneys) on the one hand, and experts who have a *direct financial stake* in the outcome of the litigation on the other." *Id*. Where an expert like Wood has a direct financial stake in the outcome of the litigation, his "conflict of interest is so great, and raises so many 'serious questions about the integrity of [Wood's] expert testimony' that to admit the conflicted testimony would violate public policy." *Id*.

A factually analogous case, *Perfect 10*, is instructive. There, the plaintiff proffered Dr. Zada, "Perfect 10's sole shareholder and CEO," as an expert who would explain how defendant's product infringed upon Perfect 10's copyright, among other things. *Id.* at *1. However, like Wood, "Dr. Zada ha[d] never testified as an expert witness in any litigation before, ha[d] never published any books or peer-reviewed articles on any relevant topics at issue in this action, ha[d] no relevant academic training, and ha[d] virtually no understanding of [defendants'] technologies or [d]efendants' serverside operations." *Id.* And Dr. Zada testified at his deposition "that he 'stand[s] to benefit financially from the outcome of this case'" and "[a]s Perfect 10's sole shareholder, Dr. Zada testified 'it would be in my interest for Perfect 10 to win this case.'" *Id.* at *2. Consequently, the *Perfect 10* Court found that Dr. Zada's testimony would violate public policy and granted defendants' motion to exclude his expert opinions but allowed him to "testify in his capacity as a fact witness to his percipient observations to the extent they are relevant and otherwise admissible. But that is all." *Id*. at *6.

Similarly, Wood is TocMail's founder, CEO, and sole employee, as well as the inventor of its patented technology described in the Amended Complaint. *See* Wood Report at 91; Wood Trs. Vol. 1 at 21:24-22:1. Indeed, Wood owns 87% of TocMail, and admitted that 87% of the proceeds

from this action, after costs, would go directly to him. Wood Trs. Vol. 1 at 20:5-21:7. Wood admitted he sued Microsoft after "tens of thousands of visitors to [TocMail's] website, which are individuals who would be business professionals interested in stopping phishing … [were told] cloaking is the reason that they're having the issue with phishing … *but they don't perceive it that way*. So therefore, we have to go for the source on how they reach that wrong conclusion." Wood Trs. Vol. 1 at 64:1-13 (emphasis added). In other words, after Wood could not make a single sale, he sued Microsoft because *he*—not the consumers—believes his lack of success is due to false advertising by Microsoft. *Perfect 10* is squarely on point, and this Court should similarly exclude Wood's improperly biased, unqualified expert opinions.

### B. Wood's Opinions are Unhelpful to the Jury Because they are Merely Inadmissible Narrative Testimony and Advocacy for TocMail.

Wood's "expert report" and opinions are nothing more than a regurgitation of the theories set forth in TocMail's Amended Complaint. Both narrate the same story, which is that TocMail's product is purportedly so ingenious that every consumer would buy it but for Microsoft's alleged false advertising. *See* Wood Report at 61 ("TocMail is the only cloud-based, time-of-click, redirect service that doesn't have this design flaw"); 66 (describing "TocMail's ingenious solution of IP Cloaking avoidance"); 67 ("From a cybersecurity perspective, TocMail's solution is historic."); 73-75 (discussing the "comprehensive protection" provided by TocMail's product); 76 ("Given the elegance of TocMail's solution, it can be incorporated into any email client[.]"). Indeed, his report closely tracks the allegations and conclusions in the Amended Complaint as exemplified in the below non-exhaustive list:

> o *Compare* Wood Report at 59 ("TocMail [is] the sole provider of a cloud-based, time-of-click redirection service that consistently defeats IP Cloaking.") *to* Am. Compl. ¶ 98 ("TocMail will remain the sole provider of a cloud-based, time-of-click redirect service capable of keeping users safe from IP Cloaking"); *see also* Am Compl. ¶¶ 4, 95, 101, 103, 114;

- o  *Compare* Wood Report at 59 ("Safe Links' primary design flaw is that it either redirects to a warning page or the original URL") *to* Am. Compl. ¶ 100 ("The design flaw shared by all of TocMail's competitors is that they send users to the original URL when the links are deemed safe.");

- o  *Compare* Wood Report at 41 ("Microsoft's false advertising successfully drowns out the findings of these reputable cybersecurity professionals.") *to* Am. Compl. ¶ 102 ("Microsoft's false advertising has a substantial influence over consumers, even though consumers have been warned about vulnerability to IP Cloaking by at least cybersecurity researcher Mikail Tunc, Cryptron Security, and Rhino Security Labs."); and

- o  *Compare* Wood Report at 47 ("By portraying Safe Links in the manner that it does, Microsoft makes every purchase decision contingent on companies believing its false portrayal of Safe Links' purported capability.") *to* Am. Compl. ¶ 94 ("Microsoft's false advertisements cause TocMail to be perceived as … useless to those who falsely believe they are already subscribing to a solution to the very same problem").

An expert, however, cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence and telling the jury what it should conclude. *See Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (where "the witness simply recounts the facts and then offers an opinion as to the conclusion which the jury should reach, such expert testimony is not permitted"); *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("An expert may not, however, merely tell the jury what result to reach."). Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. *See In re 3M Combat Arms*, 2021 WL 948839, at *10 ("This kind of narrative testimony is not helpful to the trier of fact—particularly when the opinions they purport to support are inadmissible[.]"); *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337, 1342 (S.D. Fla. 2010) (finding "it was apparent that the majority of Dr. Parisian's opinions fall outside the proper scope of expert testimony because they consist of a narrative of selected regulatory events and a summary of Bayer's internal documents").

