# APPENDIX
# 181

# Finding the Linchpins of the Dark Web: a Study on Topologically Dedicated Hosts on Malicious Web Infrastructures

Zhou Li, Sumayah Alrwais
*Indiana University at Bloomington*
{lizho, salrwais}@indiana.edu

Yinglian Xie, Fang Yu
*MSR Silicon Valley*
{yxie, fangyu}@microsoft.com

XiaoFeng Wang
*Indiana University at Bloomington*
xw7@indiana.edu

*Abstract*—Malicious Web activities continue to be a major threat to the safety of online Web users. Despite the plethora forms of attacks and the diversity of their delivery channels, in the back end, they are all orchestrated through *malicious Web infrastructures*, which enable miscreants to do business with each other and utilize others' resources. Identifying the linchpins of the dark infrastructures and distinguishing those valuable to the adversaries from those disposable are critical for gaining an upper hand in the battle against them.

In this paper, using nearly 4 million malicious URL paths crawled from different attack channels, we perform a large-scale study on the topological relations among hosts in the malicious Web infrastructure. Our study reveals the existence of a set of topologically dedicated malicious hosts that play orchestrating roles in malicious activities. They are well connected to other malicious hosts and do not receive traffic from legitimate sites. Motivated by their distinctive features in topology, we develop a graph-based approach that relies on a small set of known malicious hosts as seeds to detect dedicate malicious hosts in a large scale. Our method is general across the use of different types of seed data, and results in an expansion rate of over 12 times in detection with a low false detection rate of 2%. Many of the detected hosts operate as redirectors, in particular Traffic Distribution Systems (TDSes) that are long-lived and receive traffic from new attack campaigns over time. These TDSes play critical roles in managing malicious traffic flows. Detecting and taking down these dedicated malicious hosts can therefore have more impact on the malicious Web infrastructures than aiming at short-lived doorways or exploit sites.

## I. INTRODUCTION

Technological progress often comes with side effects. Look at today's Web: not only does it foster a booming Web industry, but it also provides new opportunities to criminals who are rapidly industrializing their dark business over the Web. Today once you unfortunately click a malicious URL, chances are that those who victimize you are no longer individual, small-time crooks but an underground syndicate: some luring you to visit malicious websites through various channels (Spam, tweets, malicious advertising, etc.), some buying and selling your traffic through redirection, and the receiving ends of the traffic performing different exploits (drive-by downloads, scams, phishing etc.) on your system on behalf of their customers. Such a complicated attack is orchestrated through *malicious Web infrastructures*, which enable those miscreants to do business with each other and utilize others' resources to make money from their misdeeds. Indeed, such infrastructures become the backbone of the crimes in today's cyberspace, delivering malicious web content world wide and causing hundreds of millions in damage every year.

**Malicious Web infrastructures**. Given the central role those infrastructures play, an in-depth understanding of their structures and the ways they work becomes critical for counteracting cybercrimes. To this end, prior research investigated the infrastructures associated with some types of channels (e.g., Spam [2], black-hat Search-Engine Optimization (SEO) [11]) and exploits (e.g., drive-by downloads [23]). What have been learnt includes the parties involved in a malicious campaign (e.g., affiliates, bot operators [28]), the underground economy behind such campaigns and how these parties work together [15], [12]. Of particular interest is the discovery of extensive sharing of resources (e.g., compromised systems, redirection servers, exploit servers) within some categories of malicious activities.

With progress being made in this domain, still our knowledge about the malicious Web Infrastructures is rather limited. Particularly, all these prior studies stay at individual redirection chains that deliver malicious content through a specific channel (e.g., spam [2], twitter [14], malvertising [16]) or lead to a specific type of illicit activities (e.g., drive-by downloads, underground pharmaceutical business). What is missing here is an in-depth understanding of the big picture: what is the topological view of today's malicious Web infrastructures, and how are malicious entities related to each other and the legitimate part of the Web, across different redirection chains, different channels, and exploits? The answer to these questions could help us identify the linchpins of the dark infrastructures, differentiating those valuable to the adversary from those expendable. As a result, we will be able to build more effective and robust techniques that disrupt malicious activities at their common weak spots, without knowing their semantics and relying on any channel/attack specific features such as URL patterns that often can be easily evaded by the adversary. Also, knowing the topological relations among malicious entities, one can make better use of what has already been detected) to discover other malicious parties.

**Topologically dedicated malicious hosts**. To gain further understanding of malicious Web infrastructures, we study

nearly 4 million malicious URL paths crawled from different feeds, particularly the topological relations among the hosts involved their connectivity with legitimate Web entities. Our key finding is the existence of *topologically dedicated malicious hosts* that play orchestrating roles in the infrastructures. From the data we have, all URL paths going through them are confirmed to be malicious. These dedicated malicious hosts have a set of distinctive topological features. First, they seem to have strong connections with each other by forming tight *Host-IP Clusters* (HICs) that share IP addresses and Whois information. Second, they are extensively connected to other malicious parties, hosting over 70% of the malicious paths in our dataset. Finally, they are not found to receive any legitimate inputs, though they may redirect traffic to legitimate parties, e.g., when they cloak.

**Our work**. Since these topologically dedicated hosts and their HICs play a central role in linking different malicious paths together, it becomes important to detect them for breaking the malicious infrastructures. In our research, we come up with a new topology-based technique designed to catch these hosts without relying on the semantics of the attacks they are involved in. Intuitively, these dedicated hosts are rather easy to reach from the dark side of the Web while extremely hard to reach from the bright side. This observation fits perfectly with the concept of PageRank [3]: that is, they should be popular in the dark world but unpopular outside. Our approach starts with a relatively small set of known malicious HICs as seeds and a large number of known legitimate HICs as references, and propagates their initial scores across a Web topology using the PageRank algorithm to compute legitimate and malicious scores for other unknown HICs. In the end, those highly endorsed by the malicious hosts but way less so by the legitimate ones are identified as dedicated malicious HICs.

Our approach works surprisingly well: in our evaluation based upon 7-month data crawled from Alexa top websites [1], our approach detects about 5,000 new topologically dedicated malicious hosts and over 20,000 malicious host paths that are not captured by existing solutions, at a false detection rate as low as 2%. Our study further reveals the roles, the operation models, and the monetization strategies of these dedicated malicious hosts, particularly those that work as Traffic Distribution Systems (TDSes), which are professional traffic buying and selling systems that manage and keep record of traffic-exchange transactions. Our major detection results and interesting findings include:

• Our algorithm achieves a high detection rate. Even with a small set of seed malicious HICs (5% of the labeled ones), we can discover a large number of other malicious HICs, with an expansion rate of 12 times.

• Our detection algorithm is general across the use of different malicious seeds, including drive-by downloads and Twitter spam in our experiments. It can also detect malicious hosts set up through different attack channels, such as drive-by downloads and scam in our data.

• For the set of dedicated malicious hosts that serve as TDSes, they are much more long-lived than doorways or exploit sites (65 days vs. 2.5 hours). They receive malicious traffic from new attack campaigns over time. Disrupting their operations has more long-lasting effects than taking down doorways or exploit sites.

• Our study shows that even after TDSes are taken down, they continue to receive a large amount of traffic, 10 times more than legitimate parked domains. Such traffic is leveraged by domain owners through parking services to continue to gain revenues from ad networks.

**Contributions**. The contributions of the paper are summarized as follows:

• *New findings*. We conduct the first study on topologically dedicated malicious hosts, and discover their pervasiveness in malicious Web infrastructures and the critical roles they play. Our study reveals their topological features and the way they are utilized. We show that TDSes play an important role in managing and exchanging traffic flows the adversary uses to deliver malicious content and bring to the light how these malicious dedicated hosts evolve with time and how they are monetized by domain owners through parking services even after their domain names are taken down.

• *New techniques*. We develop a new technique that expands from known malicious seeds to detect other malicious dedicated hosts, based upon their unique features. Our approach works effectively on large-scale real data, capturing a large number of new malicious hosts at a low false detection rate.

**Roadmap**. The rest of the paper is organized as follows: Section II presents the background information of our research, including how data was collected; Section III discusses a measurement study over the data, which reveals the important role played by dedicated malicious hosts and their prominent features; Section IV describes the design and implementation of our detection technique; Section V evaluates our detection system on its efficacy; Section VI reports a study on all the malicious dedicated hosts we found; Section VII discusses a few issues of our study and potential future work; Section VIII reviews the related research and Section IX concludes the paper.

## II. DATA COLLECTION

In this section, we explain the data collection process and the methodology we use to label data for our study. This process serves two purposes: (1) It helps us prepare data for building the Web topology graph (Section III); (2) It labels known malicious and legitimate portions of the Web using existing techniques, so that we can study their distinctive topological features for detection. Later in Section IV, we show how we can leverage the topological features learned during this process to detect malicious URLs and hosts not identified before.

## A. Data Sources

| Feed | Start | End | # Doorway URLs |
|------|-------|-----|----------------|
| Drive-by-download | 3/2012 | 8/2012 | 1,558,690 |
| Warningbird | 3/2012 | 5/2012 | 358,232 |
| Twitter | 3/2012 | 8/2012 | 1,613,924 |
| Top sites | 2/2012 | 8/2012 | 2,040,720 |

Table I

DATA FEEDS USED IN THE STUDY.

We use four different data feeds to bootstrap data collection. Each data feed includes a set of doorway URLs that we leverage to crawl and analyze the redirection topology. Our data feeds include:

● *Drive-by-download feed:* Microsoft provides us with around 30 million doorway URLs that were found to deliver malicious contents (mostly drive-by downloads) and we sample 5% (1.5 million) from them for study.

● *Warningbird feed:* We download the malicious URL set posted by the WarningBird project [14]. This set includes over 300k suspicious URLs in Twitter spam.

● *Twitter feed:* We run Twitter Search APIs [29] to pick top 10 trending terms every day. We use these terms to collect related tweets and extract all the URLs they contain. This process gives us 1.6 million URLs.

● *Top-site feed:* We gather Alexa top 1 million web sites and update them every week. We obtain 2 million URLs in total, most of which are legitimate.

All together, we have gathered about 5.5 million initial URLs, which serve as inputs to a set of crawlers described below during a 7-month period to collect data.

### B. Redirection Chain Crawling

We deploy 20 crawlers, each hosted on a separate Linux virtual machine with a distinctive IP address, to explore the URL redirection paths of these 5.5 million doorway URLs. Each crawler is built as a Firefox add-on, which keeps track of all the network requests, responses, browser events and page content it encounters in a visit. Based on such information, our approach automatically reconstructs a redirection URL path for the visit, which links all related URLs together.

More specifically, such URL paths are built in a mostly standard way, similar to Google's approach [23] except the part for analyzing Javascript. Our approach detects redirections from HTTP status code (e.g. 302), Meta refresh tag, HTML code (e.g., iframe tag) and JavaScript. The dots (URLs) here are connected using different techniques under these different types of redirections. Actually, Firefox gives away the source and destination URLs through browser events when the redirection has HTTP 3xx status code or is triggered by Meta refresh, which allows us to link the source to the destination. For those caused by HTML, we can find out the URL relation according to the Referral field of the destination URL. What gives us trouble is the redirection triggered by Javascript code, which is not specified upfront by any HTTP and HTML fields. This problem is tackled in prior research [23] by simply searching the script code to look for the string similar to the URLs involved in the HTTP requests produced after running the code: if the edit distance between the URL in the request and part of the content the script carries is sufficiently small, a causal relation is thought to be found and the URL of the document hosting the script is connected to the request.

A problem for the approach is that it cannot capture a redirection when the adversary obfuscates the JavaScript code, which is common on today's Web: what has been found is that increasingly sophisticated obfuscation techniques have been employed to evade the detection that inspects redirections [5]. To mitigate this threat, we resort to dynamic analysis, instrumenting all JavaScript DOM APIs that can be used to generate redirections, e.g., `document.write`. When such an API is invoked, our crawler inspects the caller and callee to connect the URLs of their origins.

To increase our chance of hitting malicious websites, we set the crawler's user-agent to IE-6, which is known to contain multiple security-critical vulnerabilities. In addition, to avoid some malicious servers from cloaking to the requests with an empty Referral field [7], we set the Referral field of the initial request for each URL to `http://www.google.com/`. After visiting a web page, the crawler also cleans cookies to avoid tracking.

### C. Data Labeling

For each visit, our crawler generates a set of URLs and connects them according to their causal relations, which gives us a set of *URL paths* in terms of URL redirection chains. From URL paths, we further derive a set of *host paths* that keep only host names along the redirection chains. We proceed to label all the crawled URLs, URL paths, and host paths as malicious or legitimate using a combination of existing tools and methods.



Figure 1.   Redirections from a Forefront alarmed Page. The first redirection path is not marked as malicious since it leads to only a legitimate party. The second redirection path is a malicious path as the redirection is generated from an iframe injected by an attacker.

**Labeling of malicious URLs and paths**. Specifically, we first use Microsoft Forefront, an Anti-Virus scanner, to scan the contents associated with individual URLs encountered

during the crawling.[1] Once a node (i.e., a URL) is flagged by the scanner as containing malicious contents (typically code), the URL is labeled as *malicious*. The data crawled from Alexa top sites and Twitter feeds yield mostly legitimate URLs. The data crawled from the drive-by download and the Warningbird feeds, however, do not always yield malicious URLs for each visit. The reason is that drive-by download doorway URLs are sometimes hosted on compromised hosts, which may have already been cleaned up when we visit them. Therefore, the scan we perform helps avoid falsely marking them as malicious.

Once we label a URL as malicious, we treat all the URL paths going through it as *suspicious paths*. However, not all suspicious paths are malicious. For example, a malicious doorway page may lead to multiple paths, and only one of them leads to exploits. This happens when a malicious doorway page contains multiple URLs, some of which are legitimate and redirect to other legitimate sites (e.g., doubleclick), as illustrated in Figure 1. To avoid marking them as malicious, we further inspect whether there exists another non-doorway URL on a suspicious path also marked as malicious. If so, we label the corresponding path as a *malicious path*. For the paths whose doorway pages directly contain exploit code, we label these paths as malicious without the need of examining other URLs. If all the URL paths corresponding to a host path are labeled as malicious, we label the host path as malicious as well.

| | paths | malicious paths | malicious URLs | legitimate URLs |
|---|---|---|---|---|
| Drive-by-download | 17,228,137 | 3,789,640 | 238,596 | 1,079,903 |
| WarningBird | 19,858 | 19,858 | 5,587 | 6,871 |
| Twitter | 10,429 | 10,429 | 464 | 3,100 |
| Top Sites | 339,877 | 105,428 | 6,121 | 23,219 |
| Total | 17,598,301 | 3,925,321 | 250,627 | 1,111,104 |

Table II
DATA STATISTICS AFTER LABELING.

**Labeling of legitimate URLs**. We also label the remaining URLs that correspond to reputable domains or known services as legitimate URLs. To do so, we first cluster the non-malicious URLs based on their domains and manually examine the URL clusters with over 1,000 URLs each. Among these clusters, we identify 19 reputable ones, such as `google.com` and `facebook.com`, and we use them to label legitimate URLs. In addition, we use EasyList [21] and EasyPrivacy [22] to identify ad-networks and trackers. These two lists are also utilized by the popular browser plugin Adblock plus [20] to block ads and tracking scripts. Finally, since URL shorteners (e.g., `t.co`) are extensively used by Twitter users to embed URLs in Tweets, we also identify them using a known list compiled for this purpose [18].

Of course, this labeling process is not exhaustive. All

it does is to provide a set of URLs and paths that are confirmed malicious or legitimate based on existing tools (e.g., Forefront, whitelists). The rest of the URLs (78.51%) are treated as *unknown* and our goal is to come up with a methodology for automatically detecting malicious parties from them.

## III. TOPOLOGY-BASED MEASUREMENTS

In this section, we study the properties of malicious URLs and host paths. We focus on examining the topologies and the connections of malicious and legitimate entities. Our measurements reveal the existence of a set of topologically dedicated hosts that play critical roles in malicious activities. The unique properties of these hosts inspire us to develop a graph-based detection approach, which can capture these hosts without any information about their semantics, e.g., the content they accommodate or the code they run.

### A. Hostname-IP Cluster (HIC) Construction

To study Web entity topologies, one natural way is to examine individual URLs or hostnames. However, prior research shows that attackers often register hundreds of malicious hostnames, all pointing to a small set of IP addresses under one domain registrar [19]. Once a hostname is detected, attackers can quickly switch to another one in the pool. From the topology perspective, the signals of such short-lived individual URLs or hostnames may not be strong enough to distinguish them.

Instead, we explore the groups of URLs or hostnames that are controlled by the same attackers. For this purpose, we construct *Hostname-IP Clusters (HICs)* that capture the intrinsic sharing relations between hostnames and IP addresses. The concept of HICs has been used in prior research [33] to detect servers that play central roles in drive-by download campaigns. A problem of their definition is that it is solely based upon the relations between IPs and hostnames, which does not work well on today's Web, where attackers increasingly utilize hosting or cloud services. When this happens, all the hosts running on a cloud server will be clustered together.

Our solution is to use the Whois information [31] to guide this clustering process: two hosts sharing IPs are considered to be related only if their domain names are from the same registrar. Since malicious hosts strongly prefer low-cost, less well known registrars (see Section III-C), this treatment turns out to be very effective. More precisely, our HIC construction process is as follows:

I We assign a unique HIC instance to every hostname.
II We start to merge these HICs in a similar way to that in prior work [33]. The construction process iteratively inspects every pair of HICs. We first compute the overlapping of their IPs. Let $IPS_1$ be the IP set for HIC $H_1$, and $IPS_2$ be that of HIC $H_2$. $H_1$ and $H_2$ are considered to be merged if the Jaccard distance $\frac{IPS_1 \cap IPS_2}{IPS_1 \cup IPS_2}$ is larger than a threshold $T_{IPS}$. Similar

---

[1]We do not use Google Safebrowsing because a reported malicious URL may be hosted on a compromised site and already be cleaned by the time of our crawl.

to [33], we set this threshold to 0.5, to accommodate the IP variations caused by content-distribution networks (CDN) and fast-fluxing [10]. Besides this criterion, we take an additional step to check their Whois information. Only if their registrars are also identical can we merge them together. The above process iterates until no HIC pairs can further merge.

Figure 2 illustrates this process. $HIC_1$ and $HIC_2$ can be merged since their IP address overlapping is 60% and they have the same registrar. $HIC_3$ is not merged with any other HICs because its registrar is different from others.



Figure 2.   HIC generation process.

### B. Topologically Dedicated Malicious HICs

All together, we obtain 1,951,313 HICs using the above method from our data. Among them, 15,273 are found to *only* host confirmed malicious URL paths (and the corresponding host paths) in our datasets (collected over a 7-month period). This topological property differentiates them from other HICs, which contain at least one URL path that we cannot confirm. We call the former *dedicated malicious HICs* and the latter *non-dedicated malicious HICs*.

These dedicated HICs apparently play a critical role in the malicious activities: they are attached to 76.2% of the malicious paths across all the data sources in Table II. Although we have no ground truth about whether the dedicated malicious HICs are indeed set up by malicious parties, we find that their hostnames usually exhibit patterns of domain rotations and that they are often registered under unpopular domain registrars[2]. Table III lists the top 10 (ranked by the number of paths going through) dedicated malicious HICs in our datasets. Such observations suggest that these HICs may correspond to dedicated hosts that are set up for just malicious uses, e.g., "central servers" for drive-by download campaigns [33].

### C. Graph Properties of Dedicated Malicious HICs

When we examine the inter-connections among HICs, we find that these dedicated HICs are not isolated. Instead, they tend to connect to each other. To understand their

---

connectivity, we build an *HIC graph* by linking two HICs with a directed edge if there is an URL redirection between their hosts. In total, we have 1,951,313 HIC nodes and 9,058,597 edges on the HIC graph.

Closely examining these dedicated malicious HICs, we find that they are highly intertwined: among 15,273 dedicated malicious HICs, 12,942 (84.74%) are located on a fully connected subgraph. The dedicated malicious HICs are also intensely connected with other non-dedicated malicious HICs: 80.40% of non-dedicated malicious HICs are directly or indirectly connected to at least one dedicated HIC. This observation indicates that the dedicated malicious HICs are quite easy to reach from the "dark" world. Starting from a few malicious URLs and following their redirect chains, you may easily reach some dedicated malicious HICs.



Figure 3.   CDF of the number of Legitimate Link-in HIC between Dedicated HICs and Non-dedicated HICs



Figure 4.   CDF of the number of Legitimate Link-out HIC between Dedicated HICs and Non-dedicated HICs

In contrast, these dedicated malicious HICs rarely receive traffic from legitimate or unknown parties (labeled by the methodology in Section II-C), even when these legitimate parties do appear on malicious paths. In terms of such a "link-in" relation, the dedicated malicious HICs are more remote to legitimate parties than non-dedicated malicious HICs. Figure 3 shows that 97.75% of the dedicated malicious HICs do not receive any traffic redirections from legitimate HICs. For the rest 2.25% of dedicated malicious HICs that do, they mostly correspond to malicious entities that have

---

[2] According to [6], the five best domain providers are NameCheap, 1&1, Go Daddy, Name and Gandi.

| Rank | Hostnames | Registrar |
|---|---|---|
| 1 | lsbppxhgckolsnap.ru, vznrahwzgntmfcqk.ru, ... | NAUNET-REG-RIPN |
| 2 | viagrabuytoday.com, buycialistodoors.com, ... | INTERNET.BS CORP |
| 3 | searchstr.com, ssrsearch.com | INTERNET.BS CORP |
| 4 | sqwlonyduvpowdgy.ru, qlihxnncwioxkdls.ru, ... | NAUNET-REG-RIPN |
| 5 | tadalafil-mastercard.ordercialisonlineus.com, viagra-brand-viking.cialisshopsale.com, ... | INTERNET.BS CORP |
| 6 | soxfurspwauosdis.ru, iqsxbaoyzweerppq.ru, ... | NAUNET-REG-RIPN |
| 7 | freshtds.eu | PDR Ltd. |
| 8 | puvbgoizrqsxsxzq.ru, fkffqgkqfqdxekvq.ru, ... | NAUNET-REG-RIPN |
| 10 | michaelmazur.net | TUCOWS.COM CO. |

Table III
TOP RANKED HICS

infiltrated legitimate ad networks (e.g., Doubleclick) and receive traffic from them [16]. By comparison, 25.70% of non-dedicated malicious HICs receive traffic redirections from other legitimate HICs. This observation shows that compared to legitimate or non-dedicated malicious HICs, the topologically dedicated malicious HICs are much harder to reach from the bright side of the Web.

In terms of the "link-out" relations, dedicated malicious HICs are less likely to redirect traffic to legitimate HICs. This usually happens when those malicious parties cloak. Figure 4 shows that 28.30% of the dedicated malicious HICs redirect their visitors to legitimate hosts, compared with 61.53% of non-dedicated malicious HICs that do the same.

The graph properties of these dedicated malicious HICs show that they are well connected and easy to reach from known malicious URLs, but they are much harder to get to from legitimate ones. This observation provides strong implications for developing the right technique to detect them. Particularly, the well-known PageRank algorithm fits well with such topological properties, and therefore we adopt it in our research to detect those hosts without relying on their semantic information. Note that what we focus on here is *dedicated* malicious HICs. Those non-dedicated, particularly compromised hosts, may not have such graph properties. As a result, the PageRank approach may not be applicable to find them. In the next section, we explain the this detection method in detail.

## IV. DETECTING DEDICATED MALICIOUS HICS

Our measurement study shows that there exist a set of topologically dedicated malicious HICs. These dedicated HICs are important because they appear to be the linchpins of malicious Wed infrastructures, linking to 76.2% malicious host paths across all the datasets we have crawled over a 7-month period. Since all the paths going through the corresponding hosts are malicious, detecting such dedicated malicious HICs can help us discover many other malicious hosts including doorways, redirectors, and others.

To detect such dedicated hosts, we explore the unique topological features of these HICs. Of most interest are their strong connections with other malicious hosts, and their tenuous relations with legitimate hosts (Section III-C).

Compared with prior approaches [5], [11], [33] that rely on the contents (e.g., URL patterns) or semantics (e.g.,

drive-by downloads) of specific types of attacks or specific data sources for detection, our approach utilizes *only the topological information of malicious Web infrastructures*. An important advantage of this approach is that it works on different types of attacks and different sources of data, regardless whether the attack is drive-by download, scam, or is carried through spam tweets [14] or malvertising [16], as long as it exhibits the same topological properties used for detection, which in our case is the connectivity of dedicated malicious HICs. Moreover, such an approach can be more difficult to evade by active adversaries: the dedicated malicious HICs could cloak to the crawlers, redirecting traffic to google.com, but they cannot easily change their connection structures to receive more traffic from legitimate hosts or less traffic from other malicious hosts.

### A. PageRank-based Detection

The connectivity features of the dedicated malicious HICs are well captured by the concept of *PageRank* [3], a technique widely used to evaluate the importance of web pages. In the web site ranking scenario, a web page is considered to be important and therefore has a high rank if it is well connected, easy to reach from other (randomly-selected) pages. This rank is computed by propagating the initial score of each web page across a directed hyperlink graph and iteratively updating the page's score based on the ranks of the pages that link to it. This idea has also been applied to detect web spam pages [9], comment spams [32] and spammers on social graphs [4].

In our case, what makes the dedicated malicious HICs unique is their unbalanced connections from (dedicated or non-dedicated) malicious HICs v.s. those from legitimate ones. Using PageRank as the yardstick, malicious HICs get high ranks from the dark Web and low ranks from the bright side of the Web. Therefore, our idea is to compute two different ranks and use them together for detection.

Specifically, each HIC on the HIC graph maintains a pair of scores, the good one that models its popularity among legitimate hosts, and the bad one that describes its rank among malicious hosts. The use of both scores help balance the good traffic that malicious hosts receive, for example, when DoubleClick is used to forward traffic to a malicious ad network [16], as well as the bad traffic that legitimate hosts gets, for example, when a malicious

host cloaks, redirecting a visitor's traffic to `google.com`. Given the fact that the overwhelming majority of the HICs are legitimate and tend to connect to each other and to even non-dedicated malicious HICs (that may correspond to compromised hosts), not only truly legitimate HICs but also those non-dedicated malicious ones tend to have much higher good scores than their bad scores. On the other hand, those whose bad scores are high but good scores are low are very likely to have played key roles connecting different malicious parties, while being separated from the legitimate world. In other words, they are likely dedicated malicious HICs. Thus if the bad score of an HIC is above a preset threshold $\alpha$ and the ratio of the good score to the bad score is below a threshold $\beta$, we consider this HIC as a dedicated malicious HIC. We discuss the settings for $\alpha$ and $\beta$ in Section V-A.

Specifically, our approach runs the PageRank algorithm on the HIC graph described in Section III-C. The PageRank scores are computed by iteratively applying the following operations on each HIC on the graph, starting from a set of initial scores assigned to these HICs. The operation updates the score (bad or good) $PR_{i+1}(A)$ of an HIC $A$ at the $i+1$ iteration using the score of another HIC $X$ that has an directed edge originating from $X$ to $A$ at the $i$th step:

$$PR_{i+1}(A) = 1 - d + d \sum_{X \in M(A)} \frac{PR_i(X)}{L(X)} \quad (1)$$

where $d$ is a damping factor, $M(A)$ is the set of HICs pointing to $A$, and $L(X)$ is the number of outgoing edges from $X$ to $A$.

Prior research [16] shows that malicious hosts on a path tend to stay together and those further away from them are less likely to be malicious. To model this observation and further control the level of the malicious rank (score) a non-dedicated host (e.g., a compromised website) receives, we adjust the scores of individual HICs, after the PageRank iterations, as follows. Consider a node $A$, which stands $i$ hops away from its closest known bad node (see Section IV-B), its PageRank score $s$ (good or bad) is adjusted to $s \times \theta^{i-1}$, where $\theta$ is a constant value. In our research, we set $\theta = 0.8$ when computing a bad score, which exponentially weakens as a host is further away from a malicious node. Therefore, only those very close to the dark world can receive a high bad score, as such a reputation does not propagate too far. In contrast, we use $\theta = 1$ for computing a good score, allowing the influence of a good host to propagate undamped throughout the HIC graph. In this way, any host (legitimate or not) with substantial connections to the legitimate world tends to get a high good score.

### B. PageRank Score Settings and Propagation

To bootstrap the initial scores, we utilize Alexa top 60,000 sites and EasyList sites to assign initial good scores and Microsoft Forefront to find those that need to be given non-zero initial bad scores. Both known good and known

bad hosts receive 1 as their initial good and bad scores respectively. Others just get 0 to start with. On the HIC graph, an HIC's good/bad scores are simply the aggregate scores of their corresponding hosts. For example, an HIC with $n$ known legitimate hosts (on the whitelist) and $m$ known malicious hosts (detected by the scanner) get an initial good score of $n$ and a bad score of $m$.

These initial scores are propagated across the HIC graph through iterated updates of each HIC's scores using Equation 1, except that only part of the score $PR_i(X)$ is used to update $PR_{i+1}(A)$, based upon the *weight* of $X$'s outbound link to $A$. This weight is determined by the ratio between the number of hosts $A$ has and the total number of the hosts within all the HICs receiving inputs from $X$. In other words, if there are $S$ hosts within the HICs getting traffic from $X$, and $S_A$ of them are in $A$, we use $\frac{S_A}{S}$ to update $PR_{i+1}(A)$. Figure 5 illustrates how this update works.



Figure 5. Weight distribution. Assuming A has an initial score 1, child B will receive a score $1 - d + d \times \frac{2}{3}$ and child C will receive a score $1 - d + d \times \frac{1}{3}$, as the number of host names within B is two times that of C.

### C. Dedicated malicious HIC identification



Figure 6.   Detection Framework

After rounds of iterations, the scores of individual HICs converge. At that point, we can pick up a set of possibly dedicated malicious HICs whose bad scores are high and whose good to bad score ratios are low according to the thresholds $\alpha$ and $\beta$. To mitigate false positives[3], we conservatively remove from the detection results all the HICs that involve either a host name on the lists used for bootstraping good scores or a host name with a doorway URL discovered by our crawler. The doorway URLs are used here as a heuristic because they often correspond to compromised web sites as

---

[3]Note that false positive here refers to the situation that a non-dedicated malicious HIC or a legitimate one is labeled as dedicated malicious.

opposed to dedicate malicious sites. Figure 6 summarizes the entire processing flow of our detection.

## V. Evaluation and Result Analysis

In this section, we report our evaluation of the topology-based detection method. We first describe our experiment setup, and then elaborate our experiment results, including a comparison study between our technique and the existing approaches that utilize simple topological features, indegree, for ranking malicious websites. Finally we analyze detected HICs to understand their roles (e.g., exploit servers, redirectors) in malicious activities.

### A. Evaluation

**Experiment settings.** We run the PageRank algorithm on the constructed HIC graph as specified in Section III-C with a threshold for bad score $\alpha = 0.9$. Since malicious hosts could redirect visitors to legitimate services, e.g., when they cloak, this lower-bound threshold (which is pretty high for a legitimate host) conservatively ensures that these legitimate parties will not be misclassified as malicious.

For the threshold $\beta$ that records the ratio between good and bad scores, we select it according to the number of HICs that have non-zero initial scores. Suppose $S_G$ HICs have non-zero good scores and $S_B$ HICs have non-zero bad scores during bootstrap, the threshold $\beta$ will be selected as $\beta = \frac{S_G}{S_B}\gamma$, where $\gamma$ is a parameter and we set it to 10. This definition reduces the impact of the particular input dataset on the detection results.

Our HIC graph contains in total 60,856 HICs (91,464 host names) with non-zero initial good scores, using the Alexa top 60,000 site list and EasyList described in Section IV-B. We also have in total 52,847 HICs (106,872 host names) marked as malicious by Forefront. In our experiments, we randomly select a varying subset (1%, 5%, 10%, 50%, and 90%) of known malicious HICs as seeds for setting the initial bad scores, simulating scenarios where we have knowledge about different numbers of confirmed malicious HICs for detection. In each case, $\beta$ will be set differently based on the number of the bad seeds. For all experiments, we run 20 PageRank iterations to propagate scores. Note that the labeled seed sets may not be clean, as many malicious hosts cloak or have parked. We consider such cases common in practice, as it is in general hard to obtain clean, noise-free seed data.

| Metric | Definition |
|---|---|
| Recall | $N_{TP}/(N_{TP} + N_{FN})$ |
| False Detection Rate (FDR) | $N_{FP}/(N_{FP} + N_{TP})$ |
| False Positive Rate (FPR) | $N_{FP}/(N_{FP} + N_{TN})$ |

Table IV
Metrics Definition. $N_{TP}$ is the number of true-positives. $N_{FN}$ is the number of false-negatives. $N_{FP}$ is the number of false-positives. $N_{TN}$ is the number of true-negatives.



Figure 7.   (a) Recall. (b) Expansion rate.



Figure 8.   (a) New findings. (b) FDR/FPR.

**Results.** We use several metrics to evaluate our results (see Table IV). First, we evaluate the recall of malicious host paths by examining the percentage of all confirmed malicious paths being correctly detected by varying our seed data size. Note that once we detect an HIC as malicious, we treat all the host paths going through this HIC as malicious. Figure 7 shows that using 5% known (dedicated or non-dedicated) malicious HICs as seeds, which correspond to 33,547 (6%) malicious host paths, we can detect 242,776 (48.59%) other malicious host paths[4], resulting in over 7 times of expansion in detection. The recall and the expansion rate gradually converge as we increase the percentage of seed malicious HICs. This trend is expected as we approach the limit of the recall that we can achieve.

In addition to detecting already labeled malicious paths, our method can also detect malicious paths that are not identified by existing solutions. Figure 8 (a) shows that our detector discovers more than 20,000 new malicious host paths using 90% labeled malicious HICs as seeds. These newly detected paths are mostly crawled from the Top-site and Twitter feeds, and they go through 6,080 unique host names. Through manual analysis, we find that most of these cases are not detected by Forefront because they either use HTTP status code (e.g., 302) for redirection, without relying on the use of malicious code, or their script signatures are not included by Forefront.

Finally, we evaluate our false detection and false positive rates in Figure 8 (b). For newly detected malicious HICs, we use several methods in combination to validate them, including comparing against the Google Safebrowsing list, performing content clustering analysis and URL pattern analysis (Section V-B). For the small set of remaining cases that cannot be resolved using these methods, we manually

---

[4]This result already excludes false-positive paths.

go through each case. The validation process shows that our false positive rate (FPR) is very low, less than 0.025%. The false detection rate (FDR) is also as low as 0.34% when using 5% seeds. Since our seed data may not be clean, the false detection rate grows with using more seeds, and it reaches 2.36% in the worst case.

**Detection with seed rolling.** To further improve the detection coverage, we repeat the detection process by feeding the set of detected results as new seeds to the system and re-calculate the PageRank scores. This "seed rolling" process can iterate a few times. To demonstrate the value of seed rolling, we use 5% known malicious HICs as seeds and iterate our detection for 3 times. For each new round of detection, the seed data are appended with doorway hosts (and HICs) that link to the detected HICs in the last round. We use only doorway hosts to pick new seeds. This is a conservative option because in a majority of cases, a malicious path is always associated with a malicious doorway (in addition to other malicious hosts along the redirection chain).

Figure 9 shows that after 3 iterations, the detection coverage can be significantly increased: the number of detected host paths is increased from 242,776 (48.59%) to 361,675 (72.38%), resulting in over 12 times of expansion. More prominently, it helps us discover 30,358 new host paths. In the meantime, the false detection rate (FDR) is bound to 2.63%, still low for practical use.



Figure 9.   New Findings and FDR with Seed Rolling

**Comparison with the in-degree based approach.** Previous studies (e.g., [30], [27]) have proposed simple topological features such as "in-degrees" for ranking malicious sites. Intuitively, if a site receives traffic from many other malicious sites, it is also suspicious. For comparison, we also implement an in-degree based approach for detection based on the HIC graph. For each HIC node, we measure its malicious in-degree from other known malicious HICs. If the malicious in-degree is above a threshold, we detect this HIC as also malicious.

Similarly, we use 5%, 10%, 50% and 90% of the known malicious HICs as seeds and examine the false detection rate under different requirements of recall.  As comparison,



Figure 10.   Comparison between in-degree based approach and our PageRank based approach. Both approaches are evaluated under the requirement of 40% and 50% recall of malicious host paths.

we change the threshold of the good/bad score ratio for PageRank based detection to adjust the recall rates accordingly. Figure 10 shows that the in-degree based approach causes much larger FDR than our approach. The reason is that many legitimate sites, such as google.com, may also frequently receive redirected traffic from malicious sites. Simply picking HICs by in-degree will mistakenly identify them as malicious.



Figure 11.   CDF of the in-degree distribution of the HICs that are detected by our approach (using 5% seed).

In addition to causing high false positive rates, the in-degree based approach will also miss malicious HICs that have small in-degrees. Figure 11 shows the in-degree distribution of the set of HICs detected by PageRank. With 5% seeds, our detector identifies 508 malicious HICs and their in-degree distribution is quite diverse, ranging from 1 to 3,514. Therefore, using our approach, we can detect not only big central servers, but also dedicated smaller servers in malicious activities.

**Detection with different seeds and result sharing.** One practical question for our approach is the sensitivity of its detection results to the use of different types of seeds. Whoever using our tools may wish to bootstrap detection based on any malicious data feeds that they may obtain. To answer this question, we compare the detection results using two different types of feeds. The first type is the drive-

by download feed, and the second type is the combined Top-site and Twitter feed. For both types of feeds, we use Forefront to scan the crawled data and identify malicious HICs as initial seeds. We then compare the results using 5% seeds derived from the drive-by-download feed and all the seeds derived from the Top-site and Twitter feed, so that the number of initial seeds are roughly similar. Table V presents the results. These two different seed sets result in similar numbers of detected host names, and the FDRs from both sets are low. This result shows that our approach is general across different types of seed data.

When we compare the detection results, we find that although we obtain these two seed sets through different channels, they have large overlaps in the set of detected results, among which 29.91% host names and 37.09% host paths are detected in both cases.

| | $N_D$ | $N_T$ | $\frac{N_D \cap N_T}{N_D \cup N_T}$ |
|---|---|---|---|
| Host names | 5,458 | 5,157 | 29.91% |
| Host paths | 236,763 | 118,544 | 37.09% |
| FDR (host paths) | 0.34% | 0.75% | - |

Table V
COMPARISON OF THE RESULTS DETECTED USING 5% SEEDS DERIVED FROM THE DRIVE-BY-DOWNLOAD FEED AGAINST THAT FROM THE TOP-SITE AND TWITTER FEED. $N_D$ IS THE NUMBER USING THE DRIVE-BY-DOWNLOAD FEED AND $N_T$ IS THE NUMBER USING THE TOP SITE AND TWITTER FEED.

We also find that using the seeds from the drive-by-download feed, we could detect scam attacks crawled from the WarningBird feed. Using all of the bad seeds from the drive-by-download feed, we identify 6 overlapping malicious host names and 4,125 (56.21%) overlapping malicious host paths crawled from the WarningBird feed (See Table VI). These malicious hosts are not directly flagged by Forefront but are detected through PageRank. Most of the detected paths go through (188.72.233.144), which is powered by an open-source tracker kit. Many scam pages from the WarningBird feed redirect traffic to this host. This observation indicates that attackers are already leveraging dedicated services from different channels and using them for different purposes.

| | Total | PageRank | Scanner |
|---|---|---|---|
| Host names | 4,456 | 6 | 0 |
| Host paths | 7,338 | 4,125 | 0 |

Table VI
DETECTED HOST NAMES AND HOST PATHS THAT OVERLAP WITH THE WARNINGBIRD FEED, USING THE DRIVE-BY-DOWNLOAD SEEDS.

### B. Detection Result Analysis

The low false positive rates of our detection suggest that those captured HICs are likely dedicated malicious HICs. One important question then is "what are the roles played by these hosts in the malicious Web infrastructures?" To answer this question, we focus on the set of dedicated malicious

| Role | URLs | URL paths |
|---|---|---|
| exploit | 13,216 | 89,019 |
| click-fraud | 5,955 | 36,761 |
| scam | 29,411 | 632,644 |
| fakeav | 1,604 | 1,805 |
| other | 1,031 | 90,962 |
| redirector | 286,275 | 2,479,695 |
| unknown | 69,062 | 526,952 |
| total | 406,553 | 3,088,741 |

Table VII
ROLES OF URLs.

HICs and categorize their URLs based the roles that they play in an attack. We use several methods to perform such categorization, including:

- *Forefront reporting:* When Forefront detects a piece of malicious code, it also provides a type code such as `Exploit:JS/Blacole.BK`, `Rogue:JS/FakePAV`, which can be used to infer its role.

- *Content and URL clustering:* We cluster page contents based on their DOM structures as well as URLs based on the URL patterns. We then manually examine large clusters to determine their categories.

- *Safebrowsing reporting:* We check if an URL is also reported by Safebrowsing, which sometimes provides hint about its role, e.g., malware, or phishing.

Table VII shows the role breakdown of the set of malicious URLs associated with the dedicated malicious HICs. We find that the dedicated malicious HICs are tied to a variety of roles including exploit servers, scam hosts, redirectors, etc.

Among these categories, redirectors are of a dominant fraction (70.4%) and they play active roles on 80% of the malicious paths. Among these redirectors, 31.98% of them are hosts that run Traffic Distribution Systems (TDS), a suite of traffic buying and selling tool kits that are extensively used in underground ecosystems. We discover these systems using the URL patterns of known TDS tool kits [7]. Several large TDSes that carry obvious URL patterns (hence not including less famous TDS services) alone account for 56.25% of the malicious paths. Compared with exploit servers, redirectors are less well studied and little has been known about their operations. Given the important roles that they play in malicious activities, in the next section, we report an in-depth study on these TDSes to understand their characteristics and monetization strategies.

## VI. IN-DEPTH STUDY ON TDS

As discussed in Section V-B, over 50% of the malicious paths turn out to go through Traffic Direction Systems [7], which are underground traffic brokers who buy from traffic generators (e.g., malicious doorways) and sell to traffic consumers (e.g., exploit servers). Such services facilitate traffic exchanges between malicious parties, allowing attack executors to dedicate their resources to running and managing their attacks rather than wasting their time and resources

on procuring traffic. Although such systems have been there for years, relatively little is known about how they operate in the wild, compared with other types of dedicated hosts such as exploit services [8].

In our research, we focus on those TDSes as the representative of topologically-dedicated malicious hosts. This section reports the most interesting observations we made, particularly, our discovery of their important roles in malicious activities (connecting to over 52.67% of doorway URLs, Section VI-A), their surprisingly long life span (65.21 days of median life time, Section VI-C) and the monetization activities involving them even after they are parked (receiving possibly 10 times as much traffic as legitimate parking domain does, Section VI-D).

### A. Landscape

To understand how these TDSes work, we first need to find out what tool kits they use, how popular they are, where they get traffic from and where they send traffic to.

| Feed | Doorway URLs(%) | Malicious Paths(%) |
|---|---|---|
| Drive-by-download | 53.85 | 58.06 |
| Warningbird | 0.93 | 0.34 |
| Top sites | 34.51 | 10.39 |
| Twitter | 26.25 | 1.40 |
| All | 52.67 | 56.25 |

Table VIII
TDS PREVALENCE PER FEED

As described in Section V-B, we identify TDSes from their URLs, which bear unique patterns of the tool kits they are built upon. A recent report [7] shows that just like the kits extensively used by exploit services, there are a whole set of off-the-shelf TDS kits that can be conveniently utilized by adversaries to manage, administrate and log traffic coming in and out of their systems. Among them, the most popular ones are Sutra TDS, Simple TDS, and Advanced TDS. Using known URL patterns, we find that the Sutra TDS kit is the most popular one, covering 71.02% of the TDS URLs in our set. Sutra is not a free kit, whose price ranges from $200 to $270, but it has a wide range of supported features [13]. The second popular kit is the Simple TDS, an open source kit that covers 10.19% of the TDS URLs.

**Prevalence**. In Section V-B, we show that TDSes have taken a lion's share among all the detected dedicated HICs: 52.67% of doorway URLs are found to send web traffic to these TDSs. Table VIII further illustrates the important roles they play in funneling traffic from different data sources. Except Warningbird, all data sources have significant numbers of URLs that lead to TDSes. We also find TDSes to be prevalent in paths not alarmed by ForeFront.

**Inbound Traffic**. Over 97.1% of TDSes receive web traffic directly from doorways while only 6.37% of them get traffic from non-doorway redirectors. For the doorways that bring traffic to TDSes, some of them are intentional, e.g, adult sites. Many others are compromised sites.

Figure 12 shows the cumulative percentage of new doorway domains and IP addresses that bring traffic to TDSes during our crawling period. We can clearly see a step function, which shows that doorway domains are often compromised and set up by attackers in batches and correspond to different attack campaigns. Thus, studying the incoming traffic to TDSes can also be used to detect attack campaigns. It is also worth noting that there is sharing of IP addresses among compromised doorway domains. In total there are 18,369 new doorway pages and 12,711 unique IP addresses.



Figure 12. Cumulative percentage of new doorway domains and IPs that redirect traffic to TDSes during our 7 months of crawling.

| TDS Status | | TDS URLs(%) | TDS hosts(%) | TDS Paths(%) |
|---|---|---|---|---|
| Inactive TDSes | Parked | 69.66 | 23.9 | 51.07 |
| | Suspended | 12.69 | 12.25 | 4.91 |
| | Appear to be down | 8.58 | 55.65 | 2.58 |
| Active TDSes | Redirecting to search engines | 0.03 | 1.14 | 0.004 |
| | Redirecting to None search engines | 15.50 | 21 | 41.43 |
| All TDSes | | 126,180 | 3,168 | 2,211,291 |

Table IX
LANDSCAPE OF TDS OPERATION. PERCENTAGES ARE CALCULATED TO THE TOTAL OF ALL TDSS

**Outbound Traffic**. During our crawling, we find that some TDSes would not redirect traffic further to other websites. We call them *inactive* TDSes. These inactive TDSes can be suspended for resell, parked, or appears to be down (not resolving to an IP address or send back error response code). Table IX shows the breakdown among the inactive TDSes. A majority (69.66%) of the TDS URLs are parked, 12.69% are suspended and 8.58% appear to be down by either giving us error codes or not resolving.

Note that the TDSes giving us error response codes may not be truly inactive. Actually, it is reported that TDSes tool kits can perform IP filtering [13] [7]. This finding has also been confirmed by our analysis of the Simple TDS kit. Indeed, we have observed that among the TDSes that have been crawled multiple times, some of them lead to exploit servers when we first crawl them, but later give 404 responses or forward the crawler to google.com on subsequent visits. A more detailed look into the intersection between the live TDSes and the TDSes of other categories is provided in Table X where we find that 23.08% of the live TDSes are taken down in subsequent visits. Note that our

subsequent visits happen only when the same TDS appears in another path for a later crawl.

| | |
|---|---|
| In parked hosts | 21 (3.11%) |
| In suspended hosts | 0 |
| In hosts not resolving | 156 (23.08%) |
| In hosts responding with error codes | 205 (30.33%) |

Table X
ACTIVE TDSES APPEARING IN OTHER CATEGORIES

We further study attack types associated with the active TDS paths, except those that cloak by leading to search engines. 49.11% of them are found to connect to exploit servers, 3.40% go to scam sites, and 60.80% of them redirect to the places whose attack types cannot be confirmed. The percentages here do not add up to 100%, as some TDS hosts lead to multiple types of attacks.

### B. TDS hosting infrastructure

As discussed before, we study TDSes as a representative of topologically dedicated hosts. For this type of services, a question we hope to answer is how these services, at least their domains, are hosted. In our research, we find that these TDS hosts extensively utilize free web services like free domain providers and dynamic DNS (DDNS) providers. DDNS providers such as `freetcp.com` let users register sub-domains (e.g.,aaa.freetcp.com) and resolve them to the users' own IPs. Similarly, free domain providers such as `uni.me` also give away sub-domains for free, but unlike DDNS services, they offer free hosting on their IP addresses.

To quantify the TDSes hosted by different infrastructures, we utilize a few known lists to identify free domain providers, DDNS providers, and URL shorteners. The lists are downloaded from `malwaredomains.com`, which are updated on a daily base. Using these lists, we find that 26.44% of the TDSes use DDNS, 14.39% use free domain providers and 0.7% use URL shorters. Please note that these figures are lower bounds because the lists could be incomplete. The actual number can be higher.

Additionally, we find that many TDSes share IP addresses. The top 12% of the IP addresses cover 21.5% of the TDSes. More interestingly, many of these TDSes' IP addresses share IP prefixes: the top 5 (out of 131) autonomous system numbers (ASN) associated with these TDSes belong to a few small cloud and hosting service providers, as illustrated in Table XI.

| # | ASN# | ASN Name | Country | Number of IPs |
|---|---|---|---|---|
| 1 | 16265 | LEASEWEB | NL | 45 |
| 2 | 24940 | HETZNER | DE | 33 |
| 3 | 28753 | LEASEWEB-DE | DE | 19 |
| 4 | 44050 | PIN-AS | RU | 13 |
| 5 | 21788 | NOC-Network | US | 10 |

Table XI
TOP 5 ASNs HOSTING TDSs

### C. TDS malicious life time

During our investigations of TDSes and their operations, we observe that, unlike exploit domains, they tend to live long before they're detected. In this section we attempt to estimate their life times.

**Data source.** We leverage the "PassiveDNS" data set, which contains DNS records collected by the Security Information Exchange (SIE) [26] since April 2010. This data source has also been used in prior research [8], where raw DNS records for two months were used. For our study, we have an aggregated list of records over a 2 year period through the SIE API [25]. Each record contains two time stamps to indicate the first and the last times the record has been observed to have the same value (i.e. the Rdata field in a DNS packet).

To identify the *malicious* life span of a given host, we find that it is not enough to only consider the time between the first and the last valid A record (i.e. IP address lookup) as the prior work does [8]. This is because that even after a malicious domain is taken down and has no valid A records for a while, it could be acquired by a domain registrar who wants to sell it. During the reselling period, the domain has a valid DNS record and is resolvable. More over, after a domain is repurchased, it may become legitimate. Therefore, the simple way of computing the duration between the first and last valid DNS records would just estimate the *up time* of a domain, rather than the *malicious* life time.

To avoid the overestimates incurred by the above approach, we take a more conservative approach to just look for a *lower* bound of a host's malicious life span. That lower bound is estimated based on the time interval between the first and the last observed A records that carry at least one of the IP address(s) of a given host as discovered by our crawler when it is associated with malicious activities. As a result, what we get is the malicious life span for the TDSes whose IPs are known to our crawlers. In total, there are 1,334 hostnames for such TDSes.

**Observations.** Querying the "PassiveDNS" dataset for those TDSes, we retrieve the DNS records of 1308 hosts. Table XII lists the malicious life times per hosting type (DDNS, Free Domain hosts and others). The standard deviations in all categories are quite high and thus we also consider their medians. The median malicious life time for the hosts running on possibly dedicated domains (in the "neither" category) is 65.21 days, which is much higher than most malicious domains reported in the literature, e.g. 2.5 hours [8] . We observed some TDS hosts live for years. For example, `tr-af.com` started resolving to the same IP address since *11th Jan, 2011* and it is still up. Also interestingly, we find that hosts using DDNS tend to be taken down sooner than those using free domain providers. We believe this is due to the difference in the ways they operate. As DDNSs just provide DNS services, when they are noticed of malicious domains, they can simply choose to not resolving IPs for

such domains. For free domain providers, they provide both DNS and hosting service. Therefore, when they are notified of malicious domains and they see these domains still have a lot of incoming traffic (details in the next sub section), they could choose to monetize such traffic by redirecting such traffic to ad networks.

|  | DDNS hosts | Free domain hosts | Neither |
|---|---|---|---|
| Mean | 43.20 d | 105.32 d | 138.59 d |
| Standard Deviation | 99.02 d | 128.74 d | 200.88 d |
| Median | 5.75 d | 61.76 d | 65.21 d |
| Total # of TDSes | 371 | 154 | 745 |

Table XII

TDS MALICIOUS LIFE TIMES IN DAYS. NEITHER INDICATES HOSTS RUNNING ON DEDICATED DOMAINS (I.E. NOT USING DDNS OR FREE DOMAIN PROVIDERS)

### D. TDS Parking

In Section VI-A, we discovered that the TDS hosts in 51% of TDS paths were parked. Such a high presence of domain parking warrants a closer look into the motivation behind such behavior which we elaborate on in this section. Before we study how these malicious domains are parked, we first review how regular domains are parked.

**Legitimate domain parking**. Parking services offer a way for newly acquired, underdeveloped domains, or domains reserved for future use to monetize their traffic through advertising. Domains can be parked either by setting the authoritative name server `NS` record to point to that of the parking services or using a redirector to send traffic to the parking services. Upon arriving at the parking services, there are two ways for monetization. The traditional way is to navigate a visitor to a page filled with sponsored contextual ads. Recently, a new model called ZeroClick was introduced to redirect the visitor directly to an advertiser's Web page in which case the visitor never lands at the parked domain.

Per parking service agreements [24], parking services allow only real user type-in traffic. They do not allow third party sites to redirect to parked domains. As legitimate parked domains are not actively in use, they typically do not receive a lot of traffic, except those that share very similar spellings with well-known sites, who get traffic through users typos.

**TDS parking**. TDSes receive redirections from many door-way pages, so they naturally have a lot of incoming traffic. As doorway pages usually reside on compromised domains owned by different entities, it is hard to clean all of them quickly. Therefore, even if an attack is detected and the corresponding malicious domains are taken down, there could still be a lot of traffic leading towards TDSes.

Domainers (i.e. domain owners) smartly leverage such a rich source of traffic by purchasing those suspended domains and monetizing their traffic through domain parking. Indeed, our dataset shows that 51.07% of the paths lead to parked TDSes. Using the "PassiveDNS", we identify 642 parked

TDSes by checking whether the NS (Name Server) record or the hosting IP belongs to a parking service. The top 10 parking services and the number of TDSes parked with them are shown in Table XIII. Among them, `Bodis` Parking is the most popular parking service targeted by the new domain owners of TDS hosts. It is used to park 263 different TDS hosts. Besides parking services, we find that there are also parking managers who offer a centralized approach to manage a portfolio of domains parked with a number of parking services. `Above.com` is one such parking manager who acts as a middle man.

| # | Parking Service | # TDSes |
|---|---|---|
| 1 | Bodis Parking | 263 |
| 2 | Dopa Parking | 246 |
| 3 | Oversee Parking | 148 |
| 4 | Above.com | 86 |
| 5 | Name-services.com | 61 |
| 6 | Parkpage.foundationapi.com | 53 |
| 7 | Sedo Parking | 33 |
| 8 | Name Drive Parking | 18 |
| 9 | Parking-page.net | 17 |
| 10 | Internet Traffic Corp | 11 |

Table XIII

TOP 10 PARKING SERVICES

**Traffic comparison before and after parking**. We first compare the amount of traffic to these TDS domains before and after they are parked. Before parking, they can redirect traffic to exploit servers to monetize traffic while after parking, the new domain owners can monetize the incoming traffic through the advertising models offered by parking services. To compare the traffic volume, we utilize the previously introduced "PassiveDNS" dataset. As each aggregated DNS record contains the start time, end time, and lookup count, we calculate the number of lookups per day. Note that such numbers are lower bounds, as many lookups may be resolved through caching by local resolvers. Figure 13(a) displays the number of lookups per day before and after parking. As we can see from the figure, the amount of traffic does not change significantly after the domain is parked. Compromised door way pages still redirect traffic to the TDS domains, even after the TDSes are taken down and parked.

**Traffic comparison between regular parked domains and parked TDSes**. Next, we want to examine whether monetizing TDSes through parking is more profitable for domainers than regular domains. To achieve this, we obtain 664 regular parked domains on TrafficZ name servers on Nov15, one of the most reputable parking services, and obtain their lookup rates from the PassiveDNS dataset. Figure 13(b) shows traffic volume of regular vs TDS parked domains. It is surprising that parked TDSes have more than 10 times the amount of lookups per day than the regular parked domains. This observation shows that even after the TDSes are taken down, they can still bring remarkable revenue to domainers.

**Traffic monetization**. We find that 61.66% of the parked TDSes use ad-networks and ad exchanges such as *DoubleClick* and *BidSystem*. While 56% go through tracker networks used for targeted advertising, 3.94% of the parked paths monetizing traffic directly through the ZeroClick model.

 

(a) Before and after TDS parking. After TDSes are taken down and parked, they continue to receive similar amount of traffic from compromised doorways.

(b) Regular vs TDS parking. The median lookup rate of TDSes is over 10 times higher than regular parked domains.

Figure 13.   CDF of Traffic hits per day

## VII. DISCUSSION

Although some types of dedicated malicious services have long been known [8], topological studies on the hosts playing dedicated roles in malicious Web infrastructures, regardless of the specific types of malicious activities they are involved in, have never been done before. Such studies are important because they can bring us to new types of malicious services and help detect these linchpins of the dark Web even before knowing what they exactly do. Here we discuss what we have learnt from our first step on this direction and what needs to done in the follow-up research.

Based on the large amount of data crawled from the Web during a long period of time, we discover interesting topological features of these malicious hosts: they tend to have very close relations with malicious hosts but rather tenuous connections to even highly popular legitimate services. This finding leads us to the PageRank-based approach, which works effectively in detecting those dedicated services, without relying on their malicious semantics. On the other hand, we are far from fully exploiting the opportunities even our preliminary discoveries present to us: as an example, the paths associated with those dedicated hosts link to a large number of malicious nondedicated hosts, which need to be captured with right techniques. Also, progress can still be made on the detection of such dedicated hosts, particularly those also serving doorway pages.

Our preliminary analysis of those topologically dedicated hosts has already brought us to a type of understudied malicious services—TDSes. With all the findings we make, including their unexpectedly long life span and the way they are monetized even after taken down, more questions have been raised than solved. For example, to what extent do they monetize traffic? How can an ad network trace whether the traffic is redirected from malicious channels? Answers to these questions would be invaluable to the online industry.

While we are studying the attacker's infrastructures, attackers are actively tracing us as well. They now smartly record IP addresses of visitors and only deliver malicious content to each IP once. They can also employ various cloaking techniques. Moving forward, we feel the research community should unite to build a distributed crawling infrastructure and also leverage normal user inputs to better fight against attackers.

Finally, we call for the regulation on the usage and resell of takedown domains. Our study shows that even after TDSes are taken down, they continue to receive a large amount of traffic from compromised doorway pages. Such traffic is currently leveraged by domain owners to gain revenue from the ad networks. These actions should be prohibited as such traffic is not valid human generated ones.

## VIII. RELATED WORK

**Study on malicious Web infrastructures**. Malicious activities are becoming more organized and even turning into a big underground business. Prior research focuses on the malicious infrastructures associated with specific attack channels, such as Spam [2], black-hat Search-Engine Optimization (SEO) [11] and malvertising [16]. These studies analyze the different parties in the underground business and how the malicious campaigns operate. Our study provides a topological view of the malicious Web infrastructures and we study the dedicated malicious hosts and their relationships with other entities.

**Detection of malicious entities**. To detect malicious entities, prior research either relies on content analysis or redirection chain analysis. However, these approaches are not robust against attackers' ever-changing strategies. Code analysis [5] and URL patterns [11] can be evaded if attackers change signatures. Researchers have also explored the features of redirection chains including length, short sub-sequences, cross-site redirections [14], [16], [17]. These features are proved to be effective against specific attacks but they may not be fundamental to the malicious infrastructures. Instead, we utilize the topological features, such as the relationships between different entities, which are more difficult to evade. The detected hosts are dedicated for a variety of different malicious purposes, more than just the central servers studied in [33].

**PageRank algorithm**. Our approach adopts the PageRank algorithm [3] to differentiate the malicious and legitimate entities. This algorithm has been used to detect spammers in social networks [9], online comments [32] and web spam pages [4]. Our study shows that the malicious Web infrastructures have similar properties and PageRank is also effective on their topology graphs.

## IX. CONCLUSION

In this paper, we report our study on a set of topologically dedicated hosts discovered from malicious Web infrastructures. Those hosts are found to play central roles in the dark

Web, serving over 70% of the nearly 4 million malicious redirection paths collected in our research and rarely being connected to by any legitimate hosts. Leveraging this unique feature, we develop a topology-based technique that detects these hosts without even knowing exactly what they do. This approach utilizes the PageRank algorithm to capture those with high status on the dark side of the Web but very much unknown on the bright side, and brings to the light thousands of dedicated hosts missed by the state-of-the-art malware scanner. Taking a close look at our findings, we learn that many of those hosts are actually TDSes, which play a key role in traffic exchange in malicious activities. Our further study on such services reveals their unusually long life span (65 days), compared with the exploit services studied before, and the way they are used to monetize traffic, even after their domains have been taken down.

## Acknowledgements

We thank anonymous reviewers for their insightful comments. This work is supported in part by NSF CNS-1223477 and CNS-1117106. Alrwais also acknowledges the fund from the College of Computer and Information Sciences, King Saud University, Riyadh, Saudi Arabia.

## References

[1] Alexa. Alexa top 500 global sites. http://www.alexa.com/topsites.

[2] D. S. Anderson, C. Fleizach, S. Savage, and G. M. Voelker. Spamscatter: characterizing internet scam hosting infrastructure. In *Proceedings of 16th USENIX Security Symposium on USENIX Security Symposium*, SS'07, pages 10:1–10:14, Berkeley, CA, USA, 2007. USENIX Association.

[3] S. Brin and L. Page. The anatomy of a large-scale hypertextual web search engine. In *Proceedings of the seventh international conference on World Wide Web 7*, WWW7, pages 107–117, Amsterdam, The Netherlands, The Netherlands, 1998. Elsevier Science Publishers B. V.

[4] P.-A. Chirita, J. Diederich, and W. Nejdl. Mailrank: using ranking for spam detection. In *Proceedings of the 14th ACM international conference on Information and knowledge management*, CIKM '05, pages 373–380, New York, NY, USA, 2005. ACM.

[5] C. Curtsinger, B. Livshits, B. G. Zorn, and C. Seifert. Zozzle: Fast and precise in-browser javascript malware detection. In *USENIX Security Symposium*. USENIX Association, 2011.

[6] J. Fitzpatrick. Five best domain name registrars. http://lifehacker.com/5683682/five-best-domain-name-registrars, November 2012.

[7] M. Goncharov. Traffic direction systems as malware distribution tools. http://www.trendmicro.com/media/misc/malware-distribution-tools-research-paper-en.pdf, 2011.

[8] C. Grier, L. Ballard, J. Caballero, N. Chachra, C. J. Dietrich, K. Levchenko, P. Mavrommatis, D. McCoy, A. Nappa, A. Pitsillidis, N. Provos, M. Z. Rafique, M. A. Rajab, C. Rossow, K. Thomas, V. Paxson, S. Savage, and G. M. Voelker. Manufacturing compromise: the emergence of exploit-as-a-service. In *Proceedings of the 2012 ACM conference on Computer and communications security*, CCS '12, pages 821–832, New York, NY, USA, 2012. ACM.

[9] Z. Gyöngyi, H. Garcia-Molina, and J. Pedersen. Combating web spam with trustrank. In *Proceedings of the Thirtieth international conference on Very large data bases - Volume 30*, VLDB '04, pages 576–587. VLDB Endowment, 2004.

[10] T. Holz, C. Gorecki, K. Rieck, and F. C. Freiling. Measuring and detecting fast-flux service networks. In *NDSS*. The Internet Society, 2008.

[11] J. P. John, F. Yu, Y. Xie, A. Krishnamurthy, and M. Abadi. deseo: combating search-result poisoning. In *Proceedings of the 20th USENIX conference on Security*, SEC'11, pages 20–20, Berkeley, CA, USA, 2011. USENIX Association.

[12] C. Kanich, N. Weavery, D. McCoy, T. Halvorson, C. Kreibichy, K. Levchenko, V. Paxson, G. M. Voelker, and S. Savage. Show me the money: characterizing spam-advertised revenue. In *Proceedings of the 20th USENIX conference on Security*, SEC'11, pages 15–15, Berkeley, CA, USA, 2011. USENIX Association.

[13] Kytoon. Sutra tds. http://kytoon.com/sutra-tds.html.

[14] S. Lee and J. Kim. WarningBird: Detecting suspicious URLs in Twitter stream. In *Proceedings of the 19th Annual Network & Distributed System Security Symposium*, Feb. 2012.

[15] K. Levchenko, N. Chachra, B. Enright, M. Felegyhazi, C. Grier, T. Halvorson, C. Kanich, C. Kreibich, H. Liu, D. McCoy, A. Pitsillidis, N. Weaver, V. Paxson, G. M. Voelker, and S. Savage. Click Trajectories: End-to-End Analysis of the Spam Value Chain. In *Proceedings of 32nd annual Symposium on Security and Privacy*. IEEE, May 2011.

[16] Z. Li, K. Zhang, Y. Xie, F. Yu, and X. Wang. Knowing your enemy: understanding and detecting malicious web advertising. In *Proceedings of the 2012 ACM conference on Computer and communications security*, CCS '12, pages 674–686, New York, NY, USA, 2012. ACM.

[17] L. Lu, R. Perdisci, and W. Lee. Surf: detecting and measuring search poisoning. In *Proceedings of the 18th ACM conference on Computer and communications security*, CCS '11, pages 467–476, New York, NY, USA, 2011. ACM.

[18] Malwaredomains. url_shorteners. http://mirror1.malwaredomains.com/files/url_shorteners.txt.

[19] U. Parasites. Runforestrun now encrypts legitimate js files. http://blog.unmaskparasites.com/2012/07/26/runforestrun-now-encrypts-legitimate-js-files/, 2012.

[20] R. Petnel. Adblock plus. http://adblockplus.org/en/.

[21] R. Petnel. Easylist. https://easylist-downloads.adblockplus.org/easylist.txt.

[22] R. Petnel. Easyprivacy. https://easylist-downloads.adblockplus.org/easyprivacy.txt.

[23] N. Provos, P. Mavrommatis, M. A. Rajab, and F. Monrose. All your iframes point to us. In *Proceedings of the 17th conference on Security symposium*, pages 1–15, Berkeley, CA, USA, 2008. USENIX Association.

[24] Sedo. Domain parking terms and conditions. https://sedo.com/us/about-us/policies/domain-parking-terms-and-conditions-sedocom/?tracked=1&partnerid=38758&language=us.

[25] I. SIE. Isc dnsdb api. https://dnsdb.isc.org/doc/isc-dnsdb-api.html.

[26] I. SIE. Security information exchange (sie) portal. https://sie.isc.org/.

[27] J. W. Stokes, R. Andersen, C. Seifert, and K. Chellapilla. Webcop: locating neighborhoods of malware on the web. In *Proceedings of the 3rd USENIX conference on Large-scale exploits and emergent threats: botnets, spyware, worms, and more*, LEET'10, pages 5–5, Berkeley, CA, USA, 2010. USENIX Association.

[28] B. Stone-Gross, M. Cova, L. Cavallaro, B. Gilbert, M. Szydlowski, R. Kemmerer, C. Kruegel, and G. Vigna. Your botnet is my botnet: analysis of a botnet takeover. In *Proceedings of the 16th ACM conference on Computer and communications security*, CCS '09, pages 635–647, New York, NY, USA, 2009. ACM.

[29] Twitter. Using the twitter search api. https://dev.twitter.com/docs/using-search, 2012.

[30] Y. Wang, D. Beck, X. Jiang, and R. Roussev. Automated web patrol with strider honeymonkeys: Finding web sites that exploit browser vulnerabilities. In *In Proceeding of the Network and Distributed System Security Symposium (NDSS'06)*, 2006.

[31] Whois.net. Whois lookup - domain names search, registration, & availability. http://www.whois.net/, 2011.

[32] J. Zhang and G. Gu. Neighborwatcher: A content-agnostic comment spam inference system. In *In Proceeding of the Network and Distributed System Security Symposium (NDSS'13)*, 2013.

[33] J. Zhang, C. Seifert, J. W. Stokes, and W. Lee. Arrow: Generating signatures to detect drive-by downloads. In *Proceedings of the 20th international conference on World wide web*, WWW '11, pages 187–196, New York, NY, USA, 2011. ACM.

# APPENDIX
# 182

 Akamai

What We Do | Products | Resources | Support | Contact

English - US ⌄

Free Trials

 

the akamai blog

Subscribe

Latest | Web Performance | Cloud Security | Mobile Experience | Media Delivery | Categories ⌄

Home > Enterprise Threat Protector > The Phishing Industry

# THE PHISHING INDUSTRY



By Jim Black September 26, 2019 11:00 AM

As I mentioned in my previous blog post, phishing attacks are now being created and executed on an industrial scale. Malicious actors are increasingly using highly sophisticated off-the-shelf phishing kits that allow them to deliver very targeted, short-lived attacks. These campaigns direct victims to a phishing web page that's an exact copy of a consumer or enterprise brand's site. This has lowered the barrier to entry for launching phishing attacks.

When I first started to understand phishing kits, one of the biggest surprises for me was just how advanced the kits have become and how mature the ecosystem is for the development, distribution, and support of these kits.

In a nutshell, a phishing kit is an all-in-one software package that makes it easy for anyone to launch a phishing attack, even if they are not software experts. In the past, an attacker had to clone the target site. Now, the kits have evolved to include an exact copy of the target's website, so launching an attack is even easier.

These kits are continuously enhanced by the software authors – and just like any other service, new features are added all the time. They range in price: some kits are free while others can cost up to $300. So, quite affordable.

The attack flow is straightforward. After buying the kit, an attacker simply must rent a compromised web server or use a hosting provider, upload and configure the kit, and then send phishing emails – or drive victims to the malicious page using other methods, such as social media or messaging apps. As soon as victims enter their credentials, the pilfered information is available to the attacker to sell or to use in further attacks.

Akamai's enterprise threat research team has spent significant time tracking and analyzing phishing toolkits over the past few months.

One of the most sophisticated kits the research team has analyzed is the 16Shop phishing kit. It focuses primarily on delivering attacks that leverage the Apple brand, but has also been used to launch attacks against customers of over 100 leading banks.



The kit has layered defenses as well as attack mechanisms, all constructed neatly within hundreds of files. It's a true multi-level kit, that executes different stages for different brands, all based on the information the victim provides.

It also has the ability to automatically change the phishing page layout and presentation depending on the victim's device. Mobile users will see a website tailored to their device, while desktop users see something better suited to their situation.

Another customization in 16Shop is language. Currently, the kit supports 10 languages: English, Japanese, Chinese, French, Spanish, Malay, Latin, German, Thai, and Dutch.

The kit has a sophisticated licensing system that is API driven and validates that the kit is licensed. 16Shop also has code protections that prevent it from being ripped (copied by other criminals) if copies are made, the entire kit will cease to function as the license validation fails.

In addition to a licensing system, 16Shop has a number of built-in evasion techniques which help it avoid detection by automated scans (bots) and direct access. The kit also uses a whitelist mechanism and a blacklist mechanism, allowing the person who purchased the kit to limit access to specific IP ranges if they choose.

And, in a great example of "there's no honor amongst thieves," Akamai security researchers found a backdoor in the kit, where data is siphoned off to a Telegram bot via an API. This means that a victim's personal data is stolen twice – once by the attacker and again by the software author.

In the next blog post, I'm going to discuss how attackers are bypassing the protections that enterprises rely on to detect and block phishing attacks.

In the meantime, check out the Akamai white paper, "Phishing Is No Longer Just Email It's Social".

Let's continue the conversation:

**Categories:**
Enterprise Threat Protector



Corporate Responsibility
Compliance
Events
Our Partners

www.dcnet.com/cisiona

© 2020 Dalcom Technologies | Privacy & Internal | EMEA Legal Bescriet | Support | Disclosure

# APPENDIX
# 183

https://news.softpedia.com/news/Bouncer-Phishing-Kit-Allows-Only-Certain-Users-to-Access-Malicious-Website-321771.shtml     09/30/2020



## Bouncer Phishing Kit Allows Only Certain Users to Access Malicious Website

RSA has investigated this new type of crime kit based on "black hat whitelists"

Jul 16, 2013 16:18 GMT · By Eduard Kovacs · Comment · Share

EMC's RSA has uncovered a new type of phishing kit which allows cybercriminals to ensure that only certain users can access their phishing websites. Because only users that are on "the list" can access the site, the crime kit has been dubbed "bouncer."

The bouncer phishing kit relies on a preset list of emails. A unique URL, representing a user ID value, is sent out to each of the recipients.

When someone that's not on the list attempts to access the phishing page, they're redirected to a "404 page not found" webpage.

Some older phishing kits employ similar techniques, but they restrict access based on IP addresses, while the bouncer is actually a black hat whitelist.

"When victims access the phishing link, their name has to be on the list and their 'ID' value is verified on-the-fly as soon as they attempt to browse to the URL. After a scan of the 'bouncer list', unintended visitors are stirred away from the phishing page; in fact, the page is not even generated for eyes it was not meant for," RSA's Limor Kessem explains.

Users who are allowed to access the site are presented with an attack page that's generated by the kit. Their credentials are sent to a different hijacked website.

"Another thing that makes this different is that traditional phishers like to cast as wide of a net as possible, but with this tactic the phisher is laser-focusing the campaign in an effort to collect only the most pertinent credentials for his purposes. Keeping out uninvited guests also means avoiding security companies and prompt take-downs of such attacks," Kessem added.

The campaigns analyzed by RSA targeted, in average, 3,000 recipients. The targets appeared to be webmail users, corporate email recipients and even bank employees.

Experts warn that these types of kits can be successfully used in spear phishing campaigns.

#phishing, #cyber security, #security research

### HOT RIGHT NOW

**NVIDIA Releases New Vulkan GeForce Graphics Driver - Get Version 456.62:** The update adds support for GeForce RTX 3080 and 3090 GPUs.

**DuckDuckGo Says Google's Competition Practices Actually Hurt Competition:** The search engine no longer offered as optional on Android

**Microsoft Continues Its Mission to Kill Off the Windows Control Panel:** Programs and Features becomes a part of the Settings app

**Setting a Default App on Windows 10 Is Now Easier:** Microsoft releases another change in latest preview

**Serious Sam 4 Review (PC):** A mediocre game that tries to ride the wave of melancholy

**Vivaldi Browser Getting Two New Super-Cool Features:** The latest snapshot build brings two features

**Here's a Minimalist Windows 10 Desktop That You Can Enable Too:** Simple modifications make Windows 10 look cleaner

💬 **Click to load comments**

This enables Disqus, Inc. to process some of your data. Disqus privacy policy

RIDGE
Meet The Ridge.
A slim, RFID-blocking wallet designed to streamline.
SHOP NOW
YOUR WALLET   OUR WALLET

## Related Stories

Symantec experts have

# APPENDIX
# 184

SecurityTrails

Products >     Why Us     Customers     Pricing     Blog     Support >          Log In     Sign Up For Free

# How to Find IP Ranges a Company Owns

SECURITYTRAILS BLOG · OCT 04 2018 · BY ESTEBAN BORGES

## How to Find IP Ranges a Company Owns

Reading time: 6 minutes

f Facebook   🐦 Twitter   in LinkedIn

Whether you're an infosec beginner, an intermediate user, or one of the Internet's most famous hackers, sooner or later you'll get curious about how to identify a company's public network address range.

This type of information is especially useful when you're auditing a company's network, or when you're involved in some sort of cybersecurity investigation. Even if you aren't researching a cybersecurity incident, sometimes you'll need this information to configure whitelisting rules in your own firewall.

A few weeks ago we wrote about using IP scanner tools to find active hosts within corporate and remote networks. We also published an article about the best port scanners available, which included network discovery information.

While the utilities we mentioned are indeed useful for IP mapping and network discovery, they can fall short when you need to find the complete IP ranges a company owns. That's the topic we're exploring today.

## How to identify a company's public network address range

One of the most traditional ways to get the IP address of a company is to use the ping command, which allows you to get the main IP address of the webserver behind the webpage. But that doesn't give you the full company's public network address range. It's only a single isolated IP.

When you need the full IP address ranges owned by a company, there are other terminal-based commands and web-based solutions that can help you. Let's explore them.

### Using WHOIS information

We've mentioned the powerful WHOIS command in a lot of our articles. It's one of the oldest terminal-based commands available, and can help retrieve information from domain names and IP addresses. It's also of great use when it comes to finding the public network IP ranges of any company.

When the company doesn't own any network subnets, it may be using collocated hardware, dedicated servers or virtual instances on popular cloud providers. In this case, WHOIS commands might not be as effective as one might hope, and other types of network explorations are needed.

These types of companies are often digital agencies, development teams, or software developers that rely on 3rd party networks.

For these kinds of small companies, one way to detect their public network IP addresses is by using Nmap commands with popular NSE scripts like DNS-brute, or use any other subdomain scanner tool.

However, a faster and simple solution is to use the SecurityTrails IP Explorer feature, which allows you to visualize all DNS dependent records:

- Go to https://securitytrails.com
- Type the domain name of the company you need to investigate

SEARCH BLOG

Search...

TABLE OF CONTENTS

How to identify a company's public network address range
Using WHOIS information
Using a RIR API
Using SurfaceBrowser™



Here, we found the main IP addresses used by greynoise.com, which belong to network infrastructure provided by Squarespace, Inc. If you click on subdomains, you'll find other subdomains used, along with each of their IP addresses:



In another scenario, if a company owns complete subnets (often seen in big companies), this IP range information may be stored in WHOIS records, letting you use a simple WHOIS client to retrieve the needed information.

For this purpose, we can use the following syntax:

```
whois -h whois.apnic.net Microsoft
```

This will show you all the registered IP ranges on the Asia Pacific RIR that belong to Microsoft. Here's an output example:

```
[Querying whois.apnic.net]
[whois.apnic.net]
% [whois.apnic.net]
% Whois data copyright terms http://www.apnic.net/db/dbcopyright.html
% Information related to '58.246.69.164 - 58.246.69.167'
% Abuse contact for '58.246.69.164 - 58.246.69.167' is 'hqs-ipabuse@chinaunicom.cn'
inetnum: 58.246.69.164 - 58.246.69.167
netname: Microsoft
country: cn
descr: Microsoft (China) Co., Ltd.
admin-c: YR194-AP
tech-c: YR194-AP
status: ASSIGNED NON-PORTABLE
mnt-by: MAINT-CNCGROUP-SH
last-modified: 2008-12-13T14:48:23Z
source: APNIC
person: yanling ruan
nic-hdl: YR194-AP
e-mail: sh-ipmaster@chinaunicom.cn
address: No.900,Pudong Avenue,ShangHai,China
phone: +086-021-61201616
fax-no: +086-021-61201616
country: cn
mnt-by: MAINT-CNCGROUP-SH
last-modified: 2008-12-15T08:05:03Z
source: APNIC
```

You'll see a lot of results, including company information, organizational details, country, etc.

Only in Asia, we found around 23 IP ranges owned by Microsoft. Imagine how much you can find in the rest of the world!

This is one of the most classic of methods. However, it's a manual one and not particularly friendly for non-technical users..

## Using a RIR API

If you don't like using manual commands, and you do have some programming skills, you could interact directly with any of the RIR's API and run your queries from there.

The five RIRs allow access to their API so you can launch simple queries against any of the global WHOIS databases, letting you access data from specific IP ranges, or by searching

For example, if you're using RIPE[1] as one of the major RIRs and you want to explore an IP range, you can launch a simple HTTP request like this:

```
curl 'http://rest.db.ripe.net/ripe/inetnum/193.0.0.0%20-%20193.0.7.255?unfiltered'
```

If you need to explore a company's data, you can do so by using its name, in the following way:

```
curl 'http://rest.db.ripe.net/search?source=ripe&query-string=Microsoft&flags=no-filtering
```

In both cases, the response will be returned in XML format by default.

You can do the same thing by checking the official API docs for each of the five RIRs. Remember these are free APIs, and there are limits in place for avoiding abuse. Keep that in mind.

### Using SurfaceBrowserTM

What if you could avoid querying RIRs altogether, or query another WHOIS server to get the full IP blocks of any company in the world in just one second?

Brace yourself—such a tool really exists. It's called SurfaceBrowser™.

SurfaceBrowser™ is our enterprise-grade product built as an attack surface analysis tool. And when it comes to network mapping, it can help you quickly retrieve the total IP blocks for any company in the world.

You can manually type the name of any company in the world, or choose to explore the full intelligence data we have ourselves (including total IP blocks) — from any of the Fortune 500 companies and Top 500 websites according to Alexa:



Here, we launched our test using Amazon as an example. Then, we clicked the IP Blocks option in the left menu, which can yield valuable results in less than a second.

Once you arrive at the results page, you'll be able to obtain the total IP blocks, summarized by the Regional Registrar. You'll be given the choice to show records between popular RIRs such as ARIN, RIPE, APNIC[3], AFRINIC and more. You'll also be able to visualize IP blocks by subnet size including ranges such as /29, /30, /28, /18, /16, and others.



The results will be displayed showing the IP Block number, IP Count, Unique User Agents, assigned RIR, as well as hostnames and number of hosted domains for each IP range.



From this interface, you'll be able to jump into specific IP ranges, to fetch real-time information regarding that block, which includes IP Count, Bitmask, Base IP, Broadcast IP, Network Mask, Host Mask, Service Provider, ASN lookup, and Organization.

# APPENDIX
# 185

**InfoSec Handlers Diary Blog**

Keyword, Domain, Port, IP or Hea[ Search ]          Email          Password          [ Log in ]

Sign Up for Free!  Forgot Password?

**Contact Us**

**DIARY**

**Podcasts**

**Jobs**

**Tools**

**Data**

**Forums**

**Questions?
Feedback?**
Use our contact form
or
report bugs here
For interactive help
and to chat with other
users, try our Slack
group.

slack

# Analysis of a Paypal phishing kit

Published: 2017-08-16
Last Updated: 2017-08-16 06:48:38 UTC
by Xavier Mertens (Version: 1)
0 comment(s)

They are plenty of phishing kits in the wild that try to lure victims to provide their credentials. Services like Paypal are nice
targets and we can find new fake pages almost daily. Sometimes, the web server isn't properly configured and the source code
is publicly available. A few days ago, I was lucky to find a ZIP archive containing a very nice phishing kit targeting Paypal. I took
some time to have a look at it.

I presume that the kit is related to a spam campaign but I did not get the initial email. Based on the quality of the kit, I suspect
the email to be properly written. As usual, it starts with the classic Paypal login page:



Then a fake verification page is displayed to warn the victim that a check of the account must be performed. Note that the values
are hard coded.



The next steps ask the victim to enter his/her details, including banking details.



Graphically, the different pages are very clean and use components from the Paypal website to reproduce a look and feel very
close to the official pages. Let's have a look at the code now.

First the timezone is set to Tokyo with the date_default_timezone_set() PHP function. Some comments in the code reveal that
the attacker is speaking Indonesian (example: "masuk" means "sign in"). The victim's IP address, user-agent are logged in a log
file. Then, the kit protects itself against crawlers and security scanners or infosec companies. Before displaying the login page,
they are controls performed via .htaccess to blocklist some IP addresses or User-Agents:

```
RewriteCond %{HTTP_USER_AGENT} "googlebot [OR]
RewriteCond %{HTTP_USER_AGENT} "TweetmemeBot [OR]
RewriteCond %{HTTP_USER_AGENT} "BlackWidow [OR]
RewriteCond %{HTTP_USER_AGENT} "ChinaClaw [OR]
```

```
RewriteCond %{HTTP_USER_AGENT} ^JISCW [OR]
RewriteCond %{HTTP_USER_AGENT} ^Download Demon [OR]
RewriteCond %{HTTP_USER_AGENT} ^eCatch [OR]
RewriteCond %{HTTP_USER_AGENT} ^BizGrabber [OR]
```

```
order allow,deny
deny from x.123.119.163
deny from x.163.233.200
deny from x.169.29.56
deny from x.60.126.19
deny from x.2o7.com
deny from x.163.162.66
deny from x.56.163.64
deny from x.20.57.227
```

There is also a second check of the IP address included in the PHP code. If a valid IP address or User-Agent is detected, an HTTP error 404 (page not found) is returned. Geolocation of the victim is performed via www.geoplugin.net.  To generate unique URLs, the phishing kit copies itself into a temporary directory (randomly generated). This helps to protect against basic filtering in IDS or firewalls.

After the victim provided his/her credentials, the nice feature is a connection attempt to Paypal to try to validate them. If it works, useful information is extracted from the HTML code. The following URLs are used to achieve this:

```
https://www.paypal.com/cgi-bin/webscr?cmd=_profile-address
https://www.paypal.com/cgi-bin/webscr?cmd=_profile-phone
```

When the verification screens are displayed to the victim, fields are prefilled with the extracted information from Paypal. This is really evil! All fields are also validated to prevent garbage and increase the change to capture real data. Depending on the card number that the victim provided, a next screen is presented to fill bank details. Based on the source code, three countries are targeted: US, CA and UK. Depending on the bank, specific forms are displayed to request valid connection details. Here are the US bank listed in the code:

```
else if (Inqparam=="US") { echo
<p class="field" >&#x0DF2;ank Name :
<select id="bank" name="BNAnonmous" style="padding-left:14%;">
   <option value="">Select &#x30D2;ank</option>
   <option value="Ally Financial">Ally Financial</option>
   <option value="American Express Company">American Express Company</option>
   <option value="B&aT">B&#x47;</option>
   <option value="Bank of America">Bank of America</option>
   <option value="Bank of New York Mellon">Bank of New York Mellon</option>
   <option value="Charles Schwab Corporation">Charles Schwab Corporation</option>
   <option value="Capital One">Capital One</option>
   <option value="Citizens Financial Group">Citizens Financial Group</option>
   <option value="Citigroup">Citigroup</option>
   <option value="Fifth Third Bank">Fifth Third Bank</option>
   <option value="Goldman Sachs">Goldman Sachs</option>
   <option value="HSBC Bank USA">HSBC Bank USA</option>
   <option value="JPMorgan Chase">JPMorgan Chase</option>
   <option value="Morgan Stanley">Morgan Stanley</option>
   <option value="PNC Financial Services">PNC Financial Services</option>
   <option value="SunTrust Banks">SunTrust Banks</option>
   <option value="State Street Corporation">State Street Corporation</option>
   <option value="TD Bank">TD Bank, N.A.</option>
   <option value="US Bancorp">U.S. Bancorp</option>
   <option value="Wells Fargo">Wells Fargo</option>
   <option value="others">Other</option>
</select>
```

At the end of the "verification process", an email is sent to the attacker with all the victim's details. The destination is a gmail.com account. Here is an example of data exfiltrated to the attacker:

```
++----+[ $$ |-]CikampmA-TJ4m|-] $$ ]------+*

   .++======[ Tukang Credit ]======++.
Cardholder Name :   Test Test
Card Number       :  4111 1111 1111 1111
Expiration Date :  05 / 2019
CvV2              :  111
BIN/TIN Info      : -- --
Sort Code         :  -- --
Account number  :
BSB - 0SID        :  --
Credit Limit      :
Mother's name     :
Account Name      :
Address Line 1  :  Address
Address Line 2  :
City/Town         :  City
State             :  State
Zip/PostCode      :  1202
Country           :
Phone Number      :  0123456789
SSN               : -- --
ID Number         :
DOB               :  1 / 1 / 1991
   .++=========| End ]============+.

   .+========== PC Info ]=========+.
From     :  172.16.0.30 On Wed, 16 Aug 2017 08:00:07 +0200
Browser  :  Mozilla/5.0 (Macintosh; Intel Mac OS X 10_12_5) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/60.0.3112.90 Safari/537.36
   .++=========| End ]============+.

++----| $$ |R|e|V|e|R| |GIVE UP| $$ ]------+*
```

If most phishing kits remain simple and can be easily spotted by the victims, some of them are really well developed and harder to catch, especially if the URL used is nicely chosen and distributed via HTTPS. This kit was huge with more than 300 files in a 1.8MB ZIP file. Take care!

Xavier Mertens (@xme)
ISC Handler - Freelance Security Consultant
PGP Key

Keywords: paypal phishing

0 comment(s)

Attend with Xavier Mertens in starting



Top of page ⬆

 Diary Archives

# APPENDIX
# 186

US010102372B2

(12) **United States Patent**
Huang et al.

(10) Patent No.: **US 10,102,372 B2**
(45) Date of Patent: **\*Oct. 16, 2018**

(54) **BEHAVIOR PROFILING FOR MALWARE DETECTION**

(71) Applicant: **Proofpoint, Inc.**, Sunnyvale, CA (US)

(72) Inventors: **Wayne Huang**, New Taipei (TW); **M. James Idle**, Taipei (TW)

(73) Assignee: **Proofpoint, Inc.**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/623,018**

(22) Filed: **Jun. 14, 2017**

(65) **Prior Publication Data**

US 2017/0286678 A1     Oct. 5, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/659,272, filed on Mar. 16, 2015, now Pat. No. 9,734,332.

(Continued)

(51) **Int. Cl.**
*G06F 21/00* (2013.01)
*G06F 21/56* (2013.01)
*H04L 29/06* (2006.01)

(52) **U.S. Cl.**
CPC .......... *G06F 21/562* (2013.01); *G06F 21/567* (2013.01); *H04L 63/1433* (2013.01); *G06F 2221/034* (2013.01); *H04L 63/145* (2013.01)

(58) **Field of Classification Search**
CPC ................ G06F 21/562; G06F 21/567; G06F 2221/034; H04L 63/1433; H04L 63/145
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,484,143 B1    11/2002  Swildens et al.
7,779,399 B2     8/2010  Huang et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP          3120286 A1     1/2017
WO    WO2015142755 A1     9/2015

OTHER PUBLICATIONS

Non-Final Office Action, dated Jul. 12, 2016, U.S. Appl. No. 14/659,272, filed Mar. 16, 2015.
(Continued)

*Primary Examiner* — Don G Zhao
(74) *Attorney, Agent, or Firm* — Carr & Ferrell LLP

(57) **ABSTRACT**

Provided herein are systems and methods for behavior profiling of targets to determine malware presence. The method includes, in various embodiments, applying a domain specific language to a target; observing a set of temporal sequences and events of the target; determining the presence of markers within the set of temporal sequences and events indicative of malware; and identifying the target as being associated with malware based on the markers. In some embodiments, a malware detection system is provided for creating a behavioral sandbox environment where a target is inspected for malware. The behavioral sandbox environment can include forensic collectors. Each of the collectors may be configured to apply a domain specific language to a target; observe a set of temporal sequences and events of the target; determine the presence of markers within the set of temporal sequences and events indicative of malware; and detect malware presence based on the markers.

**20 Claims, 7 Drawing Sheets**



Applying a domain specific language to a target
605

Tracking a set of temporal sequences and events of the target
610

Determining presence of one or more markers within the set of temporal sequences and events that are indicative of malware
615

Identifying the target as being associated with malware based on the one or more markers
620

## US 10,102,372 B2
Page 2

### Related U.S. Application Data

(60) Provisional application No. 61/954,373, filed on Mar. 17, 2014.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,779,472 | B1 * | 8/2010 | Lou | G06F 21/566 |
| | | | | 726/22 |
| 8,555,269 | B2 | 10/2013 | Huang et al. | |
| 8,711,838 | B1 * | 4/2014 | Guichard | H04L 12/4633 |
| | | | | 370/351 |
| 8,887,286 | B2 * | 11/2014 | Dupont | G06F 21/00 |
| | | | | 726/25 |
| 9,213,837 | B2 * | 12/2015 | Richard | G06F 21/562 |
| 9,215,074 | B2 * | 12/2015 | Wyatt | G06F 8/70 |
| 9,411,955 | B2 * | 8/2016 | Jakobsson | G06F 21/55 |
| 9,734,332 | B2 | 8/2017 | Huang et al. | |
| 2009/0077664 | A1 | 3/2009 | Hsu et al. | |
| 2009/0144827 | A1 * | 6/2009 | Peinado | G06F 21/577 |
| | | | | 726/25 |
| 2011/0061104 | A1 * | 3/2011 | Sarraute Yamada | |
| | | | | H04L 41/0823 |
| | | | | 726/23 |
| 2011/0078141 | A1 * | 3/2011 | Fakeih | G06F 17/30536 |
| | | | | 707/736 |
| 2011/0154494 | A1 | 6/2011 | Sundaram et al. | |
| 2011/0283360 | A1 | 11/2011 | Abadi et al. | |
| 2012/0137367 | A1 * | 5/2012 | Dupont | G06F 21/00 |
| | | | | 726/25 |
| 2012/0220486 | A1 * | 8/2012 | Farinas | C12Q 1/6825 |
| | | | | 506/9 |
| 2013/0086681 | A1 | 4/2013 | Jaroch | |
| 2013/0103715 | A1 * | 4/2013 | Beckman | G06F 9/547 |
| | | | | 707/770 |
| 2013/0117849 | A1 | 5/2013 | Golshan et al. | |
| 2013/0326425 | A1 * | 12/2013 | Anderson | G06F 21/56 |
| | | | | 726/23 |
| 2013/0332988 | A1 * | 12/2013 | Thomas | G06F 21/562 |
| | | | | 726/1 |
| 2014/0047544 | A1 * | 2/2014 | Jakobsson | G06F 21/55 |
| | | | | 726/23 |
| 2015/0007312 | A1 * | 1/2015 | Pidathala | H04L 63/145 |
| | | | | 726/22 |
| 2015/0067399 | A1 * | 3/2015 | Jaroker | G06F 11/2294 |
| | | | | 714/37 |
| 2015/0096025 | A1 | 4/2015 | Ismael | |
| 2015/0261955 | A1 * | 9/2015 | Huang | G06F 21/562 |
| | | | | 726/23 |
| 2015/0310196 | A1 * | 10/2015 | Turgeman | G06F 21/552 |
| | | | | 726/19 |
| 2016/0098561 | A1 * | 4/2016 | Keller | G06F 21/554 |
| | | | | 726/24 |
| 2016/0156652 | A1 * | 6/2016 | Paffenroth | H04L 63/1425 |
| | | | | 726/23 |

#### OTHER PUBLICATIONS

Final Office Action, dated Jan. 9, 2017, U.S. Appl. No. 14/659,272, filed Mar. 16, 2015.
Notice of Allowance, dated Mar. 28, 2017, U.S. Appl. No. 14/659,272, filed Mar. 16, 2015.
International Search Report and Written Opinion dated Jun. 25, 2015 in Patent Cooperation Treaty Application No. PCT/US2015/020807, filed Mar. 16, 2015, 14 pages.

* cited by examiner



100
Behavioral Sandbox Environment 130
Targets 120
Malware Detection System 110
Processor
Memory
DSL Compiler Module 125
Forensic Collectors 140A-N
Forensic Analyzers 145A-N
Protocol Analyzer 135
Rule Engine 150
Static Analysis Module 155
IP Randomizer Module 160
Network 115
Client Terminal 105

FIG. 1



*FIG. 2*



*FIG. 3*



*FIG. 4*



*FIG. 5*



*FIG. 6*



*FIG. 7*

US 10,102,372 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**BEHAVIOR PROFILING FOR MALWARE DETECTION**

CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. patent application Ser. No. 14/659,272 filed Mar. 16, 2015 (now U.S. Pat. No. 9,734,332, issued Aug. 15, 2017), which claims the benefit of U.S. Provisional Application Ser. No. 61/954,373, filed Mar. 17, 2014, which are hereby incorporated by reference herein in their entirety, including all references cited therein.

FIELD

The present technology pertains to data security, and more specifically, but not by limitation, to systems and methods that employ behavior profiling for malware detection. In some embodiments, the systems and methods use domain specific languages in order to profile the behavior of a domain such as a document, executable file, a Uniform Resource Locator (URL), or other target. The behaviors are comprised of at least temporal sequences of events that, when analyzed, will yield evidence that can be analyzed to detect the presence of malware.

SUMMARY

According to various embodiments, the present technology is directed to a method comprising: (a) applying a domain specific language to a target, the domain specific language utilized to detect malware associated with the target; (b) observing a set of temporal sequences and events of the target; (c) determining presence of one or more markers within the set of temporal sequences and events that are indicative of malware; and (d) identifying the target as being associated with malware based on the one or more markers.

According to some embodiments, the present technology is directed to a system comprising: (a) a processor; and (b) a memory for storing executable instructions, the instructions being execute by the processor to create a behavioral sandbox environment where a target is inspected for malware, the behavioral sandbox environment comprises (c) a plurality of forensic collectors that are each configured to (i) apply a domain specific language to a target; (ii) observe a set of temporal sequences and events of the target; (iii) determine presence of one or more markers within the set of temporal sequences and events that are indicative of malware; and (iv) detect malware presence based on the one or more markers.

The present technology, according to some embodiments, is directed to a non-transitory computer-readable medium having embodied thereon instructions being executable by at least one processor to perform a method for providing malware detection, the method comprising: (a) retrieving a URL, the retrieving comprising contacting a server to receive a home page code; (b) performing a preliminary determination to determine if the home page code includes a malicious signature; (c) in response to the home page code being deemed clean such that the preliminary determination is that no malicious signature is included on the home page code, parsing the home page code and translating the home page code onto a web page; (d) rendering text and links to external databases for images on the web page; (e) allocating memory to perform the rendering of the images; (f) gener-

ating an event log of all items rendered on the web page; (g) analyzing a chronological order of events in the event log to identify behavior patterns among the events; (h) comparing identified behavior patterns to predetermined rules; and (i) identifying the URL as including malware if a match is found between the identified behavior patterns and the predetermined rules.

The present technology, according to some embodiments, is also directed to a method comprising: (a) applying a domain specific language to a target, the domain specific language utilized to detect malware associated with the target; (b) observing a set of temporal sequences and events of the target; (c) determining presence of one or more markers within the set of temporal sequences and events that are indicative of malware; and (d) identifying the target as being associated with malware based on the one or more markers.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, where like reference numerals refer to identical or functionally similar elements throughout the separate views, together with the detailed description below, are incorporated in and form part of the specification, and serve to further illustrate embodiments of concepts that include the claimed disclosure, and explain various principles and advantages of those embodiments.

The methods and systems disclosed herein have been represented by appropriate conventional symbols in the drawings, showing only those specific details that are pertinent to understanding the embodiments of the present disclosure so as not to obscure the disclosure with details that will be readily apparent to those of ordinary skill in the art having the benefit of the description herein.

FIG. **1** is a schematic diagram of an example computing environment for practicing aspects of the present technology.

FIG. **2** illustrates an example malware analysis of an entry URL and anchor URLs associated with www.mysql.com.

FIG. **3** illustrates an example resource URLs created from www.mysql.com.

FIG. **4** illustrates a granular view of a resource URL having a plurality of sub-scenes (e.g., events).

FIG. **5** is an example web UI comprising a graph illustrating temporal events in an advertisement delivery process caused by a user clicking an advertisement tag.

FIG. **6** is a flowchart of an example sandboxing method of the present technology.

FIG. **7** is a schematic diagram of an example computing system that can be used to practice aspects of the present technology.

DETAILED DESCRIPTION

As more and more services and transactions are provided via the World Wide Web, users are more likely to click on a link or a document that contains malware. Email is a primary attack vector in Advanced Persistent Threats (APT), and is often used to deliver malicious URLs and documents to victims.

Current technologies, such as anti-virus software programs and network firewalls, started out aiming at detecting viruses on the personal computer (PC). However, as the PC has always had very limited computation power, the anti-virus software's goal has been to "detect as much as possible" under constrained resources.

US 10,102,372 B2

3

This concept rooted even deeper into the antivirus industry as the Internet boomed and antivirus vendors started to integrate with network devices—firewalls, gateways, email servers, and so forth. Since speed is critical and computation power is limited on an appliance, antivirus technology went further down the road of signature-based pattern matching.

However, signature-based pattern matching does not always detect the malware before it infects a computer. For malware detection that relies solely on signature-based pattern matching, it is possible that a threat is not perceived, because the signature appears to be legitimate.

Some malware uses an exploit-based malware infection (EBMI) process, which is a widely used attack vector in Advanced Persistent Threats. In EBMI, the victim is infected by opening a malicious document, often referred to as a document exploit. Common document exploit formats used in EBMI include web pages, PDF files, Word™ files, Powerpoint™ files, Excel™ files, and Flash™ files embedded inside one of the previous types.

During EBMI phase one, a victim opens a document via a document renderer, defined as a software program that displays the document. Common (document, renderer) pairs include (web page, web browser), (web page containing flash, web browser with flash support or plug-in), (web page containing Java™ applets, web browser with applet support/JRE), (PDF document, PDF reader), (Word document, MS Word™), (Excel document, MS Excel™), (Powerpoint™ document, MS Powerpoint™), and so forth.

The document in this instance, being malicious, is referred to as a document exploit. It contains mechanisms to exploit vulnerabilities either directly inside the renderer itself, or inside one of the renderer's installed plug-ins (e.g., Flash™, Java™ applet, Real Player™, and so forth.). If the exploited vulnerability is unknown to the renderer provider (vendor), then it is called a zero-day exploit.

The exploitation code (exploit) may be implemented using scripting languages (e.g., Javascript™, Actionscript™, VBScript™, VBA™). Scripting languages provide the functionality needed to exploit the targeted vulnerability. Since scripting languages are interpreted languages, it is very easy to obfuscate the exploitation code, thus making detection difficult. Common (renderer, scripting language) pairs include (web browsers, Javascript™), (Flash™, Actionscript™), (PDF, JScript™), (Office documents, VBA macros). Note that Javascript™, Actionscript™, and JScript™ are all ECMA-based scripting languages.

The following attacks may leverage an EBMI process: (a) drive-by download attacks, (b) malvertising attacks, (c) URL-based email attacks, and (d) attachment-based email attacks. In (a) (b) and (c), the browser may load a web page served by an exploit pack, which serves polymorphic web-page exploits. The server that hosts the exploit pack is called the exploit server, and the involved URLs are called the exploit URLs.

When a document exploit is opened, and upon successful exploitation, a dropper is often created on disk and executed. The dropper can either be the actual malware, or it can be just a tiny executable whose sole job is to download the actual malware over the Internet.

In order to attempt to permanently infect a compromised system, the malware will often (a) move itself to permanent disk locations; and (b) modify system configuration (e.g., registry settings) so as to be auto executed upon every system startup. In order to hide itself from security checkers and users, the malware will often rename itself to seemingly legitimate filenames or arrange for alternative, less detect-

4

able and higher-privileged methods of execution, for example, using process injection.

Once permanently installed, the malware will typically start to (a) connect back to the command-and-control (CNC) server, or to (b) send the collected information back to the attacker.

Accordingly, it would be desirable to provide methods and systems to detect malware before it is downloaded onto a user's computer. Furthermore, it would be desirable to receive detailed forensics reports on exactly what occurred during the two EBMI phases. These and other advantages of the present technology will be described with reference to the collective drawings (FIGS. 1-7).

FIG. 1 illustrates an example environment 100 in which aspects of the present technology can be implemented. The environment 100 comprises at least one client terminal 105, such as an end user computing system utilized by an end user to interact with a malware detection system, hereinafter ("system 110"). In some embodiments, the client terminal 105 and system 110 are communicatively coupled with one another via a network 115.

The network 115 may include private or public communication channels such as the Internet. Suitable networks may include, or interface with, any one or more of a local intranet, a PAN (Personal Area Network), a LAN (Local Area Network), a WAN (Wide Area Network), a MAN (Metropolitan Area Network), a virtual private network (VPN), a storage area network (SAN), a frame relay connection, an Advanced Intelligent Network (AIN) connection, a synchronous optical network (SONET) connection, a digital T1, T3, E1 or E3 line, Digital Data Service (DDS) connection, a Digital Subscriber Line connection, an Ethernet connection, an ISDN (Integrated Services Digital Network) line, a dial-up port such as a V.90, V.34 or V.34bis analog modem connection, a cable modem, an ATM (Asynchronous Transfer Mode) connection, or an FDDI (Fiber Distributed Data Interface) or CDDI (Copper Distributed Data Interface) connection. Furthermore, communications may also include links to any of a variety of wireless networks; including WAP (Wireless Application Protocol), GPRS (General Packet Radio Service), GSM (Global System for Mobile Communication), CDMA (Code Division Multiple Access) or TDMA (Time Division Multiple Access), cellular phone networks, GPS (Global Positioning System), CDPD (cellular digital packet data), RIM (Research in Motion, Limited) duplex paging network, Bluetooth radio, or an IEEE 802.11-based radio frequency network.

According to some embodiments, the system 110 may include a cloud-based computing environment for threat analysis and detection system using data analytics. In general, a cloud-based computing environment is a resource that typically combines the computational power of a large grouping of processors and/or combines the storage capacity of a large grouping of computer memories or storage devices. For example, systems that provide a cloud resource may be utilized exclusively by their owners; or such systems may be accessible to outside users who deploy applications within the computing infrastructure to obtain the benefit of large computational or storage resources.

The cloud may be formed, for example, by a network of web servers such as web servers with each web server (or at least a plurality thereof) providing processor and/or storage resources. These servers may manage workloads provided by multiple users (e.g., cloud resource customers or other users). Typically, each user places workload demands upon the cloud that vary in real-time, sometimes dramatically. The

US 10,102,372 B2

5

nature and extent of these variations typically depend on the type of business associated with the user.

The system **110** may be generally described as a particular purpose computing environment that includes executable instructions that are configured to provide target behavioral profiling to determine the presence of malware based on temporal activities and events of a target.

In general, the system **110** can be used to create and apply threat description languages to targets, such as targets **120**. The targets **120** comprise, for example, web servers that provide a URL, an entry URL, a document, an executable file, or any other targeted mentioned herein. Also, a target can be referred to as a suspect when the target is being analyzed by the system **110**.

A threat description language is referred to herein as a domain specific language (DSL). In some embodiments, the system **110** is configured to apply a formal threat description language to a target. In one example, a DSL can be used to describe and detect malware in HTTP protocol streams, which facilitates malware detection. The DSL may be used to describe behavior and patterns exhibited within conversations between HTTP clients including, but not limited to, web browsers and HTTP servers. Example HTTP servers (e.g., targets) can include Internet web servers. The DSL may be implemented as a cloud-based software-as-a-service (SaaS) or as part of a hardware appliance in communication with a network server. Source code inputs to this system **110** may have a unique file format and can comprise source code for the DSL.

In some embodiments, a DSL may be a declarative language that is defined when a user specifies tests that should be performed while analyzing an HTTP conversation, but does not specify how those tests are run, in what order, or any other kind of logic flow.

Additionally, a DSL compiler may use source code files that include rule sets to generate Java™ source code, which may contain logic flow and procedure generated by internal 'knowledge' encapsulated within the compiler.

Thus, in some embodiments, the system **110** comprises a DSL compiler module **125** to generate a set of rule files and compile the same into a collection of Java files, which in turn may be compiled into a rule engine **150**.

In other embodiments, the rules can be created using other means such as user creation or another computerized automatic code generator.

The rule engine **150** may be supported by an external runtime library, which may also be written in Java™ in various embodiments. Java™ may be advantageous due to its portability among operating systems and hardware, however, the DSL compiler module **125** could generate any other procedural based language as output, including machine code directly, assembly language, C and so forth.

The generated rule set is intended to be incorporated in one or more other systems such as a protocol analyzer **135**, which assembles network data packets into their original conversations between client terminal **105** and the target **120**, or a behavioral sandbox environment **130**, which uses a rule set to check HTTP conversations, URLs found to be visited by a program, and other activities or actions.

Temporality is one of the advantages of various embodiments for describing and detecting malware. More specifically, the rules of the DSL may be based on observed temporal sequences and events between a client terminal **105** and a target **120**. For example, if a browser visits a web page before being sent to another (second) web page, and then a Javascript is found in the second page, the Javascript may be identified as malware by the system **110**.

6

Rules may be programmed to identify malware based on any of: (a) URLs visited, pages containing certain content; (b) the presence or absence of certain HTTP headers or their values; (c) the presence of certain Javascripts (or classes of Javascripts); and (d) the detection of an attempt to download certain binaries with a known signature and other markers—just to name a few.

In one embodiment, a rule of the DSL may detect one or more of these markers and make decisions about the presence of malware based on the combinations of markers that are present (or not).

In some embodiments, a rule of a DSL can also detect entities that are somewhat like known malware, such as for Javascripts and binary downloads, and so forth. There can be, for instance, a certain confidence level that something detected is a variant of another known example malware. For example, in an attempt to disguise some new variant of a threat programmed in Javascript, malware authors may change the names of variables and non-useful code, and generally try to obfuscate the code. The system **110**, using a DSL, can detect various such changes and match the original threat vector with a given probability (calculated from how different the new version of the threat is from the original.)

After a set of rules is generated, an HTTP conversation (or other activity) may be assessed using a rule set of a DSL. In this example, the system **110** examines the conversations under all rules (or a portion thereof) that the rule set contains. Detected issues may be evinced to a collector program. In some embodiments, a DSL may not itself define how these HTTP conversations are captured by the collector program. Accordingly, a DSL may advantageously be modular, and can be integrated with anything that can present the DSL with a seemingly valid HTTP conversation.

Although examples have been outlined above regarding the use of DSLs for inspecting HTTP conversations, such examples are not to be construed as limiting. A DSL may be used by the system **110** to inspect a binary or text file, with some parts of the language being designed to have more relevance than others to the type of document/file set it is presented with. Moreover, a DSL may be a working language/system, which is constantly being enhanced as different threat vectors are discovered by researchers.

For example, the DSL can be a module or engine deployed on a network or onto a specific server or target. As used herein, the terms "module" or "engine" may also refer to any of an application-specific integrated circuit ("ASIC"), an electronic circuit, a processor (shared, dedicated, or group) that executes one or more software or firmware programs, a combinational logic circuit, and/or other suitable components that provide the described functionality.

In general, a DSL may provide, relative to a target and its activities, a clear definition of what to look for, as well as a coherent methodology that can be used by the system **110** to present the analyzed information so as to facilitate clear understanding and further use of the information. To realize these two factors, in various embodiments, the system **110** utilizes a DSL in a forensics reporting methodology (FRM).

Users of the system **110** (in some embodiments, an application programming interface (API) for the DSL) can submit the following types of targets for analysis such as URLs, a starting URL (e.g., entry point) of an entire website to be crawled and scanned for malware; advertisement tags; document files; and executable files—just to name a few.

The output of system **110** may be zero day, advanced persistent threat malware forensics, FRM-based reports, and combinations thereof. In the FRM, a target that is scanned by the system **110** is referred to as a suspect.

US 10,102,372 B2

7

In some embodiments, the system **110** is configured to provide a forensic analysis by comparing a behavior analysis of a target and identification of the malware. At the end of its automated scanning process, the system **110** (using a DSL) may determine the suspect's maliciousness, identification, and behaviors of the malware.

Determining whether a suspect (e.g., target that is suspected of having malware) is malicious or benign may be a primary objective of the system **110**. However, determining the identity of the attacker can be difficult when the suspect is new or has been rarely seen. The system **110** may be used to identify zero-day exploits and advanced persistent threat (APT) malware. To be sure, with these types of suspects, determining the identification of the malware or its authors may be difficult because these types of malware do not yet have names.

What is very valuable to victims of malware, however, is having behavioral knowledge of a suspect. The behavioral knowledge allows administrators to answer questions such as: "what does it do to the victim?"; "what does it steal?"; "what does it break?"; "what does it install?"; "where is it trying to connect back to?"; "what protocols are used?"; and so forth. The exact types of questions that can be answered by the system **110** depend on the malware itself, such as whether the malware is an executable file or a URL phishing attack, as well as the behaviors of the malware.

Such knowledge can aid the victim in their incidence response efforts, as well as help them understand more about an identity of the attacker. An FRM may be designed by the system **110**, with its forensics reporting focusing much more on maliciousness and behavior.

In some embodiments, the system **110** may detect malware and collect forensic information by letting a suspect execute inside a monitored sandbox, such as the behavioral sandbox environment **130**. Modern malware, and especially the types used in APT, often incorporates many painstakingly-developed features that differentiate a benign victim environment (BVE) against a monitored lab environment (MLE) used to analyze malware behavior, such as a malware sandbox.

Malware may incorporate both active and passive MLE-detection features. Malware can actively detect victim environment behavior such as NIC names, special CPU instructions, registry entries, so forth, that are indicative of MLEs. When malware detects that it is executing inside a sandbox, it may terminate and in some cases also delete itself. This prevents forensics information from being collected.

Passive detection techniques include for example waiting for a period of time before actually performing malicious activities. MLEs typically do not wait forever, and therefore, after letting the suspect execute for a fixed period of time and not observing any malicious behavior, an MLE can declare a malicious suspect as benign.

Due to the above-mentioned techniques, the behavioral sandbox environment **130** may first attempt to induce or provoke an attack, in order to study a malware suspect and observe its behavior. When this is successful and the suspect starts to perform malicious activities, a "scene" has been generated from a suspect.

In summary, opening, rendering and execution of a document or other suspect within the behavioral sandbox environment **130** may create a scene, which sets the scope of a forensics investigation effort. A scene can comprise sub-scenes. In one example, when scanning an entire website, opening the entry URL using a browser creates the root scene, and subsequently opening up the rest of the website's

8

pages creates sub-scenes under the root scene. An example entry URL analysis process is illustrated in FIG. **2**.

Each scene or sub-scene is comprised of evidence, which includes the activities and events occurring with respect to a target (e.g., suspect). The behavioral sandbox environment **130** may utilize multiple forensics collectors **140**A-N. For each scene, the collectors may jointly gather as much evidence as possible. Evidence may be defined as activities or events that occurred within a scene. By way of example, evidence can comprise HTTP requests and responses, exploitation efforts (e.g., heap spraying), file creation and modification, process creation, registry changes, foreign memory manipulation, as well as other behaviors of malware that can be quantified or observed. An aspect of the evidence may be the raw data that is collected, for example the raw HTTP response content. Each scene may have multiple instances of evidence. The behavioral sandbox environment **130** can be configured to apply to each instance of evidence a time stamp. Thus, instances of evidence can be sorted in chronological order by the system **110**.

Multiple forensics analyzers **145**A-N may be run against each evidence instance's raw data in some embodiments. These forensics analyzers **145**A-N generate multiple forensics reports for each instance of evidence, each forensics report may include four elements proofs, exhibits, interpretations, and correlations.

Proofs may be a predefined set of facts. In various embodiments, the forensic analyzer is designed to prove the existence of the predefined set of facts within a scene. Examples of proofs may include the following: (a) "suspicious-or-malicious-scripts"; (b) "injected-scripts"; (c) "blacklisted-url"; (d) "exploit-pack"; (e) "tds"; (f) "exploit"; (g) "dropper"; (h) "execute"; (i) "registry-modifications"; (j) "file-modifications"; (k) "network-activities"; (l) "dns-look-ups"; (m) "http-requests"; (n) "foreign-memory-read"; (o) "remote-threads-created"; (p) "mutexes-created"; (q) "process-inject"—just to name a few examples. In one embodiment, proofs are derived based on exhibits.

An exhibit may be a section of an instance of evidence that has special meaning and can be used to derive a certain proof. Examples of exhibits may include: a snippet of malicious code (exhibit) inside an HTTP response (evidence), a certain path (exhibit) in which a browser is trying to create a file (evidence), or a certain registry key (exhibit) that a PDF reader is trying to modify (evidence).

Exhibits are useful because an exhibit explains a reason why a forensics analyzer is deriving a certain proof based on particular evidence. Sometimes, exhibits are also extremely useful during incidence response; for example, knowing the exact malicious snippet that was maliciously injected into a website can be used, in various embodiments, to help the website owner quickly mitigate the infection. Because the system **110** may collect fine-grained evidence instances, exhibits may often include each activity for an instance of evidence.

In some embodiments, a forensics report may have at least one interpretation. An interpretation may be a judgment that a forensics analyzer is making against a scene, based on a set of derived proofs. Examples of interpretations may include one or more of the following: "malicious;" "suspicious;" and "blacklisted." In one example, a forensic analyzer can determine, based on evidence that a target URL has malware associated with it based on its activities in the behavioral sandbox environment **130**. The forensic analyzer can black-list the URL based on this knowledge.

In some embodiments, correlations may be used within a forensics report to express causal relationships between

US 10,102,372 B2

9

evidences. Each evidence can have a single causal evidence, but may have multiple resulting evidences. Therefore, the causal relationships of an entire scene can be visualized using a tree representation in some embodiments. An example tree graphical representation is illustrated in FIG. **5**, which is described in greater detail below.

In some embodiments, an instance of evidence is analyzed by a plurality of forensics analyzers **145**A-N, each generating one or more forensics reports. Thus, an instance of evidence may be associated with an aggregated set of exhibits, proofs, interpretations, and correlations.

Similarly, each scene can be correlated to multiple evidences. Thus, a scene will have an aggregated set of proofs and interpretations in various embodiments. For those targets that require analysis of multiple sub-scenes (e.g., scanning an entire website), sub-scene reports can be aggregated to form the root scene's aggregated report. Aggregated interpretations of a target's root scene may be used to derive a set of the target's interpretations.

As mentioned above, the present technology can be implemented with the use of an API. The API used by the system **110** may be accessed by making calls to a scanning service via HTTPS. The scanning service can include a virtualized embodiment of the system **110** executing within a cloud-based environment.

The API may implement security and authentication via a combination of secure HTTP (HTTPS), HTTP basic authentication, and {id, password} pairs embedded in request JavaScript Object Notations (jsons). That is, the scanning service can be implemented in a service that is separated from the system **110** to prevent system infection.

With respect to HTTPS, the scanning service may only be accessible via HTTPS in some embodiments. With respect to basic authentication, it may be required for every single HTTPS request, which implies every HTTPS request must be sent with a base64-encoded authentication string in some embodiments. With respect to the {id, password} pair inside request jsons, it will be understood that some API calls require this additional {id, password} pair.

Because of basic authentication and id and password pair, each user may be provided with two different {id, password} pairs, one for basic authentication and the other for the id and password pair. Examples herein will denote the pair used for basic authentication as Account ("Basic") and the pair used for an id and password pair as Account (malware detection API).

The malware detection API may support the following targets (suspects) for analysis: URLs; an entry point URL of an entire website to be crawled and scanned for malware; advertisement tags; document files; and executables. As noted above, a target may be referred to as a suspect when the target is being analyzed by the system **110**.

The scanning service may implement from scratch its own malware analysis sandbox. The scanning service may run multiple renderers (e.g., browsers, PDF readers, MS Office Word, Excel, PowerPoint) on top of its virtualization platform, such as a virtual machine executing within a cloud. The scanning service may then collect forensic information and then execute multiple analyzers against the collected data. At the end of this process, an aggregated FRM (Forensics Reporting Methodology) report may be returned to the API caller, such as the client terminal **105**.

Within the aggregated FRM (AFRM) report, the interpretation state judgment of the subject (the target) may be based on proofs of malicious activities. These proofs may be

10

derived from exhibits, which comprise those portions of the evidence instances collected during forensics extraction (see above).

Evidence contained in the AFRM report may be fully correlated, and therefore can be used to generate a precise incident traceback. The generated precise incident traceback may describe in detail the entire dependency chain of an exploit-based malware infection (EBMI) incident, from the point of malware introduction, to each involved resources, to the actual point of exploitation, to the location of the ultimately installed malware binary, to the installation and execution of that malicious binary, to the harvesting of user data, to the controlling of user environment, to the connection back to the command and control.

Certain components of an EBMI process may be downloaded over the Internet. To avoid detection, exploit kits and malicious traffic distribution systems (TDS) may implement an Internet Protocol address (IP address) cloaking scheme (also referred to herein as IP cloaking). "IP addresses" are also referred to herein variously as "IPs" and similarly an "IP address" is also referred to herein variously as an "IP". Examples of IP cloaking comprise, but are not limited to, maintaining a good list of IPs of security vendors and search engines and tracking recently-visited IPs and serve malware to each IP only once.

The system **110** may include an IP randomizer module **160** that is configured to allow the system **110** to route network traffic via multiple geographic locations and leverage an extremely large Internet Protocol address (IP address) pool. The IP randomizer module **160** can also switch IP addresses frequently enough such that the same IP address is not used for an extended (e.g., predetermined) period of time.

In some embodiments, the system **110** comprises a static analysis module **155**. The static analysis module **155** may work in tandem with a behavioral analysis module (e.g., a behavior-based analysis that may be also used for forensics analysis and malware detection discussed above). A large volume of malicious samples may be detected daily. Samples that are detected only by the behavioral analysis module may be logged and queued for further analysis (e.g., by an automatic analysis module, by a malware research team, etc.). Static rules (e.g., DSL) may then be developed for these new samples, which permit the static analysis module **155** to also detect them.

The static analysis module **155** may be advantageous for those applications that require a response as quickly as possible. At the same time, static analysis may offer more robust detection against dormant, inactive (many malware servers are active only during specific hours), or broken malware, and also against IP cloaking.

For example, whenever the static analysis module **155** detects a malicious domain that is registered by an attacker, then even if this domain is not currently serving malware (e.g., not currently exhibiting suspicious behavior), the malware detection system may still report a suspicious traceback.

The system **110** can also execute a hybrid analysis that first uses behavioral analysis to execute the malware. During execution, the system **110** may collect forensic evidence (e.g., dynamically generated code and domains involved), and send this data back to the static analysis module **155**.

The following descriptions relate to the use of the system **110** for analyzing specific types of targets/suspects.

Referring now to FIG. **2**, one type of suspect is a single web page (a URL) or an entire website. In order to describe

US 10,102,372 B2

11

an example of how an example system 110 scans a URL or website for malware, a summarization of a view of the system 110 is provided.

In this example, a scan job may start from an entry URL, which can be, for example, a root URL 202 of a website. One can expand from the entry URL 202 a graph (see example graph in FIG. 5) by following anchor URLs 204, which are commonly referred to as links. This process of building an anchor URL graph from an entry URL is called crawling.

In the HTTP model, each page, or HTTP resource, is dereferenced by a URL. HTTP resources may be linked to each other by anchor URLs, which are HTML anchors (<a) that link two HTTP resources together. Internally, the system 110 may build such a graph during its scanning processes.

Each individual page often requires multiple resources in order to render properly. These resources are each dereferenced by a URL, and collectively referred to as "render URLs" of a page.

FIGS. 3 and 4 collectively illustrate, by way of example of these resources, the render URLs 302 for the website of FIG. 2. The system 110 may also construct similar graphs during its scanning.

When given an entry URL, the system 110 may perform a crawling process and build an anchor-URL graph very similar to that shown in the example in FIG. 5. The anchor-URLs graph may inform the system 110 of a scan scope and a next page to scan. The system 110 may implement a breadth-first search when traversing this graph.

In FIG. 4, a virtualized view of an anchor URL 304 is illustrated. The anchor URL 304 is illustrated with various events or sub-scenes associated therewith. For example, the anchor URL involves customers by country. A plurality of iframe events 306 are utilized for implementing the anchor URL 304. Likewise, a set of Javascripts 308 are executed for the anchor URL 304. Each event is part of the evidence collected for the anchor URL 304.

Pages with URLs that have the same domain name as entry URL may be considered in-scope pages; if otherwise, they may be considered ex-scope pages. The system 110 may only follow in-scope pages when building the anchor-URL graph in some embodiments.

A basic scanning unit used by the system 110 may include a page. When scanning a page, the system 110 may cover all render URLs of that page, irrespective of whether these URLs are in-scope or ex-scope. The same process applies to redirect links.

The following description involves an example analysis. This example is regarding online advertising within an online advertising ecosystem. In the system 110 view of an online ad ecosystem, malvertising may occur when a malicious creative is served through an advertisement tag to a user, such as in their browser application.

Each unique malicious creative may be called a malvertisement. Examples of malvertisements include: click-to-downloads; drive-by downloads; phishing; and rogueware or ransomware—just to name a few.

The system 110 may sample each advertisement tag and scan the creative served. The serving of creatives is often targeted by malware, which means advertising tags may serve different creatives depending on visitor attributes such as IP geolocation, timezone, browser language preferences, and so forth.

To increase sample coverage, users can specify these attributes. For example, a user can instruct the system 110 to scan an advertisement tag from different IP geolocations.

During a malvertising incident, insight may be provided by the system 110 into the malvertising chain. One example

12

chain comprises a malicious advertiser who creates a malicious creative. The malicious creative is served over an advertisement network onto an advertisement exchange in this example. The malicious creative is provided to an optimizer (e.g., system 110) and publisher.

Another example chain comprises a malicious advertiser who creates a malicious creative who places the advertisement for purchase on a demand-side platform. The advertisement can be added to an exchange and published to be made available to visitors. Another example chain comprises a malware attacker who generates a malicious creative that is provided to a compromised advertiser. In this example, the advertiser places the compromised advertisement on a platform and the advertisement is published and accessed by visitors to a website that incorporates or includes the advertisement.

FIG. 5 is an example web UI built using the malware detection system API. The example web UI comprises a graph illustrating temporal events in an advertisement delivery process caused by a user clicking an advertisement tag. For each detected malvertisement, a detailed and precise malvertising chain can be formed using the evidence correlation data contained within the FRM report by the system 110.

In this example, an advertisement tag associated with www.imdb.com 505 is actuated in a behavior sandbox environment. Using the forensic collectors and analyzers, the system traces the advertisement call and service process, determining a specific chain of events that are indicative of malware activity. In this example, a call to showads.pubmatic.com 510 is actuated, which leads to an ad server call to ads.eqads.com 515 and ultimately to a publisher ad.yieldmanager.com 520.

In an exemplary embodiment, to scan document exploits (e.g., document types such as PDFs, Word, Excel, PowerPoint, Flash, and so forth), the user may first host the suspect document file somewhere accessible to the system 110, for example Amazon S3, provided by Amazon™, Inc. The user may then submit a scan job to the system 110, with the target being an HTTPS URL and with access credentials forming a part of the URL.

Upon receiving the scan request, the system 110 may download the document file and then initiate a forensics extraction process, for example, by placing the document in a sandbox. The forensic collectors may determine the document's type by analyzing the document binary content. Both dynamic and hybrid detection modules may be used as mentioned above. At the end of this process, the system 110 may return an FRM-based forensics report in an appropriate file format (e.g., json format, text file, and so forth).

The following examples involve exemplary usage scenarios that would help the user of various embodiments in developing using an API of the present technology.

In one example use case, a user needs to scan a large number of advertisement tags at high sampling rates. The user hopes to reduce traffic and eliminate unneeded data, and obtain only those reports whose results are unclean (e.g., suspicious, malicious, blacklisted content).

In some embodiments, the user may desire to speed up queries and filter out unwanted data. In one embodiment, the system can submit jobs with the response-filter field set to clean. This will cause the system 110 to filter out clean reports when delivering reports to the user. In another example, the system can use a batched report retrieval API to retrieve reports in large batches. Since a response-filter was set to clean for all jobs, the system 110 may return only those reports that are both undelivered and unclean. The user

US 10,102,372 B2

13

can call this API, for example, every five minutes to retrieve all unclean reports in the last five minutes.

In a sub-scenario, the user would also want to be notified immediately of an unclean report as the unclean report is created. During job submission, a user can set the response-filter field set to clean. At the same time, the user also sets the response-url to a callback URL provided by the user. This may cause the system **110** to post only unclean reports back to the user as the reports are created.

In another example use case, a user wishes to suspend all jobs that are tagged "Optimizer **1**." The user can make use of a query-operate API. The user can set the label1 field to Optimizer **1** and the operation field to remove.

In a further example use case, the user desires to permanently remove all jobs in the suspended state. The user can make use of the query-operate API. The user will set the state field to SUSPENDED and the operation field to remove.

In another example use case, the user desires to permanently remove all jobs. The user can make use of the query-operate API. The user will set the operation field to remove. One example implementation is provided below with both a request and response.

In a further example use case, the user desires to suspend all jobs that are tagged "Optimizer **1**." The user can make use of the query-operate API. The user will set the operation field to list.

In another example use case, the user desires to update a particular scan job whose ID is 245039. The user can make use of the job removal API. The user can set the scan-request-id field to list.

Advantages of various embodiments of the malware detection system of the present technology include, but are not limited to, being able to use malware signatures against "forensic data" such as bytestreams and events. Various embodiments of the present technology also support chronological event analysis, relational event causality analysis, and creation of multiple decisions per DSL. In some embodiments, the present technology can generating signatures of malware using forensic data (bytestreams and events) detecting malicious code and identifying both campaigns and attackers.

FIG. **6** is a flowchart of an example method for behavior profiling of a target to determine malware. In some embodiments, the method includes applying **605** a domain specific language to a target. The domain specific language utilized to detect malware associated with the target and is comprised of rules that are used in the malware detection process.

Next, the method includes observing/tracking **610** a set of temporal sequences and events of the target. This process can be accomplished using a plurality of forensic collector modules.

The method further comprises determining **615** presence of one or more markers within the set of temporal sequences and events that are indicative of malware and identifying **620** the target as being associated with malware based on the one or more markers. Steps **615** and **620** can be accomplished within a behavioral analysis sandbox using a plurality of forensic analyzers.

FIG. **7** is a diagrammatic representation of an example machine in the form of a computer system **1**, within which a set of instructions for causing the machine to perform any one or more of the methodologies discussed herein may be executed. In various example embodiments, the machine operates as a standalone device or may be connected (e.g., networked) to other machines. In a networked deployment,

14

the machine may operate in the capacity of a server or a client machine in a server-client network environment, or as a peer machine in a peer-to-peer (or distributed) network environment. The machine may be a robotic construction marking device, a base station, a personal computer (PC), a tablet PC, a set-top box (STB), a personal digital assistant (PDA), a cellular telephone, a portable music player (e.g., a portable hard drive audio device such as an Moving Picture Experts Group Audio Layer 3 (MP3) player), a web appliance, a network router, switch or bridge, or any machine capable of executing a set of instructions (sequential or otherwise) that specify actions to be taken by that machine. Further, while only a single machine is illustrated, the term "machine" shall also be taken to include any collection of machines that individually or jointly execute a set (or multiple sets) of instructions to perform any one or more of the methodologies discussed herein.

The example computer system **1** includes a processor or multiple processors **5** (e.g., a central processing unit (CPU), a graphics processing unit (GPU), or both), and a main memory **10** and static memory **15**, which communicate with each other via a bus **20**. The computer system **1** may further include a video display **35** (e.g., a liquid crystal display (LCD)). The computer system **1** may also include an alphanumeric input device(s) **30** (e.g., a keyboard), a cursor control device (e.g., a mouse), a voice recognition or biometric verification unit (not shown), a disk drive unit **37** (also referred to as disk drive unit or drive unit), a signal generation device **40** (e.g., a speaker), and a network interface device **45**. The computer system **1** may further include a data encryption module (not shown) to encrypt data.

The disk drive unit **37** includes a computer or machine-readable medium **50** on which is stored one or more sets of instructions and data structures (e.g., instructions **55**, also identified variously as **55***a*, **55***b*, **55***c*, **55***d* in FIG. **7** for residing, completely or at least partially, in various elements in FIG. **7**) embodying or utilizing any one or more of the methodologies or functions described herein. The instructions **55** may also reside, completely or at least partially, within the main memory **10** and/or within the processors **5** during execution thereof by the computer system **1**. The main memory **10** and the processors **5** may also constitute machine-readable media.

The instructions **55** may further be transmitted or received over a network via the network interface device **45** utilizing any one of a number of well-known transfer protocols (e.g., Hyper Text Transfer Protocol (HTTP)). While the machine-readable medium **50** is shown in an example embodiment to be a single medium, the term "computer-readable medium" should be taken to include a single medium or multiple media (e.g., a centralized or distributed database and/or associated caches and servers) that store the one or more sets of instructions. The term "computer-readable medium" shall also be taken to include any medium that is capable of storing, encoding, or carrying a set of instructions for execution by the machine and that causes the machine to perform any one or more of the methodologies of the present application, or that is capable of storing, encoding, or carrying data structures utilized by or associated with such a set of instructions. The term "computer-readable medium" shall accordingly be taken to include, but not be limited to, solid-state memories, optical and magnetic media. Such media may also include, without limitation, hard disks, floppy disks, flash memory cards, digital video disks, random access memory (RAM), read only memory (ROM), and the like. Various example embodiments described herein may be implemented in an operating environment compris-

US 10,102,372 B2

15

ing software installed on a computer, in hardware, or in a combination of software and hardware.

Not all components of the computer system **1** are required and thus portions of the computer system **1** can be removed if not needed, such as I/O devices.

One skilled in the art will recognize that the Internet service may be configured to provide Internet access to one or more computing devices that are coupled to the Internet service, and that the computing devices may include one or more processors, buses, memory devices, display devices, input/output devices, and the like. Furthermore, those skilled in the art may appreciate that the Internet service may be coupled to one or more databases, repositories, servers, and the like, which may be utilized in order to implement any of the embodiments of the disclosure as described herein.

The corresponding structures, materials, acts, and equivalents of all means or step plus function elements in the claims below are intended to include any structure, material, or act for performing the function in combination with other claimed elements as specifically claimed. The description of the present technology has been presented for purposes of illustration and description, but is not intended to be exhaustive or limited to the present technology in the form disclosed. Many modifications and variations will be apparent to those of ordinary skill in the art without departing from the scope and spirit of the present technology. Exemplary embodiments were chosen and described in order to best explain the principles of the present technology and its practical application, and to enable others of ordinary skill in the art to understand the present technology for various embodiments with various modifications as are suited to the particular use contemplated.

Aspects of the present technology are described above with reference to flowchart illustrations and/or block diagrams of methods, apparatus (systems) and computer program products according to embodiments of the present technology. It will be understood that each block of the flowchart illustrations and/or block diagrams, and combinations of blocks in the flowchart illustrations and/or block diagrams, can be implemented by computer program instructions. These computer program instructions may be provided to a processor of a general purpose computer, special purpose computer, or other programmable data processing apparatus to produce a machine, such that the instructions, which execute via the processor of the computer or other programmable data processing apparatus, create means for implementing the functions/acts specified in the flowchart and/or block diagram block or blocks.

These computer program instructions may also be stored in a computer readable medium that can direct a computer, other programmable data processing apparatus, or other devices to function in a particular manner, such that the instructions stored in the computer readable medium produce an article of manufacture including instructions which implement the function/act specified in the flowchart and/or block diagram block or blocks.

The computer program instructions may also be loaded onto a computer, other programmable data processing apparatus, or other devices to cause a series of operational steps to be performed on the computer, other programmable apparatus or other devices to produce a computer implemented process such that the instructions which execute on the computer or other programmable apparatus provide processes for implementing the functions/acts specified in the flowchart and/or block diagram block or blocks.

The flowchart and block diagrams in the Figures illustrate the architecture, functionality, and operation of possible

16

implementations of systems, methods and computer program products according to various embodiments of the present technology. In this regard, each block in the flowchart or block diagrams may represent a module, segment, or portion of code, which comprises one or more executable instructions for implementing the specified logical function(s). It should also be noted that, in some alternative implementations, the functions noted in the block may occur out of the order noted in the figures. For example, two blocks shown in succession may, in fact, be executed substantially concurrently, or the blocks may sometimes be executed in the reverse order, depending upon the functionality involved. It will also be noted that each block of the block diagrams and/or flowchart illustration, and combinations of blocks in the block diagrams and/or flowchart illustration, can be implemented by special purpose hardware-based systems that perform the specified functions or acts, or combinations of special purpose hardware and computer instructions.

In the description herein, for purposes of explanation and not limitation, specific details are set forth, such as particular embodiments, procedures, techniques, etc. In order to provide a thorough understanding of the present invention. However, it will be apparent to one skilled in the art that the present invention may be practiced in other embodiments that depart from these specific details.

Reference throughout this specification to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment of the present invention. Thus, the appearances of the phrases "in one embodiment" or "in an embodiment" or "according to one embodiment" (or other phrases having similar import) at various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the particular features, structures, or characteristics may be combined in any suitable manner in one or more embodiments. Furthermore, depending on the context of discussion herein, a singular term may include its plural forms and a plural term may include its singular form. Similarly, a hyphenated term (e.g., "on-demand") may be occasionally interchangeably used with its non-hyphenated version (e.g., "on demand"), a capitalized term (e.g., "Software") may be interchangeably used with its non-capitalized version (e.g., "software"), a plural term may be indicated with or without an apostrophe (e.g., PE's or PEs), and an italicized term (e.g., "N+1") may be interchangeably used with its non-italicized version (e.g., "N+1"). Such occasional interchangeable uses shall not be considered inconsistent with each other.

Also, some embodiments may be described in terms of "means for" performing a task or set of tasks. It will be understood that a "means for" may be expressed in terms of a structure, such as a processor, a memory, an I/O device such as a camera, or combinations thereof. Alternatively, the "means for" may include an algorithm that is descriptive of a function or method step, while in yet other embodiments the "means for" is expressed in terms of a mathematical formula, prose, or as a flow chart or signal diagram.

The terminology used herein is for the purpose of describing particular embodiments only and is not intended to be limiting of the inventions used herein, the singular forms "a", "an" and "the" are intended to include the plural forms as well, unless the context clearly indicates otherwise. It will be further understood that the terms "comprises" and/or "comprising," when used in this specification, specify the

US 10,102,372 B2

17

18

presence of stated features, integers, steps, operations, elements, and/or components, but do not preclude the presence or addition of one or more other features, integers, steps, operations, elements, components, and/or groups thereof.

It is noted that the terms "coupled," "connected", "connecting," "electrically connected," etc., are used interchangeably herein to generally refer to the condition of being electrically/electronically connected. Similarly, a first entity is considered to be in "communication" with a second entity (or entities) when the first entity electrically sends and/or receives (whether through wireline or wireless means) information signals (whether containing data information or non-data/control information) to the second entity regardless of the type (analog or digital) of those signals. It is further noted that various figures (including component diagrams) shown and discussed herein are for illustrative purpose only, and are not drawn to scale.

If any disclosures are incorporated herein by reference and such incorporated disclosures conflict in part and/or in whole with the present disclosure, then to the extent of conflict, and/or broader disclosure, and/or broader definition of terms, the present disclosure controls. If such incorporated disclosures conflict in part and/or in whole with one another, then to the extent of conflict, the later-dated disclosure controls.

The terminology used herein can imply direct or indirect, full or partial, temporary or permanent, immediate or delayed, synchronous or asynchronous, action or inaction. For example, when an element is referred to as being "on," "connected" or "coupled" to another element, then the element can be directly on, connected or coupled to the other element and/or intervening elements may be present, including indirect and/or direct variants. In contrast, when an element is referred to as being "directly connected" or "directly coupled" to another element, there are no intervening elements present. The description herein is illustrative and not restrictive. Many variations of the technology will become apparent to those of skill in the art upon review of this disclosure. For example, the technology is not limited to use for stopping email threats, but applies to any messaging threats including email, social media, instant messaging, and chat.

While various embodiments have been described above, it should be understood that they have been presented by way of example only, and not limitation. The descriptions are not intended to limit the scope of the invention to the particular forms set forth herein. To the contrary, the present descriptions are intended to cover such alternatives, modifications, and equivalents as may be included within the spirit and scope of the invention as defined by the appended claims and otherwise appreciated by one of ordinary skill in the art. Thus, the breadth and scope of a preferred embodiment should not be limited by any of the above-described exemplary embodiments.

What is claimed is:

**1**. A method for behavior profiling for malware detection, comprising:

creating, via executable instructions stored in memory and executed by one or more processors coupled to a computer network, a domain specific language for use for detecting searchable patterns and conditions associated with malware,

the domain specific language, executable by the one or more processors or other processors, being a declarative language definable in response to a user specification;

providing, in response to executing the domain specific language, a set of rules for use for the detecting of the searchable patterns associated with the malware, the set of rules provided by the domain specific language; and

detecting, by the set of rules, a set of temporal sequences and temporal events of a domain for the malware detection, the domain comprising a target associated with the computer network.

**2**. The method of claim **1**, wherein the target comprises any of an HTTP conversation, a URL, a starting URL, an advertisement tag, a document file, an executable file, and combinations thereof.

**3**. The method of claim **1**, wherein the domain specific language is a threat description language configured for deployment as part of hardware on a network, a server, or the target.

**4**. The method of claim **3**, wherein the target is an Internet web server and the domain specific language is configurable for describing behavior and the patterns exhibited within conversations between HTTP clients.

**5**. The method of claim **1**, wherein the domain specific language is configured for deployment as a cloud-based software-as-a-service (SaaS).

**6**. The method of claim **1**, wherein the user specification includes tests to be performed while analyzing an HTTP conversation, wherein the domain specific language does not specify how the user-specified tests are run, the order of execution or logic flow for the user-specified tests.

**7**. The method of claim **1**, further comprising:

applying, via the executable instructions stored in the memory and executed by the one or more processors or the other processors, the domain specific language to the target accessible via the computer network, the domain specific language for detecting the malware associated with the target, the set of rules for the domain specific language further including, in addition to the detecting of the set of temporal sequences and temporal events of the target,

determining a presence of a particular one of the patterns within the set of temporal sequences and temporal events, that is indicative of the malware; and

identifying the target as being associated with the malware based on the presence of the particular one of the patterns.

**8**. The method of claim **7**, wherein the particular one of the patterns comprises one or more markers.

**9**. The method of claim **7**, further comprising, utilizing the domain specific language, and creating a behavior profile for the target based on the set of temporal sequences and temporal events.

**10**. The method of claim **7**, further comprising, in response to identifying the target as being associated with the malware, determining behavioral knowledge of the target that is associated with the malware.

**11**. The method of claim **7**, further comprising:

determining if the malware is configured to protect itself from a monitored lab environment;

in response to the determining, the malware is configured to protect itself from the monitored lab environment, provoking the malware to attack; and

in response to the provoking, recording activities of the malware, wherein each of the activities comprises a time stamp such that the activities can be arranged in a chronological order.

**12**. The method of claim **11**, further comprising, using the domain specific language, creating a behavioral sandbox

US 10,102,372 B2

19 20

environment where the target is inspected for malware, the behavioral sandbox environment comprising a plurality of forensic collectors configured to gather evidence from the malware.

**13**. A malware detection system, comprising:

a processor; and

a memory for storing executable instructions, the instructions being executed by the processor to perform a method, the method comprising:

creating, via executable instructions stored in the memory and executed by the processor, a domain specific language for use for detecting searchable patterns and conditions associated with malware, the domain specific language being a declarative language definable in response to a user specification;

providing, via the domain specific language, a set of rules for use for the detecting of the searchable patterns associated with the malware, the set of rules generated from the domain specific language; and

detecting, by the set of rules, a set of temporal sequences and temporal events of a domain, the domain comprising a target associated with the computer network.

**14**. The system of claim **13**, wherein the target comprises any of an HTTP conversation, a URL, a starting URL, an advertisement tag, a document file, an executable file, and combinations thereof.

**15**. The system of claim **13**, wherein the domain specific language is configured for deployment as part of hardware on a network, a server, or the target, or is configured for deployment as a cloud-based software-as-a-service (SaaS).

**16**. The system of claim **13**, wherein the method further comprises:

applying, via the executable instructions stored in the memory and executed by the processor or other processors, the domain specific language to a target accessible via the computer network, the domain specific language for detecting the malware associated with the target, the set of rules for the domain specific language further including, in addition to the detecting of the set of temporal sequences and temporal events of the target:

determining a presence of a particular one of the patterns having one or more markers within the set of

temporal sequences and temporal events that are indicative of the malware; and

identifying the target as being associated with the malware based on the presence of the particular one of the pattern having the one or more markers.

**17**. The system of claim **16**, further comprising, utilizing the domain specific language, and creating a behavior profile for the target based on the set of temporal sequences and temporal events.

**18**. The system of claim **16**, further comprising, using the domain specific language, and creating a behavioral sandbox environment where the target is inspected for malware, the behavioral sandbox environment comprising a plurality of forensic collectors.

**19**. The system of claim **18**, wherein each of the plurality of forensic collectors is configured to:

allow the target to execute therein;

collect evidence from the malware using a plurality of collector modules, wherein the evidence comprises activities of the malware;

determine malicious behavior from the set of temporal sequences and temporal events; and

log the target in response to the malicious behavior being determined or suspected.

**20**. A method for behavior profiling for malware detection, comprising:

applying, via executable instructions stored in memory and executed by one or more processors coupled to a computer network, a domain specific language to a target accessible via the computer network,

the domain specific language being definable in response to a user specification for detecting malware associated with the target; and

providing a set of rules generated from the domain specific language including:

detecting a set of temporal sequences and temporal events of the target,

determining a presence of a particular pattern within the set of temporal sequences and temporal events, that is indicative of the malware, and

identifying the target as being associated with the malware based on the presence of the particular pattern.

* * * * *

# APPENDIX
# 187

# Cloaker Catcher:
# A Client-based Cloaking Detection System

Ruian Duan
Georgia Institute of
Technology
ruian@gatech.edu

Weiren Wang
Georgia Institute of
Technology
weirenwang@gatech.edu

Wenke Lee
Georgia Institute of
Technology
wenke.lee@gmail.com

## ABSTRACT

Cloaking has long been exploited by spammers for the purpose of increasing the exposure of their websites. In other words, cloaking has long served as a major malicious technique in search engine optimization (SEO). Cloaking hides the true nature of a website by delivering blatantly different content to users versus web crawlers. Recently, we have also witnessed a rising trend of employing cloaking in search engine marketing (SEM). However, detecting cloaking is challenging. Existing approaches cannot detect IP cloaking and are not suitable for detecting cloaking in SEM because their search-and-visit method leads to click fraud. In addition, they focus on detecting and measuring cloaking on the server side, but the results are not visible to users to help them avoid frauds.

Our work focuses on mitigating IP cloaking and SEM cloaking, and providing client-based real-time cloaking detection services. To achieve these goals, we first propose the Simhash-based Website Model (SWM), a condensed representation of websites, which can model natural page dynamics. Based on SWM, we design and implement Cloaker Catcher, an accurate, efficient and privacy-preserving system, that consists of a server that crawls websites visited by users on demand and a client-side extension that fetches spider views of websites from the server and compares them with user views to detect cloaking. Since Cloaker Catcher checks on the client side for each real user, IP cloaking can be detected whenever it occurs and click fraud in SEM can also be prevented. Using our system, we conducted the first analysis of SEM cloaking and found that the main purpose of SEM cloakers is to provide illicit services.

## General Terms

Security, Privacy, Spam

## Keywords

Cloaking, Search Engine Optimization, Search Engine Marketing, Web spam, Locality Sensitive Hash, Clustering Algorithm

## 1. INTRODUCTION

Today, popular search engines such as Google, Bing and Yahoo, are the main entries to the information on the Internet for users. By their abilities to drive web traffic and connect users with retailers, search engines have changed the advertising history. Search engines monetize their traffic either via "organic" search results or sponsored search placements - together comprising a $24B marketing sector [21].

The great value of search engine results has attracted public attention, and two major approaches have been applied to increase website visibility through search engines. The first approach, Search Engine Optimization (SEO) is the process of affecting the visibility of a website or a web page in a search engine's unpaid results. The second, Search engine marketing (SEM), [1] refers to the promotion of websites by increasing their visibility through sponsored search placements, i.e. search ads. Search engine operators encourage the use of certain techniques such as optimizing content in SEO or selecting long-tail advertising keywords in SEM. However, search engines explicitly ban techniques, such as link farms, keyword stuffing and cloaking, which are specifically designed to cheat and manipulate rankings. Among these techniques, cloaking is the basic step for serving non-compliant content. It has been widely employed to hide the true nature of websites, because of its low setup cost and the lack of effective and efficient detection methods used against it. While search operators try to identify and remove pages that host harmful content (e.g. phishing pages, malware sites, etc.), scammers seek to elude such detection using cloaking. Typically, a cloaker serves "benign" content to crawlers and scam content to normal users who are referred via a particular search request. An SEM cloaking example is that, a cloaker can advertise illegal goods or services (e.g. drugs, ghostwriting service) on sponsored ads, but claim themselves as innocent ads to search engines. Serving such illicit advertisements not only put consumers at risk, but also cause high cost to search operators, e.g. Google paid $500 million to settle a lawsuit with the U.S. Department of Justice for accepting advertisements from unlicensed pharmacies [5].

**Technical Challenges.** Various approaches have been proposed to detect cloaking sites and measure their preva-

Permission to make digital or hard copies of all or part of this work for personal or classroom use is granted without fee provided that copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page. To copy otherwise, to republish, to post on servers or to redistribute to lists, requires prior specific permission and/or a fee.
Copyright 20XX ACM X-XXXXX-XX-X/XX/XX ...$15.00.

[1]While search engine marketing can be a broader concept about marketing related to search engines, this paper refers to SEM as search advertisements, i.e. sponsored ads on search engines

lence. Previous detection studies [26, 24, 7, 14, 8, 23, 17] focused mainly on using heuristics such as search query monetizability, features in websites such as page size and HTML tags, to improve detection accuracy. However, these approaches have three drawbacks. First, they cannot handle IP cloaking because they fail to use search engine IPs to fetch spider views and real user IPs to fetch user views. Second, they are designed for SEO cloaking detection and are not suitable for SEM cloaking because these methods require inspectors to pretend to be real users and click on search results, but doing so in SEM leads to click fraud and breaks the business model of SEM. Third, their cloaking decisions are made on the server side and cannot directly protect users.

**Our Solution.** Instead of leaving all the workload and decision making to servers, we propose Cloaker Catcher, a client-based system that detects cloaking on the user side in real-time. Our system overcomes the three drawbacks shared by the previous systems. First, since detection is done on the user side, the system obtains valid user IPs. Using Google Translate, the system gets search engine IPs. Therefore, cloakers have no place to hide and IP cloaking will be detected whenever they occur. Second, since cloaking decision is made for each user without click fraud, detecting cloaking in SEM is therefore the same as in SEO. Third, our system detects cloaking when user clicks the search results or ads and provides real-time responses to users. Furthermore, this cloaking signal can be combined with other features such as DNS domains [15] to improve accuracy or integrated into existing APIs such as Safe Browsing API [10] to guard users' browsing sessions.

Apart from differentiating cloaking sites from dynamic sites, a client-based system has two additional requirements: (a) since user machines are resource constrained, the system should introduce low overhead, including both computation and network traffic, (b) the system should not have access to the users' copy of websites, because what user sees is highly private. In short, we need a cloaking detection system that is accurate, efficient, privacy-preserving, and minimizes data transmission. To meet these requirements, this paper proposes a new way to model website dynamics based on a locality sensitive hash algorithm, Simhash. We build fuzzy signatures of contents and the layout for websites. We then learn patterns, namely, Simhash Website Models (SWM), for each website and then use them to model the dynamics of websites. SWM has three significant advantages. They are compact, easy to compare and accurate in cloaking detection. We build Cloaker Catcher based on SWM and achieve a 97.1% true positive rate at only a 0.3% false positive rate with low user overhead.

With Cloaker Catcher, we further conduct a measurement to understand current state of SEO and SEM cloaking on Google search. Our results show that cloaking is more popular in SEO than SEM and the primary goal in SEM cloaking is to provide illegal service, in contrast to traffic sale in SEO.

**Roadmap.** The remainder of this paper is structured as follows. Section 2 provides the necessary background and challenges, and proposes our solution. Section 3 introduces Simhash-based Website Models (SWM) and a client-based detection system based on SWM. Section 4 describes our data collection process, model training and configuration of Cloaker Catcher. Section 5 measures the current cloaking state in SEO and SEM, followed by performance evaluation of our system and comparison against previous works in Section 6. Section 7 discusses limitations of our approach. Section 8 describes related work on search engine spams and simhash. Section 9 concludes this work.

## 2. OVERVIEW

Search engines have been the main sources of information for users since early 21st century. By typing keywords in search engines, users can get desired information in seconds. The ability of search engines to direct web traffic created strong incentives to manipulate the results of Page Rank algorithms and promote pages in search result listings, and have attracted wide attention, from both online market and researchers. Online marketers use various techniques to promote their ranking in relevant searches, which leads to higher daily visits and profits. Scammers do the same, except that they use "blackhat" techniques and try to fool users and search operators. Researchers and search operators identify these scammers based on features and penalize their sites. However, scammers use cloaking as a standard tool to obscure search engines' inspection and add significant complexity for them to differentiate legitimate web content from fraudulent pages. Our work tackles the cloaking problem and reveal activities of these scammers.

### 2.1 Background and Example

**Cloaking Types.** The key technique of cloaking is to distinguish users and crawlers. Depending on how users and crawlers are identified, cloaking techniques are classified as repeat cloaking, user-agent cloaking, referer cloaking, Javascript Cloaking, and IP cloaking. In repeat cloaking, victims are tracked on the user-side via cookies or the server-side via server log. User-agent cloaking refers to websites that check the user-agent string in HTTP request to identify crawlers. Similarly, referer cloaking is done by checking the referer field to identify users redirected from search engine sites. Javascript cloaking works by fingerprinting browsers and serving abusive payload only to real users, rather than spiders. In IP cloaking, scammers maintain a list of known crawler IPs or inspectors, such as security companies, and serve benign content to these them. IP cloaking requires more work, but is more effective. Crawler IPs are easily available online and some commercial tools, such as noIPfraud and wp-Cloaker [25], even periodically update their lists. In practice, different types of cloaking are usually used in combination, making them very hard to detect.

**Cloaking Example.** To concrete the idea of cloaking, we present one example, a plagiarism service in sponsored ads. In Figure 7a, a cloaking ad is placed for the term "Essay Writing". The cloaker provides users plagiarism service which is against Google's ad policy [22], and remains invisible to search operators. In the background, this website use the user-agent and referer to distinguish visitors and hide from inspectors.

### 2.2 Threat Model

There are multiple entities involved in SEO and SEM cloaking, including users, search engines and website owners (advertisers in SEM). Search engines periodically crawl and index websites and ensure quality of service by considering various kinds of features in their ranking algorithm. Site owners want to drive traffic to their sites by ranking high in search results or ads. Users query terms on search engines and click on the returned links. As shown in Figure 1, in

**Figure 1: Thread Model**

cloaking detection, site owners are the attackers and fool both search engines and users. The attackers craft two versions of their websites, and send the benign version to search engines for indexing and ranking, and the malicious version to users for profit. The spiders cannot see the scam content, otherwise, search engines or researchers could use other tools to analyze the page, understand what is being displayed and flag appropriately. Therefore, in this paper we trust what spiders see and distrust what users see, and compare spider views with user views to find attackers.

## 2.3 Client-based Cloaking Detection

Although many systems [17, 26, 24, 7, 14, 8, 23] have been proposed to detect cloaking, they share three draw-backs. First, they cannot detect IP cloaking. This is because these systems use centralized servers to collect user views, while scammers and commercial cloaking tools can identify their servers and send crafted benign content instead of the illicit ones. Second, most of them are designed for detecting cloaking in SEO and are not suitable for SEM. The reason is that these methods require inspectors to pretend to be real users and click on search results, and the click-through method in SEM leads to click fraud and breaks the business model of SEM, where one Pay-Per-Click ad can cost more than 100$. One exception is Najork's system [17] which uses a toolbar to send the signature of user perceived pages to search engines. But they cannot handle dynamic websites, and raises high false positive. Third, these systems detect cloaking on the server side and cannot protect individual user visits in real-time. Wang et al [23] measured the search engine response time to cloaking practice and the cloaking duration of websites. The search engine response time is defined as the time from cloaking pages show up in top 100 pages for a specific keyword until they are not. The cloaking duration refers to how long until cloaked pages are no longer cloaked. Google took around two days to remove more than 50% of the cloaked results for hot search words, and one week for pharmaceutical words, which are abuse-oriented. Yahoo took longer. In terms of cloaking duration, over 80% of these pages remained cloaked after 7 days. This means many users have visited those websites before search engines act on cloaking sites. In addition, users may revisit those sites, because they are previously returned as "trustworthy" results.

Instead of leaving all the work to search engines, we want to leverage the fact that cloakers need to reach end users and catch cloakers on the user side. There are three challenges in client-based cloaking detection. First and foremost, the algorithm should be accurate despite presence of dynamic websites. Second, the system should introduce low overhead to users, including network traffic and computation. Third,

the system should be privacy preserving. In this paper, we present Cloaker Catcher, to address the three challenges. Cloaker Catcher consists of a server which crawls websites visited by users on demand and a client-side extension which fetches spider views of websites from the server and compare them with user views to detect cloaking.

**Accuracy.** Dynamic nature of websites has been the main challenge in cloaking detection. Previous works introduce different sets of features such as statistical summary, words and HTML tags, and train a fixed threshold for detection. Similarly, this paper employs Simhash [6] to generate fuzzy signatures for words and tags on each website and use these signatures to detect cloaking. Simhash is a special signature of a feature set. It is a class of Locality Sensitive Hash (LSH) that has been extensively used in near duplicate detection in search engines. Simhash is a random projection based algorithm that maps high dimensional data to fixed bits while maintaining the property that, hamming distance between the resulting bits is an estimation of the cosine similarity between the original feature set. As the signature is fixed bits (64 in this work), the comparison can be done in $\mathcal{O}(1)$. We train Simhash-based Website Models (SWM) from multiple spider crawls using hierarchical clustering and compare with user copies to identify outliers, i.e. cloaking candidates. Our approach could achieve 97.1% TPR and 0.3 FPR.

**Efficiency.** Overhead is highly relevant to usability in client-based systems. In our system, the overhead breaks down to three parts: fetch server models, extract client view features and compare the client view with server models. Similar to previous systems, we use words and tags as features, which correspond separately to content and structure of a website. Let $N_W$, $N_T$ be number of words and tags. Server models in our work have constant sizes and introduce low network traffic to users. Feature extraction requires a pass through the website where the complexity is $\mathcal{O}(N_W + N_T)$. Comparison is expensive and computing the greatest common feature subsets between websites requires at least iterating them. Reducing the comparison cost is a well studied problem in near duplicate detection literatures of information retrieval. The standard technique is to use locality sensitive hash to reduce the feature space to fixed bits and compare these compact representations. Inspired by these works, Cloaker Catcher work employs Simhash algorithm to compress feature sets and estimate the distance between user views and spider views. A comprehensive efficiency measurement is presented in Section 6.

**Privacy.** It is privacy-invasive to disclose users' web views to servers, because these views may contain sensitive data, such as name, email address, credit card number etc. Benefiting from compact model representations, Cloaker Catcher is able to send server views to users and compares on the client side. The visited URLs of users are sensitive as well because they can be used to identify users. Luckily, Safe Browsing API [10] provides a solution to achieve differential privacy. The basic idea is to receive and send URLs in batches, which prevents servers from inferring the exact visited URL. For simplicity reasons, Cloaker Catcher communication uses the visited link and doesn't implement the URL privacy protection.

## 3. SYSTEM DESIGN

Given the challenges and solutions described in Section 2, we introduce the Simhash-based Website Model to compactly

represent websites and propose Cloaker Catcher based on SWM.

## 3.1 Simhash-based Website Model

A website is rendered through Document Object Model (DOM), which is maintained by browsers as a tree. A DOM tree contains information about layout of a website (Cascading Style Sheets is supplemental to DOM in describing the look and formatting of a document). Among different types of DOM nodes, text nodes represent messages visible to user and are frequently used in cloaking detection literatures. This work focuses on structure of DOM tree (tags) and text nodes that user actually sees. Javascript snippets are not used, since they are mainly used by websites to handle user inputs and manipulate DOM trees, which in turn attracts our attention to the aforementioned features. In order to model dynamic websites, we propose Simhash-based Website Models, which use clusters learned from multiple spider copies to quantify average and variance page updates.

### 3.1.1 Distance Approximation

Simhash [6] is a dimensionality reduction technique. It is a fuzzy hash function family that maps a high dimension dataset into fixed bits and preserves the following properties: (A) the fingerprint of a dataset is a "hash" of its features, and (B) the hamming distance between two hash values is an estimation of the cosine similarity $\theta(\vec{u}, \vec{v})/\pi$ between the original datasets (represented as vector $\vec{u}, \vec{v}$). This is different from cryptographic hash functions like SHA-1 or MD5, because they will hash two documents which differs by single byte into two completely different hash-values and the hamming distance between them is meaningless.

### 3.1.2 Computation

The computation of Simhash starts from a set of features. Given a set of features extracted from a document and their corresponding weights, we use Simhash to generate an f-bit fingerprint as follows. We maintain an f-dimensional vector V, each of whose dimensions is initialized to zero. A feature is hashed into an f-bit hash value. These f bits (unique to the feature) increment/decrement the f components of the vector by the weight of that feature as follows: if the i-th bit of the hash value is 1, the i-th component of V is incremented by the weight of that feature; if the i-th bit of the hash value is 0, the i-th component of V is decremented by the weight of that feature. When all features have been processed, some components of V are positive while others are negative. The signs of components determine the corresponding bits of the final fingerprint. In this work, we set f to 64, which is the same effective setting for a corpus of 8 billion websites as described in [16].

There are two characteristics in the computation of the Simhash. First, the order of the features doesn't matter because Simhash is maintaining a global counter V. Second, size of the feature set should be relatively large, because Simhash is random projection based approach, a small set of features may result in completely different Simhash with one feature difference. These two characteristics can be indicates that the structural information should be included in the feature set if the order is important and the number of features should be relatively large.

### 3.1.3 Feature Extraction



**Figure 2: DOM tree example**

In order to model websites and detect cloaking, we need to capture the behavior and similarity that a website maintains. We focus on text and tag features, and generate Simhash values separately. Regarding text features, our algorithm first extracts the visible sequence of words from websites, and then extracts words, bi-gram, tri-gram set (repeated elements only recorded once) from this sequence. For example, the text features of sentence "i am a cloaker" are {i, am, a, cloaker, i am, am a, a cloaker, i am a, am a cloaker}. Because there are usually a large amount of words on a website, and bi-grams and tri-grams represent structure of documents, Simhash is suitable for compressing these features.

Similarly, for tags in a DOM tree, we record presence of each non-text node (tag name), as well as presence of each child parent pair. The node set records what tag is present in a page, and child parent pair records how these tags are organized, i.e., structure information. In practice, simply recording the presence of tags yields a relatively small set of features because only a few HTML tags are frequently used. Therefore, we record both the tag name and its associated attribute names to gain more features (higher entropy). Attribute values are discarded because based on our observation, they may change for each visit, especially in SEM. A DOM tree example is shown in Figure 2. The corresponding tag features are {html, head, body, title, . . . , (head, html), (body, html), . . . }.

Figure 3 gives an example on how Simhash values for text and tag features changes along time. These graphs show changes of *www.yahoo.com* over 7x24 period from Feb.1, 2015 to Feb.7, 2015. Figure 3a shows text Simhash and Figure 3b shows tag simhash. The x-axis is bits of the Simhash value and y-axis is the id of each observation (id increases in the order of collection time). According to Figure 3, text Simhash changes rapidly, indicating dynamic nature of yahoo, and tag Simhash changes less and slower.

### 3.1.4 Clustering

Websites can have multiple versions of content for many reasons. An example is the change (expiration) of domain ownership, where a domain returns completely content all of a sudden. Since we are monitoring websites over a period of time, we need to be able to build models for different versions of websites and learn patterns for each version.

We use agglomerative hierarchical clustering [12] to cluster the collected Simhash values. It is a bottom up approach: each observation starts in its own cluster, and pairs of clusters are merged as one moves up the hierarchy. In order to decide which clusters should be combined, a measure of



(a) Text Simhash of Yahoo



(b) Tag Simhash of Yahoo

**Figure 3: Yahoo Simhash changes over 7x24 period Feb.1-7, 2015**

dissimilarity between sets of observations is required. In most methods of hierarchical clustering, this is achieved by use of an appropriate metric (a measure of distance between pairs of observations), and a linkage criterion which specifies the dissimilarity of sets as a function of the pairwise distances of observations in the sets. This work represents each Simhash as a 64-bit vector and specifies hamming distance as distance metric. The linkage method used is the average distance and the linkage criterion is inconsistent coefficient.

**Average linkage.** Let $S_{spider} = \{s_i, i \in (1, n)\}$ be the Simhash values of $n$ spider views for a website, and $s_{user}$ be the user view for this website. We use the distance from $s_{user}$ to centroid of $S_{spider}$ as a measure of similarity between $s_{user}$ and $S_{spider}$. Consider Simhash values as 64-dimension vectors, we can compute the centroid $S_{spider}$ by summing each dimension of Simhash in the cluster and divide it by the cluster size.

**Inconsistent coefficient.** This coefficient characterizes each link in a cluster tree by comparing its height with the average height of neighboring links at the same level and below it in the tree. The higher the value of this coefficient, the less similar the objects connected by the link. By using threshold of inconsistency coefficient as criterion, we could get several clusters for each website.

Equation 1 explains how inconsistent coefficient is computed. $\alpha$ is inconsistent coefficient, $d$ is the distance between two clusters, $\mu$ is mean of the heights of all the links included in the calculation, $\sigma$ is standard deviation of these heights. Each calculation in our system includes all links on the same level and below it.

$$\alpha = \frac{d - \mu}{\sigma} \quad (1)$$

Let $T_{learn}$ denote the threshold for inconsistent coefficient, Equation 2 shows the merging criterion in clustering phase. For leaf nodes, nodes that have no further nodes under them, the coefficient is set to 0.

$$S_{spider_{new}} = S_{spider,r} \cup S_{spider,s} \text{ if } \alpha < T_{learn}$$
$$\text{where } \alpha = \frac{d_{r,s} - \mu}{\sigma},$$
$$d_{r,s} = d(centroid_r, centroid_s)$$
$$\mu = avg(x), x \in links_r \cup links_s, \quad (2)$$
$$\sigma = std(x), x \in links_r \cup links_s$$
$$S_{spider,r} = \{s_{r,i}, i \in (1, n_r), centroid_r, links_r\},$$
$$S_{spider,s} = \{s_{s,j}, j \in (1, n_s), centroid_s, links_s\},$$

After hierarchical clustering, $S_{spider}$ is divided into $c$ clusters $S_{spider,k}, k \in (1, c)$. We denote each cluster $S_{spider,k}$ with the centroid and links used in clustering phase $S_{spider,k} = \{centroid_k, links_k\}$. This representation is intended for comparison with new observations (single node clusters). $centroid$ is used to compute distance from new observations to existing clusters, $links$ are used to compute $\mu$ and $\sigma$. These compact representations are the Simhash-based Website Models for this website. By limiting the maximum number of valid spider copies, SWM can represent websites in $\mathcal{O}(1)$ space.

### 3.2 Cloaking Detection

For a particular website, we compare what users see on the client side with models fetched from the server to find cloaking, i.e. compare $s_{user}$ with $S_{spider,k}, k \in (1, c)$ to find outliers. In the clustering phase, we use inconsistent coefficient to test similarity between clusters and decide whether we should merge two clusters. Since higher inconsistent coefficient $\alpha$ indicates dissimilarity, we use the this coefficient to test outliers as well. Let $T_{detect}$ denote the threshold used to test outliers. Consider the user view $s_{user}$ as a single node cluster $\{s_{user}\}$, and the outlier test is to check whether $\{s_{user}\}$ is similar to any of $S_{spider,k}, k \in (1, c)$. If $\alpha_k = (d_k - u_k)/\sigma_k > T_{detect}, \forall S_{spider,k}$, we consider $s_{user}$ as an outlier, i.e. cloaking candidate.

However, in reality, there can be consistent differences between what spiders see and what users see. For example, a website shows the ad-free version to spiders, but add ads to the user version. Moreover, there are websites that rarely changes, meaning standard deviation $\sigma$ is zero and coefficient $\alpha$ is undefined. A fixed $T_{detect}$ cannot handle such case. To tolerate errors introduced by the two problems, we introduce a minimum radius $R$. The modified formula for detection is Equation 3:

$$\text{If } d_k - R - \mu_k > T_{detect}\sigma_k, \forall S_{spider,k}, \text{ reject } s_{user} \quad (3)$$

Section 4 implements the proposed SWM and cloaking detection algorithm, and provides insights and suggestions on the selection of $T_{learn}, T_{detect}, R$.

### 3.3 Cloaker Catcher

Based on SWM and the cloaking detection algorithm, we propose Cloaker Catcher, a system consists of server side crawling and client side detection to combat cloaking. Figure 4 shows the workflow of Cloaker Catcher. We implement

**Figure 4: Workflow of Cloaker Catcher**

the client side as a chrome extension, but it is general to all modern browsers that supports extension. The server side is a program that crawl websites and store SWMs in database. When the client requests for a specific URL, server lookup the database and send the SWM to the client. The client side then compares local page content with server models to find cloaking.

In order to be accurate and efficient, we add several mechanisms and modules in the system. (A) On the client side, cloaking queries are triggered only when users click through search engine results and ads (currently configured to trigger on Google search). (B) The navigation URL landed from search engines are checked against three lists, i.e. a black list, a white list and a visited list, and is classified immediately if contained in any of the three. The black list and the white list contain URLs that are known bad or good. The two lists are commonly used in other client-based detection literature [19]. The visited list is unique to our system and it contains the websites that users have visited before. The visited list is considered good. This is based on the intuition that, cloakers will abuse users on the first visit. If a scammer want to make a sale, he has to show scam content related to the searched keyword on the first visit, otherwise, users may find this website irrelevant and leave forever. With the help of visited list, we can reduce number of cloaking queries and reduce false positives from websites that customize content for individual users. For instance, websites personalize content for logged in users (tracked through cookies). We collect the visited URL list by checking the browsing history and cookies in users' browser. (C) If the URL is not in any of the three lists, the extension sends the URL to the server and gets SWMs back. The extension computes Simhash values for current document and compares it with server side SWMs. (D) On the server side, we maintain a SWM database of the crawled websites and reply to users' request with the corresponding SWM. If the requested URL is not in the database, the server first returns immediately and start the on-demand crawling module, which crawls the websites every M hours for N times (currently, M = 1, N = 5). The on-demand crawling module can be configured to crawl from Google IPs. This is done by querying Google Translate [23].

## 4.  IMPLEMENTATION

There are three parameters to be learned in Cloaker Catcher, the upper bound of inconsistent coefficient in the clustering phase $T_{learn}$, the lower bound of inconsistent coefficient $T_{detect}$ and the minimum radius $R$ in the detection phase. In this section, we describe how we collect four different datasets, two for SEO and the other two for SEM, and how we get the

groundtruth. The groundtruth is used to train and select parameters. The four different datasets are used to measure current cloaking state in SEO and SEM in  Section 5.

### 4.1   Dataset

Popular words in SEO and SEM are different. Because high search volume doesn't directly imply high ad value. Therefore, we collect keywords and landing pages for SEO and SEM separately.

#### 4.1.1   Keywords

**SEO.** Similar to Wang et al.   [23], in order to detect and measure cloaking that intended to gather high volumes of undifferentiated traffic, and those target on specific cloak search terms, we collect two set of words, hot search words $W_{hot,search}$ and abuse oriented words $W_{spam,search}$. $W_{hot,search}$ consists of 170 unique monthly hot search words from Google trend [1] from Jan 2013 to Dec 2014. $W_{spam,search}$ is first manually collected by referring to Google's search and ad policy for basic abuse oriented words in search engine. The abuse categories include gaming ad network, adult-oriented content, alcoholic beverages, dangerous products, dishonest behavior, gambling-related content, healthcare and medicines. We then expand it using Google Suggest, and get 1024 words as $W_{spam,search}$ .

**SEM.** Popular search words doesn't imply high ad value. For example, navigational keywords, such as facebook, have low ad value, because users just want to navigate to facebook.com instead of going anywhere else or buying anything. Therefore, we collect monetizable words for SEM related data collection. We measure monetizability of words by querying Google Keyword Planner (GKP)  [3]. GKP provides convenient API for checking competition [2] and suggests bid price for keywords. In SEM, we collect two sets of keywords, trending and abuse-oriented ones. The former is obtained by using GKP to filter a large set of hot keywords, i.e. 31679, from Google Trend [1] and select words that have more than 1k monthly search, greater than 0.1 competition and higher than 0.1\$ suggested bid price. As a result, we get 11622 keywords as $W_{hot,ad}$. The abuse-oriented set, denoted by $W_{spam,ad}$, is obtained by removing words that has no competition and no bid price in $W_{spam,search}$. $W_{spam,ad}$ ends up with 573 words.

#### 4.1.2   Crawling

Starting from the four collected keyword sets, we automate browsers to do search-and-click tasks. This work uses Selenium [20], an open source browser automation tool, to visit websites while mimicked as users and spiders. We use Selenium to automate a JS-supported browser for two reasons: detect Javascript based cloaking and increase coverage [3]

When dealing with SEO keywords, we set browser user-agent as

"Googlebot/2.1 (+http://www.google.com/bot.html)"

to mimic Google bot and

"Mozilla/5.0 (Windows NT 6.3; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/37.0.2049.0 Safari/537.36"

---

[2]Competition is a [0,1] scale measure, 0 means nobody bids for it and 1 indicates high bidding competition.

[3]In our early experiments, around 20% of advertisements have Javascript redirection and cannot be retrieved by tools with no JS support, such as wget and curl.

to mimic Chrome users on Windows machine. For SEM keywords, settings for users are the same, but the bot user-agent is set as

"AdsBot-Google (+http://www.google.com/adsbot.html)"

to mimic Google ads bot. AdsBot is used by Google to inspect ads, and it is required by Adwords Policy [22] that landing pages should show consistent content to AdsBot and normal users.

In SEO and SEM, we use multiple IPs to visit and crawl websites because we get blocked frequently by Google and changing IP enables us to continuously do search-and-visits. Similar to previous works, we don't attempt to get Google IP or real users in data collection and we might miss cloakers that employs IP cloaking in our measurement. However, this doesn't affect our model training because it is trained generally for differentiating dynamic websites against cloaking ones. Our crawling process is: (A) For each word in $W_{hot,search}$, $W_{spam,search}$, $W_{hot,ad}$, $W_{spam,ad}$, we search in Google and click on results in first 20 pages (top 200) or ads in first 5 pages as normal user. We save landing URLs $URL_{landing,user}$ and web pages to disk. (B) For landing URLs collected in step (A), we directly visit them 6 times (because we need multiple spider copies to learn clusters) as Googlebot or AdsBot and save website content to disk. This gives us separate dataset for the four keyword sets, denoted as $D_{spam,search}$, $D_{hot,serch}$, $D_{spam,ad}$ and $D_{hot,ad}$.

### 4.1.3 Preprocessing

The obtained four data sets in the crawling phase. Since we want to model website on a per URL basis and parameters in URL may change for every visit, it is necessary to define the granularity of comparison, i.e. what is a unique URL. For example, ad campaign information are encoded as parameters in GET requests, and is different every time, making it difficult to compare based on full URL. Therefore, we preprocess the URLs by (1) Strip URL parameter values (2) Keep parameter names, (3) Discard scheme (4) Remove fragments. For instance, $http://www.example.com/?user=value\#fragment$ is simplified to $www.example.com/?user$. The resulting strings are used as unique identifiers for URLs. After preprocessing, $D_{spam,search}$ consists of 129393 unique URLs, $D_{hot,search}$ has 25533, $D_{spam,ad}$ has 2219, and $D_{hot,ad}$ has 25209. [4].

### 4.2 Groundtruth

We collect groundtruth semi-automatically. Starting from $D_{hot,search}$ and $D_{spam,search}$, we first remove duplicates (same signature between user views and Google views), because they are not helpful for training of SWM which is designed to handle dynamics of websites. Next, we randomly sample and manually label remained websites from $D_{hot,search}$ and $D_{spam,search}$ using heuristics such as domain reputation [2]. It is important to notice that, although the labeling process uses URL reputation information (highly reputed domains are less likely to do cloaking), it is orthogonal to the algorithm's capability, because the algorithm only measures difference of text and tag features between the original documents. Through the massive labeling process, we flagged 1195 cloaking examples. In terms of normal websites, we randomly select 5308 samples from the non-cloaking dataset. The two parts, 6503 URLs in total, are combined as

---
[4]Automating website visits through selenium and chrome sometimes results in incomplete rendering or empty content, these examples are removed from collected dataset

groundtruth $D_g$ for training and evaluation. The websites in $D_g$ are converted to Simhash values $S_{g,text}$ and $S_{g,tag}$ using the feature extraction and dimension reduction technique (Simhash) described in Section 3.1.

### 4.3 Model Training



**Figure 5: ROC for detection based on individual features and combination of them**

$T_{learn}$ and $T_{detect}$ are used to generate an adaptive threshold for each website and $R$ is to make system robust to consistent difference between spider and user copies. Based on labeled dataset $D_g$, our target is to learn the three parameters. Since $R$ is parameter unrelated to page dynamics, we first select optimal $T_{learn}$ and $T_{detect}$, and then evaluate our algorithm for different settings of $R$.

Because $R$ is a parameter to allow the system to handle consistent difference between spider and user copies, we first set $R$ to be zero, and do a five-fold stratified cross validation using Scikit-learn [18] on $D_g$. In the learning phase, our objective function is to minimize the total number of classification errors. If the total numbers are the same, we select the one with minimal $d = T_{detect} - T_{learn}$ since $d$ represents the range of coefficients that are neither similar nor dissimilar. After the five-fold stratified cross validation process using the described objective function on $S_{g,tag}$ and $S_{g,text}$ for optimal parameter selection, we find the optimal parameters: $T_{detect,tag} = 1.8$, $T_{learn,tag} = 0.7$, $T_{detect,text} = 2.1$ and $T_{learn,text} = 0.7$.

Similarly, $R_{text}$ and $R_{tag}$ are decided separately. In this section, we conduct three experiments using different features: (1) tag only (2) text only (3) combination of text and tag features. We apply five-fold stratified cross validation and the same objective function to learn and test $S_{g,tag}$ and $S_{g,text}$. The optimal parameter for tag Simhash is $R_{tag} = 17$, text Simhash is $R_{text} = 16$. Cross and oval marked lines in Figure 5 shows the ROC curve for $R_{tag}$ and $R_{text}$. Next, in order to show the combined performance for text and tag features, we set $R_{text}$ to 15 and 17 separately and change $R_{dom}$ as shown in dotted lines in Figure 5.

It is straightforward that combining tag and text signature improves performance. The learned parameters are used in Section 5 to detect and measure cloaking on the four datasets, and is set to $R_{text} = 15$ and $R_{tag} = 13$, $T_{detect,tag} = 1.8$, $T_{learn,tag} = 0.7$, $T_{detect,text} = 2.1$ and $T_{learn,text} = 0.7$, which corresponds to 0.3% FPR and 97.1% TPR. It is important to notice that, 0.3% FPR is the result on our

**Table 1: Cloaking Distribution**

| Category | Traffic Sale | | | | PPC | Error | IS | Phishing | PD | Malware | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pharmacy | Gamble | Loan | TS | | | | | | | |
| Spammy Search | 26.5% | 60.8% | 1.3% | 1.1% | 1.1% | 1.7% | 4.9% | 0.7% | 2.9% | 0.8% | 2491 |
| Hot Search | 35.5% | 2.2% | 30.1% | 29.0% | 0 | 2.2% | 2.2% | 0 | 3.2% | 0 | 93 |
| Spammy Ads | 0 | 0 | 0 | 0 | 14% | 0 | 86% | 0 | 0 | 0 | 7 |
| Hot Ads | 0 | 0 | 0 | 35% | 0 | 0 | 65% | 0 | 0 | 0 | 17 |

TS: Other Traffic Sale, PPC: Pay-Per-Click, IS: Illegal Service, PD: Parking Domain

reduced dataset, which is obtained by removing websites that have doesn't change content or structure (tags) based on visitors. If we consider the whole dataset, our false positive rate is much lower than 0.3%FPR. The selected parameters are also used to configure Cloaker Catcher and preliminary feedbacks from several users show that our system is effective in detecting both SEO and SEM cloaking.

## 5.  MEASUREMENT

### 5.1  Terminologies

We detected and measured cloaking in four collected datasets: spammy search, $D_{spam,search}$, hot search, $D_{hot,search}$, spammy ads, $D_{spam,ad}$, hot ads, $D_{hot,ad}$. Based on summarization of SEO cloaking types in  [23] and our observations of SEM cloaking, we categorized cloaking into seven types: Traffic Sale, Pay-Per-Click (PPC), Error Page, Illegal Service, Phishing, Parking Domain, and Malware. To better analyze cloaking incentives, we further divided traffic sale into four categories: pharmacy, gambling, loan, and general traffic sale. Traffic sale sites are usually from third parties and include iframe pointing target sites for traffic monetization. PPC means that landing page host pay-per-click advertisements. Error Page refers to websites that deliver erroneous information. Illegal Service includes websites that provide illicit services such as drugs, essay writing, copyrighted content, and bot service. Parking Domain are domains that redirect users to unwanted download, but not necessarily malicious.

### 5.2  Sumamry of Findings

We measured the cloaking state of hot and abuse-oriented words in the four collected datasets separately. After manually inspection of websites related to abuse-oriented words, we found that 2% of the search results and 0.32% of the ads are cloaking. For hot words, 0.36% of the search results and 0.07% of the ads are cloaking. An interesting finding is that the SEO cloaking sites mainly targets traffic sale, while the SEM cloaking websites provide illegal services.

In $D_{spam,search}$, we apply our cloaking detection system on 129393 websites. We manually label the detected results and identify 2491 cloaking websites. We further analyzed incentives of cloaking websites and show the results in  Table 1. The majority of these websites fall into traffic sale. In total, websites related to phishing, parking domain and malware sums to 110, a non-negligible amount missed by Google because of cloaking. In $D_{hot,search}$, we found 93 cloaking websites. Among these sites, pharmacy, loan and general traffic sale are prevalent categories. After combining observations of $D_{spam,search}$ and $D_{hot,search}$, we concluded that the main goal of SEO cloaking is to achieve traffic sale. In spammy ads $D_{spam,ad}$, we processed 2219 websites and

identified 7 cloaking websites.  6 of them provides illegal service.  In $D_{hot,ad}$, we checked 25209 websites and found 17 cloaking websites. 11 of them provides promoting illegal services and 6 provides traffic sale.

## 6.  PERFORMANCE

Generally, there are mainly two phases in cloaking detection literatures: feature extraction and comparison. In the feature extraction phase, these algorithms traverse the web pages and extract statistical and semantic features. In the comparison phase, the algorithms compare the features extracted from both user copies and spider copies to identify cloaking. In this section, we present a taxonomy of cloaking detection methods then explain differences between Cloaker Catcher and other cloaking detection works. Since our goal is to design a client-based detection system in which performance matters, we re-design previous works as client-based systems similar to Cloaker Catcher and compare time complexity and storage of our system with them to show that our system is a better fit for client-based cloaking detection. Secondly, we measure the computation and comparison performance using real world examples and show that the average delay is around 100 milliseconds.

### 6.1  Efficiency Comparison

We provide a taxonomy of cloaking detection methods based on Lin's summary in his tag-based system  [14]. Table 2 shows the comparison between Cloaker Catcher and previous systems along six dimensions, features, max f1-score, IP/SEM cloaking, feature extraction time, amount of data transmitted, and comparison time.

The "features" dimension specifies what features from a web page are used for cloaking detection. Possible features are terms and tags, because an HTML web page comprises these three types of elements (Javascript, CSS etc. are included files). These elements are usually used in combination to reduce false positive.

The "max F1-score" dimension is summarized empirically based on comparison presented in  [14] and  [8]. Since the two works compare the precision and recall of these algorithms, we use F1-score, i.e. $F_1 = 2 \cdot precision \cdot recall/(precision + recall)$ to summarize them. Generally, the higher the F1-score, the better the system. Najork's work  [17] uses cryptographic hash functions to fingerprint a website and have high false positive because they can not handle dynamic website. Relative F1 scores for  [27, 26, 7, 14] are directly inferred from [14]. TagDiff  [14], Dagger  [23] and our system, Cloaker Catcher, use the same types of features, and achieves similar F1-score. Hybrid Detection  [8] adds links to the feature set, and achieves slightly better results. Although adding links may improve the performance of our system, we skip it for

Table 2: Comparison of cloaking detection methods

| Methods | Features | Max F1 Score | IP/SEM | Extraction Time | Data Transmitted | Comparison Time |
|---------|----------|--------------|--------|-----------------|------------------|-----------------|
| Najork [17] | W, L, T | low | ✓ | $O(N_W + N_L + N_T)$ | $O(1)$ | $O(1)$ |
| Term & Link Diff [27] | W, L | medium | ✗ | $O(N_W + N_L)$ | $O(N_W + N_L)$ | $O(N_W + N_L)$ |
| Wu & Davison [26] | W, L | medium | ✗ | $O(N_W + N_L)$ | $O(N_W + N_L)$ | $O(N_W + N_L)$ |
| CloakingScore [7] | W | medium | ✗ | $O(N_W)$ | $O(N_W)$ | $O(N_W)$ |
| TagDiff [14] | W, T | high | ✗ | $O(N_W + N_T)$ | $O(N_W + N_T)$ | $O(N_W + N_T)$ |
| Dagger [23] | W, T | high | ✗ | $O(N_W + N_T)$ | $O(N_T)$ | $O(N_T)$ |
| Hybrid Detection [8] | W, L, T | high | ✗ | $O(N_W + N_L + N_T)$ | $O(N_L + N_T)$ | $O(N_L + N_T^2)$ |
| Cloaker Catcher | W, L, T | high | ✓ | $O(N_W + N_T)$ | $O(1)$ | $O(1)$ |

$W$: words, $T$: tags, $L$: links

now because on one hand links are not suitable for Simhash algorithm, and on the other hand directly comparing link sets introduces too much overhead.

The "IP/SEM" dimension specifies whether the original system is capable of detecting IP cloaking and SEM cloaking. Cloaker Catcher and Najork's system [17] are the only systems capable of detecting them since they are client-based. However, the poor precision of the latter prevents its usage.

The "Extraction Time", "Data Transmitted" and "Comparison Time" columns are not trivial because some of the original systems are not designed for client-based detection. To make these systems comparable to our system, we modify the previous works in a client-server way: (1) The server caches the features for a large amount of websites and responds to client requests with features for the requested URL (2) The clients request features for the current URL from the server, extract features from the client copy and compare the two sets of features to identify cloaking. This design guarantees that the server could get no more information than the URLs, which we can further use techniques employed in existing APIs such as SafeBrowsing API [10] to reduce user linkability. The time and data requirements are shown using number of terms, tags and links. As shown in the "Data Transmitted" column, Cloaker Catcher benefits from compact website models and transfers much less data compared to Dagger [23] and Hybrid Detection [8]. This is important in client-based detection because network delay is unpredictable. In terms of "Extraction Time" and "Comparison Time", the most similar system, Dagger uses text shingling to reduce number of term comparison, but they still do pairwise comparison of tags. In order to detect cloaking on the client side, their clients need to traverse the document in $O(N_W + N_T)$ time to extract features, request $O(N_T)$ features including fixed number of shingles and all the tags from the server and compare these features in $O(N_T)$. Cloaker Catcher, in contrast, uses fixed size features and compares much faster.

## 6.2  Performance of Cloaker Catcher

As described in Figure 4, Cloaker Catcher detects cloaking in several steps, in order to minimize number of server queries and detection overhead. First, it only examines the websites that are visited through Google search (this step can be generalized to crawler user agent of other search operators). Secondly, these websites are checked against three lists (black/white/visited). When the websites are not in these lists, the system requests spider copies and compares with user copies. The main delay in the detection consists of three parts, feature extraction, data transfer, and comparison. Since data transfer time depends on the network



Figure 6: Extraction and Comparison Overhead introduced by Cloaker Catcher

status and is irrelevant to the web page size, we only measure the feature extraction and comparison overhead. We randomly select 2,000 URLs from our SWM database and use selenium to automate Chrome with Cloaker Catcher to visit these websites. We record the feature extraction time and comparison time and aggregate them by web page size. The results are shown in Figure 6, x-axis is the web page size in log scale and y-axis is the time cost. The graph show solid points which are average time, along with their upper and lower error bar. When the web page size are greater than 1KB, feature extraction time grows linearly and comparison remains constant. The curves fluctuate when page size is less than 1KB because of few sampled websites. The overall delay introduced by Cloaker Catcher are hundreds of milliseconds in practice.

## 7.  LIMITATION

**URL Features.** URLs on a website show navigational features of websites, e.g. embedded links to images or videos. However, URL features are not straightforward and require further study to compactly represent them. We leave this for future work and anticipate a more robust client-based system with URL features.

**Incentive analysis automation.** We manually classified the incentives of cloaking websites in this work. However, according to our observations, this process can be automated using machine learning approaches. For example, cloaking sites that simply embed an iframe is targeting traffic sale, and ones that redirects users to downloads are doing unwanted

software download.

**SWM Availability.** Cloaker Catcher includes a server that crawls websites on demand and builds SWM. However, this can be a huge amount of work as the number of users increases. Therefore, we advise search engines to adopt our prototype and detect cloaking at scale. For individual researchers, a trade-off is to selectively crawl websites and reply SWMs for them. For instance, researchers can disable the on-demand crawling module and crawl URLs for specific categories of words. Researchers can also filter the requested URLs based on domain reputation [2] and only crawl the suspicious ones.

## 8. RELATED WORK

**Simhash.** Simhash is a popular Locality Sensitive Hash (LSH) used in information retrieval. In the field of near duplicate detection, Minhash [4] and Simhash [6] are the most popular techniques. A large scale study [9] has been done to evaluate the two algorithms. A great advantage of using Simhash over Minhash is that it requires relatively small-sized fingerprints. For example, 24 bytes Minhash and 64-bit Simhash achieves similar performance. David et al. [23] employs shingling (Minhash) and our system use Simhash to gain a more compact representation of websites.

**Semantic Features.** Previous works on cloaking detection focus on differentiating dynamic pages from blatantly different content. Various ways to measure similarity of documents are proposed. A similar toolbar based approach is proposed by Najork et al. [17]. The toolbar sends the signature of user perceived pages to search engines. But they cannot handle dynamic websites, and may raise high false positive. Wu et al. [26] used statistics of web pages to detect cloaking and Chellapilla et al. [7] detected syntactic cloaking on popular and monetizable search terms. They showed that search terms with higher monetizability had more cloaked links than popular terms. Referrer cloaking was first studied by [24]. They found a large number of referrer cloaking pages in their work. Lin et al. [14] introduced tag based methods for cloaking detection, [23] extended previous efforts to measure dynamics of cloaking over five months. They used text-based method and tag-based method to detect cloaking pages. [8] integrated previous efforts and proposed a text, link and tag based cloaking detection system. Inspired by previous works, we use texts, links and tags to model a website. We further compress the three feature sets to fixed-bits using Simhash and reduce complexity of pairwise comparison to $\mathcal{O}(1)$.

**Domain Features.** Domain and content features are orthogonal and both contain information about a particular website. Lu et al. [15] and John et al. [11] have used domain-related information, e.g. redirection and domain reputation, to detect search engine poisoning. A more thorough and long-term study of search engine poisoning is done by Leontiadis et al. [13]. Content-based detection and domain-based detection complement each other and may work better if combined.

## 9. CONCLUSION

Detection of search engine spam and ad spam is a challenging research area. Cloaking has become a standard tool in the spammer's toolbox and added significant complexity for detection. Our work has identified previous cloaking works' inability in detecting IP-based cloaking and SEM cloaking and proposed a novel client-based system, Cloaker Catcher, to address these issues. The key component of Cloaker Catcher is the compact website model, SWM, which minimizes the storage for each website and enables fast comparison between user views and spider views. We further use Cloaker Catcher to detect and classify cloaking in collected search results and ads. We present the first analysis of cloaking in search ads, which shows that, the purpose of advertisement cloakers is mainly to provide illicit services, different from search cloakers who mainly want to monetize their traffic.

Given the high accuracy and low overhead of this approach, we believe Cloaker Catcher is a practical system for search engines to provide real-time protection for users. The cloaking detection can serve as a separate warning or be integrated into existing API to improve users' experience.

## 10. REFERENCES

[1] Google trends. http://www.google.com/trends/. Accessed Dec, 2014.

[2] Web of trust. http://www.mywot.com/wiki/API. Accessed Jan, 2015.

[3] G. Adwords. Google keyword planner. https://adwords.google.com/KeywordPlanner. Accessed Feb.15, 2015.

[4] A. Z. Broder, S. C. Glassman, M. S. Manasse, and G. Zweig. Syntactic clustering of the web. *Computer Networks and ISDN Systems*, 29(8):1157–1166, 1997.

[5] T. Catan. Google forks over settlement on rx ads. http://www.wsj.com/news/articles/SB10001424053111904787404576528332418559052. Accessed: 2015-10-12.

[6] M. S. Charikar. Similarity estimation techniques from rounding algorithms. In *Proceedings of the thiry-fourth annual ACM symposium on Theory of computing*, pages 380–388. ACM, 2002.

[7] K. Chellapilla and D. M. Chickering. Improving cloaking detection using search query popularity and monetizability. In *AIRWeb*, pages 17–23, 2006.

[8] J. Deng, H. Chen, and J. Sun. Uncovering cloaking web pages with hybrid detection approaches. In *Computational and Business Intelligence (ISCBI), 2013 International Symposium on*, pages 291–296. IEEE, 2013.

[9] M. Henzinger. Finding near-duplicate web pages: a large-scale evaluation of algorithms. In *Proceedings of the 29th annual international ACM SIGIR conference on Research and development in information retrieval*, pages 284–291. ACM, 2006.

[10] G. Inc. Google safe browsing api. http://code.google.com/apis/, Aug 2015.

[11] J. P. John, F. Yu, Y. Xie, A. Krishnamurthy, and M. Abadi. deseo: Combating search-result poisoning. In *USENIX security symposium*, 2011.

[12] E. Jones, T. Oliphant, and P. Peterson. Scipy: Open source scientific tools for python. 2014.

[13] N. Leontiadis, T. Moore, and N. Christin. A nearly four-year longitudinal study of search-engine poisoning. In *Proceedings of the 2014 ACM SIGSAC Conference on Computer and Communications Security*, pages 930–941. ACM, 2014.

[14] J.-L. Lin. Detection of cloaked web spam by using tag-based methods. *Expert Systems with Applications*, 36(4):7493–7499, 2009.

[15] L. Lu, R. Perdisci, and W. Lee. Surf: detecting and measuring search poisoning. In *Proceedings of the 18th ACM conference on Computer and communications security*, pages 467–476. ACM, 2011.

[16] G. S. Manku, A. Jain, and A. Das Sarma. Detecting near-duplicates for web crawling. In *Proceedings of the 16th international conference on World Wide Web*, pages 141–150. ACM, 2007.

[17] M. Najork. System and method for identifying cloaked web servers. `https://www.google.com/patents/US20030131048`, 2003. US Patent App. 10/039,603.

[18] F. Pedregosa, G. Varoquaux, A. Gramfort, V. Michel, B. Thirion, O. Grisel, M. Blondel, P. Prettenhofer, R. Weiss, V. Dubourg, J. Vanderplas, A. Passos, D. Cournapeau, M. Brucher, M. Perrot, and E. Duchesnay. Scikit-learn: Machine learning in Python. *Journal of Machine Learning Research*, 12:2825–2830, 2011.

[19] M. A. Rajab, L. Ballard, N. Lutz, P. Mavrommatis, and N. Provos. Camp: Content-agnostic malware protection. In *NDSS*, 2013.

[20] B. Samit, B. Jari, and B. A. et al. Seleniumhq. `http://www.seleniumhq.org`.

[21] D. Sullivan. Iab: Search was 50% of us digital ad spend in 2014, desktop still bigger than mobile. `http://searchengineland.com/iab-search-was-50-of-digital-ads-219588`. Accessed: 2015-10-12.

[22] G. A. Team. Google adwords policy. `https://support.google.com/adwordspolicy/topic/1626336?hl=en&ref_topic=2996750`. Accessed Dec, 2014.

[23] D. Y. Wang, S. Savage, and G. M. Voelker. Cloak and dagger: dynamics of web search cloaking. In *Proceedings of the 18th ACM conference on Computer and communications security*, pages 477–490. ACM, 2011.

[24] Y.-M. Wang and M. Ma. Detecting stealth web pages that use click-through cloaking. In *Microsoft Research Technical Report, MSR-TR*, 2006.

[25] wpCloaker.com. Cloaking software. `http://wpcloaker.com`. Accessed Feb. 14, 2015.

[26] B. Wu and B. Davison. Detecting semantic cloaking on the web. In *Proceedings of the 15th international conference on World Wide Web*, pages 819–828. ACM, 2006.

[27] B. Wu and B. D. Davison. Cloaking and redirection: A preliminary study. In *AIRWeb*, pages 7–16, 2005.

# APPENDIX

## A. SEM CLOAKING EXAMPLE



(a) Search on Google: Essary Writing



(b) Click-through users are presented plagiarism service





(c) Spiders are presented hotel page

**Figure 7: SEM Cloaking in sponsored ads of "essay writing"**

Figure 7 shows an SEM cloaking example of keyword "essay writing". The search result page, user view and spider view are listed.

# APPENDIX
# 188

🏠 Georgia Tech Home   📍 Campus Map   👤 Directory   🖥 Offices

**Georgia Tech** | **Institute for Information Security & Privacy**

Home   About   Research   Facilities & Labs   Education   People   Events   News Center   FOR FACULTY ›   CONTACT US ›   🔍 SEARCH

GT Home › Home

# Georgia Tech Releases 2017 Outlook for Emerging Cyber Threats



***Privacy, Democracy and Technology on Collision Course***
*Sept. 28, 2016 | Atlanta, GA*

The Institute for Information Security & Privacy (IISP) at Georgia Tech today released the "2017 Emerging Cyber Threats, Trends & Technologies Report" – an expert-driven review of recent cybersecurity trends, developing research, and threat considerations for the year ahead. Among the findings:

- Global information manipulation by nation-states is now widespread, causing Western nations to curtail free speech and news consumers to tread cautiously.
- Healthcare fraud takes off in the absence of good defenses, as personal data surpasses stolen credit cards in value.
- Cultural differences and unresolved approaches to data encryption continue to mire businesses with uncertainty and risk in North America and Europe.
- Insecure, aging e-voting systems emerge, but crowdsourced and open-source solutions hold promise for a solution.
- Public proof of who is behind cyberattacks remains elusive; Georgia Tech works to develop a methodical science for attribution as a new research area.
- A growth in student applications to computer science programs and degree completion suggests a changing tide in the nation's shortfall of IT workers as colleges adapt to increased demand for education.

"Cyberattacks today are flourishing because almost every organization conducts some portion of its business online – putting even digitally cautious consumers at risk when data is not sufficiently protected," says **Wenke Lee**, co-director of the IISP and professor of computer science at Georgia Tech. "There is widespread reluctance to share threat intelligence between organizations, and there's a lack of public attribution about who is responsible for an attack, making it nearly impossible for the public to defend themselves."

Georgia Tech issues the Threat Report each fall in conjunction with the annual Cyber Security Summit, held Sept. 28 in midtown Atlanta. The Summit brings together government, industry, and academia for objective conversation about the challenges of securing information and cyber-connected systems. Attending this year were guests from Australia, Canada, England, Germany, and Israel, and visitors from University of California Davis, University of Minnesota, and throughout the university system of Georgia. Nearly 67 percent of all attendees are working professionals in private industry.

Contributors to the report and Summit included professors and research scientists from 10 units across Georgia Tech, including public policy, business, computer science, electrical engineering, professional education, and the Georgia Tech Research Institute.

"Few universities have the aptitude of nationally top-ranked computer science and engineering programs and the potency of a multi-million-dollar, applied research arm with a long history of supporting military, government and industry," says **Bo Rotoloni**, co-director of the IISP and director of the Information and Cyber Sciences Directorate at the Georgia Tech Research Institute, the university's applied research arm. "Under this unique combination, Georgia Tech can help foretell how the 'white hats' should prepare because we continually witness how the 'black hats' adapt."

Underway at Georgia Tech are multi-year research projects in the areas of information assurance, attribution, cyber-physical systems, health information technology, smart cities, and securing the Internet of Things.

**❶ Download the Report**



Download a copy of the *2017 Emerging Cyber Threats, Trends & Technologies Report*, featuring commentary from faculty researchers across 10 units at Georgia Tech, as well as industry and government experts.

### About the Institute for Information Security & Privacy

The Institute for Information Security & Privacy (IISP) at the Georgia Institute of Technology (Georgia Tech), connects government, industry, and academia to solve the grand challenges of cybersecurity. As a coordinating body for multidisciplinary labs dedicated to academic and applied research, the IISP leverages intellectual capital from across Georgia Tech and its external partners to address vital solutions for national security, economic continuity, and individual safety. The IISP provides a gateway to faculty, students, and scientists and a central location for national and international collaboration around six critical research thrusts: policy, consumer-facing privacy, cyber physical systems, risk, trust, and attribution. Unbound by system rigidity, we're creating the next solutions that close the innovation gap with immediate application in the real world.

**Georgia Tech Resources**

Offices & Departments
News Center
Campus Calendar
Special Events
GreenBuzz
Institute Communications

**Visitor Resources**

Campus Visits
Directions to Campus
Visitor Parking Information
GTvisitor Wireless Network Information
Georgia Tech Global Learning Center
Georgia Tech Hotel & Conference Center
Barnes & Noble at Georgia Tech
Ferst Center for the Arts
Robert C. Williams Paper Museum

**Cybersecurity Research Areas**

Attribution
Consumer-facing Privacy
Cyber Physical Systems
Privacy Policy
Risk
Trust
Other Research Areas at Georgia Tech

**Cybersecurity Labs & Centers**

Astrolavos Lab
CDAIT
CIPHER Lab
Communications Assurance & Performance Lab
Converged Systems Security Lab
CyFI Lab
Financial Services Innovation Lab
Georgia Tech Cyber Security
Information & Communications Laboratory
Intel ISTC-ARSA Center
Polo Club of Data Science
Systems Software & Security Laboratory

**Cybersecurity Education**

M.S. Cybersecurity
M.S. Computer Science
Online M.S. C.S.
Ph.D. Computer Science
Ph.D. Electrical & Computer Engineering
Ph.D. Fellowship
CyberCorps Scholarship for Service
Professional Education



Institute for Information Security & Privacy
Klaus Advanced Computing Building
266 Ferst Drive, Atlanta, GA 30332
(404) 385-3800

**Georgia Tech**

© Georgia Institute of Technology

Contact Us  |  Use of Customer Logos  |  Site Feedback

Emergency Information  |  Legal & Privacy Information  |  Accessibility  |  Accountability  |  Accreditation  |  Employment

# APPENDIX
# 189

US 20080154847A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2008/0154847 A1**
Chellapilla et al. (43) **Pub. Date:** **Jun. 26, 2008**

(54) **CLOAKING DETECTION UTILIZING POPULARITY AND MARKET VALUE**

(75) Inventors: **Kumar H. Chellapilla**, Redmond, WA (US); **David M. Chickering**, Bellevue, WA (US)

Correspondence Address:
**AMIN. TUROCY & CALVIN, LLP**
**24TH FLOOR, NATIONAL CITY CENTER, 1900 EAST NINTH STREET**
**CLEVELAND, OH 44114**

(73) Assignee: **MICROSOFT CORPORATION**, Redmond, WA (US)

(21) Appl. No.: **11/613,725**

(22) Filed: **Dec. 20, 2006**

**Publication Classification**

(51) **Int. Cl.**
$G06F\ 17/30$ (2006.01)
$G06F\ 17/00$ (2006.01)
(52) **U.S. Cl.** ..................... **707/3**; 707/102; 707/E17.001; 707/E17.107

(57) **ABSTRACT**

The subject disclosure pertains to systems and methods that facilitate detection of cloaked web pages. Commercial value of search terms and/or queries can be indicative of the likelihood that web pages associated with the keywords or queries are cloaked. Commercial value can be determined based upon popularity of terms and/or advertisement market value as established based upon advertising revenue, fees and the like. Commercial value can be utilized in conjunction with term frequency difference analysis to identify a cloaked page automatically. In addition, commercial values of terms associated with web pages can be used to order or prioritize web pages for further analysis.





**FIG. 1**



**FIG. 2**

Case 0:20-cv-60416-AMC Document 69-24 Entered on FLSD Docket 05/26/2021 Page 69 of 316



**FIG. 3**



FIG. 4



**FIG. 5**



**FIG. 6**



**FIG. 7**



**FIG. 8**

Case 0:20-cv-60416-AMC   Document 69-24   Entered on FLSD Docket 05/26/2021   Page 75 of 316



**FIG. 9**



**FIG. 10**



**FIG. 11**



**FIG. 12**



**FIG. 13**



**FIG. 14**



**FIG. 15**



**FIG. 16**

US 2008/0154847 A1

Jun. 26, 2008

1

# CLOAKING DETECTION UTILIZING POPULARITY AND MARKET VALUE

## BACKGROUND

[0001] The Internet has become widely utilized as an advertising means for businesses. Search engines, in addition to providing results for user queries, also serve advertisements alongside the search results. The advertisements served may be related to the search query. The more relevant the advertisements are to user's intent and the query, the greater the value to users, businesses, and search engines. However, the high amounts of revenue associated with Internet sales and advertising are also an incentive for vendors to manipulate search engines to include vendor web page links within the search results or increase ranking of a vendor web page link within the search results

[0002] Search result can be manipulated by providing false information to web crawlers/bots. Search engines typically utilize web crawlers or bots to search the Internet for web site content, copying web pages or information. The search engine can utilize this information to generate an index that facilitates searches. There are many legitimate reasons for providing different information or a different version of a web page to a crawler and a browser. For instance, web servers may remove images or audio content from web page information provided to a crawler to minimize bandwidth. However, some unscrupulous servers seek to manipulate search engines by providing one set of information to the crawler and presenting a substantially different web page to users. This type of manipulation is often referred to as "cloaking," a particular type of web spam in which users are redirected to undesired web sites. Web spam is somewhat similar to email spam, where unsolicited information and/or advertisements are sent to users. Spam in general is the electronic equivalent of traditional junk mail.

[0003] Due to the nature and volume of spam, spam is considered a nuisance that inconveniences users and creates user frustration. Not only do users waste time sorting through a deluge of undesired information, but they also likely bear the costs of the tremendous amounts of resources (e.g., storage space, network bandwidth, faster processors, . . . ) required to cope with various forms of spam (e.g., irrelevant search results, email advertisements, etc.). A variety of systems and techniques have been developed and employed to combat spam in both the Web and email, often requiring numerous filtering processes. Once identified, action is taken on the content such as redirection to a designated location (e.g., spam folder, quarantine region . . . and/or deletion, etc. However, the traditional filtering methods frequently fall far short of adequately eliminating undesired spam.

## SUMMARY

[0004] The following presents a simplified summary in order to provide a basic understanding of some aspects of the claimed subject matter. This summary is not an extensive overview. It is not intended to identify key/critical elements or to delineate the scope of the claimed subject matter. Its sole purpose is to present some concepts in a simplified form as a prelude to the more detailed description that is presented later.

[0005] Briefly described, the provided subject matter concerns facilitating detection of cloaked or spammed web pages. Internet advertising has become a large and profitable business, creating an incentive for spammers to manipulate

web search results. Web spammers can provide search engine crawlers with false web pages or information to ensure that their pages are highly ranked and provide entirely different pages to users. Because web spammers tend to target valuable search terms or queries, the value of a term or terms is indicative probability that a spammer has targeted the term. Accordingly, value of terms and/or queries can be used in identification of cloaked web pages.

[0006] Economic or commercial value of keywords, phrases or queries can be measured based upon popularity and/or market value. Typically, the more users utilize a search term, the greater the traffic to the web pages links included within the search results and the greater the value term. Consequently, popularity of terms is generally indicative of economic value. Market value of terms can be determined based upon advertising information (e.g., bid price, revenue) of terms. Various query and/or advertising logs can be utilized to determine popularity and market values.

[0007] Term values can be used in combination with term difference analysis to identify cloaked pages automatically. Traditional term frequency difference analysis evaluates differences between web page versions provided to a crawler and web page versions provided to a browser to detect cloaked pages. Identification of cloaked pages can be enhanced by evaluating popularity and/or market value of term differences.

[0008] Popularity and/or market values can also be used to prioritize web pages for further evaluation. Frequently, search engines employ people to manually review web pages and identify web spam. However, the sheer number of web pages makes it impossible to manually evaluate each page. To increase the probability that cloaked pages are evaluated and identified, web pages returned in response to popular or valuable terms can receive priority during the evaluation process.

[0009] To the accomplishment of the foregoing and related ends, certain illustrative aspects of the claimed subject matter are described herein in connection with the following description and the annexed drawings. These aspects are indicative of various ways in which the subject matter may be practiced, all of which are intended to be within the scope of the claimed subject matter. Other advantages and novel features may become apparent from the following detailed description when considered in conjunction with the drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0010] FIG. 1 is a block diagram of a system that facilitates cloaked web page identification in accordance with an aspect of the subject matter disclosed herein.

[0011] FIG. 2 is a block diagram of a system that evaluates search terms based upon popularity and/or market value in accordance with an aspect of the subject matter disclosed herein.

[0012] FIG. 3 is a more detailed block diagram of a system that evaluates search terms based upon popularity and/or market value in accordance with an aspect of the subject matter disclosed herein.

[0013] FIG. 4 is a block diagram of a system that evaluates value of search terms in accordance with an aspect of the subject matter disclosed herein.

[0014] FIG. 5 is a block diagram of a system that evaluates a web page in accordance with an aspect of the subject matter disclosed herein.

[0015]   FIG. **6** is a block diagram of an aspect of the page evaluation component in accordance with an aspect of the subject matter disclosed herein.

[0016]   FIG. **7** is a block diagram of a component that prioritizes web pages for evaluation in accordance with an aspect of the subject matter disclosed herein

[0017]   FIG. **8** illustrates a methodology for facilitating detection a cloaked web page in accordance with an aspect of the subject matter disclosed herein.

[0018]   FIG. **9** illustrates a methodology for analyzing value of terms in accordance with an aspect of the subject matter disclosed herein.

[0019]   FIG. **10** illustrates a methodology for detecting a cloaked page in accordance with an aspect of the subject matter disclosed herein.

[0020]   FIG. **11** illustrates a methodology for facilitating cloaking analysis in accordance with an aspect of the subject matter disclosed herein.

[0021]   FIG. **12** illustrates a methodology for prioritizing a set of web pages in accordance with an aspect of the subject matter disclosed herein.

[0022]   FIG. **13** depicts a graph illustrating precision and recall in cloaking detection.

[0023]   FIG. **14** depicts a graph illustrating the distribution of cloaked pages over a set of search queries.

[0024]   FIG. **15** is a schematic block diagram illustrating a suitable operating environment.

[0025]   FIG. **16** is a schematic block diagram of a sample computing environment.

### DETAILED DESCRIPTION

[0026]   The various aspects of the subject matter disclosed herein are now described with reference to the annexed drawings, wherein like numerals refer to like or corresponding elements throughout. It should be understood, however, that the drawings and detailed description relating thereto are not intended to limit the claimed subject matter to the particular form disclosed. Rather, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the claimed subject matter.

[0027]   As used herein, the terms "component," "system" and the like are intended to refer to a computer-related entity, either hardware, a combination of hardware and software, software, or software in execution. For example, a component may be, but is not limited to being, a process running on a processor, a processor, an object, an executable, a thread of execution, a program, and/or a computer. By way of illustration, both an application running on computer and the computer can be a component. One or more components may reside within a process and/or thread of execution and a component may be localized on one computer and/or distributed between two or more computers.

[0028]   The word "exemplary" is used herein to mean serving as an example, instance, or illustration. The subject matter disclosed herein is not limited by such examples. In addition, any aspect or design described herein as "exemplary" is not necessarily to be construed as preferred or advantageous over other aspects or designs.

[0029]   Furthermore, the disclosed subject matter may be implemented as a system, method, apparatus, or article of manufacture using standard programming and/or engineering techniques to produce software, firmware, hardware, or any combination thereof to control a computer or processor based device to implement aspects detailed herein. The term

"article of manufacture" (or alternatively, "computer program product") as used herein is intended to encompass a computer program accessible from any computer-readable device, carrier, or media. For example, computer readable media can include but are not limited to magnetic storage devices (e.g., hard disk, floppy disk, magnetic strips . . . ), optical disks (e.g., compact disk (CD), digital versatile disk (DVD). . . ), smart cards, and flash memory devices (e.g., card, stick). Additionally it should be appreciated that a carrier wave can be employed to carry computer-readable electronic data such as those used in transmitting and receiving electronic mail or in accessing a network such as the Internet or a local area network (LAN). Of course, those skilled in the art will recognize many modifications may be made to this configuration without departing from the scope or spirit of the claimed subject matter.

[0030]   Commercial web sites generally try to maximize the number of users that view their web site, since increases in web site traffic typically result in increases in business revenue. The more users that view the page, the greater the number of possible customers. Legitimate techniques, such as search engine optimization (SEO), can increase site traffic. For example, web site operators can optimize their sites to ensure that search engine crawlers can locate and index the site. In addition, the overall quality of a web site can be improved by offering added value to online users, thereby increasing search result ranking.

[0031]   The monetary incentives that encourage web site optimization also incentivize illegitimate or duplicitous techniques designed to manipulate search engine results and divert users. Cloaking is a technique utilized by Web servers to deliver one page to a search engine for indexing purposes while providing a second, distinct page to users browsing the site. Web servers can distinguish between search engines and other users based upon examining the user-agent string or IP address of the client accessing the site. Some spammers maintain lists of IP addresses used by search engines and identify web crawlers or bots by matching IP addresses. Cloaking distorts search engine rankings in favor of the cloaked page.

[0032]   The utility of search results can be reduced by excessive amounts of web spam. Users are likely to become frustrated if they are forced to search through irrelevant results. Eventually, users may utilize alternative search engines that are better able to filter search results to remove web spam. Reductions in numbers of users may force reductions in advertising fees and loss of revenue. Consequently, there is a financial incentive for search engine operators to identify and eliminate or reduce rankings of web spam.

[0033]   The same financial incentives that cause spammers to target certain terms can assist search engines in identifying web spam. Spammers have a greater monetary incentive to cloak or spam web pages where there is significant monetary value in redirecting users. For instance, a user searching based upon the phrase "theory of relativity" is likely to be writing a research paper or performing personal research. Commercial transactions associated with the query are likely to be minimal. In contrast, the commercial value of a search using the phrase "auto insurance" is likely to be significant. Users entering the second phrase may be potential auto insurance customers. Consequently, there is a large incentive for insurers to optimize their web sites, either legitimately or by cloaking, to respond to "auto insurance." Terms or phrases

that are more likely to result in commercial transactions resulting in significant financial revenue are much more likely to be targeted for web spam.

[0034] This relationship between commercial viability of terms and probability that web pages associated with such terms are web spam can be utilized to assist in detecting web spam. More particularly, terms associated with a particular web page can be analyzed for commercial value. The greater the commercial value of the associated terms, the greater the probability that the web page is web spam.

[0035] Referring now to FIG. 1, a system 100 that facilitates detection of web spam or cloaked web pages is illustrated. The system 100 can determine the likelihood that a web page or set of web pages is cloaked based at least in part upon the value of terms associated with a web page. Terms associated with a web page can include search terms that would cause a search engine to return the web page in the set of search results. In addition, associated terms can include differences in terms included within a copy of the web page obtained by a browser and a copy of the web page obtained by a search engine crawler.

[0036] The system 100 can include a term analysis component 102 that evaluates a search term or set of terms and determines a measure or term score (e.g., a number or classification) that reflects the value of the term. Here, a term includes a word, a name, an identifier or any other data that can be utilized to locate a web page. In addition, the term analysis component 102 can evaluate sets of terms (e.g., combinations, permutations and phrases). The term score can be expressed as a score (e.g., integer or floating point number), a classification (e.g. high, medium and low value) and the like.

[0037] The system 100 can include a page analysis component 104 that can determine the relative likelihood or probability that one or more web pages are cloaked. The page analysis component 104 can provide the term analysis component 102 with one or more terms associated with or related to a web page. In addition to content of the web page, the page analysis component 104 can analyze related terms such as "anchor text" associated with the page. Anchor text refers to text within other web pages containing a hyperlink to the web page. The term analysis component 102 can evaluate the term or terms and provide a term score or other measure of commercial value to the page analysis component 104. The page analysis component 104 can prioritize pages for further analysis or identify a page as web spam based at least in part upon term scores of terms associated with web pages.

[0038] Referring now to FIG. 2, a more detailed illustration of a term analysis component 102 is depicted. The term analysis component 102 can include a term format component 202 that can parse, format or combine terms or phrases for analysis. After terms are properly formatted, a term or set of terms can be evaluated to determine a term score that reflects value of the term or terms.

[0039] Term value can be measured using a variety of metrics. For instance, popularity can be indicative of value of terms. Typically, the more users utilize a search term, the greater the traffic to the pages within the search results and the greater the value of the term. In particular, popularity of a term or terms can be proportional to the frequency of occurrence of a term or search query. Most major search engines publish the most popular search queries for a time period. For instance, many search engines disclose the top ten search queries for a day, a month or even a year. In addition, a search

engine is likely to maintain query logs detailing popular searches. Such information can be utilized to compute the relative popularity of terms. The term analysis component 102 can include a popularity component 204 that can determine the relative popularity of a term or terms.

[0040] Value of terms can also be measured based upon market value or advertising monetization of terms. Although popularity may provide a general indication of commercial value, data regarding market value or monetization can provide additional information. For example, certain terms may have a high advertising monetization value without being particularly popular. Certain terms may be used infrequently; however, users who utilize such search terms can be particularly valuable to advertisers. In particular, terms that refer to certain illnesses that are the subject of class action or personal injury lawsuits may have a high market value. Such terms may be used infrequently, but law firms involved in those legal suits are anxious to contact potential clients. The term analysis component 102 can include a market value component 206 that can generate a market value or advertisement monetization value indicative of term value. In particular, advertisement monetization value can be based upon the advertising information associated with a term.

[0041] The advertising market for terms or keywords is complex. Typically, search engines sell online advertising through an auction process where advertisers bid for specific keywords and phrases. Web page results generally include both the links most relevant to the query and sponsored links (e.g., paid advertisements). Presentation of results on the web page allows users to distinguish advertisements from actual search results. The advertisements presented are dependent upon the search query. If a user selects a sponsored link, he or she is sent to the advertiser's web page. The user click can constitute a referral to the advertiser from the search engine and the advertiser may pay the search engine a fee for referring users (e.g., "pay-per-click" pricing).

[0042] The number of advertisements delivered in response to a query is limited and desirability of positions may vary. Generally, advertisers prefer that their sponsored links appear at the top, left portion of the page. Fees can vary based upon search terms and upon position of results on a page. Many search engines utilize an auction system, such as a Generalized Second Price (GSP) auction, to allocate positions to advertisers.

[0043] In a GSP auction, advertisers submit bids stating their maximum willingness to pay for a click for a specific term or keyword. When a user enters a keyword, he receives search results along with sponsored links, the latter shown in decreasing order based upon received bids. In particular, the advertisement with the highest bid may be displayed at the top of the page; the advertisement with the next highest bid may be displayed at the position second from the top and so forth. If a user selects a sponsored link, the advertiser is charged the amount of the next lower bid. For example, if the top-most sponsored link were selected, the advertiser would be charged the amount of the bid for the sponsored link in the second position. If only one sponsored link were displayed per page, GSP would be equivalent to a standard second price, or Vickrey-Clarke-Groves (VCG) auction.

[0044] Many popular search engines utilize a variation of the GSP auction. Frequently, advertisers' bid price is combined with expected click through rate (CTR) to compute an expected monetization score. In the variation, auctions are based upon the expected monetization score instead of bids

US 2008/0154847 A1

Jun. 26, 2008

4

and sponsored links are presented in decreasing order of expected monetization scores. Advertisers can bid for a single keyword, a keyword and additional search terms or a phrase. The bidding process can be blind or open, such that bidder's bid price and identity may or may not be disclosed to other bidders.

[0045]  Search engines provide multiple types of matching between queries and bid keywords or terms (e.g., broad match, phrase match, exact match and excluded keywords). Broad match can occur when a query contains all keywords within the bid in any order. Bid keywords can also be expanded to include plurals and relevant variations. Phrase match can occur when all bid keywords appear in the search query in the prescribed order. Broad and phrase match can allow for extraneous terms not appearing within the set of bid keywords. Exact matches may occur only when the search query matches the bid phrase exactly. Occurrence of excluded keywords would negate matches. Matching sponsored links can be ranked based upon relevance, monetizability or market value, and the like.

[0046]  The market value of terms associated with a web page (e.g. page content and/or search terms that locate the web page) can be computed in numerous ways. Market value for terms can be proportional to the total revenue generated by sponsored links provided along side the search results for a search query utilizing the terms during a specified time period. Alternatively, market value can be based upon number of user clicks for links served alongside search results, the maximum bid price for the keywords, maximum amount that was paid within the specified time period as well as many other variations. Many major search engines serve online ads and track usage. Such logs can be mined to obtain popularity and monetizability statistics for search queries.

[0047]  The term score can be equal to popularity of the term(s) or market value. Alternatively, commercial value or term score can be a function of the combined popularity and market value. The term score can be provided in any suitable format.

[0048]  Turning now to FIG. 3, another aspect of the term analysis component 102 is illustrated. The term analysis component 102 can include popularity information 302 and market value information 304. Popularity information 302 can include data from which popularity of terms can be derived. For example, popularity information 302 can include data regarding frequency of occurrence of terms within search queries for a specified period of time. Popularity information 302 can be updated periodically or dynamically. Similarly, market value information 304 can include data from which market values of terms can be derived. For instance, market value information 304 can include, but is not limited to, data regarding total advertising revenue associated with a term, number of bidders competing for search terms, the amount of bids and the like. Market value information 304 can also be updated periodically or dynamically. Popularity and market value information can be obtained in substantially real-time and/or from a local and/or remote data store.

[0049]  The popularity data and market value data can be obtained from a search engine query log 306 and an advertiser log 308, respectively. Many search engines maintain logs or data stores that include information regarding popular search queries. Such information can be utilized to populate popularity information 302. In addition, search engines generally maintain advertising information for accounting purposes. Information from the advertiser log 308 can be utilized to

populate market value information 304. Alternatively, popularity and market value information can be obtained directly from the query log 306 and advertiser log 308 as required to determine popularity and market values.

[0050]  Referring now to FIG. 4, the term analysis component 102 can include a classification component 402 capable of classifying the term score or commercial value. For example, the term score can be classified as low, medium and high, indicating the commercial value of the term and probability that the term will attract web spammers. Other systems of classification (e.g. likely, unlikely) can be utilized to categorize term scores. Any number of threshold values can be used in classification. The classification component 402 can compare term scores based upon popularity, market value or any combination thereof.

[0051]  The classification can be provided with or in place of the actual term scores. The classification of term scores can assist users in eliminating pages that are unlikely to be spammed and identifying pages for further review. Thresholds can be predetermined and may be adjusted to fine tune the term analysis and assist in accurate identification of web spam.

[0052]  Referring now to FIG. 5, an aspect of the system 100 that facilitates detection of web spam or cloaked web pages is illustrated. The page analysis component 104 can include a page evaluation component 502 that is capable of evaluating a particular web page and determining the probability that the web page is web spam. More particularly, the page evaluation component 502 can determine difference in terms between versions of web pages obtained by browsers and crawlers. Commercial values associated with such terms can be obtained from the term analysis component 102. The page evaluation component 502 generates a page score indicative of the probability that the web page is cloaked based upon the term difference analysis and the commercial value of differing terms. This page score can be compared to one or more threshold values to identify web spam automatically.

[0053]  The page analysis component 104 can also include a page order component 504 that orders or prioritizes a set of web pages. Web page order can be based at least in part upon term scores for terms associated with the web pages. Terms associated with the web pages can include search terms utilized to locate the web pages. For example, the set of web pages may be defined based upon search results from the most popular queries over a specified period of time. The search engine can associate the search query terms and web pages delivered in response to the search query. Accordingly, each web page can be associated with query terms utilized to retrieve the page. Web pages can be ordered based upon term scores for related search terms. The ordered pages can be analyzed further manually, by the page evaluation component 502 or using another method for automatic cloak detection to identify cloaked pages.

[0054]  Referring now to FIG. 6, an aspect of the page evaluation component 502 is illustrated in more detail. The page evaluation component 502 can include a page request component 602 that can obtain multiple versions of a web page. For instance, the page request component 602 can obtain one or more copies of a web page as retrieved by a user and one or more copies of the web page as retrieved by a crawler or bot, referred to as browser versions and crawler versions, respectively. A page term difference component 604 can analyze the different versions of the web page to facilitate identification of cloaked web pages.

5

[0055] There are many legitimate reasons for differences between web page versions. For example, a search engine crawler may be unable to utilize JavaScript associated with a page. Therefore, web servers may not provide JavaScript to search engine crawlers to minimize bandwidth required in provisioning of pages. Additionally, search engine crawlers may be unable to utilize streaming video or audio associated with pages. Such data may not be provided with crawler versions of the web page. In addition, certain pages are individualized for users or advertisements on the web page may update with each download. In such cases browser versions of the same page may differ.

[0056] Generally, search engines evaluate pages for search purposes based upon text associated with a page. Spammers may include text within the crawler version designed to ensure that the cloaked page will be returned in search results based upon specific keywords or terms. Cloaking behavior that is aimed at manipulating the search engine is referred to as semantic cloaking. Syntactic cloaking implies that different content is served to automated crawlers as opposed to web browsers, but different content may not be provided to every visitor. Dynamic web pages that serve different web pages to every visitor would not be considered to be syntactically cloaking, but may be semantically cloaking. The page evaluation component 502 may facilitate identification of both syntactic and semantic cloaked web pages.

[0057] In term difference analysis, differences in text terms between browser versions and crawler versions can be analyzed to determine likelihood of cloaking for a particular web page. Numerous algorithms can be utilized to perform term difference analysis. Frequently, non-cloaked pages can be identified based upon simple HTML string comparisons, HTML to text conversion and text string comparisons. For example, identical HTML, or converted text streams can be identified efficiently to eliminate non-cloaking web pages. Frequently, versions of the web pages are treated as a "bag of words." All formatting can be removed from the web pages to derive a list of words or terms. Terms can be shuffled, such that term order is irrelevant. A score generation component 606 can analyze term difference information provided by the page term difference component 604 to determine a page or cloaking score reflects the probability that the web page is cloaked.

[0058] The page term difference component 604 can also utilize normalized term frequency difference (NTFD) to generate term difference information. The page term difference component 604 can compute the NTFD for two web pages as follows:

$$D(T_1, T_2)\frac{|(T_1 \setminus T_2)| \cup (T_2 \setminus T_1)|}{|(T_1 \cup T_2)|} = 1 - 2\frac{|(T_1 \cap T_2)|}{|(T_1 \cup T_2)|}$$

Here, $T_1$ and $T_2$ are the sets of terms from the two web pages (e.g. a crawler version and a browser version of the same web page) after conversion and tokenization. $T_1$ and $T_2$ can contain many repeated terms. The set cardinality operator is represented by |.| within the equation. All set operations are extended to work with sets with repeated terms. The set of terms present in the first page, but not the second page is represented by $(T_1 \setminus T_2)$. The set of terms present in the second page, but not the first page is represented by $(T_2 \setminus T_1)$. $(T_1 \cup T_2)$ represents the union or aggregation of terms in both pages. Normalization based upon the union $(T_1 \cup T_2)$ reduces any

bias that stems from the size of the web pages. The NFTD score for any two web pages will be between zero and one. Essentially, larger web pages may have more differences in terms than smaller web pages while receiving identical cloaking scores. In general, NTDF is symmetric:

$$D(T_1, T_2) = D(T_2, T_1)$$

The NTDF is relatively simple to compute and disregards semantic and layout structure of page content.

[0059] NTFD differs from scores obtained using traditional bag of words methods. Traditionally, bag of words methods parse an HTML into terms and count each unique term only once, regardless of the number of times the term appears within the paper. Furthermore, traditional bag of word methods do not generally normalize the term set difference, resulting in a potential bias against large web pages.

[0060] The page term difference component 604 can also utilize page sections during term difference computations. As described above, all sections of the web page (e.g. navigation, header, footer, advertisements, etc.) are treated equally. However, differences in particular page sections may be more relevant than others. For example, differences in title may be more important than differences in an advertisement or footnote. Accordingly, terms may be weighted based upon their location within pages.

[0061] The score generation component 606 can utilize term difference scores, such as NTFD scores, generated based upon multiple web page versions to generate a page or cloaking score. For example, four copies of the web page denoted by $C_1$, $B_1$, $C_2$ and $B_2$ can be downloaded by the page request component 602. Here, $C_1$ and $C_2$ are obtained by mimicking a web crawler (e.g., MSNBot) and $B_1$ and $B_2$ are obtained using a web browser (e.g., Internet Explorer). The page term difference component 604 can utilize the four copies to determine term difference scores.

[0062] The score generation component 606 can generate a page score S, where S can be computed as follows:

$$S = \frac{\Delta_D}{\Delta_S}$$

Here, AD is the smaller of the NTFD scores for cross-pairs of web pages, where cross pairs refers to web page pairs in which one web page is obtained by mimicking a search engine crawler and the other is obtained by a browser (e.g., $(C_1, B_1)$ and $(C_2, B_2)$. As is the larger of the NTFD scores for the two similar-pairs of web pages, where similar pairs refers to web page pairs in which both pages are retrieved in the same manner (e.g. $(C_1, C_2)$ and $(B_1, B_2)$. Mathematically, this can be expressed as follows:

$$\Delta_D = \min(D(C_1, B_1), D(C_2, B_2))$$

$$\Delta_S = \max(D(C_1, C_2), D(B_1, B_2))$$

Although, this example utilizes NFTD scores in calculation of page scores, other term frequency difference algorithms can be utilized. This particular page score calculation is relatively conservative in labeling pages as cloaked, but is more aggressive than simply labeling all non-syntactic cloaking as non-cloaking. Alternatively, the mean of the term frequency difference scores can be used rather than min and max to increase the aggressiveness of the page score. Certain excep-

6

tions can be utilized to avoid page score computations, which would require division by zero. For example, if $\Delta_D$=0 and $\Delta_S$=0, the page can be marked as non-cloaked and S=0. If $\Delta_D$>0 and $\Delta_S$=0, the page can be identified as cloaked (S=∞).

[0063]   Once the score generation component **606** has computed a page score for a web page, dynamic web pages can be identified as follows:

$$0 < S < \infty \rightarrow \text{dynamic URLs}$$

A page score of zero would indicate that there was no difference in the cross-pair pages and no page cloaking occurred. Conversely, a page score that approaches infinity would indicate that similar pair pages are identical and therefore the page is not dynamic.

[0064]   A threshold test can be utilized to identify the page as cloaked:

$$0 < t < S \rightarrow \text{cloaking spam}$$

Here, t (0<t<∞) is a predetermined threshold that can be utilized to identify a page as web spam. Alternatively, multiple thresholds can be used to classify likelihood that the page is web spam (e.g., high, medium and low).

[0065]   The page evaluation component **502** can also include a term weight component **608** that generates a weight or set of weights based upon commercial value of term differences among web pages. The generated weights can be used in the computation of page scores. Generally, if the terms that appear in the web crawler version, but not the browser version are commercially valuable, the page is more likely to be web spam.

[0066]   The page term difference component **604** can provide the term weight component **608** with information regarding the term differences among different versions of the web page. The term weight component **608** can obtain information regarding the commercial value or term score of the differing terms. For example, the term weight component can provide the terms to a term analysis component as illustrated in FIGS. **1** through **4**. These term scores can be used during term frequency difference computations to emphasize valuable terms. Alternatively, term scores can be utilized by the score generation component **606** to adjust page scores to reflect the effect of commercial value on the probability that a web page is cloaked.

[0067]   Referring now to FIG. **7**, a more detailed depiction of the page order component **504** is illustrated. The page order component **504** can prioritize or order a set of web pages based at least in part upon term scores of terms associated or related to the web pages. Frequently, search engines employ individuals to manually review or scrub web pages to remove web spam. The set of web pages can be obtained and ordered to facilitate further analysis and identification of web spam.

[0068]   A data set management component **702** can obtain the web page set. The web pages may be received or requested based upon information from a search query log. For example, search results for the top most requested search queries can be included within the web page set.

[0069]   A page score component **704** can identify terms associated with each web page within the set of web pages. In addition, the page score component **704** can obtain term scores for each term associated with a web page and generate a page score. The page score for a web page can be based upon an aggregation of term scores for terms related to the web page. For example, the page score can be equal to the maximum term score or an average term score for the web page.

[0070]   The page order component **504** can include a prioritization component **706** that can organize or classify web pages based upon the page scores. The set of web pages can be ordered by page score. Alternatively, one or more thresholds can be applied to organize the pages for further evaluation.

[0071]   The aforementioned systems have been described with respect to interaction between several components. It should be appreciated that such systems and components can include those components or sub-components specified therein, some of the specified components or sub-components, and/or additional components. Sub-components could also be implemented as components communicatively coupled to other components rather than included within parent components. Additionally, it should be noted that one or more components may be combined into a single component providing aggregate functionality or divided into several sub-components. The components may also interact with one or more other components not specifically described herein but known by those of skill in the art.

[0072]   Furthermore, as will be appreciated various portions of the disclosed systems above and methods below may include or consist of artificial intelligence or knowledge or rule based components, sub-components, processes, means, methodologies, or mechanisms (e.g., support vector machines, neural networks, expert systems, Bayesian belief networks, fuzzy logic, data fusion engines, classifiers . . . ). Such components, inter alia, can automate certain mechanisms or processes performed thereby to make portions of the systems and methods more adaptive as well as efficient and intelligent.

[0073]   For purposes of simplicity of explanation, methodologies that can be implemented in accordance with the disclosed subject matter were shown and described as a series of blocks. However, it is to be understood and appreciated that the claimed subject matter is not limited by the order of the blocks, as some blocks may occur in different orders and/or concurrently with other blocks from what is depicted and described herein. Moreover, not all illustrated blocks may be required to implement the methodologies described hereinafter. Additionally, it should be further appreciated that the methodologies disclosed throughout this specification are capable of being stored on an article of manufacture to facilitate transporting and transferring such methodologies to computers. The term article of manufacture, as used, is intended to encompass a computer program accessible from any computer-readable device, carrier, or media.

[0074]   Referring now to FIG. **8**, a methodology **800** for facilitating detection of web spam is illustrated. Beginning at **802**, at least one web page is obtained. Terms associated with the web page can be obtained at **804**. The terms may be provided along with the web page. For instance, the associated terms can include search query terms used to locate the web page. Alternatively, the associated terms can be based upon differences between copies of the web page. For example, terms can be identified based upon differences between a browser version and a crawler version of the web page.

[0075]   The terms related to the web page can be analyzed to determine a term score indicative of commercial value at **806**. Commercial value can be computed using a variety of algorithms. Term score can be based upon popularity, market value or any combination thereof. At **808**, the web page is analyzed based upon the commercial value of associated terms. Analysis can include computation of a page score that

serves as a metric for the relative probability that the web page is cloaked. The page score can be utilized for a variety of purposes including automatic identification of cloaked pages and prioritization of web pages for further analysis.

[0076]   FIG. **9** illustrates a methodology **900** for analyzing commercial value of terms. At **902**, term information can be obtained. The term information can include indicia of the economic value of the term or combination of terms. For example, term information can include market value information regarding advertising fees, bid prices, advertising revenue and the like. Alternatively, term information can include popularity data, such as frequency with which the term is utilized in search queries. Such information can be obtained from search engine query logs and advertising logs. At **904**, a term score can be generated based upon the collected term information. The term score can be based upon popularity, market value or a combination of popularity and market value.

[0077]   Generally, the greater the value of the terms, the greater the incentive for spammers to generate web spam. At **906**, search terms can be classified based upon comparison of the term score to one or more thresholds. For example, terms or combinations of terms can be identified as unlikely to result in web spam, likely to result in web spam or highly likely to result in web spam.

[0078]   FIG. **10** illustrates a methodology **1000** for detecting a cloaked page in accordance with an aspect of the subject matter disclosed herein. At **1002**, two copies of a web page can be obtained. The first copy can be obtained by mimicking a browser and the second copy can be obtained by mimicking a search engine crawler or bot. At **1004**, a determination is made as to whether the first copy is identical to the second copy. If the copies are identical, there has been no attempt to manipulate the search engine crawler, and the web page is identified as not cloaked at **1006**. If the copies are not identical, the HTML text is analyzed at **1008**.

[0079]   HTML analysis can include a simple string comparison. HTML analysis can also include conversion to plain text and tokenization (removal of white space). At **1010**, a determination is made as to whether the resulting text is identical. If the text is identical, there has been no attempt to manipulate the search engine crawler and the web page is identified as not cloaked at **1006**. If the text is not identical, a determination is made as to whether the same terms are utilized in the two copies at **1012**. If yes, the web page is identified as not cloaked at **1006**. If no, a third and fourth copy of the web page are obtained at **1014**. The third copy can be obtained by mimicking a browser and the fourth copy can be obtained by mimicking a search engine crawler. The third and fourth copy can also be converted to text and term frequencies calculated.

[0080]   At **1016**, the web page copies and terms can be analyzed to generate a page or cloaking score that reflects the likelihood that the web page is web spam. Cloaking analysis is discussed in greater detail with respect to FIG. **11**. At **1018**, a determination can be made as to whether the page score is greater than a predetermined threshold value. If no, the web page is identified as not cloaked at **1006**. If yes, the page is identified as cloaked at **1020**. Alternatively, a set of thresholds can be used to classify the page. For example, cloaking probability for a page could be identified as low, medium or high.

[0081]   FIG. **11** illustrates a methodology **1100** for facilitating cloaking analysis. At **1102**, term frequency difference between copies of the web page can be analyzed. A variety of

algorithms can be utilized to evaluate term frequency difference including traditional bag of words methods as well as normalized term frequency difference, as described above.

[0082]   At **1104**, a term score indicative of term value can be obtained for each term or combination of terms identified during term analysis. Identified terms can include terms that appear in a crawler version of the web page, but not the web browser version of the web page. Such terms can be utilized to manipulate the search engine and the term score can indicate the likelihood that the associated web page is web spam.

[0083]   At **1106**, a page score can be computed that reflects the probability that the web page is web spam. The page score can be based upon the term frequency differences as well as the term scores associated with a page. Additionally, web page scores can be used to classify web pages (e.g., low, medium and high probability of cloaking).

[0084]   FIG. **12** illustrates a methodology **1200** for prioritizing a set of web pages. At **1202**, a set of web pages is obtained. For example, the set can include the top 20 search results for each of the top 1000 search queries for the previous day. The related or associated terms for a web page are obtained at **1204**. Related terms can include search queries utilized to retrieve the web pages. Alternatively, related terms can be based upon term difference between a browser version and a crawler version of the web page.

[0085]   At **1206**, a term score can be obtained for a term associated with a web page. The term score can be based upon popularity, market value, a combination thereof or any other indicia of value. A determination is made at **1208** as to whether there are additional terms or combinations of terms associated with the page for which a term score is to be generated. If yes, the process returns to **1206**, where a term score is obtained for the next term related to the web page. If no, at **1210** a page score based at least in part upon term values is generated. At **1212**, a determination is made as to whether there are additional web pages to evaluate. If yes, related terms are obtained for the next web page at **1204**. If no, the set of web pages can be ordered based upon the generated page score at **1214**. Ordering can include organizing the web pages by page score and/or classifying the pages based upon probability of web spam.

[0086]   Turning now to FIGS. **15** and **16**, experiments were conducted utilizing the cloaking detection systems and methods described herein. In the experiments, two lists of 5000 queries were used. The first list included the top 5000 most popular search queries computed over one month. The second list included the top 5000 most monetizable search queries over a single day. For purposes of the experiments, monetizabilty of a specific query was proportional to the total revenue generated by sponsored ads served along side the search results (for that query) during a specific time period. The first list was obtained by processing search query logs, while the latter list was obtained by processing advertising logs. Both logs were obtained from a search engine (e.g., MSN search engine). The two lists included 826 queries (17% of the total queries) that were duplicated between the lists.

[0087]   A set of URLs or web pages were obtained based upon the query lists. For each query, the top 200 search results were obtained from three separate search engines (e.g., Google, MSN Search, and Ask.com). For each search engine, only one search was performed for each unique query. Each query produced 600 search result URLs which typically contain several duplicates. Each set of 5000 queries generated 3 million URLs. Overall, the list of the 5000 most popular

US 2008/0154847 A1
Jun. 26, 2008

8

queries generated 1.49 million unique URLs (referred to herein as the popular set), and the list of the top 5000 most monetizable queries generated 1.28 million unique URLs (referred to herein as the monetizable set). Each unique URL was processed only once.

[0088]  To analyze pages for cloaking, for each URL, up to four copies of the Web page, denoted by $C_1$, $B_1$, $C_2$, and $B_2$, are downloaded and compared. As discussed with respect to FIG. **10**, there are several stages where it can be determined that a page is not cloaked. For example, during the download process, many of the non-cloaked pages are detected through simple HTML string comparisons, HTML to text conversion, and text string comparisons. Normalized term frequency difference (NTFD) is subsequently used to compute a cloaking score and used to further reduce the set of possibly cloaked URLs. Finally, using labeled data, a threshold for the cloaking score is chosen to classify remaining URLs.

[0089]  During the experiment, the first copy of the URL ($C_1$) was obtained by mimicking a popular Web crawler (e.g., MSNBot) and the second ($B_1$) was obtained using a common Web browser's (e.g., Internet Explorer) agent string. These first and second copies were checked for identical HTML content using a simple string comparison. If the first and second copies were identical, the URL was marked as not cloaked. About 70-75% of the URLs fell under this category. The HTML content for the remaining 25-30% was converted to plain text and directly compared using a simple string comparison. At this stage, about 13.5% of the URLs produced identical text streams and were marked as not-cloaked. The text streams were tokenized (using white space) and their term frequencies were computed. About 0.5% of the URLs produce identical term frequencies. The remaining URLs (about 12%) with differing text content were downloaded two more times to obtain a third ($C_2$) and a fourth ($B_2$) copy. The third and fourth copies were then converted to text and their term frequencies calculated. Note that at the end of the download process those URLs with only ($C_1$, $B_1$) pair of pages were not-cloaked (by definition). The remaining URLs had four copies ($C_1$, $B_1$, $C_2$, and $B_2$) and needed further processing.

[0090]  Each of the copies ($C_1$, $B_1$, $C_2$, and $B_2$) was asynchronously crawled using different crawler threads. For example, all $C_1$ copies were crawled by the first crawler thread. Similarly, all $B_1$, $C_2$, and $B_2$ copies were crawled by the first browser thread, the second crawler thread, and the second browser thread, respectively. The ordering of initiating URLs downloads was the same for all four threads (with the exception of early out scenarios where URLs were skipped by the $C_2$, and $B_2$ threads).

[0091]  In the event of a download failure, the download was reattempted once. URLs that failed download twice were dropped from analysis. For both the popular and monetizable query URL sets, less than 3% of the URLs failed to download. Overall, on average of about 2.1 downloads were performed per unique URL.

[0092]  A simple normalized term frequency difference (NTFD) between the four copies was used in computing a cloaking score. Computation of NTFD and the cloaking score are described in detail above with respect to FIG. **6**. Cloaked pages were identified by comparing the cloaking score to a threshold, t. For each of the URL sets (popular and monetizable) 2000 URLs were randomly sampled from the set of dynamic URLs and manually labeled as spam or no-spam.

[0093]  Turning now to FIG. **13**, a graph **1300** illustrating the trade off between precision and recall is depicted. Here, recall is indicative of the portion of cloaked pages identified, while precision reflects the accuracy or identified results. For instance, what portion of the pages identified as cloaked have been mistakenly identified. FIG. **13** shows the precision-recall curve for various values of the threshold t. The precision and recall values and their associated thresholds are also presented in Table 1 below. As illustrated by the line **1302** representing popular URLs and the line **1304** representing monetizable URLs, as the value of threshold t increases, recall gradually decreases. Precision starts out high at low values of recall and quickly reaches a final value around 75% for popular URLs and a value of 98.5% for monetizable URLs.

[0094]  All three commonly used F-measures: $F_1$, $F_{0.5}$, and $F_2$, reach the highest value at a threshold of 0.0, where the recall is 100% and the precision is 73.12% and 98.54% for popular and monetizable URLs, respectively. Indicating that the cloaking score is an effective indicator of cloaking spam.

TABLE 1

| | Precision and Recall | |
|---|---|---|
| | Precision (threshold, t) | |
| Recall | Popular URLs | Monetizable URLs |
| 10 | 85.74 (19.93) | 100.00 (15.11) |
| 20 | 81.72 (1.98) | 99.91 (1.28) |
| 30 | 75.33 (1.10) | 98.77 (0.97) |
| 40 | 76.65 (0.94) | 98.56 (0.87) |
| 50 | 77.39 (0.78) | 98.79 (0.77) |
| 60 | 77.81 (0.53) | 98.72 (0.56) |
| 70 | 77.88 (0.27) | 98.59 (0.32) |
| 80 | 75.86 (0.11) | 98.34 (0.07) |
| 90 | 73.26 (0.02) | 98.46 (0.004) |
| 100 | 73.12 (0.00) | 98.54 (0.000) |

[0095]  Referring now to FIG. **14**, a graph **1400** depicts distribution of cloaking spam URLs over different queries. A graph line **1402** illustrating percentage of cloaked pages for monetizable queries and a graph line **1404** illustrating percentage of cloaked pages for popular queries show a dramatic decrease in cloaked pages for low ranked queries. Both popular and monetizable query sets were independently sorted such that the percentage curves are monotonically decreasing with increasing sorted query rank. Note that the two query sets are not the same, only 17% of the queries appear in both the popular and monetizable query sets. On average, the top 100 (2%) most cloaked queries have ten times as many cloaking URLs within their search results than the bottom 4900 queries (98%). This skewed distribution gives an effective way of monitoring and detecting cloaked URLs. Further analysis (e.g. manual analysis) can be optimized by starting with the most frequently cloaked queries once can efficiently and quickly identify cloaked URLs

[0096]  In order to provide a context for the various aspects of the disclosed subject matter, FIGS. **15** and **16** as well as the following discussion are intended to provide a brief, general description of a suitable environment in which the various aspects of the disclosed subject matter may be implemented. While the subject matter has been described above in the general context of computer-executable instructions of a computer program that runs on a computer and/or computers, those skilled in the art will recognize that the system and

methods disclosed herein also may be implemented in combination with other program modules. Generally, program modules include routines, programs, components, data structures, etc. that perform particular tasks and/or implement particular abstract data types. Moreover, those skilled in the art will appreciate that the inventive methods may be practiced with other computer system configurations, including single-processor or multiprocessor computer systems, minicomputing devices, mainframe computers, as well as personal computers, hand-held computing devices (e.g., personal digital assistant (PDA), phone, watch . . . ), microprocessor-based or programmable consumer or industrial electronics (e.g., personal media players, television set top boxes, digital video recorders, video game systems) and the like. The illustrated aspects may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. However, some, if not all aspects of the systems and methods described herein can be practiced on stand-alone computers. In a distributed computing environment, program modules may be located in both local and remote memory storage devices.

[0097]   With reference again to FIG. **15**, the exemplary environment **1500** for implementing various aspects of the embodiments includes a mobile device or computer **1502**, the computer **1502** including a processing unit **1504**, a system memory **1506** and a system bus **1508**. The system bus **1508** couples system components including, but not limited to, the system memory **1506** to the processing unit **1504**. The processing unit **1504** can be any of various commercially available processors. Dual microprocessors and other multi-processor architectures may also be employed as the processing unit **1504**.

[0098]   The system memory **1506** includes read-only memory (ROM) **1510** and random access memory (RAM) **1512**. A basic input/output system (BIOS) is stored in a nonvolatile memory **1510** such as ROM, EPROM, EEPROM, which BIOS contains the basic routines that help to transfer information between elements within the computer **1502**, such as during start-up. The RAM **1512** can also include a high-speed RAM such as static RAM for caching data.

[0099]   The computer or mobile device **1502** further includes an internal hard disk drive (HDD) **1514** (e.g., EIDE, SATA), which internal hard disk drive **1514** may also be configured for external use in a suitable chassis (not shown), a magnetic floppy disk drive (FDD) **1516**, (e.g., to read from or write to a removable diskette **1518**) and an optical disk drive **1520**, (e.g. reading a CD-ROM disk **1522** or, to read from or write to other high capacity optical media such as the DVD). The hard disk drive **1514**, magnetic disk drive **1516** and optical disk drive **1520** can be connected to the system bus **1508** by a hard disk drive interface **1524**, a magnetic disk drive interface **1526** and an optical drive interface **1528**, respectively. The interface **1524** for external drive implementations includes at least one or both of Universal Serial Bus (USB) and IEEE 1194 interface technologies. Other external drive connection technologies are within contemplation of the subject systems and methods.

[0100]   The drives and their associated computer-readable media provide nonvolatile storage of data, data structures, computer-executable instructions, and so forth. For the computer **1502**, the drives and media accommodate the storage of any data in a suitable digital format. Although the description of computer-readable media above refers to a HDD, a removable magnetic diskette, and a removable optical media such as a CD or DVD, it should be appreciated by those skilled in the art that other types of media which are readable by a computer, such as zip drives, magnetic cassettes, flash memory cards, cartridges, and the like, may also be used in the exemplary operating environment, and further, that any such media may contain computer-executable instructions for performing the methods for the embodiments of the data management system described herein.

[0101]   A number of program modules can be stored in the drives and RAM **1512**, including an operating system **1530**, one or more application programs **1532**, other program modules **1534** and program data **1536**. All or portions of the operating system, applications, modules, and/or data can also be cached in the RAM **1512**. It is appreciated that the systems and methods can be implemented with various commercially available operating systems or combinations of operating systems.

[0102]   A user can enter commands and information into the computer **1502** through one or more wired/wireless input devices, e.g. a keyboard **1538** and a pointing device, such as a mouse **1540**. Other input devices (not shown) may include a microphone, an IR remote control, a joystick, a game pad, a stylus pen, touch screen, or the like. These and other input devices are often connected to the processing unit **1504** through an input device interface **1542** that is coupled to the system bus **1508**, but can be connected by other interfaces, such as a parallel port, an IEEE 1194 serial port, a game port, a USB port, an IR interface, etc. A display device **1544** can be used to provide a set of group items to a user. The display devices can be connected to the system bus **1508** via an interface, such as a video adapter **1546**.

[0103]   The mobile device or computer **1502** may operate in a networked environment using logical connections via wired and/or wireless communications to one or more remote computers, such as a remote computer(s) **1548**. The remote computer(s) **1548** can be a workstation, a server computer, a router, a personal computer, portable computer, microprocessor-based entertainment appliance, a peer device or other common network node, and typically includes many or all of the elements described relative to the computer **1502**, although, for purposes of brevity, only a memory/storage device **1550** is illustrated. The logical connections depicted include wired/wireless connectivity to a local area network (LAN) **1552** and/or larger networks, e.g. a wide area network (WAN) **1554**. Such LAN and WAN networking environments are commonplace in offices and companies, and facilitate enterprise-wide computer networks, such as intranets, all of which may connect to a global communications network, e.g., the Internet.

[0104]   When used in a LAN networking environment, the computer **1502** is connected to the local network **1552** through a wired and/or wireless communication network interface or adapter **1556**. The adaptor **1556** may facilitate wired or wireless communication to the LAN **1552**, which may also include a wireless access point disposed thereon for communicating with the wireless adaptor **1556**.

[0105]   When used in a WAN networking environment, the computer **1502** can include a modem **1558**, or is connected to a communications server on the WAN **1554**, or has other means for establishing communications over the WAN **1554**, such as by way of the Internet. The modem **1558**, which can be internal or external and a wired or wireless device, is connected to the system bus **1508** via the serial port interface

**1542**. In a networked environment, program modules depicted relative to the computer **1502**, or portions thereof, can be stored in the remote memory/storage device **1550**. It will be appreciated that the network connections shown are exemplary and other means of establishing a communications link between the computers can be used.

**[0106]** The computer **1502** is operable to communicate with any wireless devices or entities operatively disposed in wireless communication, e.g., a printer, scanner, desktop and/ or portable computer, PDA, communications satellite, any piece of equipment or location associated with a wirelessly detectable tag (e.g. a kiosk, news stand, restroom), and telephone. The wireless devices or entities include at least Wi-Fi and Bluetooth™ wireless technologies. Thus, the communication can be a predefined structure as with a conventional network or simply an ad hoc communication between at least two devices.

**[0107]** Wi-Fi allows connection to the Internet from a couch at home, a bed in a hotel room, or a conference room at work, without wires. Wi-Fi is a wireless technology similar to that used in a cell phone that enables such devices, e.g., computers, to send and receive data indoors and out; anywhere within the range of a base station. Wi-Fi networks use radio technologies called IEEE 802.11(a, b, g, etc.) to provide secure, reliable, fast wireless connectivity. A Wi-Fi network can be used to connect computers to each other, to the Internet, and to wired networks (which use IEEE 802.3 or Ethernet). Wi-Fi networks operate in the unlicensed 2.4 and 5 GHz radio bands, at an 11 Mbps (802.11a) or 54 Mbps (802.11b) data rate, for example, or with products that contain both bands (dual band), so the networks can provide real-world performance similar to the basic 10BaseT wired Ethernet networks used in many offices.

**[0108]** FIG. **16** is a schematic block diagram of a sample-computing environment **1600** with which the systems and methods described herein can interact. The system **1600** includes one or more client(s) **1602**. The client(s) **1602** can be hardware and/or software (e.g. threads, processes, computing devices). The system **1600** also includes one or more server(s) **1604**. Thus, system **1600** can correspond to a two-tier client server model or a multi-tier model (e.g., client, middle tier server, data server), amongst other models. The server(s) **1604** can also be hardware and/or software (e.g., threads, processes, computing devices). One possible communication between a client **1602** and a server **1604** may be in the form of a data packet adapted to be transmitted between two or more computer processes. The system **1600** includes a communication framework **1606** that can be employed to facilitate communications between the client(s) **1602** and the server(s) **1604**. The client(s) **1602** are operably connected to one or more client data store(s) **1608** that can be employed to store information local to the client(s) **1602**. Similarly, the server(s) **1604** are operably connected to one or more server data store(s) **1610** that can be employed to store information local to the servers **1604**.

**[0109]** What has been described above includes examples of aspects of the claimed subject matter. It is, of course, not possible to describe every conceivable combination of components or methodologies for purposes of describing the claimed subject matter, but one of ordinary skill in the art may recognize that many further combinations and permutations of the disclosed subject matter are possible. Accordingly, the disclosed subject matter is intended to embrace all such alterations, modifications and variations that fall within the spirit

and scope of the appended claims. Furthermore, to the extent that the terms "includes," "has" or "having" are used in either the detailed description or the claims, such terms are intended to be inclusive in a manner similar to the term "comprising" as "comprising" is interpreted when employed as a transitional word in a claim.

What is claimed is:

**1**. A system that facilitates detection of a cloaked web page, comprising:

a term analysis component that determines a term score for at least one term associated with a web page, the term score signifies value of the at least one term; and

a page analysis component that generates a page score indicative of probability that the web page is cloaked as a function of the term score.

**2**. The system of claim **1**, further comprising a popularity component that evaluates popularity of the at least one term, the term score is based at least in part upon the popularity.

**3**. The system of claim **2**, the popularity is based at least in part upon usage data obtained from a search query log.

**4**. The system of claim **1**, further comprising a market value component that evaluates market value of the at least one term, the term score is based at least in part upon the market value.

**5**. The system of claim **4**, the market value is based at least in part upon web advertisement monetization data.

**6**. The system of claim **1**, further comprising a page order component that prioritizes a set of web pages as a function of the term score, the web page is a member of the set of web pages.

**7**. The system of claim **1**, further comprising:

a term difference component that analyzes term difference between a browser version and a web crawler version of the web page; and

a page evaluation component that generates the page score for the web page as a function of the term difference analysis and the term score.

**8**. The system of claim **7**, the term difference analysis includes normalized term frequency difference.

**9**. A method that facilitates detection of web spam, comprising:

identifying at least one term related to a web page;

determining a term score indicative of the commercial value of the at least one term; and

analyzing the probability that the web page is web spam as a function of the term value score.

**10**. The method of claim **9**, further comprising:

determining popularity of the at least one term; and

determining a market value of the at least one term, the term score is a function of value of the at least one term.

**11**. The method of claim **10**, the term score is a function of frequency of occurrence of the at least one term.

**12**. The method of claim **10**, the term score is a function of advertising monetization information associated with the at least one term.

**13**. The method of claim **9**, further comprising:

comparing the term score to at least one threshold value; and

classifying the web page as a function of the comparison.

**14**. The method of claim **9**, the at least one term related to the web page is identified based at least in part upon query log information associated with the web page.

US 2008/0154847 A1

Jun. 26, 2008

11

**15**. The method of claim **9**, the at least one term is included in a set of terms that differ between a crawler version and a browser version of the web page.

**16**. The method of claim **9**, further comprising ordering a set of web pages based at least in part upon the term score, the web page is a member of the set of web pages.

**17**. The method of claim **9**, further comprising:

analyzing term difference for a browser version and a crawler version of the web page, the at least one term is based upon difference between the browser version and the crawler version; and

generating a cloaking score as a function of the term difference analysis and the term score.

**18**. The method of claim **17**, further comprising determining normalized term frequency difference for the browser version and the crawler version.

**19**. The method of claim **17**, the term difference analysis is based at least in part upon position of the at least one term on the web page.

**20**. A system that facilitates detection of a cloaked web page, comprising:

means for determining popularity of at least one term associated with a web page as a function of frequency of occurrence of the at least one term;

means for determining market value of the at least one term as a function of advertisement monetization information;

means for generating a term score indicative of commercial value of the at least one term as a function of the popularity and the market value; and

means for evaluating the probability that the web page is cloaked based at least in part upon the term score.

\* \* \* \* \*

# APPENDIX
# 190

# deSEO: Combating Search-Result Poisoning

*John P. John,* [‡,*] *Fang Yu*[§]*, Yinglian Xie*[§]*, Arvind Krishnamurthy*[‡]*, Martín Abadi*[§†]

[‡]*University of Washington*      [§] *MSR Silicon Valley*

{*jjohn, arvind*}@*cs.washington.edu*     {*fangyu, yxie, abadi*}@*microsoft.com*

## Abstract

We perform an in-depth study of SEO attacks that spread malware by poisoning search results for popular queries. Such attacks, although recent, appear to be both widespread and effective. They compromise legitimate Web sites and generate a large number of fake pages targeting trendy keywords. We first dissect one example attack that affects over 5,000 Web domains and attracts over 81,000 user visits. Further, we develop de-SEO, a system that automatically detects these attacks. Using large datasets with hundreds of billions of URLs, deSEO successfully identifies multiple malicious SEO campaigns. In particular, applying the URL signatures derived from deSEO, we find 36% of sampled searches to Google and Bing contain at least one malicious link in the top results at the time of our experiment.

## 1 Introduction

The spread of malware through the Internet has increased dramatically over the past few years. Along with traditional techniques for spreading malware (such as through links or attachments in spam emails), attackers are constantly devising newer and more sophisticated methods to infect users. A technique that has been gaining prevalence of late is the use of search engines as a medium for distributing malware. By gaming the ranking algorithms used by search engines through search engine optimization (SEO) techniques, attackers are able to poison the search results for popular terms so that these results include links to malicious pages.

A recent study reported that 22.4% of Google searches contain such links in the top 100 results [23]. Furthermore, it has been estimated that over 50% of popular keyword searches (such as queries in Google Trends [9] or for trending topics on Twitter [20]), the very first page of results contains at least one link to a malicious page [19].

Using search engines is attractive to attackers because of its low cost and its legitimate appearance. Malicious pages are typically hosted on compromised Web servers, which are effectively free resources for the attackers. As long as these malicious pages look relevant to search engines, they will be indexed and presented to end users. Additionally, users usually trust search engines and often click on search results without hesitation, whereas they

would be wary of clicking on links that appear in unsolicited spam emails. It is therefore not surprising that, despite being a relatively new form of attack, search-result poisoning is already a huge phenomenon and has affected major search engines.

In this paper, we aim to uncover the mechanics of such attacks and answer questions such as how attackers compromise a large number of Web sites, how they automatically generate content that looks relevant to search engines, and how they promote their malicious pages to appear at the top of the search results.

In order to answer these questions, we examine a live, large-scale search poisoning attack and study the methods used by the attackers. This attack employs over 5,000 compromised Web sites and poisons more than 20,000 popular search terms over the course of several months. We investigate the files and scripts that attackers put up on these compromised servers and reverse-engineer how the malicious pages were generated.

Our study suggests that there are two important requirements for a search-result poisoning attack to be successful: the use of multiple (trendy) keywords and the automatic generation of relevant content across a large number of pages. Since trendy keywords are often popular search terms, poisoning their search results can affect a large user population. Further, by generating many fake pages targeting different keywords, attackers can effectively increase their attack coverage.

Based on these observations, we develop techniques to automatically detect search-result poisoning attacks. Although there exist methods for identifying malicious content in individual Web pages [14, 22], these solutions are not scalable when applied to tens of billions of Web pages. Further, attackers can leverage *cloaking* techniques to display different content based on who is requesting the page—malicious content to real users and benign, search-engine-optimized content to search engine crawlers. Therefore, instead of detecting individual SEO pages, we identify groups of suspicious URLs—typically containing multiple trendy keywords in each URL and exhibiting patterns that deviate from other URLs in the same domain. This approach not only is more robust than examining individual URLs, but also can help identify malicious pages without crawling and evaluating their actual contents.

Using this approach, we build *deSEO*, a system that automatically detects search-result poisoning attacks

---

[*]Work partly performed while interning at MSR Silicon Valley.

[†]Also affiliated with UC Santa Cruz and Collège de France.

without crawling the contents of Web pages. We apply deSEO to two datasets containing hundreds of billions of URLs collected at different periods from Bing. Our key results are:

1. deSEO detects multiple groups of malicious URLs, with each malicious group corresponding to an SEO campaign affecting thousands of URLs.

2. deSEO is able to detect SEO campaigns that employ sophisticated techniques such as cloaking and have varying link structures.

3. We derive regular expression signatures from detected malicious URL groups and apply them to search results on Google and Bing. The signatures detect malicious links in the results to 36% of the searches. At the time our experiments, these links were not blocked by either the Google Safebrowsing API or Internet Explorer.

The rest of the paper is structured as follows. We begin with describing the background for SEO attacks and reviewing related work in Section 2. Next, we investigate a large scale attack in detail in Section 3. Based on the insights gained from the attack analysis, we present the deSEO detection system in Section 4. In Section 5, we apply deSEO to large datasets and report the results. We analyze the detected SEO groups and apply the derived signatures to filter search results in Section 6. Finally, we conclude in Section 7.

## 2   Background and Related Work

Search engines index billions of pages on the Web. Many modern search engines use variants of the PageRank algorithm [17] to rank the Web pages in its search index. The rank of a page depends on the number of incoming links, and also on the ranks of the pages where the links are seen. Intuitively, the page rank represents the likelihood that a user randomly clicking on links will end up at that page.

In addition to the rank of the page, search engines also use features on the page to determine its relevance to queries. In order to prevent spammers from gaming the system, search engines do not officially disclose the exact features used to determine the rank and relevance. However, researchers estimate that over 200 features are used [3, 6]. Among these features, the most widely known ones are the words in the title, the URL, and the content of the page. The words in the title and in the URL are given high weight because they usually summarize the content of the page.

Search Engine Optimization (SEO) is the process of optimizing Web pages so that they are ranked higher by search engines. SEO techniques can be classified as being *white-hat* or *black-hat*.

In white-hat SEO, the sites are created primarily with the end-user in mind, but structured so that search engine crawlers can easily navigate the site. Some of the white-hat techniques are creating a sitemap, having appropriate headings and subheadings, etc. They follow the quality guidelines recommended by search engines [8, 29].

Black-hat SEO techniques, on the other hand, try to game the rankings, and do not follow the search engine guidelines. Keyword stuffing (filling the page with lots of irrelevant keywords), hidden text and links, cloaking (providing different content to crawlers and users), redirects, and participating in link farms are considered black-hat techniques. These practices are frowned upon by the search engines, and if a site is caught using such techniques, it could be removed from the search index.

To detect black-hat SEO pages, many approaches have been proposed. Some are based on the content of the pages [15, 5, 21], some are based on the presence of cloaking [25, 27], while some others are based on the link structure leading to the pages [26, 4].

The SEO attacks that we study in this paper are different from traditional ones in that attackers leverage a large number of compromised servers. Since these servers were originally legitimate and their main sites still operate normally even after compromise, they display a mixed behavior and therefore are harder to detect.

Our detection methods make use of URL properties to detect malicious pages without necessarily crawling the pages. In this respect, our work is similar to previous work by Ma *et al.* [13, 12], where they build a binary classifier to identify email spam URLs without crawling the corresponding pages. The classifier uses training data from spam emails. The SEO attacks we study are very new and there are few reports on specific instances of such attacks [10]. Therefore, it is difficult to get training data that has good coverage. In addition, spam URLs have different properties than SEO URLs. Many spam domains are new and also change DNS servers frequently. Therefore, their system makes use of domain-level features such as age of the domain and the DNS-server location. Since we deal with compromised domains, there are no such strong features.

A recent analysis of over 200 million Web pages by Google's malware detection infrastructure discovered nearly 11,000 domains that are being used to serve malware in the form of FakeAV software [18]. This work looks at the prevalence and growth of FakeAV as a means for delivering malware. Our work, on the other hand, looks at the mechanisms used by the perpetrators to game search engines for the effective delivery of this kind of malware. By developing methods to detect SEO attacks, we also detect a large number of compromised domains, but without having to inspect them individually.



Figure 1: An overview of how the attack works. The victim issues a popular query to a search engine (1), and clicks one of the results, which happens to be a malicious page hosted on a compromised server (2). The compromised server forwards the request to a redirection server (3). The redirection server picks an exploit server and redirects the victim to it (4). The exploit server tries to exploit the victim's browser or displays a scareware page (5) to infect the victim through social engineering.

## 3   Dissecting an SEO Attack

In order to gauge the prevalence of search poisoning attacks, we pick a handful of trendy search terms and issue queries on Google and Bing. Consistent with previous findings, we find that the results to around 36% of the search results contain malicious links (i.e., links that redirect to pages serving malware), with many of the links appearing on the first page of results.

Figure 1 shows, from a legitimate user's perspective, how a victim typically falls prey to an SEO keyword-poisoning attack. The attackers poison popular search terms so that their malicious links show up in the search results for those terms. When the victim uses a search engine to search for such popular terms, some of the results would point to servers controlled by attackers. These are usually legitimate servers that have been compromised by the attackers and used to host SEO pages. Clicking on the search results leads to an SEO page that redirects, after multiple hops, to an exploit server that displays a scareware page. For instance, the scareware page might depict an anti-virus scan with large flashy warnings of multiple infections found on the victim system, scaring the user into downloading and installing an "anti-virus" program. The exploit servers could also try to directly compromise the victim's browser.

To understand exactly how these malicious links end up highly ranked in the search results for popular queries, we pick a few malicious links and examine them closely. Our first observation is that the URLs have similar structure—they all correspond to php files and the search terms being poisoned are present in the URL as arguments to the php file. The SEO page contains content related to the poisoned terms, and also links to URLs of a similar format. These URLs point to SEO pages on other domains that have also been compromised by the same group of attackers. By crawling these links successively till we reach a fixed point, i.e., till we see no more new links, we can identify the entire set of domains involved in a search poisoning attack.

In the rest of this section, we study one particular SEO attack, which started in August 2010, was active for around 10 weeks, and included nearly 37 million SEO pages hosted on over 5,000 compromised servers. Analyzing the php script that generates the SEO page gives us greater insight into the mechanics of this attack. Usually, the source of the php files cannot be obtained directly since accessing the file causes the Web server to execute the php commands and display the output of the execution. In this case, however, we found misconfigured Web servers that did not execute the files, but instead allowed us to download the sources. By examining the source files and log files (the locations of the log files were obtained from the source php file) stored by attackers on the Web server, we get a better understanding of the attack. Note that all the files we examined were publicly accessible without the use of any passwords.

Relying on all of this publicly accessible information, we examine the techniques used by the attackers and identify patterns that help detect other similar attacks. There are three major players in this attack: *compromised Web servers*, *redirection servers*, and *exploit servers*. We discuss each of them in detail next.

### 3.1   Compromised Web servers

*Finding vulnerable servers*

The servers were likely compromised through a vulnerability in osCommerce [16], a Web application used to

3

manage shopping sites. We believe the exploit happened through osCommerce because all of the compromised sites were running the software, and the fake pages were set up under a directory belonging to osCommerce. Additionally, this software has several known vulnerabilities that have remained unpatched for several years, so is a rather easy target for an attacker. Also, the databases associated with shopping sites are likely to store sensitive information such as mailing addresses and credit card details of customers. This offers an additional incentive for attackers to target these sites. We believe that vulnerable servers running osCommerce are discovered using search engines. Attackers craft special queries designed to match the content associated with these Web services and issue these queries to search engines such as Bing or Google to find Web servers running this software [11].

### Compromising vulnerable servers

How does the compromise happen? Surprisingly, this is the easiest part of the whole operation. The primary purpose of compromising the site is to store and serve arbitrary files on the server, and to execute commands on the server. With vulnerable installs of osCommerce, this is as easy as going to a specific URL and providing the name of the file to be uploaded. For example, if `www.example.com/store` is the site, then visiting `www.example.com/store/admin/file_manager.php/login.php?action=processuploads` and specifying a filename as a POST variable will upload the corresponding file to the server.

### Hosting malicious content

Typically, attackers upload php scripts, which allow them to execute commands on the compromised machine with the privilege of the Web server (e.g., Apache). In many cases, attackers upload a graphical shell or a file manager (also written in php), so that they can easily navigate the files on the server to find sensitive information. The shell includes functions that make it easy for the attackers to perform activities such as a brute-force attack on `/etc/passwd`, listening on a port on the server, or connecting to some remote address.

In our case, the attacker uploads a simple php script, shown in Figure 2. This file is added to the `images/` folder and is named something inconspicuous, so as to not arouse the suspicion of the server administrator. This script allows the attacker to either run a php command, run a system command, or upload a file to the server. A newer version of the script (seen since October 9th, 2010) additionally allows the attacker to change the permissions of a file.

Once this script is in place, the attacker can add files to the server for setting up fake pages that will be in-

```php
<?php
  $e=@$_POST['e'];
  $s=@$_POST['s'];
  if($e) {
    eval($e);
  }
  if($s) {
    system($s);
  }
  if($_FILES['f']['name']!='') {
    move_uploaded_file(
        $_FILES['f']['tmp_name'],
        $_FILES['f']['name']);
  }
?>
```

Figure 2: The `php` script uploaded by the attackers to the compromised server.

dexed by search engines. These files include an html template, a CSS style file, an image that looks like a YouTube player window, and a php script (usually named `page.php`) that puts all the content together and generates an html page using the template. The URLs to the pages set up by the attackers are of the form:
`site/images/page.php?page=<keyphrase>`.
The set of valid keyphrases is stored in another file (`key.txt`), which is also uploaded by the attackers. Most of the keyphrases in the file are obtained from Google *hot trends* [9] and Bing *related searches*.

In some other attacks, we observe that the attackers make use of *cloaking* techniques [25,27] while delivering malware, i.e., they set up two sets of pages and provided non-malicious pages to search engine bots, while serving malicious pages to victims. In this specific attack, however, the attackers do not use cloaking. Instead, the same page is returned to both search engines and regular users, and the page makes use of javascript and flash to redirect victims to a different page. The redirection is triggered by user actions (mouse movement in this case). The rationale here is that search engine crawlers typically do not generate user actions, so will not know that visitors will be redirected to another URL. Using such flash code for redirection makes detection much harder.

### The SEO page

The bulk of the work in creating the SEO page and links is done by the `page.php` script uploaded to the server. This is an obfuscated php script, and like many obfuscated scripts, it uses a series of substitution ciphers followed by an `eval` function to execute the de-obfuscated code. By hooking into the eval function in php, we get the unobfuscated version. The script performs three activities:

1. *Check if search engine:* When the page is requested, the script first checks if the request is from

a search engine crawler. It does this by checking the user-agent string against a list of strings used by search engines. If the request is from a search crawler, the script logs the time of the request, the IP address of the requester, the user-agent string, and the exact URL requested. Since this attack does not use any cloaking, this check seems to be only for logging purposes.

2. *Generate links:* The script loads the html template, and fills in the title and other headings using the keyphrase in the URL. It picks 40 random keyphrases from `key.txt` and generates links to the same server using these keyphrases. It then picks five other keyphrases from `key.txt` and generates links to five other domains (randomly picked from a set of other domains that have also been compromised by the attacker). In all, there are 45 links to similar pages hosted on this and other compromised servers.

3. *Generate content:* Finally, the script also generates content that is relevant to the keyphrase in the URL. It does this with the help of search engines. It queries `google.com` for the keyphrase, and fetches the top 100 results, including the URLs and snippets. It also fetches the top 30 images from `bing.com` for the same keyphrase. The script then picks a random set of 10 URLs (along with associated snippets) and 10 images and merges them to generate the content page.

The content generated for each keyphrase is stored on the server in a cached file, and all subsequent requests for the page are satisfied from the cache, without having to regenerate the content. We believe that the presence of highly relevant information on the page, along with the dense link structures, both within the site and across different compromised sites, result in increasing the pageranks of the Web pages generated by the attacker.

### 3.2   Redirection servers

The second component in the attack framework is the redirection server, which is responsible for redirecting the victim to a server that actually performs the exploit. Typically, there are one to three additional layers of redirection, before the victim reaches the exploit server. In our case, when a victim visits the compromised site and moves the mouse over the fake YouTube player, he or she gets redirected (using javascript) to another compromised domain, which again performs the redirection. We observed two major domains being used for redirection, and analyzed the working of the redirection server.

When the victim reaches the redirection server, it queries a service named *NailCash* to obtain the URL for

| Total | .in | .co.cc | .net | .com |
|-------|-----|--------|------|------|
| 191 | 16 | 28 | 73 | 74 |

Table 1: Breakdown of exploit server TLDs.

redirection. The *NailCash* service is accessed via an http request to `feed2.fancyskirt.com`. The redirection server provides as arguments an API key, a command, and a product ID. In this attack, the redirection server picks randomly among two API keys. It specifies the command as `cmd=getTdsUrl`, and the product ID as `productId=3` (which refers to FakeAV).

During our observation, the URLs requested were only for FakeAV, but it is likely that the same redirection service is used for getting URLs for other types of malware.

The redirection server caches the received URL for 10 minutes, and any requests arriving within those 10 minutes are satisfied from the cache without making a request to `feed2.fancyskirt.com`. Between August 8th, 2010 and October 13th, 2010 the redirection server redirected victims to 453 distinct domains. These domains were very similar in name, and were all hosted on just two /24 IP prefixes. One of them was located in Illinois and the other in Amsterdam.

### 3.3   Exploit servers

Finally, the attacker hosts the actual malicious content on an exploit server. We found 191 different domains being used by the exploit server over time. All the domains were hosted on two IP addresses, one located in Quebec, Canada and the other in Luxembourg. The exploit server does not display the scareware page if the user agent is suspicious (such as a search engine crawler), or if the referrer is missing. It also refuses connections from IP addresses belonging to search engine companies. Most of these domains are either .com, .net, or .co.cc, or .in, and the breakdown is shown in Table 1.

### 3.4   Results and observations

We present some of the results from our study. Starting with one compromised site, we were able to follow the links to other compromised sites and eventually map the whole network of compromised sites used in this attack. In all, we were able to identify 5400 domains, of which around 5000 were active, and the others were either down or had been cleaned up.

#### *Link structure*

Figure 3 shows the number of compromised domains each site links to. On average, each domain linked to 202 other domains, with a median value of 159. In addition, each compromised domain also linked to around 80,000 legitimate domains, since each compromised server had around 8,000 keyphrases, each corresponding to an SEO



Figure 3: The number of other compromised sites each site links to. The degree distribution indicates a dense linking structure.



Figure 4: The number of sites compromised by the attackers each day over a period of three months.



Figure 5: The interval between a site getting compromised and the SEO page getting crawled by a search engine.



Figure 6: The frequency with which each keyphrase occurs across the compromised sites.

page, linking to 10 different sites obtained from a Google search. The dense link structure helps boost the pageranks of these fake pages in the query results.

**Timeline of compromise**

Figure 4 shows the number of sites compromised on each day. We define the time of compromise as the time at which the malicious php files were added to the server. This time is obtained from the directory listing on the server. We find the compromise volume to be rather bursty, with most of the servers getting compromised in the initial phase of the attack.

Once the sites are compromised and set up to serve the fake pages, we look at how soon the first visit from search engine crawlers appear.

In Figure 5, we see that almost half of the compromised sites are crawled within four hours of compromise, and nearly 85% of the sites are crawled within a day. This could either be because search engine crawlers are very aggressive at crawling new links, or because the attackers are submitting their sites actively to the search engines through the Webmaster tools associated with each search engine. The dense link structure might also account for the quick crawling time of these pages.

**Distribution of keyphrases**

Each compromised server sets up an SEO page for each

of the keyphrases present in the file. Across all the compromised sites, we found 38 different keyphrase files, with a total of 20,145 distinct keyphrases.

Figure 6 plots the distribution of the keyphrases across the 38 files. The most popular phrases appear in 37 of the 38 files, while nearly 15% of the phrases appear in only a single file. In the median case, each phrase is seen in 11 different files. To check whether Google trends is one of the sources of these keyphrases, we consider all the keywords which were listed as Google trends over a four month period between May 28th, 2010 and September 27th, 2010. Out of the 2,125 distinct trend phrases in this period, 2,018 ($\approx$ 95%) were keyphrases used by the attackers. Exploiting trendy keywords is thus another characteristic of search poisoning attacks to increase the content relevancy.

**Traffic from victims**

This was a large scale attack exploiting over 5,000 compromised sites, each hosting close to 8,000 SEO pages—for a total of over 40 *million* SEO pages. However, this does not tell us how successful the attack actually was. We would need to take into account what fraction of these pages were indexed by search engines, how many pages showed up in top search results, and how many users clicked on links to these SEO pages. Thus, the measure of success of this SEO campaign would be the



Figure 7: The arrival of requests at the redirection server.



Figure 8: The estimated number of victims redirected to the FakeAV sites on each day.

number of victims who were actually shown the fake anti-virus page.

Unfortunately, the SEO pages on the compromised sites do not log information about who visited each link (unless it is a search engine crawler). However, all the SEO pages cause the user to get redirected to one of two redirection servers. By monitoring the logs on the redirection servers, we estimate the number of visits to the FakeAV pages.

We started monitoring the redirection server on August 27th, 2010, and so missed the first 20 days of the attack. As explained in Section 3.2, the redirection server fetches the redirect-URL from the NailCash service, and each time it does this, it adds an entry to a log file. However, since the URL is cached for 10 minutes, we miss any requests which were satisfied by the cached URL of the exploitation server. Figure 7 illustrates the situation. The solid arrows indicate observed requests (which were written to the log on the redirection server). The grey area denotes the interval when request are served from the cache, and the dotted arrows denote requests which we do not observe because they arrived before the cache entry expired.

In order to estimate the total traffic volume from the observed requests, we make the common assumption that the requests follow a *Poisson* arrival process. This implies that the inter-arrival times are exponentially distributed with mean $\lambda$. Since the exponential distribution is memoryless, the time to the next arrival has the same distribution at any instant.

Consider again Figure 7. The first request is observed at time $t = \tau_0$. Since the inter-arrival time is memoryless, the expected time to the next event is the same whether we start our observation at $t = \tau_0$ or at any other $t$ (including $t = \tau_0 + T$). Therefore, we start our observation at $t = \tau_0 + T$, where $T$ is the duration till which a fetched redirect URL is cached, and the time to the next arrival $\delta_1$ is a sample from our exponential distribution. Similarly, $\delta_2, \delta_3, \ldots, \delta_n$ are other samples from this distribution. The mean is then given by:

$$\lambda = \frac{1}{n} \times \sum_{i=1}^{n} \delta_i$$

This is valid only for homogeneous exponential functions, and since Web site visits tend to exhibit diurnal patterns, we split the time into chunks of 2 hours, during which we assume the inter-arrival distribution to be homogeneous. Once we have the mean inter-arrival time $\lambda_i$ for time interval $t_i$, we can compute the expected number of visits $n_{vis}$ as:

$$n_{vis} = \sum_{i=1}^{n} \frac{len(t_i)}{\lambda_i}$$

We use this formula to estimate the number of visits to the redirection server, and plot the results in Figure 8. We observe a peak on September 2nd, and then a sudden drop after that for a few days. We believe the drop occurred because the redirection server was added to browser blacklists. On September 7th, the redirection server was moved to another domain, and we start seeing traffic again. The redirection servers stopped working on October 21st, and that marked the end of the SEO campaign. During this period, we estimate the total number of visits to be 60,248, and by extrapolating this number to the start of the campaign (August 7th), we estimate that there were over 81,000 victims who were taken to FakeAV sites. The large number of visits suggests that the attack is quite successful in attracting legitimate user populations.

### Multiple Compromises

Perhaps unsurprisingly, we found that many of these vulnerable servers were compromised multiple times by different attackers. We speculate that these were multiple attackers based on the timestamps of when the files were added to the server, and the contents of the files. It is possible that the same attacker uploaded multiple files to the server at different times, but in many cases we see multiple php scripts which offer almost identical functionality, but are slightly different in structure. Also, since we observed the bursty nature of compromises, by looking at timestamps of these uploaded files and clustering the different sites by this timestamp, we can potentially find

groups of sites which were compromised by different attackers at different times.

This observation suggests that attackers share compromised server infrastructure, and thus detecting these sites can effectively help search engines remove a wide class of malicious content.

## 4  Detection Method

The previous section shows how search-result poisoning attacks are typically performed. In this section, we present our system *deSEO* for automatically detecting such attacks. This task is challenging as it is expensive to test the maliciousness of every link on the Web using content-based approaches. Even if we test only links that contain trendy keywords, it is not straightforward as many SEO pages may look legitimate in response to most requests; they deliver malicious content only when certain environmental requirements are met, e.g., the use of a vulnerable browser, the redirection by search engines, or user actions such as mouse movements. Without careful reverse engineering, it is hard to guess the right environment settings needed to obtain the malicious content on the page.

To automatically detect the SEO links, we revisit the attack we analyzed in the previous section. Our study yields three key observations of why the SEO attack is successful:

1. Generation of pages with relevant content.

2. Targeting multiple popular search keywords to increase coverage.

3. Creating dense link structures to boost pagerank.

Attackers first need to automatically generate pages that look relevant to search engines. In addition, one page alone may not be able to bring them many victims, so attackers often generate many pages to cover a wide range of popular search keywords. To promote these pages to the top of the search results, attackers need to hijack the reputation of compromised servers and create dense link structures to boost pagerank.

We draw on the first two observations when designing our detection method. We do not look at the link structures of Web pages because that would require crawling and downloading *all* pages to extract the cross-link information. In this paper, we show that studying just the structure of URLs works well enough to detect SEO attacks of this type.

Further, we observe that SEO links are often set up on compromised Web servers. These servers usually change their behavior after being hacked: many new links are added, usually with different URL structures from the old URLs. In addition, since attackers control a large number of compromised servers and generate pages using scripts, their URL structures are often very similar across compromised domains. Therefore, we can recognize SEO attacks by looking for newly created pages that share the same structure on different domains. By doing so, we can identify *a group of* compromised servers controlled by the same attacker (or the same SEO campaign), rather than reasoning about *individual* servers.

At a high level, deSEO uses three steps for detection. The first step is to identify suspicious Web sites that exhibit a change in behavior with respect to their own history. In the second step, we derive lexical features for each suspicious Web site and cluster them. In the last step, we perform group analysis to pick out suspicious SEO clusters. Next, we explain these three steps in detail.

### 4.1  History-based detection

In the first step, deSEO identifies suspicious Web sites that may have been compromised by attackers. SEO pages typically have keywords in the URL because search engines take those into consideration when computing the relevance of pages for a search request [7]. So, we study all URLs that contain keywords. Optionally, we could also focus on URLs that contain popular search keywords because most SEO attacks aim to poison these keywords so as to maximize their impact and reach many users.

While it is common for Web sites to have links that contain keywords, URLs on compromised servers are all newly set up, so their structures are often different from historical URLs from the same domains.

Specifically, for each URL that contains keywords delimited by common separators such as + and -, we extract the URL prefix before the keywords. For example, consider the following URL `http://www.askania-fachmaerkte.de/images/news.php?page=lisa+roberts+gillan`. The keywords in the URL are `lisa roberts gillan` and the URL prefix before the keywords is `http://www.askania-fachmaerkte.de/images/news.php?page=`.

If the corresponding Web site did not have pages starting with the same URL prefix before, we consider the appearance of a new URL prefix as suspicious and further process them in the next step.

### 4.2  Clustering of suspicious domains

In the second step, deSEO proceeds to cluster URLs so that malicious links from the same SEO campaign will be grouped together, under the assumption that they are generated by the same script.

Similar to previous URL-based approaches for spam detection [13, 12], we extract lexical features from URLs.

Empirically, we select the following features:

1. String features: separator between keywords, argument name, filename, subdirectory name before the keywords.

2. Numerical features: number of arguments in the URL, length of arguments, length of filename, length of keywords.

3. Bag of words: keywords.

In our previous URL example, the separator between keywords is "+", the argument name is `page`, the filename is `news.php`, the directory before the keywords is `images`, the number of arguments in the URL is one, the length of arguments is four, the length of filename is nine, and the bag of words is {`lisa, roberts, gillan`}

As most malicious URLs created on the same domain have similar structure, we aggregate URL features together by domain names and study the similarities across domains. Note that we consider sub-domains separately. For example, `abcd.blogspot.com` is considered a separate domain because it is possible for a sub-domain to get compromised rather than the entire domain `blogspot.com`. When aggregating for string features, we take the feature value that covers the most URLs in the domain; for numerical features, we take the median; and for bags of words, we take the union of bags.

In contrast to previous work that use URLs for spam detection, where a binary classification of URL is sufficient [13, 12], our goal is to cluster URLs. We adopt the widely used K-means++ method [2]. Initially, we select K centroids that are distant from each other. Next we apply the K-means algorithm to compute K clusters. We select and output clusters that are tight, i.e., having low residual sum of squares (the squared distance of each data point from the cluster centroid). For the remaining data points, we iteratively apply the K-means algorithm until no more big clusters (with at least 10 domains) can be selected.

Note that neither the computation of distances between data points nor the calculation of the cluster centroid is straightforward because we have many features with some of them being non-numerical values. We normalize feature dimensions so that distances fall into a weighted high-dimensional space, with the values of each dimension ranging from 0 to 1. For string features, identical values have a distance of 0 and the distance is set to 1 otherwise. For numerical features, we define the distance as the difference in numerical values, normalized by the maximum value seen in the dataset. For bags of words features, the distance between two bags of words $A = a_1, a_2, ..., a_n$ and $B = b_1, b_2, ..., b_m$ is

defined as $\frac{\|A \cap B\|}{\|A \cup B\|}$. When picking a weight for each dimension, we give a higher weight (the value 2) to string features as it is relatively infrequent for different URLs to have identical string features. For all other dimensions, we give an equal weight of 1.

When computing centroids, we adopt the same method we use to aggregate URL features into domain features, treating all URLs in a cluster as if they were from the same domain. If we find a cluster with the residual error of squares normalized by the cluster size lower than the preset threshold, we output the cluster. Empirically, we find both the weight selection and the threshold selection are not sensitive to the results as most malicious clusters are very tight in distance and stand out easily.

### 4.3   Group analysis

Finally, we perform group analysis to pick compromised domain groups and filter legitimate groups. In the previous steps, we leverage the fact that compromised sites change behavior after the compromise and their link structures are similar. In this step, we leverage another important observation, namely that SEO links in one campaign share a similar page structure (not just the URL structure).

One way to measure the similarity of two Web page structures is to compare their parsed HTML tree structure [21]. This approach is heavy-weight because we need to implement a complete HTML page parser, derive the tree representations, and perform tree difference computations. For simplicity, we focus on simpler features that are effective at characterizing pages. For instance, we simply use the number of URLs in each page, and we find this feature works well empirically.

We sample $N$ (set to 100) pages from each group and crawl these pages. Then we extract the number of URLs per page and build a histogram. Figure 9 plots the histogram of the number of URLs of a legitimate group, while Figure 10 plots the histogram for a malicious group. We can clearly see that the legitimate group has a diverse number of URLs. But the malicious one has very similar pages with almost identical number of URLs per page. The small fraction of zero link pages are caused by pages that no longer exist (possibly corresponding to compromised Web servers that have since been cleaned up).

We normalize each histogram and compute peaks in the normalized histograms. If the histogram has high peak values, we output the group as a suspicious SEO group and manually check the group. Although here we still use manual investigation to pick out the final groups, the amount of work is actually small. We show in Section 5 that deSEO outputs less than 20 groups. Therefore, a human expert only needs to check several sample URLs in each group, rather than reasoning about millions



Figure 9: An example legitimate group that has diverse distribution of number of URLs in each Web page.



Figure 10: An example malicious group that has a similar number of URLs in each Web page.

of URLs that contain keywords one by one.

Finally, for each malicious group, deSEO outputs regular expression signatures using the signature generation system AutoRE [28]. Since URLs within a group have similar features, most groups output only one signature. We apply the derived signatures to large search engines and are able to capture a broad set of attacks appearing in search engine results (see details in Section 6.3).

## 5   Results

In this section, we describe our datasets, which consist of large sets of Web URLs, search engine query logs, snapshot of Web content, and trendy keywords. Using these datasets, we evaluate the effectiveness of deSEO in identifying malicious groups of URLs corresponding to different SEO attacks.

### 5.1   Dataset

We collect three sampled sets of URLs from Bing. These URLs are sampled from all URLs that the crawler saw during the months of June 2010, September 2010, and January 2011. Each sampled set of URLs contains over a hundred billion URLs. We use the June URLs as a historical snapshot and apply deSEO to September and January URL sets.

The second dataset we use is a sampled search query log from September 2010 that contains over 1 billion query requests. It records information about each query such as query terms, clicks, query IP address, cookie, and user agent. Because of privacy concerns, cookies and user agents are anonymized by hashing. In addition, when we look at IP addresses in the log, we focus on studying the IP addresses of compromised Web servers, rather than individual normal users.

The trendy keywords we use are obtained from Google Trends [9]. We collect daily Google Trends keywords from May 28th, 2010 to February 3rd, 2011. Each day has 20 popular search terms.

### 5.2   Detection results

#### 5.2.1   History-based detection

We apply the history-based detection to the URLs of September and January. Since we have over a hundred billion URLs, to reduce the processing overhead, we first filter out the top 10,000 Alexa [1] Web sites as we believe those servers are relatively well managed and have a lower chance of getting compromised. Later, after we derive regular expression patterns, we could apply them to URLs corresponding to these Web sites to detect malicious ones, if any, hosted by these servers.

| Month | With trendy keyword | | With new structure | |
|---|---|---|---|---|
| | Domains | URLs | Domains | URLs |
| Sept 10 | 428,430 | 1,481,766 | 136,387 | 366,767 |
| Jan 11 | 512,617 | 3,255,140 | 211,225 | 1,102,878 |

Table 2: History-based URL filtering.

We extract all URLs on remaining domains that contain trendy keywords. Table 2 shows the results. In September, over 1 million URLs have trendy keywords, but in Jan the number jumps to 3 million, showing the potential increase of SEO attacks. We next choose URLs with new URL prefixes by comparing the URL prefixes of September 2010 and January 2011 to those of June 2010. For URLs that contain new prefixes, we select them and pass them to the next step. This step removes about two thirds of the URLs.

#### 5.2.2   Clustering results

We extract the domain features as described in Section 4.2 and apply the K-means++ algorithm to cluster these domains. We vary the value of K and obtain similar results since we apply the K-means++ algorithm iteratively. Table 3 shows the results of K=100. (The third and fourth columns are explained below.) For both months, the clustering algorithm outputs hundreds of groups.



Figure 11: The distribution of peak values: percentage of pages sharing the same number of URLs within a group.

### 5.2.3 Group analysis

As we have grouped similar Web sites into a small number of groups, we use group similarity to distinguish legitimate groups from malicious ones. We use the URL features mentioned in Section 4.3 to filter out obvious false-positive groups.

Figure 11 shows the distribution of the peak value among all groups. We can see that there are a small number of groups that have high peak values. But most groups have small peak values as their pages are diverse. We pick a threshold for the peak value of 0.45, which filters most legitimate groups, as shown in the third column of Table 3. After filtering, less than 20 groups remain, and we manually go through these groups to pick out malicious ones.

| Month | Number of groups | | |
|---|---|---|---|
| | Total | Above threshold | Malicious |
| Sept 10 | 290 | 14 | 9 |
| Jan 11 | 272 | 16 | 11 |

Table 3: Clustering and group analysis results.

In total, we find 9 malicious groups from the September data and 11 groups from the January data. The regular expressions derived from two datasets mostly overlap. This shows that there are a relatively small number of SEO campaigns, and that they are long-lasting. Hence, capturing one signature can be useful to capture many compromised sites over time. In total, we capture 957 unique compromised domains and 15,482 malicious URLs in our sampled datasets.

Figure 12 shows a few derived regular expression samples. These include expressions that match the URLs of compromised servers that we study in Section 3, but also a number of new ones. Note that some of the regular expressions may look generic, e.g., `*/index.php/?w{4,5}=(w+(+w+)+)$`, which matches malicious URLs like: `http:`

`//www.kantana.com/2009/index.php/ ?bqfb=justin+bieber+breaks+neck`. At first glance, one might think `index.php` followed by words would match many legitimate URLs, but it turns out that it is rare to have "`/?`" in between. Further, the word `bqfb` makes it even clearer that this is an automatically generated URL.

## 6 Attack Analysis

In this section, we leverage the results produced by deSEO to gain more insights into SEO attacks. First, we study a new attack found by deSEO, which has a different link structure than the one we detect in Section 3. Second, we study the search engine queries originating from the IP addresses of compromised servers, as SEO toolkits often query the search engines to generate SEO pages. Finally we apply the derived regular expressions to live search results to detect a broad set of attacks.

### 6.1 Study of new attack

By examining deSEO's captured malicious groups, we find another SEO attack that uses a different methodology for setting up SEO pages, boosting their page ranks, and polluting the search index. We believe that this SEO campaign is probably orchestrated by a different group of attackers. We now characterize the differences between this attack and the attack that we initially studied.

#### 6.1.1 Link structure

This attack makes use of two sets of servers—one set that hosts SEO pages that redirect to an exploit server, and a second set of pointer pages that link to only these SEO pages.

We find 120 pointer pages, all of which are hosted on hacked Wordpress [24] blogs. Further analysis shows that these are older versions of Wordpress that have vulnerabilities, and attackers use one of these vulnerabilities to modify the `xmlrpc.php` files that are included in the Wordpress installation by default. Each pointer page contains 500 links to SEO pages hosted on 12 different domains. The pointer pages are dynamic in that the set of links contained in a page changes each time the page is visited, and the set of the 12 domains also changes on a daily basis.

In all, we find SEO pages hosted on 976 domains. Similar to the previous attack, the SEO pages contain content relevant to the poisoned terms and redirect users to the exploit server. However, new to this attack, the SEO pages did not link to each other. Instead, they relied on incoming links from the pointer pages to boost their pageranks, as well as to populate the search engine index with new SEO pages. However, in addition, the SEO pages started linking to each other starting in January 2011. This change suggests that the attackers are

| Regex | Examples |
|---|---|
| .*\/images\/\w+(-\w+)+\.html | http://usedcarsdotcom.com.au/images/eddie-fisher.html |
| .*\/image\/page\.php\?page=\w+(\+\w+)+ | http://www.rawstrokes.com/cart/images/page.php?page=justin+bieber+hates+korea&check=dd35923778116c82bc9c5b102ea9e260 |
| .*\/robots.txt\/\?showc=\w+(\+\w+)+$ | http://www.soundsonshellac.com/robots.txt/?showc=tour+de+france+stage+3 |
| .*\/xmlrpc\.php\/\?showc=\w+(\+\w+)+$ | http://randomlyinsaneadventures.com/xmlrpc.php/?showc=sec+media+days+2010 |
| .*\/images\/watch\/index\.php\?q=(\w+(\+\w+)+)$ | http://www.po-kwong.com/product/images/watch/index.php?q=justin+moore |
| .*\/[a-z]{4,5}.php\?[a-z]{3,5}=\w+(\+\w+)+$ | http://eleishamiller.com/nofsj.php?page=steven+pieper |
| *\/[a-z]{3,7}\.php\?[a-z]{1,7}=(\w+(%20\w+)+)$ | http://vott500.com/ufdvq.php?go=caliphate%20definition |
| .*\/index\.php\/\?\w{4,5}=(\w+(\+\w+)+)$ | http://www.kantana.com/2009/index.php/?bqfb=justin+bieber+breaks+neck |

Figure 12: Examples of derived regular expressions.

constantly trying to improve the ranking of their pages using different strategies.

#### 6.1.2   Use of cloaking

This attack makes use of cloaking, both for the pointer pages and the SEO pages. When a pointer page is accessed by a legitimate user, the original page content is displayed, but if the page is accessed by a search-engine crawler (identified by the user-agent string), then a page containing links to the SEO pages is displayed.

The SEO pages behave differently depending on how they are accessed. When accessed by a search engine crawler, the page displayed is optimized for the poisoned keywords. When a regular user accesses the page, he/she is redirected to the exploit server, provided the referrer field matches a known search engine and the user-agent field indicates a Windows machine. In all other cases, the SEO page redirects to a benign page.

#### 6.1.3   Redirection and exploit infrastructure

This attack makes use of a completely different set of redirection and exploit servers, though the FakeAV page displayed at the end is almost identical. In comparison with the previous attack, these SEO pages go through an extra level of redirection for reaching the exploit server. We find a total of 485 exploit domains, hosted on two sets of IP address in the US (in Texas and New Jersey).

### 6.2   Queries from compromised servers

We check whether we see queries from the compromised servers captured by deSEO using the Bing search log. Queries from Web servers can be viewed as a signal of potential compromise, as they could indicate search engine scraping activities in order to generate content for SEO pages. Less than 5% of the top 500 Alexa Web sites ever submitted queries during the month of September 2010, while 46% of the compromised servers did. Note

that this does not necessarily mean the remaining ones do not issue queries to search engines. They could have been inactive during that month, or could have chosen to use other search engines.

The queries from legitimate sites are mostly infrequent (less than one per day). These may be generated by human administrators, who are logged in on the Web servers. Only around 1% of legitimate sites generated a large number of queries. These queries went through the affiliate program that partners with the search engine company to provide search results.

Queries from the IPs of compromised servers are more frequent than those of legitimate sites. In addition, queries from the same group have similar behavior. Often, they present the same user-agent string, e.g., "Mozilla/5.0 (Windows; U; Windows NT 5.1; en-US; rv:1.9.2) Gecko/20100115 Firefox/3.6".

Relying on this user-agent string, together with trendy keywords, we detect other IP addresses that share the same pattern. Accurately determining the compromised domains hosted on these IP addresses is challenging, though, because compromised servers are usually small Web servers hosted on hosting infrastructures. It is common to have many domains (sometimes tens of thousands) sharing the same IP address. Therefore, seeing bad activities from an IP address is not sufficient to pinpoint the exact compromised server.

Besides trendy keyword queries, we also identify a number of other malicious queries from these compromised servers. For example, there are queries of the form of site:< hosting_site >. This query returns all the pages from a particular site. What is interesting is that the site specified in the query is also hosted on the same IP address that issued the query. Such queries are seen when a site is compromised, and the attackers try to de-

| | 60 trendy keywords | | 60 attacker poisoned keywords | |
|---|---|---|---|---|
| | # of matched searches | # of matched URLs | # of matched searches | # of matched URLs |
| Google | 16 | 39 | 27 | 124 |
| Bing | 0 | 0 | 1 | 1 |

Table 4: Matching Google and Bing search results using derived regular expressions.

termine which pages to inject code into; they typically pick the most popular pages, i.e. the ones that show up high in the search results.

## 6.3 Matching Google and Bing queries

We apply our derived regular expressions of Section 5.2.3 to the Google and Bing search engines. We use two sets of query terms. The first set is a set of 60 trendy keywords obtained from Google Trends (February 1st to February 3rd, 2011). The second set is a set of 60 keywords poisoned by attackers (but not in Google Trends), which were randomly selected from the keywords appearing in captured malicious URLs. For each keyword, we manually perform Web search and then extract the top 100 results returned from Google and Bing. We use only 60 search terms because the search queries are issued manually—automated queries and screen-scraping are against the terms of use, and the search results obtained using the search APIs are not consistent with the results obtained through a browser. (While we do not know why the API results differ from the browser-based search results, we speculate that the API search results are not as fresh, so contain older and more well-established links.)

For a total of 120 keywords, 36% of them yield at least one malicious link in the top 100 results (which are spread over ten pages). Table 4 shows the detailed results. Not surprisingly, attackers are even more successful in poisoning non-trendy keywords that they select (45% match rate). This is because fewer Web pages may match these keywords and hence it can be easier for malicious links to appear among the top search results. Their distribution, i.e., how high in the search results these links are displayed, is shown in Figure 13. We can see that the malicious links are spread over all of the top 10 pages. Similar to previous reports [19], we find Bing top search results contain relatively fewer malicious links. (Experiments were conducted in February 2011; the search results of both Google and Bing have been improved since then.)

We manually verified all the matches and did not find false positives. All of the matches are generated by only two regular expressions—the first and the seventh in Figure 12.

We run all matching URLs through Firefox using the Google Safebrowsing API and Internet Explorer (using its internal blacklist), and none of them were blocked by



Figure 13: The number of malicious links found in different pages of the search results for 60 popular keywords.

either browser at the time of the experiment. This result indicates that deSEO is able to capture live attacks that have not yet been reported.

## 7 Discussion and Conclusion

In this paper, we study a large-scale, live search-result poisoning attack that leverages SEO techniques. Based on our observations, we develop a system called deSEO that automatically detects additional malicious SEO campaigns. By deriving URL signatures from our results and applying them to both Google and Bing, we find 36% of searches yield links to malicious pages among their top results. Our paper appears to be the first to present a systematic study of search-result poisoning attacks and how to detect them.

Attackers may wish to evade deSEO detection by not embedding keywords in URLs. However, this approach reduces the chance of getting SEO links to the top search results, because keywords in URLs appear to be an important feature for relevance computation. Also, it may reduce the chance of clicks by end users, as URLs with keywords look more relevant to users who search using these keywords. Attackers may also wish to diversify the SEO link structures so that they look different across different domains. Our history-based detection will still pick such SEO links as long as their URL structures appear different than those used previously by the same domains. To further detect the diversified SEO links as a group, we could alternatively adopt content-based solutions by comparing their page similarity [21], possibly on virtual machines [22].

13

In our study, we find that attackers usually put up a large number of new pages after compromising a Web site, which is often relatively inactive before compromise. Therefore, search engines could give a lower rank to new pages on previously inactive sites. Search engines could also consider dense link structures to identify SEO attacks, if they are willing to crawl most of the malicious pages and if they can afford to perform offline analysis. In addition, we notice that the contents of SEO pages are mostly irrelevant to the compromised site's homepage, and sometimes even the language is different. Therefore, semantic-based approaches are also promising avenues for further investigation.

## 8   Acknowledgements

We thank Úlfar Erlingsson, Qifa Ke, and Marc Najork for their valuable advice. We are grateful to Fritz Behr, David Felstead, Nancy Jacobs, Santhosh Kodipaka, Liefu Liu, Cheng Niu, Christian Seifert, David Soukal, Walter Sun, and Zijian Zheng for providing us with data and feedback on the paper. The investigation and analysis of SEO attacks was partly supported by a Cisco Fellowship and the National Science Foundation under Grants CNS-0831540 and CNS-1040663.

## References

[1] Alexa's Top 1 million Web sites. `http://s3.amazonaws.com/alexa-static/top-1m.csv.zip`.

[2] D. Arthur and S. Vassilvitskii. K-means++: the advantages of careful seeding. In *Proceedings of the 18th Annual ACM-SIAM Symposium on Discrete Algorithms*, SODA, 2007.

[3] V. Aubuchon. Google Ranking Factors - SEO Checklist. `http://www.vaughns-1-pagers.com/internet/google-ranking-factors.htm`.

[4] C. Castillo, D. Donato, A. Gionis, V. Murdock, and F. Silvestri. Know your neighbors: Web spam detection using the Web topology. In *Proceedings of the 30th International ACM Conference on Research and Development in Information Retrieval*, SIGIR, 2007.

[5] D. Fetterly, M. Manasse, and M. Najork. Spam, damn spam, and statistics: using statistical analysis to locate spam Web pages. In *Proceedings of the 7th International Workshop on the Web and Databases*, WebDB, 2004.

[6] R. Fishkin and J. Pollard. Search engine ranking factors, 2009. `http://www.seomoz.org/article/search-ranking-factors`.

[7] Googleguide. How Google works. `http://www.googleguide.com/google_works.html/`.

[8] Google search engine optimization starter guide. http://www.google.com/webmasters/docs/search-engine-optimization-starter-guide.pdf.

[9] Google trends. `http://www.google.com/trends`.

[10] Hotvideo pages: analysis of a hijacked site. `http://research.zscaler.com/2010/09/hot-video-pages-analysis-of-hijacked.html`.

[11] J. P. John, F. Yu, Y. Xie, M. Abadi, and A. Krishnamurthy. Searching the Searchers with SearchAudit. In *Usenix Security Symposium*, 2010.

[12] J. Ma, L. K. Saul, S. Savage, and G. M. Voelker. Beyond blacklists: Learning to detect malicious Web sites from suspicious urls. In *Proceedings of the SIGKDD Conference*, 2009.

[13] J. Ma, L. K. Saul, S. Savage, and G. M. Voelker. Identifying suspicious urls: An application of large-scale online learning. In *Proceedings of the International Conference on Machine Learning*, ICML, 2009.

[14] A. Moshchuk, T. Bragin, S. D. Gribble, and H. M. Levy. A crawler-based study of spyware on the Web. In *Proceedings of the Network and Distributed System Security Symposium*, NDSS, 2006.

[15] A. Ntoulas, M. Najork, M. Manasse, and D. Fetterly. Detecting spam Web pages through content analysis. In *Proceedings of the International Conference on World Wide Web*, WWW, 2006.

[16] osCommerce, Open Source Online Shop E-Commerce Solutions. `http://www.oscommerce.com`.

[17] L. Page, S. Brin, R. Motwani, and T. Winograd. The pagerank citation ranking: Bringing order to the Web. 1998. `http://www.scientificcommons.org/42893894`.

[18] M. A. Rajab, L. Ballard, P. Mavrommatis, N. Provos, and X. Zhao. The nocebo effect on the Web: an analysis of fake anti-virus distribution. In *Proceedings of the 3rd USENIX Conference on Large-scale Exploits and Emergent Threats: Botnets, Spyware, Worms, and More*, LEET, 2010.

[19] Spam SEO trends & statistics. `http://research.zscaler.com/2010/07/spam-seo-trends-statistics-part-ii.html`.

[20] Twitter trending topics. `http://twitter.com/trendingtopics`.

[21] T. Urvoy, E. Chauveau, P. Filoche, and T. Lavergne. Tracking Web spam with html style similarities. *ACM Transactions on the Web*, February 2008.

[22] Y.-M. Wang, D. Beck, X. Jiang, R. Roussev, C. Verbowski, S. Chen, and S. King. Automated Web patrol with strider honeymonkeys. In *Proceedings of the Network and Distributed System Security Symposium*, NDSS, 2006.

[23] Websense 2010 threat report. `http://www.websense.com/content/threat-report-2010-introduction.aspx`.

[24] WordPress. `http://wordpress.org`.

[25] B. Wu and B. D. Davison. Cloaking and redirection: A preliminary study. In *Adversarial Information Retrieval on the Web*, AIRWeb, 2005.

[26] B. Wu and B. D. Davison. Identifying link farm spam pages. In *Special Interest Tracks and Posters of the International Conference on World Wide Web*, WWW, 2005.

[27] B. Wu and B. D. Davison. Detecting semantic cloaking on the Web. In *Proceedings of International Conference on World Wide Web*, WWW, 2006.

[28] Y. Xie, F. Yu, K. Achan, R. Panigrahy, G. Hulten, and I. Osipkov. Spamming botnets: Signatures and characteristics. In *SIGCOMM*, 2008.

[29] Yahoo! Search Content Quality Guidelines. http://help.yahoo.com/l/us/yahoo/ search/basics/basics-18.html.

# APPENDIX
# 191

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/200111028

# Cloaking and Redirection: A Preliminary Study

**Conference Paper** · January 2005

CITATIONS
55

READS
214

**4 authors**, including:

Brian Davison
Lehigh University
**188** PUBLICATIONS   **5,310** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

IP Geolocation View project

PRAISys View project

All content following this page was uploaded by Brian Davison on 04 March 2015.

The user has requested enhancement of the downloaded file.

# Cloaking and Redirection: A Preliminary Study

**Baoning Wu** and **Brian D. Davison**
Computer Science & Engineering
Lehigh University
{baw4,davison}@cse.lehigh.edu

## Abstract

Cloaking and redirection are two possible search engine spamming techniques. In order to understand cloaking and redirection on the Web, we downloaded two sets of Web pages while mimicking a popular Web crawler and as a common Web browser. We estimate that 3% of the first data set and 9% of the second data set utilize cloaking of some kind. By checking manually a sample of the cloaking pages from the second data set, nearly one third of them appear to aim to manipulate search engine ranking.

We also examined redirection methods present in the first data set. We propose a method of detecting cloaking pages by calculating the difference of three copies of the same page. We examine the different types of cloaking that are found and the distribution of different types of redirection.

## 1   Introduction

Cloaking is the practice of sending different content to a search engine than to regular visitors of a web site. Redirection is used to send users automatically to another URL after loading the current URL. Both of these techniques can be used in search engine spamming [13, 7]. Henzinger et al. [8] has pointed out that search engine spam is one of the major challenges of web search engines and cloaking is among the spamming techniques used today. Since search engine results can be severely affected by spam, search engines typically have policies against cloaking and some kinds of dedicated redirection [5, 16, 1].

Google [5] describes cloaking as the situation in which "the webserver is programmed to return different content to Google than it returns to regular users, usually in an attempt to distort search engine rankings." An obvious solution to detect cloaking is that for each page, calculate whether there is a difference between a copy from a search engine's perspective and a copy from a web browser's perspective. But in reality, this is non-trivial. Unfortunately, it is not enough to know that corresponding copies of a page differ; we still cannot tell whether the page is a cloaking page. The reason is that web pages may be updated frequently, such as in a news website or a blog website, or simply that the web site puts a time stamp on every page it serves. Even if two crawlers were synchronized to visit the same web page at nearly the same moment, some dynamically generated pages may still have different content, such as a banner advertisement that is rotated on each access.

Besides the difficulty of identifying cloaking, it is also hard to tell whether a particular instance of cloaking is considered acceptable or not. We define the cloaking behavior that has the effect of manipulating search engine ranking results as semantic cloaking. Unfortunately, the various search engines may have different criteria for defining unacceptable cloaking. As a result, we have focused on the simpler, more basic task — when we mention cloaking in this paper, we usually refer to the simpler case of whether different content is served to automated crawlers versus web browsers, but not different content to every visitor. We name this cloaking as syntactic cloaking. So, for example, we will not consider dynamic advertisements to be cloaking.

In order to investigate this issue, we collected two data sets: one is a large data set containing 250,000 pages and the other is a smaller data set containing 47,170 pages. The detail of these two data set will be given in Section 3. We manually examined a number of samples of those pages and found several different kinds of cloaking techniques. From this study we make an initial proposition toward building an auto-

Copyright is held by the author/owner(s).
*AIRWeb'05*, May 10, 2005, Chiba, Japan.

mated cloaking detection system. Our hope is that these results may be of use to researchers to design better and more thorough solutions to the cloaking problem.

Since redirection can also be used as a spamming technique, we also calculated some statistics based on our crawled data for cloaking. Four types of redirection are studied.

Few publications address the issue of cloaking on the Web. As a result, the main contribution of this paper is to begin a discussion of the problem of cloaking and its prevalence in the web today. We provide a view of actual cloaking and redirection techniques. We additionally propose a method for detecting cloaking by using three copies of the same page.

We next review those few papers that mention cloaking. The data sets we use for this study are introduced in Section 3. The results of cloaking and redirection are shown in Section 4 and 5 respectively. We conclude this paper with a summary and discussion in Section 6.

## 2   Related Work

Henzinger et al. [8] mentioned that search engine spam is quite prevalent and search engine results would suffer greatly without taking measures. They also mentioned that cloaking is one of the major search engine spam techniques.

Gyöngyi and Garcia-Molina [7] describe cloaking and redirection as spam hiding techniques. They showed that web sites can identify search engine crawlers by their network IP address or user-agent names. They also described the use of refresh meta tags and JavaScript to perform redirection. They additionally mention that some cloaking (such as sending search engine a version free of navigational links, advertisements but no change to the content) are accepted by search engines.

Perkins [13] argues that agent-based cloaking is spam. No matter what kind of content is sent to search engine, the goal is to manipulate search engines rankings, which is an obvious characteristic of search engine spam.

Cafarella and Cutting [4] mention cloaking as one of the spamming techniques. They said that search engines will fight cloaking by penalizing sites that give substantially different content to different browsers.

None of the above papers discuss how to detect cloaking, which is one aspect of the present work. In one cloaking forum [14], many examples of cloaking and methods of detecting cloaking are proposed and discussed. Unfortunately, generally these discussions can be taken as speculation only, as they lack strong evidence or conclusive experiments.

Najork filed for patent [12] on a method for detecting cloaked pages. He proposed an idea of detecting cloaked pages from users' browsers by installing a toolbar and letting the toolbar send the signature of user perceived pages to search engines. His method does not distinguish rapidly changing or dynamically generated Web pages from real cloaking pages, which is a major concern for our algorithms.

## 3   Data set

Two data sets were examined for our cloaking and redirection testing. For convenience, we name the first data as HITSdata and the second as HOTdata.

### 3.1   First data set: HITSdata

In related work to recognize spam in the form of link farms [15], we collected Web pages in the neighborhood of the top 100 results for 412 queries by following the HITS data collection process [9]. That is, for each query presented to a popular search engine, we collected the top 200 result references, and for each URL we also retrieved the outgoing link set, and up to 100 incoming link pages. The resulting data set contains 2.1M unique Web pages. From these 2.1M URLs, we randomly selected 250,000 URLs. In order to test for cloaking, we crawled these pages simultaneously from a university IP address (Lehigh) and from a commercial IP address (Verizon DSL). We set the *user-agent* from the university address to be `Mozilla/4.0 (compatible; MSIE 5.5; Windows 98)` and the one from the commercial IP to be `Googlebot/2.1 (+http://www.googlebot.com/bot.html)`. From each location we crawled our dataset twice with a time interval of one day. So, for each page, we finally have four copies, two of which are from a web browser's perspective and two from a crawler's perspective. For convenience, we name these four copies as $B1$, $B2$, $C1$ and $C2$ respectively. For each page, the time order of retrieval of these four copies is always $C1$, $B1$, $C2$ and $B2$.

2

## 3.2  Second data set: HOTdata

We also want to know the cloaking ratio within the top response lists for hot queries.

The first step is to collect hot queries from popular search engines. To do this, we collected 10 popular queries of Jan 2005 from Google Zeigeist [6], top 100 search terms of 2004 from Lycos [10], top 10 searches for the week ending Mar 11, 2005 from Ask Jeeves [3], and 10 hot searches in each of 16 categories ending Mar 11, 2005 from AOL [2]. This resulted in 257 unique queries from these web sites.

The second step is to collect top response list for these hot queries. For each of these 257 queries, we retrieved the top 200 responses from the Google search engine. The number of unique URLs is 47,170. Like the first data set, we downloaded four copies for each of these 47,170 URLs, two from a browser's perspective and two from a crawler's perspective. But all these copies are downloaded from machines with a university IP address. For convenience, we name these four copies $HC1$, $HB1$, $HC2$ and $HB2$ respectively. This order also matches the time order of downloading them.

## 4  Results of Cloaking

In this section, we will show the results for the cloaking test.

### 4.1  Detecting Cloaking in HITSdata

Intuitively, the goal of cloaking is to give different content to a search engine than to normal web browsers. This can be different text or links. We use two techniques to compare versions retrieved by a crawler and a browser — we consider the number of differences in the terms and links used over time to detect cloaking.

As we mentioned earlier in Section 1, calculating the difference between pages from the browser's and crawler's viewpoints is not strong enough to tell whether the page does cloaking. Our proposed method is that we can use three copies of a page $C1$, $C2$ and $B1$ to decide if it is a cloaking page. The detail is that for each URL, we first calculate the difference between $C1$ and $C2$ (for convenience, we use $NCC$ to represent this number). Then we calculated the difference between $B1$ and $C1$ (for convenience, we use $NBC$ to represent this number). Finally if $NBC$ is greater than $NCC$, then we mark it as a



Figure 1: Distribution of the difference of $NCC$ and $NBC$.

cloaking candidate. The intuition is that the page may change frequently, but if the difference between the browser's copy and the crawler's copy is bigger than the difference between two crawler copies, the evidence may be enough that the page is cloaking.

We used two methods to calculate the difference between pages — the difference in terms used, and the difference in links provided. We describe each below, along with the results obtained.

#### 4.1.1  Term Difference

The first method for detecting cloaking is to use term difference among different copies. Instead of using all the terms in the HTML files, we used the "bag of words" method for analyzing the web pages, i.e., we parse the HTML file into terms and only count each unique term once no matter how many times this term appears. Thus, each page is marked by a set of words after parsing.

For each page, we first calculated the number of different terms between the copies $C1$ and $C2$ (designated $NCC$, as described above). We then calculated the number of different terms between the copies $C1$ and $B1$, (designated $NBC$). We then select pages that have a bigger $NBC$ than $NCC$ as candidates of cloaking. For this data set, we marked 23,475 candidates of the original 250K data set.

The distribution of the difference of these 23,475 pages forms a power-law-like distribution, shown in Figure 1.

To check what threshold for this difference between $NCC$ and $NBC$ is a good indication for real cloaking, first, we put the 23,475 URLs into ten different buckets based on the difference value. The range for each bucket and the number of pages within each bucket are shown in Table 1.

Then, from each bucket we randomly selected

3

| Bucket ID | RANGE | No. of Pages |
|---|---|---|
| 1 | $x <= 5$ | 8084 |
| 2 | $5 < x <= 10$ | 2287 |
| 3 | $10 < x <= 20$ | 1938 |
| 4 | $20 < x <= 40$ | 2065 |
| 5 | $40 < x <= 80$ | 2908 |
| 6 | $80 < x <= 160$ | 1731 |
| 7 | $160 < x <= 320$ | 1496 |
| 8 | $320 < x <= 640$ | 912 |
| 9 | $640 < x <= 1280$ | 1297 |
| 10 | $1280 < x$ | 757 |

Table 1: Buckets of term difference

| Threshold | PRECISION | RECALL | F value |
|---|---|---|---|
| 1 | 0.355 | 1.000 | 0.502 |
| 5 | 0.423 | 0.828 | 0.560 |
| 10 | 0.480 | 0.799 | 0.560 |
| 20 | 0.534 | 0.758 | 0.627 |
| 40 | 0.580 | 0.671 | 0.622 |
| 80 | 0.633 | 0.498 | 0.588 |
| 160 | 0.685 | 0.388 | 0.496 |
| 320 | 0.695 | 0.262 | 0.380 |
| 640 | 0.752 | 0.196 | 0.311 |
| 1280 | 0.899 | 0.086 | 0.157 |

Table 2: F-measure for different thresholds based on term difference.



Figure 2: The ratio of syntactic cloaking in each bucket based on term difference.

thirty pages and checked them manually to see how many from these thirty pages are real syntactic cloaking pages within each bucket. The result is shown in Figure 2.

The trend is obvious in Figure 2. The greater the difference, the higher proportion of cloaking that is contained in the bucket. In order to know which is the optimal threshold to choose, we calculated the precision, recall and F-measure based on the range of these buckets. For these three measures, we follow the definitions in [11] and select $\alpha$ to be 0.5 in the F-measure formula to give equal weight to recall and precision. Precision is the proportion of selected items that the system got right; Recall is the proportion of the target items that the system selected; F-measure is the measure that combines precision and recall. The results of these three measures are shown in Table 2. If we choose F-measure as the criteria, buckets 4 and 5 have the highest value. Since the range of bucket 4 and 5 is around 40 in Table 1, we can set the threshold to be 40 and declare that all pages with the difference above 40 to be categorized as cloaking pages. In that case, the precision and recall are 0.580 and 0.671 respectively.

From Figure 2, we can make an estimation of what percentage of our 250,000 page set are cloaking pages. Since we know the total number of pages within each bucket and the number of cloaking pages within the 30 manually checked pages from each bucket, the estimation of total number of cloaking pages is the product of the number of pages within each bucket and the ratio of cloaking pages within the 30 pages. The result is 7,780, so we expect that we can identify nearly 8,000 cloaking pages (about 3%) within the 250,000 pages.

### 4.1.2   Link Difference

Similar to term difference, we also analyzed this data sets on the basis of link differences. Here link difference means the number of different links between two corresponding pages.

First we calculated the link difference between the copy of $C1$ and $C2$ (termed $LCC$).We then calculated the link difference between the copy of $C1$ and $B1$ (termed $LBC$). Finally we marked the page that have a higher $LBC$ than $LCC$ as cloaking candidates. In this way, we marked 8,205 candidates. The frequency of these candidates also approximates a power-law distribution like term cloaking. It is shown in Figure 3.

As with term difference, we also put these 8,205 candidates into 10 buckets. The range and number of pages within each bucket is shown in Table 3.

From each bucket, we randomly selected 30 pages and checked manually to see how many of them are real cloaking pages. The result is shown in Figure 4.

It is obvious that the most of the pages from bucket 4 or above are cloaking pages. We also calculated the F values for these thresholds corresponding to the



Figure 3: Distribution of the difference of *LCC* and *LBC*.



Figure 4: The ratio of syntactic cloaking in each bucket based on link difference.

| Bucket ID | RANGE | No. of Pages |
|---|---|---|
| 1 | $x <= 5$ | 4415 |
| 2 | $5 < x <= 10$ | 787 |
| 3 | $10 < x <= 20$ | 746 |
| 4 | $20 < x <= 35$ | 783 |
| 5 | $35 < x <= 55$ | 441 |
| 6 | $55 < x <= 80$ | 299 |
| 7 | $80 < x <= 110$ | 279 |
| 8 | $110 < x <= 145$ | 182 |
| 9 | $145 < x <= 185$ | 100 |
| 10 | $185 < x$ | 173 |

Table 3: Buckets of link difference



Figure 5: Intersection of the four copies for a Web page.

range of each bucket. The result is shown in Table 4. We can tell that 5 is an optimal threshold with the best F value.

Since the number of pages having link difference is smaller than the ones having term difference in reality, fewer cloaking pages can be found by using link difference alone, but are more accurate.

## 4.2   Detecting Cloaking in HOTdata

Based on the experience of manually checking for cloaking pages for the first data set, we attempted to detect syntactic cloaking automatically by using all four copies of each page.

### 4.2.1   Algorithm of detecting cloaking automatically

Our assumption about syntactic cloaking is that the web site will send something consistent to the crawler but send something different yet still consistent to the browser. So, if there exists such terms that only appear in both of the copies sent to the crawler but never appear in any of the copies send to the browser or vice versa, it is quite possible that the page is doing syntactic cloaking. Here when getting the terms out of each copy, we still use the "bag of words" approach, i.e., we replace all the non-word characters within an HTML file with blank and then get all the words out of it for the intersection operation.

To easily describe our algorithm, the intersection of four copies are shown as a Venn diagram in Fig-

| Threshold | PRECISION | RECALL | F value |
|---|---|---|---|
| 1 | 0.479 | 1.000 | 0.648 |
| 5 | 0.727 | 0.700 | 0.713 |
| 10 | 0.822 | 0.627 | 0.711 |
| 20 | 0.906 | 0.520 | 0.660 |
| 35 | 0.910 | 0.340 | 0.496 |
| 55 | 0.900 | 0.236 | 0.374 |
| 80 | 0.900 | 0.167 | 0.283 |
| 110 | 0.900 | 0.104 | 0.186 |
| 145 | 0.878 | 0.060 | 0.114 |
| 185 | 0.866 | 0.038 | 0.072 |

Table 4: F-measure for different thresholds based on link difference.

5

| Bucket | RANGE | No. | Accuracy |
|--------|-------|-----|----------|
| 1 | $x <= 1$ | 725 | 40% |
| 2 | $1 < x <= 2$ | 540 | 30% |
| 3 | $2 < x <= 4$ | 495 | 30% |
| 4 | $4 < x <= 8$ | 623 | 40% |
| 5 | $8 < x <= 16$ | 650 | 90% |
| 6 | $16 < x <= 32$ | 822 | 100% |
| 7 | $32 < x <= 64$ | 600 | 100% |
| 8 | $64 < x <= 128$ | 741 | 100% |
| 9 | $128 < x <= 256$ | 420 | 100% |
| 10 | $256 < x$ | 1120 | 100% |

Table 5: Buckets of unique terms in area A and G

| Thresholds | PRECISION | RECALL | F value |
|------------|-----------|--------|---------|
| 0 | 0.647 | 1.000 | 0.785 |
| 1 | 0.703 | 0.965 | 0.813 |
| 2 | 0.766 | 0.952 | 0.849 |
| 4 | 0.836 | 0.940 | 0.885 |
| 8 | 0.902 | 0.881 | 0.891 |
| 16 | 0.922 | 0.756 | 0.831 |
| 32 | 0.960 | 0.599 | 0.738 |
| 64 | 0.979 | 0.470 | 0.635 |
| 128 | 0.972 | 0.358 | 0.523 |
| 256 | 1.000 | 0.267 | 0.422 |

Table 6: F-measure of different threshold

ure 5. We use capital letters from A to M to represent each intersection component of four copies. For example, the area L contains content that only appears in $HC1$, but never appear in $HC2$, $HB1$ and $HB2$; area F is the intersection of four copies, i.e., the content that appears on all of the four copies. The most interesting components to us are areas A and G. Area A represents terms that appear on both browsers' copies but never appear on any of the crawlers' copies, while area G represents terms that appear on both crawlers' copies but never appear on any of the browsers' copies.

So our algorithm of detecting syntactic cloaking automatically is that for each web page, we calculate the number of terms in area A and the number of terms in area G. If the sum of these two numbers is nonzero, we may mark this page as a cloaking page.

There are false negative examples for this algorithm. A simple example is that suppose there is a dynamic picture on the page, every time the web server will randomly select one from 4 JPEG files (a1.jpg to a4.jpg) to serve the request. It happens that a1.jpg is sent every time when our crawler visits this page, but a2.jpg and a3.jpg are sent when our browser visit this page. By our algorithm, the page will be marked as cloaking, but it can be easily verified that this is not the case. So, again we need a threshold for the algorithm to work more accurately.

For the 47,170 URLs, we found 6466 pages that have the sum of number of terms in area A and G greater than 0. Again, we put them into 10 buckets, as shown in Table 5. The third column is the number of pages within this bucket.

From each bucket, we randomly selected 10 pages and manually checked to see whether this page is real syntactic cloaking. The accuracy is shown in the fourth column in Table 5. We also calculated the F-measure, the results are shown in Table 6.



Figure 6: Percentage of syntactic cloaking pages within google's top responses.

Since the 4th and 5th bucket have highest F value in Table 6, we choose the threshold to be the range between bucket 4 and bucket 5, i.e., 8. So, our automated cloaking algorithm is revised to only mark pages with the sum of area A and G greater than 8 as cloaking pages. So, for our second data set, all pages in bucket 5 to bucket 10 are marked cloaking pages. Finally, we marked 4,083 pages out of the 47,170 pages, i.e., about 9% of pages from the hot query data set are syntactic cloaking pages.

### 4.2.2 Distribution of syntactic cloaking within top rankings

Since we have identified 4,083 pages that utilize cloaking, we can now draw the distribution of these cloaking pages within different top rankings. Figure 6 shows the cumulative percentage of cloaking pages within the Top 200 response lists returned by google. As we can see, about 2% of top 50, about 4% of top 100 URLs and more than 8% of top 200 URLs do utilize cloaking. The ratio is quite high and the cloaking



A. Autos
B. Companies
C. Computing
D. Entertainment
E. Games
F. Health
G. House
H. Holidays
I. Local
J. Movies
K. Music
L. Research
M. Shopping
N. Sports
O. TV
P. Travel

Figure 7: Category-specific Cloaking.

may be helpful for these pages to be ranked high.

Since we retrieved top 10 hot queries from each of 16 categories from AOL, we can consider the topic of the cloaking pages. Intuitively some popular categories, such as sports or computers, may contain more cloaking pages in the top ranking list. So we also calculated the fraction of cloaking pages within each category. The results are shown in Figure 7. Some categories, such as *Shopping* and *Sports*, are more likely to have cloaked results than other categories.

### 4.2.3   Syntactic vs Semantic cloaking

Not all syntactic cloaking is considered unacceptable to search engines. For example, a page sent to the crawler that doesn't contain advertising content or a PHP session identifier which is used to distinguish different real users is not a problem to search engines. In contrast to acceptable cloaking, we define semantic cloaking as cloaking behavior with the effect of manipulating search engine results.

To make one more step about our cloaking study, we randomly selected 100 pages from the 4,083 pages we have detected as syntactic cloaking pages and manually checked the percentage of semantic cloaking among them. In practice, it is difficult to judge whether some behavior is harmful to search engine rankings. For example, some web sites will send login page to browser, while send full page to crawler. So, we end up with three categories: acceptable cloaking, unknown and semantic cloaking.

From these 100 pages, we classified 33 pages as semantic cloaking, 32 as unknown and 35 as acceptable cloaking.

## 4.3   Different types of cloaking

In the process of manually checking 600 pages for the above sections, we found several different types of cloaking.

### 4.3.1   Types of term cloaking

We identified many different methods of sending different term content to crawlers and web browsers. They can be categorized by the magnitude of the difference.

We first consider the case in which the content of the pages sent to the crawler and web browser are quite different.

- The page provided to the crawler is full of detail, but the one to the web browser is empty, or only contains frames or JavaScript.

- The web site sends text page to the crawler, but sends non-text content (such as macromedia Flash content) to web browser.

- The page sent to the crawler incorporates content, but the one sent to the web browser contains only a redirect or 404 error response.

The second case is when content differs only partially between the pages sent to the crawler and the browser and the remaining content is identical, or one copy has slightly more content than the other.

- The pages sent to the crawler contain more text content than the ones to web browser. For example, only the page sent to the crawler contains keywords shown in Figure 8.

- Different redirection target URLs are contained in the pages sent to the crawler and to the web browser.

- The web site sends different titles, meta-description or keywords to the crawler than to web browser. For example, the header to browser uses "Shape of Things movie info at Video Universe" as the meta-description, while the one to the crawler uses "Great prices on Shape of Things VHS movies at Video Universe. Great service, secure ordering and fast shipping at everyday discount prices."

- The page sent to the crawler contains JavaScript, but no such JavaScript is sent to the browser, or the pages have different JavaScripts sent to the crawler than to web browser.

game computer games PC games console games video games computer action games adventure games role playing games simulation games sports games strategy games contest contests prize prizes game cheats hints strategy computer games PC games computer action games adventure games role playing games Nintendo Playstation simulation games sports games strategy games contest contests prize prizes game computer games PC games computer action games adventure games role playing games simulation games sports games strategy games contest contests prize prizes.

Figure 8: Sample of keywords content only sent to the crawler.

- Pages to the crawler do not contain some banner advertisements, while the pages to web browser do.

- The *NOSCRIPT* element is used to define an alternate content if a script is not executed. The page sent to web browser has the *NOSCRIPT* tag, while the page sent to the crawler does not.

### 4.3.2   Types of link cloaking

For link cloaking, we again group the situations by the magnitude of the differences between different versions of the same page. In one case, both pages contain similar number of links and the other is that both pages have quite different number of links.

For the first situation, examples found include:

- There are the same number of links within the page sent to the crawler and web browser, but the corresponding link pairs have a different format. For example, the link to web browser may contain a PHP session id while the link to the crawler does not. Another example is that the page to the crawler only contains absolute URLs, while the page to the browser contains relative URLs that are in fact pointing to the same targets as the absolute ones.

- The links in the page to the crawler are direct links, while the corresponding links within the page to web browser are encoded redirections.

- The links to web browser are normal links, but the links to the crawler are around small images instead of texts.

- The website shows links to different style sheets to web browser than to the crawler. For example, the page to the crawler contains "href=/styles/styles_win_ie.css", while the page to the browser contains "href=/styles/styles_win_ns.css".

In some cases, the number of links within the page to the crawler and the page to the web browser can be quite different.

- More links exist in the page sent to the crawler than the page sent to web browser. For example, these links may point to a link farm.

- The page sent to web browser has more links than the page sent to the crawler. For example, these links may be navigational links.

- The page sent to the browser contains some normal links, but in the same position of the page sent to the crawler, only error messages saying "no permission to include links" exist.

From the results shown within this section, it is obvious that cloaking is not rare in the real Web. It happens more often for hot queries or popular topics.

## 5   Results of Redirect

As we have discussed in Section 1, redirection can also be used as a spamming technique. To get an insight into how often the redirection appear and distribution of different redirect methods, we use the HITSdata set mentioned in Section 3. We don't use all four copies but only compare two copies for each page: one from the simulated browser's set (*BROWSER*) and the other from the crawler's set (*CRAWLER*).

### 5.1   Distribution

We check the distribution of four different types of redirection: HTTP 301 Moved Permanently and 302 Moved Temporarily responses, the HTML meta refresh tag, and the use of JavaScript to load a new page.

In order to know the distribution of above four different redirects, we tabulated the number of appearances of each type. For the first two types, the situation is simple: we just count the pages with response status of "301" and "302". The last two are more complicated; the HTTP refresh tag does not necessarily mean a redirection and JavaScript

| TYPE | CRAWLER | BROWSER |
|---|---|---|
| 301 | 20 | 22 |
| 302 | 56 | 60 |
| Refresh tag | 4230 | 4356 |
| JavaScript | 2399 | 2469 |

Table 7: Number of pages using different types of redirection.

is even more complicated for redirection purpose. For the first step, we just count the appearance of "<meta http-equiv=refresh>" tag for the third type and count the appearance of "location.replace" and "window.location" for the fourth type. The results for this first step are shown in Table 7.

To get a more accurate number of appearances of the HTTP refresh tag, we examined this further. In reality, the *Refresh* tag may just mean refreshing, not necessarily to redirection to another page. For example, the *Refresh* tag may be put inside a *NOSCRIPT* tag for browsers that do not support JavaScript. To estimate the number of real redirection by using this refresh tag, we randomly selected 20 pages from the 4,230 pages that use the refresh tag and checked them manually. We found that 95% of them are real redirection and only 5% are inside a *NOSCRIPT* tag. Besides, some pages may have identical target URL as themselves in the *Refresh* tag to keep refreshing themselves. We also counted these numbers. There are 47 pages out of 4,230 pages within the *CRAWLER* data set and 142 pages out of 4,356 pages within the *BROWSER* data set that refresh to themselves.

We did one more step for the 4,214 (4,356 - 142) pages that are pages using *Refresh* tag and refresh to a different page. Usually there is a time value assigned within the refresh tag to show how long to wait before refreshing. If this time is small enough, i.e., 0 or 1 seconds, users can not see the origin page but are redirected to a new page immediately. We fetched this time value for these 4,214 pages and draw the distribution of different time values from the range of 0 seconds to 30 seconds in Figure 9. More than 50% of these pages refresh to a different URL after 0 seconds and about 10% refresh after 1 second.

To estimate the real distribution of the JavaScript refresh method, we randomly selected 40 pages from the 2,399 pages that have been identified as candidates for using JavaScript for redirection in the first step. After manually checking these 40 files, we found the 20% of them are real redirections, 32.5% of them are conditional redirections, and the rest are not for redirection purpose, such as to avoid showing the



Figure 9: Distribution of delays before refresh.

page within a frame.

Sometimes the target URL and origin URL are within the same site, while other times they are on different sites. In order to know the percentage of redirections that redirection to the same sites, we also analyzed our collected data set for this information. Since the JavaScript redirection is complicated, we only count the first three types of redirection here. The sum of the first three types of redirection is 4,306. Within the *CRAWLER* data set, there are 2,328 pages within these 4,306 pages redirecting to the same site, while for the *BROWSER* data set, the number is 2,453.

## 5.2   Redirection Cloaking

As we have mentioned in Section 4.3, the site may return pages redirecting to different locations in case of different user agents. We consider this redirection cloaking.

We found that there are 153 pairs of pages out of 250,000 pairs that have different response code for a crawler and a normal browser when doing redirecting. Usually these web sites will send 404 or 503 response code to one and send 200 response code to the other. We even found that there are 10 pages that use different redirection method for a crawler and normal web browser. For example, they may use 302 or 301 for the crawler, but use refresh tag with the response code 200 for a normal web browser.

## 6   Summary and Discussion

Detection of search engine spam is a challenging research area. Cloaking and redirection are two impor-

tant spamming techniques.

This study is based on a sample of a quarter of million pages and top responses from a popular search engine to hot queries on the Web. We identified different kinds of cloaking and gave an estimate of the percentage of pages that are cloaked in the sample and also show an estimation of distribution of different redirect.

There are four issues that we would like to see addressed in future work. The first is that of a bias in the dataset used. Our data sets (pages in or near the top results for queries) do not nearly reflect the Web as a whole. However, it might be argued that it reflects the Web that is important (at least for the purposes of finding pages that might affect search engine rankings through cloaking). The second is that this paper does not address IP-based cloaking, so there are likely pages that do indeed provide cloaked content to the major engines when they recognize the crawling IP. We would welcome the partnership of a search engine to collaborate on future crawls.

The final issue is the bottom line. While search engines may be interested in finding and eliminating instances of cloaking, our proposed technique requires three or four crawls. Ideally, a future technique would incorporate a two-stage approach that identifies a subset of the full web that is more likely to contain cloaked pages, so that a full crawl using a browser identity would not be necessary.

Our hope is that this study can provide a realistic view of the use of these two techniques and will contribute to robust and effective solutions to the identification of search engine spam.

# References

[1] AskJeeves / Teoma Site Submit managed by ineedhits.com: Program Terms, 2005. Online at http://ask.ineedhits.com/programterms.asp.

[2] America Online, Inc. AOL Search: Hot searches, Mar. 2005. http://hot.aol.com/hot/hot.

[3] Ask Jeeves, Inc. Ask Jeeves About, Mar. 2005. http://sp.ask.com/docs/about/jeevesiq.html.

[4] M. Cafarella and D. Cutting. Building Nutch: Open source. *ACM QUEUE*, 2, Apr. 2004.

[5] Google, Inc. Google information for webmasters, 2005. Online at http://www.google.com/webmasters/faq.html.

[6] Google, Inc. Google Zeitgeist, Jan. 2005. http://www.google.com/press/zeitgeist/zeitgeist-jan05.html.

[7] Z. Gyöngyi and H. Garcia-Molina. Web spam taxonomy. In *First International Workshop on Adversarial Information Retrieval on the Web (AIRWeb)*, 2005.

[8] M. R. Henzinger, R. Motwani, and C. Silverstein. Challenges in web search engines. *SIGIR Forum*, 36(2), Fall 2002.

[9] J. M. Kleinberg. Authoritative sources in a hyperlinked environment. *Journal of the ACM*, 46(5):604–632, 1999.

[10] Lycos. Lycos 50 with Dean: 2004 web's most wanted, Dec. 2004. http://50.lycos.com/121504.asp.

[11] C. D. Manning and H. Schutze. *Foundations of statistical natural language processing*, chapter 8, pages 268–269. MIT press, 2001.

[12] M. Najork. System and method for identifying cloaked web servers, Jul 10 2003. Patent Application number 20030131048.

[13] A. Perkins. White paper: The classification of search engine spam, Sept. 2001. Online at http://www.silverdisc.co.uk/articles/spam-classification/.

[14] WebmasterWorld.com. Cloaking, 2005. Online at http://www.webmasterworld.com/forum24/.

[15] B. Wu and B. D. Davison. Identifying link farm spam pages. In *Proceedings of the 14th International World Wide Web Conference, Industrial Track*, May 2005.

[16] Yahoo! Inc. Yahoo! Help - Yahoo! Search, 2005. Online at http://help.yahoo.com/help/us/ysearch/deletions/.

View publication stats

# APPENDIX
# 192

# Detecting Semantic Cloaking on the Web

Baoning Wu and Brian D. Davison
Department of Computer Science & Engineering
Lehigh University
Bethlehem, PA 18015 USA
{baw4,davison}@cse.lehigh.edu

## ABSTRACT

By supplying different versions of a web page to search engines and to browsers, a content provider attempts to cloak the real content from the view of the search engine. Semantic cloaking refers to differences in meaning between pages which have the effect of deceiving search engine ranking algorithms. In this paper, we propose an automated two-step method to detect semantic cloaking pages based on different copies of the same page downloaded by a web crawler and a web browser. The first step is a filtering step, which generates a candidate list of semantic cloaking pages. In the second step, a classifier is used to detect semantic cloaking pages from the candidates generated by the filtering step. Experiments on manually labeled data sets show that we can generate a classifier with a precision of 93% and a recall of 85%. We apply our approach to links from the dmoz Open Directory Project and estimate that more than 50,000 of these pages employ semantic cloaking.

## Categories and Subject Descriptors

H.3.3 [**Information Storage and Retrieval**]: Information Search and Retrieval

## General Terms

Algorithms, Performance

## Keywords

Web search engine, spam

## 1. INTRODUCTION

Imagine the scenario in which a query is sent to a search engine but the top ranking pages are not relevant at all. This is quite disappointing. How could this happen? Cloaking, one type of search engine spamming technique, is a possible reason.

Users trust search engines in the sense that they expect that only the most relevant responses will be listed in the top ranking positions, and thus typically view just one page of results [35]. Since increased traffic to a commercial web site may bring more profit, more sites will compete for the top rankings, especially for popular queries.

Copyright is held by the International World Wide Web Conference Committee (IW3C2). Distribution of these papers is limited to classroom use, and personal use by others.
*WWW2006*, May 23–26, 2006, Edinburgh, Scotland.
ACM 1-59593-323-9/06/0005.

Not all content providers will work hard to generate high quality web pages in order to get higher rankings. Some will find shortcuts and instead aim to make their pages rank highly by manipulating Web page features on which search engines' ranking algorithms are based. This behavior is usually called "search engine spam" [33, 19]. Henzinger et al. [22] have pointed out that search engine spam is one of the challenges that search engines need to face and win. Search engine results will be seriously impacted if no action is taken to detect spam.

A search engine generally ranks a page based on its content and linkage information. Ranking algorithms depend on the implicit assumption that the page content is real; i.e., the content seen by the search engines is identical to the content seen by actual users with browsers. But this assumption does not hold in the case of a significant web spamming technique called cloaking. By supplying different versions of a web page to search engines and to browsers, a content provider attempts to hide (cloak) the real content from the view of the search engine.

As a simple example, from a user's perspective through a web browser, a page may be a product page selling iPods, but the content sent to a search engine crawler might additionally contain brand names of digital cameras, laptop computers and camcorders. Furthermore, some keywords such as "cheap plane ticket", "free travel" might also be added.

In addition to other spamming techniques, major search engines typically declare their opposition to cloaking [17, 41, 4].

Surprisingly, some cloaking behavior is actually acceptable to, if not welcomed by, search engines [19]. For example, some content providers will not send advertising links to search engines or may generate PHP pages that do not contain session identifiers (that would otherwise be sent to users). To help distinguish between acceptable and unacceptable cloaking behaviors, we have defined two different types of cloaking [38]: syntactic and semantic cloaking. Syntactic cloaking includes all situations in which different content is sent to a crawler versus real users. Semantic cloaking is the subset of syntactic cloaking in which differences in meaning between pages are likely to deceive a search engine's ranking algorithm. Some experts name semantic cloaking as "malicious cloaking". Obviously, semantic cloaking is the behavior of interest to search engine providers.

Building on our previous experience [38] in detecting syntactic cloaking, we address in this paper the harder problem of how to recognize semantic cloaking automatically. We

propose a two-step process to detect semantic cloaking on the Web. The filtering step will detect all candidates that may utilize semantic cloaking. A classifier will then determine whether each candidate generated from the filtering step incorporates semantic cloaking or not.

This is the first publication that attempts to detect semantic cloaking automatically. While some ideas have been proposed to detect cloaking [38, 29], they may need human judgment to decide whether the pages employ semantic cloaking. The main contribution of this paper is the design and evaluation of a novel two-step process to identify semantic cloaking behavior on the web without human involvement. In experimental tests, our classifier achieves a precision of more than 90% and a recall of more than 80%.

The rest of this paper is organized as follows: related work will be introduced in Section 2. The motivation for detecting semantic cloaking will be discussed in Section 3. The details of our algorithms for detecting semantic cloaking are given in Section 4. Experimental work and results will be presented in Section 5. We conclude with a discussion and future work in Section 6.

## 2. RELATED WORK

Most search engine spamming techniques can be put into three different categories: content spam, link spam and page-hiding spam. Cloaking is the major technique within the page-hiding category. Several different methods have been proposed [36, 8, 16, 42, 6, 26, 10, 20, 13, 1, 28, 39, 14] to address content spam and link spam, but few publications address the cloaking issue.

Gyöngyi and Garcia-Molina [19] describe cloaking and redirection as spam hiding techniques. They noted that web sites can identify search engine crawlers by their network IP address or user-agent names. They additionally point out that some cloaking (such as sending the search engine a version free of navigational links and advertisements but no change to the content) is accepted by some engines. No solution for how to combat cloaking is introduced.

Perkins [33] argues that any agent-based cloaking is spam. No matter what kind of content is sent to search engine, the goal is to manipulate search engines rankings, which is an obvious characteristic of search engine spam. Again, no solution is given in this paper.

Cafarella and Cutting [8] consider cloaking as one of the spamming techniques. They said that search engines will fight cloaking by penalizing these sites. But detecting this cloaking behavior remains a problem.

Najork was awarded a patent [29] for a method of detecting cloaked pages. He proposed the idea of detecting cloaked pages from users' browsers by installing a toolbar and letting the toolbar send the signature of user perceived pages to search engines. His method may still have difficulty in distinguishing rapidly changing or dynamically generated Web pages from real cloaking pages, and does not directly address semantic cloaking.

Henzinger et al. [22] pointed out that search engine spam is quite prevalent and search engine results would suffer greatly without taking measures. They consider cloaking as one of the major search engine spam techniques. They suggest that crawling the same page twice may detect cloaking, but they also admit that this method has difficulty in differentiating legitimate changes, such as dynamic news headlines, from cloaking behavior.

In a workshop paper [38], we introduced the idea of automatic detection of cloaking pages using more than two copies of the page. We differentiated semantic cloaking from strictly syntactic cloaking, and explored methods for syntactic cloaking recognition.

Since we use machine learning methods to detect semantic cloaking, research using machine learning methods to detect spam are also relevant.

Amitay et al. [3] propose categorization algorithms to detect website functionality. They recognized that the sites with similar roles exhibit similar structural patterns. After finding one special pattern for a certain kind of website, they can predict the websites to be in the same class if the sites show a similar pattern. For each host, they selected 16 features such as the average level of the page, in-links per page, out-links per leaf page, etc., to do the categorization. In their experimental results, they claimed to have identified 31 clusters, each of which appears to be a spam ring.

"Nepotistic links", i.e., those links between pages that are present for reasons other than merit, are bad for the link-based ranking algorithm, so it is necessary to get rid of them. Davison [13] uses multiple features of web pages to detect nepotistic links. Features included page title, page description, initial IP address octets, common outgoing links, etc.

Recently, Drost and Scheffer [14] proposed using machine learning methods to detect link spam. They generated 89 features for each page and manually labeled hundreds of examples of link spam. These examples, along with non-spam examples from the Open Directory Project [31], were used to train a classifier to recognize link spam pages.

## 3. MOTIVATION

Cloaking occurs when different content for the same URL is sent to browsers and to search engine crawlers. Since page content is one of the most important components in ranking pages, major search engines typically discourage cloaking [17, 41, 4].

The assumption made by search engines is that anyone utilizing cloaking has the potential to fool search engines to generate a higher ranking for their pages. However, based on our experience, this is not always the case.

In previous work [38], we detected that about 9% of pages within a hot query data set utilized cloaking. (We will introduce this data in Section 5.) The ratio is high enough to show that cloaking is not scarce on the Web. After manually checking approximately 1,000 examples of cloaking, we found that some of them will affect search engine results while others are not likely to be harmful to search engines.

For example, we found that many web servers that use PHP or ASP to generate dynamic content will have session identifiers within URLs for copies sent to browser, but no such session identifiers are sent to a crawler. This is reasonable in the sense that the Web servers need this kind of session identifier to differentiate different users, but these identifiers are not useful to search engines. If these identifiers were sent to search engines, search engines might think that the page has changed on every visit while actually the page has not.

Another example is that some pages will contain advertising links when being viewed from a browser, but no such links are present in the copy sent to crawlers. In fact, this behavior is helpful for search engines utilizing link-based ranking algorithms. The reason is that the base assump-

tion of link-based ranking algorithms is that a link on the Web implicitly represents an authority vote [7, 25] or a kind of trust [20]. Obviously, advertising links don't match this assumption. Hence, this kind of cloaking can help search engines collect fewer advertising links, thus generating a better ranking.

Based on the above observations, we find that it is not enough to detect syntactic cloaking behavior. If search engines penalize all instances of cloaking, obviously it is not fair to the above examples. However, given the enormous size of the Web, it is also not possible for human experts to check each page manually to decide which one to penalize. Hence, it is necessary to find a method to detect the kind of cloaking behavior that has the effect of manipulating search engine ranking results. We refer to this cloaking behavior as semantic cloaking.

## 4. ALGORITHM

In order to decide whether a Web page is employing cloaking, copies from both a browser's perspective and a crawler's perspective are needed [22]; a single copy in the search engine's cache is not enough. The reason is that spammers may send high quality content (e.g., copied from Yahoo!, CNN or Wikipedia) to the search engine's crawler; therefore, flagging content-based features of the crawled version alone is insufficient.

Also, the comparison of only one copy of a page from a browser's perspective and only one copy from a crawler's perspective is still insufficient for detecting cloaking [38, 22]. For example, a college's homepage may highlight a different faculty members' biographical information every time the page is served. It is not easy to discover this behavior by only looking at one copy from both browser's perspective and crawler's perspective. So, two or more copies from each side are necessary for detecting semantic cloaking. This is also true in the case of detecting semantic cloaking.

The problem with this 4-copy method is that it is expensive for search engines. With billions of pages on the Web today, crawling and storing four copies and calculating the differences among them requires significant resources. Hence, we propose a two-step process for detecting semantic cloaking requiring significantly fewer resources.

The first step implements a filter. By comparing only one copy from the browser's perspective and the crawler's perspective, heuristics are used to eliminate Web pages that cannot demonstrate cloaking. The goal of this step is to generate a candidate list with a reasonable precision but a perfect recall for semantic cloaking pages. All the pages that are not eliminated in the first step are sent to the second step for further inspection.

In the second step, first two more copies, one from a browser's perspective and one from a crawler's perspective, are downloaded for each candidate. Then features are extracted from across these four copies and a classifier is used to determine whether this page is doing semantic cloaking or not. The overall process is depicted in Figure 1.

### 4.1 Filtering Step

The purpose of this step is to eliminate pages that do not employ semantic cloaking.

The motivation for this step is simple: if we can tell that the page is not utilizing cloaking at all with a smaller cost, then there is no need for us to download four copies for this



**Figure 1: Data flow of the two steps for detecting semantic cloaking.**

page for further inspection. For example, if the copy from a browser's perspective and from a crawler's perspective are identical, the chance is very small that this page is employing semantic cloaking.

One possible direct rule for the filtering step is to eliminate all pages for whom the browser and crawler perspectives are identical, and to send all the pages that are different in the two copies to the classification step. Although this is a safe rule for the first step, we find this rule is still insufficient. The reason is that the Web is changing very fast. Cho and Garcia-Molina [12] showed that about 20% of Web pages changed every time they were visited and about 40% of Web pages were changed within a week. Other researchers [15, 30] also show that Web pages are changing fast. This shows that by applying the above "identical rule", we may still get a lot of candidates for the classification step.

As discussed before, even if the copy from a browser's perspective and the copy from a crawler's perspective are different, it still doesn't necessarily mean that the page is utilizing semantic cloaking. For example, some servers will send JavaScript to the browser but not to the crawler. Hence, a better heuristic for eliminating pages that are not likely to perform semantic cloaking is needed.

In order to determine a better heuristic rule, we carefully study the manually detected cloaking examples. One common characteristic of these examples is that spammers are ambitious. They will often list more keywords or links in the copy sent to the crawler than the copy sent to the browser if they utilize cloaking. Typically these keywords are real words for popular queries, e.g., names of hot games, pop stars, digital cameras. An example of a portion of a semantic cloaking page with many keywords is shown in Figure 2.

Hence, the ideal situation is that there exists a complete enough dictionary that contains all the keywords that may be used for spamming purpose. Thus, the heuristic rule can be that if the copy sent to the crawler contains a number of dictionary terms that don't exist in the copy sent to the browser, then this page will be marked as a candidate and sent to the classification step.

A threshold can be used in which pages with more than this threshold of words only in the copy sent to the crawler or sent to the browser will be marked as candidates. We refer to this heuristic rule as the "term rule" in this paper. Different thresholds will generate different candidate lists. Obviously, one is the optimal threshold in the sense that no semantic cloaking page will be filtered out during this filtering step.

As we have described above, spammers may also put dif-

game info, reviews, game reviews, previews, game previews, interviews, features, articles, feature articles, game developers, developers, developer diaries, strategy guides, game strategy, screenshots, screen shots, game screenshots, game screen shots, screens, forums, message boards, game forums, cheats, game cheats, cheat codes, playstation, playstation, dreamcast, Xbox, GameCube, game cube, gba, game, advance, software, game software, gaming software, files, game files, demos, game demos, play games, play games online, game release dates, Fargo, Daily Victim, Dork Tower, classics games, rpg, role playing games, strategy games, real time strategy, action games, FPS, shooter, first person shooters, sports games, handheld games, pda, pda games, half-life, half life, quake, quake, counter strike, counter strike, rogue spear, rainbow six, medal of honor, allied assault, unreal tournament, return to castle Wolfenstein, soldier of fortune, tribes, starsiege tribes, command and conquer, renegade, halo, grand theft auto, tony hawk, the sims, sims

**Figure 2: Sample of a meta-keyword tag sent in both HTTP response header and HTML content only to the crawler.**

ferent links in the copy sent to the crawler and in the copy sent to the browser. Similarly, we can have a rule for links: first we extract all links from pages and if a page has more than a threshold of unique links that don't occur in the copy sent to the browser or do not occur in the copy sent to the crawler, we will mark this page as a candidate and send it to the classification step. We refer to this rule as the "link rule". Again, the optimal threshold will be one for this link rule. Any page that matches either term rule or link rule will be marked and sent to the second step.

## 4.2 Classification Step

The filtering step above will admit candidate pages. We have also explained that a single copy each from the crawler and the browser is insufficient to detect semantic cloaking. Hence, for each candidate, we download another copy from both browser and crawler perspectives. For consistency, we download these two copies in the same order as the one for the initial two copies, i.e., if we use $B_1$, $B_2$, and $C_1$, $C_2$ to represent the copies downloaded as a browser and a crawler respectively, then the downloading sequence of these four copies should be either $B_1$–$C_1$–$B_2$–$C_2$ or $C_1$–$B_1$–$C_2$–$B_2$.

From the four copies of a page, a set of features can be generated. We use a set of labeled pages for training a classifier to determine whether or not the page is employing semantic cloaking.

A major concern is how to generate a set of useful features. As in most machine learning tasks, this is best performed using domain expertise. Based on our examination of many cloaking and non-cloaking pages, and with raw data in the form of four parsed versions of a page in mind, we have created a number of potentially useful features.

One goal for our classifier is widespread applicability to unseen pages — as a result, where possible we choose features that are independent of the actual content of the pages. Most features represent information about the content, rather than the content directly. Given that we are examining hypertext, we can extract features based both on the content (text, markup, etc.) as well as links to other

**Content-based features from each copy**
Response code.

Number of

- terms.
- terms in the title field of HTTP response header.
- terms in the keyword field of HTTP response header.
- terms in the description field of HTTP response header.
- lines in HTTP response header.

Whether

- "method=post" exists.
- "input type=hidden" exists.
- Google AdSense exists.
- checkbox exists.
- radiobox exists.
- "type=submit" exists.
- JavaScript exists.
- frame tag exists.
- "onmouseover" function exists.
- stylesheet exists.
- a reference to a flash file exists.
- copyright information exists.
- a reference to a JavaScript file exists.

**Figure 3: Content-based features from each copy.**

**Link-based features from each copy**
Number of

- total links.
- unique links.
- links to the same site.
- links to a different site.
- relative links.
- absolute links.
- unique sites that this page points to.

Ratio of number of

- links to the same site to the number of total links.
- links to a different site to the number of total links.
- absolute links to the number of total links.
- relative links to the number of total links.
- links to the same site to the number of links to a different site.
- absolute links to the number of relative links.

**Figure 4: Link-based features from each copy.**

pages. Note that although "title", "keyword" and "description" fields are not a part of the standard HTTP response header, we observe that many spammers include these fields into the HTTP response header. Hence, we take this observation into account in our feature selection process. We show content and link-based features of one instance of a

page in Figures 3 and 4, respectively.

Since at this point we have four copies of each page, we can also consider the differences across and within user-agents. Intuitively, such differences are important as they can distinguish between time-changing content versus static differences between versions sent to the two user-agents. We generate features for both kinds of differences.

Therefore, given two instances, we compare the feature values for many features (e.g., is the number of links contained in each the same), and we compare aspects of the content (e.g., how many terms appear only one instance, but not the other). These features are calculated from the comparison of instances sent to the same client (e.g., from $B_1$ to $B_2$), and from the comparison of instances retrieved first or last (e.g., from $C_1$ to $B_1$). Some examples of these features are shown in Figure 5.

By combining the various features described above, we finally determine 162 features for each candidate page to train the classifier.

## 4.3   Our Implementation

In reality, the ideal approach described in Section 4.1 can not be easily implemented. For example, it is quite difficult to find a powerful dictionary to contain all valid words and names (although a search engine might be able to construct something close). Hence we employ a non-optimal heuristic rule in our implementation. For the term rule, we decompose all the pages into terms by replacing all the non-alphanumeric characters with blanks. We then drop all the terms containing digits. For the remaining terms, if the copy sent to the crawler contains more than a threshold of terms that don't exist in the copy sent to the browser, we mark it as a candidate and send it to the second step.

For the link rule, we extract all the links within the "HREF" tags for all the pages. If the copy sent to the crawler contains more than a threshold of links that don't exist in the copy sent to the browser, we mark it as a candidate and send it to the second step.

For the second step, we employ a support vector machine as our classifier model. The software $\text{SVM}^{light}$ [23] is used to train the SVM classifier.

## 5.   EXPERIMENTS

In this section, we first show how we build an SVM classifier and its performance based on a small data set. We then apply our two-step process to detect semantic cloaking based on a large data set.

## 5.1   Building the classifier

The data set used for training the classifier is the set of URLs included in top response pages for hot queries. This data set is the same set used our prior work in detecting cloaking [38].

### 5.1.1   Data set

We collected ten popular queries of Jan. 2005 from Google Zeitgeist [18], the top 100 search terms of 2004 from Lycos [27], the top ten searches for the week ending Mar. 11, 2005 from Ask Jeeves [5], and ten hot searches in each of 16 categories ending Mar. 11, 2005 from AOL [2]. This resulted in 257 unique queries from these web sites.

**Features for two corresponding copies**

Whether

- the number of terms in the keyword field of the HTTP response header for $C_1$ is bigger than the one for $B_1$.
- the number of terms in the keyword field of the HTTP response header for $C_2$ is bigger than the one for $B_2$.
- the total number of links in $B_1$ is the same as the total number of links in $B_2$.
- the total number of links in $C_1$ is the same as the total number of links in $C_2$.

Number of

- common terms in $B_1$ and $C_1$.
- common links in $B_1$ and $C_1$.
- terms appearing only in $B_1$, not in $C_1$.
- links appearing only in $B_1$, not in $C_1$.

**Figure 5: Features for two corresponding copies**

For each of these queries, we retrieved the top 200 responses from the Google search engine. The number of unique URLs is 47,170. In each case we record the entire response – the HTTP headers, including response code, plus the body of the response. We also record, and follow, HTTP redirection responses.

When a client retrieves a resource from a Web server, it typically includes a `UserAgent` header field to identify the type of client. In order to disguise our request as either a search engine robot or a normal web browser, we changed the `UserAgent` HTTP header when we sent out our requests. To pretend to be a search engine robot, we set the `UserAgent` to be `Googlebot/2.1 (+http://www.googlebot.com/bot.html)`. To pretend to be a web browser, we set the `UserAgent` to be `Mozilla/4.0 (compatible; MSIE 5.5; Windows 98)`. We then downloaded four copies for each of the 47,170 URLs — two from a browser's perspective and two from a crawler's perspective. However, unlike real crawlers, all of these retrievals were performed using machines with a university IP address, meaning that pages performing cloaking based solely on IP address will be missed.

### 5.1.2   Labeled data set

In order to train a classifier, we need a labeled data set containing both positive and negative examples of semantic cloaking from the hot query data set. We used the following procedure to get such a list.

1. For the 4,083 pages identified as syntactic cloaking in [38], select one URL for each unique site.

2. For the list generated from the above step, manually check whether the URL is doing semantic cloaking.

3. For each of the URLs that are marked as semantic cloaking in step 2, extract the site and select all the pages from this site within the hot query data set.

4. For the list generated from step 3, double check whether the URL is doing semantic cloaking.

5. Combine the list from step 2 and step 4 to form the labeled list.

**Top positive features for detecting semantic cloaking**

1. Whether the number of terms in the keyword field of the HTTP response header for $C_1$ is bigger than the one for $B_1$.

2. Whether the number of terms in the keyword field of the HTTP response header for $C_2$ is bigger than the one for $B_2$.

3. Whether the number of terms in the description field of the HTTP response header for $C_1$ is bigger than the one for $B_1$.

4. Whether the number of terms in the description field of the HTTP response header for $C_2$ is bigger than the one for $B_2$.

5. Whether the number of lines in the HTTP response header for $C_1$ is bigger than the one for $B_1$.

6. Whether the number of terms in the title field of the HTTP response header for $C_1$ is bigger than the one for $B_1$.

7. Whether the number of terms in the title field of the HTTP response header for $C_2$ is bigger than the one for $B_2$.

8. Whether the number of unique terms in $C_1$ is bigger than the one in $B_1$.

9. Whether $C_1$ has the same number of relative links as $B_1$.

10. Whether the number of common terms between $C_1$ and $B_1$ is same as the number of common terms between $C_2$ and $B_2$.

**Figure 6: Top 10 features with positive weights.**

Following the above procedure, we get a labeled list of 1,285 URLs. Among them, 539 are positive examples and 746 are negative examples. Here positive means the page is doing semantic cloaking.

### 5.1.3   Training the classifier

We partitioned the labeled list into a training list and a test list. The training list contains randomly selected 60% of both positive and negative examples; the remaining 40% of both positive and negative examples are put into the test list. This ends up with a training set of 767 examples and a test set of 518 examples.

For these 1,285 pages, we extracted 162 features from the four copies and used SVM$^{light}$ [23] to build a classifier. In order to prevent features with large values (such as the number of tokens within one copy) from dominating the classifier, we scale down all features to the range [0,1]. After this scaling, we train the classifier and use precision of and recall as the metrics. Here precision means what percentage of the pages predicted by the classifier as semantic cloaking pages are actually utilizing semantic cloaking. Recall refers to the fraction of all semantic cloaking pages that are detected by the classifier. A model with 278 representative feature vectors is built by SVM$^{light}$ after the training process.

In order to avoiding overfitting, we repeated the training set and test set selection process five times. The average precision of these five runs is 93% and recall is 85%. This demonstrates that using the classifier to detect semantic cloaking is promising.

**Top negative features for detecting semantic cloaking**

1. Whether $C_1$ uses the same stylesheet file as $B_1$.

2. Whether $C_2$ uses the same stylesheet file as $B_2$.

3. Whether both $C_2$ and $B_2$ contain copyright information.

4. Whether both $C_2$ and $B_2$ contain JavaScript.

5. Whether both $C_2$ and $B_2$ contain "METHOD POST".

6. Whether both $C_1$ and $B_1$ contain JavaScript.

7. Whether $C_1$ has the same copyright information as $B_1$.

8. Whether both $C_1$ and $B_1$ contain "METHOD POST".

9. Whether both $C_2$ and $B_2$ contain checkbox.

10. Whether $B_1$ and $B_2$ have same number of terms in the META DESCRIPTION field.

**Figure 7: Top 10 features with negative weights.**

### 5.1.4   Discriminative features

We have 162 features in total. Obviously not all of them are of the same importance to the classifier. In order to know which features are most discriminative, we use two methods.

First, like Drost and Scheffer [14], we calculate the weight for each feature and output the features with highest weights as the most discriminative features. We used the model file generated by SVM$^{light}$ to calculate the weight for each feature. The top ten features with a positive weight are shown in Figure 6. These features can be considered as the most discriminative features to tell that the page is utilizing semantic cloaking.

Many features in Figure 6 are related to the HTTP response header. The reason is that we detect many semantic cloaking instances using HTTP response headers to deliver spam. Many keywords are added to the HTTP header sent to the crawler.

Similarly, the top ten features with negative weights are shown in Figure 7. These features are important to indicate that a page is not employing semantic cloaking.

The second method to present important features is to generate a decision tree. We use the WEKA [37] implementation of C4.5 [34] to generate a decision tree for our training data set, shown in Figure 8. The corresponding features for this tree are listed in Figure 9.

The features listed in Figure 9 include discriminative features for both positive and negative examples. Most of them are similar to the combination of features listed in Figure 6 and Figure 7. This demonstrates that the above features are discriminative features in deciding whether the page is utilizing semantic cloaking or not.

## 5.2   Detecting Semantic Cloaking

### 5.2.1   ODP data set

In order to demonstrate the value and validate performance of our two-step process of detecting semantic cloaking, we use a much larger data set.

Since the pages within dmoz Open Directory Project [31] are regularly used by web search, crawling, and classification

```
A <= 0
|   B <= 0.008406
|   |   C <= 0
|   |   |   D <= 0.000446: -1 (11.0/1.0)
|   |   |   D > 0.000446
|   |   |   |   E <= 0.000179: 1 (15.0)
|   |   |   |   E > 0.000179
|   |   |   |   |   F <= 0.007218: -1 (2.0)
|   |   |   |   |   F > 0.007218: 1 (2.0)
|   |   C > 0
|   |   |   G <= 0
|   |   |   |   H <= 0: 1 (10.0)
|   |   |   |   H > 0
|   |   |   |   |   I <= 0.005792
|   |   |   |   |   |   J <= 0: 1 (5.0/1.0)
|   |   |   |   |   |   J > 0: -1 (11.0)
|   |   |   |   |   I > 0.005792: 1 (2.0)
|   |   |   G > 0
|   |   |   |   K <= 0
|   |   |   |   |   L <= 0.9753: -1 (380.0/17.0)
|   |   |   |   |   L > 0.9753
|   |   |   |   |   |   M <= 0
|   |   |   |   |   |   |   N <= 0: -1 (4.0)
|   |   |   |   |   |   |   N > 0: 1 (8.0/1.0)
|   |   |   |   |   |   M > 0: -1 (11.0/1.0)
|   |   |   |   K > 0
|   |   |   |   |   O <= 0: 1 (4.0)
|   |   |   |   |   O > 0
|   |   |   |   |   |   P <= 0: 1 (3.0)
|   |   |   |   |   |   P > 0
|   |   |   |   |   |   |   Q <= 0.000141: 1 (2.0)
|   |   |   |   |   |   |   Q > 0.000141: -1 (37.0/3.0)
|   B > 0.008406
|   |   R <= 0
|   |   |   U <= 0: 1 (2.0)
|   |   |   U > 0: -1 (9.0/1.0)
|   |   R > 0
|   |   |   T <= 0
|   |   |   |   S <= 0: 1 (8.0)
|   |   |   |   S > 0
|   |   |   |   |   G <= 0: 1 (2.0)
|   |   |   |   |   G > 0: -1 (3.0)
|   |   |   T > 0: 1 (97.0/1.0)
A > 0: 1 (139.0)
```

**Figure 8: Tree generated by the C4.5 algorithm.**

research (e.g., [21, 9, 11]), it is prudent to see how many pages listed in the ODP utilize semantic cloaking.

We use the 2004 ODP RDF file [32] and extract 4,378,870 URLs from it. We then download two copies for each of these URLs, one pretending to be a crawler and one pretending to be a browser, for each of these URLs for our experiment.

### 5.2.2 Filtering step

As introduced in Section 4.1, the first step is to filter out the pages that may not employ semantic cloaking. As before, we first decompose all the pages into terms by replacing all the non-alphanumeric letters by blanks, collect the remaining terms and drop the terms containing digits.

**Features selected by C4.5 for detecting semantic cloaking**

- **A** Whether the number of terms in the description field of the HTTP response header for $C_1$ is bigger than the one for $B_1$.
- **B** The number of terms appearing only in $C_2$, not in $B_2$.
- **C** Whether $C_1$ uses the same stylesheet file as $B_1$.
- **D** The number of terms appearing only in $C_1$, not in $B_1$.
- **E** The ratio of the number of absolute links in $C_1$ to the number of relative links in $C_1$.
- **F** The number of unique terms in $C_1$.
- **G** Whether both $C_2$ and $B_2$ contain "METHOD POST".
- **H** Whether both $C_1$ and $B_1$ contain "input hidden".
- **I** The number of different terms between the title field of the HTTP response header for $C_1$ and the title field of the HTTP response header for $B_1$.
- **J** Whether both $C_1$ and $B_1$ contain a flash file.
- **K** Whether the number of relative links in $C_1$ is bigger than the number of relative links in $B_1$.
- **L** The ratio of the number of absolute links in $C_2$ to the total number of links in $C_2$.
- **M** Whether the total number of links in $B_1$ is the same as the total number of links in $B_2$.
- **N** Whether the number of different sites that $C_1$ points to is bigger than the number of different sites that $C_2$ points to.
- **O** Whether both $C_2$ and $B_2$ contain JavaScript.
- **P** Whether $C_1$ has the same copyright information as $B_1$.
- **Q** The number of terms appearing only in $B_1$, not in $C_1$.
- **R** Whether the total number of links in $C_2$ is bigger than the total number of links in $B_2$.
- **S** Whether both $C_2$ and $B_2$ contain checkbox.
- **T** Whether the number of terms appearing only in $B_1$ but not $C_1$ is the same as the number of terms appearing only in $B_2$ but not $C_2$.
- **U** Whether both $C_1$ and $B_1$ contain "METHOD POST".

**Figure 9: Features selected by the C4.5 algorithm.**

In order to investigate which threshold to choose for the term and link rules described in Section 4.1, we tried different thresholds from 1 to 10 for the term rule. The percentage of pages remaining for these different thresholds are shown in Figure 10. We arbitrarily choose 3 as our threshold for the term rule. The reason is that intuitively less than 3 different terms won't be a useful cloaking instance for spammers.

Since the candidate set generated by the link rule with threshold 3 is a subset of the set generated by the term rule, we use the candidate set generated by the term rule for the next step.

The filtering step marked 364,993 pages as cloaking candidates. That corresponds to 8.34% of the original set of pages. While a higher threshold could also be used, we believe that with better heuristic rules, it may be possible to filter out more candidates without the dropping of real semantic cloaking pages.



**Figure 10: Percentage of pages remaining for different thresholds.**

### 5.2.3  Classification step

For each of these 364,993 pages, two more copies, i.e., one from a crawler's perspective and one from a browser's perspective, are downloaded and then features are extracted from the four copies. Again, we use the same scale from training the model to scale down these features. Hence it is possible that absolute values of some features may not be within the range [0,1]. After classification, 46,806 pages are marked as utilizing semantic cloaking.

Since the classifier was trained on a different data set, we randomly select 400 pages from the set of 364,993 pages to estimate the performance of the classifier for this ODP data set. After manual checking, 52 semantic cloaking pages are detected. Then the classifier is applied to the above labeled 400 pages, the results are still good: accuracy is 96.8%, the precision is 91.5% and recall is 82.7%. Hence, this demonstrates that the classifier works well for the ODP data set.

Since the precision is 91.5% for the ODP data set and we get 46,806 pages classified as semantic cloaking, roughly speaking we have 46,806 * .915 = 42,827 true positive semantic cloaking instances in the ODP. If we also consider the cloaking in the false negatives, we get 42,827 / .827 = 51,786 cloaked pages in total in the ODP. Compared to the overall size of the ODP data set, i.e., about 4.3M pages, we see that more than 1% of all pages within the ODP are expected to utilize semantic cloaking. Importantly, since our estimates do not account for IP-based cloaking, actual cloaking rates in the ODP will be even higher.

To see whether cloaking is equally distributed across ODP topics, we calculate the distribution of the 46,806 marked pages within each of the 16 top level topics in the ODP. The results are shown in Figure 11. It makes some sense that popular topics such as "Games", "Recreation" and "Sports" also contain the highest fractions of semantic cloaking pages among all the topics. It is interesting to observe that the topic "Arts" also contains many semantic cloaking pages.

## 6.  SUMMARY AND DISCUSSION

We have proposed a two-step process to address the problem of detecting semantic cloaking on the Web. The filtering step generates a candidate set with a reasonable precision but a high recall for detecting semantic cloaking. The classification step identifies semantic cloaking pages based on a pre-trained classifier and features from four instances of a page. When tested, precision and recall for the classifier show good performance, at 93% and 85%, respectively. We



A. Arts
B. Games
C. Recreation
D. Sports
E. Home
F. Society
G. Kids&Teens
H. Computers
I. Health
J. Science
K. Regional
L. World
M. Shopping
N. Reference
O. Business
P. News

**Figure 11:  Percentage of semantic cloaking pages within each topic.**

also show that many semantic cloaking pages exist in the ODP.

For the filtering step, we use a simple heuristic rule, i.e., if more than three non-digit-containing terms are present in the crawler's copy but not in the browser's copy, we will put the page into the candidate list. More work can be done for this step in the future. Different heuristic rules or different thresholds can be used to filter out more pages without employing semantic cloaking.

For the classifier, we think more features may be added later to improve the performance. For example, we focus on the terms in the title, description, keyword fields and the number of terms in total when training the classifier. We observe that in the ODP data set, a labeled page uses ALT tag to apply semantic cloaking and our classifier fails to recognize it. Hence, more features may be necessary to make the classifier more robust. For example, we may consider features related to the images within Web pages.

Also, during manual labeling, we found some pages to be difficult to classify as utilizing semantic cloaking or not. Therefore, it may be beneficial to incorporate a separate class for such pages, and thus could consider ordinal classification techniques [24, 40].

We detect cloaking by forging different `UserAgents`. Thus, we will miss cloaking instances utilizing IP-based cloaking, i.e., cloaking behavior based on the IP address of the machines that send out HTTP requests. Hence, our collection is a lower bound of semantic cloaking instances. We fully expect search engines to observe a higher fraction of cloaking pages when retrieving Web pages from known IP addresses that are used for search engine crawlers.

Finally, what are the consequences of publicizing our approach to spammers? We argue that our method is robust as long as the spammers are ambitious. Spammers can only bypass the filtering step of our algorithm by listing very few additional keywords in the copy sent to the search engines.

Sophisticated spammers might also tune their pages to reduce their profile within the strong features that we have identified for the classifier presented in this paper. However, with many features, it will be difficult (and unlikely) for a spammer to avoid all such features. Regardless, periodic retraining of the classifier is likely to be necessary to maintain peak performance, which will make the identification of any particular features here moot. In conclusion, we believe our

approach will identify most semantic cloaking, and make undetected cloaking more difficult and/or less effective.

# 7.   REFERENCES

[1] A. Acharya, M. Cutts, J. Dean, P. Haahr, M. Henzinger, U. Hoelzle, S. Lawrence, K. Pfleger, O. Sercinoglu, and S. Tong. Information retrieval based on historical data, Mar. 31 2005. US Patent Application number 20050071741.

[2] America Online, Inc. AOL Search: Hot searches, Mar. 2005. http://hot.aol.com/hot/hot.

[3] E. Amitay, D. Carmel, A. Darlow, R. Lempel, and A. Soffer. The connectivity sonar: Detecting site functionality by structural patterns. In *Proceedings of the Fourteenth ACM Conference on Hypertext and Hypermedia*, pages 38–47, Aug 2003.

[4] AskJeeves / Teoma Site Submit managed by ineedhits.com: Program Terms, 2005. Online at http://ask.ineedhits.com/programterms.asp.

[5] Ask Jeeves, Inc. Ask Jeeves About, Mar. 2005. http://sp.ask.com/docs/about/jeevesiq.html.

[6] K. Bharat and M. R. Henzinger. Improved algorithms for topic distillation in a hyperlinked environment. In *Proceedings of the 21st ACM SIGIR International Conference on Research and Development in Information Retrieval*, pages 104–111, Melbourne, AU, 1998.

[7] S. Brin and L. Page. The anatomy of a large-scale hypertextual Web search engine. *Computer Networks and ISDN Systems*, 30(1–7):107–117, 1998.

[8] M. Cafarella and D. Cutting. Building Nutch: Open source. *Queue*, 2(2):54–61, Apr. 2004.

[9] S. Chakrabarti, M. Joshi, K. Punera, and D. Pennock. The structure of broad topics on the web. In *Proceedings of 11th International World Wide Web Conference*, pages 251–262, Honolulu, Hawaii, US, 2002. ACM Press.

[10] S. Chakrabarti, M. Joshi, and V. Tawde. Enhanced topic distillation using text, markup tags, and hyperlinks. In *Proceedings of the 24th Annual ACM SIGIR International Conference on Research & Development in Information Retrieval*, pages 208–216, 2001.

[11] P. Chirita, W. Nejdl, R. Paiu, and C. Kohlschutter. Using ODP metadata to personalize search. In *Proceedings of the 28th Annual International ACM SIGIR Conference on Research & Development in Information Retrieval*, pages 178–185, Salvador, Brazil, August 2005.

[12] J. Cho and H. Garcia-Molina. The evolution of the web and implications for an incremental crawler. In *Proceedings of the Twenty-sixth International Conference on Very Large Databases (VLDB)*, 2000.

[13] B. D. Davison. Recognizing nepotistic links on the Web. In *Artificial Intelligence for Web Search*, pages 23–28. AAAI Press, July 2000. Presented at the AAAI-2000 workshop on Artificial Intelligence for Web Search, Technical Report WS-00-01.

[14] I. Drost and T. Scheffer. Thwarting the nigritude ultramarine: Learning to identify link spam. In *Proceedings of European Conference on Machine Learning*, pages 96–107, Oct. 2005.

[15] D. Fetterly, M. Manasse, and M. Najork. A large-scale study of the evolution of web pages. In *Proceedings of the 12th International World Wide Web Conference*, pages 669–678, Budapest, Hungary, May 2003.

[16] D. Fetterly, M. Manasse, and M. Najork. Spam, damn spam, and statistics: Using statistical analysis to locate spam web pages. In *Proceedings of WebDB*, pages 1–6, June 2004.

[17] Google, Inc. Google information for webmasters, 2005. Online at http://www.google.com/webmasters/faq.html.

[18] Google, Inc. Google Zeitgeist, Jan. 2005. http://www.google.com/press/zeitgeist/zeitgeist-jan05.html.

[19] Z. Gyöngyi and H. Garcia-Molina. Web spam taxonomy. In *First International Workshop on Adversarial Information Retrieval on the Web (AIRWeb)*, Chiba, Japan, 2005.

[20] Z. Gyöngyi, H. Garcia-Molina, and J. Pedersen. Combating web spam with TrustRank. In *Proceedings of the 30th International Conference on Very Large Data Bases (VLDB)*, pages 271–279, Toronto, Canada, Sept. 2004.

[21] T. Haveliwala. Topic-sensitive PageRank. In *Proceedings of the Eleventh International World Wide Web Conference*, pages 517–526, Honolulu, Hawaii, May 2002.

[22] M. R. Henzinger, R. Motwani, and C. Silverstein. Challenges in web search engines. *SIGIR Forum*, 36(2):11–22, Fall 2002.

[23] T. Joachims. Making large-scale support vector machine learning practical. In B. Schölkopf, C. Burges, and A. Smola, editors, *Advances in Kernel Methods: Support Vector Machines*. MIT Press, Cambridge, MA, 1998.

[24] T. Joachims. Optimizing search engines using clickthrough data. In *Proceedings of the 8th ACM SIGKDD International Conference on Knowledge Discovery and Data Mining*, pages 133–142, 2002.

[25] J. M. Kleinberg. Authoritative sources in a hyperlinked environment. *Journal of the ACM*, 46(5):604–632, 1999.

[26] R. Lempel and S. Moran. The stochastic approach for link-structure analysis (SALSA) and the TKC effect. *Computer Networks*, 33(1–6):387–401, 2000.

[27] Lycos. Lycos 50 with Dean: 2004 web's most wanted, Dec. 2004. http://50.lycos.com/121504.asp.

[28] G. Mishne, D. Carmel, and R. Lempel. Blocking blog spam with language model disagreement. In *Proceedings of the First International Workshop on Adversarial Information Retrieval on the Web (AIRWeb)*, 2005.

[29] M. Najork. System and method for identifying cloaked web servers, June 21 2005. U.S. Patent number 6,910,077.

[30] A. Ntoulas, J. Cho, and C. Olston. What's new on the web? The evolution of the web from a search engine perspective. In *Proceedings of 13th International World Wide Web Conference*, pages 1–12, New York City, USA, May 2004.

[31] Open Directory Project, 2005. http://dmoz.org/.

[32] Open Directory RDF Dump, 2005. http://rdf.dmoz.org/.

[33] A. Perkins. White paper: The classification of search engine spam, Sept. 2001. Online at http://www.silverdisc.co.uk/articles/spam-classification/.

[34] J. R. Quinlan. *C4.5: Programs for Machine Learning.* Morgan Kauffman, San Mateo, CA, 1993.

[35] C. Silverstein, M. Henginger, J. Marais, and M. Moricz. Analysis of a very large AltaVista query log. *SIGIR Forum*, 33:6–12, 1999.

[36] A. Westbrook and R. Greene. Using semantic analysis to classify search engine spam, Dec. 2002. Class project report at http://www.stanford.edu/class/cs276a/projects/reports/.

[37] I. H. Witten and E. Frank. *Data Mining: Practical Machine Learning Tools and Techniques.* Morgan Kaufmann, second edition, 2005.

[38] B. Wu and B. D. Davison. Cloaking and redirection: A preliminary study. In *Proceedings of the First International Workshop on Adversarial Information Retrieval on the Web (AIRWeb)*, May 2005.

[39] B. Wu and B. D. Davison. Identifying link farm spam pages. In *Proceedings of the 14th International World Wide Web Conference*, pages 820–829, Chiba, Japan, May 2005.

[40] J. Xu, Y. Cao, H. Li, and M. Zhao. Ranking definitions with supervised learning methods. In *Proceedings of the 14th International World Wide Web Conference*, pages 811–819, May 2005.

[41] Yahoo! Inc. Yahoo! Help - Yahoo! Search, 2005. Online at http://help.yahoo.com/help/us/ysearch/deletions/.

[42] H. Zhang, A. Goel, R. Govindan, K. Mason, and B. V. Roy. Making eigenvector-based reputation systems robust to collusions. In *Proceedings of the Third Workshop on Algorithms and Models for the Web Graph*, Oct. 2004.

# APPENDIX
# 193

# SIGIR WORKSHOP REPORT

# Adversarial Information Retrieval on the Web (AIRWeb 2006)

Brian D. Davison
Lehigh University, USA
*davison@cse.lehigh.edu*

Marc Najork
Microsoft Research, USA
*najork@microsoft.com*

Tim Converse
Yahoo! Search, USA
*tconvers@yahoo-inc.com*

## 1   Introduction

The attraction of hundreds of millions of web searches per day provides significant incentive for many content providers to do whatever is necessary to rank highly in search engine results, while search engine providers want to provide the most accurate results. The conflicting goals of search and content providers are adversarial, and the use of techniques that push rankings higher than they belong is often called search engine spam. Such methods typically include textual as well as link-based techniques, or their combination.

AIRWeb 2006, the Second International Workshop on Adversarial Information Retrieval on the Web, provided a focused venue for both mature and early-stage work in web-based adversarial IR. This workshop brought together researchers and practitioners concerned with the on-going efforts in adversarial information retrieval on the Web, and built on last year's successful meeting in Chiba, Japan as part of WWW2005. The workshop solicited technical papers on any aspect of adversarial information retrieval on the Web, including, but not limited to:

- search engine spam and optimization,
- crawling the web without detection,
- link-bombing (a.k.a. Google-bombing),
- comment spam, referrer spam,
- blog spam (splogs),
- malicious tagging,
- reverse engineering of ranking algorithms,
- advertisement blocking, and
- web content filtering.

Papers addressing higher-level concerns (e.g., whether 'open' algorithms can succeed in an adversarial environment, whether permanent solutions are possible, etc.) were also welcome.

Authors were invited to submit papers and synopses in PDF format. We encouraged submissions presenting novel ideas and work in progress, as well as more mature work. Submissions were reviewed by a program committee of eighteen search experts on relevance, significance, originality, clarity, and technical merit. Out of the thirteen submissions to this year's workshop, a total of six peer-reviewed papers were presented—four research presentations and two synopses of work in progress, conveying the latest results in adversarial web IR.

In addition, the workshop included an invited talk on sponsored search by Jan Pedersen of Yahoo! and a panel session with experts on blog spam, including: Tim Converse (Yahoo! Search), Dennis Fetterly (Microsoft

Research), Natalie Glance (Nielsen BuzzMetrics), Jeremy Hylton (Google), Greg Linden (Findory) and Paul Querna (Ask.com).

The complete workshop program, including full papers and presentations are available online at `http://airweb.cse.lehigh.edu/2006/`.

# 2   Presentations

The day was divided into two technical paper sessions, an invited talk, a panel session on blog spam, and a final discussion period. We summarize each below.

## 2.1   Morning Paper Session

Ricardo Baeza-Yates led the morning talks with his presentation on "Link-Based Characterization and Detection of Web Spam," while stressing that the presenting author is the one who knows least. Ricardo motivated his talk with a number of spam examples, including a pseudo-search engine that returns constant results and link farms. Noting Fetterly et al.'s 2004 statement that "in a number of these distributions, outlier values are associated with web spam", he presented the spam detection accuracy of a series of decision trees based on increasingly complex features based on statistical measures of pages in a manually-labeled UK dataset. Simple measures included indegree, reciprocity, maximum PageRank of page in host; more sophisticated measures considered variations of TrustRank and Truncated PageRank; the final approach probabilistically counted "supporters" at different distances. While combinations of features generally (but not always) improved performance, the detection accuracy was still only about 80%, causing Ricardo to note that it was not a magic bullet.

Tanguy Urvoy presented a novel approach to the problem of spam detection with his talk on "Tracking Web Spam with Hidden Style Similarity." Rather than looking at links or content, he examined the formatting of the page source. His approach was to focus on what most would consider noise by simply stripping out all alphanumeric characters, and to detect if two or more HTML pages were generated by the same tools and templates. Clusters were then created of highly-templatic content sources for easy detection.

Rashmi Raj's synopsis, "Web Spam Detection with Anti-Trust Rank" focused on the propagation of untrustworthiness backward from a seed set of untrusted pages. This approach was analogous (although inverted) to Gyongyi et al.'s TrustRank.

## 2.2   Invited Talk

Jan Pedersen, chief scientist of Yahoo! Search and Marketplace, delivered his invited talk on "Sponsored Search: Theory and Practice." After reminding us why sponsored search is important (a successful, large market!), Jan described the history of sponsored search (starting with GoTo.com and ending with the improvements introduced by Google), including that GoTo's origin was in part a response to the practice of search engine optimization (with a transparent ranking function). Jan then presented an analysis framework based on auction theory to precisely define the various kinds of ranking mechanisms used. He concluded his presentation with a discussion of practical issues such as keyword matching concerns, estimating click rates, and click fraud and traffic quality, and revenue maximization.

## 2.3   Afternoon Paper Session

After lunch, Bernard (Jim) Jansen continued the sponsored search theme with his synopsis on "Adversarial Information Retrieval Aspects of Sponsored Search." He pointed out that there has not yet been much academic work on sponsored search, even though it contains a significant information retrieval component.

He also noted the adversarial problem of click fraud within sponsored search. Jim described how click fraud is performed and gave suggestions on how to combat and prevent it.

Károly Csalogány gave an admirable first presentation in English, entitled "Link-Based Similarity Search to Fight Web Spam." This work introduced the use of link-based similarity measures (e.g., co-citation, SimRank) to detect spam, and compared it to existing trust and distrust propagation techniques on two country-specific datasets. Similarity-based methods were shown to have better performance.

Kumar Chellapilla presented his work on "Improving Cloaking Detection using Search Query Popularity and Monetizability." After motivating the problem of cloaking with a number of striking examples (such as a frame that obscured content beneath), he presented his hypothesis that the more monetizable a query is, the more likely it is to be spammed. This was tested by collecting the 5,000 most popular queries from query logs, and the 5,000 most monetizable queries (those that generated the most revenue from sponsored ads on a single day). By applying an extension to Wu and Davison's (2005, 2006) technique for cloaking detection, Chellapilla and Chickering found 9.7% cloaking in monetizable queries, and 6.0% cloaking in popular queries.

## 2.4   Expert Panel Session

This year's panel consisted of experts in blog spam, including Tim Converse (Yahoo! Search), Dennis Fetterly (Microsoft Research), Natalie Glance (Nielsen BuzzMetrics), Jeremy Hylton (Google), Greg Linden (Findory), and Paul Querna (Ask.com). During the first part of the session, the panelists introduced themselves and outlined their perspectives on blog spam.

Natalie Glance is one of the creators of BlogPulse, a blog search and analytics website backed by Nielsen BuzzMetrics. She stated that blog spam, like other web spam, is driven by search engine optimizers, and pointed out that one of reasons why blogs are attractive targets for spammers is that they provide effectively free hosting of sponsored ads and link farms. While not targeting blog search, blog spam will pollute blog search results. She also noted that blog spam distorts statistical measures (e.g. trend graphs), which is particularly annoying to blog analytics companies such as BuzzMetrics.

Jeremy Hylton works on blog search for Google, and started by elaborating on the temporal dimension of blogs. Postings are dated, which allows search engines to rank them in reverse temporal order (giving high rank to recent postings). However, very recent posts by definition did not have a chance to attract links, making traditional link-based ranking algorithms (such as PageRank) ill-suited for the blog domain. Moreover, time-based ranking schemes can be overwhelmed by the sheer volume of content—spammers can automatically generate large streams of postings. Jeremy explained that Google's blog search doesn't crawl blogs, but instead uses RSS and Atom feeds (which avoids the problem of cloaked pages). In later discussion, Hylton additionally noted that there is little comment spam in feeds (as opposed to web pages). He also claimed that blog search does not have to worry about navigational queries. Finally, Jeremy presented some graphs showing blog spam over time. According to these graphs, about 10-20% of all postings are spam (with occasional spikes to 50%), while 2-10% of all blogs consist entirely of spam (spam blogs or "splogs").

Paul Querna supports Bloglines, an Ask.com product. A few months ago, it launched a blog search service. By indexing and monitoring what users subscribe to and read on Bloglines, Paul reports that Ask is able to avoid spam blogs since it is much harder for automated tools to impersonate a human reader than to generate bogus content. This fact, coupled with the observation that humans do not like spam and generally will not read, it makes it possible to leverage the human readership of RSS aggregators in the job of spam detection. In response to a later question, Paul confirmed that they have seen fake users in the system.

Greg Linden operates Findory.com, which uses personalization to recommend blog articles based on what you read. He cited Technorati and Bloglines statistics that suggested that most blogs (99.8%) have no regular readers. He argued that the winner take all effect in web search (where top-ranked results garner most of the traffic) is a driver for spam, and that personalization seems to be a solution.

Tim Converse heads the algorithmic anti-spam group at Yahoo! Search. He pointed out that publicly writable pages allow for the violation of the propagation-of-trust along links assumption that is at the basis of the various link-based ranking algorithms used by search engines. One attempt to fight comment spam

is the *nofollow* link attribute for HTML anchors, introduced more than a year ago, which indicates that the link should not be trusted. According to Tim, about 1% of links use *nofollow* (corresponding to billions of links), so the attribute is in all likelihood an improvement. Tim is more concerned with the newer tactic of blogs composed entirely of spam postings (splogs), which are used for link creation, not as a destination. He finds that RSS and syndication provides a cheap and powerful framework for spammers to acquire human-authored (and often high-quality) content, which they can then repurpose to generate spam web pages (or spam postings). He notes that there is a spectrum from intelligent aggregation and spam-purposed text scraping, weaving and stitching. Finally, he predicts increasing cooperation and authentication between search engines and content providers to address the spam problem.

Dennis Fetterly of Microsoft Research continued the concerns about repurposed content in splogs and in general, giving a number of examples of the same content (including both legitimate news sites as well as link farm spam). He shared the results of manual labeling more than 2500 blogs: 13.7% were spam, and noted that 39% of spam blog pages were from four popular blog hosting sites.

The second part of the panel consisted of questions by the audience to the panelists. Asked to break down blog spam, the panelists agreed that most blog spam is aimed at link generation (to game PageRank-style algorithms), followed by direct revenue generation through embedded advertisements. In the opinion of the panelists, human-interactive proofs (a.k.a. "Captchas") are a highly effective way to reduce comment spam; the main argument against them being the accessibility issues of image-based captchas. Even very simple captchas (such as asking users to answer the question "how much is two plus two?" before admitting a post) are currently effective. While there was agreement that it would be good to have a "clearinghouse" for blog spam, the panelists believed that the competitive nature of the search industry makes it difficult to establish such an institution.

We did see some differences in panelist opinions, typically reflecting the technology used. For example, the two panelists using collaborative recommendations (Findory's Linden and Bloglines's Querna) agreed that there is never a good reason to show a splog as the result of a blog search. Those representing the biggest engines (Yahoo's Converse and Google's Hylton), said they would show it, but would downgrade the spam.

## 2.5 Discussion

Marc Najork provided some concluding remarks and found wide support for continuing the workshop series, and general agreement to co-locate with WWW in 2007. *Authors' note: a workshop proposal for WWW in 2007 is underway.*

# 3 Acknowledgments

We extend our sincere thanks to SIGIR, to the authors and presenters, to the expert panelists and invited speaker, and to the members of the program committee for their contributions to the material that formed an outstanding workshop.

APPENDIX
194

# Web Spam Detection

**Marc Najork**
Microsoft Research, Mountain View, CA, USA

## Synonyms

Spamdexing; Google bombing; Adversarial information retrieval

## Definition

Web spam refers to a host of techniques to subvert the ranking algorithms of web search engines and cause them to rank search results higher than they would otherwise. Examples of such techniques include content spam (populating web pages with popular and often highly monetizable search terms), link spam (creating links to a page in order to increase its link-based score), and cloaking (serving different versions of a page to search engine crawlers than to human users). Web spam is annoying to search engine users and disruptive to search engines; therefore, most commercial search engines try to combat web spam. Combating web spam consists of identifying spam content with high probability and – depending on policy – downgrading it during ranking, eliminating it from the index, no longer crawling it, and tainting affiliated content. The first step – identifying likely spam pages – is a classification problem amenable to machine learning techniques. Spam classifiers take a large set of diverse features as input, including content-based features, link-based features, DNS and domain-registration features, and implicit user feedback. Commercial search engines treat their precise set of spam-prediction features as extremely proprietary, and features (as well as spamming techniques) evolve continuously as search engines and web spammers are engaged in a continuing "arms race."

## Historical Background

Web spam is almost as old as commercial search engines. The first commercial search engine, Lycos, was incorporated in 1995 (after having been incubated for a year at CMU); and the first known reference to "spamdexing" (a combination of "spam" and "indexing") dates back to 1996. Commercial search engines began to combat spam shortly thereafter, increasing their efforts as it became more prevalent. Spam detection became a topic of academic discourse with Davison's paper on using machine learning techniques to identify "nepotistic links," i.e., link spam [4], and was further validated as one of the great challenges to commercial search engines by Henzinger et al. [9]. Since 2005, the workshop series on *Adversarial Information Retrieval on the Web* (AIRWeb) provides a venue for researchers interested in web spam.

## Foundations

Given that the objective of web spam is to improve the ranking of select search results, web spamming techniques are tightly coupled to the ranking algorithms employed (or believed to be employed) by the major search engines. As ranking algorithms evolve, so will spamming techniques. For example, if web spammers were under the impression that a search engine would use click-through information of its search result pages as a feature in their ranking algorithms, then they would have an incentive to issue queries that bring up their target pages, and generate large numbers of clicks on these target pages. Furthermore, web spamming techniques evolve in response to countermeasures deployed by the search engines. For example, in the above scenario, a search engine might respond to facetious clicks by mining their query logs for many instances of identical queries from the same IP address and discounting these queries and their result click-throughs in their ranking computation. The spammer in turn might respond by varying the query (while still recalling the desired target result), and by using a "bot-net" (a network of third-party computers under the spammer's control) to issue the queries and the click-throughs on the target results.

Given that web spamming techniques are constantly evolving, any taxonomy of these techniques must necessarily be ephemeral, as will be any enumeration of spam detection heuristics. However, there are a few constants:

- Any successful web spamming technique targets one or more of the features used by the search engine's ranking algorithms.
- Web spam detection is a classification problem, and search engines use machine learning algorithms to decide whether or not a page is spam.
- In general, spam detection heuristics look for statistical anomalies in some of the features visible to the search engines.

### Web Spam Detection as a Classification Problem

Web spam detection can be viewed as a binary classification problem, where a classifier is used to predict whether a given web page or entire web site is

spam or not. The machine learning community has produced a large number of classification algorithms, several of which have been used in published research on web spam detection, including decision-tree based classifiers (e.g., C4.5), SVM-based classifiers, Bayesian classifiers, and logistic regression classifiers. While some classifiers perform better than others (and the spam detection community seems to favor decision-tree-based ones), most of the research focuses not on the classification algorithms, but rather on the features that are provided to them.

**Taxonomy of Web Spam Techniques**

*Content spam* refers to any web spam technique that tries to improve the likelihood that a page is returned as a search result and to improve its ranking by populating the page with salient keywords. Populating a page with words that are popular query terms will cause that page to be part of the result set for those queries; choosing good combinations of query terms will increase the portion of the relevance score that is based on textual features. Naïve spammers might perform content spam by stringing together a wide array of popular query terms. Search engines can counter this by employing language modeling techniques, since web pages that contain many topically unrelated keywords or that are grammatically ill-formed will exhibit statistical differences from normal web pages [11]. More sophisticated spammers might generate not a few, but rather millions of target web pages, each page augmented with just one or a few popular query terms. The remainder of the page may be entirely machine-generated (which might exhibit statistical anomalies that can be detected by the search engine), entirely copied from a human-authored web site such as Wikipedia (which can be detected by using near-duplicate detection algorithms), or stitched together from fragments of several human-authored web sites (which is much harder, but not impossible to detect).

*Link spam* refers to any web spam technique that tries to increase the link-based score of a target web page by creating lots of hyperlinks pointing to it. The hyperlinks may originate from web pages owned and controlled by the spammer (generically called a *link farm*), they may originate from partner web sites (a technique known as *link exchange*), or they may originate from unaffiliated (and sometimes unknowing) third parties, for example web-based discussion forums or in blogs that allow comments to be posted (a phenomenon called *blog spam*). Search engines can respond to link spam by mining the web graph for

anomalous components, by propagating distrust from spam pages backwards through the web graph, and by using content-based features to identify spam postings to a blog [10]. Many link spam techniques specifically target Google's PageRank algorithm, which not only counts the number of hyperlinks referring to a web page, but also takes the PageRank of the referring page into account. In order to increase the PageRank of a target page, spammers should create links on sites that have high PageRanks, and for this reason, there is a marketplace for expired domains with high PageRank, and numerous brokerages reselling them. Search engines can respond by temporarily dampening the endorsement power of domains that underwent a change in ownership.

*Click spam* refers to the technique of submitting queries to search engines that retrieve target result pages and then to "click" on these pages in order to simulate user interest in the result. The result pages returned by the leading search engines contain client-side scripts that report clicks on result URLs to the engine, which can then use this implicit relevance feedback in subsequent rankings. Click spam is similar in method to *click fraud*, but different in objective. The goal of click spam is to boost the ranking of a page, while the goal of click fraud (generating a large number of clicks on search engine advertisements) is to spend the budget associated with a particular advertisement (to hurt the competitor who has placed the ad or simply to lower the auction price of said ad, which will drop once the budget of the winning bidder has been exhausted). In a variant of click fraud, the spammer targets ads delivered to his own web by an ad-network such as Google AdSense and obtains a revenue share from the ad-network. Both click fraud and click spam are trivial to detect if launched from a single machine, and hard to detect if launched from a bot-net consisting of tens of thousands of machines [3]. Search engines tackle the problem by mining their click logs for statistical anomalies, but very little is known about their algorithms.

*Cloaking* refers to a host of techniques aimed at delivering (apparently) different content to search engines than to human users. Cloaking is typically used in conjunction with content spam, by serving a page containing popular query terms to the search engine (thereby increasing the likelihood that the page will be returned as the result of a search), and presenting the human user with a different page. Cloaking can be achieved using many different techniques: by literally serving different content to search engines than to

ordinary users (based for example on the well-known IP addresses of the major search engine crawlers), by rendering certain parts of the page invisible (say by setting the font to the same color as the background), by using client-side scripting to rewrite the page after it has been delivered (relying on the observation that search engine crawlers typically do not execute scripts), and finally by serving a page that immediately redirects the user's browser to a different page (either via client-side scripting or the HTML "meta-redirect" tag). Each variant of cloaking calls for a different defense. Search engines can guard against different versions of the same page by probing the page from unaffiliated IP addresses [13]; they can detect invisible content by rendering the page; and they can detect page modifications and script-driven redirections by executing client-side scripts [12].

## Key Applications

Web spam detection is used primarily by advertisement-financed general-purpose consumer search engines. Web spam is not an issue for enterprise search engines, where the content providers, the search engine operator and the users are all part of the same organization and have shared goals. However, web spam is bound to become a problem in any setting where these three parties – content providers, searchers, and search engines – have different objectives. Examples of such settings include vertical search services, such as product search engines, company search engines, people search engines, or even scholarly literature search engines. Many of the basic concepts described above are applicable to these domains as well; the precise set of features useful for spam detection will depend on the ranking algorithms used by these vertical search engines.

## Future Directions

Search engines are increasingly leveraging human intelligence, namely the observable actions of their user base, in their relevance assessments; examples include click-stream analysis, toolbar data analysis, and analysis of traffic on affiliate networks (such as the Google AdSense network). It is likely that many of the future spam detection features will also be based on the behavior of the user base. In many respects, the distinction between computing features for ranking (promoting relevant documents) and spam detection (demoting facetious documents) is artificial, and the boundary between ranking and spam suppression is likely to blur as search engines evolve.

## Experimental Results

Several studies have assessed the incidence of spam in large-scale web crawls at between 8% and 13% [11,5]; the percentage increases as more pages are crawled, since many spam sites serve a literally unbounded number of pages, and web crawlers tend to crawl high-quality human-authored content early on. Ntoulas et al. describe a set of content-based features for spam detection; these features, when combined using a decision-tree-based classifier, resulted in an overall spam prediction accuracy of 97% [11].

## Data Sets

Castillo et al. have compiled the WEBSPAM-UK2006 data set [2], a collection of web pages annotated by human judges as to whether or not they are spam. This data set has become a reference collection to the field, and has been used to evaluate many of the more recent web spam detection techniques.

## Cross-references

► Indexing the Web
► Web Page Quality Metrics
► Web Search Relevance Feedback
► Web Search Relevance Ranking

## Recommended Reading

1. Becchetti L., Castillo C., Donato D., Leonardi S., and Baeza-Yates R. Using rank propagation and probabilistic counting for link-based spam detection. In Proc. KDD Workshop on Web Mining and Web Usage Analysis, 2006.
2. Castillo C., Donato D., Becchetti L., Boldi P., Leonardi S., Santini M., and Vigna S. A reference collection for web spam. ACM SIGIR Forum, 40(2):11–24, 2006.
3. Daswani N. and Stoppelman M. and the Google Click Quality and Security Teams. The anatomy of clickbot.A. In Proc. 1st Workshop on Hot Topics in Understanding Botnets, 2007.
4. Davison B.D. Recognizing nepotistic links on the web. In Proc. AAAI Workshop on Artificial Intelligence for Web Search, 2000.
5. Fetterly D., Manasse M., and Najork M. Spam, damn spam and statistics. In Proc. 7th Int. Workshop on the Web and Databases, 2004, pp. 1–6.
6. Gyöngyi Z., and Garcia-Molina H. Spam: its not just for Inboxes anymore. IEEE Comput., 38(10):28–34, 2005.
7. Gyöngyi Z. and Garcia-Molina H. Web Spam Taxonomy. In Proc. 1st Int. Workshop on Adversarial Information Retrieval on the Web, 2005, pp. 39–47.
8. Gyöngyi Z., Garcia-Molina H., and Pedersen J. Combating Web spam with TrustRank. In Proc. 30th Int. Conf. on Very Large Data Bases, 2004, pp. 576–587.
9. Henzinger M., Motwani R., and Silverstein C. Challenges in web search engines. ACM SIGIR Forum 36(2):11–22, 2002.
10. Mishne G., Carmel D., and Lempel R. Blocking blog spam with language model disagreement. In Proc. 1st Int. Workshop on Adversarial Information Retrieval on the Web, 2005, pp. 1–6.

11. Ntoulas A., Najork M., Manasse M., and Fetterly D. Detecting spam web pages through content analysis. In Proc. 15th Int. World Wide Web Conference, 2006, pp. 83–92.

12. Wang Y.M., Ma M., Niu Y., and Chen H. Spam double-funnel: connecting Web spammers with advertisers. In Proc. 16th Int. World Wide Web Conference, 2007, pp. 291–300.

13. Wu B. and Davison B. Detecting semantic cloaking on the web. In Proc. 15th Int. World Wide Web Conference, 2006, pp. 819–828.

# APPENDIX
# 195

# Michael Wood

 Michael.wood@tocmail.net           754-246-9651

 linkedin.com/in/michael-wood-7662141a8

## Summary

My passion is problem solving through programming. Pursuit of this passion has led to ground-breaking software development in cryptography, automatic root-cause identification of network issues in world-wide data communication infrastructures, real-time monitoring of the human autonomic nervous system, PTSD rehabilitation, and cybersecurity. The uniqueness of the problem solving is shown in the 10 patents that I have been granted. These projects required a combination of assembler, C, PHP, JAVA, React, Node.js, Javascript, HTML and CSS along with Linux networking and kernel development, Android programming, and REST consumption and development as well.

I've been writing fast, efficient, optimized code to solve a wide variety of problems for over 30 years. Problem solving through programming is a passion I continue to pursue every single day.

## Experience

 **Chief Executive Officer**
TocMail Inc.
Oct 2019 - Present (1 year +)
Founded TocMail Inc., and developed the TocChat and TocMail apps.

TocChat is an Android messaging app that integrates patented anti-phishing on shared links and unique privacy modes as well. It was written in Java using Google Firebase for authentication, Google's Firestore realtime database, and SendBird's messaging infrastructure.

TocMail's backend involves a combination of Linux C networking services (including custom IMAP/SMTP services) as well as PHP/MySQL with new services being written in JAVA/MySQL. The front-end is written in JavaScript, HTML, and CSS.

 **Software Engineer**
Freelance
Feb 2014 - Oct 2019 (5 years 9 months)
Developed eight patented cybersecurity methodologies and implemented them in Linux C, Node.js, Java, PHP/MySQL, React, Javascript, HTML, and CSS.

 **Software Engineer**
Freelance
Mar 2007 - Jan 2014 (6 years 11 months)
Developed Android (Java) and iOS (Objective C) software driven brain exercise to interrupt PTSD episodes and lessen their severity over time with continued practice (based on EMDR and Bessel van der Kolk's brain imaging studies).

**Senior Software Engineer**
Helicor, Inc.

Jun 2004 - Feb 2007 (2 years 9 months)

Helicor produced a medical biofeedback device that incorporated my patented methodology for monitoring real-time vagus nerve activity. I assisted with the assembler, direct to chip programming.

This device was the winner of Frost & Sullivan's 2006 Technology Innovation Award. It was the best-in-class medical biofeedback device, outperforming its competitors in multiple clinical studies. The technology was acquired by Respironics, Inc.

### Independent Medical Biofeedback Researcher

Freelance

Oct 2001 - May 2004 (2 years 8 months)

Designed a patented methodology for detecting subtle changes in heart rythm to non invasively measure absolute autonomic system balance (between the parasympathetic and sympathetic branches).

### Senior Network Engineer

Freelance

Jan 2001 - Sep 2001 (9 months)

Designed various solutions to a variety of TCP/IP networking issues. Primarily involved Linux network programming in C with some kernel development.

### Senior Vice President Software Development

Micromuse

Jan 2000 - Dec 2000 (1 year)

I managed the development team, and served as lead developer, to integrate Calvin Alexander Networking's root-cause analysis technology I invented into Micromuse's NetCool Suite. The integration was successfully completed in less than a year's time. The value of Micromuse's stock more than doubled during this time.

### Chief Executive Officer

Calvin Alexander Networking

Oct 1998 - Dec 1999 (1 year 3 months)

Calvin Alexander Networking was established to develop and market the automated network management invention that I created while at Scudder Stevens and Clark. In addition to company management, I also served as the lead developer responsible for the Linux C network programming components. Calvin Alexander Networking was acquired by Micromuse Inc.

### Data Communications Consultant for Scudder Stevens and Clark

Scudder Stevens & Clark

Jun 1991 - Oct 1998 (7 years 5 months)

Designed the entire network infrastructure for Scudder Stevens and Clark's Manhattan Office Building. Managed data communication operations.

I invented and patented an automated method for discovering all the devices that exist in a world-wide network along with accurately deducing how they were physically cabled together (e.g. Switch A slot 4 has

a 100 Mb ethernet cable connecting to Switch B slot 2 port 3). The invention was expanded to automatically pinpoint the root cause of network congestion or failure.

**Chief Executive Officer**
Cryptech Inc.
Feb 1990 - Jun 1991 (1 year 5 months)
Cryptech developed products based on the REDOC-II encryption system I developed while attending college. The cryptographers who broke the US encryption standard (DES) published a paper attesting that my encryption could not be broken by their methods. This cryptography remains unbroken, and is studied in the textbook Advanced Cryptography by Bruce Schneir. The encryption patent and technology was acquired by Libera Inc.

## Education

**Jamestown Community College**
Mathematics

## Skills

C (Programming Language) • Linux • JavaScript • PHP • HTML • Cryptography • Java • MySQL • Assembler • Cascading Style Sheets (CSS)

## Honors & Awards

**Patent #US5003596: Method of cryptographically transforming electronic digital data from one form to another** - US Patent Office
Mar 1991

**Patent #US7691049: Method and apparatus for determining accurate topology features of a network** - US Patent Office
Aug 2000

**Patent #US7691049: Methods and Devices for Relieving Stress** - US Patent Office
Apr 2010

**Patent #US9467324: Firewall security for computers with internet access and method** - US Patent Office
Oct 2016

**Patent #US9742734: Firewall security for computers with internet access and method** - US Patent Office
Aug 2017

**Patent #US9882877: Transparent traffic control device and method for securing internet-connected devices** - US Patent Office

Jan 2018

**Patent #US9992233: Enhanced firewall and method for securing internet communications**
- US Patent Office
Jun 2018

**Patent #US10320746: Computer security system and method based on user-intended final destination** - US Patent Office
Jun 2019

**Patent #US10348682: Transparent traffic control device and method** - US Patent Office
Jul 2019

**Patent #US10574628: Computer security system and method based on user-intended final destination** - US Patent Office
Feb 2020

# APPENDIX
# 196

# Cybersecurity Related Publications
## Michael Wood

Cusick T.W., Wood M.C. (1991) The Redoc II Cryptosystem. In: Menezes A.J., Vanstone S.A. (eds) Advances in Cryptology-CRYPTO' 90. CRYPTO 1990. Lecture Notes in Computer Science, vol 537. Springer, Berlin, Heidelberg. https://doi.org/10.1007/3-540-38424-3_38

Patent #US5003596: Method of cryptographically transforming electronic digital data from one form to another

Patent #US7691049: Method and apparatus for determining accurate topology features of a network

Patent #US9467324: Firewall security for computers with internet access and method

Patent #US9742734: Firewall security for computers with internet access and method

Patent #US9882877: Transparent traffic control device and method for securing internet-connected devices

Patent #US9992233: Enhanced firewall and method for securing internet communications

Patent #US10320746: Computer security system and method based on user-intended final destination

Patent #US10348682: Transparent traffic control device and method

Patent #US10574628: Computer security system and method based on user-intended final destination

Patent Application 16/116,386: System and Method for Blocking Persistent Malware

Patent Application 16/264,579: Computer Security System and Method Based on User-Intended Final Destination

Patent Application 16/789,035: Computer Security System and Method Based on User-Intended Final Destination

## Informal Publications

Published https://hackingexposed.blog.

Published https://terraprivacy.blog.

# APPENDIX
# 197

## Unrelated Publications
## Michael Wood

Patent #US7691049: Methods and Devices for Relieving Stress

*Pauline Paradoxes Decoded.* Tubi Publishing. 2013.

*Golden Rule Bible: Romans*. Tubi Publishing. 2013.

*Breaking the Romans Code*. Tubi Publishing. 2011.

*Paul on Homosexuality*. Tubi Publishing. 2011.

*The Jerome Conspiracy*. Religious Fiction. Tubi Publishing. 2010.

*The Hidden Bible*. Religious Fiction. Tubi Publishing. 2010.

*The Jesus Secret*. Tubi Publishing. 2010.

APPENDIX
198

# Cloak and Dagger: Dynamics of Web Search Cloaking

David Y. Wang, Stefan Savage, and Geoffrey M. Voelker

Deptartment of Computer Science and Engineering
University of California, San Diego

## ABSTRACT

Cloaking is a common "bait-and-switch" technique used to hide the true nature of a Web site by delivering blatantly different semantic content to different user segments. It is often used in search engine optimization (SEO) to obtain user traffic illegitimately for scams. In this paper, we measure and characterize the prevalence of cloaking on different search engines, how this behavior changes for targeted versus untargeted advertising and ultimately the response to site cloaking by search engine providers. Using a custom crawler, called *Dagger*, we track both popular search terms (e.g., as identified by Google, Alexa and Twitter) and targeted keywords (focused on pharmaceutical products) for over five months, identifying when distinct results were provided to crawlers and browsers. We further track the lifetime of cloaked search results as well as the sites they point to, demonstrating that cloakers can expect to maintain their pages in search results for several days on popular search engines and maintain the pages themselves for longer still.

## Categories and Subject Descriptors

H.3.5 [**Information Storage and Retrieval**]: Online Information Services—*Web-based services*

## General Terms

Measurement, Security

## Keywords

Cloaking, Search Engine Optimization, Web spam

## 1. INTRODUCTION

The growth of e-commerce in the late 20th century in turn created value around the attention of individual Internet users — described crassly by Caldwell as "The Great Eyeball Race" [3]. Since then, virtually every medium of Internet interaction has been monetized via some form of advertising, including e-mail, Web sites, social networks and on-line games, but perhaps none as successfully as *search*. Today, the top Internet search engines are a primary means for connecting customers and sellers in a broad range

Permission to make digital or hard copies of all or part of this work for personal or classroom use is granted without fee provided that copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page. To copy otherwise, to republish, to post on servers or to redistribute to lists, requires prior specific permission and/or a fee.
*CCS'11*, October 17–21, 2011, Chicago, Illinois, USA.
Copyright 2011 ACM 978-1-4503-0948-6/11/10 ...$10.00.

of markets, either via "organic" search results or sponsored search placements—together comprising a $14B marketing sector [16].

Not surprisingly, the underlying value opportunities have created strong incentives to influence search results—a field called "search engine optimization" or SEO. Some of these techniques are benign and even encouraged by search engine operators (e.g., simplifying page content, optimizing load times, etc.) while others are designed specifically to manipulate page ranking algorithms without regard to customer interests (e.g., link farms, keyword stuffing, blog spamming, etc.) Thus, a cat and mouse game has emerged between search engine operators and scammers where search operators try to identify and root out pages deemed to use "black hat" optimization techniques or that host harmful content (e.g., phishing pages, malware sites, etc.) while scammers seek to elude such detection and create new pages faster than they can be removed.

In this conflict, one of the most potent tools is *cloaking*, a "bait-and-switch" technique used to hide the true nature of the Web site by delivering blatantly different content to different user segments. Typically a cloaker will serve "benign" content to search engine crawlers and scam content to normal visitors who are referred via a particular search request. By structuring the benign version of this content to correspond with popular search terms—a practice known as keyword stuffing—Web spammers aggressively acquire unwitting user traffic to their scam pages. Similarly, cloaking may be used to prevent compromised Web servers hosting such scam pages from being identified (i.e., by providing normal content to visitors who are not referred via the targeted search terms). In response to such activity, search engine providers attempt to detect cloaking activity and delist search results that point to such pages.

In this paper, we study the dynamics of this cloaking phenomenon and the response it engenders. We describe a system called *Dagger*, designed to harvest search result data and identify cloaking in near real-time. Using this infrastructure for over five months we make three primary contributions. First, we provide a contemporary picture of cloaking activity as seen through three popular search engines (Google, Bing and Yahoo) and document differences in how each is targeted. Second, we characterize the differences in cloaking behavior between sites found using undifferentiated "trending" keywords and those that appear in response to queries for targeted keywords (in particular for pharmaceutical products). Finally, we characterize the *dynamic behavior* of cloaking activity including the lifetime of cloaked pages and the responsiveness of search engines in removing results that point to such sites.

The remainder of this paper is structured as follows. Section 2 provides a technical background on cloaking and the related work we build upon, followed by a description of Dagger's design and implementation in Section 3. Section 4 describes our results, followed in Section 5 by a discussion of our overall findings.

## 2.   BACKGROUND

The term "cloaking", as applied to search engines, has an uncertain history, but dates to at least 1999 when it entered the vernacular of the emerging search engine optimization (SEO) market.[1] The growing role of search engines in directing Web traffic created strong incentives to reverse engineer search ranking algorithms and use this knowledge to "optimize" the content of pages being promoted and thus increase their rank in search result listings. However, since the most effective way to influence search rankings frequently required content vastly different from the page being promoted, this encouraged SEO firms to serve different sets of page content to search engine crawlers than to normal users; hence, cloaking.

In the remainder of this section we provide a concrete example of how cloaking is used in practice, we explain the different techniques used for visitor differentiation, and summarize the previous work that has informed our study.

### 2.1   An Example

As an example of cloaking, entering the query "bethenney frankel twitter" on Google on May 3, 2011 returned a set of search results with links related to Bethenney Frankel. (The appendix includes screenshots of this example, with Figure 11a showing a screenshot of the search results.) For the eighth result, the bold face content snippet returned by Google indeed indicates that the linked page includes the terms "bethenney frankel twitter" (in addition to other seemingly unrelated terms, a common indicator of keyword stuffing). Further, Google preview shows a snapshot of the page that the Google crawler sees. In this case it appears the link indeed leads to content with text and images related to "bethenney frankel". Upon clicking on this link on a Windows machine, however, we are sent through a redirect chain and eventually arrive at a landing page (Figure 11b). This page is an example of the fraudulent anti-virus scams that have become increasingly popular [5, 15] and shares little with "bethenney frankel twitter" (and indeed, both the previous snippet and any hints of the previewed snapshot do not appear). Finally, if we revisit the search result link but disguise our identity to appear as a search crawler (in this case by modifying the `User-Agent` string in our HTTP request header) we get redirected using a 302 HTTP code to the benign root page of the site (Figure 11c), presumably to avoid possible suspicion. This case represents a classic example of IP cloaking. The site is detecting Google IP addresses, as evidenced by the snippet and preview, and providing an SEO-ed page with text and images related to "bethenney frankel twitter" that it deceives Google into indexing. The core idea here is clear. The scammer is crafting content to reflect the transient popularity of particular terms (in this case due to Bethenney Frankel's sale of her cocktail line) and serving this content to search engine crawlers to capitalize on subsequent user queries, but then directs any user traffic to completely unrelated content intended to defraud them.

### 2.2   Types of Cloaking

For cloaking to work, the scammer must be able to distinguish between user segments based on some identifier visible to a Web server. The choice of identifier used is what distinguishes between cloaking techniques, which include *Repeat Cloaking, User Agent Cloaking, Referrer Cloaking* (sometimes also called "Click-through Cloaking"), and *IP Cloaking*.

In the case of *Repeat Cloaking*, the Web site stores state on either the client side (using a cookie) or the server side (e.g., tracking client IPs). This mechanism allows the site to determine whether the visitor has previously visited the site, and to use this knowledge in selecting which version of the page to return. Thus first-time visitors are given a glimpse of a scam, in the hopes of making a sale, but subsequent visits are presented with a benign page stymieing reporting and crawlers (who routinely revisit pages).

In contrast, *User Agent Cloaking* uses the `User-Agent` field from the HTTP request header to classify HTTP clients as user browsers or search engine crawlers. User agent cloaking can be used for benign content presentation purposes (e.g., to provide unique content to Safari on an iPad vs. Firefox on Windows), but is routinely exploited by scammers to identify crawlers via the well-known `User-Agent` strings they advertise (e.g., Googlebot).

*Referrer Cloaking* takes the idea of examining HTTP headers even further by using the `Referer` field to determine which URL visitors clicked through to reach their site. Thus, scammers commonly only deliver a scam page to users that visit their site by first clicking through the search engine that has been targeted (e.g., by verifying that the `Referer` field is http://www.google.com). This technique has also been used, in combination with repeat cloaking and chains of Web site redirections, to create one-time-use URLs advertised in e-mail spam (to stymie security researchers). However, we restrict our focus to search engine cloaking in this paper.

Finally, one of the simplest mechanisms in use today is *IP Cloaking*, in which a scammer uses the IP address of the requester in determining the identity of the visitor. With an accurate mapping between IP addresses and organizations, a scammer can then easily distinguish all search engine requests and serve them benign content in a manner that is difficult to side-step. Indeed, the only clear way for search engine operators to mechanistically detect such cloaking is through acquiring fresh IP resources—but the signal of "delisting" seems to provide a clear path for efficiently mapping such address space even if it is initially unknown [1]. Although challenging to detect in principle since it would nominally require crawling from a Google IP address, in practice a crawler like Dagger can still detect the use of IP cloaking because cloakers still need to expose different versions of a page to different visitors (Section 3.3). As a result, we believe Dagger can detect all forms of cloaking commonly used in the Web today.

### 2.3   Previous work

The earliest study of cloaking we are aware of is due to Wu and Davidson [24]. They first developed the now standard technique of crawling pages multiple times (using both user and crawler identifiers) and comparing the returned content. Using this approach, they refer to situations in which the content differs as "syntactic cloaking", whereas the subset of these differences that are deemed to be driven by fraudulent intent (using some other classifier [25]) are termed "semantic cloaking".

Chellapilla and Chickering used a similar detection framework to compare syntactic cloaking on the most popular and monetizable search terms [4]. In this study, monetizability corresponds to the amount of revenue generated from users clicking on sponsored ads returned with search results for a search term. Using logs from a search provider, they found that monetized search terms had a higher prevalence of cloaking (10%) than just popular terms (6%) across the top 5000 search terms. While we do not have access to logs of search provider revenue, we also demonstrate significant differences in cloaking prevalence as a function of how search terms are selected.

Up to this point, all studies had focused exclusively on user agent

---

[1] For example, in a September 2000 article in *Search Engine Watch*, Danny Sullivan comments that "every major performance-based SEO firm I know of does [use cloaking]" [19].

cloaking. In 2006, Wang et al. extended this analysis to include referrer cloaking (called click-through cloaking by them), where pages only return cloaked content if accessed via the URL returned in search results [21]. Targeting a handful of suspicious IP address ranges, they found widespread referrer cloaking among the domains hosted there. In a related, much more extensive study, Wang et al. used this analysis in a focused study of redirection spam, a technique by which "doorway" Web pages redirect traffic to pages controlled by spammers [22]. Finally, Niu et al. performed a similar analysis incorporating referrer cloaking but focused exclusively on forum spamming [14].

These prior studies have used a range of different inputs in deciding whether multiple crawls of the same page are sufficiently different that cloaking has occurred. These include differences in the word distribution in the content of the two pages [4, 24], differences in the links in the page [24], differences in HTML tags [12] or differences in the chain of domain names in the redirection chain [21, 22]. A nice summary of these techniques as well as the different algorithms used to compare them is found in [12]. Our approach represents a combination of these techniques and some new ones, driven by a desire to support crawling and detection in near-real time (Section 3).

Finally, the use of cloaking is predominately driven by so-called "black hat" search engine optimization (SEO) in which the perpetrators seek to attract traffic by using various methods to acquire higher ranking in search engine results. Two contemporaneous studies touch on different aspects of this behavior that are echoed in our own work. John et al. examine one very large scale "link farm" attack used to create high rankings for "trending" search terms and thus attract large amounts of undifferentiated traffic [8]. While this particular attack did not use cloaking per se (except implicitly in the use of JavaScript redirection) we encounter similar structures driving the popularity of cloaked sites in our measurements. Leontiadis et al. perform a broad study of SEO-advertised pharmaceutical sites (driven by focused searches on drug-related terms) and note that cloaking is commonly used by compromised sites and, in part, serves the purpose of "hiding" the existence of such sites from normal visitors [10]. We explore both kinds of search traffic streams in our analysis (driven by trending and focused search terms) and find significant differences between them.

In general, most studies of cloaking have focused on a single snapshot in time. Moreover, the prevalence of cloaking reported in all such studies is difficult to compare due to variations in detection approach, differences in how search terms are selected and changes in scammer behavior during different time periods. Thus, one of our primary contributions is in extending these previous efforts to examine the dynamics of cloaking over time, uncovering the fine-grained variability in cloaking, the lifetime of cloaked search results (bounding the response time of search engines to cloaked results) and the duration of the pages they point to. Ultimately, these *dynamics* in the ranking of cloaked sites drive the underlying economics of their attack.

## 3. METHODOLOGY

Dagger consists of five functional components: collecting search terms, fetching search results from search engines, crawling the pages linked from the search results, analyzing the pages crawled, and repeating measurements over time. In this section, we describe the design and implementation of each functional component, focusing on the goals and potential limitations.

### 3.1 Collecting Search Terms

The first challenge in data collection is building a meaningful

test set for measuring cloaking. Since our goal is to understand the dynamics of scammers utilizing cloaking in search results, we want to target our data collection to the search terms that scammers also target rather than a random subset of the overall search space. In particular, we target two different kinds of cloaked search terms: those reflecting popular terms intended to gather high volumes of undifferentiated traffic, and terms reflecting highly targeted traffic where the cloaked content matches the cloaked search terms.

For our first set of search terms, as with previous work we seed our data collection with popular *trending* search terms. We also enhance this set by adding additional sources from social networks and the SEO community. Specifically, we collect popular search terms from Google Hot Searches, Alexa, and Twitter, which are publicly available and provide real-time updates to search trends at the granularity of an hour.[2] We extract the top 20 popular search trends via Google Hot Searches and Alexa, which reflect search engine and client-based data collection methods, respectively, while the 10 most popular search terms from Twitter adds insight from social networking trends. These sources generally compliment each other and extend our coverage of terms. We found that terms from Google Hot Searches only overlapped 3–8% with trending terms from both Twitter and Alexa. Note that, for trending terms, the page being cloaked is entirely unrelated to the search terms used to SEO the page. A user may search for a celebrity news item and encounter a search result that is a cloaked page selling fake anti-virus.

For our second set of search terms, we use a set of terms catering to a specific domain: pharmaceuticals. We gathered a generic set of pharmaceutical terms common to many spam-advertised online pharmacy sites, together with best-selling product terms from the most popular site [11]. Unlike trending search terms, the content of the cloaked pages actually matches the search terms. A user may search for "viagra" and encounter a cloaked page that leads to an online pharmacy site selling Viagra.

We construct another source of search terms using keyword suggestions from Google Suggest. Google Suggest is a search term autocomplete service that not only speeds up user input, but also allows users to explore similar long-tail queries. For example, when users enter "viagra 50mg", they are prompted with suggestions such as "viagra 50mg cost" and "viagra 50mg canada". Specifically, we submit search terms from Google Hot Searches and the online pharmacy site to Google Suggest and use the result to create dynamic feeds of search terms for trending and pharmaceutical searches, respectively. While investigating SEO community forums, we found various software packages and services using popular search term services as seeds for extending the terms they target using suggestion services. Combined with a suggestion service, each search term forms the basis of a cluster of related search terms from lists of suggestions [23]. The main attraction of a suggestion service is that it targets further down the tail of the search term distribution, resulting in less competition for the suggestion and a potentially more advantageous search result position. Moreover, long-tail queries typically retain the same semantic meaning as the original search term seed. Furthermore, recent studies have shown superior conversion rates of long-tail queries [20].

### 3.2 Querying Search Results

Dagger then submits the terms, every four hours for trending

---

[2]We originally considered using an even broader range of search term sources, in particular Yahoo Buzz, Ask IQ, AOL Hot Searches, eBay Pulse, Amazon Most Popular Tags, Flickr Popular Tags, and WordPress Hot Topics. Since we detected no more than a few cloaked results in multiple attempts over time, we concluded that scammers are not targeting these search terms and no longer considered those sources.

queries and every day for pharmaceutical queries, to the three most actively used search engines in the US: Google, Yahoo, and Bing. With results from multiple search engines, we can compare the prevalence of cloaking across engines and examine their response to cloaking. From the search results we extract the URLs for crawling as well as additional metadata such as the search result position and search result snippet.

At each measurement point, we start with the base set of search terms and use them to collect the top three search term suggestions from Google Suggest.[3] For trending searches, Google Hot Searches and Alexa each supply 80 search terms every four-hour period, while Twitter supplies 40. Together with the 240 additional suggestions based on Google Hot Searches, our search term workload is 440 terms. Note that while overlap does occur within each four-hour period and even between periods, this overlap is simply an artifact of the search term sources and represents popularity as intended. For example, a term that spans multiple sources or multiple periods reflects the popularity of the term. For pharmaceutical queries, we always use a set of 230 terms composed of the original 74 manually-collected terms and 156 from Google Suggest.

Next, we submit the search terms and suggestions to the search engines and extract the top 100 search results and accompanying metadata. We assume that 100 search results, representing 10 search result pages, covers the maximum number of results the vast majority of users will encounter for a given query [17]. Using these results Dagger constructs an index of URLs and metadata, which serves as the foundation for the search space that it will crawl and analyze. At this point, we use a whitelist to remove entries in the index based on regular expressions that match URLs from "known good" domains, such as `http://www.google.com`. This step reduces the number of false positives during data processing. In addition, whenever we update this list, we re-process previous results to futher reduce the number of false positives. Afterwards, we group similar entries together. For example, two entries that share the same URL, source, and search term are combined into a single entry with the same information, except with a count of two instead of one to signify the quantity. As a result, for each search engine, instead of crawling 44,000 URLs for trending search results (440 search terms × 100 search results), on average Dagger crawls roughly 15,000 unique URLs in each measurement period.

### 3.3   Crawling Search Results

For each search engine, we crawl the URLs from the search results and process the fetched pages to detect cloaking in parallel to minimize any possible time of day effects.

**Web crawler.** The crawler incorporates a multithreaded Java Web crawler using the `HttpClient 3.x` package from Apache. While this package does not handle JavaScript redirects or other forms of client-side scripting, it does provide many useful features, such as handling HTTP 3xx redirects, enabling HTTP header modification, timeouts, and error handling with retries. As a result, the crawler can robustly fetch pages using various identities.

**Multiple crawls.** For each URL we crawl the site three times, although only the first two are required for analysis. We begin disguised as a normal search user visiting the site, clicking through the search result using Internet Explorer on Windows. Then we visit the site disguised as the Googlebot Web crawler. These crawls download the views of the page content typically returned to users and crawlers, respectively. Finally, we visit the site for a third time as a user who does not click through the search result to down-

load the view of the page to the site owner. As with previous approaches, we disguise ourselves by setting the `User-Agent` and `Referer` fields in the HTTP request header. This approach ensures that we can detect any combination of user-agent cloaking and referrer cloaking. Moreover, our third crawl allows us to detect pure user-agent cloaking without any checks on the referrer. We found that roughly 35% of cloaked search results for a single measurement perform pure user-agent cloaking. For the most part, these sites are not malicious but many are involved in black-hat SEO operations. In contrast, pages that employ both user-agent and referrer cloaking are nearly always malicious (Section 4.5).

**IP cloaking.** Past studies on cloaking have not dealt with IP address cloaking, and the methodology we use is no different. However, because the emphasis of our study is in detecting the situation where cloaking is used as an SEO technique in scams, we do not expect to encounter problems caused by IP cloaking. In our scenario, the cloaker must return the scam page to the user to potentially monetize the visit. And the cloaker must return the SEO-ed page to the search crawler to both index and rank well. Even if the cloaker could detect that we are not a real crawler, they have few choices for the page to return to our imitation crawler. If they return the scam page, they are potentially leaving themselves open to security crawlers or the site owner. If they return the SEO-ed page, then there is no point in identifying the real crawler. And if they return a benign page, such as the root of the site, then Dagger will still detect the cloaking because the user visit received the scam page, which is noticeably different from the crawler visit. In other words, although Dagger may not obtain the version of the page that the Google crawler sees, Dagger is still able to detect that the page is being cloaked (see Appendix A for an illustrated example).

To confirm this hypothesis, we took a sample of 20K cloaked URLs returned from querying trending search terms. We then crawled those URLs using the above methodology (three crawls, each with different `User-Agent` and `Referer` fields). In addition, we performed a fourth crawl using Google Translate, which visits a URL using a Google IP address and will fool reverse DNS lookups into believing the visit is originating from Google's IP address space. From this one experiment, we found more than half of current cloaked search results do in fact employ IP cloaking via reverse DNS lookups, yet in every case they were detected by Dagger because of the scenario described above.

### 3.4   Detecting Cloaking

We process the crawled data using multiple iterative passes where we apply various transformations and analyses to compile the information needed to detect cloaking. Each pass uses a comparison-based approach: we apply the same transformations onto the views of the same URL, as seen from the user and the crawler, and directly compare the result of the transformation using a scoring function to quantify the delta between the two views. In the end, we perform thresholding on the result to detect pages that are actively cloaking and annotate them for later analysis.

While some of the comparison-based mechanisms we use to detect cloaking are inspired by previous work, a key constraint is our real-time requirement for repeatedly searching and crawling to uncover the time dynamics of cloaking. As a result, we cannot use a single snapshot of data, and we avoided intensive offline training for machine learning classifiers [4, 12, 24, 25]. We also avoided running client-side scripts, which would add potentially unbounded latency to our data collection process. Consequently, we do not directly measure all forms of redirection, although we do capture the same end result: a difference in the semantic content of the same URL [21, 22]. Since we continuously remeasure over time, man-

---

[3] We only use three suggestions to reduce the overall load on the system while still maintaining accuracy, as we found no significant difference in our results when using five or even ten suggestions.

ual inspection is not scalable outside of a couple of snapshots [14]. Moreover, even an insightful mechanism that compares the structure of two views using HTML tags, to limit the effects of dynamic content [12], must be applied cautiously as doing so requires significant processing overhead.

The algorithm begins by removing any entries where either the user or crawler page encountered an error during crawling (a non-200 HTTP status code, connection error, TCP error, etc.); on average, 4% of crawled URLs fall into this category.

At this point, the remaining entries represent the candidate set of pages that the algorithm will analyze for detecting cloaking. To start, the detection algorithm filters out nearly identical pages using text shingling [2], which hashes substrings in each page to construct signatures of the content. The fraction of signatures in the two views is an excellent measure of similarity as we find nearly 90% of crawled URLs are near duplicates between the multiple crawls as a user and as a crawler. From experimentation, we found that a difference of 10% or less in sets of signatures signifies nearly identical content. We remove such pages from the candidate set.

From this reduced set, we make another pass that measures the similarity between the snippet of the search result and the user view of the page. The snippet is an excerpt from the page content obtained by search engines, composed from sections of the page relevant to the original query, that search engines display to the user as part of the search result. In effect, the snippet represents ground truth about the content seen by the crawler. Often users examine the snippet to help determine whether to follow the link in the search result. Therefore, we argue that the user has an implicit expectation that the page content should resemble the snippet in content.

We evaluate snippet inclusion by first removing noise (character case, punctuation, HTML tags, gratuitous whitespace, etc.) from both the snippet and the body of the user view. Then, we search for each substring from the snippet in the content of the user view page, which can be identified by the character sequence '...' (provided in the snippet to identify non-contiguous text in the crawled page). We then compute a score of the ratio of the number of words from unmatched substrings divided by the total number of words from all substrings. The substring match identifies similar content, while the use of the number of words in the substring quantifies this result. An upper bound score of 1.0 means that no part of the snippet matched, and hence the user view differs from the page content originally seen by the search engine; a lower bound score of 0.0 means that the entire snippet matched, and hence the user view fulfills the expectation of the user. We use a threshold of 0.33, meaning that we filter out entries from the candidate set whose user view does not differ by more than two-thirds from the snippet. We chose this threshold due to the abundance of snippets seen with three distinct substrings, and 0.33 signifies that the majority of the content differs between the snippet and user view. In practice, this step filters 56% of the remaining candidate URLs.

At this point, we know (1) that the views are different in terms of unstructured text, and (2) that the user view does not resemble the snippet content. The possibility still exists, however, that the page is not cloaked. The page could have sufficiently frequent updates (or may rotate between content choices) that the snippet mismatch is misleading. Therefore, as a final test we examine the page structures of the views via their DOMs as in [12]. The key insight for the effectiveness of this approach comes from the fact that, while page content may change frequently, as in blogs, it is far less likely for the page structure to change dramatically.

We compare the page structure by first removing any content that is not part of a whitelist of HTML structural tags, while also attempting to fix any errors, such as missing closing tags, along

the way. We compute another score as the sum of an overall comparison and a hierarchical comparison. In the overall comparison, we calculate the ratio of unmatched tags from the entire page divided by the total number of tags. In the hierarchical comparison, we calculate the ratio of the sum of the unmatched tags from each level of the DOM hierarchy divided by the total number of tags. We use these two metrics to allow the possibility of a slight hierarchy change, while leaving the content fairly similar. An upper bound score of 2.0 means that the DOMs failed to match any tags, whereas a lower bound score of 0.0 means that both the tags and hierarchy matched. We use a threshold of 0.66 in this step, which means that cloaking only occurs when the combination of tags and hierarchy differ by a third between the structure of the user and crawler views. We chose this threshold from experimentation that showed the large majority of cloaked pages scored over 1.0. Once we detect an entry as actively cloaking, we annotate the entry in the index for later processing.

When using any detection algorithm, we must consider the rate of false positives and false negatives as a sign of accuracy and success. Because it is infeasible to manually inspect all results, we provide estimates based on sampling and manual inspection. For Google search results, we found 9.1% (29 of 317) of cloaked pages were false positives, meaning that we labeled the search result as cloaking, but it is benign; for Yahoo, we found 12% (9 of 75) of cloaked pages were false positives. It it worth noting that although we labeled benign content as cloaking, they are technically delivering different data to users and crawlers. If we consider false positives to mean that we labeled the search result as cloaking when it is not, then there are no false positives in either case. In terms of false negatives, when manually browsing collections of search results Dagger detected cloaked redirection pages for the majority of the time. The one case where we fail is when the site employs advanced browser detection to prevent us from fetching the browser view, but we have only encountered this case a handful of times.

## 3.5   Temporal Remeasurement

The basic measurement component captures data related to cloaking at one point in time. However, because we want to study temporal questions such as the lifetime of cloaked pages in search results, Dagger implements a temporal component to fetch search results from search engines and crawl and process URLs at later points in time. In the experiments in this paper, Dagger remeasures every four hours up to 24 hours, and then every day for up to seven days after the original measurement.

The temporal component performs the same basic data collection and processing steps as discussed in the previous components. To measure the rate at which search engines respond to cloaking, we fetch results using the original search term set and construct a new index from the results that will capture any churn in search results since the original measurement. Then we analyze the churn by searching for any entry with a URL that matches the set of cloaked pages originally identified and labeled. Note that there still exists the possibility that for every cloaked page removed from the new index, another cloaked page, which originally was not a part of the index, could have taken its place. Therefore, this process does not measure how clean the search results are at a given time, just whether the original cloaked pages still appear in the search results.

To measure the duration pages are cloaked, the temporal component selects the cloaked URLs from the original index. It then performs the measurement process again, visiting the pages as both a user and a crawler, and applying the detection algorithm to the results. There still exists the possibility that pages perform cloaking at random times rather than continuously, which we might not de-



Figure 1: Prevalence of cloaked search results in Google, Yahoo, and Bing over time for trending and pharmaceutical searches.

tect. However, we consider these situations unlikely as spammers need sufficient volume to turn a profit and hence cloaking continuously will result in far greater traffic than cloaking at random.

## 4. RESULTS

This section presents our findings from using Dagger to study cloaking in trending and pharmaceutical search results in Google, Yahoo, and Bing. We use Dagger to collect search results every four hours for two months, from March 1, 2011 through August 1, 2011, crawling over 47 million search results. We examine the prevalence of cloaking in search results over time, how cloaking correlates to the various search terms we use, how search engines respond to cloaking, and how quickly cloaked pages are taken down. We also broadly characterize the content of cloaked pages, the DNS domains with cloaked pages, and how well cloaked pages perform from an SEO perspective. Where informative, we note how trending and pharmaceutical cloaking characteristics contrast, and also comment on the results of cloaking that we observe compared with results from previous studies.

### 4.1 Cloaking Over Time

Figure 1a shows the prevalence of cloaking over time for trending search results returned from each search engine. We show the percentage of the cloaked search results averaged across all searches made each day. Recall from Section 3.3 that we crawl the top 100 search results every four hours for 183 unique trending search terms (on average) collected from Google Hot Searches, Google Suggest, Twitter, and Alexa, resulting on average in 13,947 unique URLs to crawl after de-duping and whitelisting. Although we crawl every four hours, we report the prevalence of cloaking at the granularity of a day for clarity (we did not see any interesting time-of-day effects in the results). For example, when cloaking in Google search results peaked at 2.2% on April 12, 2011, we found 2,094 out of 95,974 cloaked search results that day.

Initially, through May 4th, we see the same trend for the prevalence of cloaked search results among search engines: Google and Yahoo have nearly the same amount of cloaked results (on average 1.11% on Google and 0.84% on Yahoo), whereas Bing has 3–4× fewer (just 0.25%). One explanation is that Bing is much better at detecting and thwarting cloaking, but we find evidence that cloakers simply do not appear to target Bing nearly as heavily as Google and Yahoo. For instance, cloaked results often point to link farms, a form of SEO involving collections of interlinked pages used to boost page rank for sets of search terms. For large-scale link farms

that we have tracked over time, we consistently find them in Google and Yahoo results, but not in Bing results.

Similarly, Figure 1b shows the prevalence of cloaking over time when searching for pharmaceutical terms. We crawl the top 100 search results daily for 230 unique pharmaceutical search terms collected from a popular spam-advertised affiliate program, further extended with Google Suggest, resuling in 13,646 unique URLs to crawl after de-duping and whitelisting. (Note that the gap in results in the first week of June corresponds to a period when our crawler was offline.) Across all days, we see the same relative ranking of search engines in terms of cloaking prevalence, but with overall larger quantities of cloaked results for the same respective time ranges: on average 9.4% of results were cloaked on Google, 7.7% results on Yahoo, and 4.0% on Bing.

The difference in quantities of cloaked results for trending and pharmaceutical terms reflects the differences between these two types of searches. In trending searches the terms constantly change, with popularity being the one constant. This dynamic allows cloakers to target many more search terms and a broad demographic of potential victims—anyone by definition searching using a popular search term—at the cost of limited time to perform the SEO needed to rank cloaked pages highly in the search results. In contrast, pharmaceutical search terms are static and represent product searches in a very specific domain. Cloakers as a result have much more time to perform SEO to raise the rank of their cloaked pages, resulting in more cloaked pages in the top results. Note, though, that these targeted search terms limit the range of potential victims to just users searching in this narrow product domain. Section 4.7 further explores the effects of SEO on cloaked results.

Looking at trends over time, cloakers were initially slightly more successful on Yahoo than Google for trending search terms, for instance. However, from April 1 through May 4th, we found a clear shift in the prevalence of cloaked search results between search engines with an increase in Google (1.2% on average) and a decrease in Yahoo (0.57%). We suspect this is due to cloakers further concentrating their efforts at Google (e.g., we uncovered new link farms performing reverse DNS cloaking for the Google IP range). In addition, we saw substantial fluctuation in cloaking from day to day. We attribute the variation to the adversarial relationship between cloakers and search engines. Cloakers perform blackhat SEO to artifically boost the rankings of their cloaked pages. Search engines refine their defensive techniques to detect cloaking either directly (analyzing pages) or indirectly (updating the ranking algorithm). We interpret our measurements at these time scales as



(a) Google

(b) Yahoo

Figure 2: Prevalence of cloaked search results over time associated with each source of trending search terms.

| Search Term | % Cloaked Pages |
|---|---|
| viagra 50mg canada | 61.2% |
| viagra 25mg online | 48.5% |
| viagra 50mg online | 41.8% |
| cialis 100mg | 40.4% |
| generic cialis 100mg | 37.7% |
| cialis 100mg pills | 37.4% |
| cialis 100mg dosage | 36.4% |
| cialis 10mg price | 36.2% |
| viagra 100mg prices | 34.3% |
| viagra 100mg price walmart | 32.7% |

Table 1: Top 10 pharmaceutical search terms with the highest percentage of cloaked search results, sorted in decreasing order.



Figure 3: Distribution of percentage of cloaked search results for pharmaceutical search terms, sorted in decreasing order.

simply observing the struggle between the two sides. Finally, we note that the absolute amount of cloaking we find is less than some previous studies, but such comparisons are difficult to interpret since cloaking results fundamentally depend upon the search terms used.

## 4.2   Sources of Search Terms

Cloakers trying to broadly attract as many visitors as possible target trending popular searches. Since we used a variety of sources for search terms, we can look at how the prevalence of cloaking correlates with search term selection.

Figures 2a and 2b show the average prevalence of cloaking for each source on search results returned from Google and Yahoo, respectively, for trending searches; we do not present results from Bing due to the overall lack of cloaking. Similar to Figure 1, each point shows the percentage of cloaked links in the top 100 search results. Here, though, each point shows the average percentage of cloaked results for a particular source, which normalizes the results independent of the number of search terms we crawled from each source. (Because different sources provided different numbers of search terms, the percentages do not sum to the overall percentages in Figure 1.)

From the graphs, we see that, through May 4th, using search terms from Google Suggest, seeded initially from Google Hot Searches, uncovers the most cloaking. For Google search results, averaged across the days, Google Suggest returns $3.5\times$ as many cloaked search results as Google Hot Searches alone, $2.6\times$ as Twitter, and $3.1\times$ as Alexa. Similarly, even when using Yahoo, Google Sug-

gest returns $3.1\times$ as many cloaked search results as Google Hot Searches alone, $2.6\times$ as Twitter, and $2.7\times$ as Alexa. As discussed in Section 3.1, cloakers targeting popular search terms face stiff SEO competition from others (both legitimate and illegitimate) also targeting those same terms. By augmenting popular search terms with suggestions, cloakers are able to target the same semantic topic as popular search terms. Yet, because the suggestion is essentially an autocomplete, it possesses the long-tail search benefits of reduced competition while remaining semantically relevant.

The above results demonstrate that the prevalence of cloaking in search results is highly influenced by the search terms. As another perspective, for each measurement period that crawls the search terms at a given point in time, we can count the number of cloaked results returned for each search term. Averaging across all measurement periods, 23% and 14% of the search terms accounted for 80% of the cloaked results from Google and Yahoo, respectively. For reference, Table 1 lists the results for the top 10 search terms on Google and Figure 3 shows the distribution of the percentage of cloaked search results for pharmaceutical search terms. The query "viagra 50mg canada" is the pharmaceutical term with the largest percentage of cloaked search results on Google with 61%. Yet, the median query "tramadol 50mg" contains only 7% of cloaked search results. Note that the percentages sum to much more than 100% since different search terms can return links to the same cloaked



Figure 4: Churn in the top 100 cloaked search results and overall search results for trending search terms.



Figure 5: Churn in the top 100 cloaked search results and overall search results for pharmaceutical search terms.

pages. As an example in Figure 3, the sixth point shows the average percentage of cloaked search results, across all measurements, for the search term with the sixth highest percentage of cloaked search results. We plot the first 10 points with the most significant percentage of cloaked search results, then plot every 10th search term, for clarity. From these results we see high variance in the percentage of cloaked search results.

### 4.3    Search Engine Response

Next we examine how long cloaked pages remain in search results after they first appear. For a variety of reasons, search engines try to identify and thwart cloaking. Although we have little insight into the techniques used by search engines to identify cloaking,[4] we can still observe the external effects of such techniques in practice.

We consider cloaked search results to have been effectively "cleaned" by search engines when the cloaked search result no longer appears in the top 100 results. Of course, this indicator may not be directly due to the page having been cloaked. The search engine ranking algorithms could have adjusted the positions of cloaked pages over time due to other factors, e.g., the SEO techniques used by cloakers may turn out to be useful only in the short term. Either way, in this case we consider the cloaked pages as no longer being effective at meeting the goals of the cloakers.

To measure the lifetime of cloaked search results, we perform repeated search queries for every search term over time (Section 3.5). We then examine each new set of search results to look for the cloaked search results we originally detected. The later search results will contain any updates, including removals and suppressions, that search engines have made since the time of the initial measurement. To establish a baseline we also measure the lifetime of all our original search results, cloaked or not. This baseline allows us to differentiate any churn that occurs naturally with those attributable to "cleaning". We perform these repeated searches on each term every four hours up to 24 hours and then every day up to seven days.

Figures 4a and 4b show the lifetime of cloaked and overall search results for Google and Yahoo for trending searches. Each point shows the average percentage of search results that remain in the top 100 for the same search terms over time. The error bars denote the standard deviation across all searches, and we plot the points for "cloaked" slightly off-center to better distinguish error bars on different curves. The results, for both search engines, show that cloaked search results rapidly begin to fall out of the top 100 within the first day, with a more gradual drop thereafter. In contrast, search results in general have similar trends, but decline more gradually. For Google, nearly 40% of cloaked search results have a lifetime of a day or less, and over the next six days only an additional 25% drop from the top 100 results. In contrast, for the baseline only 20% of overall search results have a lifetime of a day of less, and

---

[4] Google has a patent in the area [13], but we have not seen evidence of such a client-assisted approach used in practice.



Figure 6: Increase in harmful trending search results over time on Google as labeled by Google Safe Browsing.



Figure 7: Duration pages are cloaked.

an additional 15% are cleaned after the next six days. Yahoo exhibits a similar trend, although with less rapid churn and with a smaller separation between cloaked and the baseline (perhaps reflecting differences in how the two search engines deal with cloaking). Overall, though, while cloaked pages do regularly appear in search results, many are removed or suppressed by the search engines within hours to a day.

Figures 5a and 5b show similar results for pharmaceutical searches. Note that the maximum time delta is 30 days because, unlike trending terms, the pharmacy search terms do not change throughout the duration of our experiment and we have a larger window of observation. While we still see similar trends, where cloaked search results drop more rapidly than the churn rate and Google churns more than Yahoo, the response for both Google and Yahoo is slower for pharmaceutical terms than for trending terms. For example, whereas 45% and 25% of cloaked trending search results were "cleaned" for Google and Yahoo, respectively, within two days, only 30% and 10% of cloaked pharmacy search results were "cleaned" for Google and Yahoo, respectively.

As another perspective on "cleaning", Google Safe Browsing [7] is a mechanism for shielding users by labeling search results that lead to phishing and malware pages as "harmful". These harmful search results sometimes employ cloaking, which Google Safe Browsing is able to detect and bypass. This insight suggests that the rate that Google is able to discover and label "harmful" search results correlates with the rate at which they can detect cloaking. We can measure this Safe Browsing detection by repeatedly querying for the same terms as described in Section 3.5 and counting the number of "harmful" search results.

As observed in Section 4.2, the prevalence of cloaking is volatile and depends heavily on the specific search terms. The prevalence of detected harmful pages is similarly volatile; although 37% of the results on average on Google are marked as harmful for the terms we search for, there is substantial variance across terms. Therefore, we normalize the change over time in the number of harmful search results labeled by Google Safe Browsing relative to the first measurement. Figure 6 shows the average normalized change in the number of harmful labels over time, across all queries on trending search terms. The number of harmful labels increases rapidly for the first day, with nearly 2.5× more labels than the original measurement, and then increases steadily over the remaining six days, where there are nearly 5× more labels than the original query. This behavior mirrors the results on cleaning above.

## 4.4   Cloaking Duration

Cloakers will often subvert existing pages as an SEO technique to capitalize on the already established good reputation of those pages with search engines. We have seen that the search engines respond relatively quickly to having cloaked pages in search results. Next we examine how long until cloaked pages are no longer cloaked, either because cloakers decided to stop cloaking or because a subverted cloaked page was discovered and fixed by the original owner.

To measure the duration that pages are cloaked, we repeatedly crawl every cloaked page that we find over time, independent of whether the page continues to appear in the top 100 search results. We then apply the cloaking detection algorithm on the page (Section 3.4), and record when it is no longer cloaked. As in Section 4.3, we crawl each page every four hours up to 24 hours and then every day up to seven days.

Figure 7 shows the time durations that pages are cloaked in results returned by Google and Yahoo. Each point shows the percentage of all cloaked pages for each measurement period that remain cloaked over time, and the error bars show the standard deviations across measurement periods. We see that cloaked pages have similar durations for both search engines: cloakers manage their pages similarly independent of the search engine. Further, pages are cloaked for long durations: over 80% remain cloaked past seven days. This result is not very surprising given that cloakers have little incentive to stop cloaking a page. Cloakers will want to maximize the time that they might benefit from having a page cloaked by attracting customers to scam sites, or victims to malware sites. Further, it is difficult for them to recycle a cloaked page to reuse at a later time. Being blacklisted by Google Safe Browsing, for instance, requires manual intervention to regain a positive reputation. And for those cloaked pages that were subverted, by definition it is difficult for the original page owners to detect that their page has been subverted. Only if the original page owners access their page as a search result link will they realize that their page has been subverted; accessing it any other way will return the original contents that they expect.

## 4.5   Cloaked Content

Since the main goal of cloaking as an SEO technique is to obtain user traffic, it is natural to wonder where the traffic is heading. By looking at the kind of content delivered to the user from cloaked search results, not only does it suggest why cloaking is necessary

| Category | % Cloaked Pages |
|---|---|
| Traffic Sale | 81.5% |
| Error | 7.3% |
| Legitimate | 3.5% |
| Software | 2.2% |
| SEO-ed Business | 2.0% |
| PPC | 1.3% |
| Fake-AV | 1.2% |
| CPALead | 0.6% |
| Insurance | 0.3% |
| Link farm | 0.1% |

Table 2: Breakdown of cloaked content for manually-inspected cloaked search results from Google for trending search terms. Note that "Traffic Sale" pages are the start of redirection chains that typically lead to Fake-AV, CPALead, and PPC landing pages.



Figure 8: Proportional distribution of cloaked search results in Google over time for trending searches.

for hiding such content, but it also reveals the motives cloakers have in attracting users.

We have no fully automated means for identifying the content behind cloaked search results. Instead, we cluster cloaked search results with the exact same DOM structure of the pages as seen by the user when clicking on a search result. We perform the clustering on all cloaked search results from Google across all measurement points for trending searches. To form a representative set of cloaked pages for each cluster, we select a handful of search results from various measurement times (weekday, weekend, dayime, morning, etc.) and with various URL characteristics. We then manually label pages in this representative set to classify the content of the pages being cloaked.

We manually label the content of each cluster into one of ten categories: traffic sales, pay-per-click (PPC), software, insurance, Fake-AV, CPALead,[5] link farm, SEO-ed business, error, and legitimate. Traffic sales are cloaked search results with the sole purpose of redirecting users through a chain of advertising networks, mainly using JavaScript, before arriving at a final landing page. Although we are unable to follow them systematically, from manually examining thousands of traffic sales, we observed these search results directing users primarily to Fake-AV, CPALead, and PPC pages. Occasionally cloaked search results do not funnel users through a redirection chain, which is how we are able to classify the PPC, software, insurance, Fake-AV, and CPALead sets. The link farm set contain benign pages that provide many backlinks to boost the rankings of beneficiary pages. The SEO-ed business refers to businesses that employ black-hat SEO techniques, such as utilizing free hosting to spam a large set of search results for a single term. The errors are pages that have client side requirements we were unable to meet, i.e., having an Adobe Flash plugin. Finally, the legitimate set refers to pages that display no malicious behavior but were labeled as cloaking due to delivering differing content, as is the case when sites require users to login before accessing the content.

Table 2 shows the breakdown of cloaked search results after manually inspecting the top 62 clusters, out of 7671 total, which were sorted in decreasing order of cluster size. These 62 clusters account for 61% of all cloaked search results found in Google for trending searches across all measurement points. From this, we see that about half of the time a cloaked search result leads to some form of abuse. Further, over 49% of the time, cloaked search results

sell user traffic through advertising networks, which will eventually lead to Fake-AV, CPALeads, or PPC.

Interestingly, the DOM structure of the largest cluster, which alone acounted for 34% of cloaked search results, was a single JavaScript snippet that performs redirection as part of traffic sales. Other large clusters that accounted for 1–3% of cloaked search results also consist primarily of JavaScript that performs redirection as part of traffic sales.

Despite the fact that the clusters we have examined account for 61% of all cloaked search results, there still exists 39% that have not been categorized and likely do not share the same distribution. While incrementally clustering, we noted that the top clusters grew larger and larger as more and more data was added. This suggests the presence of long-term SEO campaigns, as represented by the top clusters, that constantly change the search terms they are targeting and the hosts they are using. Therefore, since the uncategorized search results fall within the long tail, they are unlikely to be actively involved in direct traffic sales. Instead, we speculate that they fall in the link farm or legitimate sets given that those groups have the most difficult time in forming large clusters because they are not being SEO-ed as heavily across search terms.

The kinds of pages being cloaked is also dynamic over time. Figure 8 shows the classification of cloaked page content for search results from Google using trending terms, from March 1, 2011 through July 15, 2011. We classify the HTML of cloaked pages, using the file size and substrings as features, into one of the following categories: Linkfarm, Redirect, Error, Weak, or Misc. The Linkfarm category represents content returned to our "Googlebot" crawler that contains many outbound links hidden using CSS properties. The Redirect category represents content returned to a user that is smaller than 4 KB and contains JavaScript code for redirection, or an HTML meta refresh. The Error category represents user content that is smaller than 4 KB and contains a blank page or typical error messages. The Weak category contains user content below 4 KB in file size not already classified; similarly, the Misc category contains user content larger than 4 KB not already classified. As an example, on March 7th approximately 7% of the cloaked content detected were linkfarms, 53% were redirects, 6% were errors, 3% were weak and 31% were misc.

Looking at the trends over time reveals the dynamic nature of the content being hidden by cloaking. In particular, we saw a surge in redirects from March 15th to June 5th. During this period, the average distribution of redirects per day increased from 11.4% to

---

[5] Cost-per-action pages that ask a user to take some action, such as filling out a form, that will generate advertising revenue.



Figure 9: Histogram of the most frequently occuring TLDs among cloaked search results.



Figure 10: Distribution of cloaked search result positions.

41.3% and later dropped off to 8.7%. Interestingly, as redirects begin to fall off, we see a corresponding increase in errors. During the high period of redirects, errors represented 8.0% of the average distribution, but afterwards represented 24.3%. One explanation of this correlation is that the infrastructure supporting redirects begins to collapse at this point. Anecdotally, this behavior matches the general time frame of the undermining of key Fake-AV affiliate programs [9], frequently observed at the end of the redirect chains.

### 4.6   Domain Infrastructure

Analyzing the underlying intent of cloaked pages confirmed again that cloakers are attempting to attract traffic by illegitimately occupying top search result positions for trending and pharmacy search terms and their suggestions. The implication is that the key resource that spammers must possess, to effectively utilize cloaking in their scams, is access to Web sites and their domains. Ideally, these sites should be established sites already indexed in search engines. Otherwise, solely using traditional SEO tactics, such as link farming, will have limited success in obtaining high search result positions. Recent reports confirm that many pages have been targeted and infected by well known exploits to their software platforms, and subsequently used to cloak hidden content from search engines [18].

In this section, we examine the top level domains (TLDs) of cloaked search results. Figure 9 shows histograms of the most frequently occuring TLDs among all cloaked search results, for both Google and Yahoo. We see that the majority of cloaked search results are in .com. Interestingly, cloaked search results from pharmaceutical queries utilize domains in .edu and .org much more frequently, where together they represent 27.6% of all cloaked search results seen in Google and 31.7% in Yahoo. For comparison, .edu and .org together represent just 10% in Google and 14.8% in Yahoo for trending searches. Cloakers spamming pharmaceutical search terms are using the "reputation" of pages in these domains to boost their ranking in search results similar to the recent accusations against overstock.com [6].

### 4.7   SEO

Finally, we explore cloaking from an SEO perspective by quantifying how successful cloaking is in high-level spam campaigns. Since a major motivation for cloaking is to attract user traffic, we can extrapolate SEO performance based on the search result positions the cloaked pages occupy. For example, a campaign that is able to occupy search result positions between 1–20 is presumably much more successful than one that is only able to occupy search result positions between 41–60.

To visualize this information, we calculate the percentage of cloaked search results found between ranges of search result positions for each measurement. Then we take the average across all measurements. Again, we only focus on Google and Yahoo due to the lack of cloaked search results in Bing. For clarity, we bin the histogram by grouping every ten positions together, the default number of search results per page.

Figure 10 shows the resulting histograms for trending search terms and pharmaceutical terms, side by side. For trending searches we see a skewed distribution where cloaked search results mainly hold the bottom positions; for both Google and Yahoo, positions further away from the top contain more cloaking. Compared to the positions 1–10 on the first page of results, the number of cloaked search results are $2.1\times$ more likely to hold a search result position between 31–40 in Google, and $4.7\times$ more likely to be in position 91–100; results for Yahoo are similar. In some ways, this distribution indicates that cloaking is not very effective for trending search terms. It does not lead to a higher concentration in the most desirable search result positions (top 20), likely due to the limited amount of time available to SEO. Although cloakers will have fewer opportunities for their scams as a result, presumably it still remains profitable for cloakers to continue the practice.

Interestingly, we see a very different trend in pharmaceutical searches where there is an even distribution across positions. The number of cloaked pages are just as likely to rank in the first group of search results (positions 1–10) as any other group within the top 100. Wu and Davison [24] had similar findings from 2005. One possible explanation is that the differences again reflect the differences in the nature of cloaked search terms. Cloaking the trending terms by definition target popular terms that are very dynamic, with limited time and heavy competition for performing SEO on those search terms. Cloaking pharmacy terms, however, is a highly focused task on a static set of terms, providing much longer time frames for performing SEO on cloaked pages for those terms. As

a result, cloakers have more time to SEO pages that subsequently span the full range of search result positions.

## 5.  CONCLUSION

Cloaking has become a standard tool in the scammer's toolbox and one that adds significant complexity for differentiating legitimate Web content from fraudulent pages. Our work has examined the current state of search engine cloaking as used to support Web spam, identified new techniques for identifying it (via the search engine snippets that identify keyword-related content found at the time of crawling) and, most importantly, we have explored the dynamics of cloaked search results and sites over time. We demonstrate that the majority of cloaked search results remain high in rankings for 12 hours and that the pages themselves can persist far longer. Thus, cloaking is likely to be an effective mechanism so long as the overhead of site placement via SEO techniques is less than the revenue obtained from 12 hours of traffic for popular keywords. We believe it is likely that this holds, and search engine providers will need to further reduce the lifetime of cloaked results to demonetize the underlying scam activity.

### Acknowledgments

We thank Damon McCoy for insightful comments and discussion of this work, and we also thank the anonymous reviewers for their valuable feedback. This work was supported in part by National Science Foundation grants NSF-0433668 and NSF-0831138, by the Office of Naval Research MURI grant N000140911081, and by generous research, operational and/or in-kind support from Google, Microsoft, Yahoo, Cisco, HP and the UCSD Center for Networked Systems (CNS).

## 6.  REFERENCES

[1] John Bethencourt, Jason Franklin, and Mary Vernon. Mapping Internet Sensors with Probe Response Attacks. In *Proceedings of the 14th USENIX Security Symposium*, Baltimore, MD, July 2005.

[2] Andrei Z. Broder. On the Resemblance and Containment of Documents. In *Proceedings of the Compression and Complexity of Sequences (SEQUENCES'97)*, pages 21–29, June 1997.

[3] Lee G. Caldwell. *The Fast Track to Profit*. Pearson Education, 2002.

[4] Kumar Chellapilla and David Maxwell Chickering. Improving Cloaking Detection Using Search Query Popularity and Monetizability. In *Proceedings of the SIGIR Workshop on Adversarial Information Retrieval on the Web (AIRWeb)*, August 2006.

[5] Marco Cova, Corrado Leita, Olivier Thonnard, Angelos Keromytis, and Marc Dacier. An Analysis of Rogue AV Campaigns. In *Proceedings of the 13th International Symposium on Recent Advances in Intrusion Detection (RAID)*, September 2010.

[6] Amir Efrati. Google Penalizes Overstock for Search Tactics. http://online.wsj.com/article/SB10001424052748704520504576162753779521700.html, February 24, 2011.

[7] Google Safe Browsing API. http://code.google.com/apis/safebrowsing/.

[8] John P. John, Fang Yu, Yinglian Xie, Arvind Krishnamurthy, and Martin Abadi. deSEO: Combating Search-Result Poisoning. In *Proceedings of the 20th USENIX Security Symposium*, August 2011.

[9] Brian Krebs. Huge Decline in Fake AV Following Credit Card Processing Shakeup. http://krebsonsecurity.com/2011/08/huge-decline-in-fake-av-following-credit-card-processing-shakeup/, August 2011.

[10] Nektarios Leontiadis, Tyler Moore, and Nicolas Christin. Measuring and Analyzing Search-Redirection Attacks in the Illicit Online Prescription Drug Trade. In *Proceedings of the 20th USENIX Security Symposium*, August 2011.

[11] Kirill Levchenko, Neha Chachra, Brandon Enright, Márk Félegyházi, Chris Grier, Tristan Halvorson, Chris Kanich, Christian Kreibich, He Liu, Damon McCoy, Andreas Pitsillidis, Nicholas Weaver, Vern Paxson, Geoffrey M. Voelker, and Stefan Savage. Click Trajectories: End-to-End Analysis of the Spam Value Chain. In *Proceedings of the IEEE Symposium and Security and Privacy*, Oakland, CA, May 2011.

[12] Jun-Lin Lin. Detection of cloaked web spam by using tag-based methods. *Expert Systems with Applications*, 36(4):7493–7499, 2009.

[13] Marc A. Najork. System and method for identifying cloaked web servers, United States Patent number 6,910,077. Issued June 21, 2005.

[14] Yuan Niu, Yi-Min Wang, Hao Chen, Ming Ma, and Francis Hsu. A Quantitative Study of Forum Spamming Using Contextbased Analysis. In *Proceedings of 15th Network and Distributed System Security (NDSS) Symposium*, February 2007.

[15] Moheeb Abu Rajab, Lucas Ballard, Panayiotis Mavrommatis, Niels Provos, and Xin Zhao. The Nocebo Effect on the Web: An Analysis of Fake Anti-Virus Distribution. In *Proceedings of the 3rd USENIX Workshop on Large-Scale Exploits and Emergent Threats (LEET'10)*, April 2010.

[16] Search Engine Marketing Professional Organization (SEMPO). State of Search Engine Marketing Report Says Industry to Grow from $14.6 Billion in 2009 to $16.6 Billion in 2010. http://www.sempo.org/news/03-25-10, March 2010.

[17] Craig Silverstein, Monika Henzinger, Hannes Marais, and Michael Moricz. Analysis of a Very Large Web Search Engine Query Log. *ACM SIGIR Forum*, 33(1):6–12, 1999.

[18] Julien Sobrier. Tricks to easily detect malware and scams in search results. http://research.zscaler.com/2010/06/tricks-to-easily-detect-malware-and.html, June 3, 2010.

[19] Danny Sullivan. Search Engine Optimization Firm Sold For $95 Million. http://searchenginewatch.com/2163001, September 2000. Search Engine Watch.

[20] Jason Tabeling. Keyword Phrase Value: Click-Throughs vs. Conversions. http://searchenginewatch.com/3641985, March 8, 2011.

[21] Yi-Min Wang and Ming Ma. Detecting Stealth Web Pages That Use Click-Through Cloaking. Technical Report MSR-TR-2006-178, Microsoft Research, December 2006.

[22] Yi-Min Wang, Ming Ma, Yuan Niu, and Hao Chen. Spam Double-Funnel: Connecting Web Spammers with Advertisers. In *Proceedings of the 16th International World Wide Web Conference (WWW'07)*, pages 291–300, May 2007.

[23] Wordtracker. Five Reasons Why Wordtracker Blows Other

Keywords Tools Away. http://www.wordtracker.com/find-the-best-keywords.html.

[24] Baoning Wu and Brian D. Davison. Cloaking and Redirection: A Preliminary Study. In *Proceedings of the SIGIR Workshop on Adversarial Information Retrieval on the Web (AIRWeb)*, May 2005.

[25] Baoning Wu and Brian D. Davison. Detecting Semantic Cloaking on the Web. In *Proceedings of the 15th International World Wide Web Conference*, pages 819–828, May 2006.

# APPENDIX

# A.  CLOAKING ILLUSTRATION

Figure 11 uses browser screenshots to illustrate the effects of cloaking when searching on Google on May 3, 2011 with the terms "bethenny frankel twitter", a topic popular in user queries at that time. The top screenshot shows the first search results page with the eighth result highlighted with content snippets and a preview of the linked page; this view of the page corresponds to the cloaked content returned to the Google crawler when it visited this page. These search results are also examples of what Dagger obtains when querying Google with search terms (Section 3.2).

The middle screenshot shows the page obtained by clicking on the link using Internet Explorer on Windows. Specifically, it corresponds to visiting the page with the `User-Agent` field set to:

```
Mozilla/5.0 (compatible; MSIE 8.0; Windows NT 5.2;
Trident/4.0; Media Center PC 4.0; SLCC1; .NET CLR
3.0.04320)
```

and the `Referer` field indicating that the click comes from a search result for the terms "bethenny frankel twitter". This page visit corresponds to when Dagger crawls the URL as a search "user" (Section 3.3), displaying an advertisement for Fake-AV.

The bottom screenshot shows the page obtained by crawling the link while mimicking the Google crawler. Specifically, it corresponds to visiting the page with the `User-Agent` field set to:

```
Mozilla/5.0 (compatible; Googlebot/2.1;
+http://www.google.com/bot.html)
```

and corresponds to when Dagger visits the URL as a search "crawler". Note that this page also uses IP cloaking: the content returned to Dagger, which does not visit it with a Google IP address, is different from the content returned to the real Google search crawler (as reflected in the snippet and preview in the top screenshot). Nevertheless, because the cloaked page does return different content to search users and the Dagger crawler, Dagger can still detect that the page is cloaked.



(a) Google Search Results Page



(b) User from Windows



(c) Crawler

Figure 11: Example of cloaking in practice: (a) the first search results page for the query "bethenny frankel twitter", including the Google preview; (b) the page obtained by clicking on the highlighted link from a Windows machine (with `Referer` indicating a search result); and (c) the same page visited but with the `User-Agent` field in the HTTP request header set to mimic that of the Google search crawler.

APPENDIX
199



Available online at www.sciencedirect.com

**SciVerse ScienceDirect**

Procedia Technology 4 (2012) 566 – 572

**Procedia**
Technology

C3IT-2012

# A Reputation Based Detection Technique to Cloaked Web Spam

A.Naga Venkata Sunil[a], Anjali Sardana[a]

*[a]Department of Electronics and Computer Engineering, IIT Roorkee, Roorkee,247667, India*

**Abstract**

Web spamming techniques are used by spammers in order to boost one's PageRank of the page and show themselves in top of the results. Spamming techniques can be classified as boosting techniques and hiding techniques. Search engines are facing problems mainly due to hiding techniques. Cloaking is a kind of hiding technique which is used to return different pages to the crawler and the user on their request to the cloaked web server. The cloaked web server always return same page to the user but it returns different pages to different crawlers because different search engines use different PageRanking techniques. Dynamic cloaking is a kind cloaking technique in which web servers intermittently send cloaked and non cloaked pages to crawler on its request. There is no method to detect dynamic cloaking to the best of our knowledge. This paper discusses various techniques that exist to detecting cloaking and an exhaustive comparison between the existing techniques is done. This paper also presents an abstract model to detect cloaking based on reputation.

© 2011 Published by Elsevier Ltd. Selection and/or peer-review under responsibility of C3IT
Open access under CC BY-NC-ND license.
*Keywords:* cloaking; reputataion; crawler; webspam; PageRank;

## 1. Introduction

Najork defined "Web spam refers to a host of techniques to subvert the ranking algorithms of web search engines and cause them to rank search results higher than they would otherwise"[2]. Cloaking is a kind of search engine spamming technique, in which different pages are sent to search engine bot and an ordinary browser on their request to cloaked web server. Even if two requests come from two different crawlers at the same time to the cloaked server, different pages are sent to the crawlers because different search engine uses different ranking algorithms. Z. Gyöngyi and H. Garcia-Molina [1] classified cloaking under hiding techniques because, it is hiding original high quality page from the user. Google [7] defined cloaking as "Cloaking refers to the practice of presenting different content or URLs to users and search engines. Serving up different results based on user agent may cause your site to be perceived as deceptive and removed from the Google index". Because of this cloaking the quality of search engine results are declining, since the cloaked server sends high PageRanked page to the crawler and spammed page to the user. So these pages are indexed in top of the results by search engines for user's query.

*A.Naga Venkata Sunil and Anjali Sardana / Procedia Technology 4 (2012) 566 – 572* 567

There are three methods of cloaking which are used by cloakers, to issue different pages on crawler and browser request. They are as follows:

- IP address: Whenever a HTTP request comes to a cloaked site, it will check the list of IP addresses of the search engine crawlers. If there is a hit then it will send a high quality page to the crawler else it will send cloaked page. Now-a-days there are software's or websites that are providing updated IP addresses of search engine crawlers, so that made the work of cloaker's easy.
- User-agent delivery: In this method the crawlers are identified by seeing the user-agent field of the HTTP request. The browser request and the crawler request are differentiated because they have different user-agent headers and crawler may fake this by placing some browser's application.
- Referer HTTP header: The referer header includes the IP address of the referrer of the request. So a cloaker can easily identify who is the referrer of the request. Like user-agent this header can also be faked.

In this paper we present critical review on existing techniques and presented an abstract model to detect cloaking based on reputation of the URL. Reputation of a URL means assessing the trustworthiness of the URL based on various factors like age of the URL, whether the server is using dynamic IP or not, whether the company is in fortune 500 list or not, etc. We will collect top 200 two hundred URL's of the most popular 100 queries of microsoft's bing search engine. Classify each URL in one among the three categories based on the reputation given by the sites like cisco IronPort SenderBase Security Network [9]. By applying different technique to each URL based on its category, classify the URL whether it is cloaked or not. The contributions of the paper are:

(a) It presents different existing techniques to detect cloaking and an exhaustive comparison between then is done,
(b) Presented an abstract model to detect cloaking using reputation as a constraint,
(c) The proposed technique reduces the computations by detecting cloaking at intermediate steps and reduces memory by using efficient data structures.

Section 2 describes the existing techniques to detect cloaked web spam and exhaustive comparison is made among the existing techniques. Section 3 describes about dynamic cloaking, Section 4 discusses a reputation based technique to detect cloaking. Section 5 discusses about the conclusion and future work to done.

## 2. Detection techniques for cloaked web spam

Cloaking detection techniques use difference in pages obtained between crawler and browser as major constraint. This section describes various techniques to detect syntactic and semantic cloaking.

### 2.1 Identifying cloaked web servers:

Najork[8] has proposed a technique to identify cloaked web servers in which first object is collected by sending request to the web server by a crawler and second object is collected by sending request to the server from a ordinary browser. A Web server is identified as cloaked server if both the objects do not match. This method is used to detect cloaking by taking minimum number of copies but it falsely identify the non cloaked web servers also as cloaked web servers, because web is dynamic in nature there may be frequently updated sites

### 2.2 Detecting cloaking using HITS and HOTS data:

B. Wu and B. D. Davison [3] presented three methods to detect syntactic cloaking using two different datasets.

- Term Difference: Three copies of URL named $C_1$, $B_1$ and $C_2$ are collected. "Bag of words" of each copy of URL is collected, which means collecting all the terms that appeared in the page only once no matter how many times it appear in the page. Calculating the difference

in terms between both the crawler's copies ( NCC) and calculating the difference in terms between browser's copy $B_1$ and crawler's copy $C_1$ (NBC), a page is considered as a cloaking page if NBC>NCC exceeds a predetermined threshold value.

- Link Difference: This method is similar to the previous method in which difference in links is considered.

These two techniques do not provide satisfactory results because a high threshold improves precision at the expense of very low recall. They proposed a third method which automatically detects the cloaking using HOTS dataset. In that method they collected four copies of the page named $C_1$, $C_2$, $B_1$ and $B_2$.

*Algorithm to detect cloaking automatically:*

In this method "bag of words" approach has been used. The difference between both the crawler's copy (denoted as HCC) and browser's copy (HBB) is calculated. If the sum of the terms that are present in both crawler's copy but not in browser's copy and  terms that are present in both the browser's copy and not in crawler's copy exceeds some threshold value then it is considered as cloaking.

### 2.3 Cloaking score:

Chellapilla and Chickering[5] proposed a method using the concept of normalized term frequency difference(NTFD). Two different query categories namely popularity and monetizability are used. Popularity of a query is defined to be proportional to the number of times it occurred in the query logs and monetizability as the amount of revenue generated by user clicks on sponsored links. In this method browser's copy $B_1$ and crawler's copy $C_1$ are collected, then both the copies are checked to find whether have same HTML or not, if so the URL is marked as non-cloaked, if not HTML is converted into simple text and verified whether both copies have same text, if so it is considered as legitimate URL, otherwise copy of browser $B_2$ and crawler $C_2$ are downloaded.  Then NTFD can be calculated  by using equation (1) :

$$NTFD(T_1,T_2)=1-2(|T_1 \cap T_2|/|T_1 \cup T_2|)$$
(1)

Where |.| indicates the cardinality set operation, here the set is multiset of terms. The value of NTFD will always lies in [0,1]. Equation (2) gives the cloaking score S of a URL.

$$S=\Delta_D/\Delta_S$$
(2)

Where $\Delta_D=min\{NTFD(B_1,C_1),NTFD(C_2,B_2)\}$, and $\Delta_S=max\{ NTFD(B_1, B_2),NTFD(C_1,C_2)\}$. If the value of S exceeds some threshold value then it is considered as cloaked. This method performed well for URLs retrieved from monetizable queries. Choosing a threshold value is not an easy task, since it can be in the interval [0,∞).

### 2.4 Detecting semantic cloaking:

 B. Wu and B. D. Davison introduced a technique to find semantic cloaking. Semantic cloaking refers to differences in meaning between pages which have the effect of deceiving search engine ranking algorithms [4]. This is a two step method in which the first step is filtering step and second step is classifying step. In first step the difference between crawler's copy $C_1$ and browser's copy $B_1$ is calculated. If $TB_1C_1$ is less than some threshold then it is considered as not-cloaked and filtered in this step. In classification step two more copies are downloaded each from crawler's

*A.Naga Venkata Sunil and Anjali Sardana / Procedia Technology 4 (2012) 566 – 572* 569

perspective ($C_2$) and browser's perspective ($B_2$). From the four copies $B_1$, $B_2$, $C_1$ and $C_2$ a set of features are extracted. The features extracted may of Content-based features or Link-based features from each copy. Based on these features a classifier is built and used to detect whether the page is semantically cloaked or not. Content-based features include features like response codes and number of terms in HTTP response header and few other attributes. Link-based features includes number of different kinds of links like total links, unique links etc.

*2.5 Tag-Based cloaking detection:*

Jun-Lin Lin[7] proposed three tag-based techniques to detect cloaking. Every URL copy is considered as a multiset of tags and standard set operations are performed. In this method tags are used to calculate the difference because the web is dynamic in nature, all the legitimate sites have similar kind of structure even if the content is changed, but a cloaked URL presents different structure to both the crawler and the browser. Here the tag difference between two multisets $S_1$ and $S_2$ is shown in (3):

$$|(S_1 \backslash S_2) \cup (S_2 \backslash S_1)| = |(S_1 \cup S_2)| - |(S_1 \cap S_2)| \quad (3)$$

Author defined three formulas and named them as TagDiff2, TagDIff3 and TagDiff4. The difference between the tag's of browser's copy and crawler's copy of a URL are calculated as follows:

$$\text{TagDiff2:} \quad |B_1 \backslash C_1| + |C_1 \backslash B_1| \quad (4)$$

$$\text{TagDiff3:} \quad (|B_1 \backslash C_1| + |C_1 \backslash B_1|) - (|C_1 \backslash C_2| + |C_2 \backslash C_1|) \quad (5)$$

$$\text{TagDiff4:} \quad |(B_1 \cap B_2) \backslash (C_1 \cup C_2)| + |(C_1 \cap C_2) \backslash (B_2 \cup B_1)| \quad (6)$$

Equations (4), (5) and (6) are used to calculate the tag difference between browser's copy and crawler's copy. Here $B_1$, B2, C1 and $C_2$ are taken as multisets of tags of browser's and crawler' copies of the URL. If difference exceeds some threshold then it is marked cloaked URL. The number after TagDiff indicates the number of copies of the URL. The body spammed page can also be marked as legitimate site if it considers only tag structure.

*Comparison of detection techniques:*

The comparison between cloaking detection techniques are based on number of copies of URL needed, how the data elements are used i.e. whether a URL copy is considered as set or multiset and drawback of each method. Table 1 gives the comparison between various cloaking detection techniques.

Table 1. Comparison among cloaking detection techniques

| Method | Copy | Group | Drawback |
|---|---|---|---|
| Identifying cloaked web servers(Najork) | 2 | Feature vectors | Identifies dynamic page also as cloaked |
| Link Difference | 4 | Set | Only fewer cloaking pages can found because link difference is smaller. |
| Term Difference | 4 | Set | Term and link difference falsely identifies dynamic pages as cloaked and they need more number of copies. |
| Algorithm to detect automatically | 4 | Set | Falsely identifies dynamic pages as cloaked |

| Cloaking Score | 4 | Multiset | Choosing threshold for S is not an easy task [7]. |
| Detecting semantic cloaking | 4 | Set+Multiset | It needs 4 copies if initial step is not satisfied. |
| TagDiff2 | 2 | Multiset | Fails in the case, if structure of the page is changed. |
| TagDiff3 | 3 | Multiset | Fails in the case, if structure of the page is changed. |
| TagDiff4 | 4 | Multiset | Fails in the case, if structure of the page is changed. |

## 3. Dynamic cloaking:

Jun-Lin Lin defined dynamic cloaking as "the practice of cloaking intermittently to make it difficult to identify"[6]. Dynamic cloaker can switch between "Cloak" and "No Cloak" modes. In "Cloak" it will send keyword enriched page to the crawler, in "No Cloak" mode cloaker will send same version to both crawler and browser.

### 3.1 Event driven cloaking:

In this method the switching between the modes is done based on crawler event. Here crawler event indicates the request from the crawler. A timer is maintained to note the last crawler event.

- Initially mode is set to the "Cloak".
- When a crawler event occurs i.e. when a crawler sends a request, it will check its mode. If it "Cloak" mode it will send different copies to crawler and browser and it will switch itself to the "No Cloak" mode.
- When a time up event occur the cloaker switches to "Cloak" mode, generally time up event will occur if timer exceeds some predefined threshold of last crawler event.

### 3.2 Monitor table:

This method uses monitor table to store the IP addresses of the crawlers which sends the request and the time of the most recent visit of the crawler. When a crawler event occurs it will check whether the IP address of that crawler is in table or not, if it's not present then it is appended to the table with the current time and replies the crawler with the high PageRanked page. If the IP address of the crawler is already there then it replies the crawler with non spammed version and it updates the time of that crawler entry with the current time. A time up event occurs if an entry exceeds a predefined threshold.

## 4. A reputation based technique to detect cloaking

The implementation flow of the proposed technique is given in fig 1. Initially download crawler's copy (C1) and browser's copy (B1) of each URL and simple text comparison is made between the copies.



Case 0:20-cv-60416-AMC   Document 69-24   Entered on FLSD Docket 05/26/2021   Page 172 of 316



Figure 1: Flowchart of implementation

If they are equal we will declare the page as legitimate page. If they are not equal then classify the URL's into one of the three categories named: good, poor and moderate. Apply cloaking detecting technique starting with pages having high reputation, because of this the pages having poor reputation like spammed pages will never appear in top of the search results. If the URL is a classified under:

- Good: Download another copy of the crawler's copy (C2) and calculate the difference between C1, C2 as NCC and difference between C1, B1 as NCB. If NBC exceeds NCC by some defined threshold (as per experimental results) then classify the URL as cloaked otherwise as legitimate.

- Moderate: Download another copy of the crawler's copy (C2) and browser's copy (B2) and calculate the difference as shown in (6) for words. If the difference exceeds some defined threshold (as per experimental results) then classify the URL as cloaked.

- Poor: Download another copy of the crawler's copy (C2) and browser's copy (B2). Sort the words in pages according to some predefined order. Now calculate the difference by using Equation (6) for each word in decreasing order of their frequencies. If the difference exceeds some predefined threshold value then stop at that instance and declare the page as cloaked. The sorting of the words plays a vital role because the pages with less reputation has high possibility of body spam, redirections, etc. so the difference between the pages sent to the crawler and browser will be more. So they can be identified at intermediate step itself. We will use some efficient data structures to maintain the words according to their frequencies.

So this technique treats each URL differently based on its reputation. If the URL is having high reputation then there is less possibility of cloaking so simply technique is applied. If the URL is having poor reputation there is high possibility of cloaking so we use four copies to detect cloaking using equation (6) on sorted list of words. By evaluating the URL's from high reputation to poor reputation and displaying the results according to evaluation order, the false positives will also never occur in top of the search results. By this way cloaked pages that are not detected by the technique will also never appear in top of the results.

## 5. Conclusions and future work

This paper proposed a reputation based technique to detect static cloaking, since static cloaking is most common form of cloaking, it is causing severe threat to the search engines. This method has to be practically implemented by collecting large dataset and finding reputation of each URL. The method proposed in this paper uses reputation of the URL to apply appropriate technique on the URL to find cloaking. Most of the techniques have inherent disadvantage of downloading more number of copies and high computations. The proposed technique will reduce the number of computations by detecting at intermediate steps and maintaining the data of the page using efficient data structures.

This paper also presented an exhaustive comparison of existing techniques based on the attributes: number of copies used, group that was used by the method and the drawback of each method. This technique should be examined on real life data set to validate the technique. The technique should be further extended to detect dynamic cloaking to make search engines results free from cloaking.

## References

1. Z. Gyöngyi and H. Garcia-Molina. Web spam taxonomy. *In First International Workshop on Adversarial Information Retrieval on the Web (AIRWeb'05),* Chiba, Japan ( 2005),  pp. 1-11.
2. Marc Najork, Web Spam Detection. *In Encyclopedia of database systems, Springer Verlag*, September 2009, Part 23, pp. 3520-3523.
3. B. Wu and B. D. Davison. Cloaking and redirection: A Preliminary Study. *Adversarial Information Retrieval on the Web - AIRWEB* , 2005, pp. 7-16.
4. Baoning Wu and Brian D. Davison. Detecting semantic cloaking on the Web. *15th International World Wide Web Conference, Industrial Track,* Edinburgh, Scotland, May 22-26, 2006, pp. 819-828.
5. Chellapilla, K., & Chickering. D. M. Improving cloaking detection using search query popularity and monetizability. *In Proceedings of the second international workshop on adversarial information retrieval on the web,* Seattle, USA, August 2006,pp. 17-24.
6. Jun-Lin Lin. Detection of cloaked web spam by using tag-based methods. *Expert Systems with Applications journal of Elsevier*, 2009, pp. 7493–7499.
7. Google,http://www.google.com/support/webmasters/bin/answer.py?answer=66355, updated 08/11/2011.
8. M. Najork. System and method for identifying cloaked web servers.  Patent Application number 20030131048 (2005).
9. Cisco IronPort SenderBase Security Network. http://www.senderbase.org/index , updated May 2011.

# APPENDIX
# 200

# Osterman Research

## WHITE PAPER

**White Paper** by Osterman Research
Published **September 2019**
Sponsored by **NetGovern**

## Using Third-Party Solutions With Office 365

# Executive Summary

Office 365 is licensed for use by more than 180 million users at more than 1.4 million commercial, education and government organizations, making it currently the most popular enterprise cloud service in the world. It covers a variety of situations, scenarios, and capability sets. Microsoft has won massive market momentum by bundling office productivity software and cloud-based services in Office 365 and Microsoft 365, much like it did with its original bundling of Word, PowerPoint and Excel back in the 1990s to create Microsoft Office. This paper discusses aspects of the email messaging and collaboration services that are nearly synonymous with Office 365.

While Microsoft offers an industry-leading communications, collaboration and productivity platform, organizations need to understand their real requirements and most would be well-served by reinforcing the service in several key, supplemental areas, most especially security, archiving, eDiscovery, and encryption. Decision makers need to be aware that relying exclusively on the native capabilities in Office 365 can present challenges and business risks for their organization. While the inclusion of similar capabilities in the platform may give some the impression of platform self-sufficiency, organizations should recognize that certain features may not best align with their business needs, now or in the future. In specific areas, it's important to recognize that a focused third-party vendor with deep industry and solution experience is often able to deliver deeper and better capabilities compared to Microsoft, thereby complementing Office 365 and reducing the business risk of embracing all Office 365 features as sufficient or even ideal.

## KEY TAKEAWAYS

As with any application, decision makers should perform due diligence on how Office 365 will perform for their organization. This includes:

- Understanding the capabilities on offer in Office 365, and how those capabilities match the organization's security requirements, compliance mandates, and legal processes.

- Undertaking a deep dive on Office 365's features and functions, in order to understand what is and isn't available in Office 365, and how what's available in Office 365 compares to capabilities on offer in third-party solutions that may better address your business needs. Insufficient security and compliance capabilities can result in high threat business events, e.g., data breaches, business email compromise, GDPR fines, ransomware infections, phishing attacks leading to credential theft, theft of intellectual property, and other problems.

- Developing a risk matrix of the security threats and compliance mandates facing your organization, and deciding which risks you are willing to address with standard capabilities in Office 365, along with defining the financial provision that will have to be made if an adverse event occurs. For various other risks, being proactive in establishing more effective safeguards by adding third-party solutions to mitigate the risk will be the better path.

- Planning how to address any identified supplemental needs for Office 365 ideally before rolling out the platform. For organizations where these capabilities are essential, important, frequently used, and necessary to everyday workflow, relying on "good enough" tools is not good enough. Lack of capability starts to have a business net-negative impact. And equally, for organizations where these capabilities are infrequently used, actually having best-of-breed solution sets available is much more important than only "good enough" functionality sets.

## ABOUT THIS WHITE PAPER

Osterman Research conducted an in-depth survey of organizations that are or will be using Office 365, and combined insights from this survey with its own analysis and

*Decision makers must perform due diligence on how Office 365 will perform for their organization.*

evaluation of Office 365. Osterman Research provides regular analysis of Office 365 through its Office 365 Analysis Service, available by subscription. This white paper was sponsored by NetGovern; information about the company is provided at the end of this paper.

# Issues to Consider for Improving Office 365 Security

Microsoft offers default security capabilities for all customers in Office 365, along with capabilities bearing the "advanced" moniker for the more pernicious threats. Regardless, security threats are still getting through these defenses, in part because native security in Office 365 is not as robust as some third-party solutions (in December 2018, SE Labs found that Microsoft Exchange Online Protection [EOP] achieved only an eight percent effectiveness rating and Microsoft Advanced Threat Protection [ATP] achieved only a 35 percent rating, significantly lower than third-party solutions that were in the high nineties[1].

The use of third-party solutions can result in higher catch rates for spam, phishing, malware and other threats. Third-party solutions with true advanced capabilities also reduce the likelihood that more sophisticated threats – such as Business Email Compromise (BEC) and account compromise – will be successful. The current security solutions used in Office 365 environments are shown in Figure 1.

**Figure 1**
**Current Security Solutions Employed for Office 365**
Percentage of Organizations



Source: Osterman Research, Inc.

*The use of third-party solutions can result in higher catch rates for spam, phishing, malware and other threats.*

## ACHIEVING HIGH CATCH RATES

Catch rates for all types of malicious content must be very high because the consequences of malicious content successfully bypassing security layers can be business impactful (e.g., lost staff and management time, lost funds) and even business critical (e.g., business interruption, reputational damage, reduced market value, lost customer confidence, stolen data and intellectual property, regulatory fines under GDPR and similar for not having effective security practices in place). With the increased use of sophisticated social engineering techniques, and the patience of

[1] https://selabs.uk/download/enterprise/essp/2018/dec-2018-essp.pdf

some attackers, it only takes one malicious event to have a significant compromise situation. High catch rates are necessary to protect against:

- Advanced threats that leverage social engineering techniques, post-delivery weaponization of attached payloads and URLs, and business email compromise to perpetuate fraud. The intention here is to stop or make safe such social engineering attacks to prevent the user becoming compromised, avoiding the subsequent loss and recovery cost.

- Ransomware that cripples business operations through malicious encryption, and other types of malware that exfiltrate data for sale, exposure, or to use as part of credential phishing campaigns.

- Fileless malware that executes in memory and doesn't leave any trace on disk. Such approaches have been effective at bypassing anti-malware techniques that only analyze what is happening on-disk.

- Evasive phishing campaigns using new techniques to avoid detection by existing, automated security solutions.

- Graymail, which some users want and others no longer want to receive. Graymail is not usually a carrier of malicious content, but for some users receiving graymail is an annoyance.

## AZURE AD AND OFFICE 365 AUDITING

While Microsoft owns the platform, customers are still responsible for the activity of their users, and so insider threats are still possible. The Azure AD Audit and Sign-in Logs via Azure Portal, and the Unified Audit Log in the O365 Security and Compliance Center, have some limitations for insider threats. These include difficulty in searching and interpreting the logs that are generated, multiple consoles/screens, no single correlated view of on-premises and cloud activity for organizations with hybrid environments, and short retention periods for audit logs that put customers at risk for compliance retention and investigations.

## IMPROVING INBOX SECURITY

Pursue a strategy of email defense-in-depth by adding an additional layer of security with one of the new offerings in the emerging category that Osterman Research classifies as "Inbox Detection & Response" (IDR), and which Gartner recently referred to for the first time as "Cloud Email Security Supplements." These are normally intended as a complement to any existing gateway security, and are being provided by third-party security specialists who are integrating with Office 365's native API to continuously inspect emails that have already been delivered. Some offerings include functionality to automate the removal of emails found to be malicious, with the primary use case being the remediation of phishing emails missed by gateway security, and can incorporate some sort of automated framework for users to rescan or submit suspicious emails.

## ZAP MALICIOUS CONTENT REMOVAL

Once malicious content is identified in a mailbox, it should be possible to remove all instances from all mailboxes. Office 365 offers Zero-Hour Auto Purge (ZAP), which only partly addresses this requirement. ZAP will automatically move a newly classified malicious message from a user's inbox to their Junk folder, but cannot delete it permanently or move the offending message to the quarantine, meaning the user still retains access through their Junk folder. Office 365 also offers PowerShell options for completely deleting malicious content, but if scoped incorrectly, this can completely delete valid content from user mailboxes.

## CO-EXISTENCE OF SECURITY SOLUTIONS

A common refrain in the security industry is the need for cross-vendor collaboration and multi-solution coordination, because no single vendor is ever going to catch and

*Office 365's ZAP feature only partially addresses the requirement for removing malicious messages.*

prevent all threats. As confirmed by post-delivery analysis of threat-bearing emails that were checked by Microsoft's tools, but still delivered to the user's inbox, there is a great need for effective co-existence of security solutions. For example, Microsoft's tools frequently miss emails from compromised accounts, and often allow delivery of fake Office 365 announcements and billing demands, which, if successful, lead to account compromise. Third-party solutions from specialist email security vendors include innovations that complement and extend the native EOP and ATP security tools in Office 365.

## ADD A LAYER OF INBOX SECURITY

One option for pursuing a strategy of email defense-in-depth with Office 365 is to add an additional layer of security with one of the new offerings in the emerging category that Osterman Research classifies as "Inbox Detection & Response" (IDR), and which Gartner recently baptized as "Cloud Email Security Supplements." These are normally intended as a complement to any existing gateway security, and are being provided by third-party security specialists who are integrating with Office 365's native API to continuously inspect emails that have already been delivered. Some offerings include functionality to automate the removal of emails found to be malicious (see also Malicious Content Removal below), with the primary use case being the remediation of phishing emails missed by gateway security. Another feature to look for is the incorporation of some sort of automated framework for users to rescan or submit suspicious emails for evaluation.

## CREDENTIAL PHISHING

Credential phishing is an increasingly common attack vector. If an attacker can secure valid credentials, further concealed attacks can be executed and hidden from sight. In evaluating your security needs, look for capabilities to detect near-match spoofing of domain names, because attackers will craft domain options that look similar to a distracted human eye, or even worse, that are hidden completely from display on mobile devices. When internal accounts have been compromised and the message header settings are perfectly valid technically, other non-message header signals must be assessed and correlated in order to identify the attempted fraud. People have higher trust for internal messages from known accounts and known people, and carefully planned internal attacks via compromised accounts are often nearly impossible for a recipient to identify.

*Look for specific delivery SLAs for sandboxed messages.*

## THINGS TO CONSIDER WHEN EVALUATING ADVANCED THREAT CAPABILITIES

Organizations are under attack from targeted and advanced threats and effective defenses are essential. Consequently, it's important to evaluate whether Office 365's native security capabilities versus those of third-party solutions will meet an organization's requirements. Consider the following:

- All necessary file types should be checked for threats, not just Office file types that are the predominant area of interest for Microsoft[2]. Attackers are not limited to the file types created by Office 365 applications, and thus for organizations using more than Office file types in daily business interactions, supplementing what Office 365 offers is essential.

- Dynamic scanning or time-of-click URL checking should work for all links clicked by an end user, rather than being limited to URL links in Outlook email messages and Office documents. When users have access to make types of files, Office 365 ATP Safe Links will be silent. Also, there is a need to ensure clicks can be followed where "multi-hops" are in place, otherwise malicious intent can be hidden from scanning. Where a link is unknown, and potentially risky, isolation of weblinks is an effective technique to allow users access in a way that keeps them safe from potential infection or phishing compromise (read-only website view).

---

[2] Documents linked via a URL in an email or document will now be detonated at time-of-click in Safe Attachments (for supported file types).

- Intelligence on newly-identified threats in an email should be shared beyond the original inbox as close to real-time as possible, so that any other instances across the network are neutered before causing havoc. Microsoft offers signal sharing and correlation in its Intelligent Security Graph, but the time delay and effectiveness of this signal sharing is unclear.

- Vendors should specify a maximum guaranteed delivery time for scanned and sandboxed messages, with specific SLA reporting. In an attempt to reduce the delivery time, Office 365 has introduced various configurable options for administrators to turn on or off, but it is always in the context of "best efforts" and never against a tracked benchmark. The performance and stability of ATP is bundled with more general Office 365 Health Status Indicators, hence there is no structured way to assess trending performance status. The tolerable delay in email delivery for increased security processing is shown in Figure 2. Nearly half of organizations consider a delay up to only a few seconds acceptable.



**Figure 2**
**Tolerable Delay for Increased Security Processing**
Percentage of Organizations

Source: Osterman Research, Inc.

**Next-generation advanced detection mechanisms should be included in Office 365.**

- Next-generation advanced detection mechanisms should include deep content inspection, recursive analysis of embedded documents, evaluation of threats below the application and operating system levels, and identification of dormant code. Sandboxing on controlled physical machines should also be available to analyze for malware that has been intentionally designed to evade virtual sandboxing detonation mechanisms. Microsoft offers several advanced detection capabilities in Microsoft Defender ATP (originally Windows Defender ATP for Windows-only), but this is part of a Microsoft 365 subscription not an Office 365 one.

- Advanced disarming capabilities such as deep content filtering or CDR (content disarm and reconstruction) should be considered to neutralize threats within attachments and inline files. These solutions effectively handle zero-days and unknown threats compared to legacy detection-based technologies that are easily evaded by sophisticated attackers. All incoming files should be disarmed before the user is given access to them to ensure that files are malware-free.

- Disarming solutions available in the market are fast and cost-effective compared to legacy detection-based technologies and should be considered. The average latency for file handling via legacy detection solutions could reach a few minutes while disarming technology tools enable latency of just a few seconds for file handling.

- Finally, robust defenses against CEO Fraud and BEC attacks are essential elements of a security solution. While Office 365 offers defenses against such attacks, they are less refined than those offered by third-party vendors. For example, the Anti-Phishing Policy in E3 only supports management of anti-spoofing settings, while the ATP version of the Anti-Phishing Policy in E5 adds impersonation protections. Note that domains must be explicitly declared for impersonation protection in the ATP version, but it is unclear how effective the reactive setting is against homograph domain attacks (including look-alike and sound-alike domain names). Some third-party solutions offer proactive protection against homograph domain attacks, among other advanced capabilities. In the same way, Office 365 does not offer email writing style analysis as part of its detection methods for BEC attacks. When a BEC attack circumvents the anti-phishing policy for an Office 365 customer, it is up to the recipient to judge the validity of the message contents. Third-party solutions can strengthen such judgments with AI-enabled analysis of the writing style of a new email against a previously trained model of the supposed sender's writing style. If the two don't match, alerts are triggered. Checks of this nature are not offered in Office 365.

## ENSURING PROPER SECURITY CONFIGURATIONS

Threat protection should be enabled by default, rather than being dependent on an administrator configuring a complex set of policies to address the range of threat scenarios facing the organization. For example, while Microsoft's Advanced Threat Protection (ATP) module for Office 365 offers the possibility of checking attachments and links for unknown and emerging threats, an administrator must set up policies to apply these capabilities to individuals, groups and the organization before any added safety is enabled. No threat protection is on by default, and even when it is on, users must be connected to Office 365 in order for Safe Attachments and Safe Links to work.

## ANTI-SPAM TECHNOLOGIES

The native spam filtering in Office 365 does block considerable spam, but there are certain characteristics and constraints customers should take into account, including:

- The spam quarantine should share intelligence with users on the prevalence of particular spam messages or variants. When users access their quarantine in Office 365, a post-delivery analysis of how other users classified such messages is not shared, leaving each user to make their own decision on the validity or otherwise of individual spam messages.

- Quarantined spam messages should be retained for as long as admins determine is appropriate. While Office 365 increased the maximum timeframe to 30 days in September 2018, admins do not have the option to increase the limit beyond 30 days.

- When users review messages in their spam quarantine, Office 365 does not offer the option of a workflow process where an administrator can verify the safety of a message before releasing it to a user.

- Admins should have the ability to create different policies to deal with different types of spam, bulk messages and graymail. Office 365 provides the ability to create policies that differentiate based on who such messages are sent to, but not on the type of spam nor its severity or rating scale. For example, all spam must be delivered to a singular location for a given recipient set, instead of being able to direct different levels of spam to junk, the quarantine, or deleted items. Office 365 goes part of the way towards this with a differentiation between spam and high confidence spam, but there are no other spam severity settings available. Likewise for bulk email; it's all to one place for a defined recipient set.

- Once a user has made the decision to block a given sender, future messages from that address should be deleted immediately. But that is not the case in

*Threat protection should be enabled by default, rather than being dependent on an administrator configuring a complex set of policies.*

Office 365. Messages from blocked senders are still sent to the spam quarantine. This overloads the quarantine with possible spam as well as email from blocked senders; it would be much better just to have emails that have not been sent from blocked senders shown in the quarantine.

- Notifications about spam and other quarantined content should be customizable by admins, particularly with regard to frequency and time-of-day. Office 365 does not work this way; notifications are sent when Microsoft decides to send them, and since no attempt is made to be time-zone aware, many people receive quarantine notifications out of work hours. The minimum frequency is daily, and it is not possible to send a notification for each message received.

## MULTI-SOLUTION INTEGRATION

Different security tools focus on identifying and neutralizing specific types of threats, and while focused capabilities are beneficial, integration across multiple tools gives security analysts the big picture. Relevant considerations for Office 365 platform users include:

- Monitoring all security solutions in use from a single interface makes security staff more efficient. The Threat Management section of the Office 365 Security & Compliance Center offers monitoring of email- and content-borne security threats, while other Microsoft security solutions are monitored in Office 365 Cloud App Security (in E5 plans) or Microsoft Cloud App Security (in Microsoft 365 plans). The new Microsoft 365 Security Center may address the current division of monitoring capabilities, but this is still a work-in-progress.

- Security solutions should be able to monitor security capabilities across all cloud-based and on-premises solutions. The tools in Office 365 are Office 365 centric, and unless higher priced plans are acquired, offer no insight into on-premises solutions and security threat events in other cloud services. Microsoft has recently introduced a new cloud-based SIEM - called Azure Sentinel - that is expected to deliver an integrated monitoring service, but this is not included in Office 365.

- A single, consolidated list of all threat types should be offered to improve a security analyst's overall understanding of the changing threat landscape. Threat Explorer in Office 365 only offers filtered slices of threat data – for example, malware, phishing, and user-reported – but not a consolidated list.

## DATA LOSS PREVENTION

DLP is a defensive technology that analyzes content containers in-motion and at-rest for content that violates policy. For example, an outbound email message that contains sensitive customer data should either be blocked entirely, encrypted to limit access, or sanitized through redaction before release. However, DLP applies not only to email, but also to the sharing of files via OneDrive. Proper DLP in Office 365 environments should include inline and offline capabilities – available from third-party vendors – to properly address potential violations.

Issues to take into account in using Microsoft's DLP capability in the E3 and E5 suites:

- DLP solutions should work across all of the file types and applications that an organization uses, rather than just focusing on the Microsoft Office applications. Without this broad level of support, data is more likely to be lost as people carry out standard business tasks through non-Office file formats. DLP policies that trigger on a Microsoft Word document, for example, will fail to identify an Apple Pages document with the same content inside.

- Vendors should offer an extensive set of standard DLP policies out-of-the-box, so that the organization immediately gains a baseline of protection against data loss. While Microsoft now offers a basic DLP rule to identify credit card numbers

*The effectiveness of DLP requires more nuance than brute force approaches offer.*

in email messages, no other out-of-the-box policies are offered in Office 365. It's important to note that simplistic approaches can trigger false positives (e.g., valid 16-digit numbers like SKU codes could be mistaken for credit card numbers).

- Organizations working across multiple legal jurisdictions and geographical regions require the ability to tailor DLP policies for specific situations, rather than having all-of-business policies. Organizations subscribing to Multi-Geo in Office 365 are able to leverage these capabilities, but otherwise such capabilities are not available.

- Some third-party add-on apps can lead to data loss and compliance risks in the cloud if they have broad permissions to access enterprise data. In some cases, these OAuth-enabled apps can be malicious or they can be used for persistent data access by threat actors after an account has been compromised.

- Stop-and-block DLP systems apply brute force to prevent an email containing sensitive information being shared, but more nuanced approaches enable both policy-based encryption of the complete message as well as automated redaction of sensitive information. Without the more nuanced options available, end users and administrators must invest more time in manual rectification steps, slowing the spread of valid messages and content.

- Document fingerprinting identifies standard business forms that are likely to contain sensitive or confidential information that should not be shared freely. Office 365 supports complete document fingerprinting when all of the fingerprinted cues from the original document template are present, but will not trigger if only a partial match is made. A business form could be cut in half, for example, with each half sent in a different email message to avoid detection by the DLP rule. Some third-party DLP vendors use a different approach for creating the original document fingerprint in order to more reliably identify full and partial matches of the fingerprint.

- Messages that violate DLP policies should be routable to a role, not just a specific individual. Supporting this nuance enables the right supervisor or manager to review the message for sensitive information, in light of their greater awareness of the context surrounding the content that is invariably invisible to a security administrator.

- While DLP policies can prevent sensitive content being shared with the wrong recipients, they lack the nuance to detect when a sender is sending something to the wrong recipient accidentally. While the message may be encrypted by policy, for example, it will still be delivered to the wrong person. Advanced DLP offerings should be able to detect when content is being sent to someone who has never been sent such content before, when someone is sending content that's usually sent internally to an external distribution list, or has selected a distribution list that they don't normally use.

- There are no workflow options for messages and files that violate a DLP policy. For example, if an email message triggers a policy, it is either blocked or encrypted. There is no policy action option for routing the violating message to an administrator or administration queue for review. As with DLP in Exchange Online, DLP in the Security & Compliance Center doesn't offer any nuanced options to request a review by someone other than the original end user.

- Actions by an administrator in creating or modifying a DLP policy should be centrally logged for subsequent review and analysis. While Office 365 logs matches of DLP policies, the actual creation and editing of DLP policies are invisible to the Audit Log. This means there is no way to see who created or modified a policy, and when.

*There are no workflow options for messages and files that violate a DLP policy.*

- Identifying content hidden in image files should be supported by a DLP solution, so that circumvention isn't just as simple as scanning an offending document to an image file. OCR capabilities in some third-party DLP solutions detect content in images and trigger DLP policy matches, a capability not available in Office 365.

## EMAIL RETRACTION

When emails are sent in error, the ability to retract an email limits data loss and prevents embarrassing mistakes from becoming fodder for public discussion. Within a given Office 365 tenant, there are some options for message retraction if the message is unread, and some PowerShell commands to locate and delete offending messages across mailboxes. The latter must be used with extreme care, because wrongly scoping the PowerShell command will lead to undesirable data loss. Once a message has gone outside of a given Office 365 tenant, however, there is no automated ability to retract the message. All that the red-faced sender can do is send a follow-up email requesting deletion, but the execution of this request is solely at the judgment of the recipient. Often highlighting the message sent in error does more to elevate its interest than achieve the deletion request.

# Issues to Consider for Improving Office 365 Archiving and Content Management

Microsoft has a particular approach to archiving and eDiscovery that suits its Office 365 and Microsoft-centric view of the world. However, the use of third-party solutions can offer a better archiving and eDiscovery experience, in line with the business and compliance requirements of the modern organization. This is especially relevant for archiving and eDiscovery around business records that do not originate in Office 365.

## ARCHIVING

While many organizations are moving in the direction of embracing as much of Office 365 as possible, few are exclusively using Office 365. The majority of organizations have additional information systems, digital tools, and repositories of data. Organizations need to manage this complex information space in line with business, legal, and information management requirements. Important considerations in this respect for Office 365 platform customers include:

- An archiving solution should be able to capture and store all business-relevant content types and make these available through an integrated interface. Email is the big ticket item for digital archiving, but not exclusively so. As organizations embrace newer communication and collaboration tools such as instant messaging (e.g., Skype for Business and Microsoft Teams), collaboration systems (e.g., Microsoft Teams), and enterprise social networks (e.g., Yammer), the ability to archive this content becomes increasingly important, although even within Office 365, not all Office 365 content types are archivable. Other content types - external social media posts, text messages, voicemail and any other content that falls under archiving's purview - must equally be captured and stored in an integrated archiving environment. In recent years, Microsoft has offered the ability to integrate some third-party content into Office 365 using third-party integration specialists, and more recently has introduced its own tools for this integration. Check to see if the Office 365 and third-party content types used within your organization are supported for archiving.

- Content should be archived in its native format to preserve all content signals and metadata. Microsoft's approach is contrary to this principle, however, as any third-party data imported into Office 365 is converted into an Exchange email format for storage. For example, a Facebook post is converted into an Exchange

*Content should be archived in its native format to preserve all content signals and metadata.*

email for archiving, an approach that suits Microsoft's legacy technology but not modern requirements.

- Archiving solutions should integrate into a central view for compliance managers, legal staff, and senior management, among others. Office 365 enables content search against current and archived data, but does not offer a view of all archived data. Archived data can be searched, but not browsed.
- Some organizations require the creation of a central location for archived data, while others prefer in-place archival. Office 365 only offers in-place archiving for Office 365 data, along with any third-party data imported into Office 365 and converted into an Exchange email format. Office 365 does not offer archival via content movement, a capability that is available from third-party vendors.

- Separate retention, preservation and disposition policies for a user's mailbox and archives should be available to support more granular or nuanced archiving requirements. Office 365 offers policies that apply universally across a user's mailbox and archives, with no option of policy differentiation. Some third-party vendors offer more granular options.

## eDISCOVERY

Legal investigations require the ability to search for responsive content across relevant content systems in the organization, and the ability to lock content to prevent deletion or modification until the legal investigation has concluded. Effective eDiscovery capabilities are a core requirement at such times. Organizations require the following:

- An eDiscovery tool should be able to search across all corporate data repositories, including those delivered via cloud services (such as Office 365) and via on-premises servers and solutions. The eDiscovery tools in Office 365 do not offer this capability. They can search some of the data originally created in Office 365 (several workloads in Office 365 are not covered by eDiscovery searches), as well as any third-party data that has been imported from third-party systems and converted into an Exchange email format, or for customers with Advanced eDiscovery in Office 365, content that has been uploaded into Azure. Any content in systems outside of Office 365 is non-addressable by an Office 365 eDiscovery search.

- eDiscovery case administrators should be able to send litigation hold notification alerts, reminders and escalations using native capabilities of the platform, rather than having to resort to out-of-band communications. Having the ability to see when and to whom these were sent within the context of an eDiscovery case gives evidence that due process was followed, and provides clarity on current status and next actions for any case administrator. The standard eDiscovery tools in Office 365 do not offers these capabilities, although the new version of Advanced eDiscovery for E5 customers offers Custodian Management for initial and further communications.

- Content and eDiscovery searches should come with an SLA, rather than a best-efforts approach that repeats generic statements about ever-increasing speed. Microsoft claims that average search times are being reduced all the time, but no SLA is offered for eDiscovery searches.

- eDiscovery tools should be able to query data in-place, without requiring a content export from the original content system and subsequent importing into Office 365 or Azure (for Advanced eDiscovery searches). eDiscovery content searches can search most Office 365 content in-place, but not any content beyond Office 365. Any non-Office 365 content must first be imported into Office 365 or Azure for analysis.

- Litigation holds should be enforceable across all content systems, including Office 365, cloud services, and on-premises locations used by the organization.

*An eDiscovery tool should be able to search across all corporate data repositories, including those delivered via cloud services...and via on-premises servers and solutions.*

Preventing deletion and modification of content in source systems preserves actual business records and interactional dynamics, rather than an imported manifestation of the same. eDiscovery tools in Office 365 can place litigation holds on the major workloads in Office 365 (but not all workloads), and do not extend to non-Office 365 locations even if these are based on Microsoft's on-premises server tools.

- The ability to define the format of content to be produced in response to an eDiscovery request should be possible. While native-format files are often preferred by the requesting party - and supported in Office 365 - producing in different formats that reduce fidelity or exclude full metadata can make a difference to the legal outcome of the case. Third-party eDiscovery vendors often support additional production formats, in addition to native-format files.

- Content exports of eDiscovery searches into third-party review tools should be protected from spoliation, for example by using a forensic image format. This is not available in Office 365, with copies of emails and documents being downloaded for import, along with a spreadsheet of exported case data. This export set could be manipulated prior to importing into a review tool.

- Project tracking and workflow capabilities should be available for eDiscovery cases, so that when multiple people are working on a case, it is clear who is doing what by when. Tracking capabilities are not available in the standard eDiscovery tools in Office 365. The new Advanced eDiscovery release of 2019 adds new case management tools, but these only enable a shared list of tasks to complete rather than supporting task assignments.

- Admins should have the ability to create case templates for repeatability and auditing, with standard search queries and locations, key actions and requirements to complete, and an audit trail of what was and was not performed. Office 365 provides the ability to create new cases from scratch, but no ability to create templates to streamline future efforts and codify learning.

- eDiscovery content searches confer great power to locate sensitive information across the information space within an organization. Multi-national, multi-business and multi-region organizations often require the ability to restrict the search scope of given eDiscovery users to enforce compliance boundaries. Microsoft offers some capabilities for setting up compliance boundaries, but this requires the intervention of Microsoft Support and the use of PowerShell to create search permission filters. Nonetheless, eDiscovery users are still able to select any repository across the organization when constructing a content search, although the search results themselves will be limited to the boundary created.

- eDiscovery searches should be able to be configured to ignore certain content parts of available content items. For example, standard signature blocks in emails should be able to be excluded from an eDiscovery search, and other boilerplate text in emails and documents should be able to be ignored as well. eDiscovery content searches in Office 365 do not support these exclusions and search restrictions, which results in false positives when a search term is located in the signature block or boilerplate text.

## COMPLIANCE BOUNDARIES

Government and industry regulations dictate standards of behavior from organizations and mandate that certain rights are honored and various capabilities made available within technology and organizational processes. The ability to comply with key elements of data privacy regulations – with the European General Data Protection Regulation (GDPR) as the prime example - should be easy to support and appropriate to the actual requirements specified.

*Microsoft enhanced the capabilities in Office 365 for creating logical boundaries to separate content locations that eDiscovery Managers can search.*

Microsoft enhanced the capabilities in Office 365 for creating logical boundaries to separate content locations that eDiscovery Managers can search. The same controls can be used to limit who can access eDiscovery cases. The intent is to support organizations who must comply with different regulations in different geographical areas, such as multi-national corporations and governments made up of multiple agencies.

Compliance Boundaries are enabled using PowerShell, via the search permissions filtering cmdlets. There are several relevant issues Office 365 platform customers should be aware of:

- An organization wanting to create compliance boundaries must first nominate a user-level attribute in Azure AD that can be used to divide individuals into separate logical groupings, such as by department, company, office, or other. Microsoft has a specific list of attributes that can be used, in order to enable support across Exchange, SharePoint and OneDrive. Clearly, good processes will need to be in-place to ensure the nominated attribute is kept current for all employees.

- A support request must be filed with Microsoft Support to sync the nominated Azure AD attribute to all OneDrive accounts. This will also map the attribute to SharePoint as a hidden managed property. The completion of this support request can take 4-6 weeks.

- Role groups must be created in the Security & Compliance Center, in order to divide people with eDiscovery Managers rights into separate groups for accessing the separate agencies, departments or other groupings. When a new eDiscovery case is created, the correct role group needs to be given access rights.

- A PowerShell cmdlet is used to tie together a nominated attribute value and a specific eDiscovery Managers role group.

- For organizations using Multi-Geo, an additional parameter in the cmdlets can also be used to specify additional search constraints and which datacenter is used for exporting data. This provides further capability to keep relevant data within a specified geographical boundary. The use of Multi-Geo with compliance boundaries also introduces some implications for the search rights of eDiscovery Managers.

- There are still some anomalies that Microsoft needs to fix over time. For example, while the cmdlets will prevent the return of search results of content locations in a different boundary, an eDiscovery case can still include content locations beyond the boundary. The boundary is enforced below the level of the user experience, which could lead to confusion as a consequence of eDiscovery Managers selecting locations they don't actually have permissions to search. Secondly, compliance boundaries are ignored for legal holds, meaning that an eDiscovery Manager in one boundary can still put users in other boundaries on legal hold. Third, compliance boundaries do not apply to Exchange Public Folders.

*There are still some anomalies that Microsoft needs to fix over time.*

Having a structured way to enforce logical boundaries between content is important for large, complex organizations when moving to the cloud. The architecture of a single worldwide tenant with or without Multi-Geo support comes with the requirement to create boundaries in some way; previously this would be done with separate physical infrastructure and therefore separate physical boundaries in an on-premises world.

Since the user-level attribute offers a real-time status of the boundary affiliation of a user, it is unclear how Microsoft handles eDiscovery searches for previous time periods where the user was affiliated with another boundary. For example, if a 2019

case requires searches against Department1 data locations from calendar year 2017 when User1 was in that department but User1 moved to Department2 in 2018, will User1's data sources still be searched? It would appear the answer is no, and therefore potentially responsive material will be excluded by design.

## SUBJECT ACCESS REQUESTS

Article 15 of GDPR provides right of access by a data subject to two things: firstly, confirmation of whether or not personal data concerning him or her are being processed, and if so, secondly, access to that personal data and various additional information, such as the purposes of the processing, the categories of personal data concerned, and data storage periods, among others. The context and scope is personal data, as defined in Article 4(1), which includes a name, ID number, location data, an online identifier (e.g., user name), or other specific factors about the identity of the person.

The capabilities provided by Microsoft in Office 365 for handling data subject requests, by contrast, produces a collection of email messages and documents (by default) that were created by or addressed to a data subject by searching for their name, instead of insight into personal data about the data subject. Data collected by the data subject request can be re-scoped by changing the search query to reduce the quantity of data included, but must be exported for review (which then creates a separate exported data set that sits outside of the data privacy controls in Office 365). This brute force approach to identifying data created by or addressed to a data subject goes far beyond the requirements of GDPR, and results in an onerous task for manually reviewing all exported messages and documents. Further, Microsoft's approach is likely to include personal data on other data subjects (and thus could trigger a data breach situation by releasing the artifacts to the original requestor), and is also likely to hand-over confidential and secret business information about the organization merely because the name of the data subject was included as the author, contributor or otherwise involved. Office 365's data subject request tool identifies and exports data authored or created by a data subject, rather than identifying personal data about a data subject.

## RIGHT-TO-BE-FORGOTTEN

Article 17 of GDPR gives data subjects the right-to-be-forgotten or right of erasure for personal data. This right can be exercised under certain conditions (e.g., that the reason for the personal data being collected has lapsed, or that the data subject withdraws their consent for the processing of their personal data), but can also be rejected by a data controller under certain conditions (e.g., that the data must be retained to meet a legal obligation or assist with a legal claim). In other words, there is a lot of nuance at play, which poses challenges to organizations using poor practice approaches for storing personal data (e.g., Excel spreadsheets with HR data) and to Microsoft for its ability to provide tools to organizations that identify personal data that only falls within the boundaries of the specific erasure request. There are no automated tools offered in Office 365 to help organizations comply with Article 17 rights; everything will require tedious manual review.

# Issues to Consider for Improving Office 365 Encryption

Encryption solutions protect email messages and documents from unauthorized access. Microsoft offers native encryption capabilities in Office 365 that focus mainly on supporting Outlook emails and Office documents, but some third-party encryption solutions add richness and capability that is missing from Microsoft's offer. Issues that Office 365 customers should consider include:

- Encryption capabilities should be integrated with the places where people work, such as Outlook for Windows, Outlook for Mac, and Outlook on mobile devices.

*Microsoft offers native encryption capabilities in Office 365 that focus mainly on supporting Outlook emails and Office documents.*

Users should have the ability to automatically encrypt all messages or only manually encrypt certain messages. Recent releases of Outlook in Office 365 ProPlus included integrated encryption, and the ability for a user to manually select encryption for a given message. Automatic encryption of all messages as a user-level setting in the Outlook client is not available, and while Outlook mobile supports in-line decryption of encrypted messages, there is no ability to send an encrypted message with a manual action in Outlook mobile.

- All document and file types in use within the organization should work with your encryption solution, and all encrypted attachments should work the same way. Third-party encryption solutions offer broader coverage of file types, compared with Office 365 which focuses on Office documents and Adobe PDF. Note that PDF documents encrypted with Office 365 Message Encryption are handled differently after delivery then Office documents.

- Once an encrypted message has been sent, senders should be able to revoke or change the encryption status of a message after delivery on a per-recipient basis from the Sent folder in Outlook. Office 365 does not offer this capability to senders. Note that the 2019 edition of Advanced Encryption - available in the higher priced Office 365 plans - enables an administrator to revoke a message under two conditions. First, the message must have been sent to an external recipient who doesn't also have a guest user account in the tenant. Secondly, it must be a link-based message, not one that supports in-line decryption in Outlook. Revocation does not work for internal users in the Office 365 tenant, and does not work for non-link-based encrypted messages. The administrator can use PowerShell or the message encryption report in the Security & Compliance Center to revoke a message, although there is a delay of about a day for messages to be listed in the encryption report (which seems tediously long).

- Sending an encrypted message prevents unauthorized access beyond the person to whom the message was sent, but if the wrong recipient was selected by mistake, or the correct recipient's account has been compromised through a phishing attack, a data breach situation can still happen. Senders should be able to request additional identity verification so that only the correct recipient is able to view the message, such as via a multi-factor authentication test. Additional identity verification options are not available in Office 365, and when combined with the lack of reporting available to message senders, means that no information is available to give warning of inappropriate access until it is too late.

- An encryption solution should provide non-link-based message sending options to avoid encrypted messages looking like phishing messages. While Microsoft has pushed in the direction of in-line in-client message display, many of the recent "innovations" have represented a pulling back to link-based messages, especially in the business-to-consumer space. Given the infrequency with which people receive these, they could be used to as a phishing vector - especially if people get used to supplying credentials to view the message.

- The subject line of an encrypted message should be encrypted, not passed through in clear-text. There is no option to encrypt the subject line in Office 365 Message Encryption, which means that any sensitive information in the subject line itself will remain unprotected.

- Post-delivery reports should be available to senders and admins to determine if encrypted messages were received by the recipient. Since post-delivery actions are required in the message to determine recipient authenticity, some signals must be available on receiving status, but none of these are made available to senders. Reporting is available for administrators on messages that were sent, but no intelligence on whether the message was delivered, marked as spam, or opened by the recipient. An administrator can revoke a message if it is a link-

*An encryption solution should provide non-link-based message sending options to avoid encrypted messages looking like phishing messages.*

based version accessible through the Office 365 web portal. Revocation is not available for messages delivered to an Outlook client with in-line decryption.

# Other Issues to Consider

We have reviewed important aspects of Office 365 across security, compliance, archiving, eDiscovery, and message encryption above. Four additional issues to consider are discussed in this section:

## STORAGE OF AUDIT LOGS

Audit log entries should be stored for as long as an administrator wants to retain them, including indefinitely. While the higher-priced plans in Office 365 offer retention for up to 365 days, lower-priced plans have shorter durations and no plans offer indefinite retention. Even in Microsoft's world, longer retention timeframes requires pushing audit log entries to another system.

## GROUP SPRAWL

Group sprawl – the tendency for the number of groups to increase at a rapid pace, some of which may no longer be necessary – is an increasing issue in Office 365, particularly with the popularity of Microsoft Teams. This is occurring because, by default, anyone in your organization can create Office 365 Groups, and it turns out that many users unfamiliar with Office 365 provision groups accidentally. This is a serious issue in the context of information governance, since it can lead to data management problems, such as data fragmentation. Given that group sprawl can happen both intentionally and accidentally, it creates a situation in which more and more server space is consumed and data becomes harder to find and manage.

## EVENTS IN THE AUDIT LOG

As a vital provider of insight into what is happening across the organization's digital footprint, audit logging should include:

- A complete set of relevant events from on-premises and cloud-based solutions. Office 365's audit log contains many events generated in Office 365, but excludes mail flow events in Exchange Online, event logging from on-premises solutions, and event logging from other cloud-based solutions. The Office 365 audit log provides partial insight only.

- Some audit events - or periods of time for all audit events - will contain important signals for legal cases, such as whether someone did or did not perform an action in Office 365. Being able to place audit events on litigation hold ensures appropriate evidence is retained, but this capability is not offered in Office 365.

- When audit log events are exported for analysis in other tools, such as Microsoft Excel, there should be no limit on the number of events that can be exported at any time. Office 365 imposes an artificial limit of 50,000 events per export.

- Audit events should be logged and available for review in as near real-time as possible. Some workloads in Office 365 log in near real-time (hat tip, Exchange Online), while other newer workloads – such as Microsoft Teams – can take up to 24-hours to push events to the audit log. Such a delay is inexcusable.

- Immutable storage of audit log events should be available, to guarantee log events were not modified or deleted after being created. Office 365 does not offer such capabilities; a third-party solution is required for situations where immutable storage is necessary.

> *When audit log events are exported for analysis in other tools...there should be no limit on the number of events that can be exported at any time.*

## SUPERVISORY REVIEW CAPABILITIES

Supervisory review capabilities received their start in the financial services industry, via industry regulations requiring human oversight and supervision of communications to ensure rogue actors were not engaging in unethical behaviors. For organizations subject to such regulations, having an effective way of reviewing specific communication types is essential. Required capabilities include:

- Broad availability across Office 365 plans and non-Office 365 data repositories, in order to provide a broad picture of all communications and sampling at a pre-defined rate for supervision. Supervisory review capabilities in Office 365 are only available in the higher-priced Office 365 plans, and only apply to email messages, Microsoft Teams chat and channel messages stored in Exchange, and any third-party data imported into Office 365 and converted into an Exchange email format. They do not support other communication forms in SharePoint and Yammer that are not stored in Exchange Online. Note that content from Microsoft Teams faces a delay of up to 24 hours before being available for supervisory review, and the ability to sample third-party content depends on the frequency of import.

- Case management and workflow tools for managing supervised content, including escalation and discussion between multiple supervisors. These capabilities have been signaled as on the roadmap for supervisory review in Office 365, but are currently unavailable. This means supervisors must escalate and discuss specific content items using tools outside of the supervision toolkit.

- Logging of additions and changes to supervision policies to create an enduring record of who created, modified or deleted a policy at a specific point in time, in order to give evidence of compliance with supervision regulations. The Office 365 audit log is blind to supervision policies. Creating, editing, and deleting supervision policies are not audit logged.

- Unified visibility for supervisors across all of the supervision policies they have access to. Office 365 provides access to policy matches on a policy-by-policy basis, meaning that if a supervisor is overseeing five different policies, he or she must visit each in turn to review matches and decide whether any captured messages are valid or questionable.

While supervisory review had its start in the financial services industry, be aware that Microsoft is attempting to extend its remit for additional scenarios beyond compliance, such as capturing and reporting on instances of offensive language. And despite the additional scenarios, the core ability to review communications between people can have relevance for any organization wanting to be proactive in minimizing deliberate or obfuscated wrongdoing.

## Comparing the Costs

Microsoft offers a large number of SKUs for Office 365 covering a wide range of price points, although our research has found that the most commonly deployed plans for business customers are Enterprise Plans E3 and E5. While Plan E5 provides the full array of security, archiving and other capabilities available in Office 365, it is possible to employ Plan E3 (with a retail price that is 43 percent lower than Plan E5) in combination with third-party solutions that will either supplement or replace some of the native capabilities in Office 365. Current and anticipated preferences for the use of native vs. third-party solutions in Office 365 are shown in Figure 3.

*While supervisory review had its start in the financial services industry, be aware that Microsoft is attempting to extend its remit for additional scenarios beyond compliance.*

**Figure 3**
**Preferences for Use of Native vs. Third-Party Solutions in Office 365**
Percentage of Organizations, Mid-2019 and Mid-2020



*Source: Osterman Research, Inc.*

As examples, we compared two sets of solutions that can be used in combination with Office 365 Plan E3:

- Vendor 1: US-based provider of security and archiving capabilities

- Vendor 2: European provider of security and archiving capabilities

Based on the list prices that are publicly available for Office 365 Plans E3 and E5 and for the solutions shown above, Figure 4 shows the comparison of the various solutions. As shown in the figure, the total cost of purchasing Plan E3 in combination with third-party solutions is anywhere from 25 percent to 34 percent less expensive than the cost of a subscription to Plan E5.

It's important to note that Plan E5 offers some capabilities that are not duplicated completely with a combination of Plan E3 and third-party solutions, but the vast majority of business-grade requirements will be satisfied using the latter.

*For the majority of Office 365 users, we believe that a combination of Plan E3 and various third-party solutions will offer what most users need.*

**Figure 4**
**Comparison of Office 365 Plan E5 and Plan E3 with Third-Party Solutions**
Cost per month per user (US dollars)



*Source: Osterman Research, Inc.*

## THE BOTTOM LINE ON COSTS

Osterman Research believes that Plan E5 offers a number of useful capabilities and, for some users, the 75 percent premium that Microsoft charges for it over Plan E3 will be worth it. However, for the majority of Office 365 users, we believe that a combination of Plan E3 and various third-party solutions will offer what most users need, but at significantly lower cost. For example, a 100-user organization will save $10,644 to $12,800 per year by using Plan E3 and third-party solutions; an organization of 1,000 users will save $112,320 to $142,000 per year.

## Summary

We encourage you to make use of Office 365 for productivity and team collaboration if it meets your business needs in these areas and aligns with your IT strategy. It is a widely used platform, and has a great deal of market momentum behind it.

However, be aware that in security and compliance areas more focused third-party providers are likely to offer better capabilities than relying solely on what Microsoft has to offer, and for organizations who use non-Microsoft tools and on-premises solutions in addition to Office 365, third-party solutions will certainly be the better route.

Part of the due diligence process in evaluating Office 365 as a decision maker is to decide what are essential capabilities and priorities for your organization, and whether the capabilities on offer in Office 365 meet or exceed these, or if a third-party solution better complements Office 365 and offers a better approach, given your needs.

*Plan E3 – in combination with third-party solutions – is anywhere from 25 percent to 34 percent less expensive than Plan E5.*

# Sponsor of This White Paper

Files are now routinely shared across dozens of applications, then stored in multiple locations or on many devices around the world, making it difficult to ensure the security and compliance of your enterprise content. NetGovern delivers an Information Governance solution that is both Prescriptive and Proactive. It reduces risk, while providing you with the ability to extract insight and value from unstructured data.

NetGovern enables regulated organizations to instantly search for information regardless of where it is stored or how it was shared. We connect to multiple cloud and on-site systems covering email, IM, file stores & collaboration platforms. Consolidated search results are enhanced via our smart audit, advanced eDiscovery, and automated remediation capabilities. Hundreds of clients worldwide trust our Certified Partners to help them preserve, protect and enrich the value of their most valuable asset – Information.

For more information, info@netgovern.com.



www.netgovern.com

@net_govern

+1 866 497 0101

+1 514 392 9220

© 2019 Osterman Research, Inc. All rights reserved.

No part of this document may be reproduced in any form by any means, nor may it be distributed without the permission of Osterman Research, Inc., nor may it be resold or distributed by any entity other than Osterman Research, Inc., without prior written authorization of Osterman Research, Inc.

Osterman Research, Inc. does not provide legal advice.  Nothing in this document constitutes legal advice, nor shall this document or any software product or other offering referenced herein serve as a substitute for the reader's compliance with any laws (including but not limited to any act, statute, regulation, rule, directive, administrative order, executive order, etc. (collectively, "Laws")) referenced in this document.  If necessary, the reader should consult with competent legal counsel regarding any Laws referenced herein. Osterman Research, Inc. makes no representation or warranty regarding the completeness or accuracy of the information contained in this document.

THIS DOCUMENT IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND.  ALL EXPRESS OR IMPLIED REPRESENTATIONS, CONDITIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE DISCLAIMED, EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE DETERMINED TO BE ILLEGAL.

# APPENDIX
# 201







Microsoft's Exchange Online Advanced Threat Protection defends against unknown malware for $2 per user per month

EMIL PROTALINSKI    @EPRO    APRIL 8, 2015 9:24 AM



Microsoft today introduced Exchange Online Advanced Threat Protection (ATP), a new security feature that expands Office 365's existing Exchange Online Protection against spam, viruses, and malware. As its name implies, the email filtering service provides additional protection against specific types of advanced threats.

ATP is currently in private preview and is expected to be available this summer as an optional service to all Office 365 customers for $2 per user per month. Government customers will be able to get for a discounted $1.75 per user per month.

Recommended Videos                                    Powered by AnyClip

Xbox Game Pass Pulls 10 Million Subscribers





Exchange Online Protection already has layered antivirus protection powered by three different engines. But that's for known malware and viruses; ATP has a feature called Safe Attachments, which protects against unknown malware and viruses by routing messages and attachments to a special hypervisor environment for behavior analysis.

**VB Transform 2020** - Hosted Online. **Learn More**.

The system uses a variety of machine learning and analysis techniques to detect malicious intent. If no

suspicious activity is detected, the message is released for delivery to its destination.

Next, while Exchange Online Protection scans each message and provides time of delivery protection, blocking any malicious hyperlinks in a message, ATP goes further by protecting against malicious URLs hidden in safe links via redirects. ATP's Safe Links feature proactively protects users if they click a safe link that could later take them to unsafe sites by means of a forwarding service.

ATP also offers rich reporting and tracking capabilities, so IT admins can see who is getting targeted in their organization and the category of attacks they are facing. Reporting and message tracing shows which messages have been blocked due to an unknown virus or malware, while the URL trace capability can be used to track individual malicious links in the messages that have been clicked.

Exchange Online ATP can be used by whole organizations or assigned just to a specified group of users. Microsoft describes it very much as an "extra" set of features, but the company should work towards including it in Office 365 out-of-the-box — security capabilities should never be optional.



Get a lifetime of SSD-powered web hosting for ju...

These slide templates will make your next presentatio...

This app suite gives you access to 50+ tools designe...

9 skills to tea while you're o

store

# APPENDIX
# 202





| MENU | ≡ |
| --- | --- |

## MICROSOFT ANNOUNCE ADVANCED THREAT PROTECTION FOR OFFICE 365

Posted on April 9, 2015 | by Staff Writer | Leave a comment

Microsoft have launched new Advanced Threat Protection for Office 365, with the announcement made on the company blog by Shobhit Sahay, technical product manager for the Office 365 team.

The Exchange Online Advanced Threat Protection (ATP) is a new email filtering service that provides additional protection against specific types of advanced threats. ATP is currently in private preview and is expected to be available this summer as an optional service for Office 365 commercial customers

ATP for Exchange Online delivers the following benefits:

- **Protection against unknown malware and viruses**—Today EOP employs a robust and layered anti-virus protection powered with three different engines against known malware and viruses. ATP extends this protection through a feature called Safe Attachments, which protects against unknown malware and viruses, and provides better zero-day protection to safeguard your messaging system. All messages and attachments that don't have a known virus/malware signature are routed to a special hypervisor environment, where a behavior analysis is performed using a variety of machine learning and analysis techniques to detect malicious intent. If no suspicious activity is detected, the message is released for delivery to the mailbox.

- **Real time, time-of-click protection against malicious URLs**—EOP scans each message in transit in Office 365 and provides time of delivery protection, blocking any malicious hyperlinks in a message. But attackers sometimes try to hide malicious URLs with seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received. ATP's Safe Links feature proactively protects your users if they click such a link. That protection remains every time they click the link, so malicious links are dynamically blocked while good links can be accessed.



Follow  • • •

- **Rich reporting and URL trace capabilities**—ATP also offers rich reporting and tracking capabilities, so you can gain critical insights into who is getting targeted in your organization and the category of attacks you are facing. Reporting and message tracing allows you to investigate messages that have been blocked due to an unknown virus or malware, while the URL trace capability allows you to track individual malicious links in the messages that have been clicked.

**Share Intel:**

  

*Loading...*

**Related**

**FortiSandbox Catches Hidden Zero-Day & Advanced Threats**
Fortinet has announced the launch of FortiSandbox 2.0, delivering enhanced features to their top-rated FortiSandbox Advanced Threat Detection Appliances and FortiSandbox Cloud solutions with the power to discover and isolate more advanced threats from
In "Defenses"



**BAE Systems Applied Intelligence Takes Aim At Zero Day Attacks**
In "Cloud"

**Dell Fortifies SonicWALL Against Email Data Leaks**
Today Dell announced improvements to SonicWALL, their hosted email security service. The solution offers advanced compliance scanning, management and email encryption and the prevention of sensitive data leaks. Dell SonicWALL Hosted Email
In "Authentication"

tagged with Advanced Threat Protection, ATP, Exchange Online, Microsoft, Office 365

Defenses

# WHAT'S YOUR VIEW?

Follow

Enter your comment here...

Search ...

**Popular** | Most Commented | Latest


### Employees Don't Care About Corporate Secrets – BYOD Business Models Must Be Deployed
August 5, 2015


### US Heathcare industry at high risk for cyber attacks
February 20, 2015


### Massive Ransomware Operation Discovered With 'APT-like' Evasion Capabilities
July 14, 2015


### Employees Suffer as SMEs Fail to Combat Spam, Phishing & Malware
July 23, 2015

## NEWSLETTER SIGN-UP

Enter your email address to sign-up to the free weekly newsletter. Please refer to our Privacy Policy for more information.

Enter your email address

Sign-Up

## THREATS

- Malware
- DDoS
- APTs
- Phishing
- Social Engineering
- Man-in-the-middle
- Eavesdropping

Follow  •••

- Keyloggers
- Breaches

## QUICK FIND

Select Category ▼

## FOLLOW @CYBERTHREATSPY ON TWITTER

My Tweets

## TOP POSTS & PAGES

 Security Fears To Drive SMEs to Cloud in 2016

 Capgemini Bolsters Cybersecurity Offering with IDaaS

 Holiday Shopping Season Heralds Rise in Point of Sale Malware

 Centrify Partners with 5 Cloud Access Security Brokers to Enhance SaaS Security

 2016 To Be Biggest 'Cybercriminal Christmas' Ever?

## QUICK INDUSTRY

- Energy & Utilities
- Finance
- Healthcare
- Public Sector
- Retail
- Telecoms

### LATEST NEWS RSS

- RSS - Posts

◼ Follow    •••

## HAVE YOU GOT THREAT INTEL?

If you have discovered a vulnerability, flaw or bug, contact our editorial team to share your intel with our readers. editorial@threatintelligencetimes.co.uk

## ADVERTISE WITH US

For all enquiries relating to advertising, please contact one of our sales team at sales@threatintelligencetimes.co.uk.

## PRIVACY POLICY

Threat Intelligence Times does not sell, give, or trade the statistics or data they store to any 3rd parties for data-mining or marketing purposes. For more information please contact us.

Blog at WordPress.com.

Follow    •••

# APPENDIX
# 203



## Microsoft Announces A New Email Filtering Service Called Exchange Online Advanced Threat Protection (ATP)

by Microsoft News    🐦 @@msftnws

🕐 Apr 9, 2015 at 6:38 GMT

https://youtube.com/watch?v=GEE5y9sE_t4%3Ffeature%3Doembed

Microsoft yesterday announced Exchange Online Advanced Threat Protection (ATP), a new email filtering service that provides additional protection against specific types of advanced threats. This service is currently in private preview and is expected to be available this summer as an optional service for Office 365 enterprise customers.

ATP for Exchange Online features:

- **Protection against unknown malware and viruses**—Today EOP employs a robust and layered anti-virus protection powered with three different engines against known malware and viruses. ATP extends this protection through a feature called Safe Attachments, which protects against unknown malware and viruses, and provides better zero-day protection to safeguard your messaging system. All messages and attachments that don't have a known virus/malware signature are routed to a special hypervisor environment, where a behavior analysis is performed using a variety of machine learning and analysis techniques to detect malicious intent. If no suspicious activity is detected, the message is released for delivery to the mailbox.

- **Real time, time-of-click protection against malicious URLs**—EOP scans each message in transit in Office 365 and provides time of delivery protection, blocking any malicious hyperlinks in a message. But attackers sometimes try to hide malicious URLs with seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received. ATP's Safe Links feature proactively protects your users if they click such a link. That protection remains every time they click the link, as malicious links are dynamically blocked while good links can be accessed.

- **Rich reporting and URL trace capabilities**—ATP also offers rich reporting and tracking capabilities, so you can gain critical insights into who is getting targeted in your organization and the category of attacks you are facing. Reporting and message tracing allows you to investigate messages that have been blocked due to an unknown virus or malware, while the URL trace capability allows you to track individual malicious links in the messages that have been clicked.

Read more about it here.

RELATED | ADVANCED THREAT PROTECTION | ATP | EXCHANGE ONLINE | MICROSOFT | OFFICE 365 | THREATS

TWEET | SHARE | [skype] | [g+] | [pocket] | [reddit]



**Turn Data Into Opportunities**

DOMO    The quickest, easiest, and most secure way to drive your business with data    〉



### Secure Cloud Storage

 Yahoo!



### Microsoft explains what they are doing to keep…

mspoweruser.com



### Altai Systems - Association Management

 altaisystems.com



### Microsoft cloud outages extends to Office 365,…

mspoweruser.com



### Payroll & HR Solutions

 Amtec



### Dark Mode finally hits the Reading Pane in Office…

mspoweruser.com



### Microsoft announce OneDrive…

mspoweruser.com

### OneDrive for Android updated with support for…

mspoweruser.com

## COMMENTS ⚠

ALSO ON **MSPOWERUSER**



### GitHub announces several new tools …

a day ago • 1 comment

Today, GitHub announced several new tools and features to significantly …



### LG Velvet smartphone with Wacom stylus …

7 hours ago • 1 comment

Last month, LG announced its plan to introduce a new minimalistic design …



### Microsoft says new Surface Book 3 and …

a day ago • 13 comments

The webcams on the current line of Surface products are nothing to write home …



### Two weeks aft banning Zoom

20 hours ago • 1 co

New York City Sc enthusiastically a Zoom for remote

**MSPowerUser Comment Policy**

We welcome relevant and respectful discussion, but rudeness and personal attacks will not be tolerated.

Please read our Comment Policy before commenting.

Comments for this thread are now closed ✕

## ADVERTISEMENT ⚠



WINDOWS 10



Microsoft release Windows 10 Insider Preview Build 19624 to Insiders in the Fast Ring



Just in time for the Surface Earbuds, Microsoft adds device management to Cortan...



Microsoft refutes claim of Windows use decline, says usage up 75%



Windows 10's missing profile bug seems to have made a return



Microsoft is adopting Google's QUIC technology for Windows HTTP/3 stack

ADVERTISEMENT ⚠

DEALS



Deal Alert: Echo Dot (3rd Gen) price is back to its record low — again

If asking digital assistants to play music, answer questions, read stories, and tell jokes is your thing, then Amazon Echo Dot is definitely a great product and in many aspects, it's even ...



Deal Alert: Get the new Amazon Echo Show 8 for just $99.99 and Echo Show 5 for o...

Amazon is running a sale on their Echo products, and the best deals are available on the Amazon Echo Show 5 and 8, both ideal for video conferencing between separated families, especially th...



### Deal Alert: Get $290 discount on Surface Pro X + Signature Keyboard with Slim Pe...

You can now get a steep $290 discount on Surface Pro X bundle, which includes the Surface Pro X device, Signature Keyboard and the Slim Pen. Amazon is currently offering the Black Surface Pr...



## Deal Alert: Save up to $300 on Microsoft Surface Pro 7

You can now get a huge $300 discount on the purchase of the Surface Pro 7 (256GB). The Surface Pro 7 with i5 processor, 8GB RAM, and 256GB storage is now available at a price point of $899, ...



Deal Alert: Microsoft Surface Book 2 is $559 cheaper today

You can now get a Microsoft Surface Book 2 device with Intel Core i7, 13.5-inch display, 16GB RAM and 512GB storage for just $2,071 —that's $427.63 cheaper than the usual price($2,499). ...



Deal Alert: Echo Dot (3rd Gen) price is back to its record low

If asking digital assistants to play music, answer questions, read stories, and tell jokes is your thing, then Amazon Echo Dot is definitely a great product and in many aspects, it's even ...



### Deal Alert: Get $320 discount on Surface Pro X + Signature Keyboard with Slim Pe...

Microsoft is offering a steep $320 discount for its Surface Pro X bundle, which includes the Signature Keyboard with Slim Pen. Microsoft is currently offering the Black Surface Pro X + Black...



## Deal Alert: Surface Pro 7 is $300 cheaper today

Microsoft's latest Surface Pro, the Surface Pro 7 is not only versatile and light but also comes with full Windows 10 and that means you can do pretty much everything with it. It's also ...



## Deal Alert: Apple AirPods with Charging Case now available at a discounted price

Apple AirPods with the wireless charging case is now available at $169, down from $199. Apple AirPods with regular charging case is now available at $129, down from $159. The discounted pric...



Deal Alert: 15″ Surface Book 2 is $449 cheaper today

You can now get a Microsoft Surface Book 2 device with Intel Core i7, 15-inch display, 16GB RAM and 500GB storage for just $2,449 —that's $449 cheaper than the usual price($2,899). Find ...

ADVERTISEMENT ⚠





© 2020 MSPoweruser - All rights reserved                    Not associated with Microsoft

# APPENDIX
# 204




# Exclusive: Microsoft 'Delay in fix to Advanced Threat Protection flaw'

Nov 23, 2015

NEWS by Tom Reeve

**Microsoft customer Nick Ioannou "incredulous at company's failure to fix Safe Links flaw which leaves security holes in supposedly cleansed email"**

Microsoft has admitted that there is a problem with its Advanced Threat Protection module, a paid-for add-on to Office 365, which allows malicious URLs to slip through its premium email protection product.

Enterprise customers of Office 365 can pay an extra fee on top of the basic software-as-a-service price to add ATP. ATP features two components, Safe Attachments which analyses attachments and Safe Links which provides real-time protection when clicking on a URL.

Safe Links rewrites URL links to route the HTTP request through Microsoft's servers. When the user clicks the link, Microsoft checks the target web page for malware before passing the URL to the user's browser. Users receive a warning message if the site is blocked or appears to contain malware.

Nick Ioannou, head of IT at the RG Partnership Ltd, told *SCMagazineUK.com* that he complained to Microsoft in September that Safe Links wasn't working in all instances. He says he submitted a ticket on 1 September and supplied additional information to Microsoft which enabled its engineers to identify the problem and reply to him by 4 September.

In the reply, which *SCMagazineUK.com* has seen, Microsoft identified the cause of the problem and admitted that the flaw enables malicious links to pass through ATP unchecked.

It goes on to say: "You have received a few emails containing links which were not rewritten by ATP safe links… A request was opened to our product engineering team, and they confirmed that all urls... should be caught by ATP safe links. As such, they are currently working on finding a solution for this. However, there is no ETA for when a fix will be deployed, as this whole process requires extensive analysis and testing."

Ioannou didn't want *SCMagazineUK.com* to go into the exact details of the flaw because it still hasn't been fixed, but it's safe to say that the danger arises because of the interaction between ATP and Office 365 but it could be solved by a rewrite

But it has been more than two months now and Ioannou tells *SC* that the problem has not been fixed. In response to a chasing email, Microsoft wrote to Ioannou today saying: "The issue… is still under investigation by our Product Engineering team. Unfortunately, there is no ETA for a resolution as of yet."

Ioannou told *SC*: "Microsoft has admitted they need to recode. When you pay extra for ATP and Safe Links, you don't expect this. Safe Links is designed to protect you against what I call the Jamie Oliver exploit: a link that looks clean when it goes through the email server today could direct you to a website with malware tomorrow."

He felt that the product was not as mature as it could have been. "It should be in beta – it should never have been released and charged for," he said.

SC asked Microsoft for a comment but no one from the company replied by the time of publication.

Topics:    SERVERS, CLOUD & INFRASTRUCTURE

# Find this article useful?

Get more great articles like this in your inbox every lunchtime

REGISTER

Find out more about our daily bulletins

APPENDIX
205






# Office 365 E5 - New Features

**JANUARY 28, 2016 | OFFICE 365**

**Microsoft have launched the new O.   ce 365 E5 plan which replaces the existing E4 plan.**

**Announced at Microsoft's Convergence EMEA conference in November 2015, pricing plans are set at £21.80, per user a month.**

Whilst retaining features from its predecessor – E5 unveils features that are geared towards enhancing security, communications and analytics.

Here's some of the new features:

**New Skype for Business services**

Skype for Business packs loads of new features in E5. It's clear Microsoft are making moves in the business phone and conferencing market. The top two features:

- **Cloud PBX** – Allows you to place and receive phone calls in your Skype for Business client. You'll be able to manage these calls with features such as hold, transfer and forward. You'll be able to do this at the office or remotely using mobile, laptop and other devices – Eliminating the need for a traditional telephone system.

- **PSTN Conferencing** –  You'll be able to join Skype for Business meetings from any telephone by dialling a local access number. You can also join an online meeting without an internet connection, allowing you to continue working wherever you choose.

**Advanced Threat Protection**

New and sophisticated viruses, propagate around the web daily. As savvy as you think you are, on occasion you'll unwittingly open emails that contain dangerous attachments or dodgy links. E5 introduces Advanced Threat Protection for mailboxes (ATP) to help manage that threat.

  

- **Safe Links –** Sometimes, attackers try to hide malicious URLs with 'safe' links that redirect to unsafe sites, by a forwarding service. Safe Links will keep you protected as it'll detect these malicious URLs and stop you navigating to the sites.

- **Reporting –** Offers a rich suite of reporting tools that helps you identify trends, patterns and if specific people within your organisation are being targeted.



*Mailbox Security Flowchart*

**Delve Analytics**

Delve is the brand new Office 365 application that as you're working collates information about you, who you speak to, and what you use.

- Powered by Office Graph, Delve will learn from you as you use it. It'll learn what documents you access regularly, what documents you use with colleagues and learn who you contact regularly.

- It'll present this information in a dashboard styled interface, allowing you to get into work quickly. It'll also monitor the content you digest and suggest similar content to you.

- You'll be able to set up your own 'profile' within Delve. You'll be able to map out your skills and specialisms and have visibility over everyone else's.

A full list of E5 features are available on the Microsoft Website.

Existing E4 users will keep their plan until contract renewal and then be offered options to downgrade or upgrade.

  

If you want to know more about Advantage's IT Support and Managed Services or Office 365, call **0203 004 4600** or visit our website.

**SHARE ARTICLE**

  

Subscribe to our emails and get updates, tips & tricks, training, whitepapers, events and more straight to your inbox

**Signup Today**

Home  ›  Intelligence Hub  ›  Tips & Tricks  ›  Office 365 E5 - New Features

**LATEST TWEETS**

 The #Cloud is the biggest technological advances of our era–& it's all been facilitated by the web. Complex computi… https://t.co/PADFmhgdzy

 As your business grows you may find that products such as #Sage50 don't have the features & functionality to keep s… https://t.co/YSekkByxXi

**CONNECT WITH US**

   

**CONTACT US**

Advantage Business Systems Limited,







Fax: 0203 004 4625







© Copyright Advantage Business Systems 2020

# APPENDIX
# 206

Sign in   **Join now**

# Secure your email and secure your business

April 4, 2017 • 11 Likes • 0 Comments



**Edel Creely**  |  **Follow**
Managing Director at Arkphir...

I've mentioned it before, but it is important to reiterate that email is the first port of call for cybercriminals when infiltrating your IT systems. A recent Trilogy blog post People play the primary role in data security talks about the role that employees need to take. Here, I would like to draw your attention to some additional IT systems which are available to help.

If you are using Microsoft Office Exchange online, Exchange Online Protection is enabled by default. But as more and more businesses move email to the cloud, an additional feature in Office 365 called Advanced Threat Protection (ATP) is highly recommended.

Advanced Threat Protection protects mailboxes against unsafe attachments and malicious links *in real time*.

- **Safe Attachments** sends unsafe attachments to an area (called a detonation chamber) where machine learning techniques evaluate the content for suspicious activity before being sent to the recipient.

- **Safe Links.** Microsoft's standard Exchange Online Protection scans links for malicious content. Because

Sign in    Join now

seemingly safe links (the links are redirected to unsafe sites by a forwarding service after the message has been received), ATP adds a further dimension. Safe Links protects your environment when users click a link. What happens is that while the email content is being scanned, the URLs are rewritten to go through Office 365. If a link is unsafe, the user is warned not to visit the site or informed that the site has been blocked.

- **Reporting** is available, so that administrators can track who did what and when, but you can also see which individuals are being targeted together with the type of attacks. Reporting and message trace allow you to investigate messages that have been blocked due to unknown viruses or malware, while URL trace capability allows you to track individual malicious links in the messages that have been clicked.

Watch the video below to learn how to provide better zero-day protection to secure your email system and better safeguard your business.

Sign in    Join now



**Edel Creely**
Managing Director at Arkphir...

**Follow**

0 comments



**Sign in** to leave your comment

**More from Edel Creely** **24 articles**

Benefits for IT Managers when using a managed IT services partner

**Benefits for IT Managers when using a...**

October 31, 2017

15 ways to make your organisation more secure

**15 ways to make your organisation more secure**

October 10, 2017

© 2020

User Agreement

Cookie Policy

About

Privacy Policy

Copyright Policy

Sign in    Join now

Community Guidelines                    Language

# APPENDIX
# 207





Notes          Signatures          Statistics          About Sucuri Labs          Threat Report

🔍 Search...

# Protecting Phishing Pages via .htaccess

Posted on July 11, 2017 by Yuliyan Tsvetkov 

Phishers usually want to protect their pages from being detected by search engines and security companies. To achieve that, they add .htaccess files that deny access to their phishing directories from known IP addresses and networks. Depending on the scenario, if they are targeting a specific type of service (online banking for instance) attackers may allow only a set of visitors from a specific country to see that phishing page.

Though  attacker's skillset may vary, some will just try to customize third-party scripts they find online and it's not uncommon when they do it poorly. For example, one phishing campaign uses a bot blocking .htaccess file that can be easily found on the Internet. It really protects sites from unwanted bots, but has very little to do with search engines, security companies, and geographic regions (although it blocks some of them) - it just saves bandwidth.

```
deny from 216.163.255.1 # rpa.metlife.com bored employees
deny from 67.127.164.125 # DSL bandwidth waster
deny from 193.253.199. # france SE art-online.com bandwidth waster
deny from 80.179.254. # clown from Israel using downloader
deny from 64.37.103. # spambots and other non customers
deny from 69.61.12.100 # spambot from servershost.net
```

Along with the .htaccess file, there may be other files within the phishing structure, such as:





« A Simple Prestashop Login Swiper

Malicious Backdoor Hidden Inside Fake Image »

**PRODUCTS**

Website Firewall
Website Antivirus
Website Backups
WordPress Security
Enterprise Services

**SOLUTIONS**

DDoS Protection
Malware Detection
Malware Removal
Malware Prevention
Blacklist Removal

**SUPPORT**

Blog
Knowledge Base
SiteCheck
Research Labs
FAQ
Report Abuse

**COMPANY**

About
Media
Events
Employment
Contact
Testimonials

   

Customer Login



Terms of Use   Privacy Policy   Frequently Asked Questions

© 2019 Sucuri Inc. All rights reserved.

# APPENDIX
208



Spoofed C-level executive emails are the next big threat, and it's costing businesses billions.





According to the Federal Bureau of Investigation (FBI), recent report shows that global losses from compromised business email have reached **$5.3 billion**[1], with CEOs being spoofed the most by such attacks.

Businesses are increasingly becoming susceptible to such security attacks because unsuspecting email users are working from mobile devices that may not have the proper security measures in place to filter out such threats.

Chief Information and Security Officers (CISOs)[2] have shared that IT security, especially for mobile devices, can often be overlooked by businesses, particularly by C-level executives, who are often attractive targets for identity and data theft. This has lead to increased incidences of employees unknowingly replying to false emails that they believe are coming from their top executives and revealing sensitive corporate data or downloading malicious attachments which target the business networks.

Proactive email security is therefore needed to mitigate such email-based risks across all devices. Offering zero day email protection, **Microsoft Advanced Threat Protection (ATP)** will be the first defence to scan your business email automatically for threats and unknown attacks.

It's time to safeguard your business data - ATP helps guard against sophisticated threats including unknown malware and viruses. It offers email filtering and real time, time-of-click protection against malicious URLs, protecting your employees and key executives with access to confidential company data from email-based threats, malware and other sophisticated threats which can result in the loss of personal and business data.

## Filter out threats with Advanced Threat Protection.



### Secure your mailbox and protect against unsafe attachments
Safe Attachments is designed to detect malicious attachments before anti-virus signatures are available, and to provide better zero day email protection to safeguard your messaging system. All messages and attachments without a known virus/malware signature are routed to a special hypervisor environment, where a behavioral analysis is performed using a variety of machine-learning and analysis techniques to detect malicious intent. Safe Attachments then detonates attachments that are common carriers of malicious content, such as Office documents, PDFs, executable (EXE) files, and Flash files. If no suspicious activity is detected, the attachment is released for delivery to the mailbox.



### Protect your environment when users click on malicious links
Safe Links is a feature that helps prevent users from going to malicious websites when they click them in email. Attackers sometimes try to hide malicious URLs within seemingly safe links, redirecting users to unsafe sites through a forwarding service after the message has been received. The ATP Safe Links feature proactively protects your users if they click such a link. That protection remains every time they click the link, so malicious links are dynamically blocked while good links remain accessible.



### Obtain rich reporting and track links within messages
Safe Attachments has two traffic reports which show aggregated data for a tenant by disposition (blocked, replaced etc.) and the file types. The report also shows detailed data (i.e. date, sender, recipient, ID, subject). Safe Links has advanced reporting features that make it easy to determine who has clicked through a malicious link to support faster remediation. The rich reporting URL trace capabilities provide critical insights into who is getting targeted in the organization and the category of attacks being faced. Addtionally, ATP reporting will expand to provide analysis on why ATP flagged an email as a threat and granular details on scan times for emails with attachments.

Get zero day email protection for your Office 365 subscription with Advanced Threat Protection at just

**$3.00**
/user/month*

## Unsure of your email security risk?
## Contact us for a one-to-one consultation today.

 1800-SME-1111 (1800-763-1111)     g-segmentict@singtel.com

*Add-on of Advanced Threat Protection is applicable to: Exchange Online Plans (Plan 1, Plan 2, Kiosk, Protection), Office 365 Business Essentials, Business Premium, Office 365 Enterprise E1, E3.
Contract term for Advanced Threat Protection (ATP) will be tied to the specified Office 365 basic pack's contract term.

Source:
[1] https://www.zdnet.com/article/trend-micro-finds-ceos-are-spoofed-the-most-by-business-email-compromise/
[2] https://www.computerweekly.com/news/252437107/C-suite-a-cyber-attack-risk-say-security-chiefs

Copyright© 2018 Singapore Telecommunications Ltd. (CRN 199201624d). All rights reserved.

# APPENDIX
209

**What are the Priorities for Data Protection and Privacy Officers in 2020?**   DOWNLOAD   ✕

# CPO
MAGAZINE



- Advertisement -

Know what to expect from the CCPA   View the infographic ›   MICRO FOCUS

HOME    NEWS    INSIGHTS    RESOURCES    f    🐦    in    👤    🔍

READING
PHISHING ATTACKS: INSIGHTS FROM MORE THAN 1,000 FREE PHISHING KITS 🌙

CYBER SECURITY    INSIGHTS    ·  5 MIN READ

# Phishing Attacks: Insights from More Than 1,000 Free Phishing Kits

SARAH MEYER   ·   JANUARY 10, 2018

Home  ›  Cyber Security



f Share    🐦 Tweet    in Share    📌 Pin it    ＋    －

In a world where consumer friendly, easy to use software which allows for the development of anything from mobile phone applications to websites it should be no surprise that tool kits aimed at making phishing attacks easier than ever before are appearing on a daily basis. These 'phishing kits' are usually not around for any length

Case 0:20-cr-60410-RKA   Document 65-14   Entered on FLSD Docket 03/28/2024   Page 249 of 316

of time. It doesn't take long before security vendors or internet providers – often cooperating with authorities take them down or blacklist the sites created using these phishing kits.

A recent study by Imperva provided information on the methods used by phishers when they develop phishing kits that allow for the development of phishing web sites in what has been called an 'easy to deploy' format. The study examined over 1000 of these free 'phishing kits' in an effort to get under the skin of what can now be characterized as an increasingly complex and rapidly maturing phishing industry.

- Advertisement -

Phishing attacks are not going away anytime soon – in fact the problem is getting worse – in part due to the increasing availability of phishing kits that make developing sites that provide a vital resource for those engaged in this activity relative child's play.

## Phishing attacks – Specialized skillsets in play

Some of the findings of the study might surprise security experts. This includes the fact that phishing exhibits many of the attributes of a diversified industry. Whereas in past years, phishing 'projects' were the domain of highly skilled operators who would develop, execute and manage an entire phishing campaign and then reap the benefits of a phishing attack. Today the phishing domain is much more 'role-based'. The new approach sees many teams with different skillsets fulfilling different roles. The modern cybercriminal now subcontracts portions of the project (like building phishing sites) and focuses on large scale exploitation of the data such as passwords that are gathered, thus increasing revenue.

Before you continue reading, how about a follow on LinkedIn?



# DIY – The phishing campaign revolution

There can be no doubt that phishing is evolving. There is now a closer relationship between phishing technology developers and those who run the phishing campaigns. This has led to the proliferation of so called 'DIY Phishing Kits'. The attraction of these kits is that they dramatically reduce the costs and labor involved in the development of phishing campaigns. The knock-on effect of the availability on the Internet of free phishing kits has been the lowering of the barriers to entry for those who wish to engage in phishing activity. These kits make it extremely easy to create a copy or copies of target websites and steal valuable information – and they are evolving at a rate which makes ongoing protection against phishing almost impossible. It is becoming apparent that all security professionals can do is be reactive and deal with phishing attacks as and when they occur. An analogy between the flu virus and phishing is apt – develop a vaccine against the flu and it is well-nigh useless when the next iteration of the virus strikes again.

# Nothing in life is free

When the aspirant (read: naïve) phishing campaigner sources a phishing kit for free they are going to get exactly what they pay for. What they are in fact doing in most cases is providing the developer of the kit with a back door to the information the campaigner is gathering. They are in essence unpaid data gatherers. Even factoring in the cost of developing the kit the developer has the opportunity to enjoy an incredible return on investment. The study surmises that this is the main reason behind the spread of free phishing kits on underground sites.

# Extending the lifespan of phishing attack sites

In an effort to extend the lifespan of the sites, developers have taken to installing mechanisms that block unwanted visitor from the sites. This gives the appearance that the site is not functioning – diverting attention from it while it continues to be accessible to those who are being targeted by the phishing attacks. Once again, risk to those operating the sites is reduced and the ROI of the owners is increased. There are several common methods of preventing access, including:

- .htaccess files — contain a list of blocked IP addresses related to search engines and security companies bots
- .txt files —used to prevent bots from accessing specific remote directories
- PHP scripts — dynamically check if the remote IP address is allowed to access the phishing pages

In addition, those who run the phishing attack websites also use the strategy of randomly redirecting the visitor to a new site which mirrors the existing sites' content – this to a certain extent avoids blacklisting. The study showed that 13% of phishing sites used this strategy of randomizing the URL by employing the following steps:

- Create a random phishing kit subdirectory on the site
- Copy the content of the entire kit inside it
- Redirect the visitor to the newly generated random location

# A summary of the phishing attack ecosystem

Phishing campaign operators are trying to find ways to extend the life expectancy of their pages and servers and increase their ROI.

The business model that resembles traditional industrialized processes has emerged – this is driving the production of increasing numbers of 'free' phishing kits – and dramatically increasing the number of phishing attacks.

As various features have been introduced to make phishing sites more efficient

Case 1:20-cv-00613-MWC Document 83-21 Filed on 05/30/24 Page 252 of 316

and to extend the life expectancy of their pages, phishing kits have become actively promoted and distributed at no charge on 'dark' sites. However, free phishing kits often hide implicit recipients who receive the phished information at the same time as those who have set up the phishing site. Attackers therefore decrease their effort and risk, and increase their return on investment by leveraging the work of inexperienced criminals who deploy their kits.

At least 25% of phishing kits contained hidden recipients that transmitted the stolen information to third parties (likely the original kits' authors).

It also seems that the growth in phishing attacks is the work of a relatively small group of developers. About half of the kits were created by this small group of experienced phishers, while almost a third of the kits belonged to 3 large clusters. This shows that phishing kits come from a restricted number of sources.

## The future of phishing attacks

As the 'science' and industrial production of 'free' phishing kits grows in complexity, it is inevitable that individuals and organizations will continue to come under attack. This includes malicious attempts to obtain passwords and similar information – as well as the use of ransomware to extort monies from these organizations.

So what can organizations do? According to Luda Lazar, security research engineer at Imperva:

"Since many of the phishing sites redirect victims to the legitimate target site, a web application firewall (WAF) on the legitimate target site can detect phishing attempts through these references. Effective protection requires staying current with the dynamics of phishing campaigns which could include use of communal threat intelligence services that track phishing campaigns and then update security controls accordingly.

"Moreover, in the tight race between cyber criminals and cyber security systems,

Case 5:18-cv-04048-LHK   Document 89-24   Filed 05/26/2021   Page 253 of 316

security officers should always assume they will lose some of the battles. Thus, a comprehensive security solution should not restrict itself to prevention. It should also include post-infection mechanisms, in this case, breach detection tools to detect compromised machines or accounts through the hackers' attempt to abuse enterprise data and automatically quarantine the compromised asset, thereby preventing further access."

> #Phishing attacks are not going away anytime soon due to the increasing availability of free 'easy to deploy' kits.
>
> Click to Tweet

Importantly, it is up to the security professionals who are the gatekeepers of information technology in the organization to educate those who might be subject to phishing attacks. This is especially true when it comes to education initiatives aimed at C-Suite executives who may have access to tremendously sensitive information.



- Advertisement -

TAGS

#PHISHING



**Sarah Meyer**

**Staff Writer at** **CPO Magazine**

Sarah Meyer is a technology writer for more than 10 years. She writes on public policy issues with a focus on cybersecurity and personal data protection. Sarah has previously worked for large multinational cybersecurity companies in the areas of government relations and public policy engagement.

*- Advertisement -*

# Leave a Reply

 Please Login to comment

 Subscribe ▾

*- Advertisement -*



*- Advertisement -*

*- Advertisement -*

# LEARN MORE

About

Contact

Our Advertising

Privacy Policy

Cookie Policy

Terms of Use

# STAY UPDATED

Enter your email ...

☐ I agree to the privacy policy and terms

**SUBSCRIBE**

*We respect your privacy*

# FOLLOW US



# CPO
MAGAZINE

**News, insights and resources for data protection, privacy and cyber security professionals.**

## LEARN MORE

About

Contact

Our Advertising

Privacy Policy

Cookie Policy

Terms of Use

## STAY UPDATED

Enter your email ...

☐ I agree to the privacy policy and terms

**SUBSCRIBE**

*We respect your privacy*

## FOLLOW US



© 2020 Data Privacy Asia Pte. Ltd.

# APPENDIX
# 210

**Timothy Neilen**   Books   Now   Quotes

# Phishing - don't get caught!

19 Sep 2018

*This article was originally written for publishing on the company blog at answers IT, and has been cross posted here.*

Email is an indispensable communication tool, unfortunately many attacks also originate in emails. According to the OAIC Notifiable Data Breaches Quarterly Statistic Report, published on 31 July 2018 the majority of cyber incidents were linked to the compromise of credentials through phishing (29%), followed closely by brute-force attacks (14%) more staggering is the total breaches by unknown methods (34%).

Phishing is a play on the word "fishing". The bait is often a email or social media message from a spammer, the fish are the unsuspecting victims who act on them. Spammers send out millions of messages, but only a few need to bite…

For the majority of our clients, we recommend Office 365 to provide email services. Office 365 includes protection mechanisms (Exchange Online Protection) to prevent malware from being introduced into Office 365 by a client or by an Office 365 server. However, this isn't the only defense you should have to protect yourself.

In addition to your mail providers standard protection or filtering, there are additional layers that can be added to protect your business from email-based attacks. When it comes to security, layering multiple complimentary solutions is the best approach.

## Advanced Threat Protection

The next layer in your stack should be Advanced Threat Protection (ATP). ATP extends this protection through a feature called Safe Attachments, which protects against unknown malware and viruses, and provides better zero-day protection to safeguard your messaging system. All messages and attachments that don't have a known virus/malware signature are routed to a special virtualised environment, where a behavior analysis is performed using a variety of machine learning and analysis techniques to detect malicious intent.

Attackers sometimes try to hide malicious URLs with seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received. ATP Safe Links proactively protects you if you do visit a malicious URL. That protection remains every time they click the link, and malicious links are dynamically blocked while good links are accessible.

ATP also offers rich reporting and tracking capabilities, this allows us to analyse who is being targeted and what sort of attack vectors are being used. It also allows us to determine who has clicked on unsafe links, leading to conversations and training about remaining vigilant.

## Additional Complimentary solutions

Additional layers that can be useful in protecting against email-bourne attacks include solutions such as Anti-Virus/Anti-Malware, Managed DNS Security and Intrusion Detection systems.

## Humans are layers, too!

Even with the above solutions in place, there's one final layer that needs to be considered: you!

When reading emails, the first things that are likely to get our is the sender's name, email, and subject. It may come as a surprise that spoofing these is an easy thing to do. Even if you know the source of the email, if something looks suspicious, report it to answers IT - we would much rather take a quick call and give you the "all OK", avoiding hours upon hours of trying to recover from a potential breach. Plus it'll save your company from having to go through the painstaking and embarrassing Notifiable Data Breaches Reporting process.

---

## Related posts

Navigating your Office and Microsoft 365 options 05 Nov 2019

Are you ready for Windows 7 end of life? Upgrade to Windows 10 today 19 Oct 2019

Using GitHub to manage public keys 05 Sep 2019

---

APPENDIX
211

 

# Advanced Threat Protection



## The Challenge

As hackers around the globe launch increasingly sophisticated attacks, organizations are seeking tools that provide additional protection. Microsoft is pleased to offer customers security capabilities in Microsoft Office 365 with Advanced Threat Protection (ATP), an email filtering service that provides stronger protection against specific types of advanced threats.

## The Microsoft Approach

Office 365 ATP offers three core features to better secure your email:

1. Safe Attachments, which protects against unknown malware and viruses
2. Safe Links, which provides real-time, time-of-click protection against malicious URLs
3. Rich reporting and trace capabilities

## Safe Attachments

Safe Attachments is designed to detect malicious attachments before anti-virus signatures are available, and to provide better zero-day protection to safeguard your messaging system. All messages and attachments without a known virus/malware signature are routed to a special hypervisor environment, where a behavioral analysis is

performed using a variety of machine-learning and analysis techniques to detect malicious intent. Safe Attachments then detonates attachments that are common carriers of malicious content, such as Office documents, PDFs, executable (EXE) files, and Flash files. If no suspicious activity is detected, the attachment is released for delivery to the mailbox.

## Safe Links

Safe Links is a feature that helps prevent users from going to malicious websites when they click them in email. Attackers sometimes try to hide malicious URLs within seemingly safe links, redirecting users to unsafe sites through a forwarding service after the message has been received. The ATP Safe Links feature proactively protects your users if they click such a link. That protection remains every time they click the link, so malicious links are dynamically blocked while good links remain accessible.

## Dynamic delivery of Safe Attachments

Dynamic Delivery eliminates email delays by sending the body of the email with a placeholder attachment, while the actual, suspicious attachment undergoes the Safe Attachments scan. Recipients can then read and respond to the message, having been notified that the original attachment is being analyzed. If the attachment is cleared, it replaces the placeholder; if not, the admin can filter out the unwanted and potentially malicious attachment.

## URL Detonation

URL Detonation provides deeper protection against malicious URLs. Not only does ATP check a list of malicious URLs when a user clicks on a link, but Office 365 ATP will also perform real-time behavioral malware analysis in a sandbox environment against malicious attachments at destination URLs. For example, if an email includes a link to a Word document on a web server, the document is downloaded into our sandbox environment and detonated as if it were an attachment.

## Rich reporting

Safe Attachments has two traffic reports which show aggregated data for a tenant by disposition (blocked, replaced etc.) and the file types. The report also shows detailed data (i.e. date, sender, recipient, ID, subject). Safe Links has advanced reporting features that

make it easy to determine who has clicked through a malicious link to support faster remediation. The rich reporting URL trace capabilities provide critical insights into who is getting targeted in the organization and the category of attacks being faced. Reporting and message tracing enable investigation of messages that have been blocked due to unknown viruses or malware, while the URL trace capability enables tracking of individual malicious links in the messages that have been clicked.  Addtionally, ATP reporting will expand to provide analysis on why ATP flagged an email as a threat, identifiying threats caught by ATP which would have been missed without ATP (identifiying advanced threats specificially), and granular details on scan times for emails with attachments.  ATP reporting, will ultimately enable proactive email protection.

---

6TH OCT 2018 | BY SOLID SYSTEMS

---

**Share this entry**



Our Story
Our Services
Our Passion
Careers
Get In Touch
Blog

**South Africa**

Cape Town | Johannesburg

+27 21 110 0000

**United Kingdom**

London

+44 20 3150 0261

**Contact us on**

letstalk@solidsystems.co.za

in    f

# APPENDIX
# 212



# AN EXAMINATION OF A PHISHING KIT DUBBED LUIS



By Larry Cashdollar   October 12, 2018 8:14 AM

0 Comments

    

There have been plenty of articles describing the structure of phishing emails, and how to spot them. However, less explored, are phishing websites - what they are, how they are used, and how users can protect themselves. We'll take a deep dive into a particular phishing website and the methods used in the author's attempt to avoid detection. While reading through my Twitter feed, I noticed a tweet from @WifiRumHam discussing a zip file of phishing kits he discovered that is hosted on a compromised web server. He pointed me to a 66 MB file named luis-debug.zip. The zip file has five directories that are each unique to the target site being phished. I checked the source code in the first directory. It has code that targets a bank popular in the southern and midwestern states. I've blurred the images, as this is an ongoing investigation.

```
$ ls -l
```

```
total 20
```

```
drwxr-xr-x 3 www-data www-data 4096 Sep 13 10:39 55450bcff5cf109349f7a22507e8cfed
```



Akamai

```
drwxr-xr-x 3 www-data www-data 4096 Sep 22  2015 home
```

```
-rw-r--r-- 1 www-data www-data  718 Aug 20 16:18 index.php
```

```
-rw-r--r-- 1 www-data www-data  234 Sep 13 10:39 vu.txt
```

```
Figure 1.  A listing of the bank malware phishing directory.
```

The code in index.php includes the code in the file blocker.php that checks that the victim connecting to it does not match certain criteria. The criteria are that the victim isn't a bot, or security company that might report the phishing site.  Instead, blocker.php uses a blacklist to block out domains and IP addresses for Internet security companies, like Phishtank and Cyveillance. The antibots.php file in the below file listing implements this same bot thwarting functionality for the /home and md5sum directories. They do this by matching the connecting client's hostname or IP address with a blacklist of IP addresses, domains, and user-agent strings to those of popular web crawlers and security companies.   The code snippet below is a list of strings that will be matched against the connecting client's domain. A match against any indicators in the blacklist returns a 404 page.

```
$blocked_words = array("above","google","softlayer","amazonaws","cyveillance","phishtank","dre
```

The code in index.php then generates a md5sum of the current time which then is used to create a unique directory that copies into a "home" directory.  The last step is a redirect to this new unique directory after the code in index.php logs the victims IP address in the file vu.txt. The new unique md5sum directory then has a copy of the contents in the home directory.

```
$ ls -l 55450bcff5cf109349f7a22507e8cfed
```

```
total 72
```

```
-rw-r--r-- 1 www-data www-data  1536 Dec 22 2017 action.php
```



```
-rw-r--r-- 1 www-data www-data  2124 Jan 9 2015 antibots.php
```

```
-rw-r--r-- 1 www-data www-data 17859 Nov 18  2015 confirm.php
```

```
-rw-r--r-- 1 www-data www-data 10013 Nov  5 2015 encriptar.php
```

```
-rw-r--r-- 1 www-data www-data   296 Sep 20 2015 Finish.php
```

```
drwxr-xr-x 2 www-data www-data  4096 Sep 22 2015 images
```

```
-rw-r--r-- 1 www-data www-data  6502 Nov 18 2015 index.php
```

```
-rw-r--r-- 1 www-data www-data  2180 Dec 22 2017 mailer.php
```

```
Figure 2.  A listing of the bank malware md5sum directory.
```

You see encriptar.php and anon.js files in the file listing.  The author, Anonisma, went a step further and incorporated AES encryption into this phishing kit in both these files. In another step to avoid detection, the phishing kit page contents are then encrypted into a JavaScript string and then decrypted by the client browser to into HTML. The decrypted HTML is then rendered inside of the browser's Document Object Model (DOM).  This avoids transmitting the suspicious web page in clear text over unencrypted connections, thereby avoiding detection by security applications. Viewing the source of the phishing web pages will show the JavaScript decryption routine, instead of the real HTML.

```
view-source:http://example.com/45ea0d1c5447ca7da132a3d783c79b54/
```

```
<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.01 Transitional//EN">
<html>
```




```
8   var output = Aes.Ctr.decrypt(Anonismat, Anonismap, 256);
9   document.write(output)</script></head></html>
```

Figure 3. Javascript used to decrypt the webpage.

The victim is directed to the phishing site in their browser, shown in figure 4, instead of the legitimate site.



Figure 4.  The webpage decrypted by the browser.

The code used to implement the AES encryption appears to have been copied, using these pages as these original sources:

https://www.movable-type.co.uk/scripts/aes.html https://www.movable-type.co.uk/scripts/aes-php.html

This kit is also designed to steal more of the victim's information associated with the account, by adding another account information confirmation form.  This confirmation form is also AES encrypted by





**Confirm Your Account**

**Account Information**

**Profile Update**

**Address Information**

Full Name:

Home Address:

City:

State:

Zip Code:

Phone Number:

**Security Information**

Social Security Number:

Mother's Maiden Name:

Date of Birth:

**Credit / Debit Card Information**

Card Number:

Card PIN:

Card Verification Code:

Expiration Date:

Figure 5.  The second form collecting more of the victim's information.

The victim is then redirected to the legitimate banking site, as if no nefarious actions have happened. The victim's credentials and personal information captured by the phishing site are then emailed out by mailer.php to the attacker's gmail.com account.

# Conclusion

   

security applications as cybercriminals find new ways to obfuscate their activities. I expect that highly customizable software kits that will allow even the most novice cybercriminals to launch their own campaigns will become more prevalent.  With the combination of homoglyphs, tricking the eye, and the obfuscation methods bypassing network monitoring that I have described above, phishing emails are getting harder and harder to detect by individuals and enterprise security systems alike.

     

Categories:

[Cloud Security](#)

---



### Mitigating Credential Stuffing Attacks in the Financial Sector

Financial services firms around the world are experiencing credential stuffing attacks at an alarming rate. Cybercriminals are using readily available automation tools, botnets, and compromised account credentials to mount increasingly sophisticated and stealthy attacks. Many businesses are using multi-factor authentication (MFA) to strengthen access security and combat credential theft.

Learn More ›



### Phishing Tool Analysis: Modlishka

One of the goals of phishing sites is to lure individuals into providing sensitive data, such as personally identifiable information, banking and credit card details, and passwords, through the use of email, SMS, social media, and messaging apps.

Learn More ›

## Leave a comment

Akamai

Email Address*

URL

☐ Remember personal info?

Comments* (You may use HTML tags for style)

Captcha*:

amm6 f d

Type the characters you see in the picture above.

Preview    Submit

| COMPANY | CAREERS | NEWSROOM | RESOURCES | | TRUST CENTER |
|---|---|---|---|---|---|
| Leadership | Students | Media Resources | About Blog | Facebook | Policy Details |
| | | | | LinkedIn | Manage Preferences |

Investor Relations

For Developers

Diversity

Community

Corporate Responsibility

Compliance

Events

Our Partners

©2020 Akamai Technologies    Privacy & Policies    EMEA Legal Notices    Support    Webmaster

# APPENDIX
# 213

 spiceworks

| #signatures = #codetwo | » |

Home > Cloud > Microsoft Office 365

# Microsoft "Safe Links" - Do they make Office 365 safer?



by Brittany for Avanan on Oct 23, 2018 at 21:31 UTC
Brand Representative for Avanan

Microsoft Office 365    General IT Security

---

Get answers from your peers along with millions of IT pros who visit Spiceworks.    Join Now



CodeTwo
1,215 Followers · Follow
22 Mentions  |  11 Products

Adam (CodeTwo)
IT Animal

GROUP SPONSORED BY CODETWO

Microsoft Safe Links replaces the URLs in an incoming email with URLs that allow Microsoft to scan the original link for anything suspicious and redirect the user only after it's cleared. For example:



Once the user clicks the link, Microsoft ATP scans the location to ensure it isn't malicious before redirecting the end-user's browser. It checks if that destination domain is not on a custom blacklist created by the organization or on Microsoft's blacklist. If the URL leads to an attachment, the attachment will be scanned by Microsoft for malware. If the URL is deemed unsafe based on any of the above, the user is taken to a page displaying a warning message asking them if they wish to continue to the unsafe destination.

So, why would "Safe Links" be considered unsafe in any way? Well, there are a few major shortcomings that end up making your email less secure from phishing attacks:

1. **Safe Links bypassed with IP traffic misdirection**

   As mentioned before, Microsoft follows links to determine their risk before allowing the user to navigate to them. However, Microsoft follows the Safe Links from special IP addresses that are easily distinguished from end user requests. The hackers created and shared their own Microsoft IP's blacklist with those IP addresses here. So, when the request is coming from a Microsoft IP, it is redirected to a benign page and Microsoft's ATP clears it. But then it redirects the user straight to the malicious URL.

2. **Safe Links bypassed using obfuscated URLs**

   Another weakness of the Safe Links scan is that it doesn't apply Safe Links to domains that are whitelisted by Microsoft, so popular sites like Google.com are given a pass. It may sound like it makes sense, but it opens the door for another common trick named "Open Redirect", which looks like this:

   *https://www.google.com/url?sa=D&q=https://www.evilsite.com*

   Google will not check this link for malicious content and the end-user will be redirected right to the malicious site. The security team and end-users are lulled into a false sense of security, believing that Microsoft ATP will take care of them and are less likely to think twice when clicking the link.

3. **It makes it impossible to know where the link is going**

   Even if users want to exercise due diligence when clicking a link, Safe Links makes it more difficult to check the URL themselves. The link is rewritten as an extremely complex redirect, making it difficult to parse. Here's an example from real life, you just have to discern which leads to the real UPS site and which is from a fake phishing attack:

   https://na01.safelinks.protection.outlook.com%2F%3Furl%3Dhttps%3A%2F%2Fwwwapps.ups.com%2FWebTracking%2Ftrack%3Ftrack%3Dyes%26trackNums%3D1ZY8A3700336636844

   https://na01.safelinks.protection.outlook.com%2F%3Furl%3Dhttps%3A%2F%2Fwwwapps.ups.com%40WebTracking.email%3Ftrack%3Dyes%26trackNums%3D1ZY8A3700336636844

   Answer is at the bottom of the post!

4. **Users are more likely to login on a Fake O365 login page if the domain is outlook.com**

   Many phishing attacks try to steal the end-user credentials through fake Office 365 login pages. The users that will check where the link is going will see a URL in "*.outlook.com", a Microsoft registered domain name. This can lead users to fall for attack as they are more likely to enter their credentials into a page that looks to be hosted on a known Microsoft domain.

Overall, we believe that "Safe Links" trains the users to be less cautious when clicking links and provides little, real security value.

**Do you believe that "Safe Links" have helped protect your users?**

*(PS: The answer to the UPS "Safe Link" question: the first link is legitimate. The second one goes the the malicious site webtracking.email.)*

  

## Popular Topics in Microsoft Office 365

Where do you stack up against other IT pros? Take the Challenge »

Cloud signatures finally coming to Outlook next month!

Office 365 tenant to tenant migration (2020)

No Chat button on teams

TEST YOUR SMARTS

**Which of the following retains the information it's storing when the system power is turned off?**

ROM

CPU

RAM

GPU

Submit »    88% of IT pros got this right.



## 7 Replies

**Sponsored by Spiceworks**



### A new cloud-based version of Spiceworks Inventory

*"Spiceworks has taken our popular on-prem Inventory to the cloud with minimal setup, details of the computers on your network, and Spiceworks Help Desk integration. And it's free!"*



**greggmh123** ✓  Oct 23, 2018 at 22:36 UTC

Trend Micro Hosted Email Security has a similar feature. I have been training users to hover over a link to see if it was going to go where the text claimed, e.g. in a "Click HERE to get your invoice" kind of email, hovering would show the vendor's site. With the Trend Micro HES feature enabled, ALL links get re-written, so they no longer matched the vendors' sites. It caused so much confusion that I disabled it.

Gregg





**TrepidPrism** ✓  Oct 24, 2018 at 03:25 UTC

I came to the same conclusion about Microsoft Safe links. It caused a bunch a trouble with conflicting information from Knowbe4 with the URL rewrite. Nice concept bad implementation.

 1



**NY Y@nkee lady** ✓  Oct 24, 2018 at 05:54 UTC

Nope links don't help.  Microsoft is not scanning, it's transferring your info back to them... There goes your privacy!





Oct 24, 2018 at 07:50 UTC

Great article Brittany and some valid points. I do wonder what the alternative is to protect from threats at time of click. At Cyren we agree with everything you say, so we leverage our web/DNS security to do time of click protection. When you are in the inbox, as I think Avanan is, you can scan at regular intervals, but can you actually scan at the precise time of click without changing the URL? This would be a great solution. I suspect there are pros cons to all approaches. Be good to get others' views.



---



**Dwhipps** ✔ Oct 24, 2018 at 12:55 UTC

Good idea, but won't really help much in it's current implemented form I'm afraid.. it needs to be smarter to put it bluntly.



---



**Riso** ✔ Oct 24, 2018 at 13:21 UTC

I only found out about this today and it is causing issues with our webapp that sends links to clients. When they click the link it no longer gets back to the app. Its a really odd security implementation.



---



**Hello_Dave** ✔ Nov 1, 2018 at 13:47 UTC

Thanks for the article. The SafeLinks in this format would essentially nullify all of the end-user training we've worked so hard on for the last 2 years. There's no way to know where the actual link is taking you, and now you just have to trust that Microsoft's scans and filters will catch everything. I just don't see this as feasible in our market.



---

  

 This topic has been locked by an administrator and is no longer open for commenting.

To continue this discussion, please ask a new question.

## Read these next...

 Load More

# APPENDIX
# 214

SECURITYWEEK NETWORK:   **Information Security News**  |  **Infosec Island**  |  **CISO Forum**          Security Experts:  **WRITE FOR US**



Subscribe **|** 2020 CISO Forum **|** ICS Cyber Security Conference **|** Contact



**Malware & Threats**    **Cybercrime**    **Mobile & Wireless**    **Risk & Compliance**    **Security Architecture**    **Security Strategy**    **SCADA / ICS**    **IoT Security**

Home › Email Security



## Evasive Malware, Meet Evasive Phishing

By Siggi Stefnisson on December 28, 2018

Tweet    Aanbevelen 0    



GET THE DAILY BRIEFING

BRIEFING

Business Email Address      SUBSCRIBE

In a previous column, I wrote about how **evasive malware has become commoditized** and described how the techniques being used in any given piece of malware had grown in number and sophistication—the layering of multiple techniques being its own form of sophistication. At the time, we had been digging around in our sandbox array and found that 98 percent of malware sent for analysis was using at least one evasive technique, and one-third of malwares were using a combination of six or more detection evasion techniques. Then there are malwares like Cerber ransomware, which is very sandbox aware and runs 28 evasive processes or, if you like, uses 28 techniques intended to confound security systems and thus evade detection.

**Phishing following the malware curve**

I have spent most of my career in the malware world, so I've got a well-developed sense of the detection cat-and-mouse game between security professionals and malware developers—recognizing that for some the preferred metaphor is an arms race. Given the extensive and rich history of the evolution of malware, "evasive malware" entered the lexicon long ago and is an often-used term of art. Malware's roots pre-date the Web, with early experiments playing "gotcha" with fork bombs and trojans infecting mainframes. In the 1980s, with the advent of PCs, we saw the first worms, self-encrypting viruses, and even the first ransomware—distributed on floppy disks. We come to the present, in which I keep a catalogue of evasive malware tactics divided into 26 categories, and talk frequently about how malware has entered a "hyper-evasive" phase.

"Evasive phishing," however, is not a term much heard. When I do a search on the phrase, I get eight times the results for evasive malware that I do for evasive phishing. But my expectation is that we all will—and need to—start talking a lot more about "evasive phishing" than in the past. To be clear, when I use the term evasive phishing, I'm not talking about clever phishing pitches, well-designed emails or sites, or any social engineering techniques to mislead the user. I'm talking on a more "product strategy" and technical level about techniques to hide phishing infrastructure—principally web sites—from security systems and phishing URL crawlers.

**Phishing kits exemplify the trend**

Without even getting into the (very important) topic of the growth of "phishing-as-a-service," we can see evasive tactics in the more straightforward and very large phishing kit sub-market—these kits are pre-packaged spoofed web pages downloaded as a ZIP file for a fee usually in the $50 range.

Most Recent   Most Read

» US Talks Tougher on Chinese Tech, But Offers Few
    Specifics

Tactics to evade or make detection more difficult can include things like encrypting the whole phishing site with AES encryption, or encoding the title of the website in an effort to fool phishing crawlers. Basic tactics in use fall into two general categories: 1) blocking security systems from evaluating and seeing the true nature of the phishing site, by looking up the IP or domain from which the user is connecting and blocking (or redirecting) accesses originating from certain IP addresses or ranges; and blocking access from security bots or crawlers or other user agents that are searching for phishing sites, like the Googlebot, Bingbot, or Yahoo! Slurp.

**87% using evasive techniques**

We just did a bit of focused work around phishing kits, where we monitored the use of files or code which makes a judgment about the user, as I was explaining above, then decides whether to actually show the phishing site. From a sample of 2,025 sites generated by various kits, it turns out that 87 percent of them use at least one type of basic evasive technique. The most common method for implementing this is use of a .htaccess file in the kit, which is a PHP script with these blocking or redirect functions.

By the way, we also learned that many specialize in a single brand, like spoofing the Office 365 log-in page, or imitating Paypal or Dropbox pages. But many are multi-brand kits—for the money the cybercriminal gets the option of mounting phishing campaigns targeting any of many brands.

There's a reason why surveys of IT and security admins this year keep pointing to phishing as the top source of breaches and, unsurprisingly, their top security concern. That will only change as security systems get up the curve on combating evasive phishing, which begins with a broader recognition of the changed nature of the game. Evasive malware, move over and make room for evasive phishing.

Tweet    **f** Aanbevelen 0    RSS



Sigurdur "Siggi" Stefnisson is vice president of threat detection at **Cyren**, an Internet Security as a Service provider that protects users against cyberattacks and data breaches through cloud-based web security, email security, DNS security and sandboxing solutions.

**Previous Columns by Siggi Stefnisson:**

» Evasive Malware, Meet Evasive Phishing

» Phishing Training is a Tool, Not a Solution

» Who's Winning the Cybercrime Battle?

» Malware Businesses Blending the Legitimate and the Illegitimate

» Weak Security Socializes Risk

sponsored links

» **2020 CISO Forum: September 23-24, 2020 - A Virtual Event**
» **2020 Singapore ICS Cyber Security Conference [VIRTUAL- June 16-18, 2020]**
» **2020 ICS Cyber Security Conference | USA [Oct. 19-22]**
» **Virtual Event Series - Security Summit Online Events by SecurityWeek**

**Tags:** INDUSTRY INSIGHTS    Email Security    Phishing

Porn Video Interrupts US Court Hearing for Accused Twitter Hacker

Researcher Details Sophisticated macOS Attack via Office Document Macros

Education's Digital Future and the End of Snow Days

Colorado City Pays $45,000 Ransom After Cyber-Attack

Vulnerabilities in Protocol Gateways Can Facilitate Attacks on Industrial Systems

Federal Program Offers New Cybersecurity Tool for Elections

Drone Maker DJI Says Claims About Security of Pilot App 'Misleading'

Takeaways From the "CryptoForHealth" Twitter Hack

High-Wattage IoT Botnets Can Manipulate Energy Market: Researchers



We'll take care of your adversaries

LEARN MORE ›

red canary

**Popular Topics**
›› Information Security News
›› IT Security News
›› Risk Management
›› Cybercrime
›› Cloud Security
›› Application Security
›› Smart Device Security

**Security Community**
›› IT Security Newsletters
›› ICS Cyber Security Conference
›› CISO Forum, Presented by Intel
›› InfosecIsland.Com

**Stay Intouch**
›› Twitter
›› Facebook
›› LinkedIn Group
›› Cyber Weapon Discussion Group
›› RSS Feed
›› Submit Tip
›› Security Intelligence Group

**About SecurityWeek**
›› Team
›› Advertising
›› Events
›› Writing Opportunities
›› Feedback
›› Contact Us

Wired Business Media          Copyright © 2020 Wired Business Media. All Rights Reserved. Privacy Policy

# APPENDIX
215



# Cybersecurity Threat Landscape & MERS Countermeasures

*Presented by: Scott Thompson, MBA CISM*

*MERS IT, Cybersecurity & Facilities Director*

# Get Your Badge Scanned for Credit!

This session has been approved for continuing education credits.

  

You must <u>get your badge scanned</u> to receive credit for attending!



# Today's Topics

## Cybersecurity Threat Landscape

- **Common Threat Facts**

- **Real-Life Breach Examples**

- **Social Engineering**

- **Phishing**

- **Threat Severities**

## MERS Countermeasures

- **Daily Threats**

- **Cybersecurity Defenses**

- **Cybersecurity Framework**

- **Cybersecurity Collaboration**

- **Future Threat Landscape**





Cybersecurity Threats

# Common Threat Frequency & Protections

## UnsecureAccess
### (Login from personal device )

**FACT:**
**20%** of workers use personal devices for work without permission

**PROTECTION MEASURE:**

## Data Encryption

Encrypt data on devices



www.core.co.uk - hello@core.co.uk



# Common Threat Frequency & Protections

| UnsecureAccess (Login from personal device) | Stolen/ Lost Devices (Laptop/Mobile Misplaced) |
| --- | --- |
| **FACT:** **20%** of workers use personal devices for work without permission | **FACT:** A laptop is stolen every **53 seconds** leaving data vulnerable |
| **PROTECTION MEASURE:** **Data Encryption** Encrypt data on devices | **PROTECTION MEASURE:** **Ablity to Remote Wipe Data** Remotely wipe lost devices |


www.core.co.uk - hello@core.co.uk



# Common Threat Frequency & Protections

| UnsecureAccess (Login from personal device) | Stolen/ Lost Devices (Laptop/Mobile Misplaced) | Weak Credentials (Simple, reused passwords) |
|---|---|---|
| **FACT:** 20% of workers use personal devices for work without permission | **FACT:** A laptop is stolen every **53 seconds** leaving data vulnerable | **FACT:** 81% of hacking breaches use compromised credentials |
| **PROTECTION MEASURE:** **Data Encryption** Encrypt data on devices | **PROTECTION MEASURE:** **Ablity to Remote Wipe Data** Remotely wipe lost devices | **PROTECTION MEASURE:** **Multi-Factor Authenticaton** Verify user before access |



www.core.co.uk - hello@core.co.uk



# Common Threat Frequency & Protections

## Outdated Antivirus
**(Old or dated virus protection)**

**FACT:**
A new malware specimen is released every **4.2 seconds**

**PROTECTION MEASURE:**

**IntelligentDefense**

Threat detection / prevention



www.core.co.uk - hello@core.co.uk



# Common Threat Frequency & Protections

| **Outdated Antivirus**<br>(Old or dated virus protection) | **Ransomware / Phishing**<br>(Email ransomware issues) |
|---|---|
| **FACT:**<br>A new malware specimen is released every **4.2 seconds** | **FACT:**<br>**91%** of cyberattacks start with a phishing email |
| **PROTECTION MEASURE:**<br>**IntelligentDefense**<br>Threat detection / prevention | **PROTECTION MEASURE:**<br>**Safe Links**<br>Search and strip links of threats |



www.core.co.uk - hello@core.co.uk



# Common Threat Frequency & Protections

## Outdated Antivirus
**(Old or dated virus protection)**

**FACT:**
A new malware specimen is released every **4.2 seconds**

**PROTECTION MEASURE:**

**Intelligent Defense**

Threat detection / prevention

## Ransomware / Phishing
**(Email ransomware issues)**

**FACT:**
**91%** of cyberattacks start with a phishing email

**PROTECTION MEASURE:**

**Safe Links**

Search and strip links of threats

## Leaked Data
**(Sharing confidential data)**

**FACT:**
**58%** of users accidently share sensitive information

**PROTECTION MEASURE:**

**Restrict Access to Users**

Only allow specific users


www.core.co.uk - hello@core.co.uk



# Common Threat Frequency & Protections

| Outdated Antivirus (Old or dated virus protection) | Ransomware / Phishing (Email ransomware issues) | Leaked Data (Sharing confidential data) |
|---|---|---|
| **FACT:** A new malware specimen is released every **4.2 seconds** | **FACT:** **91%** of cyberattacks start with a phishing email | **FACT:** **58%** of users accidently share sensitive information |
| **PROTECTION MEASURE:** **Intelligent Defense** Threat detection / prevention | **PROTECTION MEASURE:** **Safe Links** Search and strip links of threats | **PROTECTION MEASURE:** **Restrict Access to Users** Only allow specific users |



www.core.co.uk - hello@core.co.uk

**Greatest risks/threats are from staff members due to accidental, intentional or victim-related vulnerabilities**



# Capital One Breach on Amazon Web Services Cloud



- **Stolen Information**
  - 106 million people affected
  - 100 million credit applications from 2005 – 2019
    - 140K Social Security numbers
    - 80K bank account numbers

- **"Suspected" Hacker**
  - Former Amazon employee
  - Openly discussed potential hack plans online with other hackers prior to attack

- **"Tip of the Iceberg "**
  - Vodafone, Ford, MSU, Ohio DOT and other organizations also hacked



# Organization Size Does NOT Matter…

## Most serious attack vectors



- Other
- Exploits/loss through mobile devices
- Crytpo-malware/ransomware
- Insert threats: Malicious actions caused by internal staff
- DDoS attack
- Targeted attack
- Hardware theft
- Phishing/social engineering
- Accidental loss of hardware
- Careless/uniformed employees
- Viruses/malware/Trojans

MERS of Michigan | 13

*Source: Kaspersky*

# No Victim Too Small



NATIONAL

## 22 Texas Towns Hit With Ransomware Attack In 'New Front' Of Cyberassault

August 20, 2019  10:16 AM ET
Heard on Morning Edition

BOBBY ALLYN

Texas state Capitol building in Austin. This week, state officials confirmed that 22 municipalities have been infiltrated and ransom demanded.

Bill Clark/CQ-Roll Call/Getty Images

*Source:*  www.npr.org

**Texas Towns Attack**

- 1 threat actor/group

- Simultaneous attacks (new)

- Hacked IT support vendor

**State and local governments** becoming more targeted with ransomware attacks

- 169 successful attacks since 2013 (already 60 in 2019)

- Most from overseas sources

- About 17% pay the ransoms



# To Pay or Not to Pay?



**Ransomware Attacks Are Testing Resolve of Cities Across America**

A handwritten sign posted near City Hall in Baltimore after some of the government's computer systems were hacked in May. The city, which did not pay a ransom of about $76,000, has spent more than $5.3 million to recover from the attack.  Stephanie Keith/Reuters

*Source:* www.nytimes.com

**Who paid ransom?**
- Lake City (FL) paid $460K
  - Avoided recovery costs with cyber insurance

**Who refused to pay ransom?**
- Baltimore did not pay $76K
  - Recovery cost over **$5.3M** at the time of this article

- Atlanta refused to pay a $51K
  - Hackers posted attack online
  - Cost of recovery **~$17M** at the time of this article

**Ransomware attacks doubled over the past year…cyber insurance and/or ransom payments may be emboldening the hackers.**

# Social Engineering

Use deception to manipulate individuals into divulging confidential or personal information that may be used for fraudulent purposes





# Security Awareness Training





# Phishing

Send broad emails that look like they are from reputable sources in attempt to get individuals to reveal sensitive personal information

- Common Types:
  - Spear Phishing – Target a group or individual
  - Whaling – Target an executive group or individual
  - SMShing – Use text message to manipulate
  - Vishing – Use voice to manipulate





# Vishing For Data



WATCH THIS HACKER BREAK INTO MY CELL PHONE ACCOUNT IN 2 MINUTES

Pause (k)

   0:00 / 2:29

  

MERS of Michigan | 19



# Phishing Scam Example

From: Municipal Employees' Retirement System <notification@mersofmich.com>
Reply-to: Municipal Employees' Retirement System <notification@mersofmich.com>
Subject: Test of the Municipal Employees' Retirement System Emergency Notification System
📎 MemberPortal.pdf

Template ID: 33869-991061
✉ Send me a test email
🚩 Toggle Red Flags

This is a message from Municipal Employees' Retirement System Security.

Please click here to acknowledge receipt of this message

This is a test of the Municipal Employees' Retirement System Notification System. If this were an actual event, this message would contain information about the event as well as appropriate guidance. This is only a test.

IMPORTANT: If you did not receive this test notification on your mobile device, please CLICK HERE to add your mobile SMS/Voice to your profile.

To download the Mobile Application which has enhanced capabilities, view the attachment for more details and instructions for download.

Any questions can be directed to Municipal Employees' Retirement System Security.

If you have received this message in error, please send an email to the System Administrator at sysadmin@mersofmich.com

Close

## Click Rate (Percentage)



| | Industry | MERS |
|---|---|---|
| | 13 | 7 |
| | 10 | 3 |

MERS of Michigan | 20



# Security Threat Meter



**Advanced Persistent Threats (APTs)
typically go undetected for 9   months**



# Anatomy of an APT Attack





MERS Cybersecurity

# "A Day in the Life" of MERS Cybersecurity

**New Threats Every Day**

- About 95% of incoming email is spam or malicious

- 30K+ port scans per day from China alone
  - (>100K per day overall)

**Every change is a potential new vulnerablity**

- Constantly patching and upgrading application and infrastructure systems against latest threats



MERS
Municipal Employees' Retirement System

# Real-Life MERS Cyber Security Incidents

## Incident vs Breach



- Spoofed emails

- Googe.com false alarm

- Training company purchase card incident

- Whaling Emails

- FBI Fraud Alert false alarm



# MERS Cybercrime Defenses

Constant battle to balance **Operations** vs **Security…**



…so we don't become the **Denial of Service we are trying to prevent**

**Familiar Defenses**
- Anti-Virus software (AV)
- Vulnerability scanning software
- Password Management Software
- Mobile Device Management Software
- Security Awareness Training

**Less Familiar Defenses**
- Intrusion Prevention Software (IPS)
- Data Loss Prevention Software (DLP)
- 2FA Access Control for Admin Levels
- Non-Persistent Virtual Desktops
- Media Access Control (MAC) Filtering



# Cyber Incident Response



# Cybersecurity Information Sharing

- Public/private sector collaborations
- Confidential security information sharing
- Formed to combat "Black Hat" information sharing

- Dozens of emails/warnings per day (~7000/year)
- Requires FBI background check
- May require $$ or in-kind contribution in exchange for training







**Michigan Cyber
Civilian Corps**



# Future Threat Landscape



**Cloud Migrations / Solutions**



**Bot Technology**



**Internet of Things ( IoT)**



**Artificial Intelligence (AI)**



# AI – Scary Possibilities…







# Please Complete a Session Survey!







## Step 1:
Locate and access the "**Schedule**" Icon

## Step 2:
Select the **session** you just attended (look for correct date and time)

## Step 3:
Scroll down and click "**Breakout Session Survey**" to complete the survey

# Contacting MERS of Michigan

## MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM

1134 Municipal Way
Lansing, MI 48917

800.767.MERS (6377)

www.mersofmich.com



*This presentation contains a summary description of MERS benefits, policies or procedures. MERS has made every effort to ensure that the information provided is accurate and up to date. Where the publication conflicts with the relevant Plan Document, the Plan Document controls.*

