# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                       CASE NO. 0:20-CV-60416-AMC
3

4     TOCMAIL INC., a Florida
      corporation,
5
                        Plaintiff,
6
      vs.
7

      MICROSOFT CORPORATION, a
8     Washington corporation,
9                      Defendant.
10    _____/
11

12                              March 18, 2021
                                10:10 a.m. - 4:40 p.m. EDT
13

14

15

16          VIDEOTAPED DEPOSITION OF MICHAEL WOOD
17               TAKEN VIA ZOOM TELECONFERENCE
18

19       Taken on behalf of the Defendant before
20    Alice J. Teslicko, RMR, Notary Public in and for the
21    State of Florida at Large, pursuant to a Rule 30(b)(6)
22    Notice of Taking Deposition in the above cause.
23

24

25

                                              Page 1

```
1    correct.  He did not -- he was not an expert in the
2    case in any sense of the word.  As stated in the
3    expert report, Mr. Tunc's role was to click on an
4    email link in two emails.  I don't consider that to
5    be -- to rise to the level of an expert, expert
6    knowledge, to click on two links.
7         Q    Sir, do you know what the law is on the
8    definition of experts?
9         A    No, I don't.
10        Q    Do you know what Rule 702 of the Federal
11   Rules of Evidence says about expert testimony?
12        A    I've read it, but again, I wouldn't trust
13   myself to parse that.
14             You're asking me what I believe.  You asked
15   me to testify that he was an expert.  I can't testify
16   to something I don't believe.  If my lawyer tells me
17   that that qualifies as an expert, then I would have to
18   change my mind.  But to the best of my knowledge,
19   that's not an expert.
20             Now, if the law says something else, then I
21   need to know that.  But all I can testify to is what I
22   know.
23        Q    In your report -- in your report you rely on
24   videos and product testing that is done in conjunction
25   with Mr. Tunc, correct?
```

Page 18

```
 1        A    I rely on videos done in conjunction -- I
 2   made the videos.  I videotaped -- well, I guess he
 3   videotaped his phone and sent those screen shots to
 4   me.  So yes, he videotaped his phone and sent me the
 5   copy of those videos.
 6        Q    Right.  And you intend to rely on those as
 7   part of your expert opinion in this case.  Those are
 8   part of your report that you cite to in your report,
 9   correct?
10        A    I will agree that it's in my report.  I will
11   agree that I plan on using the video.  To say that I
12   rely on it in the form of an expert, that's not how I
13   would express it.  I feel like you're putting words in
14   my mouth.
15        Q    No, sir.  Actually, I'm trying to get words
16   out of your mouth, because I'm entitled to understand
17   how you intend to use the videos and report and I'm
18   entitled to test the bounds of the report.  So I'm
19   going to try again.
20             In your report you reference videos made by
21   Mr. Tunc, correct?
22        A    In my report I do have a link to the raw
23   video that Mr. Tunc provided to me.
24        Q    All right.  And did you think -- first of
25   all, you were the only expert for TocMail in this
```

```
 1   case, correct?
 2        A    That is correct, I am the only --
 3             MR. MARTIN:  Objection to form.
 4        Q    You may answer.  Say that again.
 5        A    I am the only expert for TocMail.
 6        Q    So you're the expert for TocMail and of
 7   course, there's no doubt you do have an economic
 8   interest in the outcome of this case, correct?
 9        A    That is very correct.
10        Q    What percentage of the company do you own?
11        A    I think at last -- I got to remember.  If I
12   remember correctly -- oh, it's not written down -- but
13   Osvaldo now has seven, not five percent.  So Osvaldo
14   has seven, not five percent; Pedro five, so that's 12;
15   and Esteban one, so that's 13.
16             87 percent, to the best of my knowledge.
17        Q    All right.  So you would have -- depending
18   on the outcome of this case if you were to prevail,
19   87 percent of the proceeds would go to you, correct?
20        A    87 percent of the proceeds would go to me?
21        Q    And you are the sole technical expert --
22        A    No, I said that as a question to myself.
23        Q    Oh, I'm sorry.  I mean net proceeds after
24   you hopefully pay your lawyer and pay other expenses.
25        A    Right.  At this moment after I pay my
```

Page 20

1    lawyer, then yeah, it would go into the company.  We

2    would pay different expenses and then out of that

3    remaining amount of money, then yes, by the end of the

4    year it would be divided up according to those

5    percentages.

