**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-60416-CIV- CANNON/HUNT**

TOCMAIL INC, a Florida corporation,

        Plaintiff,

v.

MICROSOFT CORPORATION, a
Washington corporation,

        Defendant.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
***DAUBERT* MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF**
**PLAINTIFF'S EXPERTS**

Plaintiff, TOCMAIL INC ("Plaintiff" or "TocMail"), by and through undersigned counsel, hereby respectfully files its Memorandum of Law in Opposition to Defendant, MICROSOFT CORPORATION'S ("Microsoft" or "Defendant"), *Daubert* Motion to Exclude the Opinions and Testimony of Plaintiff's Experts Michael Wood ("Wood") and Marcie D. Bour ("Bour"), ("*Daubert* Motion" or "Motion") [ECF No. 69], and states:

## I.      INTRODUCTION

Microsoft seeks to exclude the testimony of Bour by first arguing that she failed to apportion which part of gross sales of products containing Safe Links were attributable to false advertisements regarding that feature. However, it is well-established in the Eleventh Circuit that it is the defendant's burden to conduct such an apportionment.  Microsoft even acknowledges that "revenues attributable to Safe Links are not available." Where a defendant fails to meet its burden of apportionment, as is the case here, plaintiff is entitled to seek disgorgement of the total revenue.

Microsoft next argues that Bour failed to present evidence of *causation* in her *damages* Report. Again, Microsoft argues against well-established law. It is perfectly permissible for damages experts to assume causation in their damages models. Bour expressly stated, as Microsoft concedes, that she is not opining on causation. Microsoft's argument is entirely meritless.

Microsoft seeks to exclude Wood's testimony by arguing that Wood is not qualified to testify regarding cybersecurity issues. Yet, Wood has extensive experience in the cybersecurity industry for over thirty years.  Wood also has been issued seven cybersecurity patents. Wood easily meets the non-stringent qualification standard for testifying as an expert witness.

Microsoft further argues that, as a TocMail shareholder, Wood is too biased for his expert testimony to be admitted. Once again, Microsoft argues against well-established law that bias, including financial interest, is a matter for the jury to weigh and is not a matter of admissibility.

Microsoft's Motion should be denied in full.

## II.   LEGAL STANDARD

In determining whether an expert's testimony is admissible, the court should consider whether (1) "the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology used is sufficiently reliable; and (3) "the testimony assists the trier of fact, through the application of . . . technical . . . expertise, to understand the evidence or to determine a fact in issue." *Quiet Tech. DC-8, Inc. v Hurel-Dubois UK Ltd.*, 326 F. 3d 1333, 1340-411 (11th Cir. 2003).  "*Daubert* itself stresses that '[t]he inquiry envisioned by Rule 702 is ... a flexible one.'" *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001).

"[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."  *Quiet Tech.*, 326 F. 3d 1333, 1341 (11th Cir. 2003). "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. (*citing Daubert*, 509 U.S. at 596).

Indeed, "[t]he proponent does not have to prove that the [expert's] opinion is scientifically correct, just that it is reliable and helpful." *Bachmann v. Hartford Fire Ins. Co.*, 323 F. Supp. 3d 1356, 1359-60 (M.D. Fla. 2018) (citations omitted).  "If the proponent does so, then the court should open the gate by permitting the proponent to elicit testimony from the expert witness concerning his or her reliable opinions and by allowing the jury to fulfill its role of determining the weight to accord such testimony."  *Id.* "[T]he rejection of expert testimony is the exception rather than the rule." *Commercial Long Trading Corp. v. Scottsdale Ins. Co.*, No. 12-22787, 2013 WL 12093149, *2 (S.D. Fla. April 3, 2013).

### III.   MS. BOUR'S OPINIONS SHOULD NOT BE EXCLUDED.

Bour, a partner at YIP Associates, is a Certified Public Accountant who has over thirty-five (35) years of professional experience providing forensic accounting and litigation consulting services, including experience in methodologies for damages' calculation, in Florida and throughout the United States.  *See* Bour's CV and testimony log, included with her expert Report (ECF 69-31), attached here as **Exhibit "1"**; *see also Bour Declaration*, ¶ 1, attached as **Exhibit "2"**; Bour's Deposition transcript is attached as **Exhibit "3."** [1] Bour routinely provides testimony in Federal and State Court in commercial disputes regarding economic damages including lost profits. *See* Ex. 1. Bour is also a Master Analyst in Financial Forensics and a Certified Fraud Examiner, and she also holds the designations of Accredited in Business Valuation and Certified Valuation Analyst. *Id.*; *Bour Dec.*, ¶ 3. She has over 40 publications and speaking engagements, including at national and regional conferences, on topics focused on forensic accounting, calculating economic damages for litigation, business valuation, and methodologies for calculating

---

[1] Microsoft acknowledges that Bour submitted a Supplemented Expert Report on May 21, 2021, but Microsoft filed its *Daubert* Motion anyway over six weeks before the deadline to file such Motions.  To be clear, the Supplemented Report was both timely and proper for the reasons already expressed to Microsoft in an email prior to it filing its *Daubert* Motion, a copy of which is attached as **Exhibit "4."** Microsoft did not respond to that email. Additionally, Microsoft's attempt to paint TocMail in a bad light by claiming that TocMail knew Microsoft would be filing a *Daubert* Motion prior to the deadline is an unbelievable mischaracterization of the facts.  Microsoft's counsel did reach out to TocMail's counsel on May 18, 2021 to confer on expected competing *Daubert* and Summary Motions, as well as motions to seal and page requirement issues.  The extent of conferral regarding *Daubert* and Summary Judgment motions was that both sides would clearly oppose either side's Motions. No "substance" whatsoever was discussed. Moreover, TocMail's counsel again reiterated that the deadline for the Motions was July 9, 2021, which Microsoft's counsel merely confirmed.  Microsoft did not suggest in any manner that it intended to file its *Daubert* motion over six weeks prior to the deadline, and there is no way TocMail could have known that, especially considering the parties just had a Status Conference with the Court in which Microsoft agreed that the deadlines should be pushed back due to the outstanding Motion to Dismiss.  Nevertheless, none of Microsoft's positions for exclusion of Bour in its Motion are impacted by the updates in the Supplemented Report.  While not at issue, a copy of the Supplemented Report is attached for the Court's reference as **Exhibit "5."**

lost profits in addition to having been an instructor on "Calculating Business Damages." Ex. 1; *Bour Dec.*, ¶ 4. Bour has also served in numerous leadership positions including National Association of Certified Valuators and Analysts' Executive Advisory Board and its Litigation Forensics Board. Ex. 1; *Bour Dec.*, ¶ 5. She currently serves on the Florida Bar Unlicensed Practice of Law Standing Committee. *Id.* Bour has performed in excess of 100 and possibly in excess of 200 lost profits analyses. *Bour Decl.*, ¶ 6. Bour has served as an expert witness in forensic accounting matters for over 25 years and has provided expert testimony approximately 22 times in the past four years alone. Ex. 1; *Bour Decl.*, ¶ 7.

**A.    Ms. Bour's Methodology Followed Eleventh Circuit Law Which Squarely Places the Burden of Apportionment Entirely on Defendant.**

**1.    Damages and Disgorgement of Profits under the Lanham Act Generally.**

Under the Lanham Act, a plaintiff in a false advertising case is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of the action." 15 U.S.C. § 1117(a). "This recovery is cumulative, that is, the Court may award [Plaintiff] both its damages and [Defendant's] profits." *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir. 1994).

