**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-60416-CIV- CANNON/HUNT**

TOCMAIL INC., a Florida corporation,

       Plaintiff,

v.

MICROSOFT CORPORATION, a
Washington corporation,

       Defendant.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AGAINST DEFENDANT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Plaintiff, TOCMAIL INC. ("TocMail" or "Plaintiff"), by and through undersigned counsel hereby moves for Summary Judgment against Defendant, MICROSOFT CORPORATION ("Microsoft" or "Defendant"), as to liability and in support thereof states:

### I.       INTRODUCTION

TocMail brought this false advertising case under the Lanham Act due to Microsoft's deliberate false advertising concerning Safe Links — a cloud-based email security service. From the launch of Safe Links in 2015 up through today, Microsoft has publicly promoted and continues to publicly promote Safe Links as effective protection against a cyberattack that is referred to as *IP Cloaking* or *IP Evasion*. While Microsoft externally sells Safe Links as effective protection against IP evasion, internally Microsoft engineers write how "easily" that attack bypasses Safe Links. For six years, from the launch in 2015 up to this present day, attackers *easily* bypass Safe Links using the very attack that Safe Links is promoted as protection against. Thus, the falsity of Microsoft's promotions is indisputable.

Microsoft has designated employee Jason Rogers ("Rogers") as a rebuttal cybersecurity expert. In 2017, in an internal Microsoft discussion regarding an attack that "evade[d]" Safe Links, Jason Rogers wrote "The scary thing about this sort of attack is that a f[]ing 5th grader could set it up." In 2018, Rogers wrote an internal email explaining how "it is easy" for attackers to use "IP-based evasion" to prevent Safe Links from seeing malicious content. Microsoft employee Amar Patel ("Patel") has been designated as Microsoft's other rebuttal cybersecurity expert.  In 2018, Patel co-created an internal presentation also discussing how "easily" attackers are using IP evasion to hide malicious content from Safe Links. In 2019, a malicious campaign used IP evasion to evade Safe Links ***200,000 times*** **"with 100% accuracy."** An internal 2020 email explicitly states that "IP-based evasion" still remains a "gap" in Safe Links' security. When Safe Links wrongly classifies a malicious link as being clean, this is called a *false negative ("FN")*. A document internally distributed in May 2020 provides that "evading Microsoft IPs" (i.e. IP evasion) is a reason that "there are still *numerous* FNs [false negatives] that are going undetected" calling this a "prominent gap" in Safe Links' security (emphasis added). Remarkably, an internal December 2020 email states that "preventing IP evasion is a large bucket of work that we are investing in very heavily over the next 6 months." Microsoft's own internal records document that Microsoft is still looking for a solution ***in 2021*** to the very attack that Safe Links has been promoted as protecting against for six years and counting.

It is Microsoft's own internal records that explicitly and repeatedly document how "easy" it is to bypass Safe Links using the very attack that Safe Links is promoted as protecting against. This motion relies on Microsoft's own documents, correspondence and deposition testimony and, thus, the facts are undisputed. Summary judgment in favor of TocMail is clear as a matter of law.

2

## II.    FACTUAL SUMMARY

In April 2015, Microsoft introduced a new email filtering service called Office 365 Advanced Threat Protection ("OATP" or "ATP"). *TocMail's Undisputed Facts ("Facts")*, ¶ 1. ATP primarily consisted of two components: Safe Attachments and Safe Links. *Id.*[1]

### A.    The Two Components of Safe Links — Reputation and Detonation.

Safe Links began as a URL reputation service. *Id.* at ¶ 2. The term URL refers to "a link to a website," which is the webpage address where a link takes you. *Id.* at ¶ 3. For example, the URL for Microsoft's homepage is *www.microsoft.com*, and the URL for Microsoft's Office 365 page is *www.microsoft.com/en-us/microsoft-365/microsoft-office*. *Id.* When a user clicks a link in an email, Safe Links' reputation service checks the link's URL against a list of URLs already seen in the past that have previously been determined to be malicious. *Id.* at ¶ 2. If the URL is in the previously seen bad list, then the user is prevented from visiting the URL. *Id.* The reputation service acts as a "memory" of links already seen and deemed malicious in the past. *Id.*

A list of already-known-bad URLs is called a *URL blacklist*. *Id.* at ¶ 4. For the reputation service to catch a bad URL, the URL blacklist must contain an "exact match at the time-of-click." *Id.* "The very nature of exact match in blacklisting renders it easy to be evaded." *Id.* at ¶ 5. That is because it "is effective only for known malicious URLs." *Id.* New URLs, by their very nature, cannot have an "exact match" in any already-known-to-be-bad URL blacklists. Hence, it is "easy" for attackers to bypass the reputation service simply by using a new, never-seen-before URL. *Id.* This is problematic given that Safe Links is responsible for protecting approximately 9.5 million unique URLs a day. *Id.* at ¶ 6. Microsoft internally acknowledged that "reputation checking isn't

---

[1] Microsoft has stipulated to the authenticity of all files it produced in this case in response to discovery and ESI requests.

cutting it. It is pretty easy for an attacker to change domain names and/or IP addresses on the fly." *Id.* at ¶ 5.

In 2017, Microsoft added another component to Safe Links called *detonation*. *Id.* at ¶ 7. URLs that pass through the reputation check are sent to the detonation service for analysis. *Id.* at ¶ 8. The detonation service attempts to follow links to the website to access and analyze the content in order to determine if the link is good or bad. *Id*. Microsoft internally refers to the detonation service as *Sonar*. *Id*. Today, Safe Links primarily consists of two components: reputation and detonation (Sonar). *Id*.

When Safe Links wrongly classifies a bad link as being good, this is called a *false negative*, which is abbreviated as *FN*. *Id.* at ¶ 9. In September 2018, the Safe Links' team analyzed Sonar's "phish FN volume" (instances where Sonar failed to detect phishing). *Id.* at ¶ 13. The results of this analysis are important because the majority of cybercrime involves credential phishing – an attack that uses a fake login page that looks identical to a legitimate site in order to trick users into revealing their login credentials. *Id.* at ¶ 10. In an internal document under a header "Credential Phishing," Microsoft wrote: "Securing the user from these phish mails is the core of the ATP's detonation based and ML [machine learning] based promises." *Id.* Indeed, phishing is the most common threat that companies deal with today. *Id*. In regards to URLs, "phish FN volume" refers to the collection of instances where the detonation service wrongly classified phishing links as being clean, which is the single greatest cybersecurity issue. Remarkably, the Sonar team discovered for "URLs … most of this is network evasion." *Id.* at ¶ 13. In other words, *just one single attack* – network evasion – accounted for most of Sonar's failures to detect phishing links. Just one single attack is the reason that phishing remains the biggest cybersecurity issue.

