UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 0:20-cv-60416-CANNON/HUNT

TOCMAIL INC., a Florida corporation,

      Plaintiff,

v.

MICROSOFT CORPORATION, a Washington
corporation,

      Defendant.

**DEFENDANT MICROSOFT CORPORATION'S MOTION FOR SUMMARY
<u>JUDGMENT AND INCORPORATED MEMORANDUM OF LAW</u>**

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................ 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ................................... 2

    A.   Microsoft and its Cybersecurity Feature, Safe Links .............................. 2

    B.   TocMail and its Product ...................................................................... 4

    C.   The Alleged False Advertising and Consumer Purchasing Decisions ...... 6

    D.   TocMail "Tests" its Theory ................................................................. 7

    E.   TocMail's Alleged Damages ................................................................ 8

III. STANDARD OF LAW ............................................................................... 9

IV.  ARGUMENT ............................................................................................ 9

    A.   TocMail Cannot Meet Its Burden of Proving Each Element of a False
       Advertising Lanham Act Claim. ........................................................... 9

        1.   Microsoft's Advertisements Are Not Literally False ..................... 10

        2.   Microsoft's Advertisements Are Not Misleading ......................... 12

            a.   Microsoft's advertising is true and not misleading in
               context. ......................................................................... 13

            b.   Microsoft's advertising is not misleading given its intended
               audience. ....................................................................... 18

        3.   TocMail Cannot Prove Microsoft's Advertising Deceived, or Had
           the Capacity to Deceive, Consumers. ......................................... 19

        4.   TocMail Cannot Prove Microsoft's Advertising Had a Material
           Effect on Consumers' Purchasing Decisions. ............................... 21

        5.   TocMail Cannot Prove It Has Been Or is Likely to Be Injured by
           Microsoft's Advertising. ............................................................ 24

    B.   TocMail's Speculative and Flawed Damages Methodology Cannot
       Support an Award of Damages to TocMail. .......................................... 26

        1.   TocMail is Not Entitled to a Disgorgement of Microsoft's Profits. ......... 26

        2.   TocMail is Not Entitled to Actual Damages ................................. 28

        3.   TocMail is Not Entitled to Injunctive Relief. ............................... 30

V.   CONCLUSION ......................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*,
  No. 08 CIV.11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009)............................16

*BASF Corp. v. Nu-Vision, LLC*,
  No. 6:09-CV-894-MSS-DAB, 2010 WL 11626579 (M.D. Fla. Sept. 27, 2010)..............28, 30

*Belcher Pharm., LLC v. Hospira, Inc.*,
  419 F. Supp. 3d 1292 (M.D. Fla. 2020)....................................................................13, 19, 21

*Burger King Corp. v. Pilgrim's Pride Corp.*,
  934 F. Supp. 425 (S.D. Fla. 1996) ........................................................................................28

*Club Exploria, LLC v. Austin*,
  No. 618CV576ORL28DCI, 2020 WL 6585802 (M.D. Fla. Nov. 10, 2020)..........................23

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*,
  911 F.2d 242 (9th Cir. 1990) .........................................................................................16, 18

*Fitzpatrick v. City of Atlanta*,
  2 F.3d 1112 (11th Cir. 1993) .................................................................................................9

*Gibson v. Resort at Paradise Lakes, LLC*,
  No. 8:16-CV-791-T-36AAS, 2018 WL 10373435 (M.D. Fla. Feb. 2, 2018)..............20, 21, 23

*Hickson Corp. v. N. Crossarm Co.*,
  357 F.3d 1256 (11th Cir. 2004) ...........................................................................................19

*J-B Weld Co., LLC v. Gorilla Glue Co.*,
  978 F.3d 778 (11th Cir. 2020) ........................................................................................21, 22

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
  299 F.3d 1242 (11th Cir. 2002) ..........................................................................11, 13, 21, 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)......................................................................................................24, 26

*Marlite, Inc. v. Eckenrod*,
  No. 10-23641-Civ, 2012 U.S. Dist. LEXIS 195195 (S.D. Fla. Jan. 31, 2012) ......................30

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
  745 F. Supp. 2d 1359 (S.D. Fla. 2010), *aff'd*, 702 F.3d 1312 (11th Cir. 2012).......9, 13, 20, 21

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
  105 F.3d 841 (2d Cir. 1997).................................................................................................21

*Natural Answers, Inc. v. SmithKline Beecham Corp.*,
  529 F.3d 1325 (11th Cir. 2008) ...........................................................................................24

*Oestreicher v. Alienware Corp.*,
  544 F. Supp. 2d 964 (N.D. Cal. 2008), *aff'd*, 322 F. App'x 489 (9th Cir. 2009) ..................16

*In re Optical Techs., Inc.*,
    246 F.3d 1332 (11th Cir. 2001) ...........................................................................9

*Optimum Technologies, Inc. v. Home Depot U.S.A., Inc.*,
    217 Fed. Appx. 899 (11th Cir. 2007)..................................................................27

*Patt v. Antech Diagnostics, Inc.*,
    No. 818CV01689JLSDFM, 2019 WL 6654078 (C.D. Cal. July 30, 2019)..........16

*Pediatric Nephrology Assocs. of S. Fla. v. Variety Children's Hosp.*,
    No. 1:16-CV-24138-UU, 2017 WL 5707516 (S.D. Fla. Nov. 13, 2017) ...........19, 21, 23

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ...............................................................................16

*Resol. Tr. Corp. v. Stroock & Stroock & Lavan*,
    853 F. Supp. 1422 (S.D. Fla. 1994) ....................................................................25

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. 1999)...............................................................................10

*St. Charles Mfg. Co. v. Mercer*,
    737 F.2d 891 (11th Cir. 1983) ........................................................................26, 27

*Stiefel Lab., Inc. v. Brookstone Pharm., L.L.C.*,
    535 F. App'x 774 (11th Cir. 2013)...................................................................12, 22

*Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*,
    254 F. Supp. 2d 1239 (M.D. Fla. 2003)...............................................................25

*Suntree Techs., Inc. v. EcoSense Int'l, Inc.*,
    802 F. Supp. 2d 1273, 1287–88 (M.D. Fla. 2011), *aff'd*, 693 F.3d 1338 (11th
    Cir. 2012). ......................................................................................................19, 20

*Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*,
    915 F. Supp. 360 (S.D. Fla. 1996), *aff'd sub nom.* 136 F.3d 139 (11th Cir.
    1998) ......................................................................................................................19

*United Indus. Corp. v. Clorox Co.*,
    140 F.3d 1175 (8th Cir. 1998) .........................................................................16, 19

*Vector Prod., Inc. v. Hartford Fire Ins. Co.*,
    397 F.3d 1316 (11th Cir. 2005) ...........................................................................27

*Williams v. Aztar Indiana Gaming Corp.*,
    351 F. 3d 294 (7th Cir. 2003) ..............................................................................16

## Statutes

15 U.S.C. § 1117(a) ........................................................................................................27

## Other Authorities

Fed. R. Civ. P. 56............................................................................................................8

## I.      INTRODUCTION

TocMail's claim for false advertising under the Lanham Act fails as a matter of law because TocMail lacks the evidence necessary to meet its burden of proof. TocMail is a newly-formed company that admittedly has no sales, revenue, or paying customers, has no reputation in the marketplace, and has undertaken minimal efforts to advertise its product, a purported single-purpose cybersecurity plug-in that only provides protection against one type of cyberattack accomplished through "IP Cloaking."[1] Despite this, TocMail blames its lack of business viability on Microsoft's alleged false advertising of Safe Links, just one of many features in Microsoft's robust cybersecurity suite, which became available in 2015. TocMail claims that, because it allegedly holds a patent for the technology behind its product, Safe Links is necessarily defenseless against IP Cloaking, and Microsoft's advertising about Safe Links' general effectiveness in protecting users from malicious links – even advertising that pre-dates TocMail's existence – is necessarily false. Further, TocMail assumes that the reason consumers do not purchase its product and instead purchase Microsoft products that include the Safe Links feature is that the alleged false advertisements lead consumers to believe they are already specifically receiving the IP Cloaking prevention service TocMail purports to offer. Yet, the advertisements at issue do not mention TocMail or IP Cloaking, and TocMail has not asked a single customer whether he or she read the at-issue advertisements and whether they influenced his or her purchase decision.

