UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 0:20-cv-60416-CANNON/HUNT

TOCMAIL INC., a Florida corporation,

   Plaintiff,

v.

MICROSOFT CORPORATION, a Washington corporation,

   Defendant.

**DEFENDANT MICROSOFT CORPORATION'S L.R. 56.1(a)
STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1(a), Defendant Microsoft Corporation ("Microsoft") respectfully sets forth the following material facts about which it contends there exists no genuine issue of fact:

**A. Microsoft's Cybersecurity Feature, Safe Links**

1. The software at issue in this case concerns Microsoft's Safe Links, a cybersecurity feature[1] that protects users from malicious URLs, including those accomplished through a type of attack known as IP network evasion[2], in emails and their attachments, at the time of delivery and

---

[1] For context, and as stated in the Parties' Joint Statement of Undisputed Facts [ECF No. 95] ("JSUF"), Safe Links is a feature accessible to consumers who purchase a larger, stand-alone cloud-based security suite that was originally named "Advanced Threat Protection" ("ATP") but was recently renamed "Microsoft Defender for Office 365" ("Defender") (referred to herein interchangeably as "ATP" or "Defender"), or purchase an Office 365 suite that includes the Defender security suite. JSUF ¶¶ 1, 3.

[2] IP network evasion, referred to as "IP Cloaking" by TocMail, is a type of cyberattack that TocMail explains as occurring when a dynamic URL redirects IP addresses it detects to be a security scanner to a benign site, but redirects IP addresses it does not detect to be a security scanner to a malicious site, where the user's device can be hacked (referred to herein as "IP Cloaking" for consistency). See ECF No. 42 ("Am. Compl.") ¶ 20.

1

at the time-of-click, by checking the URL's reputation and detonating if necessary. *See* Deposition of Jason Rogers dated March 17, 2021 ("**Exhibit 1**") at 26:23-27:8; Deposition of Microsoft Corporate Representative Jason Rogers dated March 16, 2021 ("**Exhibit 2**") at 15:7-22; Microsoft's Amended Responses to Plaintiff's Second Set of Interrogatories ("**Exhibit 3**") at Response to Interrogatory No. 10, 15; Microsoft's Amended Responses to Plaintiff's 4th Set of Interrogatories ("**Exhibit 4**") at Response to Interrogatory No. 17; Deposition of Microsoft Corporate Representative Amar Patel dated March 9, 2021 ("**Exhibit 5**") at 47:17-48:10.

2. Safe Links provides protection, in part, by checking a URL's reputation against Microsoft's most current URL reputation list and blocking known malicious links at the time of click, every time the link is clicked. Ex. 2 at 14:9-15:22, 16:24-25, 58:15-59:3; 60:1-9.

3. Safe Links also protects users from malicious links that were not known at the time of delivery but were discovered to be malicious post-delivery. Ex. 2 at 15:23-16:5.

4. Microsoft invests its resources into thwarting and prioritizing what its algorithms deem to be the most critical and common forms of cyberattacks affecting its customers, but IP Cloaking is not such a threat to Microsoft users. *See* Deposition of Amar Patel dated March 10, 2021 ("**Exhibit 6**") at 24:13-18; Deposition of Abhijeet Hatekar dated March 29, 2021 ("**Exhibit 7**") at 40:16-22; Microsoft's Am. Resp. to Plaintiff's 1st Set of Interrogatories ("**Exhibit 8**") at Response to Rog. No. 8.

5. Since mid to late 2018, Microsoft has had the ability to use and does use IP anonymization to "mask" its known IP addresses with unknown third-party IP addresses, and route detonation traffic out of non-Microsoft IP ranges, helping avoid cyberattacks through evasion of known Microsoft IP addresses (what TocMail refers to as IP Cloaking). Ex. 3 at Response to Interrogatory No. 15; Ex. 6 at 58:22-59:15; Ex. 7 at 38:5-10, 41:14-18, 42:17-20, 94:4-95:21.