Here, Wood's report largely consists of factual summaries derived from other sources which require no expert interpretation, including a lengthy summary of the history of phishing and cloaking and a summary of fact discovery in the case.[3] Because this narrative testimony and the proffered conclusive opinions about those facts are improper expert testimony that is both of no help to the jury and is irrelevant to the merits of the case, Wood's opinions should be excluded. *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d at 1342 (excluding expert's narrative of selected regulatory events and summary of internal documents); *Edwards v. Shanley*, 580 F. App'x 816, 824 (11th Cir. 2014) (finding "the district court did not abuse its discretion by concluding [the expert's] opinion would not have assisted the trier of fact to understand the evidence or to determine a fact in issue."); *Omar*, 177 F. App'x at 63 n.5.

Florida courts have also excluded experts who merely are mouthpieces for their clients or counsel. *See Finestone v. Fla. Power & Light Co.,* No. 03-14040-CIV, 2006 WL 267330, at *14 (S.D. Fla. Jan. 6, 2006), *aff'd,* 272 F. App'x 761 (11th Cir. 2008) (holding it would not rely on two experts who were "mere mouthpieces for counsel's argument"); *Companhia Energetica Potiguar v. Caterpillar Inc.,* No. 14-CV-24277, 2016 WL 7507848, at *8 (S.D. Fla. Aug. 1, 2016) (citing *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (experts cannot act as the "mouthpiece of the witnesses on whose statements ... the expert purports to base his opinion")); *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350,

---

[3] *See* Wood Report at 14-16 (discussing origin of cloaking); 16-18 (discussing origin of IP Cloaking); 18-20 (discussing how the use of IP Cloaking underwent three stages of development); 20-25 (discussing IP cloaked malware); 26-29 (discussing how people moved to cloud-based servers); 29-32 (discussing IP cloaked phishing sites); 67 (discussing origin of cookies); 67 (discussing TocMail's product); 68-69 (discussing a criminal hacker named Hector Monsegur); 70-72 (discussing how Google is working to prevent IP Cloaking); 72 (discussing how Facebook is suing over cloaking); 73-76 (discussing TocMail's product); 89-91 (reciting TocMail's requests for admissions).

1364 (S.D. Fla. 2015) (excluding expert and noting "expert testimony generally is not helpful when it offers 'nothing more than what lawyers for the parties can argue in closing arguments'") (quoting *U.S. v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004)). *See also Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 3289076, at *1 (E.D. Wis. June 28, 2013) (granting motion to exclude where the expert was "retained simply to serve as a mouthpiece for [the plaintiff's] President and CEO, and [] CFO"). Here, Wood *is* TocMail's CEO and, as explained above, his opinions are nothing more than self-serving, conclusive statements that reiterate TocMail's claims and should be excluded.

In addition, Wood provides a host of "'bad company' opinion[s] not grounded in expert analysis, [which] has marginal relevance to the [c]ase and should be excluded." *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d at 1339. For example, Wood's Executive Summary concludes, "[i]t's indisputable that Microsoft knew that its cloud email security was defenseless when it announced the launch of Office 365," Wood Report at 3, and that "Microsoft knew that hackers were hiding malware by redirecting Microsoft's IP addresses to benign content in 2009." *Id.* at 8. Therefore, he continues, Microsoft engaged in "willful, intentional deception." *Id.* at 4. Wood's report also provides a bulleted list of "Microsoft's Confessions." *Id.* at 33. However, Wood's opinions on Microsoft's knowledge and intent are improper and "are inadmissible: courts have held that the question of (corporate) intent or motive is a classic jury question and not one for experts." *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d at 1338. And, where there is a "risk that [an expert's] testimony serves more as advocacy for [the] [p]laintiff [] and less as an objective source of needed information," it is appropriate to exclude the expert. *Ulysse v. Waste Mgmt. Inc. of Fla.*, No. 11-CV-80723, 2013 WL 12177854, at *3 (S.D. Fla. Oct. 29, 2013) (citing *Lippe v. Bairnco Corp.*, 288 B.R. 678, 685 (S.D.N.Y. 2003) ("An expert's role is to assist the trier of fact

by providing information and explanations; the expert's role is not be an advocate.")). That is the case here, where Wood's testimony unobjectively favors TocMail's position and does not provide or explain necessary information to the jury.

In sum, Wood is nothing more than a businessman trying to advance his company's and his own goals.  He is conflicted, biased, and unqualified to provide expert opinions on Microsoft's advertising and the inner workings of Safe Links. His report promotes his product, denigrates Microsoft, and contains narrative and legal argument that TocMail's counsel can make. It does not assist the factfinder in understanding the evidence or determining a fact in issue through the application of specialized or technical expertise, and thus Wood must be excluded from testifying as an expert. *Edwards*, 580 F. App'x at 823 (affirming exclusion of expert's opinions and noting "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