6         Q    With 87 percent going to you?

7         A    That is correct.

8         Q    So you are the only technical expert

9    speaking on behalf of TocMail, correct?

10        A    Yes.

11        Q    And you endeavored to put together an expert

12   report -- you understood the purpose of that expert

13   report was to fully apprise my client of what your

14   positions were as a technical expert, true?

15        A    I believe in the beginning of the report,

16   that I mentioned that I would be testifying as an

17   expert under two statutes.  One is by providing the

18   report and then the second, that the scope that's in

19   the beginning of the report will serve as our

20   notification of the topics that I will also testify as

21   an employee expert; in the same way that Amar Patel

22   and Jason Rogers are going to testify under their

23   listed set of topics.

24        Q    Yes.  You're the only employee of TocMail

25   currently, true?

1          A     Yes, that is correct.   That's still true.

2          Q     All right.   But my point about the report

3    was you understood that this report is meant to

4    apprise Microsoft of the entirety of your opinions

5    related to the issues upon which you've brought suit,

6    correct?

7          A     Not to my knowledge.   To my knowledge, that

8    is incorrect.   That the report -- that I will be

9    testifying in two capacities.

10              Just as Jason Rogers and Amar Patel have not

11   given the entirety of all of their opinions because

12   they're going to be testifying as employee experts,

13   I will also, in addition to the report, be testifying

14   as an employee expert and that's specified in the

15   scope section of the expert report.

16         Q     Maybe I'm not being clear, Mr. Wood.   You

17   sat through now two days of depositions each for

18   Mr. Patel and Mr. Rogers, during which your lawyer had

19   time to question them about their opinions in this

20   case, correct?

21         A     Correct.

22         Q     And you understand that the purpose of

23   having an expert report -- because you're coming in as

24   a non-retained expert, a full expert, and you're also

25   coming in as an employee expert, according to your

1    to withdraw from your report and your opinion any

2    opinions of Mr. Tunc or any work done by Mr. Tunc?

3         A    Okay.  First of all, the opinions of

4    Mr. Tunc that precede this lawsuit are cited in the

5    exact same way as Cryptron Security, Rhino Security.

6    His emails with Microsoft preceded this lawsuit and I

7    did not know Mr. Tunc at the time that he wrote his

8    blog article, at the time that he had the email

9    exchange with Microsoft.  So on what grounds would I

10   take that out of the report?

11        Q    Well, you don't have any personal knowledge

12   of those conversations or emails, do you?

13        A    Not any more than all the documents that are

14   in the appendix.  When you write an expert report, you

15   pull up studies and you talk to credible individuals.

16             Mr. Tunc has quite a few cybersecurity

17   credentials, which makes him a reasonable source, as

18   does Hector Monsegur, as do the testers at Cryptron

19   Security.  For those, for Mr. Tunc's blog article, I

20   rely on it in the exact same way that I do for Rhino

21   Security Labs, for Cryptron Security, for the Avanan

22   article.  All of that is in the same area with the

23   same import.

24        Q    So I'm sorry, you're telling me what it is

25   you do in an expert reports.  Exactly how many expert

Page 25

1    reports have you authored before this one?

2        A    This is my one and only.

3        Q    So again, did you speak to anyone directly

4    at Rhino about their article?

5        A    No, I reached out to them and they did not

6    contact back.  I like to be as thorough as possible.

7        Q    All right.  But Mr. Tunc reached back and

8    out offered to be your expert if you paid him a

9    thousand GBP a day, right?