Additionally, the law is well-settled in this Circuit that a Lanham Act plaintiff does not need to demonstrate actual damages in order to obtain disgorgement of defendant's profits. *Ameritox, Ltd. v. Millennium Labs., Inc.*, No. 8:11-cv-775-T-24, 2014 WL 1456347 *9 (M.D. Fla. April 14, 2014); *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988); *Tiramisu Intern. LLC v Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010). The Lanham Act "covers claims for both trademark infringement and false advertising" and thus neither "the calculation of damages or appropriate awards to a plaintiff should be altered based upon the nature of the violation under the Act." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, No. 16-21203, 2018

WL 10322164 *8 FN 10 (S.D. Fla. Jan. 13, 2018). "Unlike in the case of future lost profits caused by breach of contract, 'Lanham Act damages may be awarded even when they are not susceptible to precise calculations.'" *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008).

Moreover, Section 1117(a) provides: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a) "It 'shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer.'"  *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019).

### 2. Defendants Have the Burden of Apportionment under the Lanham Act.

Microsoft's primary argument for excluding Bour's opinion on disgorgement of profits is that she "failed to conduct a necessary *apportionment* analysis to determine what percentage of Microsoft's sales … is attributable to the Safe Links feature[,]" which cannot be purchased on its own. (emphasis added) *Motion*, pp. 3, 16. Microsoft argues that Bour was required to apportion profits "that were directly attributable to the alleged wrongful conduct." *Id.* at p. 16.  However, "'the plaintiff need only prove gross sales and then **it is up to the infringer to prove which, if any, of those sales were not attributable to the wrongful act**, and deductible costs and expenses to arrive at net profits.'" *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1315-16 (S.D. Fla. 1998) (*citing McCarthy*, Trademarks and Unfair Competition § 30:65 (4th ed. 1998)) (emphasis added); *see also Hard Candy, LLC*, 2018 WL 10322164 at *6. "[U]nder the Lanham Act and the common law, it is the infringer's burden to prove any proportion of its total profits which may not have been due to the infringement." *Nutrivida*, 46 F. Supp. 2d at 1315 (*citing Hamilton–Brown Shoe Co. v. Wolf Bros. & Co.,* 240 U.S. 251, 261 (1916).

Indeed, this law is not in dispute – it is well-settled that **the defendant** has the burden to show that any of its sales were not attributable to the wrongful act. *See, e.g., Axiom Worldwide, Inc. v. Excited Med. Corp.*, 591 Fed.Appx. 767, 777 (11th Cir. 2014) (affirming district court's award of defendant's profits where plaintiff "met its burden to prove gross sales revenue," but the defendant "failed to meet 'its burden of proving that any portion of its sales were not attributable to its wrongful acts or that its sales included deductible costs and expenses.'"); *New Century Mortg. Corp. v. 123 Home Loans, Inc.*, No. 05-08549, 2007 WL 9702272 *3 (S.D. Fla. Aug. 9, 2007) ("[I]t is, in fact, Defendant's burden to demonstrate 'which, if any, of those sales were not attributable to the wrongful act, and deductible costs and expenses to arrive at net profits.' . . . Accordingly, this Court concludes that the Eleventh Circuit does not require more than evidence of the amount of sales of a given year, such as Defendant's tax returns, to meet Plaintiff's burden of demonstrating proof of Defendant's sale.")(entire report adopted 2007 WL 9702268); *Ameritox*, 2014 WL 1456347 at *9-10 ("[The defendant] argued that, under §1117(a), [the plaintiff] bore the burden of establishing what portion of [the defendant's] profits were due to the allegedly false [advertising], as opposed to other aspects of the packaging and promotion of the [defendant's] products. [The plaintiff] disagreed and argued that it was only required to prove [the defendant's] sales and that [the defendant] had to establish any apportionment.... [T]he Court agrees with [the plaintiff]") (citation omitted); *Axiom Worldwide, Inc. v. HTRD Group Hong Kong Ltd.*, 2013 WL 3975675 *11 (M.D. Fla. July 31, 2013) (stating that it is the defendant's "burden to prove any proportion of its total profits which may not have been due to the [wrongful conduct]" and the defendant must "prove which, if any, of those sales were not attributable to the wrongful act").

If the defendant cannot apportion which profits are not attributable to the wrongdoing, then the plaintiff receives the full amount of gross sales, even it if that represents a windfall. *See*

*Ameritox*, 2014 WL 1456347 at *10 (citations omitted) ("[I]f the defendant can apportion its profits, then the plaintiff is given the appropriate amount and not a windfall. **If the defendant cannot apportion its profits, equity supports the view that, having already been held liable for [violating the Lanham Act], it is the defendant who should suffer the consequences of its own failure to apportion its profits.**") (emphasis added); *Wyndham Vac. Ownership, Inc. v. Am. Consumer Credit, LLC*, No. 18-CIV-80095, 2019 WL 11025869 *3 (S.D. Fla. Oct. 20, 2019) ("'There may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.'") (*quoting Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207 (1942)); *Tiramisu*, 741 F. Supp. 2d at 1288 ("Numerous courts have held that 'when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales."); *Nutrivida*, 46 F. Supp. 2d at 1316 ("Any doubts about the actual amount of gross sales or profits will be resolved against the infringing party."). Indeed, when a defendant fails to carry its "statutory burden" under 15 U.S.C. § 1117, "the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490, 2011 WL 2295269 *4 (S.D. Fla. June 8, 2011).

Microsoft correctly acknowledges that Safe Links "cannot be purchased on its own" and can only be purchased as part of its ATP standalone product or as part of a version of Office 365 that includes ATP within it. *Motion*, pp. 16-17. However, Microsoft then wrongly states that Bour was required to "determine what percentage of revenues from ATP and Office 365 are directly attributable to Safe Links" and that "Bour was required to do" "a proper appointment analysis."

Microsoft's argument is completely opposite and directly contradictory to all well-established crystal-clear law.  It is indisputable that Bour was required to only show total gross sales for the products at issue that contain Safe Links, and then the burden shifted to Microsoft to "prove which, if any, of those sales were not attributable to" the false advertising. As Microsoft repeatedly points out, Safe Links is not a product but rather a feature in a larger product. Microsoft also admits that "[b]ecause Microsoft sales information is maintained at the product level and not at the feature level, revenues attributable to Safe Links are not available, although revenues for [the larger products of] ATP and Office 365 are available." *Motion*, p. 17.   Kathryn Griffith, Microsoft's corporate representative designee regarding Microsoft's financial information, confirmed at deposition that Microsoft does not maintain financial information at the Safe Links level. *Griffith Depo*, 8:22-9:2, attached as **Exhibit "6"** ███████████████████████

███████████████████████████████████████████████████████

█████████ ; *Griffith Depo*, 21:20-24 ████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████ Given that Safe Links' revenues are unavailable, it was Microsoft's expert's responsibility to apply "a proper apportionment analysis" in his report. Yet, he did not even apply the "apportionment analysis" that Microsoft now argues is appropriate and can be done. *Motion*, p. 18.

Microsoft admits that "Bour used the revenues for ATP and Office 365 [which must be purchased to get Safe Links] to calculate" disgorgement of profits.  *Motion*, p. 16-17. That is exactly what Ms. Bour is required to do under all applicable law – she calculated total gross sales for the products at issue that contain Safe Links.  The burden then shifted to Microsoft to establish any apportionment.  Noticeably, Microsoft fails to reference a single case to support its position

that TocMail had the burden of apportionment.[2]  Rather, Microsoft relies entirely on its rebuttal expert for its backwards argument.  The law clearly places that burden on Microsoft, not TocMail.