**B.     Introduction to IP Evasion (Network Evasion).**

Attackers' webpages can use the visitor's IP address to detect when Sonar is visiting it. *Id.* at ¶ 11.  When the webpage identifies that the visitor's IP address is one of Sonar's IP addresses, the webpage sends benign (clean) content. In other words, the webpage sends benign (clean) content to Sonar and sends the malicious content to everyone else. *Id.*

Microsoft's Safe Links' team calls this *IP evasion*: "[O]ur definition of IP evasion[:] an attacker can create a link where when Sonar visits that link the attacker can determine the IP ranges of our visit. … [I]f they determine our visit from Sonar detonation is coming from Microsoft's IP range they can choose to use that information to display whatever web page they wish to." *Id.* Microsoft uses the term *network evasion* interchangeably with *IP evasion.  Id.* at ¶ 12. TocMail refers to this as *IP Cloaking. Id.* at ¶ 14. At least one leading member on Microsoft's email security team, Abhijeet Hatekar ("Hatekar"), has been aware of IP evasion since 2010. *Id.* at ¶ 15. Patel has known about IP evasion since at least as early as 2016. *Id.*[2]

Microsoft is aware that attackers actively use three "types" of "Network Evasion": using the IP addresses belonging to a security vendor to evade detection, using the IP address(es) belonging to the intended victim to evade detection, and using the geolocation of the visiting IP address to evade detection. *Id.* at ¶ 12-13. These three types of network evasion shall hereafter be referred to as IP Blacklisting, Targeted Evasion, and Geo Evasion. As shown below, *all three* are mentioned throughout Microsoft's records.

A part of the internet communication language called *redirects* is often referenced in Microsoft's records and its promotion of Safe Links. For example, in 2006, researchers at

---

[2] Since this motion refers to Microsoft's documents, Microsoft's terminology is used throughout herein: *IP evasion* and *network evasion*.

Microsoft's Cybersecurity and System's Management Group observed the following evasive behavior: "Redirecting [scanners] to known-good sites such as *google.com*." *Id.* at ¶ 16. This simply means that when security scanners connected to the malicious webpage, the webpage *redirects* them (i.e. forwards them) to *google.com*, thereby preventing the scanners from seeing the malicious content. *Id.* at ¶ 17. In fact, attackers are still doing this very same thing today. For example, in July 2020, a Microsoft spam researcher named Michael Wise ("Wise") wrote about seeing this same attack. *Id.* at ¶ 18.  Wise wrote about "the observed technique" of redirecting security scanners to *google.com* and redirecting everyone else to "the real phish site." *Id*. Wise wrote that the malicious webpages are "using the connecting IP address to determine behavior" (i.e. IP evasion) *Id.* Hence, attackers use the *redirect* component of the internet communication language to implement IP evasion. *Id.* at ¶¶ 11, 17, 18, 20, 31, 37, 44. The webpages use the visitor's IP address to redirect security scanners to a known-good site such as *google.com*, and redirect the intended victim to the phishing site. *Id.* It is just as simple as that.

As stated above, phishing is the biggest cybersecurity threat today.  *Id.* at ¶ 10.  Attackers routinely use redirects in phishing attacks: "when you click one of these URLs, a redirect takes you to a bad place. This is the attack vector exploited by phishing attacks." *Id.* at ¶ 19. Phishing sites easily use redirects to implement IP evasion.  Simply redirect Sonar to a clean site every time that Sonar connects.  A Microsoft email chain in October 2019 has the subject "Phish Campaign using IP Evasion ([EVASION] – Phishing URL redirects to clean site on detonation.). *Id.* at ¶ 20. In that chain, Hatekar stated: "We need to make progress on this **customer impacting issue**." *Id.* (emphasis added).

As stated above, Microsoft researchers wrote about malicious sites that redirect security scanners to *google.com* in 2006. Incredibly, fourteen years later, in April 2020, an internal

Microsoft email from Liming Hong shows that **Safe Links failed to detect a "phishing" site *801 times* because the link was redirecting Sonar to *google.com*.** *Id.* at ¶ 21. That is how easily attackers bypass the security service that tens of millions rely upon.

**C.    Microsoft's Internal Records Unequivocally Document Attackers Easily Using IP Evasion to Bypass Safe Links From 2015 Through Present Day.**

The Microsoft documents below undisputedly establish that attackers have been easily using IP evasion to bypass Safe Links from the day it was introduced up to this present day.

**[2015 - 2016]:** In 2015, Safe Links began as a mere URL reputation service. *Id.* at ¶ 2. Despite Microsoft's promotions of Safe Links' effectiveness against IP evasion, Safe Links failed to keep its users safe from this attack because it was not even looking for evasion at this time.  As testified to by Microsoft's cybersecurity expert Jason Rogers: "[A]ny kind of IP evasion technique would be meaningless for those servers. They're simply checking reputation and returning block pages as appropriate." *Id.* at ¶ 23.

**[2017]:** Microsoft added the detonation component to Safe Links in January 2017. In March 2017, Rogers gave a confidential, internal presentation that included the slide "Why does detonation have false negatives? Evasion: GEO IP Check." *Id.* at ¶ 24.

A December 2017 internal message chain (copied to an email) between Jason Rogers and Debra Ghosh demonstrates Microsoft's true knowledge regarding Safe Links' actual effectiveness versus that which Microsoft externally promotes:

> Debraj Ghosh 7:27 AM:  can you look at the PDF from coke consolidated when you get a chance?
> . . .
> Jason Rogers 7:54 AM:  It's basic plain jane docusign login via spoof O365 login page.
> . . .
> Jason Rogers 7:56 AM:  In theory.  But that stuff should be rolled out to Microsoft and it isn't catching it, I just ran it through.  **I think this is an FN on Sonar's phish detections**.

Debraj Ghosh 7:56 AM:  wait, let's decouple what you just said
Debraj Ghosh 7:57 AM:  1. our brand impersonation does not work yet
Debraj Ghosh 7:57 AM:  2. this is a FN because SONAR missed
Debraj Ghosh 7:57 AM: so amar needs to address why we missed
Debraj Ghosh 7:57 AM: ?
Jason Rogers 8:06 AM:  More or less. Sonar will fully admit that the phish detection stuff is still being tuned big time. I'm guessing the intermediate select your email provider page **was enough to evade**.
. . .
Debraj Ghosh:  8:07 AM: F[] man.
Debraj Ghosh 8:07 AM:  when the hell is abhishek's shit going to start working?
Jason Rogers 8:08 AM:  It'll take a while….**the only reason we aren't out of business is because everyone else sucks just as bad**.
Jason Rogers 8:08 AM:  **The scary thing about this sort of attack is that a f[]ing 5th grader could set it up.**
Jason Rogers 8:08 AM:  Super low tech

*Id.* at ¶ 25 (emphasis added).  Amazingly, this is Microsoft's own cybersecurity expert making those statements, acknowledging that a fifth grader could set up the attack that is evading Sonar and that the only reason Microsoft is not out of business is because everyone else is just as bad. Microsoft continued to sell companies on Safe Links anyway.