Nevertheless, TocMail implausibly contends that *all of Microsoft's 100 million ATP subscribers would have been TocMail's customers but for Microsoft's alleged false advertising.*

---

[1] According to TocMail, "IP Cloaking" is a hacking technique that occurs when a malicious website redirects IP addresses it detects to be a security scanner to a benign site, and redirects user IP addresses it does not detect to be a security scanner to a malicious site, where the user's device can be hacked. *See* ECF No. 46 ("Am. Compl.") ¶ 20. Microsoft refers to this type of cyberattack that uses malicious links more generally as network evasion.

Am. Compl. ¶ 95. And based on TocMail's assumption that it is destined to be the only provider of IP Cloaking protection until its patent expires in 2035, TocMail claims over $15 Billion in future lost profits through 2035 and disgorgement of Microsoft's profits for its sale of all products that include the Safe Links feature.

As explained in detail below, TocMail cannot prove the elements of its claim. The advertisements at issue are true and not misleading, and, critically, TocMail failed to procure necessary survey expert testimony to prove the materiality of the advertisements in consumers' decisions to purchase Microsoft products and not TocMail's product. TocMail will also be unable to prove any damages as there is no causal link connecting Microsoft's alleged conduct to TocMail's speculative damages drummed up by TocMail's damages expert's flawed and unreliable methodology. Accordingly, judgment should be entered in favor of Microsoft as a matter of law.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Microsoft and its Cybersecurity Feature, Safe Links

TocMail alleges Microsoft has engaged in the false advertising of Safe Links, a cybersecurity feature integrated within a larger cloud-based security suite originally named "Advanced Threat Protection" ("ATP") but recently renamed "Microsoft Defender for Office 365" ("Defender,") (referred to herein as either "ATP" or "Defender," interchangeably). *See* ECF No. 95, Parties' Joint Statement of Undisputed Facts ("JSUF") ¶ 1. The Safe Links feature was developed in 2015 and protects users from malicious URLs in emails and their attachments, at the time of delivery (*i.e.*, when an email containing a URL is delivered to a user inbox) and at the time-of-click (*i.e.*, when a URL is clicked by a user). *Id.* ¶ 2; ECF No. __, Microsoft's L.R. 56.1(a) Statement of Material Facts ("SMF") ¶ 1. Safe Links provides protection, in part, by identifying and blocking known malicious links at the time of click – every time the link is clicked – by

2

checking the URL against Microsoft's most current data on URL reputation, and warning users of malicious links it detects (detonation). SMF ¶¶ 1-2. In this way, Safe Links protects users from malicious links that were unknown at the time of delivery but were discovered to be malicious post-delivery. *Id*. ¶ 3. Microsoft invests its resources into thwarting and prioritizing what its algorithms deem to be the most critical and common forms of cyberattacks affecting its customers, and IP Cloaking is not such a threat to Microsoft users. *Id*. ¶ 4. Despite this, Microsoft has the ability to use IP anonymization to "mask" its known IP addresses with unknown, unpublished ones of a third-party, so hackers will not see Microsoft IP addresses, and route detonation traffic out of non-Microsoft IP ranges, helping avoid cyberattacks through evasion of known Microsoft IP addresses (what TocMail refers to as IP Cloaking). *Id*. ¶ 5.

Microsoft does not guarantee that Safe Links can block every single type of cyberattack every single time, as hackers are constantly evolving their techniques in the ever-changing threat landscape. SMF ¶ 12. Importantly, Microsoft does not advertise that Safe Links is 100% effective or that it protects users 100% of the time from cyberattacks, as neither Microsoft nor any other company can make that claim (despite TocMail's presumptuous and untested guarantee that it prevents IP Cloaking 100% of the time). *Id*. ¶ 13. Microsoft's ATP FAQs document dispels any notion to the contrary with the following Q&A: "Will ATP catch 100% of malicious attacks? No. In fact, no advanced threat protection product can catch 100% of malicious attacks." *Id*. ¶¶ 13, 21. Likewise, its product brochure anticipates that its consumers will experience malicious content getting through to their system, stating: "Even if the message passes through detonations, the content is analyzed further … and we take actions based on what you have configured as policy." *Id*. ¶ 13. This is also made know to customer-facing Microsoft professionals. *Id*. ¶ 22. Regardless, Safe Links is effective at protecting users from malicious links. *Id*. ¶ 6.

Safe Links is a feature that cannot be purchased on its own; consumers can only get access to Safe Links when they purchase Defender, either as a separate add-on to Office 365 products, or by purchasing an Office 365 suite that includes Defender. JSUF ¶ 3, SMF ¶ 7. Defender is a robust cloud-based email filtering service with various different features, one of which is Safe Links, that together help protect against malware, viruses, and harmful links in real-time, and offers rich reporting and URL trace capabilities. SMF ¶ 8. It provides anti-phishing, anti-spam, and anti-malware, among other things. *Id.* ¶ 9. Similarly, Office 365 includes a variety of services including, Skype, Yammer, SharePoint, Microsoft Teams, and other applications such as Word, PowerPoint, and Excel, for example. *Id.* ¶ 10. Protecting users from malicious links is just one of Defender's intended and advertised purposes. *See* Am. Compl. Ex. 2-4, 6. Further, many consumers purchase Defender and Office 365 suites with Defender for reasons that have nothing to do with protection from malicious links: for example, on March 15, 2021, only 2.7% of commercial tenants (*i.e.* companies) worldwide even had the Safe Links feature within Defender or Office 365 with Defender turned on. SMF ¶ 11.

## B.    TocMail and its Product

TocMail's product, a plugin for the RoundCube email reader, was made available on December 12, 2019. JSUF ¶ 4; SMF ¶ 25. Shortly thereafter, TocMail's CEO, Michael Wood ("Wood"), was allegedly issued a patent to the technology purportedly behind TocMail's product on February 25, 2020, which he purportedly assigned to TocMail. Am. Compl. ¶ 98. TocMail claims its product prevents one specific type of cyberattack that it refers to as "IP Cloaking." SMF ¶ 26. TocMail claims its product has the "first" and "only" technology that can enable a cloud-based security scanner to *always* thwart malicious links because, unlike other services that attempt to detect malicious links, it does not attempt to determine if a URL is cloaked. *Id*. ¶¶ 27-28.

Two months after it its product was available and the day after its CEO allegedly obtained the patent, on February 26, 2020, TocMail filed this lawsuit making the mind-boggling claim that it would have sold its product to all Microsoft Defender customers but for Microsoft falsely advertising Safe Links as the "solution to IP Cloaking," allegedly causing economic and reputational harm to TocMail in the tens of billions of dollars.[2] Am. Compl. ¶ 95; SMF ¶ 34. Yet, TocMail admits that despite having over 33,000 visitors to its website, it has not made a single sale and it has no revenue. SMF ¶ 30.  TocMail also admits its advertising efforts consisted only of entering into one agreement with Google AdWords for which it spent less than $4,500 in its first 8 months of advertising, and then suspending the service (thus having no advertising whatsoever) between July 2020 and December 17, 2020. *Id.* ¶ 31. Beyond a press release and few emails to potential investors, TocMail has not engaged in other marketing. *Id.* ¶ 32. TocMail further admits it has no documents that reflect its and/or its product's reputation in the marketplace. *Id.* ¶ 33.

---

[2] Nearly two months after the close of expert discovery, TocMail's damages expert, Marcie Bour ("Bour"), issued a supplemental expert report which revised TocMail's lost profits damages theory from the assumption that it would have captured all of Microsoft's 100 million consumers to the assumption that TocMail would have "a market share *equivalent to* Microsoft's" by April 2020. *See* ECF 77 at 10 (citing ECF 77-1 ¶ 52).  As a result of her new lost profits theory, Bour reduced TocMail's lost profits damages from approximately $15.3 Billion to $9.5 Billion. SMF ¶ 51.  In addition to a revised lost profits theory and calculation, Bour's supplemental report provided a new methodology to derive a third disgorgement of profits calculation and included a new "sensitivity analysis." ECF 77 at 3 (citing ECF 77-1 ¶ 9). For the reasons set forth in Microsoft's motion to strike and reply in support (ECF Nos. 77, 86), Bour's supplemental report should be stricken as untimely and improper under Rules 16(f)(1)(C) and 37(c)(1)(C) of the Federal Rules of Civil Procedure, and TocMail's new damages theories and calculations should be disregarded by the Court. Accordingly, the supplemental report is not considered in this motion, but should the Court deny Microsoft's motion to strike and allow the supplemental report, Microsoft reserves its right to address it and respectfully requests that the Court grant it leave to file an amended motion for summary judgment in light of the new evidence.