6. While Safe Links does not provide, or advertise that it provides, 100% protection for its users against all forms of attacks, (Ex. 6 at 103:7-107:6; Ex. 7 at 37:2-18), Safe Links is effective at protecting users from malicious links and IP evasion (IP Cloaking). Ex. 7 at 31:22-33:25 (explaining Microsoft has not "solved" IP evasion (nor could anyone say so), but that Microsoft has technology to combat it; "Q. So the problem of identifying whether evasion is occurring or not, IP evasion specifically, is that still a problem today? A. No. Q. So you're able to do a better job of identifying whether IP evasion occurred? A. Not in 100 percent of the cases, but, yes, more than 95 percent of the time we are able to identify. Q. You're able to identify that IP evasion took place? A. Yes, and take corrective actions as well."), 41:14-18 ("in late 2018 itself, you know, when we invested into -- into a third-party solution for anonymizing IP ranges from Microsoft, we started seeing, you know, huge success in our effectiveness."), 94:20-95:21 (discussing technology that combats IP evasion, stating "we have seven or eight different techniques to basically combat IP evasion. No one layer will be 100 percent successful.").

7. In order to have access to the Safe Links feature, a consumer must purchase or license Microsoft software packages, like ATP/Defender or an Office 365 suite that includes the ATP/Defender security suite, each of which includes a myriad of other services. Deposition of Microsoft's Corporate Representative Kathryn Griffith dated March 23, 2021 ("**Exhibit 9**") at 9:5-17; Expert Rebuttal Report of Keith Ugone ("**Exhibit 10**") ¶¶ 20, 25, Ex. 4; Am. Compl. ¶ 57; ECF Nos. 42-3, 42-5 at p. 84.

8. Defender is a robust cloud-based email filtering service that helps protect an organization against unknown malware, viruses and harmful links in real-time, and it offers rich reporting and URL trace capabilities. ECF Nos. 42-3 at p. 5, 42-4 at p. 5, 42-5 at p. 85, 42-6 at pp. 2-3.

9. Defender provides anti-phishing, anti-spam, spoof intelligence, and anti-malware, among other things. Ex. 1 at 28:23-30:20; ECF No. 42-2 at p. 2.

10. Office 365 includes a variety of services including, but not limited to, Skype, Yammer, SharePoint, Microsoft Teams, and other applications such as Outlook, Word, PowerPoint, and Excel, for example. Ex. 10 ¶¶ 25, 50(c)(i); ECF No. 42-5 at p. 4 (*see* Table of Contents' Services Overview).

11. On March 15, 2021, only 2.7% of commercial tenants (which are companies and organizations) worldwide had the Safe Links policy within Defender or Office 365 with Defender turned on. Microsoft's Response to Plaintiff's 5th Set of Interrogatories ("**Exhibit 11**") at Response to Interrogatory No. 22.

**B. Microsoft's Advertising of Safe Links**

12. Microsoft does not guarantee that it can block every single type of cyberattack every single time, as hackers are constantly evolving their techniques in the ever-changing threat landscape. Ex. 6 at 82:14-24; Ex. 7 at 31:22-32:9.

13. Microsoft does not advertise Safe Links is 100% effective, or that Safe Links protects users 100% of the time from IP Cloaking, as neither Microsoft nor any other company can represent being able to do so (despite TocMail's guarantee that it prevents IP Cloaking 100% of the time). Ex. 6 at 35:17-20, 37:9-19, 103:7-104:3, 106:16-107:2; Ex. 7 at 33:14-25; Deposition of Debraj Ghosh dated March 11, 2021 ("**Exhibit 12**") at 71:11-16, 128:13-16,136:10-15; TOCMAIL_00002108 ("**Exhibit 13**") at -09 (Microsoft's Office 365 Advanced Threat Protection FAQ states "Will ATP catch 100% of malicious attacks? No. In fact, no advanced threat protection product can catch 100% of malicious attacks"); ECF No. 42-2 at p. 6 (product brochure anticipates that its consumers will experience malicious content getting through to their system, stating: "Even

4

if the message passes through detonations, the content is analyzed further … and we take actions based on what you have configured as policy."); *c.f.* Deposition of Michael Wood dated March 19, 2021 ("**Exhibit 14**") at 127:2-16 (stating that TocMail stops "cloaking based phishing" attacks "a hundred percent.").

14. The advertising messages at issue are not easily accessible. For example, in order to view these messages, consumers must search for specific content, click on multiple webpages, download various brochures, and read through thousands of words and multiple pages to get to the at-issue messages, making it unlikely that many, much less all, Microsoft consumers ever viewed them. Ex. 10 ¶ 46.