### C. Wood Fails to Use Any Methodology, Let Alone a Reliable Methodology to Reach His Opinions.

Wood has not applied any methodology, standard, or test to form his conclusions. Instead, a significant portion of his report and opinions rely upon a video and statements made by Mikail Tunc, a third-party Wood does not consider to be an expert. Wood Tr. Vol. 1 at 18:2-6; 19:6-11; 42:15-22; 43:25:44:2; *see* Wood Report at 61-67. Tunc's video is a recording of Tunc purportedly using his cellular phone to click on a URL "in Safe Links" (as the narration calls it – not in Outlook) and his phone being sent to the original URL, which is allegedly a malware download page. Wood Report at 62, 63, 66. It is unclear how the "test" was performed and the video demonstration does not show anything other than a "Bank" and red bug icons, with arrows directing to the words "Safe Links" and "TocMail," while a voiceover narrates. *Id.* Wood relies on the dubious video to reach the conclusion that "Safe Links' users will never be safe from links that alter their destination after

delivery for as long as Safe Links continues to send users to the original URL." *Id.* at 60-61. But the video is nothing more than an illustration. Wood admits "that part is illustrative … here's what would happen in the real world, but we're not going to intentionally infect Mikail Tunc's phone with malware." Wood Trs. Vol. 2 at 103:4-10. Thus, not only is this demonstration not a realistic simulation, but it shows that *Safe Links worked as advertised*. Wood admits that malware never reached Tunc's phone in the video. *Id.* at 103:11-15 ("Q. So – so in the video, and in the example, just so we're clear and the jury's clear, Safe Links didn't allow any malicious content to reach the user, right? A. That is correct."); 56:7-11 ("Q. So in this demonstration with Mr. Tunc what you're doing is having Safe Links redirect to a non-malicious site; true? A. Yes, Safe Links was redirected to a non-malicious site."). And because Safe Links works to identify and block actual malicious links, it would not have identified the benign "test" link as malicious and blocked it, but would instead allow the user to go to the benign link, as it did here. Deposition of Jason Rogers, dated March 17, 2021, attached as "**Exhibit 4**" ("Rogers Trs.") at 88:7-13.

Indeed, Tunc's video demonstration fails to substantiate Wood's opinion; nor does Wood conduct his own test of the Safe Links feature. Instead, he merely observes and refers to Tunc's "illustrative" video that actually shows Safe Links did its job. Wood Report at 61-67. This is insufficient to meet the standard of reliability required under *Daubert. See Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 666 (M.D. Fla. 2012), *aff'd*, 725 F.3d 1377 (Fed. Cir. 2013) ("*Daubert* … requires courts to determine whether the expert has used a reliable methodology."). "As the Eleventh Circuit has explained, district courts must conduct 'an exacting analysis of the foundations of expert opinions.'" *Id.* (citing *Frazier*, 387 F.3d at 1260). As such, this Court must find Wood's opinions are "properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an

accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, Adv. Comm. Note. Here, Wood's opinions, based on an unrealistic and unverifiable simulation performed by a third party, are not well-grounded or well-reasoned and should be excluded.

Moreover, the Tunc video is inadmissible hearsay because it is an out-of-court statement by a declarant who was not made available to testify[4], and is being offered to prove its truth. Fed. R. Evid. 801-802. Wood cannot rely on Tunc's video as this would improperly permit Wood to become a conduit for the opinion of another person who is not subject to cross-examination. This cross-examination is critical because Wood admitted that he and Tunc had a "fundamental difference of opinion that … prevented [Wood] from collaborating" with Tunc beyond the video recording. Wood Trs. Vol. 2 at 60:8-12. Therefore, Wood's opinions based on the Tunc video must be excluded. *See In re 3M Combat Arms*, 2021 WL 948839, at *3 (finding testimony was nothing more than a "mere conduit[] for hearsay"); *Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 07-CIV-21404, 2009 WL 2208166, at *2 (S.D. Fla. July 24, 2009) ("admission of this hearsay evidence would undermine the rules of evidence because it impermissibly permits the testifying experts to bolster their opinions and creates the danger that the testifying expert will in fact serve as conduits for the opinions of others who are not subject to cross examination.").

Further, Wood's opinions are based on nothing more than his own unsupported conclusions and assumptions. For example, Wood testified: "I know that Safe Links does not work as

---

[4] TocMail was asked to make Mr. Tunc available for deposition because his video is a significant part of the Wood Report and Microsoft sought the opportunity to cross-examine Mr. Tunc instead of relying on Wood's interpretation of Mr. Tunc's video. Wood Trs. Vol. 1 at 33:20-35:9. Although Wood had communications with Mr. Tunc and was able to make him available for the preparation of his expert report, TocMail responded that "[w]e have absolutely no ability to produce him [to testify]," *id.* at 34:25-35:1, and Mr. Tunc was not made available to Microsoft for deposition.

advertised … I know that 100 – I don't have to go beyond my own personal knowledge to know that." Wood Trs. Vol. 1 at 45:11-15. He also testified that he would "come to the same conclusion" even without the work of ethical hacker Mikail Tunc, criminal hacker Hector Monesgur, or cybersecurity company Rhino Security Labs, on which he relies.[5] *Id.* at 47:4-12. Moreover, after hearing testimony from Microsoft's corporate representative and Safe Links engineers on Safe Links' server configuration, which runs contrary to his opinion as to why Safe Links fails to work,[6] Wood simply rejected the evidence presented. *Id.* at 54:19-61:8. Despite admitting that Microsoft's engineers "know[] more than me about the server configuration," *id.* at 57:8-15, he continued to conclusively opine (in line with and in support of TocMail's incorrect theory), that "Safe Links is a service that's run on [known] EOP servers. Safe Links has the same IP addresses as EOP. To admit that EOP is defenseless against IP Cloaking is to admit that Safe Links is defenseless as well." Wood Report at 41; *see* Wood Trs. Vol. 1 at 54:19-61:8.