10       A    I would not characterize it that way.  We

11   had talked about him being an expert and yes, I asked

12   how much do you charge on a daily basis, just as I had

13   asked that of Ms. Bour as a financial expert.  So it

14   wasn't that he reached out and said, hey, I'd like to

15   be an expert for a thousand GBP per day.  That's not

16   how it happened.  I'm sure I approached him.

17       Q    My point is you had communications regarding

18   the substance of this case with Mr. Tunc, correct?

19       A    The substance of this case?  Regarding Safe

20   Links' inability to stop IP cloaking, the very topic

21   of his blog article that he helped me understand,

22   that's the degree to which we've discussed the case,

23   to the best of my knowledge.

24       Q    Well, actually, sir, you told him you were

25   suing Microsoft.  You told him you intended to pursue

Page 26

```
 1              MS. LOVETT:  Objection --

 2              THE WITNESS:  Well, my point is that if

 3        you're asking would I put into my report words

 4        from a criminal hacker, I have.  Hector Monsegur,

 5        for one.

 6    BY MS. LOVETT:

 7        Q    And I'm getting to Mr. Monsegur.  Look, the

 8    jury's entitled to know what you relying on as an

 9    expert.

10        A    Yes, I agree.

11        Q    So you're relying on a criminal hacker and I

12    don't know what you relied on for Mr. Tunc, because

13    you told me you haven't done a background check.

14              But in your report you specifically --

15    unlike Mr. Monsegur, the criminal hacker who you admit

16    to be a criminal hacker -- unlike Mr. Monsegur, you

17    and Mr. Tunc had some level of collaboration to create

18    a video to which your report links, correct?

19        A    That is correct.

20        Q    All right.  So I'll just represent to you,

21    we have asked that you make -- that your side of the

22    case make Mr. Tunc available for a deposition, and

23    that request has been refused.

24              Do you have a particular issue -- and I

25    don't want you to disclose anything your lawyer has
```

Page 33

```
 1   told you, but do you have a particular issue with
 2   Mr. Tunc appearing as a witness in this case?
 3              MR. MARTIN:  Object to form,
 4         mischaracterizes TocMail's position.
 5              MS. LOVETT:  Josh, we can stipulate on the
 6         record.  If you guys are willing to facilitate a
 7         deposition of Mr. Tunc, we'll take that right
 8         now.
 9              MR. MARTIN:  Again, as you know very well,
10         we have no authority whatsoever over Mr. Tunc.
11         You cannot force a third party to have a
12         deposition.  We haven't even had any
13         communications with him in months.
14              MS. LOVETT:  Yeah, he's still in the report.
15         You guys are still relying on things that he
16         says.  But then when we want to talk to him, it
17         came back we don't have any -- you know, we have
18         no control.  I'm just making clear that that's
19         your position.
20              MR. MARTIN:  Our position is that we haven't
21         communicated with him in months.  We have no
22         ability to produce him.  If we could, we would.
23         So when you say that we're refusing to produce
24         him, that's completely inaccurate, a
25         mischaracterization of the circumstances.  We
```

```
 1        have absolutely no ability to produce him.
 2             MS. LOVETT:  You have no ability to produce
 3        him.
 4   BY MS. LOVETT:
 5        Q    So what he says and what you cite to, you
 6   know, Mr. Wood, in the report can't be tested because
 7   we can't cross-examine Mr. Tunc.  We have to rely on
 8   what you say Mr. Tunc says and your interpretation of
 9   what he says.
10             So I'm asking again whether you would be
11   willing ethically to withdraw your references to
12   Mr. Tunc in your report?
13        A    Can you show me in the report where I quote
14   Mr. Tunc from a source that is not -- I quote his
15   blog, which you can check out and read the same words
16   to see if I'm quoting his blog correctly.  So I don't
17   understand why you're saying that I quoted something
18   from him that you cannot check out.
19        Q    The way this works, sir, is I get to ask the
20   questions.
21        A    Okay.  So the question as I understand -- if
22   I can't tell you the part I don't understand, then I'm
23   kind of stuck.
24        Q    Well, the video demonstration that you did,
25   sir, that Mr. Tunc did for you --
```

Page 35

1    a number of levels where you disagree with Mr. Tunc,

2    correct?