In fact, in *Pandora*, a case from the Southern District of Florida, the defendant moved to exclude the plaintiff's damages expert on the exact same basis that Microsoft has attempted to exclude Ms. Bour here.  *Pandora*, 2011 WL 2295269 *4.  Specifically, the defendant argued that the plaintiff's damages expert failed to sufficiently apportion profits attributable to the alleged wrongful conduct.  The Court held that such argument by the defendant "fails as a matter of law" because, under 15 U.S.C. § 1117, it is the defendant's "burden to prove any proportion of its total profits which may not have been due to the infringement." *Id.*

The law is so abundantly clear that the Court can easily reject Microsoft's contention. Bour, as a matter of law, should not be excluded from testifying as to Microsoft's sales for disgorgement of Microsoft's profits.

### 3.    Microsoft Did Not Apportion Safe Links. TocMail is Entitled to Gross Sales.

Surprisingly, Microsoft makes the case that TocMail is entitled to seek disgorgement of all of gross sales, as Microsoft's expert has not even attempted to apportion sales of Safe Links from sales of ATP and Office 365. Therefore, Microsoft must show that it did not violate the Lanham Act to avoid disgorgement of total gross revenue.  *See Ameritox*, 2014 WL 1456347 at *10 ("'having already been held liable for [violating the Lanham Act], it is the defendant who should suffer the consequences of its own failure to apportion its profits.'") (citation omitted).

---

[2] In its Section regarding disgorgement, Microsoft cited general cases regarding *Daubert* standards and reliability, but nothing on the issue of apportionment or even disgorgement under the Lanham Act.  For example, the *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245 (11th Cir. 2010) case cited by Microsoft involved claims that a prescription drug caused the plaintiff to develop diabetes. *Motion*, p. 18.  The expert at issue was a medical expert, and the case had nothing to do with disgorgement or apportionment, or even damages in any manner, and was not a Lanham Act case.

However, as will be explained at length in TocMail's Motion for Summary Judgment, Microsoft's internal communications document that Microsoft did violate the Lanham Act by knowingly deceiving the public regarding Safe Links' effectiveness. In fact, internal documents acknowledge just how ineffective Safe Links' link scanner is against IP Cloaking — the very attack at the center of this case.  For example, Microsoft has designated Amar Patel as an employee rebuttal cybersecurity expert to provide evidence under Rule 702, 703 or 705. Patel acknowledged that ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.[3] *Patel Exp. Depo*, 170:15-18, attached as **Exhibit "7,"** and Ex. 6, Slides 2, 20, attached as **Exhibit "8."**

Microsoft's email security team ██████████████████████████████████

██████████████████████████ *Patel Exp. Depo.*, 163:3-9; *Patel 30(b)(6) Depo.*, 18:20-22, attached as **Exhibit "9."** Microsoft's Brian Wilcox wrote in an internal email that ███████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████ MSFT_TOC00271256, attached as **Exhibit "10"**; MSFT_TOC00144820, attached as **Exhibit "11."** Ross Adams, Microsoft's Principle Program Manager on Office 365 Information Protection Team, internally acknowledged: ██████

██████████████████████ MSFT_TOC00006640 (emphasis added), attached as **Exhibit "12."**

Microsoft has designated Jason Rogers as its other employee rebuttal cybersecurity expert.

██████████████████████████████████████████████████████████████

---

[3] ██████████████████████████████████████████████████████████
██ *Patel Expert Depo*, 30:14-20.



MSFT_TOC00206845 (*see* MSFT_TOC00206848), attached as **Exhibit "13"** (emphasis added).

Amazingly, this is Microsoft's own cybersecurity expert making those statements, ███████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████

  This false advertising case is quite straightforward. *Externally* Microsoft promotes Safe

Links as providing effective protection while *internally* Microsoft acknowledges ███████

████████████████████████████████████████ [4] If Microsoft is found

liable, Bour is entitled to present testimony on Microsoft's gross sales for disgorgement.

**B.     Microsoft's Second Ground for Exclusion of Bour is Also Directly Contradictory to Applicable Law Because a Damages Expert May Unquestionably Assume Causation.**

The second ground on which Microsoft seeks to exclude Bour is her "failure to apply a causation analysis." *Motion*, pp. 20-22. As explicitly specified in Bour's Report, "I will not be expressing an opinion regarding causation or liability in this matter." *Bour Report*, ¶ 4. Bour was retained as a damages expert, not a causation expert. *Id.* ¶¶ 2-3. "It is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages." *Robroy Industries-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512, 2017 WL 1319553, *4 (E.D. Tex. 2017); *see also N. Palm Motors, LLC v. General Motors LLC*, No. 9:19-cv-80872, 2020 WL 6384308 *1-2 (S.D. Fla. Oct. 30, 2020) (denying motion to exclude damages expert where defendant argued that the expert failed to consider facts of causation but expert was not "a liability or causation expert"); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. für Chemische Industrie*, No. 11-cv-681, 2015 WL 5459662, at *10 (S.D.N.Y. Sept. 16, 2015) ("[A] damages expert does not need to perform her own causation analysis to offer useful expert testimony."); *Gaedeke Holdings VII, Ltd. v. Baker*, No. CIV-11-649, 2015 WL 11570978 at *3 (W.D. Okla. Nov. 30, 2015) ("Proof of causation often comes from fact witnesses, and it is appropriate for expert witnesses to assume causation will be established and then proceed to calculate the damages."); *Lloyd's Acceptance Corp. v. Affiliated FM Ins. Co.*, No. 4:15 CV 1934,

---

[4]
████████████████████████████████████████████████████████
MSFT_TOC00044022, attached as **Exhibit "14."** Rogers, Microsoft's expert, admitted under oath that ████████████████████████████████████████
████████████████████████                *Rogers Expert Depo.*, 82:1-7, attached as **Exhibit "15."**

2013 WL 4776277, at *8 (E.D. Wis. Sept. 6, 2013) ("damages experts are permitted to 'assume that the defendant's alleged misdeeds caused the plaintiff's loss'"); *Orthofix, Inc. v. Gordon*, No. 1:13-cv-01463, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 31, 2016) ("It is entirely appropriate for a damages expert to assume liability for the purpose of his or her opinion. To hold otherwise would be illogical."); *RMD, LLC v. Nitto Ams., Inc.*, No. 09-2056, 2012 WL 5398345 at *10 (D. Kan. Nov. 5, 2012) ("For purposes of presenting his damage calculation methods . . . Vianello is permitted to presume causation"); *CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc.*, No. CIV-04-0651, 2006 WL 2054646 at *4 (W.D. Okla. July 24, 2006) ("For the purposes of presenting his damage calculation methods, Mr. Swanson is entitled to presume causation."); *Children's Med. Ctr. of Dallas v. Columbia Hosp. at Med. City Dallas Subsidiary*, 3-04-CV-2436, 2006 WL 616000, at *7 (N.D. Tex. Mar. 10, 2006) ("It is not necessary for Jacobs, or any other damages expert, to establish the requisite causal connection between liability and damages. Rather, plaintiff may establish causation by other means.").