**[2018]:** In March 2018, Hatekar, a Microsoft principal software development engineering manager, stated in an internal email: "Here is another example where Phishing page blocked traffic from Microsoft IP ranges."  *Id.* at ¶¶ 15, 26. Anytime Microsoft acknowledges Sonar seeing different content based on IP addresses is a reference to an attacker successfully using IP evasion. *Id.* at ¶ 11.

In April 2018, Rogers wrote: "**IP-based evasion** — … **it is easy** for an attacker to only display malicious content in specific targeted IP ranges." *Id.* at ¶ 27 (emphasis added).

In September 2018, Amar Patel co-created an internal presentation that included a slide entitled: "Attackers are preventing us from seeing phish content/landing pages." *Id.* at ¶ 13.  This is the slide discussed above where Microsoft found that "most" of the "phish FN volume" for URLs is "network evasion." *Id.*  Patel's presentation included another slide entitled: "Network

Geo-IP Evasion (**Problem**).” *Id.* (emphasis added). This slide includes three bullet points — one bullet point for each of the ways that attackers implement IP evasion. *Id.* The bullet point for IP blacklisting says: “Evade Microsoft IP Ranges: Attackers can *easily* attribute the traffic to Microsoft and not serve the phish content.” *Id.* (emphasis added). The bullet point for Geo Evasion provides: “Target a specific region: Attackers validate and attribute the traffic to a specific region and display content accordingly.” *Id.* The bullet point for Targeted Evasion: “Target a specific tenant or a user: Spear phishing combined with network IP evasion to target a specific org/user’s expected network range.” *Id.* In fact, the presentation explicitly documents Microsoft’s awareness that attackers actively use all three implementations against Sonar: “Following evasion types *are occurring*: Microsoft IP Range evasion, Target a specific region, Target a specific tenant or a user.” *Id.* at ¶ 12 (emphasis added).

In November 2018, Microsoft started allowing Sonar to use what Microsoft calls “IP Anonymization.” *Id.* at ¶ 28. Microsoft has shared this “IP Anonymization” story with at least one company – “Bosch” – “to instill confidence” in them to secure a “$300 million account.” *Id.* However, these IP addresses are not actually “anonymous.” *Id.* at ¶ 29. The IP addresses belong to a company called Proxify and “IP address information is public information already” as Patel has testified. *Id.* at ¶ 28-29. Also, this self-described IP Anonymization does not block *any* Targeted Evasion, as admitted by Jason Rogers at deposition. *Id.* at ¶ 30. Moreover, attackers can still use Blacklist IP evasion to redirect Sonar to a good site *with 100% efficacy*, as admitted by Patel at deposition. *Id.* at ¶ 31 (see also the following document).

**[2019]** A February 2019 internal email chain disclosed a phishing campaign **sent to over 200,000 (“200k”) recipients** that Microsoft wrote “is **evading us with a 100% accuracy** because of at least 3 reasons”; the first reason being the IP Blacklisting type of IP evasion (“[i]nitial IP

range blacklisting"). *Id.* at ¶ 32. Despite the deployment of so-called *IP Anonymization*, the attacker evaded Sonar with 100% efficacy over 200,000 times in a single phishing campaign. *Id.* In that email chain, Ross Adams of Microsoft stated "what we have here is an evasion technique" and "**a solution is required**." *Id.* (emphasis added).  Hatekar also called the attack a "gap," one in which the "customer saw phishing page but we always see spam," and that "please note, **we are currently missing 100%** on them." *Id.* (emphasis added).

An internal February 2019 email from Amar Patel with a subject "Customer Impacting Issues" states "For the URLs we did get a chance to detonate, our misses were due to network evasion." *Id.* at ¶ 33.

In April 2019, Brian Wilcox ("Wilcox"), Microsoft Senior Program Manager for ATP, wrote how trivial it still is for attackers to use IP evasion to send different content to Sonar: "Yup, it would be trivial to … serve different content … My concern is it is really easy to resolve our IP space." *Id.* at ¶ 34.

**[2020]:** In January 2020, Ross Adams wrote that "it is trivial to hide the content from us" during email delivery simply by using evasive redirects (hiding content "behind some redirection that we can't see"). *Id.* at ¶ 35.

A February 2020 document provides: "Network evasion… We are reviewing a long term plan." *Id.* at ¶ 36.

Also in February 2020, Pawel Partyka ("Partyka"), a Senior Security Researcher in Microsoft 365 Defender, wrote: "Site is using geo-evasion so SONAR returned **always** good verdict." *Id.* She also wrote: "URL from the message was always **redirecting** one or twice to final site. **SONAR could detect phish** if full URL was detonated **except for campaign that used geo-evasion**." *Id.*  Amar Patel confirmed Sonar's susceptibility to Geo Evasion at deposition:

"Q. Specifically with respect to Sonar, which is referenced here, so geo evasion was able to bypass it here in 2020? A. That's what this says, yeah." *Id.*

Incredibly, Partyka explicitly stated that Sonar will not detect IP evasion when attackers use *redirects* to implement it – in 2020. The import of this is exemplified by the April 2020 example provided above where Safe Links failed to detect a phishing site *801 times* simply because it was redirecting Sonar to *google.com*. *Id.* at ¶ 21.

A May 2020 Microsoft document stated: "**there are still numerous FNs that are going undetected** as they are being evaded in the detonation environment. Attackers are preventing our ability to see the phish content/landing pages due to various types of evasion techniques that are employed: • **Network level evasion (Ex: Evading Microsoft ips, geo-based evasions etc.**)." *Id.* at ¶ 37 (emphasis added).

That same document in May 2020 acknowledged Safe Links' inability to detect IP evasion implemented via *redirects* as a "prominent gap" in "IP Anonymization": "Here are two prominent gaps: 1. A URL submitted to Sonar for detonation contains a redirection." *Id.* When asked about the redirection "gap" at deposition, Amar Patel testified: "when we write documents like this, she is trying to be very objective, you know." *Id.* Thus, when being "objective" internally, Microsoft knows that redirects are still a prominent gap in IP Anonymization, yet uses the story of IP Anonymization to "instill confidence" in companies anyway. *Id.*

It was in July 2020 that Michael Wise wrote about "the observed technique" of redirecting security company's devices to *google.com* and everyone else gets "a redirect to the real phishing site." *Id.* at ¶ 18.