### C.      The Alleged False Advertising and Consumer Purchasing Decisions

Safe Links advertising is truthful. SMF ¶ 24.  Despite this, three advertising messages about Safe Links form the basis for TocMail's Lanham Act Claim: (1) "Safe Links Protects Users Right at the Point of Click," (2) "Attackers Redirect to Unsafe Sites via a Forwarding Service After the Message Has Been Received; But with Safe Links, Malicious Links are Dynamically Blocked while Good Links Remain Accessible," and (3) "ATP Safe Links ensures hyperlinks are harmless." Am. Compl. ¶¶ 58, 63, 72. The context in which each message appears is discussed in detail *infra* at 13-17, and attached to the Amended Complaint. Am. Compl. Ex. 2-10. None of the messages promote Safe Links as the "solution to IP Cloaking," or even mention "IP Cloaking." *Id*. ¶¶ 58, 63, 72, Ex. 2-10. Each statement at issue was targeted to highly knowledgeable Information Technology ("IT") professionals in the cybersecurity industry. This is undisputed by Plaintiff. *See id*. ¶ 71; SMF ¶ 16. These professionals usually test Safe Links before purchasing it as well. SMF ¶ 23. The messages at issue are also not easily accessible. For example, in order to view these messages, consumers must search for specific content, click on multiple webpages, download various brochures, and read through thousands of words and multiple pages to get to the at-issue messages, making it unlikely that any, much less all, Microsoft consumers ever viewed them. *Id.* ¶ 14. Further, the majority of these messages were created and disseminated between 2015 and 2019, before TocMail even existed. *Id.* ¶ 15.

TocMail claims consumers do not purchase its product because they believe they are already receiving the service TocMail provides. SMF ¶ 36. Yet, it admits that it never conducted a survey to determine why consumers elected not to purchase the TocMail service. *Id.* ¶ 37. TocMail never reached out to consumers individually to determine why they did not purchase its service, and indeed TocMail admits that it does not know why any individual consumer made any particular purchasing decision. *Id.* ¶ 38. It has not heard from a single business consumer. *Id.* ¶ 39.

### D.    TocMail "Tests" its Theory

TocMail claims Microsoft is vulnerable to IP Cloaking primarily because it believes "Safe Links runs on EOP servers." Am. Compl. ¶ 61; SMF ¶ 42. TocMail alleges that because Microsoft IP addresses are publicly known (and easily deployed via a free software called MKHTAccess_Red), hackers can use these IP addresses for IP Cloaking. SMF ¶ 43. However, Safe Links' URL detonation occurs on separate servers than its Exchange Online Protection ("EOP")[3] servers. *Id.* ¶ 6. And, while Microsoft makes some of its IP ranges publicly known, Microsoft can route its detonation traffic out of non-Microsoft attributable IP ranges, to help prevent cyberattacks through IP Cloaking. *Id.* ¶ 45.

TocMail relies upon a video that merely shows words and icons and purports to demonstrate a hacker using a cell phone to click on a URL "in Safe Links" and the phone being sent to the original URL, which is allegedly a malware download page. SMF ¶ 46. It is unclear how the "test" was performed, and the video demonstration does not show anything other than a "Bank" and red bug icons, with arrows directing to the words "Safe Links" and "TocMail," while a voiceover narrates. *Id.* ¶ 47. From this, TocMail concludes that "Safe Links' users will never be safe from links that alter their destination after delivery for as long as Safe Links continues to send users to the original URL." *Id.* ¶ 48. However, the phone in the video did not click a URL that contained malware; TocMail admitted the video "is illustrative…here's what would happen in the real world, but we're not going to intentionally infect Mikail Tunc's phone with malware." *Id.* ¶ 49. Thus, because Safe Links did not identify a malicious link, it allowed the user to access the benign link. *Id.* ¶ 50.

---

[3] EOP is the default cloud-based security service for Office 365. SMF ¶ 42, n.3. When consumers purchase Defender, this add-on service provides additional security features and layers of protection for Office 365. *Id.*

E.        **TocMail's Alleged Damages**

TocMail claims that because it is the sole provider of a cloud based redirect service supposedly capable of consistently thwarting IP Cloaking, **all** 100 million of Microsoft's Defender subscribers would have instead subscribed to TocMail but for Microsoft's purported false advertising by April 2020, within 6 months of TocMail making a single press release in November 2019. Am. Compl. ¶ 95; SMF ¶ 35. Despite the facts that (i) the two services are not comparable, (ii) TocMail did little to market its newly-created product, and (iii) other third-parties offer similar services, TocMail's expert estimated that TocMail's future lost profits through the year 2035 (through which time TocMail allegedly holds its patent and expects to retain all customers) are approximately $15.3 Billion, but later reduced this figure to $9.5 Billion at her deposition. Am. Compl. ¶ 102; SMF ¶¶ 29, 32, 35, 51, 54; *see supra*, n.3. TocMail's lost profits calculation was also based on the speculation that TocMail would become a billion-dollar company, despite the fact it has not made a single sale and no valuation has been done. SMF ¶ 59. Further highlighting the lack of foundation on which the lost profits stand, TocMail's CEO stated he would accept "three years' worth of lost profits" if corrective advertising occurred. *Id.* ¶ 32.

TocMail also seeks treble disgorgement of Microsoft's profits because it alleges Microsoft has knowingly, willfully, and intentionally deceived companies over a sustained period of almost ten years. Am. Compl. ¶ 104. TocMail, however, has not conducted a survey or poll, or gathered any other evidence of consumer deception, let alone willful deception. SMF ¶ 40. To the contrary, the evidence shows that Microsoft's advertising is truthful. *Id.* ¶¶ 24, 40. Nor has TocMail retained an expert to conduct a causation analysis. *Id.* ¶ 41.  The disgorgement amount is based on Bour's estimates of Microsoft's U.S. and global revenues for ATP/Defender and Office 365 with ATP/Defender between July 2015 and June 2020, which are $7.3 Billion and $14.2 Billion, respectively. *Id.* ¶ 64.  However, Bour did not determine the revenue derived specifically from

Safe Links, nor was the Safe Links revenue tied to each of alleged false statements at issue. *Id.* ¶ 66. As an afterthought to the billions in damages it seeks, TocMail also requests injunctive relief, attorneys' fees and costs. Am. Compl. at pp. 29-30.

## III.    STANDARD OF LAW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re Optical Techs., Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2001) (citation omitted). Where, as here, the non-movant bears the burden of proof at trial, the moving party "simply may show – that is, point out to the district court – that there is an absence of evidence to support the non-moving party's case" or, "[a]lternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (quotation omitted).

## IV.    ARGUMENT

### A.    TocMail Cannot Meet Its Burden of Proving Each Element of a False Advertising Lanham Act Claim.

"A plaintiff bringing a false advertising claim under § 43(a)(1)(B) of the Lanham Act must show (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been-or is likely to be-injured as a result of the false advertising." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 745 F. Supp. 2d 1359, 1376 (S.D. Fla. 2010), *aff'd*, 702 F.3d 1312 (11th Cir. 2012)Because TocMail cannot prove the essential elements of its

claim, summary judgment should be entered for Microsoft as a matter of law.

**1.    Microsoft's Advertisements Are Not Literally False.**

TocMail alleges that all three statements in Safe Links advertisements are literally false. Am. Compl. ¶¶ 60, 65, 73. A Lanham Act claim based on literal falsity must identify an unambiguous statement that is false on its face. A "plaintiff[] alleging a literal falsehood [is] claiming that a statement, on its face, conflicts with reality, [which] is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999). TocMail's theory of literal falsity fails because Safe Links advertisements are not literally false (rather they are true) and Safe Links works as advertised. SMF ¶ 24.

The three advertising messages forming the basis of TocMail's Lanham Act Claim are: (1) "Safe Links Protects Users Right at the Point of Click," (2) "Attackers Redirect to Unsafe Sites via a Forwarding Service After the Message Has Been Received; But with Safe Links, Malicious Links are Dynamically Blocked while Good Links Remain Accessible," and (3) "ATP Safe Links ensures hyperlinks are harmless." Am. Compl. ¶¶ 58, 63, 72.