15. The majority of these messages were created and disseminated between 2015 and 2019, and therefore predate the creation of TocMail's product in December 2019. *See* Am. Compl. ¶ 64 (stating Ex. 3 was created in 2015, Ex. 4 was created in 2016, Ex. 5 was created in 2017, and Ex. 6 was created in 2019); *id.* ¶ 75 (stating Ex. 9 was created in 2019); *id.* Ex. 8 at p. 2 ("last updated January 2018"); *id.* Ex. 9 at p. 2 ("last updated March 2018").

16. Each statement at issue was made to Information Technology ("IT") professionals within the cybersecurity industry that are highly knowledgeable in cybersecurity, not an average lay customer. This is undisputed by Plaintiff. Am. Compl. ¶ 71; Ex. 12 at 46:1-13, 132:1-25; Ex. 2 at 29:20-23, 61:2-12; ECF No. 42-2 at p. 4-5 (advertisement directed to "admin"); ECF No. 42-3 at p. 9 (same).

17. A senior product marketing manager for Safe Links succinctly describes "time of click," a phrase in Microsoft's Advertising Message #1 at issue in the Amended Complaint as follows: "Time of click protection is when we examine a link against our reputation filters again if it lands in a user mailbox after it has already gone through the standard EOP filters. Advanced

malicious links often morph from the edge to the inbox so we test the link against our reputation filters again at the time of click.  If the link passes our reputation check again at the time of click then we do not block it … [We will] add the link to our reputation filters [if] we [later] determine[] it was malicious because not every link is known by our reputation filters or will be caught by our ML models.  We do not guarantee 100% catch for malicious links.  I'm not sure if there is a clearer way to describe what Safe Links does." MSFT_TOC00007255 ("**Exhibit 15**") at -55.

18. The phrase, "malicious links are dynamically blocked," in Microsoft's Advertising Message #2 at issue in the Amended Complaint, means that "in some cases, … we can protect against [] known threats. And so as the threats evolve, as people see new mail coming in and new links coming in[,] we are updating the reputation of the Safe Links server with our ongoing improving knowledge of known threats. Some of that knowledge comes from the detonation service. And so … we are going to continually be blocking malicious links that may be sent to you, and that's what this is indicating." Ex. 6 at 105:14-25.

19. The statement, "Safe Links [] proactively protects your users if they click such a link. That protection remains every time they click the link…," in Microsoft's Advertising Message #2 at issue in the Amended Complaint, is accurate because "[e]very time the user clicks on a link[,] Safe Links will have the opportunity to evaluate whether that link is good or bad assuming the customer has bought ATP and they've turned on Safe Links for that user." Ex. 6 at 102:19-25. "The Safe Links protection service will have the opportunity to evaluate that link with two measures. The first will be the reputation service, the second will be time-of-click detonation, and that's what this is saying." *Id.* at 103:17-20; *see also id.* 101:24-105:7.

20. The word "ensure" in Message #3 is not synonymous with "guarantee," nor does Microsoft advertise a 100% guarantee or that Safe Links is 100% effective. Ex. 6 at 106:16-107:2

6

("We don't guarantee 100 percent protection, but what we do do is a number of things, as I stated. You know, we have the ability to detect [False Negatives] and correct them using time travel where we can recall an e-mail out of the user's inbox, … we have the ability to attack anomalous account activity and protect that user from any harm, and we also have the ability to update reputation. So at a later time if we learn that this link is bad we can block it, and we can certainly update the reputation with that updated logic as well."), 35:17-20, 103:7-104:3; Ex. 7 at 37:9-19; Ex. 12 at 71:11-16, 128:13-16, 136:10-15; Ex. 13 at -09; MSFT_TOC00077054 ("**Exhibit 16**") at -54

21. That Safe Links is not 100% effective is made clear through customer-facing documents and talking points. Ex. 13 at -09 (Office365 Advanced Threat Protection FAQs: "Will ATP catch 100% of malicious attacks? No. In fact, no advanced threat protection product can catch 100% of malicious attacks, despite claims to the contrary. The notion of 100% protection is a misperception that is driven by the marketing and sales messages of some vendors in this industry."); Ex. 16 at -54 (Office365 Field Advisory: "No solution is 100% secure, but the best services update quickly … Microsoft invests more than $1 billion annually to ensure our services remain best in class and can constantly keep or exceed the pace of the evolving threat landscape.").