---

[5] "While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, such expert must make informed findings and not merely regurgitate another expert's opinion." *Davis on Behalf of J.D.D. v. Carroll*, 329 F.R.D. 435, 442 (M.D. Fla. 2018). Thus, in addition to being inadmissible hearsay, the fact that Wood blindly relies on third-parties' work and statements to formulate his conclusions, without doing anything more with them, is another reason why his opinions should be excluded.

[6] The crux of TocMail's argument is that Microsoft has falsely advertised its Safe Links feature because Safe Links is vulnerable to a hacking technique known as IP Cloaking. Am. Compl. ¶¶ 55, 73. TocMail's basis for its claim is that "ATP Safe Links runs on [Exchange Online Protection "EOP"] servers and therefore ATP Safe Links has the exact same IP addresses as EOP[.]" *Id.* ¶ 61; Wood Report at 6-7. Wood claims these IP addresses are publicly known (and easily deployed via a free software called MKHTAccess_Red). Wood Report at 10; Wood Trs. Vol. 2 at 95:2-11, 96:1-2. Hackers can therefore use these publicly available IP addresses for IP Cloaking. Wood Report at 10. But contrary to TocMail's assumption, Safe Links' URL detonation occurs on "**separate servers** [from EOP servers] that are deployed in a completely separate way." *See* Rogers Trs. at 152:24-153:4 (emphasis added); *see also id.* 151:9-153:12; Deposition of Microsoft Corporate Representative Amar Patel, dated March 9, 2021, attached as "**Exhibit 5**," at 46:18-47:1 ("ATP has its own set of servers and Safe Links has its own set of servers"); Deposition of Amar Patel, dated March 10, 2021, attached as "**Exhibit 6**," at 46:24-47:3 ("Safe Links has its own dedicated set of servers.").

But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," as there is here. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014) (quoting *General Elec. Co. v. Joiner* 522 U.S. 136, 146 (1997); *Cook ex rel. Est. of Tessier*, 402 F.3d at 1111 (same) (affirming district court acted within its discretion in excluding the testimony of plaintiff's proffered expert); *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions, as we have here."). Indeed, "[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702, Adv. Comm. Note. Accordingly, because Wood lacks the qualifications necessary to render his opinions and his opinions are unhelpful to the jury and based on nothing more than his unsupported assumptions and speculation, Wood's opinions and testimony should be excluded.

## IV.    BOUR'S OPINIONS SHOULD BE EXCLUDED

### A.   Bour Did Not Use a Reliable Methodology to Establish a Disgorgement Figure that Fits TocMail's Theory of the Case.

To seek disgorgement of profits damages, TocMail has the initial burden of establishing Microsoft's sales for *Safe Links*. 115 U.S.C. § 1117(a); Expert Report of Marcie D. Bour, attached as "**Exhibit 7**" ("Bour Report") at ¶ 48. TocMail retained Bour to calculate TocMail's alleged disgorgement damages, but she failed to do so by not calculating Safe Links' sales, if any, that were directly attributable to the alleged wrongful conduct at the center of this case: Microsoft's three purportedly false advertising statements about Safe Links.

Bour and TocMail admit that the Safe Links feature cannot be purchased on its own and can only be obtained if a consumer purchases one of two larger Microsoft software suites: the

Defender/ATP security suite or an Office 365 suite that includes Defender/ATP. *See* Deposition of Marcie Bour dated March 15, 2021, attached as "**Exhibit 8**" ("Bour Trs.") at 23:11-17; Am. Compl. ¶ 57. Bour also recognizes that ATP and Office 365 contain a variety of services and sub-products within them. Bour Trs. 28:13-24. For example, ATP and Office 365 contain Safe Attachments, Word, PowerPoint, and Excel. Expert Rebuttal Report of Keith Ugone, attached as "**Exhibit 9**" ("Ugone Report") ¶¶ 70, 72; Am. Compl. Ex. 4 (Office 365 ATP Product Guide listing services, including Safe Attachments, among others); *Id.* Ex. 5 ("Office 365: Everything You Want to Know," listing Skype, Yammer, SharePoint, Microsoft Teams, Microsoft Office, and other applications). Each of these features, services, and sub-products has value, and their collective value is what creates the sale price of ATP and Office 365. Ugone Report ¶¶ 70, 71. Yet, Bour used the revenues for ATP and Office 365 to calculate TocMail's alleged damages instead of the revenues for the sole feature at issue, Safe Links. *Id.*; Bour Report ¶ 15.

Because Microsoft sales information is maintained at the product level and not at the feature level, revenues attributable to Safe Links are not available, although revenues for ATP and Office 365 are available. Bour Trs. 58:17-23, 59:5-18, 60:2-11; Deposition of Microsoft Corporate Representative Kathryn Griffith dated March 23, 2021, attached as "**Exhibit 10**" ("Griffith Trs.") at 8:22-9:15; 21:16-24. In this instance, it was up to Bour, the expert, to assign a value to the individual Safe Links feature within the broader products in which it is included, and then use that valuation to determine what percentage of revenues from ATP and Office 365 are directly attributable to Safe Links. Ugone Report ¶ 72. Bour failed to do that. Bour Trs. 64:8-18.