3         A    Except for -- the one thing we agree on is

4    that Safe Links can be trivially bypassed by IP

5    cloaking.  That was the one area where we had a

6    meeting of the minds.  Most of the other things and

7    philosophies were very different.

8         Q    Okay.  So my point is -- you've never met

9    Mr. Tunc personally?

10        A    No.  He's over in the UK, as I think you

11   know.

12        Q    Had you met with him on Zoom?

13        A    For the testing we met on Zoom.  I think

14   that was our first Zoom.

15        Q    And again, you asked him to do the testing,

16   but basically anybody could have done the testing,

17   right?

18        A    That is correct and that's why each time the

19   word "expert" comes up -- he wasn't chosen for the

20   testing because it required any form of expertise.  He

21   was just chosen so I could get to know him a little

22   more for other considerations.

23        Q    Are you familiar with the term "consulting

24   expert"?

25        A    I've heard the term.  I do not know the

                                                Page 42

1    definition of that.

2        Q    Okay.  I'm going to define it for you

3    loosely.  I'm not defining it straight out of the

4    code, but I'm sure Mr. Martin can meet it with an

5    objection if he feels that's appropriate.

6            As a party who is not a retained expert, but

7    upon whose work the ultimate expert relies.

8            MR. MARTIN:  Objection to form.

9        Q    I'm going to give you that as a definition

10   that I want to use for consulting expert, and I'll

11   further tell you that typically consulting experts are

12   not discoverable, unless a testifying expert relies on

13   their work.

14           If we accept that definition of "consulting

15   expert", were you relying on Mr. Tunc's videos as part

16   of your expert report?

17       A    Am I correct that I'm not allowed to ask you

18   what you mean by the word "rely"?

19       Q    That's not a tough one.

20       A    It is, because would I say that I relied on

21   him clicking two links?  I did rely on him to click

22   two links.  Would I say I relied on him for an expert

23   opinion, no.  So I mean the word "rely" has so many --

24   as I stated, I'm trying so hard to be specific here.

25           I did rely on Mr. Tunc to click two links.

Veritext Legal Solutions
346-293-7000

1    I did rely on him to videotape his screen during the

2    testing.   I did rely on him for those two things, yes.

3        Q    You did rely on his blog post as part of the

4    basis for your opinion on whether or not Safe Links

5    worked appropriately?

6        A    Rely or did it confirm the testing?   I'm

7    just --

8        Q    So Mr. Wood, in expert parlance, and I know

9    this is new for you --

10       A    It is, and that's what I'm struggling with.

11   I'm not trying to be difficult, I promise you.

12       Q    I have no doubt that you're not, nor am I.

13            But as an expert witness, typically we have

14   reliances where we say that this expert relied on

15   X, Y, and Z to reach their conclusions, okay.   So

16   typically experts put that information in their

17   reports and they say "this is what I'm relying on."

18            So your expert report, while very nicely

19   done and especially for a first effort, is different

20   from some that we have seen before and putting, for

21   example, Ms. Bour's; where Ms. Bour says, "Look, I'm

22   relying on the Consumer Price Index.   I'm relying on,

23   you know, this table."