In *N. Palm Motors*, a case in the Southern District of Florida, the defendant made nearly identical arguments to Microsoft's arguments here.  *N. Palm Motors*, 2020 WL 6384308 *1-2. Specifically, General Motors argued that plaintiff's damages expert should be excluded because he accepted the allegations in the complaint as true and "did not include in his calculations facts that, according to GM, caused [plaintiff's] damages either in whole or in part." *Id.* at *1.  Among other things, GM argued that plaintiff's expert failed to consider that the plaintiff "cannot 'identify a single customer that was turned away due to a lack of inventory,'" and that the expert's opinions "are speculative, unreliable, and unhelpful to a jury because his calculations do not incorporate these facts." *Id.*  However, the expert was "not retained to assist [plaintiff] in proving causation," and "[h]e does not purport to be a liability or causation expert." *Id.* at *2.  In denying the motion

to exclude plaintiff's expert, the Court stated that "[t]he jury will be instructed about any findings that it must make as to liability and causation before it turns to a calculation of damages." *Id.*

Similarly, the defendant in *Robroy* also made nearly identical arguments to Microsoft's arguments here. *Robroy*, 2017 WL 1319553 *4. In response, the court stated: "The Court rejects [defendant's] argument that a damages expert in a false advertising case may not limit his testimony to damages, but also must testify regarding causation." *Id.* In concluding, the court also found: "Much of [defendant's] motion, which focuses almost entirely on the issue of causation, is therefore beside the point. Even when [defendant] purports to address the issue of damages, its arguments frequently bleed over into quarrels with [the expert's] proof of causation." *Id.* at *6.

Here, Microsoft's entire argument in Section IV.B. of its Motion is that Ms. Bour should be excluded because she did not consider causation: "[w]ithout any evidence of such causation – which there is none – Bour's damages are too speculative." *Id.* at p. 20. Indeed, as explicitly stated in Bour's Report, Bour will not be providing any opinions regarding causation or liability. *Bour Report*, ¶ 4. Rather, Bour's damages models and numbers assume that liability and causation will be established at trial, and her damages models will be used by the jury for calculating damages thereafter.[5] The same applies to Bour's two disgorgement models.[6]

---

[5] For example, Bour will not be testifying that Microsoft's false advertisements caused X number of consumers to withhold trade from TocMail, nor that the false advertisements caused a certain group to withhold trade, nor the length of time for damages. Rather, Bour will be providing various calculations of lost profits for the jury to choose from based on the jury's determination, for example, of the group(s) that withhold trade from Plaintiff, the duration of the withholding, and the percentage of the group that withhold trade *based on evidence presented at trial independent of Bour*.

[6] Throughout its Motion, Microsoft wrongly seeks to conflate the two separate revenue calculations in Bour's Report – revenue for ATP and revenue for Office 365. *See e.g., Motion*, p. 17 (Bour "relied on the total value of Office 365"). To be clear, Bour has two separate and independent revenue charts for disgorgement purposes. One chart is comprised solely of sales from purchases that included ATP (which includes Safe Links) and in no way "relie[s] on the total value

As set forth above, the law is clear that it is "perfectly permissible" for a damages expert to assume causation and liability in providing her opinion. As with its backwards arguments regarding the burden of apportionment, Microsoft's contention that Bour should be excluded because she failed to consider causation is once again directly contradictory to the actual law on the issue. Like in *Robroy*, even when Microsoft claims to be arguing damages, it is merely rehashing the issue of causation and "is therefore beside the point."

Microsoft also wrongly suggests that TocMail should have already established causation and liability at this stage on a *Daubert* motion prior to trial and even prior summary judgment motions. For example, Microsoft's Motion states, "[w]ithout any *evidence* of such causation— which there is none . . ." *Motion*, p. 20 (emphasis added). Microsoft also contends that Ms. Bour was "depending on someone else to establish" causation "[y]et this never occurred." *Id.* However, "Proof of causation often comes from fact witnesses." *Gaedeke Holdings*, 2015 WL 11570978 at *3. Hence, Microsoft inexplicably refers to a lack of evidence to be presented at a trial (or summary judgment) that has not yet occurred.

Microsoft also states contrary to established law: "Bour fatally relies on various unsupported and unverified assumptions supplied by TocMail, including that all Defender and Office 365 customers read the advertisements, were misled by them, and chose to purchase Microsoft's product and not TocMail's because of those advertisements." *Motion*, p. 3. This is

---

of Office 365." *Bour Report*, ¶ 75. The other chart reflects sales from purchases of the larger Office 365. For both charts, Microsoft has the burden to show any apportionment. Additionally, regardless of apportionment, the jury may award disgorgement based on sales of Office 365 if it finds such sales are "reasonably related" to the wrongdoing. *See Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 6:16-cv-2001, 2018 WL 2182303 *2 (M.D. Fla. May 9, 2018). Regardless, the two independent revenue calculations/charts are not intended to be cumulative but rather provide the Court and/or jury multiple options for awarding disgorgement. They should each be considered independently.

backwards. First, to be entitled to disgorgement, TocMail does not need to establish actual damages, let alone have to prove anything remotely close to that which Microsoft wrongly asserts.[7] For damages, it will be up the jury to decide the number of users that withheld trade from TocMail. Bour will not be opining on this issue, and therefore it is not an assumption of her damages model.

## C.     Microsoft Grossly Mischaracterizes Ms. Bour's Opinions.

Microsoft argues that Bour was asked to "assume many unreasonable facts, numbers, and theories provided by Mr. Wood and TocMail's counsel." *Motion*, p. 22-23. This section is largely a continuation of its causation arguments from Section IV.B.  As discussed above, the law is clear that Bour, as a damages expert who is not opining on causation or liability, is certainly allowed to accept such assumptions for purposes of her damages calculations.  To avoid any doubt, TocMail entirely disagrees with Microsoft's claims that the facts and numbers are unreasonable.

Even if it were proper to consider Microsoft's causation and liability arguments, Microsoft's positions are again unfounded.  For example, Microsoft argues "Bour further assumes that … TocMail would have a 98% profitability rate … Indeed, such an astronomical number cannot meet *Daubert's* reliability prong." *Motion*, p. 24. Microsoft cited its expert who purportedly "did [his] research on email security firms." *Id.*, FN10. However, Microsoft's expert should have checked the Cost of Goods Sold (COGS) for ATP which was ███████████████████

---

[7] Microsoft also tries to argue that TocMail cannot seek disgorgement of Office 365 sales because supposedly less than 3% of Office 365 commercial users employ Safe Links. *Motion*, p. 18. If this were actually true, Microsoft's expert would still be required to do an apportionment analysis, which he did not do. Nevertheless, the statistic is not true. Microsoft performed a statistical bait and switch by taking a percentage of *companies* and wrongly applying that to its touted percentage of *users*.  Given that enterprises with tens of thousands of employees are far more likely to use Safe Links than two-person companies, this is a gross statistical error at best. For example, consider the situation where 99 two-person companies do not use Safe Links (198 users) while one large company with 400,000 users does use Safe Links. That means 1 out of 100 *companies* (1%) are using Safe Links but that 400,000 out of 400,198 *users* (over 99%) are actually using Safe Links. There is simply no validity to Microsoft's claim.

███████████████████████████████████████████████████ *See* MSFT_TOC00043528,

attached as **Exhibit"16."** █████████████████████████████████████

███████████████████████████████████ Thus, the Microsoft product

that competes with TocMail's product actually has a gross profit margin similar to the profitability

rate calculated by Bour. Microsoft's argument regarding profitability is without merit.