In August 2020, Partyka, wrote that Safe Links was fully bypassed simply by redirecting Sonar *once* to a known good site. *Id.* at ¶ 38. "I sent email with a link that during first visit redirects

to www.bing.com to several users in my test tenant. Email was delivered to Inbox because of this evasion technique[.] 3 users clicked on the link and were allowed to the site." *Id.* That's all it took to bypass Sonar's security *in August 2020*.

An August 2020 email automatically generated by Cortana collating open issues sent to Patel's email address includes "**TocMail v. Microsoft**" and "**How quickly can we respond to adding fixes for evasion?**" *Id.* at ¶ 39 (emphasis added).

An internal September 2020 email from Tommy Blizard, states: "from what we are observing in campaign deep dives, what are some of the **gaps on Sonar** side we'd like to surface. I think **IP-based evasion** is already on their radar." *Id.* at ¶ 40.

In October 2020, Brian Wilcox wrote that Sonar will detect malicious URLs "assuming *of course* there are not multiple **layers of evasion** taking place **such as network [evasion]** . . . .." *Id.* at ¶ 41.   He went on to state in that email, in discussing an attack of sending different content to Safe Links would "lead to at least evasion of rep[utation], maybe evasion of sending to Sonar" and that "Doing so is trivial." *Id.* Wilcox testified at deposition that he meant that such implementation was easy to do.   *Id.*   Importantly, Wilcox refers to such attacks as "Known Evasions (of Rep[utation])" (i.e. known to Microsoft) and states that Microsoft knows that this attack "will be exploited" and it is "a valid scenario." *Id.*

An internal December 2020 email chain discusses an attack disclosed by VISA which successfully used "a combination of IP evasion and sandbox evasion" to bypass the entirety of OATP.   *Id.* at ¶ 42.

**[2021]**   Incredibly, *even in 2021*, Microsoft is still looking for a solution to the IP evasion problem.   In a telling email dated December 21, 2020, Brian Wilcox internally stated, "**preventing IP evasion is a large bucket of work that we are investing in very heavily over the next 6**

**months**." (i.e., through June 2021). *Id.* Naturally, Microsoft would not be investing "very heavily" in preventing IP evasion in 2021 if Safe Links had already been fulfilling its promoted purpose of providing IP cloaking/evasion protection.

Moreover, in January 2021, an internal Microsoft email chain discussed "New/Additional FY21 Budget ask for IP Evasion prevention." *Id.* at ¶ 42.

This sampling of Microsoft's own documents establish that attackers have continued to use IP evasion to *easily* bypass Sonar from the day it was launched up through today.

**D.    TocMail's Entry to the Market.**

In December 2019, TocMail began selling its namesake TocMail service. *Facts*, ¶ 43. TocMail is a cloud-based time-of-click protection service that uses a patented methodology to keep users safe from IP evasion. *Id.* at ¶ 43, 53. Only Microsoft and TocMail promote their cloud-based, time-of-click services as effective protection against IP evasion. *Id.* at ¶ 43. Hence, TocMail and Microsoft compete within a two-player niche inside the larger time-of-click market.

As documented above, attackers use IP evasion to *easily* bypass Safe Links. Since 2015, Microsoft has been falsely promising protection by Safe Links against an attack that easily bypasses Safe Links while acquiring tens of millions of ATP customers. *Id.* at ¶ 22. Thus, TocMail is inherently harmed when its sole competitor uses false advertising to wrongly convince companies that Safe Links is already protecting them from this attack. A party cannot pull tens of millions of consumers out of the marketplace while trying to find a way to make the product fulfill its promoted purpose. In the absence of Microsoft's false advertising, TocMail would have entered a market in which no company is falsely convinced that it already has cloud-based, time-of-click protection against cloaking — a wide-open market for TocMail to offer its patented solution to.

Instead, TocMail is effectively shut out of the very niche market that it alone provides the actual solution for. Hence, the injury to TocMail is both direct and significant.[3]

## F.    Microsoft's False Promotions of Safe Links.

As discussed above, phishing sites typically and easily use redirects to implement IP Evasion. For example, phishing sites can simply use the visitor's IP address to redirect security scanners to *benignlink.com* and redirect everyone else to *malwarelink.com*. *Id.* at ¶ 44.  In fact, Microsoft produced a video animation of this very example, a video that then promotes Safe Links as the supposed solution. *Id.*   This short animation is helpful for the Court because this is Microsoft's own depiction of the links that Safe Links purportedly protects against, and it states one of the subject false promotional messages.   Additionally, the animation makes it straightforward to understand IP evasion implemented via redirects.

### 1. Deceptive Message #1

In the video mentioned above, the Microsoft narrator states: "Sophisticated attackers will plan to ensure links pass through the first round of security filters by making the links benign, only to weaponize them once the message is delivered. Meaning that the destination of that link is altered later to point to a malicious site." *Id.*  During this narration, the video also shows a link redirecting "the first round of security filters" to *benignlink.com*, and then shows the same link redirecting the user to *malwarelink.com*. *Id.*  The video then promotes Safe Links as the supposed solution: "*with Safe Links, we're able to protect users right at the point of click* by checking the link for reputation and triggering detonation if necessary." *Id.* (emphasis added).

---

[3] TocMail's patented solution can also be "incorporated into any email client [including Outlook], it can be incorporated into an IMAP proxy, it can be incorporated into an SMTP gateway, it can be incorporated into Microsoft's proprietary email system, and more." *Id.* at ¶ 53.

Attackers use IP evasion to redirect security scanners to benign sites and redirect victims to harmful sites. *Id.* at ¶ 11, 18, 44. In other words, the video depicts behavior that attackers implement via IP evasion then promotes Safe Links as the solution. Hence, Microsoft promotes Safe Links as protection against the very attack that Microsoft acknowledges *easily* bypasses Safe Links' Sonar as discussed at length above.

Microsoft hosted this video on its main webpage for Office 365 Advanced Threat Protection from at least March 2019 through at least August 2020. *Id.* at ¶ 45. Additionally, this video was disseminated via a YouTube page controlled by Microsoft. *Id.* Given that most ATP customers "are enterprise customers," each viewer can represent up to hundreds of thousands of potential licenses. *Id.* For example, Microsoft customers Cognizant and Bosch each have 289,500 and 395,000 employees respectively. *Id.* at ¶ 50, 58.

Microsoft's main webpage for ATP also included an ebook that promoted the same false message:

> Sophisticated attackers will plan to ensure links pass through the first round of security filters. They do this by making the links benign, only to weaponize them after the message is delivered, altering the destination of the links to a malicious site. With Safe Links, we are able to protect users right at the point of click by checking the link for reputation and triggering detonation if necessary.