TocMail claims Microsoft falsely advertises Safe Links as the "solution to IP Cloaking," while TocMail's product is allegedly the only solution—the "first" and "only" technology—that can prevent attacks through IP Cloaking. Am. Compl. ¶¶ 42, 90, 92. The crux of its argument is that Safe Links is purportedly vulnerable to IP Cloaking. Am. Compl. ¶¶ 55, 73. TocMail claims Safe Links fails to protect users from IP Cloaking because "Safe Links has the exact same IP addresses as EOP, [so] Safe Links runs on 'EOP servers,' the same servers as Office 365." SMF ¶ 42. TocMail further claims Safe Links' and EOP's IP addresses are publicly known (and easily deployed via a free software called MKHTAccess_Red), so hackers can use these IP addresses for IP Cloaking. *Id.* ¶ 43. These assumptions are wrong.

First, none of the three ads at issue mention the words "TocMail," "IP Cloaking," or even the word "cloaking." *See* Am. Compl. ¶¶ 58, 63, 72. Thus, the ads cannot be unambiguously false on their face, as they do not provide any message about IP Cloaking whatsoever. On this basis alone, TocMail's literal falsity theory fails and its Lanham Act claim should be dismissed. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1249 (11th Cir. 2002) (vacating district court's finding of literal falsity of a contact lens company's marketing letter that was initially found to misrepresent the company's superiority by failing to make clear the referenced study was comparing lens wear-time and not lens quality because the letter "*explicitly states* …[the] study compared a one-day lens to a two-week lens").

Further, Safe Links' URL detonation occurs on "**separate servers** [from EOP servers] that are deployed in a completely separate way." SMF ¶ 44. And, since the second half of 2018, Microsoft has worked with a third-party company to obtain the ability to "mask" Microsoft's known IP addresses with the third-party's unknown IP addresses. *Id.* ¶ 54. In other words, Microsoft can "route [its] detonation traffic out [of] non-Microsoft attributable IP ranges," *Id.* ¶ 45, and hackers will see the third-party's IP addresses, **not** Microsoft's, preventing cyberattacks through IP Cloaking. *Id.*

Moreover, TocMail purportedly tested its theory and failed to prove it. It's CEO provided an expert report that relied on a video, where a known hacker named Mikail Tunc recorded himself purportedly using his cellular phone to click on a URL "in Safe Links" (as the narration calls it – not in Outlook). SMF ¶ 46.  The video purportedly shows Tunc's phone being sent to the original URL, which is allegedly a malware download page. *Id.* It is unclear how the "test" was performed, and the video demonstration does not show anything other than a "bank" and red bug icons, with arrows directing to the words "Safe Links" and "TocMail," while an automated voice narrates. *Id.*

11

¶ 47. Wood relies on Tunc's video to conclude that "Safe Links' users will never be safe from links that alter their destination after delivery for as long as Safe Links continues to send users to the original URL." *Id.* at ¶ 48.

But the video is nothing more than an illustration and does not demonstrate the three advertising statements are literally false.  Wood admits "that part is illustrative … here's what would happen in the real world, but we're not going to intentionally infect Mikail Tunc's phone with malware." *Id.* ¶ 49.   Thus, not only is this demonstration not a realistic simulation, but it shows that **Safe Links worked as advertised**. Wood admits that no malware ever reached Tunc's phone in the video. *Id.*, Ex. 14 at 103:11-15 ("Q. So – so in the video, and in the example, just so we're clear and the jury's clear, Safe Links didn't allow any malicious content to reach the user, right? A. That is correct."); 56:7-13 ("Q. So in this demonstration with Mr. Tunc what you're doing is having Safe Links redirect to a non-malicious site; true? A. Yes, Safe Links was redirected to a non-malicious site."). Therefore, because Safe Links works to identify and block *actual* malicious links, it would not have identified the benign "test" link as malicious and blocked it, and would instead allow the user to go to the benign link, as occurred here. *Id.* ¶ 50.   Thus, Safe Links works as advertised and its advertisements are truthful. *Id.* ¶ 24.

TocMail cannot show a reality contrary to the messages at issue. Where, like here, "there is no evidence from which a reasonable jury could conclude that [the defendant's] marketing statements … were literally false, there is an absence of evidence to support [the plaintiff's] case, and summary judgment is appropriate." *Stiefel Lab., Inc. v. Brookstone Pharm., L.L.C.*, 535 F. App'x 774, 778 (11th Cir. 2013) (quotation omitted).

### 2.    Microsoft's Advertisements Are Not Misleading.

As a fallback to its literal falsity theory, TocMail alleges in the Amended Complaint that all three of the purported deceptive messages are, "at a very minimum," "misleading, confusing,

and/or deceptive." Am. Compl. ¶¶ 60, 65, 73.   To succeed under this theory, TocMail must establish that the three advertising statements were "literally true but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Belcher Pharm., LLC v. Hospira, Inc.*, 419 F. Supp. 3d 1292, 1296 (M.D. Fla. 2020) (quotation omitted). However, when viewed in context and considering the advertisements' intended audience, it is clear the three statements at issue are not misleading.

> a.      **Microsoft's advertising is true and not misleading in context.**

Upon a motion for summary judgment, the "court must analyze the message conveyed in full context and 'must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.'" *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 745 F. Supp. 2d 1359, 1377 (S.D. Fla. 2010), *aff'd*, 702 F.3d 1312 (11th Cir. 2012) (quoting *Johnson & Johnson Vision Care*, 299 F.3d at 1248). Indeed, the court should read "the entire advertisement." *Id.* (noting "[t]he reference…must be viewed in the context of the entire advertisement," finding the ad was not literally false and granting summary judgment).

**Message #1: Safe Links Protects Users Right at the Point of Click.**

Message #1, from the Office Essentials: Advanced Threat Protection brochure, is literally true and properly qualified in context. It states, in full:

> Sophisticated attackers will plan to ensure links pass through the first round of security filters. They do this by making the links benign, only to weaponize them after the message is delivered, altering the destination of the links to a malicious site. With Safe Links, we are able to protect users right at the point of click by checking the link for reputation and triggering detonation if necessary.

Am. Compl. Ex. 2. at 7.

The same advertisement explains that protection at point of click depends upon the knowledge of Microsoft's reputation filter at the time of click *and* the Safe Links policies the customer has in place. First, Microsoft discusses its reputation check, stating: "Before an email is

delivered to an inbox, around 25% of all malicious messages received are blocked immediately at the edge. We look at the reputation of IP addresses by referencing our constantly updated block list of millions of domains and IPs. If the source is a known perpetrator of malicious messages, we will block it." *Id.* at 4. It also explains that "[a]ttachments and links are detonated with actions taken according to the policies you have in place." *Id.*  Importantly, Microsoft states it cannot catch all cyber-attacks, explaining: "Even if the message passes through detonations, the content is analyzed further by multiple machine learning models. These examine the full message and we take actions based on what you have configured as policy." *Id.* at 6. At the end of the brochure, it explains Safe Links is a service to "mitigate" (*i.e.* lessen or reduce) malicious content, not block them every single time. *Id.* at 10.

> A senior product marketing manager for Safe Links describes "time of click" as follows:

> "Time of click protection is when we examine a link against our reputation filters again if it lands in a user mailbox after it has already gone through the standard EOP filters.  Advanced malicious links often morph from the edge to the inbox so we test the link against our reputation filters again at the time of click.  If the link passes our reputation check again at the time of click then we do not block it … [We will] add the link to our reputation filters [if] we [later] determine[] it was malicious because not every link is known by our reputation filters or will be caught by our ML models.  We do not guarantee 100% catch for malicious links.  I'm not sure if there is a clearer way to describe what Safe Links does."

SMF ¶ 17. In other words, Microsoft is constantly updating its reputation filters as it receives new information so that Safe Links can protect users at the time of click, as advertised.  When viewed in context, Message #1 is not misleading.