22. This "no-guarantee" concept is also made known to customer-facing marketing professionals within Microsoft. *See* Ex. 15 at -55 ("As for the URL that got through, it is impossible to catch everything 100%"); *id.* at -55 ("We do not guarantee 100% catch for malicious links. I'm not sure if there is a clearer way to describe what Safe Links does."); MSFT_TOC00036565 ("**Exhibit 17**") at -65 ("This one is simply a missed spam, I agree. This is going to happen sometimes. We do not guarantee 100% detection.") (emphasis added); MSFT_TOC00201836 ("**Exhibit 18**") at -40 ("You need to explain we filter to prevent [False Positives] and that Nobody detonates 100% of all links."); MSFT_TOC00059187 ("**Exhibit 19**") at -87 ("customers also

7

realize that no solution is 100% effective.").

23. Notwithstanding Safe Links advertisements, Microsoft's customers usually test Safe Links before purchasing it, thereby reaching their own conclusions regarding the efficacy of Safe Links and its value to their company. *See* Ex. 12 at 11:6-12:4, 133:1-25.

24. Safe Links advertising is truthful. Ex. 2 at 60:1-60:15 (discussing Message #1); Ex. 2 at 15:7-22, Ex. 6 at 102:1-11 (discussing Message #2); Ex. 2 at 58:19-59:3 (discussing Message #3); *see generally* Ex. 2 at 61:2-12 (discussing importance of context).

### C. Plaintiff TocMail, Inc. and Its Product

25. TocMail, Inc. ("TocMail") developed a product named TocMail, a plugin for the RoundCube email reader, that became available on December 12, 2019. TocMail's 2nd Amended Response to Microsoft's First Set of Interrogatories ("**Exhibit 20**") at Response to Interrogatory No. 1; www.tocmail.net (last visited May 23, 2021); Expert Report of Michael Wood ("**Exhibit 21**") at p. 75.

26. TocMail claims its product prevents one specific type of cyberattack it refers to as "IP Cloaking." Am. Compl ¶ 90; Ex. 21 at p. 10.

27. TocMail claims (but has not proven) its allegedly patented product is the "first" and "only" technology that can enable a cloud-based security scanner to *always* thwart malicious links because it avoids IP Cloaking instead of detecting it, as other cybersecurity services do. Am. Compl. ¶¶ 90, 92, 93, 103; Ex. 21 at pp. 10, 66.

28. By using "IP Cloaking avoidance," TocMail's claims its technology does not attempt to detect if a link is cloaked or not; it avoids determining if a link redirects a user, and where they would be redirected to. Am. Compl. ¶ 88; Ex. 21 at p. 66.

29. TocMail's product and Safe Links are not equivalent products, as Safe Links

performs a broader array of tasks and provides a wider variety of cybersecurity protection to consumers. *Compare* www.tocmail.net (last visited May 23, 2021) *to* ECF Nos. 42-2 at pp. 6-7, 42-3 at pp. 8-9, 42-4 at pp. 9-11.

### D. TocMail's Lack of Sales and Marketing Efforts to Break into the Market

30. TocMail admits that although it has had over 33,000 visitors to its website to date, it has not made a single sale or subscription of its product and it has no revenue. Ex. 20 at Responses to Interrogatories No. 2, 3; Deposition of Michael Wood dated March 18, 2021 ("**Exhibit 22**") at 183:10-16.

31. TocMail also admits its advertising efforts consisted of only one agreement with Google AdWords for which it spent less than $4,500 in its first 8 months of advertising, and then suspending the advertisement (thus having no advertising whatsoever) between July 2020 and December 17, 2020. Ex. 20 at Response to Interrogatory No. 1; TocMail's Amended Response to Microsoft's 2nd Set of Interrogatories ("**Exhibit 23**") at Responses to Interrogatories No. 13, 14; Email from TocMail's counsel clarifying TocMail's response to Interrogatory No. 13, dated February 3, 2021 ("**Exhibit 24**") at p. 3.

32. Beyond its Google AdWords agreement, a press release, and a few emails to potential investors, TocMail has not engaged in other marketing. Ex. 22 at 62:23-63:18, 140:22-141:6; Ex. 20 at Interrogatory Response No. 1, 7.

33. TocMail admits it has no documents that reflect its and/or its product's reputation in the marketplace. TocMail's Response to Microsoft's First Request for Production ("**Exhibit 25**") at Response to Request No. 5.