Bour testified that she did not even attempt to assign a value to Safe Links individually, but relied on the total value of Office 365 because she was operating under "the theory … that the safety offered by … Safe Links is a critical part of the brand and its image as being a safe product."

Bour Trs. 43:3-10, 114:14-25. Not only did she make an unjustified leap in assigning the total value of Office 365 to the individual feature of Safe Links, but Bour did nothing to verify the implausible theory that the safety provided by Safe Links is so integral to products like ATP and Office 365 that they are literally worthless without it. This alone is reason to exclude her opinion, as her calculation is based on rampant speculation that is not grounded in the facts of the case. *See First Premium Servs., Inc. v. Best W. Int'l, Inc.*, No. 95-1466-CIV, 2004 WL 7203535, at *3 (S.D. Fla. Jan. 8, 2004) (excluding expert where he "did nothing to determine the[] accuracy" of underlying facts and his "unquestioning reliance on the returns renders his opinions unreliable"); *see also Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1255–56 (11th Cir. 2010) (finding expert's "conclusions were not logically supported by the facts of this case" and noting "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). In fact, Bour cannot rely on this faulty theory because it runs directly contrary to the evidence in this case. TocMail has no consumer survey or other evidence to prove that, to consumers, the feature imparting all value to ATP and Office 365 is Safe Links. Instead, the evidence shows that on March 15, 2021 only 2.7% of commercial tenants worldwide even had the Safe Links policy within ATP or Office 365 turned on. *See* Microsoft's Response to Plaintiff's Interrogatory No. 22, attached as "**Exhibit 11**." In other words, approximately 97% of users did not deem Safe Links to be a useful component of the product they purchased – they chose to not even use it.

A proper apportionment analysis, which Bour was required to do, is not impossible. "There's a number of different methodologies that can be used to take a larger revenue base or even the revenues associated with a multifeatured or multifunctionality product and, in a sense, parse that down to what's in dispute," including a survey or conjoint analysis, to determine "the

difference between willingness to pay versus what the market price is," and a "before-and-after analysis" of Office 365 or ATP before it had the Safe Links feature and after. Deposition of Microsoft's Rebuttal Expert Keith Ugone dated March 22, 2021, attached as "**Exhibit 12**" ("Ugone Trs.") at 216:16-22; 218:14-219:2. Yet, Bour admitted that she did not make any effort to calculate Safe Links revenues, and instead simply relied on revenues for ATP and Office 365 in calculating TocMail's damages, and, in so doing, she failed to employ the "level of intellectual rigor that characterizes the practice of an expert in [her] field." *Kumho Tire Co*., 526 U.S. at 152; *see* Bour Trs. 37:4-8, 39:23-40:3, 40:10-18, 43:3-10, 64:8-18, 114:14-25.

Consequently, the disgorgement damages figures Bour ultimately reaches—the "Microsoft Identified U.S. Revenue for Office 365/Microsoft 365 and Related Products that include OATP and/or Safe Links" and "Estimated Global Revenue for Office 365/Microsoft 365 and Related Products that include OATP and/or Safe Links" for fiscal years 2016 to 2020, in an amount of $7,265,476,519 and $14,181,675,655, respectively—are grossly overinflated and flawed. Bour Report ¶ 75. These figures also do not provide a reliable measure of damages attributable to the alleged wrongful conduct. TocMail's theory of the case is that Safe Links (not ATP or Office 365) fails to perform as advertised and that purchasers of ATP and Office 365 were materially deceived by Microsoft's advertising of *Safe Links*, which caused them to purchase the broader ATP or Office 365 products. Am. Compl. ¶¶ 84, 85. Thus, in not apportioning ATP and Office 365 revenues, Bour failed to tie the profits TocMail seeks to disgorge from Microsoft from the sales of ATP and Office 365 directly due to the advertising of Safe Links. *See generally Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). Accordingly, Bour's methodology is flawed, her damages calculation is overstated, and her report, opinions, and testimony should be excluded as misleading and unreliable. *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582

F.3d 1227, 1233–34 (11th Cir. 2009) (affirming exclusion of plaintiff's expert's opinion on injury and damages that was too broad and ill-fitting for plaintiff's liability theory); *Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp. 2d 1299, 1304, 1306 (S.D. Fla. 2010) (citations omitted) (because the expert did not provide an "adequate explanation in the report, deposition, or at oral argument, the [c]ourt can only conclude that the [p]laintiffs have failed to meet their burden of establishing the reliability of the methodology[.]") (citations omitted).

> **B. Bour's Disgorgement and Lost Profits Calculations Are Unreliable and Unhelpful Because They Were Not Reached by Applying Any Scientific Methodology or Causation Analysis.**

Not only did Bour fail to assign a value to Safe Links and derive a portion of Microsoft's U.S. and global ATP and Office 365 revenues to Safe Links, Bour also failed to determine the amount of Microsoft's revenue that is attributable to consumers who purchased ATP or Office 365 *because of* the three purportedly false advertising messages about Safe Links. In addition, Bour's lost profits calculation fails to determine TocMail's lost sales *because of* the three purportedly false advertising messages about Safe Links. Without any evidence of such causation—which there is none—Bour's damages are too speculative.