24            So what I'm asking you is, I want to get a

25   sense of what you were relying on in your report and I

                                        Page 44

```
 1    think, you know, you rely on -- you talked about
 2    Rhino, you've talked about Mr. Tunc's blog, and you
 3    talked about the work of a known criminal hacker,
 4    Mr. Monsegur.
 5           Are those things part of what makes up your
 6    opinion that Safe Links does not work as advertised?
 7    A     If I were -- let me try to answer it this
 8    way.  If I were to -- and I'm not saying I'll exclude
 9    it from the report, but would I still come to the same
10    conclusion without all three of those, based upon my
11    own testing and my own analysis?  I know that Safe
12    Links does not work as advertised.
13    Q     Okay.
14    A     I know that 100 -- I don't have to go beyond
15    my own personal knowledge to know that.
16    Q     Okay.
17    A     You present it to someone else, as to how
18    did it -- Mr. Tunc was part of the impetus of
19    understanding the area.  But as I say, I do my own
20    testing.
21           Fortunately, you can test 100 percent any
22    product, any link standard's ability to block or not
23    IP cloaking.  You don't need any source code.  You can
24    just do it all on your own.  Any link scanner you can
25    test with 100 percent, and I did so.  I tested Safe
```

Page 45

```
1    Links, I tested TocMail, as did Hector Monsegur.

2           Hector Monsegur did not just test the

3    product, he provided the source code of his testing.

4    So anyone can replicate his test.

5       Q    Right.  You didn't talk to Mr. Monsegur, who

6    is a known criminal hacker, or have any interaction

7    with him, right?

8       A    The man who helped the FBI stop so many

9    cyber crimes in his life?  I did not talk to him, no.

10      Q    Okay, and I understand you want to give him

11   the plug.  But the reason that Mr. Monsegur was able

12   to ultimately help the FBI is because he was a

13   criminal hacker to begin with, correct?

14      A    I already stated that part.  I just wanted

15   to make sure that the record is balanced.

16      Q    Okay.  So you're sticking up for

17   Mr. Monsegur?

18      A    I think the work that he did afterwards is

19   amazing, the things that he helped with for the

20   security of our country, yeah.

21      Q    You've never met Mr. Monsegur?

22      A    I've read articles about him about the work

23   he's done.  There's many articles about him.

24      Q    What I asked you was, you never met

25   Mr. Monsegur?
```

Page 46

```
 1      A    I believe I started yes, and I did read -- I

 2   mean, no, I did not meet him, but I did read many

 3   articles about him.

 4      Q    Okay, fair enough.  So just to be very clear

 5   for the record, you're not relying on Mr. Monsegur or

 6   on Mr. Tunc or on Rhino.  You derived your own expert

 7   opinion based on your own testing that Safe Links, in

 8   your opinion, does not function as advertised; am I

 9   correct?

10      A    That is not what I said.  What I said was if

11   I -- even if I did not have them, would I come to the

12   same conclusion because of my testing, yes.  However,

13   Hector Monsegur gave me some ideas on how to test from

14   his article.

15           The reason that you put all of these things

16   into a report is that it is my understanding that

17   anything that led up to the conclusion has to be

18   included and disclosed in the report.

19           There was an entire evolution -- I didn't

20   wake up one day and say oh, my goodness, Safe Links

21   does not do what it advertised.  It took a lot of

22   research, a lot of time, a lot of investigating to

23   make sure that that was indeed the case.

24           I came across his blog article that said

25   what I had suspected, but I do not believe that we're
```

Page 47

```
 1    I've done to investigate cloaking, its popularity, how

 2    it can be used against link scanners, I did a lot of

 3    research even before I wrote my patent.

 4              So the reason I filed a patent was based on

 5    a lot of research that has nothing to do with this

 6    case, but that would go into your question, to name

 7    all the things.  So it's just the word "all."

 8        Q    And let me go back, because I want to be

 9    really clear.  The research that you undertook to

10    write this report -- I'm not interested in your entire

11    body of work -- but the research that you undertook to

12    write this report was done for the purpose of this

13    litigation, correct?

14        A    Yes, I'd say that's fair.

15        Q    That was the sole purpose of the research

16    undertaken for the report, was to put forth your

17    claims as an expert witness in this case, true?

18        A    Yes, that's true.

19        Q    Okay.  So I want to talk about, again,

20    page 41.  I know you were present for Mr. Rogers'

21    deposition.

22              As between you, Michael Wood, and

23    Mr. Rogers, a long-time employee of Microsoft who is

24    the principal product manager for Safe Links, who do

25    you think is better qualified to tell the jury what
```

Page 54

 1   the server configuration and structure is at

 2   Microsoft?

 3        A    What the server configuration and structure

 4   is at Microsoft?  Jason Rogers would be.