Additionally, Bour's damages model includes an annual 2.2 million dollar budget for

"marketing and sales" and an additional annual $300,000 budget for "Major Account

Representatives." *Report*, ¶ 87(b). However, Microsoft asserts that Bour supposedly assumed that

because of "a single TocMail press release … TocMail would retain this market share for at least

15 years." *Motion*, p. 23. Microsoft's gross mischaracterization of Bour's Report is baseless.

Microsoft also argues that Bour "assumes that after TocMail poached every single

Microsoft Office 365 and ATP customer, *the startup* would have the infrastructure, servers, and

personnel to support these one hundred million customers within a matter of five months. Such

unverified assumptions and numbers merely provided by TocMail render Bour's opinions and

calculations fatally conclusive and unreliable." *Motion*, p. 24. Yet, as Wood has already testified,

TocMail's offerings are cloud-based and therefore take advantage of the cloud's scale-on-demand

capabilities. *Wood Depo. (3-19-21)*, 116:17-118:22, attached hereto as **Exhibit "17."** TocMail has

accounts with three cloud service providers: Digital Ocean, Linode, and Amazon Web Services.

*Id.* at 118:4-22. They have more than enough infrastructure, servers, and personnel to handle the

expansion "in days, if not hours." *Id.* at 117:16.

Perhaps most importantly, Microsoft wrongly states that Bour's model "assumes"

"TocMail poached every single Microsoft Office 365 and ATP customer" — "one hundred million

customers." *Motion* p. 24. However, Bour's model does not presume that TocMail would "poach"

even one customer from Microsoft, let alone 100 million of them. Bour's model is not based on any such migration nor is it even based on presuming that companies would choose TocMail over ATP (as TocMail can be used simultaneously with ATP, including simultaneously with ATP Safe Links) — a fact the Microsoft admits in its Motion. *Motion*, p. 23, FN 8. Rather, Bour's damages model presumes a market share of users for TocMail if Microsoft would have never engaged in its false advertising, a market share that would not necessarily have come from Microsoft (e.g. companies that kept email security on-premise). Hence, the constant weaving of the false narrative of some form of "migration" throughout the Motion renders the Motion fatally flawed as well.

Microsoft's Motion to exclude Bour has no merit and should be denied.

### IV.    MR. WOOD'S OPINIONS SHOULD NOT BE EXCLUDED.

As an initial note, Michael Wood, TocMail's CEO, has been designated as a *cybersecurity* expert, not a *liability* expert as Microsoft misstates in the first sentence of its motion. *Motion*, p. 1. Mr. Wood testified at deposition that his report was written "from a *cybersecurity expert* standpoint." *Wood Depo. (3-18-21)*, 207:20-21 attached as **Exhibit "18"** (emphasis added). Microsoft acknowledged its understanding of the same during Wood's deposition: "So I'm trying to figure out as a cybersecurity expert, for the jury's benefit…" *Id.* at 208:20-21.[8]

Wood's Report enumerates the cybersecurity issues that are the full "Scope" of his report and expert testimony. *Wood Report*, pp. 13-14 (ECF 69-1). For example, Wood will testify

---

[8] To be clear, Wood's cybersecurity testimony does impact liability and even damages. For example, Wood testified how TocMail's technology will be able to defeat IP Cloaking without requiring any additional changes throughout the years. *Wood Depo (3-19-21)*, 132:15-136:12. His testimony explains why Bour's damages model assumes no additional spending in this area, contrary to Microsoft's assertion that Bour did so "to keep numbers artificially high." *Motion*, pp. 24-25. Also, at trial, Wood will testify regarding the input that he provided to Bour. He will do so "without the necessity of qualifying the witness as an . . . expert" because he is a corporate "officer" as permitted in the Eleventh Circuit. *See U.S. v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011).

regarding "[h]ow cloaking and IP Cloaking work."; "Why cloud-based scanners cannot reliably detect IP Cloaking."; "The degree of vulnerability of Microsoft's customers to IP Cloaking when they were using on-premise email security scanners."; "The degree of vulnerability of Microsoft's customers to IP Cloaking after they moved to Microsoft's cloud-based Office 365 email security."; "The degree of effectiveness of Office 365's ATP Safe Links at protecting users from IP Cloaking from the inception of ATP Safe Links to present."; and "The degree of effectiveness of TocMail at protecting users from IP Cloaking." *Id.* Wood will also be testifying to the other cybersecurity topics enumerated on pages 13-14 in his Report. Such opinions are directly relevant to this present litigation and will be helpful to the finder of fact.

Furthermore, pursuant to Federal Rule of Civil Procure 26(a)(2)(C), Wood may testify as a lay expert witness independent of his Report given that he timely disclosed "the subject matter on which [the witness is] expected to present evidence" and "a summary of the facts and opinions to which [the witness is] expected to testify." *Wood Report* p.14; *see* Fed R. Civ. P. 26(a)(2)(C).

**A.   Mr. Wood Has the Requisite Cybersecurity Expertise and in the Eleventh Circuit, Bias is a Credibility Matter for the Jury to Decide.**

**1.   Wood Has the Requisite Cybersecurity Expertise to Provide his Opinions.**

Microsoft argues that Wood should be excluded because "Wood has never served as an expert witness before." *Motion*, p. 6. "By that logic, *no witness* could ever qualify as an expert for the first time because that would require being retained *previously* as an expert." *Health & Sun Research, Inc. v. Australian Gold, LLC*, No. 8:12-cv-2319, 2013 WL 6086457, at *3 (M.D. Fla. Nov. 19, 2013); *see also Clena Invests, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) ("Every expert found to be qualified by a court must be so designated a first time.").

Microsoft further argues that Wood should be excluded because he does not have an "academic" degree in cybersecurity. *Motion*, p. 6. However, "[t]he fact that [the expert] does not

have a college degree in a hard science is not determinative of his qualifications." *Mason. v. Safeco Ins. Co. of Am.*, No. 4:09-CV-1081, 2010 WL 3341582, at *5 (E.D. Mo. Aug. 23, 2010) (finding self-taught expert qualified); *see also Jackson v. City of Bloomington*, No. 17-cv-1046, 2019 WL 202160 (C.D. Ill. Jan. 15, 2019) (finding that "Defendants' emphasis of [the expert's] lack of formal education" – the expert "did not finish high school" – "is misplaced" because "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.") (*quoting Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). This includes experts who are "self-taught." *Speedfit LLC v. Woodway USA, Inc.*, 13-CV-1276, 2019 WL 1436306, *6 (E.D.N.Y. Mar. 29, 2019); *see also* W*ellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881-82 (5th Cir. 2013) (finding expert could "help the jury understand software concepts and terms" where expert had taught himself programming language and implemented the software).

"An expert in this Circuit may be qualified 'by knowledge, skill, experience, training, or education.'" *Johnson v. Carnival Corp.*, No. 19-cv-23167, 2021 WL 1341527, *2 (S.D. Fla. Apr. 9, 2021). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Id.* Hence, qualifying as an expert "is not a stringent inquiry." *Entourage Custom Jets, LLC v. Air One MRO, LLC*, No. 18-22061, 2020 WL 837171, *3 (S.D. Fla. Feb. 20, 2020). Nevertheless, Microsoft argues that Wood "lack[s] the bare minimal qualifications to testify as an expert in this matter." *Motion*, p. 6.