*Id.* at ¶ 45. Microsoft continues to disseminate both the video and ebook individually. *Id.*

Significantly, the video visually depicts behavior implemented via IP evasion while the narrator speaks about redirects that change destination after delivery. *Id.* at ¶ 44. This is especially important because links that change destination after delivery are literally the most common attack as Microsoft's expert Jason Rogers explicitly wrote in an email: "The most common tactic that attackers use with links is to point the URL to something benign and then post delivery to move it to point to something malicious on the server side." *Facts*, ¶ 46. Thus, Microsoft has been falsely

promoting Safe Links as protection against the most common attack, an attack that easily bypasses

Safe Links and one that is still a problem for Microsoft six years later.

### 2. Deceptive Message #2.

Prior to ATP, Office 365 originally had one email security service called Exchange Online

Protection (EOP). *Id.* at ¶ 47.   EOP is responsible for discarding bad emails *before* they are

delivered. *Id.*   On April 8, 2015, Microsoft introduced Safe Links as a new service that checks

links emails *after* they have been delivered (every time the user clicks the link):

> EOP scans each message in transit in Office 365 and provides time of delivery protection,
> blocking malicious hyperlinks in a message. But attackers sometimes try to hide malicious
> URLs with seemingly safe links that are *redirected* to unsafe sites by a forwarding service
> *after the message has been received*. ATP's Safe Links feature proactively protects your
> users if they click *such a link*. That protection remains every time they click the link, as
> malicious links are dynamically blocked while good links can be accessed.

*Id.* at ¶ 48 (emphasis added). Microsoft introduced Safe Links as effective protection against one

specific type of link: hyperlinks that seem to be "safe links" at the "time of delivery" yet are

"*redirected* to unsafe sites … *after the message has been received*." *Id.*   Deceptive Messages #1

and #2 both promote Safe Links as protecting against links that redirect spam filters to a safe site

and then redirect users to an unsafe site after the message has been received.   Yet, attackers

routinely use IP evasion to redirect security scanners to a different site than users. As documented

above, they simply redirect Sonar to *google.com* and redirect the victims to the phishing site —

bypassing Safe Links using the exact same attack that Deceptive Messages #1 and #2 promote

Safe Links as effective protection against.   Yet, notably, this promotion promises to protect all the

company's users "**every time they click the link**." *Id.* (emphasis added).

Microsoft uses Deceptive Message #2 in its most prominent ATP marketing materials,

including the Office 365 ATP Product Guide and the Office 365 Partner DataSheet, which is not

only used by Microsoft Partners to sell ATP, but Microsoft itself sent this DataSheet to "to all

subscribed Office 365 Dedicated customer contacts" as well as linking it to "the quarterly update that is sent to the field." *Id.* Microsoft continues to currently promote Deceptive Message #2 directly on its *microsoft.com* website. *Id.*

### 3. Deceptive Message #3.

Microsoft not only portrays Safe Links as effective protection against IP evasion implemented using redirects, but also goes so far as to promote Safe Links as *ensuring* such protection: "*Ensure* users are protected against URLs that *redirect to malicious sites ... even if they are changed after the message has been received.*" *Id.* at ¶ 49. In fact, Microsoft even promotes Safe Links as ensuring protection against all harmful links: "*Ensure* document hyperlinks are harmless with ATP Safe Links" and "*ensure* hyperlinks in documents are harmless with ATP Safe Links." *Id.* (emphasis added).

Even after this lawsuit was filed, Microsoft has continued to promote the same false message of ensuring protection against IP evasion. For example, a Microsoft presentation created after September 2020 provides: "We know that attackers frequently send messages with benign links …, hoping to bypass conventional filters, and then weaponize them post-delivery. We continue to secure users long after their mail is delivered with … [Safe Links'] at time-of-click." *Id.* at ¶ 50. The presentation later states: "Safe Links wraps the URL to *ensure* it's not malicious at the time-of-click" *Id.* (emphasis added).

Remarkably, one year after the launch of this lawsuit, Microsoft began explicitly promising companies that Safe Links *ensures* protection against *every* evasion tactic: "**Safe links ensure[s] real-time, dynamic protection against email campaigns *no matter the … evasion tactic*.**" *Id.* at ¶ 51 (emphasis added). As documented above, Microsoft has never enabled Safe Links to fulfill

its promoted purpose of protecting against IP evasion implemented using redirects and certainly not against *all* evasion tactics and *all* hyperlinks.

**G.      Attackers Continue to Use IP Evasion to Easily Bypass Sonar with 100% Efficacy.**

Microsoft's self-described IP Anonymization simply means that Sonar sometimes connects to webpages using an IP address owned by Microsoft and other times connects using an IP address owned by Proxify. Microsoft started using these proxy IP addresses in November 2018, headed by Amar Patel's Sonar team. *Id.* at ¶ 28.  However, two months prior, Patel's own September 2018 IP evasion presentation explicitly acknowledged that attackers will be able to implement "evasion of … Proxify IPs." *Id.* at ¶ 13.

The identity of owners of IP addresses is *public information*. *Id.* at ¶ 29.  Hence, it is just as easy for attackers to redirect IP addresses belonging to Proxify as it is to redirect IP addresses belonging to Microsoft, not to mention that Proxify has a paltry number of IP addresses compared to Microsoft. *Id.* at ¶ 29. Microsoft published its EOP/Sonar IP addresses at *https://docs.microsoft.com/en-us/office365/SecurityCompliance/eop/exchange-online-protection-ip-addresses*. *Id.* at ¶ 52. This page disclosed 602,497 Microsoft IP addresses. *Id.*  To evade Sonar, attackers' webpages redirected these 602,497 IP addresses to a good site. Proxify has 1,295 IP addresses. *Id.* at ¶ 29.  In other words, Microsoft merely added 0.21% more IP addresses and **slapped on the label "IP Anonymization."**

Even today, attackers can easily bypass Sonar with ***100% efficacy*** just by redirecting traffic from Microsoft/Proxify to a known good site, as Amar Patel has testified: "Q. [C]an an attacker blacklist both Microsoft IP addresses and Proxify IP addresses to redirect Safe Links to a benign site *every time* Safe Links connects? A. They could choose to do that." *Id.* at ¶ 31.

The Achilles heel for Safe Links is Targeted Evasion — where an attacker's webpage looks for the targeted company's IP address(es) instead of looking for the IP addresses belonging to the security service. *Id.* at ¶ 30. Such webpages only send malicious content to visitors connecting from the victim's IP address(es). *Id.* at ¶ 12-13, 27, 30.  In this way, it does not matter how many "anonymous" IP addresses that Microsoft uses, Sonar will *always* be redirected to the good site simply because none of the IP addresses will be the same as targeted victims' IP address(es) – as Jason Rogers admitted at deposition when asked "why would Microsoft not route traffic through anonymous proxy service to combat tenant-targeted attacks?," Rogers testified that "If you were targeting specific content to a specific IP, it wouldn't matter what other IP you used. You would only get the specific content to the one specific IP being targeted." *Id.* at ¶ 30.  Additionally, as noted, Rogers has also explicitly written that Targeted Evasion is "easy." *Id.* at ¶ 27.  Hence, even today, attackers use IP evasion to *easily* bypass Sonar with 100% efficacy.