**Message #2: Attackers Redirect to Unsafe Sites via a Forwarding Service After the Message Has Been Received; But with Safe Links, Malicious Links are Dynamically Blocked while Good Links Remain Accessible.**

> In context, the second message at issue fully states:

> Real-time, time-of-click protection against malicious URLs—EOP scans each message in transit in Office 365 and provides time of delivery protection, blocking malicious hyperlinks in a message. But, attackers sometimes try to hide malicious

URLs with seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received. ATP's Safe Links feature proactively protects your users if they click such a link. That protection remains every time they click the link, as malicious links are dynamically blocked while good links can be accessed.

Am. Compl. Ex. 3 (2015 ATP Product Guide) at 5, Ex. 4 (2016 ATP Product Guide) at 5, Ex. 5

(2017 Office 365: Everything You Wanted to Know brochure) at 85.

Message #2 begins by stating that Safe Links offers a "time of click" protection, as discussed *supra*, and that it blocks malicious hyperlinks in an email. The phrase "malicious links are dynamically blocked" means that "in some cases, … we can protect against [] known threats. And so as the threats evolve, … we are updating the reputation of the Safe Links server with our ongoing improving knowledge of known threats. Some of that knowledge comes from the detonation service. And so … we are going to continually be blocking malicious links that may be sent to you, and that's what this is indicating." SMF ¶ 18.

Microsoft further explains that Safe Links proactively protects users from malicious URLs that redirect users to an unsafe website because "[e]very time the user clicks on a link[,] Safe Links will have the opportunity to evaluate whether that link is good or bad assuming the customer has bought ATP and they've turned on Safe Links for that user." SMF ¶ 19. "The Safe Links protection service will have the opportunity to evaluate that link with two measures. The first will be the reputation service, the second will be time-of-click detonation, and that's what this is saying." *Id.* In this way, Safe Links proactively protects users from malicious links every time they click on a link, as Message #2 states.  When read in context, message #2 is not misleading.

**Message #3: ATP Safe Links ensures hyperlinks are harmless.**

Message #3 states in full in an Office 365 ProPlus Pitch Deck: "ensure hyperlinks in documents are harmless with ATP Safe Links," and in a 2019 Exchange Online Business Class

Email System brochure: "Ensure document hyperlinks are harmless with ATP Safe Links." Am. Compl. ¶¶ 72, 75.

"Essential to any claim under section 43(a) of "the Lanham Act is a determination of whether the challenged statement is one of fact—actionable under section 43(a)—or one of general opinion—not actionable under section 43(a)." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir. 2000).  In making this assessment, courts draw a distinction between an advertisement that uses "specific rather than general assertions[4];" in other words, "general terms" of superiority or opinion, in contrast to "specific or absolute characteristics of a product." *Id.* at 246; *see United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998). "[P]uffing immunizes an advertisement from liability under the Lanham Act." *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990).

Message #3 is nonactionable puffery.  Indeed, courts have expressly found the word "ensure" to be nothing more than mere puffery.[5]  Even if this statement weren't puffery, however, Message #3 is not misleading.  Microsoft uses the word "ensure" when explaining how a customer's decision to enable certain Safe Links policies can help protect his or her organization

---

[4] For example, a lamp that is "far brighter than any lamp" is puffery, whereas an advertiser who "quantified numerically the alleged superior brightness with statements such as "'35,000 candle power and 10–hour life'" has made an actionable statement of fact. *Cook*, 911 F.2d at 245.

[5] *See, e.g., Williams v. Aztar Indiana Gaming Corp.*, 351 F. 3d 294, 299 (7th Cir. 2003) (holding statement "As always, our top priority is simply this: to ensure your complete, 100 satisfaction" amounts to sales puffery); *Patt v. Antech Diagnostics, Inc.*, No. 818CV01689JLSDFM, 2019 WL 6654078, at *6 (C.D. Cal. July 30, 2019) (finding "protocols designed to 'ensure accurate results' are nonactionable puffery and therefore cannot be said to deceive a reasonable consumer as a matter of law"); *In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, No. 08 CIV.11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (finding "a robust process for ensuring prompt resolution of audit issues .... to ensure that any remedial action is undertaken promptly" was puffery); *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973–74 (N.D. Cal. 2008), *aff'd*, 322 F. App'x 489 (9th Cir. 2009) (laptop was a "powerful machine … packed full of fans and exhaust units to ensure optimum performance" was puffery).

from malicious hyperlinks sent through email. For example, Microsoft states "ATP provides a way for you to create policies in the Exchange Admin Center (EAC) that *help* ensure your users access only links in emails or attachments to emails that are identified as not malicious." Am. Compl. Ex. 5 at 82 (emphasis added).  And in the "talk track" to a pitch deck for potential customers, Microsoft states "Ensure hyperlinks in documents are harmless with ATP Safe Links: • Protect your organization from harmful hyperlinks through ATP Safe Links policies; • Create a custom blocked URL list for more advanced protection; • View ATP reports in the Office 365 Security and Compliance Center dashboard." Am. Compl. Ex. 8 at 23. As explained in the pitch deck, an organization's ability to ensure it is protected is dependent on the policies and customizations it chooses to enact. In other words, Safe Links is a tool to help organizations achieve their security goals. *See* Am. Compl. Ex. 6 at 2 (Safe Links is "a feature *that helps* prevent users from going to malicious websites when they click them in email.") (emphasis added).

Moreover, "ensure" is not synonymous with "guarantee," nor does Microsoft advertise a 100% guarantee of protection from cyberattacks or that Safe Links is 100% effective, as it explicitly disclaims. SMF ¶ 20.  This is made clear through customer-facing documents and talking points. *Id.* ¶ 21 (quoting Office365 Advanced Threat Protection FAQs: "Will ATP catch 100% of malicious attacks? No. In fact, *no advanced threat protection product can catch 100% of malicious attacks*, despite claims to the contrary. *The notion of 100% protection is a misperception* that is driven by the marketing and sales messages of some vendors in this industry.") (emphasis added). This "no-guarantee" concept is also made known to customer-facing marketing professionals within Microsoft. *Id.* ¶ 22, Ex. 18 ("You need to explain we filter to prevent [false positives] and that Nobody detonates 100% of all links."). Accordingly, Message #3, a non-specific opinion in

general terms that refers to various ways in which Safe Links can help protect against harmful links, is not actionable, if mere puffery, and is otherwise not misleading. *Cook*, 911 F.2d at 245.

> **b.      Microsoft's advertising is not misleading given its intended audience.**

Another crucial component of the context for the three statements is the audience to whom they were directed. The ads were made for and communicated to highly knowledgeable IT professionals in the cybersecurity industry. SMF ¶ 16. This is undisputed by Plaintiff. *See* Am. Compl. ¶ 71 ("Slide 1 indicates that these PowerPoint presentations are to be used when presenting to Business Decision Makers, Technology Decision Makers, and IT Decision Makers.").

For example, Exhibit 5 of the Amended Complaint, which contains Message #2 (*see* Am. Compl. ¶ 63), is a 2017 document titled "Office 365: Everything You Wanted to Know" that states "*The intended audience of this document are the IT Pros (Primary) and Developers (Secondary) in Organizations using or planning to deploy Office 365*." Am. Compl. Ex. 5 at 3 (emphasis added). The messages at issue were created with this in mind and reflect this intended audience. SMF ¶ 22, Ex. 19 ("customers also realize that no solution is 100% effective."); Am. Compl. Ex. 2 at 5 ("As an admin, you can access spoof intelligence …"); *Id.* at 9 ("Investigation into an incident can also be separately delegated to your security investigation team…").

Microsoft's intended audience has experience and expertise that informs their purchasing decisions. Typically, these IT professionals test Safe Links before purchasing it, thereby reaching their own conclusions regarding the efficacy of Safe Links and its value. SMF ¶ 23, Ex. 12 (explaining customers "were trialing the product and … exploring its possibilities, [so] they were able to communicate and meet with our engineering team twice a month"); *id.* (explaining that in his experience "no customer ever bought our product based on something that they read or something that they saw as their presentation … Typically what we saw is when a customer finally

ended up buying Office ATP … it was through a vigorous set of trials and testing.…"). Indeed, "[t]he greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, [] the less likely it is that a finding of literal falsity will be supported." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998).

When each advertisement is read in context in light of the sophisticated audience to whom the statements are targeted, it is clear they are not misleading, and summary judgment is warranted. *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F. Supp. 360, 366–67 (S.D. Fla. 1996), *aff'd sub nom.* 136 F.3d 139 (11th Cir. 1998) (granting summary judgment, noting a "[p]laintiff cannot state a claim under the Lanham Act by attributing inferences to an otherwise clear advertisement" and finding "the advertisement is neither literally false nor misleading to the target audience.").