### E. TocMail's Claims

34. On February 26, 2020, two months after it developed its product, TocMail filed its

lawsuit claiming that all Microsoft Defender/ATP customers would have been TocMail customers but for Microsoft falsely advertising Safe Links as the "solution to IP Cloaking," which has caused economic and reputational harm to TocMail in the tens of billions of dollars. *See* Compl. (ECF No. 01); Am. Compl. ¶¶ 93-95.

35. TocMail claims that because it is the sole provider of a cloud based redirect service supposedly capable of consistently thwarting IP Cloaking, "all 100 million subscriptions [of ATP/Defender] would have subscribed to TocMail as TocMail is their only option," but for Microsoft's purported false advertising; this would have purportedly occurred by April 2020, within 6 months of TocMail making a single press release of its product in November 2019. Am. Compl. ¶ 95; Expert Report of Marcie D. Bour ("**Exhibit 26**") at ¶ 82; Deposition of Marcie Bour dated March 15, 2021 ("**Exhibit 27**") at 35:21-36:1, 145:12-146:23.

### F. TocMail Has Not Surveyed Consumers About Their Purchase Decisions to Substantiate its Claims.

36. TocMail presumes the reason for consumers purchasing Microsoft products and not TocMail's product is that consumers believe they are already receiving the service TocMail provides and there is no point in buying TocMail's product. Ex. 22 at 93:7-16 ("[T]here would be some people in there who rejected [TocMail] just because they believed that they already have the protection."); Am. Compl. ¶¶ 94, 102, 115.

37. But TocMail admits that it never conducted a survey to determine why consumers elected not to purchase the TocMail service. Ex. 22 at 91:9-93:16, 96:2-11.

38. TocMail never reached out to consumers individually to determine why they did not purchase its service, and indeed TocMail admits that it does not know why any individual consumer made any particular purchasing decision. Ex. 22 at 96:2-11.

39. TocMail has not heard from a single business consumer regarding the TocMail

service. Ex. 22 at 183:19-184:6.

40. TocMail has not conducted a survey, poll, or gathered any other evidence of any consumer deception, let alone willful deception caused by the three Microsoft advertising messages at issue, and to the contrary, as explained above at Para. 24, Microsoft's advertising is truthful. *See* Ex. 21 (does not include any data from a consumer survey); Ex. 27 at 118:20-119:13, 138:5-20; Ex. 22 at 90:15-96:11.

41. Further, TocMail did not engage any expert to conduct a causation analysis and TocMail's damages expert, Ms. Marcie Bour ("Bour"), testified that she was directed by TocMail to assume that consumers were deceived by the ads. Ex. 27 at 38:18-19, 39:19-20, 41:14, 41:17-18, 42:24-25, 56:23-57:2, 121:21-122:8, 138:25-139:3, 149:19-22.

**G. TocMail's Theory of Microsoft's Alleged False Advertising is Based on a Flawed Premise.**

42. TocMail's basis for its claim that Microsoft has falsely advertised its Safe Links feature is that "ATP Safe Links runs on EOP servers[3]" and therefore "ATP Safe Links has the exact same IP addresses as EOP" and does not protect users at the time of click from malicious links Am. Compl ¶¶ 61-62; Ex. 21 at pp. 6-7.

43. TocMail claims these IP addresses are publicly known (and easily deployed via a free software called MKHTAccess_Red), and Hackers can therefore use these publicly available IP addresses for IP Cloaking. Ex. 22 at 74:9-17, 75:8-11; Ex. 21 at p. 10.

---

[3] Exchange Online Protection ("EOP") is the default cloud-based security service for Office 365, which provides consumers with security features and layers of protection within Office 365. Am. Compl. ¶ 43; Ex. 1 at 14:5-11. If a consumer wishes to obtain additional, enhanced layers of protection, it can purchase ATP/Defender as a separate add-on to Office 365 or purchase an Office 365 suite that includes the Defender security suite. *Supra* Para. 7. The Defender add-on includes Safe Links as a part of a myriad of other services to provide additional security features and layers of protection beyond those provided by EOP. *Id.*

44. However, Safe Links' URL detonation occurs on its own server. Ex. 1 at 152:20-153:4 ("separate servers [from EOP servers] that are deployed in a completely separate way."), 151:10-153:12; Ex. 5 at 46:22-23 ("ATP has its own set of servers and Safe Links has its own set of servers"); Ex. 6 at 46:24-25 ("I don't believe ATP Safe Links runs on EOP servers").