Bour explains she was not hired to perform her own causation analysis and that she was depending on someone else to establish the underlying assumptions of her calculations. *See* Bour Trs. 56:23-57:2 ("I am not going to be providing testimony with regard to causation, whether Mr. Wood or TocMail or some other party that I'm not aware of is providing that testimony. I'm relying on somebody else establishing that."); 138:25-139:3 ("from a causation perspective, the assumption is that the false statements contributed towards the image of Microsoft and Microsoft being safe from IP cloaking"); 149:19-22 ("[m]y assumption is that the false advertising resulted in TocMail being unable to market its product and absent that, I have forecasted the lost profits."). Yet, this never occurred; neither Wood, nor anyone else, ever conducted a consumer survey or

provided any type of causation opinion in an expert report on which she could rely. *See generally* Wood Report. Accordingly, Bour's disgorgement and lost profits calculations both assume, without any basis, that all consumers who purchased ATP or Office 365 with the Safe Links feature (i) were exposed to the at-issue statements about Safe Links, (ii) were confused by these statements in the manner alleged by Plaintiff, and (iii) changed their purchasing behaviors (either to purchase ATP or Office 365, or to not purchase TocMail) as a result of their exposure and confusion arising from the allegedly misleading statements. Ugone Report at p. 4(d), ¶ 65. Bour did not conduct any study to confirm these assumptions on which the prospect of any damages depends, she did not review testing in this regard performed by another, nor did she review any documents or even ask for underlying supporting data for these conclusions; in fact, she is not even aware of who (if anyone at all) would be providing a causation analysis. Bour Trs. 56:23-57:2, 121:21-122:8.

The assumptions underlying Bour's calculations are not grounded in reality. Had Bour reviewed the alleged false statements from the actual materials in which they are found, it would be apparent that the statements and materials themselves were hard to access. *See* Ugone Report ¶ 46 (detailing the steps a consumer would need to take to navigate the Microsoft website to locate the materials and scroll to the appropriate page, where in some instances, the documents are 115 pages long). The statements were also made to an intended audience of IT professionals who are well-versed in cybersecurity and not to average consumers, *see* Deposition of Debraj Ghosh dated March 11, 2021, attached as "**Exhibit 13**," at 46:2-13, 132:10-25, thus supporting a likelihood that the statements would not be viewed by many, and certainly not all, Microsoft customers. In addition, the deceptive messages at issue do not mention IP Cloaking, (*see* Am. Compl. ¶¶ 58, 63, 72, 75), therefore it is unlikely that Microsoft customers would infer from those statements that

Safe Links solves the IP Cloaking issue and form such a misunderstanding, let alone change consumer purchasing decisions, as she assumes.

Despite her failure to apply a causation analysis, Bour admits that "causation is [] integral." Bour Trs. 56:5-9. Indeed, absent any such analyses, Bour simply performs mathematical calculations rather than a reliable determination of TocMail's damages attributable to Microsoft's alleged false advertising. But this type of "expert opinion is not helpful and the risk is too great that the trier of fact will be confused or place undue weight on such an opinion." *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1124 (S.D. Fla. 2014). *See* Ugone Trs. at 65:1-2, 15-22 (explaining Bour is "just doing math" and the "underlying portion of [] Ms. Bour's proposed monetary remedies represent mathematical calculations, … rather than reliable measures of damages attributable to alleged wrongful conduct"); *id.* at 22:4-14. *See Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1245 (M.D. Fla. 2003) (striking plaintiff's expert report because expert failed to consider various factors and "does not purport to value the business, only 'do the math'"). Because Bour has no foundation to support her math, her damages figures are nothing more than unsupported conjecture and should be excluded for this reason alone.

### C. Bour Relies on Unsupported Assumptions and Unrealistic Market Conditions to Reach an Unreliable and Unscientific Lost Profits Figure.

TocMail has not had a single sale since its launch in December 2019 and has no valuation. Bour Trs. 92:21-93:1. Despite this, Bour's lost profits calculation is based on TocMail being a billion dollar a year company. *Id.* at 47:5-7. This valuation is seemingly pulled out of thin air. Bour admits that she is capable of performing a valuation of a company but did not perform one of TocMail because she was not asked to do so. *Id.* at 91:8-12; 92:21-93:4, 93:22-94:1. What she was asked to do is assume many unreasonable facts, numbers, and theories provided by Mr. Wood and

TocMail's counsel. *See, e.g.,* Bour Trs. 77:6-18; 99:20-100:1; 126:21-127:11; 138:21-139:4; 148:24-149:4.

For instance, Bour calculated TocMail's lost profits through the year 2035 by "assum[ing] that TocMail would be the subject of a press release, which would generate interest in the product. It would take 30-90 days for companies to investigate TocMail and the claims in the press release. Revenue is forecasted to begin at 50% of the projected seats in February 2020, and 75% of projected seats in March 2020. The remaining customers would switch to TocMail in April 2020."[7] Bour Report ¶ 82. In other words, Bour's lost profits analysis boldly assumes that by April of 2020—four months after the company launched—*every* Microsoft Defender/ATP and Office 365 customer would have switched to TocMail[8] after having reviewed and investigated a single TocMail press release but for the allegedly false ads at issue, and that TocMail would retain this market share for at least 15 years. Bour Trs. 24:14-25:7, 145:12-147:16; Bour Report ¶¶ 81-83.