 5        Q    Sure.  So Rachel, if you'll blow up the box

 6   there and the paragraph across -- actually starting

 7   with "this is the very absurdity."  These are your

 8   words, right?

 9        A    Yes, I remember them from the other day.

10        Q    Sure.  So you say "bottom line" -- go ahead.

11   "Bottom line, Safe Links is a service that's run on

12   EOP servers."

13             You heard Mr. Rogers testify yesterday that

14   that is not the case?

15             MR. MARTIN:  Objection to form.

16        A    I heard Mr. Rogers testify -- did Mr. Rogers

17   testify that that was not the case?  Yes, he testified

18   that that was not the case.

19        Q    Okay.  And again, as between you and he, he

20   is more qualified to tell the jury how those servers

21   are set up, true?

22        A    He's not more -- okay.  Mr. Rogers also

23   yesterday testified -- okay, Amar Patel testified that

24   Sonar is part of Safe Links.  Mr. Rogers testified

25   that Sonar is not part of Safe Links.

1          So when it comes to names of what is part of

2     EOP, what's part of Safe Links, does Mr. Rogers know

3     the server configuration, etc., yes.  You now went to

4     a different topic of whether it would be classified as

5     EOP servers and there seems to be -- in the ESI

6     Mr. Patel put out a -- for example, yesterday, if I

7     remember correctly, Mr. Rogers said that Sonar does

8     not run on EOP IP addresses, that they're separate IP

9     addresses.

10          In the ESI, Mr. Patel provided one single

11     link for both EOP/Sonar IP addresses and the URL

12     specifically says that it's EOP, Exchange Online

13     Protection IP addresses.

14          So if the label, the URL says something

15     different than Mr. Rogers, I don't think Mr. Rogers is

16     trying to say something wrong.  I think just, it

17     appears that the labels get -- there's some

18     disagreement in Microsoft whether the label is

19     something that's EOP, ATP, Safe Links, etc.

20     Q    Well, I'm reading to you from Mr. Rogers'

21     deposition taken yesterday.  This is from the rough

22     drafts, because I want to make sure -- for counsel's

23     benefit, it's page 136.

24          I'm going specifically to line seven:  "So

25     do you agree with the conclusion that Mr. Wood seems

Page 56

 1    to make here.  To admit the EOP is defenseless against

 2    IP cloaking is to admit the Safe Links is defenseless

 3    as well?"

 4              And he says, answer at line 11:  "No.  Once

 5    again, EOP has nothing to do with the server or any

 6    kind of page following or you know, URL detonation or

 7    file detonation.  It is not part of the EOP."

 8              So my question for you is, can you accept

 9    that Mr. Rogers, who is telling the jury that this

10    part of your report is completely wrong based on the

11    way that Microsoft operates Safe Links, can you agree

12    that he knows more than you?

13              MR. MARTIN:  Objection to form.

14        A    He knows more than me about the server

15    configuration, agreed.  Does that come into play in

16    this part of the report?  You have videos that say

17    that ATP is EOP.  If ATP is EOP, then ATP runs on EOP

18    servers, because ATP is EOP.

19              I don't --

20        Q    I'm not asking you -- you were there, you

21    watched the man testify that this part of the report

22    is utterly false.  Are you willing to withdraw the

23    conclusions on this part of the report or are you

24    going to continue to tell the jury that you know more

25    about Microsoft than the employees of Microsoft?