Wood began his professional career in the late 1980's designing network security (cybersecurity) products. *Wood Declaration*, ¶ 3, which is attached hereto as **Exhibit "19."** A copy of Wood's CV is attached as **Exhibit "20."**  He realized that the effectiveness of these network security products was dependent on the strength of the cryptographic algorithm being used. *Wood Dec.*, at ¶ 4.  Therefore, he designed and patented the strongest block cipher at this

time (U.S. Patent No. 5,003,596). *Id*. Wood co-authored a published paper with cryptography researcher Dr. Thomas Cusick (PhD in Cryptography from Cambridge University) regarding the mathematical innovations upon which Wood's cryptography is built. *Id.* at ¶ 5. Wood's security breakthrough is included in *Applied Cryptography* by Bruce Schneir. *Id*. This was but one component that Wood designed for network security (cybersecurity) products.

For the next decade, Wood worked in Information Technology, which included overseeing security. *Id.* at ¶ 6. Wood also invented a methodology to automatically create a blueprint of an organization's physical network infrastructure, worldwide, accurate to the hour. *Id*. Wood patented this methodology and also served as the lead programmer on the commercial version. *Id*. Wood negotiated the sale of his patent and technology to Micromuse Inc., a network management software company, for $42 million in stock with a one-year stock lockup stipulation. *Id*. Wood's technology proved so valuable to Micromuse that it catapulted the stock value of the multi-national corporation, resulting in a stock value in excess of $95 million by the time the stock lockup period expired.[9] *Id*. This technology has applications to both network management and to hacking (as a reconnaissance tool). *Id*.

Following the sale of his technology to Micromuse, Wood continued developing other inventions, all involving Software Engineering. *Id.* at ¶ 7. Then, in 2014, he returned to focusing full time on cybersecurity due to hackers remotely controlling his computers. *Id.* at ¶ 8. Unable to find an off-the-shelf product to block the miscreants, he devoted himself full-time to the study of hacking, devouring dozens of highly technical books on the subject (including the 488-page tome

---

[9] In a transparent attempt to discredit Wood's significant accomplishment, Microsoft makes the ludicrous assertion that Micromuse paid $42 million in stock for a technology that was "obsolete by the time it was acquired and therefore was never used." *Motion*, p. 5. Microsoft cites an out-of-context discussion regarding IBM's acquisition of Micromuse that occurred many years later as the basis for its patently false assertion.

*Hacking: the Art of Exploitation*). *Id.* Wood then programmed his own software firewall, which instantly identified the (two) IP addresses being used to access his computers, and blocked them. *Id.* at ¶ 9.  He then designed a Window's version of the product called Hacker Deterrent. *Id.* at ¶ 10.  However, when Microsoft changed from Windows as a product to Windows as a service (aka Windows 10), it forbade developers from offering users full control over their network traffic. *Id.* at ¶ 11. Wood therefore moved to focusing on solving the problem of phishing, during which time he immersed himself in every study he could find on the issue of cloaking (the reason that phishing is a big problem in the first place).  *Id.*

Wood designed, patented, and developed his initial technology to effectively block email phishing links, naming the technology PhishViewer.[10] *Id.* at ¶ 12. Although PhishViewer solved the problem of cloaking, PhishViewer always required users to *manually* make a choice. *Id.*

However, on May 23, 2019, Wood was notified that another patent was going to issue — a patent whose claimed methodology solves the problem of cloaking while also automatically taking users to approved sites. *Id.* at ¶ 13. Therefore, Wood shifted his focus to adding the automated methodology to PhishViewer thereby creating TocMail — a cybersecurity service that TocMail introduced to the marketplace in December 2019. *Id.* at ¶ 14.

During his early days of cybersecurity research and invention, Wood also published a blog entitled "Hacking Exposed," a cybersecurity blog. *Wood Report*, Appx. 196. His innovations in cybersecurity have led to the issuance of seven cybersecurity patents, including two for solving the problem of IP Cloaking (i.e. the PhishViewer patent and the TocMail patent). *Id.* at ¶ 15.

---

[10]  A video demonstration of the original PhishViewer technology is available at *https://tocmail.net/phishviewer*.  One of the Hacker Deterrent ads, along with positive reviews of actual users, is also available at *https://tocmail.net/HackerDeterrent*.

Certainly an individual with Wood's background and accomplishments more than satisfies being "minimally qualified" through experience. Any objections to the level of his expertise go to credibility and weight, not gate-keeping.

###### 2.      Bias is not Grounds for Disqualification in the Eleventh Circuit.

Microsoft also argues that because Wood is a shareholder in TocMail, his "financial … stake in the outcome of the case" means that "he must be stricken as an expert." *Motion*, p. 1. However, "*Daubert* nowhere states that an expert witness must be disqualified because he has … a direct financial stake in the outcome." *Equalia, LLC v. Kushgo LLC*, No. 2:16-cv-02851, 2017 WL 114084 at *2 (D. Nev. Jan. 11, 2017); *see also U.S. ex rel. Maxwell v. Kerr-McGree Chem. Worldwide, LLC*, No. CivA04Cv-01224, 2006 WL 2053534, at *3 n.1 (D. Colo. July 21, 2006) ("The fact that Maxwell is an expert witness and has a financial stake in this case, does not in any manner disqualify him as an expert in this case."). In fact, even when an expert has a "significant emotional and financial stake in the case, it is 'the province of the jury to weigh the credibility of witnesses, including witnesses testifying as experts.'" *Sands v. Integon Nat'l Ins. Co.*, No. 18-cv-00714, 2020 WL 7027442, *11 (D. Colo. Nov. 30, 2020) (citation omitted).

Indeed, courts from within the Eleventh Circuit have held that employees of parties can testify as their own expert. *See CMR Constr. & Roofing, LLC v. ASI Preferred Ins. Corp.*, No. 2:19-cv-442, 2021 WL 1214876, *5 (M.D. Fla. March 31, 2021) (refusing to exclude employee expert who split profits with the party and stating that to the extent the "financial agreement is relevant, such an issue would go to the credibility of [the expert's] testimony rather than its admissibility"). This is due to the Eleventh Circuit's interpretation of Rule 702, "which requires courts to determine that the expert's method is reliable, not that it is free of any possibility of bias." *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1333 (11th Cir. 2014) (also stating that "[t]he risk of

bias would mean, at most, that Dr. Rosenthal's testimony is to some extent 'shaky,' and shakiness goes to the weight of her testimony, not its admissibility."); *see also McAteer v. Ciardi Ciardi & Astin, P.C.*, No. 9:18-cv-81264, 2019 WL 4420363 at *1 (S.D. Fla. Sep. 16, 2019) ("credibility and persuasiveness are reserved for the jury"); *Centre Hill Courts Condo. Ass'n v. Rockhill Ins. Co.*, No. 19-cv-80111, 2020 WL 475633, *3 (S.D. Fla. Jan. 27, 2020) ("The district court cannot exclude an expert based on a belief that the expert lacks personal credibility.").

"[F]inancial incentive alone is not enough to disqualify a witness." *N. Shore Co-Owners' Ass'n. v. Nationwide Mut. Ins. Co.*, No. 1:18-cv-03632, 2021 WL 527014, *5, n.2 (S.D. Ind. Feb. 12, 2021). Indeed, Microsoft did not cite *any* case in which a qualified witness was excluded because of a financial stake in the case. In stark contrast, in the *Perfect 10* case cited by Microsoft, the court stated "Mr. Zada almost certainly lacks the specialized knowledge to qualify as an expert." *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 10894452, at *6 (C.D. Cal. Oct. 31, 2014). Moreover, *Perfect 10* was contrary to established law within its own circuit. *See In re Plant Insulation Co.*, 544 Fed.Appx. 669, 671 (9th Cir. 2013) ("[T]he Non-Settling Insurers allege that the experts, Steven Snyder and David McClain, have a direct financial stake in the outcome of the case ... and this precluded them from testifying. *This is not our law.* Generally, 'evidence of bias goes toward the credibility of a witness, not his competency to testify.'") (emphasis added).