**H.     TocMail's By-Design Solution Renders Cloaked Redirects Harmless.**

As stated earlier, Microsoft produced a video depicting an email link that redirects security scanners to *benignlink.com* (i.e. original URL -> *benignlink.com*) and the same link redirects the user to *malwarelink.com* (i.e. original URL -> *malwarelink.com*). TocMail holds the patent on the methodology of sending users straight to the approved destination *bypassing all redirects in between*. *Id.* at ¶ 53. Using Microsoft's video as an example, TocMail users are sent straight to *benignlink.com* (not to the original URL). Therefore, the original URL cannot redirect the users to *malwarelink.com* because the users do not connect to the original URL in the first place. *Id.* at ¶ 17.  Hence, TocMail's solution demonstrably works *by design*. It is inherent in the internet communication language (HTTP) that a site cannot redirect a user unless the user connects to the

site first.  *Id.*  Therefore, TocMail's protection keeps users safe from all intermediary site redirects due to an immutable, inherent property of the internet communication protocol itself.  *Id.*

Targeted Evasion is a perfect example given that Rogers has testified that IP Anonymization is useless against it. In Targeted Evasion, only visitors with an IP address belonging to the targeted company are redirected to the phishing site; everyone else (including Sonar and TocMail) are redirected to the good site.  TocMail's patented approach uses the attackers' ace against them.  Because TocMail is sent to the good site *every time*, TocMail sends its users to the good site *every time*, preventing the attacker from redirecting users to a malicious site. Microsoft's false advertising has convinced companies that Microsoft provides this protection (while internally acknowledging the opposite), all to the injury of TocMail whose patented solution is seen as offering no value to the very companies that need it most.

### III.      MEMORANDUM OF LAW

**A.      Standard for Motion for Summary Judgment.**

A party is entitled to Summary Judgment when the party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  After the moving party meets its initial burden of identifying evidence in the record supporting its motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007). Indeed, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* (emphases in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* "'Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Pesci v. Budz*, 935 F.3d 1159, 1165 (11th Cir. 2019) (citations omitted).

Moreover, summary Judgement may be granted for any "part of each claim." Fed. R. Civ. P. 56(a). Even "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case.  Fed. R. Civ. P. 56(g).

**B.     The Undisputed Facts Establish that Microsoft is Liable for False Advertising.**

Lanham Act False Advertising is codified in 15 U.S.C. § 1125(a)(1)(B). A plaintiff prevails on a claim for false advertising under the Lanham Act by establishing that "(1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) [the plaintiff] has been, or likely will be, injured as a result of the false or misleading statement."  *Hi-Tech Pharms., Inc. v. HBS Int'l. Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018).

**1.     Microsoft's Promotions were Literally False.**

"The first element of a false advertising claim is 'satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading.'" *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010).  When an advertisement is unambiguous, "either facially or considered in context," it is classified as literally false. *Id.* at 1309.  Thus, when assessing whether an advertisement is literally false, the Court should "analyze what message is conveyed by the advertisement, *even implicitly*, and then determine whether that message is false." *Green Bullion Financial Servs., LLC v. Money4Gold Holdings, Inc.*, 639 F. Supp. 2d 1356, 1366 (S.D. Fla. 2009) (emphasis added). "Courts 'must analyze the message conveyed in full context,'

and 'must view the face of the statement in its entirety....'" *Osmose, Inc.*, 612 F.3d at 1308; *see also Incarcerated Entm't, LLC v. Warner Bros. Pictures*, 261 F. Supp. 3d 1220, 1230-31 (M.D. Fla. 2017) ("The Eleventh Circuit is clear that 'the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.'") (citations omitted).

Microsoft's promotions unambiguously convey to companies that Safe Links provides effective protection against a very specific type of link — links that redirect spam filters to a good site and then redirect the user to a bad site when clicked after delivery.  This unambiguous promise of protection is literally false.  The undisputed evidence from Microsoft set forth above shows that Microsoft internally acknowledged, many times over a period of years, how "easy" and "trivial" it is for attackers to bypass Safe Links using the very attack that Safe Links is promoted as protecting against.  As late as 2020, using redirects to implement IP Evasion *explicitly* remained a "prominent gap." Even in 2021, Microsoft is still investing heavily to address this gap.  When an attacker *easily* harms customers using the very attack that the customer has been promised protection against, that promise of protection is literally false.

In addition to the evidence above, Microsoft's own engineers recognized that Safe Links' inability to block *redirects* to phishing sites meant that it was "not performing as advertised." Specifically, Manny Gonzalez stated: "ATP [Safe Links] is certainly not performing as advertised … ATP [Safe Links] is not blocking obvious phishing E-mails *redirecting* to obvious unofficial web URLs [i.e. redirecting to links to the fake phishing sites]." *Id.* at ¶ 54 (emphasis added).

Based solely on Microsoft's own records, the advertisements are literally false as a matter of law.  The Court should grant TocMail summary judgement on the first element.

### 2.    Microsoft's False Ads Deceived or Had the Capacity to Deceive Consumers.

"If the court deems an advertisement to be literally false, then the movant is not required to present evidence of consumer deception." *Osmose, LLC*, 612 F.3d at 1319 (*citing Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)). Here, because the subject ads are literally false, evidence of consumer deception is not required and this element is satisfied. Thus, the Court should grant TocMail Summary Judgment on this element.

### 3.    The Deception Had a Material Effect on Purchasing Decisions.

To establish materiality "a plaintiff need only show that a defendant's 'deception is likely to influence the [consumer's] purchasing decision.'" *ADT LLC v. Vision Security, LLC*, No. 13-81197-CV, 2014 WL 3764152 *4 (S.D. Fla. 2014) (quoting *Johnson & Johnson*, 299 F.3d at 1250) (emphasis added). To show this, "[a] plaintiff may establish th[e] materiality requirement by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.'" *Johnson & Johnson*, 299 F.3d at 1250; *see also N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (affirming finding that false statements "represent[ing] the quality of the device" satisfied the materiality element); *River Light V, L.P. v. Tanaka*, 17-22843-Civ, 2018 WL 5778234, *6 (S.D. Fla. Nov. 2, 2018) (granting summary judgment on plaintiff's false advertising claim and finding that "Tanaka's deception is material in that it concerns an inherent quality or characteristic of her offerings . . .").