### 3.   TocMail Cannot Prove Microsoft's Advertising Deceived, or Had the Capacity to Deceive, Consumers.

If the Court finds the statements at issue are true, but somehow misleading, TocMail is required to establish that the statements deceived, or had the capacity to deceive, consumers. *Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1287–88 (M.D. Fla. 2011), *aff'd*, 693 F.3d 1338 (11th Cir. 2012). TocMail "must present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence. Consumer survey research often is a key part of the Lanham Act claim alleging that an advertisement is misleading or deceptive." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256 (11th Cir. 2004); *Belcher Pharm.*, 419 F. Supp. 3d at 1296. Where, like here, a plaintiff "ha[s] not submitted sufficient consumer or market research showing 'that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement'" then it "ha[s] not produced sufficient evidence nor raised a genuine issue of material fact that Defendants' advertisements are misleading." *Gibson v. Resort at Paradise Lakes, LLC*, No.  8:16-CV-791-T-36AAS, 2018 WL

10373435, at \*14 (M.D. Fla. Feb. 2, 2018) (granting summary judgment); *Miller's Ale H., Inc.*, 745 F. Supp. 2d at1377 (S.D. Fla. 2010) (same); *Suntree Techs.*, 802 F. Supp. 2d at 1288 (same); *Pediatric Nephrology Assocs. of S. Fla. v. Variety Children's Hosp.*, No. 1:16-CV-24138-UU, 2017 WL 5707516, at \*7–8 (S.D. Fla. Nov. 13, 2017) (granting summary judgment because "there is no evidence" the ad deceived or had the capacity to deceive since "there is no consumer survey").

TocMail has no avenue through which it can prove the second element of its claim. TocMail has failed to conduct a consumer survey or any market research whatsoever. SMF ¶ 37. TocMail's CEO testified that TocMail did not conduct a consumer survey or hire an expert to do one. *Id.* TocMail's damages expert, Bour, testified that she was directed by TocMail to assume that consumers were deceived by the ads. *Id.* ¶ 41. TocMail has not determined whether Microsoft customers saw the messages at issue, whether they were misled or confused by them, or whether they influenced their purchasing decisions. *Id.* ¶¶ 37-40. In fact, these messages are not even easily accessible, requiring that consumers read multiple pages to get to the at-issue messages and making it unlikely that any, much less all, Microsoft consumers ever viewed them. *Id.* ¶ 14.

TocMail also admits it did not ask even one individual that visited TocMail's website why he or she did not purchase its product. SMF ¶ 39. Indeed, TocMail has not determined what consumers inferred from the messages at issue, let alone that consumers believe they are receiving the alleged IP Cloaking prevention service TocMail is selling, as TocMail alleges. *Id.* ¶ 36. But even without a survey, this claim of deception is unlikely because the plain face of the Safe Links ads at issue do not use the words "IP Cloaking," and Safe Links and TocMail's product are wholly different products, with Microsoft providing a wider scope of protections than TocMail's narrow IP Cloaking focus. Am. Compl. ¶¶ 58, 63, 72; SMF ¶ 29. Thus, TocMail cannot prove consumers were deceived by the messages and assuming as much is insufficient to meet its burden. *Belcher*,

20

419 F. Supp. 3d at 1298 (finding "there is no evidence that the…advertisements…were even viewed by consumers, much less influenced them on whether to purchase [defendant's] [] products over [plaintiff's]. So the Court concludes [plaintiff] failed to present evidence to support its claims and [defendant] is entitled to summary judgment in its favor."); *Gibson*, 2018 WL 10373435, at *14; *Pediatric Nephrology Assocs.*, 2017 WL 5707516, at *8.  Therefore, TocMail's failure to establish Safe Links' target audience and prove with extrinsic evidence, through a survey or market research, that a significant portion of this audience was confused, deceived, or misled (or even had a capacity to be) by any of the three specific messages at issue requires entry of summary judgment. *Miller's Ale H., Inc.*, 745 F. Supp. 2d at 1377.

### 4.    TocMail Cannot Prove Microsoft's Advertising Had a Material Effect on Consumers' Purchasing Decisions.

Even if the advertisements at issue were literally false or misleading, which they are not, TocMail's claim still fails because TocMail has not proved materiality.  *See Johnson & Johnson Vision Care*, 299 F.3d at 1250 (holding a plaintiff must prove materiality regardless of whether advertisements are literally false or misleading).  To this end, TocMail must establish that "the defendant's deception is likely to influence the purchasing decision." *Id.*

"The materiality requirement is based on the premise that not all deceptions affect consumer decisions." *Id.*  Accordingly, TocMail must establish that the three statements at issue "misrepresented an inherent quality or characteristic of the product." *Id.*  If the statements "are irrelevant to consumer purchasing decisions, [then they] are immaterial and cannot be the basis for a false advertising claim." *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 796–97 (11th Cir. 2020); *see Johnson & Johnson Vision Care*, 299 F.3d at 1250 (citing *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) and explaining in that case, the statement at

issue "was literally false, but irrelevant to consumer decisions" so consumers "did not make purchasing decisions based on [that statement]").

TocMail and Bour assume the three messages at issue were material to consumers' decisions to purchase Defender or Office 365 suites because presumably consumers generally care about "security." Am. Compl. ¶¶ 76-84; SMF ¶ 67. However, Defender and Office 365 contain many features and services other than Safe Links that provide security to users. JMF ¶ 3; SMF ¶¶ 7, n.3.   Therefore, even if "security" were important to consumers, it does not mean that the availability of Safe Links is material to purchasing Office 365, let alone material to a consumer's decision to purchase Office 365 *specifically for the Safe Links security feature. See J-B Weld Co., LLC*, 978 F.3d at 796–97; *Johnson & Johnson Vision Care*, 299 F.3d at 1250.

Critically, TocMail has not hired an expert to conduct a poll or survey on consumer purchase decisions, it has not asked Microsoft consumers whether the at-issue ads were the reason for their purchases of Microsoft products, and it has not asked the potential customers that have visited its own website why they did not purchase TocMail's product. SMF ¶¶ 37-40. Without having conducted a survey to determine if the three statements at issue about Safe Links were material to consumers' decisions to purchase Defender or Office 365, TocMail cannot meet its burden of proof and summary judgment is appropriate. *See Stiefel Lab, Inc.*, 535 F. App'x 774 ("Because [plaintiff] did not show that [defendant's] false statements…influenced consumer choices, the district court properly granted summary judgment"); *J-B Weld Co.*, 978 F.3d at 796, 798 (granting summary judgment where plaintiff "has not presented evidence indicating that either 'steel bond' or 'epoxy' is material to purchasing decisions" because "the survey did not ask respondents whether [that] would have affected their decision to purchase one product or the other. Without asking that question…the survey fails to address the critical issue of effect on purchasing

22

decisions, and therefore cannot be probative of materiality."); *Pediatric Nephrology Assocs.*, 2017 WL 5707516, at *8 ("[Plaintiff] has no consumer survey or expert testimony to show that consumers altered their purchasing decisions…Accordingly, summary judgment is appropriate on the Lanham Act claim."); *Club Exploria, LLC v. Austin*, No. 618CV576ORL28DCI, 2020 WL 6585802, at *11 (M.D. Fla. Nov. 10, 2020) (granting summary judgment where plaintiff "has not presented any expert testimony or other evidence to support its contention that the website advertisements were likely to be material to consumer purchasing decisions."); *Gibson*, 2018 WL 10373435, at *16 (plaintiff "offer[ed] no evidence showing what consumers thought of the advertisements in this case and under these circumstances, *i.e.* whether the statements expressed in the advertisements were material to any consumers' decision…to attend an event or make a purchase[.]").