45. And, while some of Microsoft's IP ranges are publicly known, (Ex. 6 at 43:19-23, 44:8-11, 44:20-23, 45:21-46:1), Microsoft can "route [its] detonation traffic out [of] non-Microsoft attributable IP ranges," (*id.* at 60:19-20), and in doing so, hackers see a third-party's IP addresses, not Microsoft's IP addresses, which helps prevent cyberattacks through IP Cloaking. Ex. 3 at Response to Interrogatory No. 15; Ex. 6 at 58:22-59:7; Ex. 7 at 32:16-33:2, 94:4-95:21; Deposition of Brian Wilcox dated March 25, 2021 ("**Exhibit 28**") at 154:14-155:10.

**H. TocMail's Testing of Safe Links Proves Safe Links Works as Advertised.**

46. Michael Wood's ("Wood") expert report relies upon a video of a known hacker named Mikail Tunc, recording himself purportedly using his cellular phone to click on a URL "in Safe Links" (as the narration calls it – not in Outlook) and his phone being sent to the original URL, which is allegedly a malware download page. Ex. 21 at pp. 61-67.

47. It is unclear how the "test" was performed and the video demonstration does not show anything other than a "Bank" and red bug icons, with arrows directing to the words "Safe Links" and "TocMail," while a voiceover narrates. Ex. 21 at p. 10 (providing link to https://www.youtube.com/watch?v=ST-zXIa-TJw); pp. 61-66 (images).

48. Based on the video, Wood concludes that "Safe Links' users will never be safe from links that alter their destination after delivery for as long as Safe Links continues to send users to the original URL." Ex. 21 at pp. 60-61.

49. But Wood admits the malware never even reached Tunc's phone in the video and

12

that the video "is illustrative … here's what would happen in the real world, but we're not going to intentionally infect Mikail Tunc's phone with malware." Ex. 14 at 103:4-17; *see id.* at 56:7-25.

50. As expected, because Safe Links works to identify and block actual malicious links, it would not have identified a benign "test" link as malicious and blocked it, and would have instead allowed the user to go to the benign link, as it did here. Ex. 1 at 88:5-13.

### I. TocMail's Lost Profits Damages Theory is Speculative.

51. Bour estimated TocMail's future lost profits through the year 2035 are approximately $15.3 Billion, but later reduced this figure to $9.5 Billion for the first time during her deposition. Ex. 26 ¶ 110; Ex. 27 at 25:18-23 (admitting she "didn't feel there was sufficient information available to rely on a hundred percent of [Microsoft's ATP/Defender consumer] seats being captured [*i.e.* migrating to TocMail] and there wasn't enough information … to allocate how many consumer seats [TocMail] would have captured" from Microsoft).

52. Bour's lost profit's calculation is based on unverified assumptions and unrealistic market conditions. Ex. 27 at 80:3-8, 84:23-85:8, 99:20-100:1; Deposition of Keith Ugone dated March 22, 2021 ("**Exhibit 29**") at 66:3-14.

53. Bour's lost profits calculation entailed taking "the number of seats for Microsoft Office products sold with ATP," multiplying it by the cost of a subscription to TocMail's product, and projecting the calculated amount of sales TocMail would have earned through the year 2035, assuming that every single customer would have purchased TocMail's product but for the allegedly false ads at issue. Am. Compl. ¶¶ 95, 102; Ex. 26 ¶¶ 81-83; Ex. 27 at 24:17-22.

54. TocMail acknowledges that there are third-party cybersecurity products that offer similar protection as TocMail's product. *See* Ex. 14 at 113:7-115:5; Ex. 21 at p. 59; Am. Compl. ¶¶ 39, 99.

55. Yet, Bour's lost profits calculation assumes every single Microsoft customer would have purchased TocMail but for the at-issue ads, which requires the assumption that not one consumer would have transitioned to another competitor in the market, such as Proofpoint or Mimecast, for example. Ex. 27 at 99:20-100:1; Ex. 29 at 89:6-15, 90:2-5.

56. Bour's analysis assumes 100% of Microsoft consumers would have been exposed to the three messages, 100% of Microsoft consumers were confused, and 100% of Microsoft consumers materially relied on the statements to alter their purchase decision. Ex. 27 at 118:20-119:13, 138:21-139:4, 140:6-19, 143:12-21.