---

[7] This assumption is unrealistic not only because of the extremely truncated timeframe in which TocMail expects to capture all of Microsoft's Office 365 and Defender/ATP customers, but also because these dates have passed, and the events never occurred. That is, Bour speculates about the past and what could have happened had TocMail done a press release, but it did not, or at least, we know it did not generate interest. Damages figures based on such a faulty premise renders them unreliable.

[8] Bour makes this preposterous leap despite the fact that she admits that Safe Links is part of one of two larger Microsoft software suites, Bour Trs. at 23:11-17, 59:5-18, and recognizes that Defender/ATP and Office 365 contain a variety of services and sub-products within them. *Id*. at 28:13-24. Thus, Bour acknowledges that TocMail is not equivalent to ATP or Office 365. Indeed, TocMail's single-purpose feature (purportedly designed to avoid malicious links)  functions via a RoundCube plugin that works with an email platform, and it does not purport to provide the variety of services Office 365 can provide, such as Skype, Yammer, SharePoint, Microsoft Teams, and other applications such as Word, PowerPoint, and Excel, for example. *See* Wood Report at 76; Ugone Report ¶¶ 70, 72; Am. Compl. Ex. 4, 5. Thus, Bour's assumption that *every* Defender/ATP and Office 365 consumer would abandon Microsoft in favor of TocMail requires the absurd premise that *every* Microsoft consumer is not only interested in TocMail, but is also willing to forgo all of these additional services within their Office 365 and Defender/ATP suites. Alternatively, that consumer would have to buy TocMail's plugin in addition to Microsoft's offerings, and thus, Microsoft would not lose *all* of its consumers as Bour predicts.

Indeed, Bour speculated that "the market would take care of itself with the press release and sales, without requiring TocMail to spend somewhere between 14 and 16 percent of its revenues to get the word out about TocMail." Bour Trs. 80:3-8. She states the press release is an "impetus" for TocMail's rapid growth, but points to no marketing plans, market research, or back-up data, and instead admits that *her "numbers were developed in conjunction with Mr. Wood." Id.* at 44:13-47:1 (emphasis added).[9] Based on what Wood told Bour, she also assumes that after TocMail poached every single Microsoft Office 365 and ATP customer, the startup would have the infrastructure, servers, and personnel to support these one hundred million customers within a matter of five months. *Id.* 35:9-20. Such unverified assumptions and numbers merely provided by TocMail render Bour's opinions and calculations fatally conclusive and unreliable. *See Companhia Energetica Potiguar,* 2016 WL 7507848, at *8 (excluding expert testimony where expert "blindly relied on [plaintiff]-fed information … without doing h[er] own independent investigation").

Based on all these assumptions, Bour calculated her lost profits figure by taking the total number of Microsoft Office 365 and ATP customers, multiplying it by the cost of TocMail's service, which would gradually increase at 1% a year, and then projecting that calculation out through the year 2035. Bour Report ¶¶ 80-83. Bour further assumes that for the next 15 years TocMail would have a 98% profitability rate, which she admitted is an unusually high profitability rate in her experience. Bour Trs. 84:23-85:8. Indeed, such an astronomical number cannot meet *Daubert's* reliability prong.[10] Moreover, to keep the numbers artificially high, she did not account

---

[9] As discussed *supra*, however, Wood is not a qualified marketing expert, nor was he designated as one. *See* Wood Report at App'x 195.

[10] *See* Ugone Trs. 189:24-190:10 ("I did my research on email security firms, including two identified by TocMail, and then three more identified by, you know, articles that identified other email securities firms. And so I looked to see what are the general profitability rates associated

for certain costs and assumed, for example, there will be no need for TocMail to spend on research and development through 2035. *Id.* 74:15-25, 77:6-18; Ugone Trs. 25:10-15. Yet, such an assumption defies reality in a constantly evolving field like cybersecurity. Thus, without performing a market analysis, Bour reached an unfounded lost profits figure of $15,304,059,336,[11] which should be excluded. *See* Bour Report at ¶ 110. *See R & R Int'l, Inc.*, 2010 WL 3605234, at *15 (finding future profit analysis "falls short" because expert failed to perform market analysis and relied on speculation); *Lancaster v. Harrow*, No. 8:17-CV-634-T-33JSS, 2018 WL 3650119, at *5 (M.D. Fla. Mar. 28, 2018) (court agreeing that expert's "report contains unsupported speculation," "lacks the historical rates and comparable transactions," opinions "are based upon nothing but subjective conclusions which do not logically follow any process," and "are nothing more than conclusory statements with no articulated methodology or support as required by *Daubert*."); *Lincoln Rock, LLC v. City of Tampa*, No. 8:15-CV-1374-T-30JSS, 2016 WL 6818959, at *8 (M.D. Fla. Nov. 18, 2016) (finding expert's "methodology also assumes [plaintiff] would have opened its doors, would have generated enough revenue to survive, would have achieved profitability, and would have been an appealing acquisition target…." But "[t]hese

---

with those companies and they're nowhere near the 98 percent, whether you're talking about gross margins or whether you're talking about net margins. Clearly on the net margin level, but also at the gross margin level, they're not close to the 98 percent. That should be a signal that you're missing something.").