Veritext Legal Solutions
346-293-7000

```
 1              MR. MARTIN:  Objection to form.
 2       A     Neither.  What you asked him did not comport
 3  with what I wrote and so if you asked him -- I'm
 4  sorry, this is your deposition but --
 5       Q     Yeah, it actually is.
 6       A     Yeah, okay.  So the question you asked him
 7  does not match in my mind what was written, so I still
 8  don't see that as a denial of what I wrote here.
 9       Q     I showed him this exact box.  I showed him
10  this exact piece and said is this correct, and he said
11  it was not because you were conflating issues and by
12  making the exact statement that you make here on the
13  box on the right:  "Safe Links has the same IP
14  addresses as EOP.  To admit that EOP is defenseless
15  against IP cloaking is to admit that Safe Links is
16  defenseless as well," that is a marquee statement that
17  you make here and I asked him is that correct and he
18  said no.
19              So I'm asking you, are you telling the jury
20  that you know better than Mr. Rogers?
21       A     I said Mr. Rogers and Mr. Patel on the
22  record have a disagreement over what constitutes even
23  Safe Links itself.
24              So Mr. Patel testified that Safe Links is
25  made up of reputation plus detonation.  Mr. Rogers
```

Page 58

 1   testified that Sonar is not part of Safe Links, and so

 2   if Safe Links is part of -- if ATP is EOP, then when

 3   Safe Links reaches out through Sonar, EOP is reaching

 4   out through Sonar, because ATP is EOP.

 5           It's just semantics.  Would you like me to

 6   put in a declaration that there's some semantical

 7   disagreement between Patel and Rogers regarding what

 8   is Safe Links, whether Safe Links is part of EOP?

 9   I'll be glad to add that.

10      Q    Sir, that's your interpretation.  That's not

11   at all what was said.  But again, you see things the

12   way you want to see them and now you're offering to

13   put a declaration defining how Mr. Rogers and

14   Mr. Patel, who are Microsoft long-time employees,

15   don't know as much as you do about what goes on inside

16   of Microsoft.

17           If you want to do that, go ahead.  I'm going

18   to return to my deposition and ask you questions.

19           So on the record, despite seeing this

20   yesterday -- because what Mr. Patel told you was he

21   didn't believe they ran on the same servers, he'd have

22   to ask Mr. Rogers.  Mr. Rogers then told you this is

23   not the same thing and what Mr. Wood is saying here,

24   respectfully, is incorrect.

25           Today you decided to double down; am I

```
 1    right?

 2            MR. MARTIN:  Objection to form.

 3    BY MS. LOVETT:

 4       Q    You may answer.

 5       A    I am willing to use whatever terminology --

 6    for example, I use "IP cloaking," you guys say "IP

 7    evasion."  I'm willing to use "IP evasion."

 8            Some part of Microsoft says that Safe Links

 9    is part of EOP.  If from that perspective EOP --

10    anything Safe Links does, EOP is doing.  That is not

11    Mr. Rogers' perspective.  He's saying that Safe Links

12    is separate from EOP.  I'm fine with that.  None of

13    that changes a single conclusion about Safe Links'

14    inability to do what it promises.

15            So I'm happy to use whatever labels, but

16    just for --

17       Q    These aren't labels.  This is function being

18    explained to you by the engineers that built this and

19    that deal with this every day at Microsoft.

20            But you're going to have your own

21    interpretation.  That's what you're telling the jury?

22            MR. MARTIN:  Objection to form.

23       A    That's what I'm telling the jury.  We will

24    play Microsoft's videos that say ATP is EOP.  There's

25    different groups in Microsoft that have different
```

Page 60

1   opinions about what constitutes EOP, what constitutes

2   ATP, and none of that affects my report whatsoever.

3          That's why it doesn't matter to me how the

4   labels are, and I'm happy to adjust the report to

5   whatever labels your two cybersecurity experts want to

6   use.  But there are disagreements in Microsoft itself

7   about whether or not Safe Links is part of EOP.

8      Q    Okay, and I understand that's your opinion.

9          How much money are you asking the jury for,

10  again, in this case?

11     A    How much money am I asking the jury for?

12  I'm asking the jury for the amount that we would

13  have -- that we are losing due to not being able to

14  protect tens of millions of consumers due to your

15  false advertisings, which would be in the tens of

16  billions of dollars, possibly, or single digit.