In fact, the court in *Perfect 10* actually acknowledged that other courts who have considered the issue of whether a party can testify as its own expert have allowed the party expert to testify. *Id.* at *5. Specifically, the court in *Perfect 10* quoted *Tagatz v. Marquette University*, 861 F.2d 1040, 1042 (7th Cir.1988), which held that "the fact that a party testifying as his own expert is not disinterested does not distinguish him from any other party who testifies in his own behalf." *Id.* at *5. Additionally, the court in *Perfect 10* also cited *Masterson Marketing, Inc. v.*

*KSL Recreation Corp.*, 495 F. Supp. 2d 1044, 1050 (S.D. Cal. 2007), which "held that a plaintiff could rely on his own expert report to support his claims." *Id.* at *5.

Unlike the Plaintiff in *Perfect 10*, Wood is not merely considering himself an expert because he owns and operates a business.  Rather, Wood has over 30 years of experience with cybersecurity issues, including seven cybersecurity patents and two patents specifically with respect to the specific attack at issue in this case – IP cloaking. Regardless, courts have overwhelmingly held that, provided an expert's testimony is not based on a contingency fee (which it is not here), having a financial interest in the case is not a matter of admissibility.

**B.**     **Wood's Report Contains Highly Relevant Opinions That Will Be Helpful to the Jury.**

    **1.**     **Factual Summaries are Admissible.**

In Section III.B. of its Motion, Microsoft claims that "Wood's report largely consists of factual summaries" and then argues that such "factual summaries" should be excluded because they are supposedly "improper expert testimony." *Motion*, p. 12.  A recent decision by the Eleventh Circuit shows that Microsoft's "argument[] is meritless," as such summaries in an expert report are admissible because such factual summaries are also independently admissible under Fed. R. Evid. 1006. *Dubay v. King*, 844 Fed.Appx. 257 (11th Cir. 2021). ("DuBay's arguments are meritless. DuBay argues that Furth's summaries were unreliable and irrelevant and thus inadmissible under Rule 702 and *Daubert*. But Furth's summaries were independently admissible under Rule 1006."). Specifically, Rule 1006 provides: "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006.   "The admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury." *Id.* at Advisory Notes.

As documented in Wood's Report, cloaking began to be used in the 1990's and rapidly became popular, resulting in voluminous writings regarding its use over more than two decades. Wood's report includes 237 Appendixes spanning 3,621 pages. Wood's summaries of the voluminous writings regarding cloaking will be helpful to the jury to understand IP Cloaking and how it is used in order to assess the evidence put forth by both TocMail and Microsoft.  These are exactly the type of summaries contemplated by Rule 1006. Such summaries are not excludable via a *Daubert* challenge, but are rather "admissible either as expert testimony under Rule 702 or as summary testimony to prove content under Rule 1006." *Dubay*, 844 Fed.Appx. at 263 (*citing WWP Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1039-40 & n.7 (8th Cir. 2011).[11]

## 2. Wood's Report Contains Highly Technical Information Relevant to the Case.

As noted in the Advisory Committee Notes to Rule 702, it is permissible "for an expert to educate the factfinder about general principles . . . [and] [t]he amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles." Fed. R. Evid. 702 Advisory Comm. Notes, 2000 Amendment. For this kind of expert testimony, Rule 702 simply requires that: "(1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." *Id.*

---

[11] Microsoft's assertion that Wood's Report "largely consists of … a summary of fact discovery in the case" is patently false. Wood's Report was submitted on October 1, 2020 and discovery did not close until March 30, 2021.  When submitted, Microsoft had only produced approximately 1,075 pages of the 336,145 pages of documents it ultimately produced in the case (0.32%). Depositions were not taken until March 2021. Wood's Report was based on his own experience, research, and testing, and the three-page supplemental report he submitted November 17, 2020 was based on two studies that Wood unearthed. Microsoft's argument is disingenuous at best.

Microsoft lifts a few snippets out of a 103-page Report to misportray the Report as nothing more than a narrative of the allegations in the complaint. *Motion*, p. 8-9.[12] However, Wood's Report explains detailed technical information regarding cybersecurity attacks, IP cloaking, email security scanners and how they work, vulnerabilities and numerous other technical issues such as PHP, Javascript, *.htaccess* files, and more to "educate the factfinder on general principles" of cybersecurity to assist the trier of fact in the issues central to this case. In fact, Microsoft has previously acknowledged "the complexity and technicality of the issues" in this case. *Joint Motion for 1.5 Spacing*, ¶ 11 (ECF No. 65). Now, Microsoft argues that all of these highly technical matters "require no expert interpretation." *Motion*, p. 10. To the contrary, expert explanation will greatly assist the trier of fact due to "the complexity and technicality of the issues."

For example, Wood's report explains **"server-side"** (pp. 5, 30-31, 80) vs "client-side" (pp. 5, 30-3) attacks, **"IP-based"** (pp. 14-18, 82) vs other forms of cloaking (p. 82), **"blacklisting"** (pp. 81-82) vs "whitelisting," (pp. 77-79) and more. *Wood Report*. He does so to assist the trier of fact in understanding the specialized terminology used in numerous materials relevant to this case, including a document written by Microsoft researchers at the same time that Office 365 was being launched; a document describing Microsoft's latest anti-cloaking technology called Rozzle. *Wood Report*, p. 5. Microsoft's researchers wrote: "Rozzle is **helpless at** avoiding **server-side** cloaking. … It is not useful against server-side techniques such as **IP blacklisting**." *Wood Report* p. 5. Only through expert assistance with the specialized terminology would the jury understand that the researchers' reference to being "helpless at" "server-side" "IP blacklisting" was their

---

[12] Furthermore, in the same section that Microsoft asserts Wood's supposed lack of "expert analysis," Microsoft acknowledges that his report concludes that "the use of IP Cloaking underwent three stages of development." *Motion* p. 10, FN 3. This Three-Stage Development is *Wood's* conclusion that he derived from *expert analysis* of the collection of documents disclosed in pages 14-32. This Three-Stage Development is not mentioned in any individual document.

*explicit* acknowledgement of Rozzle being *defenseless against IP Cloaking*. This also rebuts

Microsoft's argument that Wood's Report should be excluded because of the bolded sentence:

> **It's indisputable that Microsoft knew that its cloud email security was** ***defenseless*** **when it announced the launch of Office 365.** *As documented shortly below*, at the same time that Microsoft's marketing team was convincing companies to move to Microsoft's cloud, Microsoft's researchers were discussing how *'helpless'* they are against this attack, and they discussed how its latest cloaking detection technology 'is not useful' against it.

*Wood Report*, p. 3 (emphasis added). Wood was merely introducing the upcoming Rozzle study

that explicitly included the researchers' acknowledgement of this.

Microsoft's contention relies on *In re Trasylol*, 709 F. Supp. 2d 1323, 1351 (S.D. Fla.