Microsoft's false advertisements at issue are all regarding Safe Links, Microsoft's email *security* service for Office 365; and the false advertisements themselves all pertain directly to email *security*.  There simply cannot be a more inherent quality than the email security capability of an email security service. Given that the false ads unequivocally involve an inherent quality or

characteristic of Safe Links, the Court need to look no further to grant TocMail Summary Judgment on the element of materiality as a matter of law.

Even though materiality is clear here without more, the undisputed evidence itself explicitly acknowledges that security is an inherent quality of all Microsoft products, not just its cybersecurity products: "Microsoft enables customers to make this transition by *building security into the fabric* of our products and solutions."; "For Microsoft, security is addressed from the first line of code, and not a bolt on feature, but rather a value-added feature to our services."; Specifically regarding email itself: "one of the *core value propositions* of the new Exchange [email service] - Keeping your organization safe." *Facts*, ¶ 55 (emphasis added). The undisputed facts explicitly state that security is an inherent quality or characteristic.

Moreover, Microsoft's own documents further demonstrate that security is important to the purchase of all its products, not just its cybersecurity products: "The security of our products and services is important in our customers' decisions to purchase or use our products or services." In regards to "provid[ing] advanced protection against online threats" for email, "without this, all other features are useless" according to a Microsoft marketing study; a study in which stated "If you don't have security, shut down shop."*Facts*, ¶ 56.

Evasion itself affects companies' decisions to purchase ATP, as customers do inquire as to evasion, as shown in an email written by Amar Patel in April 2020: "They want to know what our approach to evasion is and how to tell that story to customers *when they ask*." *Id.* at ¶ 57. (emphasis added). Patel's Sonar team "laid out the anti-eavasion [sic] plan to [be] … communicate[d] back to customers." *Id.*  This evasion plan was presented to customers such as Cognizant and BP. *Id.* Cognizant has 289,500 employees.  *Id.*  BP has 63,600 employees. *Id.* Moreover, the Sonar team explicitly chose to "[d]iscuss how we approach evasion *to instill confidence*" with Bosch, who has

395,000 employees and has become a $300 million account for Microsoft. *Id.* at ¶ 58.   This included discussing "IP" evasion *Id.* Bosch explicitly asked Microsoft about Sonar's IP evasion capability. *Id.* VirtUSA engaged in an "email dialogue on Evasion" with Microsoft's Sonar team in which VirtUSA explicitly inquired as to ATP's "countermeasures for Evasion."   *Id.* at ¶ 59. Hence, Safe Links' purported ability to block IP evasion is indeed important to purchase decisions, as established by Microsoft's own record.

Based solely on indisputable facts in Microsoft's own record, TocMail moves the Court to grant it Summary Judgment on the element of materiality.

### 4.      The Misrepresented Service Affects Interstate Commerce.

This element should be uncontested.  Microsoft sells its products, including ATP and Safe Links, nation-wide and even world-wide.  Moreover, Microsoft sells ATP on the internet, and it is a cloud-based internet service.  *Facts*, ¶ 22. Thus, Safe Links affects interstate commerce. *See Gibson v. BTS N., Inc.*, 16-24548, 2018 WL 888872, *5 (S.D. Fla. Feb. 14, 2018) (finding that marketing services on the internet affects interstate commerce because "[t]he internet constitutes an instrumentality of interstate commerce").

### 5.      TocMail Is Likely Injured as a Result of the False Advertising.

The injury element is established when the Plaintiff "likely will be[] injured." *Hi-Tech Pharms., Inc. v. HBS Int'l. Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018). "This element of the Lanham Act only requires the Plaintiff to prove that she has been or is *likely* to be injured as a result of the false advertising  . . . ." *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1314 (S.D. Fla. 2019) (emphasis added); *see also U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, No. 19-62225-CIV, 2021 WL 810279, *3 (S.D. Fla. Mar. 3, 2021) ("'Any person who believes that he or she is *likely to be damaged* by' a false or misleading representation of fact . .

.") (citing 15 U.S.C. § 1125(a)) (emphasis added); *Church & Dwight Co. v. SPD Swiss Precision Diagnostics*, 843 F.3d 48, 72 (2d Cir. 2016) ("At the liability stage, the Lanham Act 'demands only proof providing a *reasonable basis* for the belief that the plaintiff *is likely to be damaged* as a result of the false advertising.'") (emphasis in original).

Moreover, injury, or likelihood of injury, is separate and distinct from the amount of damages a plaintiff may obtain and, in fact, a plaintiff is not even required to seek damages under the Lanham Act. *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019); 15 U.S.C. § 1117(a); *Pensacola Motor Sales v. Eastern Shore Toyota, LLC*, No. 3:09cv571, 2010 WL 3781552, *2 (N.D. Fla. Sep. 23, 2010) ("It is clear that actual confusion and damages are not required under § 1125(a). Capacity to deceive and *likelihood of injury* are sufficient.") (emphasis added); *U.S. Healthcare v. Blue Cross of Gr. Phil*, 898 F.2d 914, 922 (3d Cir. 1990) (The injury element "does not place upon the plaintiff a burden of proving detailed individualization of loss of sales. Such proof goes to quantum of damages and not to the very right to recover."); *De Simone v. VSL Pharm., Inc.*, 395 F. Supp. 3d 617, 628-29 (D. Md. 2019) ("As a threshold issue, this [injury] element does not require proof of actual damages such as lost sales to [Defendant].  . . . On its face, therefore, the statute permits false advertising actions based on the threat of injury alone. . . [T]he inquiry into violation and the inquiry into remedies ha[s] to be kept conceptually separate because the Lanham Act provides for multiple types of remedies.")[4]

---

[4] Under 15 U.S.C. § 1117, a plaintiff may seek disgorgement of the defendant's profits, which "'shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer.'" *Hard Candy*, 921 F.3d at 1353. "[T]he focus is entirely on the alleged infringer's gain; the plaintiff is not required to present any evidence of particular financial harm that it suffered so as to the justify legal redress." *Id.* at 1354.  A plaintiff can also seek injunctive relief.  *Lexmark*, 572 U.S. at 135-36.

Injury "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). The false advertising does not have to be "the only reason behind a consumer's actions for a plaintiff to prevail on a false advertising claim . . . Courts have found that causation just requires that the false advertising proximately cause the claimed injury—**it need not be the only cause or even the predominant cause of the injury**." *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1110 (M.D. Fla. 2019) (citations omitted) (emphasis added).