TocMail also has no other evidence to prove that consumers' purchase decisions were made because of the three statements about Safe Links at issue. Instead, TocMail presumes the reason consumers purchase Microsoft products and not TocMail's product is that consumers believe they are already receiving the service TocMail provides and there is no point in buying TocMail's product. Am. Compl. ¶ 93; SMF ¶ 36. Not only does TocMail fail to confirm this rank speculation through a survey or by speaking to a single consumer, but it also fails to consider the far more plausible theory that consumers purchase Microsoft products for reasons other than Safe Links (*e.g.*, other services and programs included in Microsoft Office suites such as Outlook, Word, Excel, and PowerPoint, or the availability of IT support). SMF ¶ 10.  This is particularly likely here because, as TocMail acknowledges, Safe Links is not a standalone product for sale but is instead an integrated feature in larger suites of software offerings. JMF ¶ 3; SMF ¶¶ 7, n.3. The available evidence suggests this is the case: on March 15, 2021, 97.3% of commercial tenants (*i.e.*

companies and organizations) worldwide who had a package that contained Safe Links *did not even have Safe Links turned on.* SMF ¶ 11. Based on this statistic alone, it is highly unlikely that any statement about Safe Links was material to any consumer's decision to purchase Office 365 or Defender, given that the overwhelming majority of commercial tenants do not use the feature.

> ### 5.    TocMail Cannot Prove It Has Been Or is Likely to Be Injured by Microsoft's Advertising.

Finally, TocMail cannot establish the last element of its claim – that it has been or is likely to be injured by Microsoft's three advertising messages.[6] "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014).

TocMail cannot prove the three alleged false advertisements at issue have proximately caused injury to its sales between the date of TocMail's launch and the present.[7]  Since TocMail

---

[6] Initially, TocMail sought disgorgement of Microsoft's profits dating back from 2011, an arbitrary date, through 2035, the year its purported patent expires. SMF ¶ 51. In a second amended interrogatory response, TocMail "reserve[d] the right to determine whether the disgorgement time period shall start in 2015 (with the introduction of Safe Links) or 2019 (with the launch of TocMail)." *Id.* ¶ 63. Regardless of the dates TocMail chooses, it cannot recover damages.

[7] To the extent TocMail seeks damages beginning in 2011, it is unable to do so. Safe Links was not created until 2015. JSMF ¶ 2. Therefore, it is literally impossible for Microsoft's advertising (which was not in existence between 2011 and 2014) to have caused TocMail any injury or for Microsoft to have profited from it prior to 2015. And, to the extent TocMail seeks damages between 2015 and December 11, 2019, it is likewise unable to do so because TocMail did not offer its product for sale until December 12, 2019. *Id.* ¶ 4. Compounding this flaw is the fact that the alleged false advertising mostly occurred prior to December 12, 2019. *See* Am. Compl. ¶¶ 64 (stating Ex. 3 was created in 2015, Ex. 4 was created in 2016, Ex. 5 was created in 2017, and Ex. 6 was created in 2019), ¶ 75 (stating Ex. 10 was created in 2019), Ex. 8 at 2 ("last updated January 2018"), Ex. 9 at 2 ("last updated March 2018"). The Eleventh Circuit has established that a plaintiff cannot prove it was proximately injured by an advertisement when the plaintiff's product was not for sale at the time of that advertisement. *See Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1331 (11th Cir. 2008) (affirming summary judgment because the plaintiff "was not selling or promoting [its product] at the time of the allegedly false advertising, it cannot claim to have suffered lost sales, lost market share, or increased promotional costs." As a result, "the amount of [plaintiff's] claimed damages is entirely speculative.").

became available in December 2019, it has engaged in minimal advertising efforts, entering into one agreement with Google AdWords for 8 months, and no advertising whatsoever between July 2020 and December 17, 2020. SMF ¶¶ 31. Beyond a single press release and few emails to potential investors, TocMail has not engaged in other marketing. *Id.* ¶ 32. It admitted it has not made a single sale and has no revenues. *Id.* ¶ 30. Therefore, Microsoft could not have proximately caused TocMail injury to sales when it has not even tried to make any.

Nor can TocMail prove it is likely to be injured by Microsoft through the year 2035, as it rests on nothing more than speculation and the assumption that the content of the at-issue statements will remain the same through the year 2035, and that there will be no change in the market, as discussed below. SMF ¶ 60. But "Florida law requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions" like TocMail's. *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247, 1249 (M.D. Fla. 2003) (granting motion for partial summary judgment and striking expert's lost profit damages model because it was based on "pure speculation"); *see Resol. Tr. Corp. v. Stroock & Stroock & Lavan*, 853 F. Supp. 1422, 1429 (S.D. Fla. 1994) ("the Court cannot help but conclude that the degree to which the RTC's damage theories rest on speculation raises the dispositive issues to the level of being questions of law. It is also quite clear that in such situations, the issues need not, and should not, go to the jury.").

TocMail also cannot prove the three alleged false advertisements at issue have proximately caused injury to its reputation.  TocMail admits it has no documents that reflect its and/or its product's reputation in the marketplace. SMF ¶ 33.  Moreover, TocMail did not calculate damages based on harm to its reputation—because it has none. Indeed, TocMail seems to have abandoned its claim of reputational injury when it did not even bother to respond to Microsoft's argument on

this point in its Motion to Dismiss. ECF No. 46 at 21. Thus, TocMail is not entitled to reputational damages. *See St. Charles Mfg. Co. v. Mercer*, 737 F.2d 891, 893 (11th Cir. 1983) ("[t]he plaintiffs introduced no evidence showing any damage to their reputations. Accordingly, we affirm the district court's denial of this award.").

Further, TocMail did not engage any expert to conduct any damages causation analysis. SMF ¶ 41. No one has conducted a survey of consumers to determine if they saw the Safe Links ads at issue, if they were deceived by these ads, and if these ads were material to their decisions to purchase Defender or Office 365 with Defender over TocMail's product, because of the Safe Links feature. *Id.* ¶¶ 37-40. Instead, TocMail's damages were calculated with the fatal assumptions that 100% of Microsoft consumers would have been exposed to the three messages, 100% of these consumers were confused, and 100% of these consumers materially relied on the statements to alter their purchase decisions. *Id.* ¶ 56. By failing to survey consumers, let alone speak to a single consumer, TocMail cannot establish Microsoft's advertising of Safe Links proximately caused its alleged injury. *See Lexmark Int'l, Inc.*, 572 U.S. at 140.

### B. TocMail's Speculative and Flawed Damages Methodology Cannot Support an Award of Damages to TocMail.

In the event the Court finds TocMail can prove all five elements of its false advertising Lanham Act claim, TocMail cannot prove it is entitled to an award of damages because Bour did not apply a reliable methodology to reach her damages figures.[8]

### 1. TocMail is Not Entitled to a Disgorgement of Microsoft's Profits.

"[A]n accounting of defendant's profits is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter

---

[8] These flaws are explained in detail in Microsoft's *Daubert* motion to exclude Marcie D. Bour and reply memorandum in support thereof. *See* ECF Nos. 69, 81.

future conduct." *Optimum Technologies, Inc. v. Home Depot U.S.A., Inc.*, 217 Fed. Appx. 899, 902 (11th Cir. 2007). None of these scenarios is supported by the record here. First, there is no evidence that Microsoft's conduct was willful[9], and, as discussed *supra* at pp. 3-4, 15, and 18, Microsoft does not state and has never intended to state, that Safe Links is 100% effective; in fact, its ads say the opposite. SMF ¶¶ 13, 21. Second, Microsoft has not been unjustly enriched; it invests countless resources, time and energy into updating its solution to protect customers from ever-evolving cybersecurity issues, putting the most common and high-risk threats before lesser known attacks, such as IP Cloaking. *Id.* ¶¶ 4, 6, 21. Microsoft also could not have enriched itself by tapping the reputation and good will of TocMail, as TocMail admits it has no reputation or good will in the marketplace it has not entered. *Id.* ¶¶ 30, 32, 33; *see also Optimum Techs*., 217 Fed. Appx. at 902–03. Finally, (i) the ads at issue explain what Safe Links does and are truthful, *see* SMF ¶ 24, (ii) the ads do not mention IP Cloaking or TocMail, Am. Compl. ¶¶ 58, 63, 72, Ex. 2-10, and (iii) Safe Links and TocMail's product are wholly different products, SMF ¶ 29. Given that there is no risk of confusion, there is no need to deter future conduct that cannot harm TocMail.