57. Bour also assumes for the next 15 years TocMail would have a 98% profitability rate but admitted that is an unusually high profitability rate in her experience. Ex. 27 at 84:23-85:8.

58. Bour assumes there is no need for TocMail to incur any research and development costs through 2035 and did not account for any. Ex. 27 at 77:1-18, 79:17-80:2; Ex. 29 at 25:10-15.

59. Bour's lost profits calculation is also based on TocMail's company being a billion dollar a year company, but TocMail has had no valuation conducted. Ex. 27 at 47:5-7, 92:21-93:4.

60. Bour failed to consider how sales would be impacted if Microsoft would revise or remove any of the messages at issue. Ex. 27 at 120:14-21, 144:5-16; Ex. 29 at 42:8-14, 50:1-10.

61. TocMail's corporate representative testified that TocMail would only seek three years' worth of lost profits if corrective advertising occurred. Ex. 22 at 145:1-25.

**J. TocMail's Disgorgement Damages Theory is Unfounded.**

62. Initially, TocMail sought disgorgement of Microsoft's profits dating back from 2011, an arbitrary date, through the present. TocMail's Original Response to Microsoft's First Set of Interrogatories ("**Exhibit 30**") at Response to Interrogatory No. 8.

63. TocMail has now retreated from seeking damages dating back to 2011, but has not yet determined what its damages are, even though discovery has closed. Ex. 12 at Response to Interrogatory No. 8 (TocMail "reserves the right to determine whether the disgorgement time period shall start in 2015 (with the introduction of Safe Links) or 2019 (with the launch of TocMail)."

64. TocMail's disgorgement amount is based on Bour's estimates of Microsoft's U.S. and global revenues for ATP/Defender and Office 365 with ATP/Defender between July 2015 and June 2020, which are $7.3 Billion and $14.2 Billion, respectively. Ex. 26 ¶ 75.

65. Bour admitted that she did not at any point calculate Safe Links' revenues, and instead simply provided the revenues for ATP/Defender and Office 365 with ATP/Defender, broader products that integrate Safe Links as one feature among many features, services and sub-products, including, for example, Safe Attachments or PowerPoint. Ex. 27 at 20:19-21:4, 37:4-8, 39:23-40:3, 82:15-83:5, 165:1-166:6, 166:21-167:10.

66. Bour did not determine the revenue derived specifically from Safe Links, nor was the Safe Links revenue tied to each of the alleged false statements to which consumer purchases should be causally linked. Ex. 10 at ¶¶ 68-72, Ex. 27 at 38:9-40:18, 114:14-21, 140:14-19; Ex. 29 at 216:16-22, 218:14-219:2.

67. Bour testified that the reason she did not attempt to assign a value to Safe Links individually, but instead utilized the price of Microsoft products sold with the Safe Links feature, because she was operating under "the theory … that the safety offered by … Safe Links is a critical part of the brand and its image as being a safe product," but she has no evidence to support her theory because TocMail did not conduct a consumer survey or obtain any evidence that supports this notion. Ex. 27 at 43:1-25, 38:9-13, 38:19-22, 40:3-5; *see id.* 118:20-119:13, 138:5-20.

Dated: July 9, 2021 Respectfully submitted,

*/s/ Evelyn A. Cobos*
Evelyn A. Cobos

**GREENBERG TRAURIG, LLP**
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile: (713) 374-3505
MARY-OLGA LOVETT
Email: lovettm@gtlaw.com

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
FRANCISCO O. SANCHEZ
Florida Bar No. 598445
Email: sanchezo@gtlaw.com
      orizondol@gtlaw.com
EVELYN A. COBOS
Florida Bar No. 092310
Email: cobose@gtlaw.com
      FLService@gtlaw.com

***Attorneys for Microsoft Corporation***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of July, the foregoing document is being served this day on all counsel of record on the service list via electronic mail.

/s/ *Evelyn A. Cobos*
EVELYN A. COBOS

## SERVICE LIST

JOHNSON & MARTIN, P.A.
Joshua D. Martin
500 W. Cypress Creek Rd., Suite 430
Ft. Lauderdale, FL 33602
Tel: (954) 790-6699
Fax: (954) 206-0017
Email: josh.martin@johnsonmartinlaw.com

*Attorneys for Plaintiff*