[11] Bour later reduced her initial lost profits figure at her deposition to $9,537,453,935, stating that "[s]ufficient information has not been obtained to quantify the consumer seats, [] for purposes right now of lost profits" so "the lost profits damages has been reduced and the portion related to consumer sales has been for purposes of my calculation today not included." Bour Trs. 22:7-9, 22:16-19. "Lack of data, however, cannot overcome [an expert's] failure under *Daubert* to employ scientific methods or rely on adequate data in performing his future lost profits analysis." *R & R Int'l, Inc. v. Manzen, LLC*, No. 09-60545-CIV, 2010 WL 3605234, at *16 (S.D. Fla. Sept. 12, 2010) (excluding expert's lost profits opinions).

conclusory observations, combined with the flawed [] methodology, are too speculative to support [expert]'s damage estimate [and] fails the reliability-prong of *Daubert*.").

Additionally, Bour's calculation requires that this Court also accept the premise that not one consumer would have transitioned to another competitor in the market, such as Proofpoint or Mimecast, for example.[12] Bour Trs. 148:24-149:4 ("Q. … you're assuming that TocMail would be more successful than any other third-party product of which you know? A Yes); Ugone Trs. 89:7-15, 89:25-90:5, 92:13-93:11, 109:7-110:14, 172:17-173:8. Indeed, not only are numerous unreasonable assumptions injected into Bour's damages calculations, but she also excludes reasonable considerations. Bour's but-for world fails to factor in any competitors in this market space, which is shortsighted and unrealistic. Bour Trs. 99:20-100:1 ("Q: Did you as part of your assumptions make the assumption that TocMail, despite the highly competitive environment and companies spending $125 billion annually on security, did you make the assumption that there would be no competitors to the TocMail patent for over 15 years?  A: Yes"); Ugone Trs. 25:10-12, 66:3-14. Finally, Bour failed to consider whether Microsoft would revise or take down any of the messages at issue and how that could impact sales, which is inherently inconsistent with her assumption that the Court rule in favor of TocMail, given that TocMail seeks injunctive relief. Ugone Trs. 42:8-14; 50:1-10. What Bour did not do is as problematic and insufficient as what she did do. *See First Premium Servs.*, 2004 WL 7203535, at *4 (finding expert's "failure to consider

---

[12] Proofpoint and Mimecast are cited by TocMail as examples of "other cloud-based, time-of-click, redirect services have the exact same design flaw." Am. Compl. ¶ 99. As stated by Microsoft's expert, Dr. Ugone: "Proofpoint and Mimecast earned revenues of $890 million and $430 million in the last year, respectively. This demonstrates that Microsoft's advertisements regarding its security products do not prevent third-party security software producers from making significant sales of their own products." Ugone Report ¶ 50(b). It further shows that "Ms. Bour's analysis, which assumes that **every** at-issue Microsoft customer would purchase the TocMail product absent the allegedly misleading statements, is unreliable." *Id.*

additional components of a valid damage analysis renders his lost profits calculation inadmissible… For example, Mr. Freeman did no analysis and failed to consider IIIFL's efforts or opportunities to mitigate damages.").

Here, there is no question that the number and significance of unfounded assumptions underlying Bour's lost profits calculation renders it wholly speculative and unreliable, and her testimony and opinions regarding same should be excluded. *See BGW Design Ltd., Inc. v. Serv. Am. Corp.*, No. 10-20730-CIV, 2011 WL 13172487, at *2 (S.D. Fla. Nov. 30, 2011) (granting motion to exclude expert's lost profit calculation because her "opinions are based largely on speculation and conjecture."); *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1346 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (finding lost profits for proposed new product was not recoverable because "[plaintiff's] claim–linking [defendant's] conduct to [plaintiff's] alleged lost profit damages—is contingent on the validity of an even longer list of assumptions" with respect to bringing the product to market); *see also Sun Ins. Mktg. Network, Inc.*, 254 F. Supp. 2d at 1247 (excluding expert's opinion with respect to lost profits because it "is based on several assumptions which are not grounded on known facts, but speculation and conjecture on what might have happened").

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Wood and Bour should be barred from testifying at trial and their opinions should be excluded in their entirety.

## CERTIFICATION REGARDING PRE-FILING CONFERENCE

Pursuant to Local Rule 7.1(a)(3), undersigned counsel for Microsoft certifies that they have conferred with counsel for TocMail on May 18, 2021 via telephone in a good faith effort to resolve the issues raised in this Motion and the parties were unable to reach an agreement.

Dated:  May 26, 2021                    Respectfully submitted,

By */s/ Evelyn A. Cobos*_____
EVELYN A. COBOS

**GREENBERG TRAURIG, LLP**
Mary-Olga Lovett (*admitted pro hac vice*)
Texas Bar No. 00789289
1000 Louisiana, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile: (713) 754-7541
Email: lovettm@gtlaw.com

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
FRANCISCO O. SANCHEZ
Florida Bar No. 598445
Email: sanchezo@gtlaw.com
        orizondol@gtlaw.com
EVELYN A. COBOS
Florida Bar No. 092310
Email: cobose@gtlaw.com
        FLService@gtlaw.com

***Attorneys for Defendant,***
**MICROSOFT CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of May, I served for foregoing document on all counsel of record identified on the below Service List in the manner specified.

/s/ *Evelyn A. Cobos*
EVELYN A. COBOS

## <u>SERVICE LIST</u>

JOHNSON & MARTIN, P.A.
Joshua D. Martin
500 W. Cypress Creek Rd., Suite 430
Ft. Lauderdale, FL 33602
Tel: (954) 790-6699
Fax: (954) 206-0017
Email: josh.martin@johnsonmartinlaw.com

*Attorneys for Plaintiff*