17     Q    So you're asking for somewhere in the

18  single-digit billions of dollars to the double-digit

19  billions of dollars, somewhere in there, for the harm

20  allegedly to consumers.

21          Is there anything you're going to be -- are

22  you going to be protecting, handing any of that over

23  to the consumers or is that all for TocMail?

24     A    Well, out of the hundred million that I

25  could have taken for myself, I kept less than

Page 61

1              We've had tens of thousands of visitors to

2      our website, which are individuals who would be

3      business professionals interested in stopping

4      phishing, because those are the types of people who

5      are interested in stopping phishing, and when we tell

6      them cloaking is the reason that they're having the

7      issue with phishing -- over 95 out of a hundred times

8      it's going to be cloaking, is the reason that they're

9      experiencing phishing.

10             So now what we're telling them is accurate,

11     true.  It is their problem, but they don't perceive it

12     that way.  So therefore, we have to go for the source

13     on how they reach that wrong conclusion.

14             (Discussion off the record.)

15     Q     So when you talk about writing your patent

16     and getting your patent -- when you wrote your patent,

17     did you do so specifically targeting the weakness that

18     you believe existed in Microsoft Safe Links?

19     A     No.  As stated in the patent, that there is

20     a traditional way of doing link scanning and so Safe

21     Links is just one of the many link scanners that have

22     the design flaw.

23     Q     Go ahead, sorry.

24     A     No, it's okay.

25     Q     Were you aware of the alleged deficiency in

Page 64

1    talking about.  Have I bid on a job or tried to get a

2    job through it, no, if that's what you mean by "use".

3         Q    Right.  I'm presuming that you're going to

4    Freelancer.com to see if there are projects you can

5    work on, as opposed to looking for anyone to assist

6    you with your work?

7         A    I went there considering the possibility

8    that if -- you asked about do I give my money away.  I

9    did.  And so with this lawsuit, if I had to get a job

10   in order to keep funding Josh's bills, then I was

11   considering the possibility of offering my services as

12   a freelancer, yeah.

13        Q    So I didn't actually ask if you gave your

14   money away.  You did volunteer that.  Are you talking

15   about the technology that you sold to Micromuse?

16        A    I am.

17        Q    And you were paid $95 million for licensing

18   that technology?

19        A    No.  As I wrote there, I was the one who

20   sold it.  It was my invention, solely my invention,

21   but prior to it I had already written a contract for

22   Adam Forbes, who was my best friend, my best buddy at

23   the time.  He got 50 percent.

24             When we made the deal with Micromuse, we

25   told Micromuse, both of us, to take 15 percent out of

CERTIFICATE OF OATH

        I, Alice J. Teslicko, RMR, a Notary Public
    for the State of Florida at large, do hereby
    certify that the witness, Michael Wood, appeared
    via teleconference before me and was duly sworn.
        Signed and sealed this 21st day of March,
    2021.


                         Alice J. Teslicko, RMR


Commission No. GG249076
My Commission Expires:
December 14, 2022

Page 215

```
 1                        CERTIFICATE
 2   STATE OF FLORIDA      )
                           )   ss.
 3   COUNTY OF MARTIN      )
 4
             I, ALICE TESLICKO, RMR, a Registered
 5   Merit Reporter and Notary Public for the State of
     Florida at Large, do hereby certify that I reported
 6   the deposition of Michael Wood, a witness called by
     the Defendant in the above-styled cause; and that the
 7   foregoing pages constitute a true and correct
     transcription of my shorthand report of the deposition
 8   of said witness.
 9           I further certify that I am not an attorney
     or counsel of any of the parties, nor a relative or
10   employee of counsel connected with the action, nor
     financially interested in the action.
11
             WITNESS my hand and official seal in the
12   City of Stuart, County of Martin, State of Florida,
     this 21st day of March, 2021.
13
14
15                        Alice J. Teslicko, RMR
16   My commission expires:
     December 14, 2022
17   Commission No. GG249076
18
19
20
21
22
23
24
25
                                              Page  216
```