2010). However, in that case, unlike Wood, the author "comes armed with a Report [entirely]

designed to … stack inference upon inference in order to offer her [one] 'takeaway' or 'take home

message' with respect to intent, knowledge, or causation in a manner unrelated to any regulatory

expertise." *Id.* "[T]he major problem identified-the lack of analysis or connection between the facts

and the opinions-persists throughout Dr. Parisian's Report" *Id.* at 1350.

Contrary to *Trasylol*, the minimal references to Microsoft's knowledge in Wood's Report

are based on Microsoft's own writings, connected to the facts, and related to Wood's expertise.

Moreover, as in the Rozzle example, Wood simply explains the specialized terminology without

making any *inference* whatsoever regarding Microsoft's knowledge — let alone "stack[ing]

inference upon inference" as was the case in *Trasylol.* Wood's report consistently ties all of his

opinions to an analysis of related documents combined with his cybersecurity expertise.[13]

---

[13] Experts are permitted to testify regarding "objective" statements of another's knowledge. *Ma v. Equifax Info. Servs., LLC*, 288 F. Supp. 3d 1360, 1367 (N.D. Ga. 2017) (finding, in response to defendant's argument that the expert "should not be allowed to testify as to Defendant's state of mind and what Defendant 'knew'" that the expert may testify regarding "objective" forms of another's knowledge, but not "subjective" kinds.)

C.     **Wood's Test Employed a Generally Accepted Methodology.**

The Eleventh Circuit interprets the fourth factor of reliability as follows: "(4) whether [the test] is *generally accepted in the field.*" *United States v. Gutierrez*, 810 Fed.Appx. 761, 767 (11th Cir. 2020). Wood has testified that there is a "standard test" for assessing whether a link scanner is vulnerable to IP Cloaking. *Wood Depo. (3-19-21)*, 9:15-16. Both Cryptron Security and Hector Monegur applied the standard IP Cloaking test to Safe Links — both finding Safe Links to be vulnerable. *Id.* 7:19-25. World-renowned hacker Hector Monsegur is notable for assisting the FBI in stopping over 300 cyberattacks. *Wood Report*, p. 68. Wood designed his test based on Hector Monsegur's article. *Wood Depo. (3-18-21),* 47:10-14. Thus, the methodology for Wood's test that he disclosed in his Report was generally accepted in the field. *Wood Report*, pp. 61-67. Therefore, Wood's methodology meets the *Daubert* requirement of reliability. *See Gutierrez*, 810 Fed.Appx. at 767 ("we [previously] upheld the admission of expert testimony that met only the 'general acceptance' *Daubert* factor. . . . [B]ecause the district court credited *testimony* that the experts' method was generally accepted") (emphasis added).

Inexplicably, despite page 67 of the Report explicitly stating that the entire source code for the test is included in Appendix 237, Microsoft states that "[i]t is unclear how the 'test' was performed." *Motion*, p. 12. Furthermore, the Court can review Wood's video using the clickable link in Wood's Report. (ECF 69-1) (see link for "narrated video" on page 61).

Wood designed the test, programmed the test, configured the servers, and created the final video. *Wood Report* p. 61. In order to enable Wood to watch the server traffic in realtime, Wood paid Mikail Tunç $482 to click two email links on Tunç's phone, and send a screen recording. *Wood Report* pp. 13, 62. Wood reiterated that *the sum total* of Tunç's involvement was to click two email links and send the screen recording. *Wood Depo. (3-18-21)*, 18:3-6; 19:4-5. Microsoft

repetitively misportrays the situation stating that this was "'testing' performed by Mikail Tunc," "Tunc's video," "Tunc's video demonstration," "Tunc's 'illustrative video," "the Tunc video," and "Wood's opinions based on the Tunc video." *Motion*, pp. 6, 12-14. Simply repeating a falsehood over and over does not make it true.[14]

Microsoft also misportrays its failure to depose Tunç. Even though Fed. R. Civ. Pro. 26(b)(4)(D) prohibits depositions of non-testifying consultants, TocMail indicated that it had no objection to Microsoft deposing Tunç. *See* March 2021 email chain between counsel, attached as **Exhibit "21."** As stated to Microsoft, Tunç is a non-employee of TocMail who completed his one-time consulting task and TocMail had not communicated with him in many months. *Id.* TocMail had no authority to compel Tunç to testify. *Id.* Microsoft simply chose not to pursue a deposition of Tunç.[15]

Thus, Wood's Report should be admitted in full. Nevertheless, should the Court deem any individual opinions or statements inadmissible, the remainder of the Report should be admitted.

## V. CONCLUSION

TocMail respectfully requests that the Court deny Defendant's *Daubert* Motion.

---

[14] Microsoft also incoherently spends approximately four pages attempting to exclude a video that Microsoft argues "shows that *Safe Links works as advertised.*" *Motion*, p. 13.

[15] Microsoft also asks the Court to make *Daubert* decisions presuming that its experts are correct and that Bour/Wood are supposedly wrong. *Motion*, pp. 13, 15, 17, 19, 21-25. That is improper. *Quiet Tech.*, 326 F.3d at 1341 (citation omitted) ("'The district court[] err[ed]…[by] misconce[iving] of the limited 'gatekeeper' role envisioned in *Daubert*. By attempting to evaluate the credibility of opposing experts . . .'")). For example, Rogers testified ███████████████████ ██████████████ *Exp. Depo*, 152:9-10 (Ex. 15). Wood testified that Microsoft's ESI refutes Rogers: "In the ESI, Mr. Patel provided one single link for both EOP/Sonar IP addresses and the URL specifically says that it's EOP, Exchange Online Protection IP addresses." *Wood Depo. (3-18-21)*, 56:10-13. Microsoft asks the Court to presume that Rogers is correct and that "Wood simply rejected the evidence presented." *Motion*, p. 15. However, an internal Microsoft email states: ████████████████████████████ ████████████████████████████████████ precisely as Wood testified. MSFT_TOC00043674, **Exhibit "22."**

Dated: June 9, 2021                     Respectfully submitted,

                                        By:   /s/ Joshua D. Martin
                                        Joshua D. Martin
                                        Florida Bar No. 028100
                                        josh.martin@johnsonmartinlaw.com
                                        JOHNSON & MARTIN, P.A.
                                        500 W. Cypress Creek Rd., Suite 430
                                        Fort Lauderdale, Florida 33309
                                        Telephone: (954) 790-6699
                                        Facsimile: (954) 206-0017
                                        *Attorneys for Plaintiff, TocMail Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 9th day of June 2021, the foregoing document is

being served this day on all counsel of record on the service list via electronic mail.

                        By:    /s/ Joshua D. Martin
                               Joshua D. Martin

## SERVICE LIST

### *TOCMAIL INC. v. MICROSOFT CORPORATION*
### 20-60416-CIV- CANNON/HUNT

**Joshua D. Martin**
E-Mail: josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd.
Suite 430
Fort Lauderdale, Florida 33309
Telephone: (954) 790-6699
Facsimile: (954) 206-0017

**Francisco O. Sanchez**
E-Mail: sanchezo@gtlaw.com
        orizondol@gtlaw.com
**Evelyn A. Cobos**
E-Mail: cobose@gtlaw.com
        MiaLitDock@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

**Mary-Olga Lovett** *(admitted pro hac vice)*
E-Mail: lovettm@gtlaw.com
**Rene Trevino** *(admitted pro hac vice)*
E-Mail: trevinor@gtlaw.com
GREENBERG TRAURIG LLC
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile: (713) 374-3505