Injury is straightforward when the defendant falsely claims to offer a product that the plaintiff alone provides. *De Simone*, 395 F. Supp. 3d at 631 ("Under these circumstances, the path from the false advertising to the plaintiff's injury is shorter and more direct. In such an instance, where 'the plaintiff has a monopoly of the kind of wares concerned, and if to secure a customer the defendant must represent his own as of that kind, it is a fair inference that the customer wants those and those only. Had he not supposed that the defendant could supply him, presumably he would have gone to the plaintiff who alone could.'") (citation omitted); *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375 (7th Cir. 2018) ("A more extended treatment of the causation question was largely unnecessary given how easy it is to trace Elanco's harm. Elanco sells the only FDA-approved rbST supplement in the United States, so any false or misleading advertising regarding rbST . . . will *necessarily* harm Elanco.").

On those same lines, injury is fully established in a two-player market when the other player uses false advertising to gain a competitive advantage. *Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 260-61 (2d Cir. 2014) ("this was a market with only two direct competitors . . . Because its only competitor for such a pure product at the time was [plaintiff], **it follows that [plaintiff] was damaged by [defendant's] false advertising** . . . [and] in the context of a two-player market,

. . . the district court's utilization of a presumption of injury carries no risk of speculative injury to [plaintiff]."); *Insurent Agency Corp. v. Hanover Ins.* Co., No. 16 Civ. 3076, 2018 WL 3979589, *6 (S.D.N.Y. Aug. 20, 2018) ("[B]ecause [plaintiff] and [defendant] are the only two providers of lease guaranties in New York City, one can infer that [defendant's] 'sales . . . came at the expense' of [plaintiff].").

Finally, when a defendant enters the market first, and pervasively engages in false advertising, the plaintiff is injured by effectively being shut out of that market. *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949, 954 (D.C. Cir. 1993) (finding an award appropriate for delay in receipt of income from a delayed national rollout that was "stymied by [defendant's] false advertisements" and stating that "ALPO was not certain to succeed, of course, but the question is who is to bear the now-hypothetical risk that it would fail? . . . 'When assessing actual damages, the court may take into account the difficulty of proving an exact amount of damages from false advertising, as well as the maxim that '**the wrongdoer shall bear the risk of uncertainty which his own wrong has created**.'"") (emphasis added).

Here, TocMail and Microsoft are the only cybersecurity vendors that promote their cloud-based, time-of-click services as effective protection against IP evasion.  To be granted Summary Judgment on injury, it only needs to be *likely* that Microsoft's false advertisements influenced *one* company to decide to withhold trade from TocMail, or that it is likely that Microsoft's false advertisements *will* influence one company to withhold trade from TocMail. The sum of consumers that withhold trade has no bearing on the injury element; nor does it have any bearing on the other remedies that TocMail may be entitled to.  Given the false advertising campaign sustained over six consecutive years from one of the largest and most-trusted tech companies, it is inconceivable that not a single consumer believed Microsoft over a startup, causing them to

withhold trade from TocMail, Microsoft's only competitor for cloud-based protection against IP evasion.  Furthermore, because TocMail competes with Microsoft regarding the "most common tactic that attackers use with links" in a two-player niche market, injury from the pervasive and prolonged false advertising is not only likely — it is inevitable.  That in and of itself establishes a likelihood of injury, and TocMail should be granted Summary Judgment on the element of likely injury accordingly.

Moreover, Microsoft's records demonstrate injury as well.  For example, when Bosch, a $300 million account, was considering cutting over to ATP in May 2020, Bosch asked Microsoft specifically about IP evasion and inquired whether it would need to add a third-party solution on top of ATP for this.  *Id.* at ¶ 58.  Bosch *explicitly* inquired "Why is an IP-address range used which is easily attributable to Microsoft?"  *Id.*  According to Microsoft's "talking points" for its meeting with Bosch to discuss Bosch's concerns, Microsoft promoted IP Anonymization as an effective solution and told Bosch in response to whether a third party solution on top of ATP was necessary that "they should be covered for email-based threats."  *Id.*  Had Microsoft told Bosch the truth about its inability to protect against IP evasion, Bosch would have had only one company to look to for the cloud-based, time-of-click implementation that it was seeking to use – TocMail. For every company that Microsoft outright deceives in the same manner as Bosch, TocMail is injured. This includes Cognizant and BP (with a combined 353,100 employees) with whom Microsoft also shared its "anti-evasion" story.

Microsoft's false advertising of ATP is the reason that Microsoft is a Security Brand today. "Office 365 ATP has helped change[] industry perception and put Microsoft on the map as a Security Brand." *Id.* at ¶ 60.  More specifically, the perception that Microsoft thwarts the evasive redirects used by phishing sites is the foundation for Microsoft's entire cybersecurity business.

Specifically, Microsoft expressly stated internally on June 30, 2020 that: "The most important component to our strategy is Office ATP. Enterprise customers are disproportionately attacked through email and 80% of security sales result from phishing breaches.  This makes OATP the primary onramp for the $7B Microsoft security business." *Id.*

Above all else, companies choose their cybersecurity vendor based on who they perceive as capable of protecting against the redirects commonly used in phishing attacks. The fact that Microsoft has used false advertising to establish itself as a trusted Security Brand before TocMail even entered the market made injury to TocMail not just likely, which is sufficient in and of itself, but inevitable.

Granting TocMail Summary Judgment on the element of injury is clear as a matter of law.

## IV.    CONCLUSION

WHEREFORE, Plaintiff, TOCMAIL INC., hereby moves for Summary Judgment against Defendant, MICROSOFT CORPORATION, as to liability on TocMail's false advertising claim. However should the Court deem otherwise, TocMail moves for Summary Judgment on each of the individual elements, as well as for such other and further relief the Court deems just and proper.

Dated:  July 9, 2021                                    Respectfully submitted,

By:   /s/Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
Email: josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd.
Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorneys for Plaintiff, TocMail Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 9th day of July 2021, I electronically served the fore-

going document on all counsel of record on the attached service list via electronic mail.

By:   /s/ Joshua D. Martin
Joshua D. Martin

## <u>SERVICE LIST</u>

### *TOCMAIL INC. v. MICROSOFT CORPORATION*
### 20-60416-CIV- CANNON/HUNT

**Joshua D. Martin**
E-Mail: josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd.
Suite 430
Fort Lauderdale, Florida 33309
Telephone: (954) 790-6699
Facsimile: (954) 206-0017

**Francisco O. Sanchez**
E-Mail: sanchezo@gtlaw.com
           orizondol@gtlaw.com
**Evelyn A. Cobos**
E-Mail: cobose@gtlaw.com
           MiaLitDock@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

**Mary-Olga Lovett** *(admitted pro hac vice)*
E-Mail: lovettm@gtlaw.com
**Rene Trevino** *(admitted pro hac vice)*
E-Mail: trevinor@gtlaw.com
GREENBERG TRAURIG LLC
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile: (713) 374-3505