But, even if the Court deems an accounting appropriate, Bour did not apply any methodology whatsoever, or at least a reliable one, to arrive at the disgorgement damages she

---

[9] Treble damages are also not warranted in this matter because "the plaintiff must prove that the defendant's conduct was intentional." *Vector Prod., Inc. v. Hartford Fire Ins. Co.*, 397 F.3d 1316, 1320, n.2 (11th Cir. 2005). And, they "must be based on a showing of actual harm." *Optimum Techs.,* 217 Fed. App'x at 904. There is no evidence that Microsoft intended to deceive consumers through its ads, or that the ads proximately caused harm to TocMail. The evidence shows the opposite—the ads are truthful and TocMail did not suffer any reputational or economic harm. SMF ¶¶ 24, 33. TocMail is also unentitled to attorneys' fees which is only awarded in an "exceptional case." 15 U.S.C. § 1117(a). "An exceptional case is where the infringing party acts in a malicious, fraudulent, deliberate, or willful manner." *Optimum Techs.*, 217 F. App'x at 903. That is not the case here, and attorneys' fees should not be awarded. *Id*.; *St. Charles Mfg. Co.*, 737 F.2d at 894.

proposes. Bour simply cited Microsoft's revenues for Defender and Office 365 with Defender[10], two much larger, multi-dimensional products that encompass many services, of which Safe Links is one small feature. SMF ¶¶ 64-66. In doing so, Bour grossly overstated sales. Therefore, Bour does not provide meaningful revenues for her disgorgement analysis because she did not determine Microsoft's sales owed to Safe Links, and without a survey, she cannot tie Microsoft's sales owed to Safe Links to consumer reliance on the three advertisements at issue. *See Burger King Corp. v. Pilgrim's Pride Corp.*, 934 F. Supp. 425, 426 (S.D. Fla. 1996) ("Plaintiff has the burden of showing the amount of [d]efendant's sales of the *infringing* product.") (emphasis added). Accordingly, TocMail cannot obtain damages based on disgorgement.

## 2. TocMail is Not Entitled to Actual Damages.

TocMail also seeks actual damages in the form of lost profits. Under Florida law, a business may recover lost profits only if "the defendant's action caused the damage **and** there is *some standard* by which the amount of the damages may be adequately determined." *BASF Corp. v. Nu-Vision, LLC*, No. 6:09-CV-894-MSS-DAB, 2010 WL 11626579, at *2 (M.D. Fla. Sept. 27, 2010) (emphasis added). Although, "[c]alculating lost prospective profits does not require exactitude[], the amount must be established with 'reasonable certainty' by 'some standard such as regular market values, or other established data, by reference to which the amount may be satisfactorily ascertained.'" *Id.* (citation omitted). "Lost prospective profits are not recoverable where there is

---

[10] Bour testified that she did not attempt to assign a value to Safe Links, but instead utilized the price of Microsoft products sold with the Safe Links feature because she was operating under "the theory … that the safety offered by … Safe Links is a critical part of the brand and its image as being a safe product." SMF ¶ 67. This assumption was not tested or verified. TocMail did not conduct any survey asking consumers whether they believe safety is provided solely by Safe Links, whether Safe Link's safety is synonymous with Office 365's safety, and the value attributable to the product's safety. *Id*. ¶¶ 37-41.

no competent evidence supporting the amount of the award or where the calculation of lost profits requires speculation or conjecture." *Id.*

TocMail relies on a series of unreasonable and unverified assumptions to derive a speculative lost profits figure of approximately $15.3 Billion, which was later reduced to $9.5 Billion for the first time at Bour's deposition.[11] SMF ¶ 51. Bour's speculative arithmetic entailed taking "the number of seats for Microsoft Office products sold with ATP," multiplying it by the cost of a subscription to TocMail's product, and projecting the calculated amount of sales TocMail would have earned through the year 2035. *Id.* ¶ 53. Bour's calculation requires the following assumptions (since there is no consumer survey or other evidence): (1) every single Microsoft customer would have purchased TocMail's product but for the alleged false ads, (2) not one consumer would have transitioned to another competitor in the market, although TocMail recognizes there are third-party cybersecurity products that offer similar protection as TocMail's product, and (3) TocMail would retain that market share for 15 years. *Id.* ¶¶ 51-56. Her lost profits calculation also rests on the following assumptions: (1) by April 2020 TocMail would steal "all 100 million" of Microsoft's consumers seats, following a single press release[12], (2) for the next 15 years, TocMail would have a 98% profitability rate, although she admitted that is an unusually high profitability rate in her experience, (3) TocMail, a new company in the ever-evolving

---

[11] For the reasons stated in Microsoft's motion to strike, the Court should not consider Bour's Supplemental Report and opinions contained therein, including her new lost profits analysis and calculation. *See supra*, n. 3.

[12] Although a simple line-item for "marketing" was budgeted as a "cost" in Bour's calculation of lost profits following the issuance of a single press release, TocMail has not produced a marketing plan or provided any support for the assumption that its advertising could capture "all 100 million subscriptions" from Microsoft and maintain those subscriptions through 2035. In fact, it is undisputed that TocMail has engaged in minimal advertising (spending less than $4,500 in its first 8 months of advertising) and even suspended all advertising between July 2020 and December 17, 2020. SMF ¶ 32.

cybersecurity field, would have no need to account for research and development costs through 2035, and (4) TocMail being valued as a billion-dollar-a-year company, even though TocMail has never been valued. *Id.* ¶¶ 57-59. Moreover, Bour failed to consider how sales would be impacted if Microsoft would revise or take down any of the messages at issue.[13] *Id.* ¶ 60. Accordingly, Bour's faulty calculation, based on unverified assumptions and unrealistic market conditions (instead of on any reliable standard), is insufficient to establish TocMail's alleged future lost profit damages. *BASF Corp.,* 2010 WL 11626579, at *2.

### 3. TocMail is Not Entitled to Injunctive Relief.

Finally, TocMail is not entitled to injunctive relief because it cannot show irreparable harm or that legal remedies are inadequate. *See Marlite, Inc. v. Eckenrod*, No. 10-23641-Civ, 2012 U.S. Dist. LEXIS 195195, at *9 (S.D. Fla. Jan. 31, 2012) (finding because the harm alleged by [plaintiff] has for the most part already occurred and the harm can be reduced to a monetary sum, the injury is not irreparable" and "injunctive relief is inappropriate"). Where, as here, significant monetary damages are sought, it is clear the requested monetary relief predominates over the claims for equitable relief, making an award of injunctive relief inappropriate.

## V. CONCLUSION

For the foregoing reasons, Microsoft respectfully requests the Court grant its Motion and enter summary judgment in favor of Microsoft.

---

[13] TocMail's CEO testified that, should Microsoft correct the ads at issue, TocMail would only seek three years of future lost profits (albeit without any basis for this determination), in stark contrast to Bour's analysis and damage figure. SMF ¶ 61.

Dated: July 9, 2021                              Respectfully submitted,


                                                 */s/ Evelyn A. Cobos*
                                                 Evelyn A. Cobos

                                                 **GREENBERG TRAURIG, LLC**
                                                 1000 Louisiana Street, Suite 1700
                                                 Houston, Texas 77002
                                                 Telephone: (713) 374-3541
                                                 Facsimile:  (713) 374-3505
                                                 MARY-OLGA LOVETT
                                                 Email: lovettm@gtlaw.com

                                                 **GREENBERG TRAURIG, P.A.**
                                                 333 S.E. 2nd Avenue, Suite 4400
                                                 Miami, Florida 33131
                                                 Telephone: (305) 579-0500
                                                 Facsimile:  (305) 579-0717
                                                 FRANCISCO O. SANCHEZ
                                                 Florida Bar No. 598445
                                                 Email: sanchezo@gtlaw.com
                                                        orizondol@gtlaw.com
                                                 EVELYN A. COBOS
                                                 Florida Bar No. 092310
                                                 Email: cobose@gtlaw.com
                                                        FLService@gtlaw.com

                                                 ***Attorneys for Microsoft Corporation***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 9th day of July, the foregoing document is being served

this day on all counsel of record on the service list via electronic mail.

<u>/s/ *Evelyn A. Cobos*</u>
EVELYN A. COBOS


## <u>SERVICE LIST</u>

JOHNSON & MARTIN, P.A.
Joshua D. Martin
500 W. Cypress Creek Rd., Suite 430
Ft. Lauderdale, FL 33602
Tel: (954) 790-6699
Fax: (954) 206-0017
Email: josh.martin@johnsonmartinlaw.com

*Attorneys for Plaintiff*

32