# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil Action No.: 0:20-cv-60416-RS

TOCMAIL INC, a Florida corporation,

       Plaintiff,

v.

Microsoft Corporation, a
Washington corporation,

       Defendant.

_____

**REBUTTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.**

**December 7, 2020**

## REBUTTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.

### December 7, 2020

I.      OVERVIEW OF ASSIGNMENT ................................................................ 1

II.     SUMMARY OF OPINIONS ...................................................................... 3

III.    QUALIFICATIONS AND EXPERIENCE ................................................. 9

IV.     FACTS, DATA, AND INFORMATION CONSIDERED ........................... 10

V.      OVERVIEW OF PARTIES ..................................................................... 12

        A. TocMail Inc.  ("TocMail") ............................................................. 12

        B. Microsoft Inc. ("Microsoft") ........................................................ 13

VI.     MICROSOFT'S ACCUSED PRODUCTS ................................................ 15

        A. Microsoft Safe Links ..................................................................... 16

        B. Microsoft 365 Advanced Protection For Consumers .................... 17

        C. Microsoft Advanced Threat Protection ("ATP") ......................... 19

        D. Microsoft Products With ATP Or Advanced Protection Included ........... 22

        E. Sales Of Microsoft Products That Include The Safe Links Feature ......... 25

VII.    TOCMAIL'S ASSERTIONS ................................................................... 27

VIII.   THE '628 PATENT ............................................................................... 29

IX.     OVERVIEW OF TOCMAIL'S CLAIMED MONETARY REMEDIES AS
        PRESENTED BY MS. BOUR ................................................................. 30

        A. Claimed Lost Profits Damages ....................................................... 30

        B. Claimed Disgorgement .................................................................. 35

X.      EVALUATION OF TOCMAIL'S CLAIMED DAMAGES AS PRESENTED BY
        MS. BOUR ............................................................................................ 37

        A. Ms. Bour Failed To Analyze Or Consider The Possibility Microsoft Could Remove
           The Allegedly Misleading Statements In The Future .................................. 38

        B. Ms. Bour's Proposed Monetary Remedies Represent Mathematical Calculations
           Rather Than Reliable Measures Of Economic Harm Attributable To Alleged
           Wrongful Conduct ........................................................................... 40

        C. Ms. Bour Failed To Consider That Not All Consumers Were Exposed To, Confused
           By, Or Altered Their Purchase Behavior Because Of Microsoft's Allegedly
           Misleading Statements ....................................................................... 41

           1. Many Microsoft Customers Likely Were Not Exposed To The Allegedly False
              Statements ................................................................................. 42

CONFIDENTIAL – COUNSEL ONLY

2.  Consumers Who Were Exposed To The Allegedly Misleading Statements May Not Have Been Confused In The Manner Alleged By Plaintiff ........................... 47

3.  Consumers Who Were Exposed To And Confused By The Allegedly Misleading Statements May Not Have Purchased The TocMail Product ............................... 48

D.  Ms. Bour's Calculation Of Claimed Lost Profits Is Based Upon Flawed And Unsupported Assumptions ........................................................................... 52

1.  Ms. Bour Assumes An Unreasonably Large Percentage Of Microsoft Customers Would Have Purchased TocMail's Product........................................................... 52

2.  Ms. Bour Utilizes An Unreasonable And Overstated Incremental Profit Margin For TocMail's Alleged Lost Sales ......................................................................... 56

3.  Ms. Bour Projects Lost Profits Over An Unreasonably Long Time Horizon....... 59

4.  Ms. Bour Assumes An Unreasonably Low Discount Rate.................................. 61

E.  Ms. Bour's Calculation Of Disgorgement Of Microsoft's Profits............................. 62

1.  Ms. Bour Assumes That All Microsoft Revenues From Products That Include The Safe Links Feature Represent Revenues With An Economic Nexus To The Alleged Wrongful Conduct.................................................................................... 63

2.  Ms. Bour Fails To Meet Her Burden Of Identifying Revenues *Attributable To Safe Links* ........................................................................................................... 65

3.  Ms. Bour Fails To Apportion Microsoft's Revenues Only To Those Revenues Associated With The *At-Issue Safe Links Feature* ............................................... 67

4.  Ms. Bour Presents Only Microsoft Revenues Without Accounting For Any Costs.................................................................................................................... 69

## REBUTTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.

### December 7, 2020

## I.  OVERVIEW OF ASSIGNMENT

1.   I have been retained as an economics and damages expert for Microsoft Corporation ("Microsoft") in the matter of *TocMail Inc. vs. Microsoft Corporation*.  I understand that TocMail Inc. ("TocMail") asserts that Microsoft has falsely advertised the ability of its Safe Links feature (included in the Office Advanced Threat Protection ("ATP") product) to protect cloud-based email users from a malicious content security threat called "IP cloaking."[1]  Absent Microsoft's alleged false advertising, TocMail contends it would have been able to sell a product allegedly embodying its patented method for protecting against attacks that use IP cloaking.[2]

2.   As a result of Microsoft's alleged false advertising, TocMail is seeking lost profits damages and disgorgement of Microsoft's profits as monetary remedies.[3]  On October 1, 2020, TocMail submitted the expert report of Ms. Marcie Bour (the "Bour Report") to support its claim of lost profits and disgorgement of Microsoft's profits attributable to the alleged wrongful conduct.

   a.   TocMail's Lost Profits Claim.  In her report, Ms. Bour assumes all or virtually all of Microsoft customers who bought products including the Safe Links feature would have purchased a TocMail subscription in the absence of Microsoft's alleged false advertising.[4]  Ms. Bour concludes that the present value of TocMail's lost profits between November 2019 (i.e., the assumed hypothetical launch date of TocMail) and

---

[1] Plaintiff's First Amended Complaint ("Amended Complaint") filed on November 13, 2020, pp. 4 – 8.

[2] Amended Complaint, pp. 21 – 22.

[3] Amended Complaint, pp. 22 – 25.

[4] Bour Report, pp. 22 – 23.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

May 2035 (i.e., the expiration date of TocMail's patent according to Plaintiff) is approximately ███████.[5]

b. <u>TocMail's Disgorgement Claim</u>. Ms. Bour states that "[t]he Lanham Act requires a plaintiff to provide the infringing defendant's sale. [sic]  The burden then shifts to a defendant to prove 'all elements of cost or deductions claimed.'"[6]  As an input into a measure of claimed disgorgement, Ms. Bour estimates Microsoft's revenues from (i) the sale of ATP as a standalone product and (ii) the sale of other Microsoft products that include ATP.[7]  Ms. Bour identified Microsoft's U.S. revenues from the at-issue products with ATP or Safe Links between July 2015 and June 2020 of ███████.[8]  Ms. Bour also estimates Microsoft's global revenues from the at-issue products with ATP or Safe Links of ████████ between July 2015 and June 2020.[9]

3.     I have been requested by counsel for Microsoft to evaluate the opinions contained in the Bour Report.  In conducting my analyses, I have been asked to assume Microsoft is found to be in violation of the Lanham Act, as claimed by TocMail (which Microsoft disputes).[10]

My opinions and the bases for my opinions are contained in the remainder of this report.[11]

_____

[5] Bour Report, p. 6.

[6] Bour Report, p. 13.

[7] Bour Report, p. 4.

[8] Bour Report, p. 21.

[9] Bour Report, pp. 14, 21.  As described in **Section IX** below, Ms. Bour relies upon the overall Microsoft annual financial statements which report Microsoft's total revenue earned globally and total revenue earned in the United States.

[10] Should the trier of fact determine that Microsoft has not falsely advertised its products, as claimed by TocMail, there would be no basis, from an economic perspective, to award damages.

[11] I understand that fact discovery in this case is ongoing and closes February 22, 2021.  In the event additional information relevant to an evaluation of TocMail's claimed monetary remedies is made available, I reserve the ability to evaluate that information and update my opinions and analysis.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

## II.   <u>SUMMARY OF OPINIONS</u>[12]

4.      Based upon the application of my economics and damages quantification training and experience to (a) my understanding of TocMail's allegations, (b) documentary evidence, and (c) my review of the Bour Report, I have concluded that the monetary remedy-related opinions presented in the Bour Report are unsupported by the economic evidence in this matter.  As discussed throughout this report, the claimed monetary remedies presented by Ms. Bour are unreliable and significantly overstated, based upon flawed inputs for which she provides no support, and are based upon calculations that do not apply reliable economic methods or principles.  Consequently, Ms. Bour does not provide the trier of fact with any reliable measures of monetary remedies.  The bases for my opinions are summarized below and discussed in more detail later in this report.

   a.   <u>Ms. Bour Failed To Analyze Or Consider The Possibility Microsoft Could Remove The Allegedly Misleading Statements In The Future</u>.  In light of the alleged harm to TocMail primarily accruing in the future and being highly uncertain, updating Microsoft's advertising and other materials to remove statements that are adjudicated to be misleading on a going-forward basis is an efficient remedy with an economic nexus to TocMail's alleged economic harm.  This would address directly the alleged wrongful conduct and then allow TocMail to earn the future profits it would have been able to earn but-for the alleged wrongful conduct through commercializing its security product.

   b.   <u>Ms Bour Presents Claimed Monetary Remedies That Contain A Fatal Irreconcilable Inconsistency</u>.  Assuming a liability outcome, Ms. Bour calculates claimed monetary remedies to TocMail over a 15-year period into the future.  Underlying these calculations, Ms. Bour opines that in the absence of the alleged false advertising, TocMail would have captured all of Microsoft's future Accused Products' customers

_____

[12] This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout this report and the associated exhibits.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

within six months of a <u>single press release</u> introducing TocMail's product.[13]  This presents a fatal irreconcilable inconsistency in Ms. Bour's analysis.  Given the 15-year period into the future over which monetary remedies are being claimed, Ms. Bour does not reconcile why a favorable adjudicated outcome (if it were to occur to trigger the possibility of a monetary remedy) followed by Microsoft removing any statements adjudicated to be false would not cure fully within six months the claimed future harm being asserted by TocMail through Ms. Bour.

c.  <u>Ms. Bour's Proposed Monetary Remedies Represent Mathematical Calculations Rather Than Reliable Measures Of Damages Attributable To Alleged Wrongful Conduct</u>.  Ms. Bour fails to provide any evaluation of the inputs into her calculations or whether her claimed monetary remedies have an economic nexus to the alleged wrongful conduct.  Ms. Bour failed to properly evaluate economic factors inherent in a measure of lost profits or disgorgement including: (i) the portion of lost sales, if any, directly attributable to the alleged wrongful conduct, (ii) the reasonableness or accuracy of her lost profits inputs, and (iii) the portion of Microsoft revenues with a nexus to the alleged wrongful conduct.  Absent any such analyses, Ms. Bour simply performs mathematical calculations rather than a reliable determination of TocMail's damages (or Microsoft's profits) attributable to Microsoft's alleged false advertising.  Absent a reliable measure of these inputs, Ms. Bour's claimed monetary remedies are unreliable and Plaintiff has failed to provide evidence to support a reliable monetary remedy in this matter.

d.  <u>Ms. Bour Failed To Consider That Not All Consumers Were Exposed To, Confused By, Or Altered Their Purchase Behavior Because Of Microsoft's Allegedly Misleading Statements</u>.  Ms. Bour implicitly assumes that all consumers who purchased a product with the Safe Links feature (i) were exposed to the asserted statements, (ii) were confused by the statements in the manner alleged by Plaintiff, and (iii) changed their purchasing behaviors as a result of their exposure and confusion arising from the allegedly misleading statements.  Ms. Bour's implicit assumptions are inappropriate and inconsistent with at least the following evidence, which she failed to consider in her report.

i.  <u>Many Microsoft Customers Likely Were Not Exposed To The Alleged False Statements</u>.  Ms. Bour fails to analyze in her report the specific alleged misleading statements made by Microsoft and evaluate whether her implicit assumption that all Microsoft customers who purchased a product with Safe Links would have been

_____

[13] In her report, Ms. Bour assumes that, after a November 2019 press release, it would "take 30-90 days for companies to investigate TocMail and the claims in the press release." (Bour Report, p. 23.) After that, Ms. Bour assumes that TocMail would make sales to 50% of Microsoft's seats on the accused products in February 2020, 75% of those Microsoft seats in March 2020, and 100% of those Microsoft seats starting in April 2020. (Bour Report, p. 23.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

exposed to those statements is reasonable or appropriate.  A review of the actual materials identified by Plaintiff which included one of the allegedly false statements supports a conclusion that these statements only are included in materials that are difficult to access, and likely would not be viewed by many, much less all, Microsoft customers.

ii.  <u>Consumers Who Were Exposed To The Allegedly Misleading Statements May Not Have Been Confused In The Manner Alleged By Plaintiff</u>.  Ms. Bour fails to evaluate in her report the alleged misleading statements to determine whether her assumption is accurate that each and every Microsoft customer would interpret those statements as solving IP Cloaking and/or being 100% effective at eliminating unsafe email links.  Ms. Bour failed to acknowledge in her report that the claimed statements (1) do not reference IP Cloaking, (2) do not imply there are no benefits from third-party security products, and (3) one of the three statements focuses on hyperlinks in documents, a feature unrelated to TocMail's email security product. Contrary to Ms. Bour's unsupported assumptions, it is reasonable to expect that at least some consumers who were exposed to the allegedly misleading claims would not be confused in the manner alleged by Plaintiff.

iii.  <u>Consumers Who Were Exposed To And Confused By The Allegedly Misleading Statements May Not Have Altered Their Purchasing Decisions</u>.  Ms. Bour does not provide any analysis in her report supporting her implicit assumption that each confused consumer would have changed their purchasing decision and purchased the TocMail product but-for the alleged wrongful conduct.  Ms. Bour's assumption is unreasonable and inconsistent with the following evidence: (1) TocMail has no sales and is not commercially successful, (2) Microsoft's first-party security offerings do not prevent other third-party security products from achieving commercial success, and (3) many Microsoft customers with Safe Links may have received it in a product with other features and may have placed little or no value on Safe Links.

e.  <u>Ms. Bour's Calculation Of Lost Profits Is Based Upon Flawed And Unsupported Assumptions</u>.  Ms. Bour presents a claimed calculation of lost profits based upon unreasonable assumptions that she presents without any support or independent analysis in her report regarding the appropriateness or accuracy of those assumptions. Ms. Bour's flawed assumptions include at least the following.

i.  <u>Ms. Bour Assumes An Unreasonably Large Percentage Of Microsoft Customers Would Have Purchased TocMail's Product</u>.  Ms. Bour assumes, without support, that absent Microsoft's alleged false advertising each and every Microsoft customer who purchased a product including the Safe Links feature would purchase TocMail's product.  Effectively, Ms. Bour's claimed lost sales are based upon an

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020
_____

assumption that (1) 100% of at-issue Microsoft customers were exposed to the allegedly misleading statements, (2) 100% of at-issue Microsoft customers were confused by those statements in the manner alleged by Plaintiff, and (3) 100% of at-issue Microsoft customers altered their purchase behavior and declined to purchase TocMail's product when they otherwise would have purchased that product.  As discussed above, each of these assumptions is unsupported and inconsistent with the available economic evidence and as such, Ms. Bour has not presented a reliable or relevant measure of TocMail's actual lost sales as a result of the alleged wrongful conduct.

ii.   Ms. Bour Utilizes An Unreasonable And Overstated Incremental Profit Margin For TocMail's Alleged Lost Sales.  Ms. Bour fails to perform an independent analysis of the incremental costs TocMail likely would incur if it made its claimed lost sales. Ms. Bour's identified incremental costs imply TocMail would operate at a gross profit rate of over ███ from 2020 to May 2035.  Ms. Bour's assumed profitability is unreasonably high and inconsistent with the actual profitability observed at other cybersecurity companies focused on email security, which had gross profit margins ranging from 63% to 78% and net profit margins ranging from -39.1% to 0.8%.

iii.   Ms. Bour Projects Lost Profits Over An Unreasonably Long Time Horizon. Ms. Bour projects TocMail's claimed lost profits through May 7, 2035, Plaintiff's asserted date of expiration of the '628 Patent, nearly 15 years into the future.  Ms. Bour's assumptions underlying her calculation of lost profits are unsupported and unreasonable, and her attempts to project those same inputs 15 years into the future are highly speculative.  Also, an underlying assumption of Ms. Bour's projections is that TocMail would not be able to mitigate any of the claimed impact of Microsoft's alleged false advertising over the entire projection period.

iv.   Ms. Bour Assumes An Unreasonably Low Discount Rate.  Ms. Bour utilized a discount rate of 7.5% based in part on Microsoft's weighted average cost of capital ("WACC") of 5.52% with a claimed upward adjustment to account for the diversification of Microsoft (relative to TocMail).  Ms. Bour's discount rate is flawed and unreliable for at least the following reasons: (1) the increase in WACC above Microsoft's 5.52% is arbitrary and unsupported; (2) the WACC of 7.5% primarily is based upon Microsoft and inconsistent with the WACC of other established email security firms; and (3) Ms. Bour does not account for business risks specific to TocMail, a new firm that has not made a single sale of its product and has not demonstrated the ability to make the sales that Microsoft was able to achieve.

f.   Ms. Bour's Calculation Of Disgorgement Of Microsoft's Profits.  With respect to TocMail's claimed disgorgement, Ms. Bour identifies Microsoft's revenues from the

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020
_____

sale of ATP as a standalone product and from the sale of Office 365 and Microsoft 365 products that included ATP. While Ms. Bour identifies Microsoft's total revenues from products that include Safe Links, she does not provide a relevant or reliable measure of Microsoft's profits attributable to the alleged wrongful conduct (or even a relevant input into such a calculation). Ms. Bour's presented revenue figures are flawed for at least the following reasons.

i.   <u>Ms. Bour Assumes That All Microsoft Revenues From Products Including The Safe Links Feature Represent Revenues With A Nexus To The Alleged Wrongful Conduct</u>. From an economic perspective, the benefit to Microsoft, if any, from the alleged wrongful conduct would not be equal to **all** revenues and profits attributable to products which included the Safe Links feature. Rather, Microsoft's alleged at-issue profits (assuming liability and assuming disgorgement is the appropriate remedy) would be equal to the incremental profits earned from consumers who were exposed to an allegedly false statement, confused by that statement, and purchased a Microsoft product when they otherwise would not have as a result of the allegedly misleading statements. Plaintiff has not shown evidence that any (much less all) Microsoft customers altered their purchasing behavior as assumed by Ms. Bour. As discussed above, this assumption is unreasonable and inconsistent with the available economic evidence. Ms. Bour's failure to properly evaluate the incremental Microsoft revenues or profits earned as a result of the alleged wrongful conduct renders the inputs she presents irrelevant and unreliable.

ii.  <u>Ms. Bour Fails To Meet The Burden Of Identifying Revenues Attributable To Safe Links</u>. Even if the trier-of-fact agrees with Ms. Bour's assumption that **all** Microsoft customers who purchased a product with Safe Links saw an allegedly misleading statement and purchased a Microsoft product with Safe Links because of that statement, Ms. Bour failed to consider (and properly evaluate) in her report that the revenues and profits received by Microsoft on such products with a claimed nexus to the allegedly misleading statements are not solely related to Microsoft's Safe Links feature. An appropriate evaluation of Microsoft's profits to be disgorged should measure only those profits attributable to Safe Links. Even though Ms. Bour states she only is required to identify revenues and not relevant deductible costs, Ms. Bour still fails to properly meet her burden as she described it. Rather than identify the revenues that would serve as a relevant input into a calculation of disgorgement attributable to the alleged wrongful conduct (i.e., Microsoft's incremental revenues from Safe Links), Ms. Bour simply presents **all** revenues associated with any Microsoft product that included Safe Links as part of a product with numerous other features.

iii. <u>Ms. Bour Fails To Apportion Microsoft's Revenues Only To Those Revenues Associated With The At-Issue Safe Links Feature</u>. Ms. Bour presents all Microsoft

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

revenues from each product that included the Safe Links feature, and has failed to apportion those revenues to the revenues attributable to Safe Links. Ms. Bour made no efforts to perform any apportionment of Microsoft's revenues from these broader products, even to the revenues attributable to Microsoft's security product products such as ATP Plan 1, the product with the fewest features offered for sale by Microsoft that includes Safe Links. Over the July 2015 to June 2020 period, Microsoft's broader products had an overall average price of ███████████ -- compared to an overall average price for ATP Plan 1 of ████████████. Even if Ms. Bour had attempted to calculate Microsoft's revenue solely attributable to ATP (which she did not), such an analysis would fail to properly apportion Microsoft's revenues as Safe Links is a single feature out of numerous features included in ATP Plan 1. As such, the revenues presented by Ms. Bour include substantial revenues attributable to products and features with no nexus to the alleged wrongful conduct, and her failure to properly apportion Microsoft's revenues renders those figures unreliable and irrelevant as an input into an estimation of disgorgement.

iv.   <u>Ms. Bour Presents Only Microsoft Revenues Without Accounting For Any Costs</u>. Even if Ms. Bour had properly identified Microsoft's revenues attributable to the alleged wrongful conduct, which as discussed above she has not, a proper evaluation of disgorgement also would incorporate a deduction for Microsoft's costs. Over the July 2015 to June 2020 period, Microsoft's gross margin ████ ██████████████████████████████████████████████. In the event Plaintiff provides a reliable measure of Microsoft's incremental revenues earned as a result of the alleged wrongful conduct, which as discussed in detail above it has not, these gross margin figures could be applied to more appropriately defined revenues to begin to evaluate Microsoft's incremental profits (in conjunction with other deductions).

5.   For all of the reasons described herein, among others discussed throughout this report but not summarized here, the calculations presented by Ms. Bour regarding TocMail's claimed monetary remedies attributable to the alleged wrongful conduct are unreliable and overstated.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020
_____

### III.   QUALIFICATIONS AND EXPERIENCE

6.   I am a Senior Advisor (Managing Principal - Retired) at Analysis Group, Inc. ("AG").  AG provides economic, financial, statistical, health care analytics, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models.  Internationally, AG consists of more than 1,000 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, health care analytics, and strategy consulting.

7.   My primary responsibility at AG is to provide economic and financial consulting services to clients.  Throughout my career, I have provided financial consulting services in false advertising matters, antitrust cases, intellectual property cases, breach of contract cases, fraud-related cases, business tort cases, business interruption cases, employment / loss of earnings matters, lender liability cases, and securities-related cases.  I have provided expert testimony in deposition and trial settings numerous times.

8.   I specialize in the application of economic principles to complex financial disputes.  I am generally retained in cases requiring economic and financial analyses.  Financial models I have constructed or evaluated in the past have contained as components revenue analyses, cost analyses, assessments of capacity, assessments of profitability, assessments of reasonable royalties, and assessments of the competitive business environment.  I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams.  During the

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020
_____

course of my career, I have frequently performed financial analyses using large databases of information and complex computer models.

9.  I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.  Attached as **Exhibit 1** is a true and correct copy of my current resume.  A listing of publications I have authored is contained in my resume.  Attached as **Exhibit 2** is my trial and deposition testimony experience.  My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

10.  AG is being compensated based upon hours incurred and the hourly rates of the personnel involved.  Payment to AG is not contingent upon my findings or the outcome of this matter. AG is being compensated at a rate of $650 per hour for my time.  Hourly rates for other staff at AG working on this matter range from $300 to $500 per hour, depending upon the level and experience of the staff involved.

## IV.  <u>FACTS, DATA, AND INFORMATION CONSIDERED</u>

11.  The facts, data, and information available to me in forming my opinions are set forth in **Exhibit 3** or elsewhere in my report (including exhibits).[14]  Examples of the types of information available to me include the following:

_____

[14] I understand that fact discovery in this case is ongoing and closes February 22, 2021.  In the event additional information relevant to an evaluation of TocMail's claimed monetary remedies is made available, I reserve the ability to evaluate that information and update my opinions and analysis.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

    a.  <u>legal documents</u> (e.g., Amended Complaint, Plaintiff's responses to interrogatories from Defendant);

    b.  <u>patents</u> (i.e., United States Patent No. 10,574,628);

    c.  <u>expert reports</u> (i.e., Expert Report of Marcie D. Bour dated October 1, 2020);

    d.  <u>documents produced by Microsoft</u> (e.g., financial data regarding units sold and revenues of Office 365 products); and

    e.  <u>information independently obtained</u> (e.g., information from TocMail's website, Microsoft's website, and various third-party websites).

12.    In addition, during the preparation of my expert report, discussions were held with Ms. Kathryn Griffith, a Director at PricewaterhouseCooper LLP ("PwC"). Generally, the following topics were discussed:

    a.  how Microsoft commercializes the Safe Links feature;

    b.  how Microsoft accounts for the costs attributable to Safe Links; and

    c.  Microsoft's produced unit sales and revenue data.

13.    My analyses and opinions are based upon the information available to date and are contained throughout this narrative to my report and the associated exhibits. I reserve the ability to review documents, depositions transcripts, expert reports, or other information still to be produced by the parties and to supplement my opinions based upon that review, if appropriate. I also reserve the ability to use demonstrative exhibits and/or other information at trial to explain and illustrate my opinions.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

### V.   OVERVIEW OF PARTIES

#### A.   TocMail Inc.   ("TocMail")

14.     TocMail, short for "time-of-click mail," is a cybersecurity company headquartered in

Florida that allegedly offers "time-of-click" protection against email hacking.[15]  According

to its website, TocMail's time-of-click mail services are capable of defeating the attack that

professional hackers use to bypass other cloud-based time-of-click services.[16]  More

specifically, TocMail alleged that its services protect against a hacking technique used to

bypass email security called IP cloaking, described in detail below.[17]

15.     TocMail asserts that cloud-based security has a major flaw that can be mitigated with

TocMail's onsite security service: not sharing the same internet address as the end user.[18]

A cloud-based security service will evaluate a link in an email by: (a) using the link, (b)

evaluating whether the link is benign or malicious, and (c) if it determines the link is

benign, allowing the user to access the link.[19]  With IP Cloaking, an email with malicious

content can evaluate the underlying internet address accessing an embedded link and

determine if it is the user or a cloud-based security scanner.  A hacker can provide the

_____

[15] "TocMail."  (https://TocMail.net/#instructions, viewed on November 20, 2020.)  *See also*, Amended Complaint, p. 2.

[16] "TocMail."  (https://TocMail.net/#instructions, viewed on November 20, 2020.)

[17] "TocMail."  (https://TocMail.net/#instructions, viewed on November 20, 2020.)

[18] Amended Complaint, p. 20.

[19] TocMail.  (https://TocMail.net/#instructions, viewed on November 20, 2020.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

security scanner with a benign link so the security service allows the user to access the link, and when the user accesses the link the hacker can redirect the user to malicious content.[20]

16.     TocMail claims to be the owner of the U.S. 10,574,628 Patent ("'628 Patent") entitled "Computer Security System and Method Based on User-Intended Final Destination."[21] TocMail asserts (without any support of which I am aware) that the patented technology enables it to be the only company able to offer a "cloud redirect service that solves this all-important issue."[22]  TocMail claims it solves the IP Cloaking issue by evaluating whether the destination from a link is benign, and then sending the user directly to the benign site rather than allowing it to access the email link.[23]  TocMail allegedly began selling its solution on December 12, 2019 through its website with a commercial license available for $3 per user per month, and TocMail claims it intends to begin selling consumer licenses for $5 per user per month but has made no sales.[24]

**B.  Microsoft Inc. ("Microsoft")**

17.     Microsoft is a world leader in the development of software, services, devices, and cloud based platforms for consumers and businesses, headquartered in Redmond, WA.[25] Microsoft's products include "cross-device productivity applications; server applications;

_____

[20] Amended Complaint, p. 3.

[21] U.S. 10,574,628 Patent.  *See* **Section VI** below for a description of this patent.

[22] Complaint filed on February 26, 2020 ("Complaint"), p. 32.

[23] TocMail.  (https://TocMail.net/#instructions, viewed on November 20, 2020.)

[24] Plaintiff's Answers And Objections To Defendant's First Set Of Interrogatories To Plaintiff, p. 4.

[25] Microsoft Corporation SEC Form 10-K for the fiscal year ended June 30, 2020, p 3.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

___

business solution applications; desktop and server management tools; software development tools; and video games."[26] Founded in 1975, Microsoft characterizes its mission as bringing "technology and products together into experiences and solutions that unlock value for [its] customers."[27] On August 1, 1989, the company released its earliest version of Office Suite productivity applications.[28] Currently, Microsoft offers a variety of cloud-based office products and services to consumer and commercial customers.[29]

18. Currently, Microsoft operates in three segments, (a) Productivity and Business Processes, (b) Intelligent Cloud, and (c) More Personal Computing.[30] As part of its Productivity and Business Processes segment, Microsoft has developed a series of products and services that support efficiencies, communication, information services for customers that is categorizes into four segments: Office Commercial, Office Consumer, LinkedIn, and Dynamics.[31] (*See* **Table 1**.)

___

[26] Microsoft Corporation SEC Form 10-K for the fiscal year ended June 30, 2020, p 3.

[27] Microsoft Corporation SEC Form 10-K for the fiscal year ended June 30, 2020, p 3.

[28] "Facts About Microsoft."  (https://news.microsoft.com/facts-about-microsoft/, viewed on November 20, 2020.)

[29] "Microsoft 365 And Office 365 Plan Options."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/ office-365-platform-service-description/office-365-plan-options, viewed on November 20, 2020.)

[30] Microsoft Corporation SEC Form 10-K for the fiscal year ended June 30, 2020, pp. 7 – 12.

[31] Microsoft Corporation SEC Form 10-K for the fiscal year ended June 30, 2020, p. 7.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

**Table 1**
**Microsoft's Products And Services Included In**
**The Productivity And Business Processes Segment**

| Products and Services | Description |
|---|---|
| Office Consumer | Includes (a) Microsoft 365 Consumer (formerly Office 365 Consumer) and (b) Office. |
| Office Commercial | Includes (a) Microsoft 365 subscriptions and (b) Office 365 subscriptions. |
| LinkedIn | Web-based platform that includes (a) free services and (b) monetized services such as Talent Solutions, Learning Solutions, Marketing Solutions, and Premium Subscriptions. |
| Dynamics | Cloud-based and on-premises business solutions for financial management, enterprise resource planning, customer relationship management, supply chain management, and other application development platforms. |

## VI.     MICROSOFT'S ACCUSED PRODUCTS

19.    It is my understanding that Microsoft is alleged to falsely advertise its Safe Links feature.[32]

TocMail alleges that:

> Over a five-year period, Microsoft engaged in a sustained marketing campaign to falsely promote the narrative that Safe Links solves the cloud security flaw of IP Cloaked links and, therefore, companies can safely move to Microsoft's cloud service.[33]

20.    The specific feature at issue, Safe Links, is included in (a) all consumer Microsoft 365 licenses and (b) some, but not all, commercial Microsoft 365 and Office 365 licenses.[34]

_____

[32] Amended Complaint, p. 1.

[33] Amended Complaint, p. 13.

[34] Currently, Microsoft has updated the name associated with its consumer licenses and only sells Microsoft 365 (formerly Office 365 consumer) licenses.  For commercial licenses, Microsoft currently sells subscription plans of both Office 365 and Microsoft 365.  Office 365 commercial licenses include a cloud-based suite of productivity apps including Outlook, Word, and PowerPoint (among others).  Microsoft 365 commercial licenses include Office 365 and other services (e.g., Windows 10 Enterprise, Enterprise Mobility + Security).  ("Microsoft 365 And Office 365 Platform Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 20, 2020.)  *See also,* "Compare Office 365 to Microsoft 365."  (https://www.microsoft.com/en-us/microsoft-365/enterprise/compare-microsoft-365-

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

With respect to consumer licenses, Safe Links is one of several features within a security solution called Advanced Protection.[35]  For commercial licenses, Safe Links is included in Microsoft's ATP security product, which is included with some, but not all commercial subscription options.[36, 37]  For commercial licenses that are not included with ATP, it also is available as a standalone product.  I discuss the accused Safe Links feature as well as each of the Microsoft products which include Safe Links (among other features) in more detail below.  (A detailed summary of Microsoft 365 and Office 365 subscription options and the products included in those subscriptions also is included in **Exhibit 4**.)

A.  **Microsoft Safe Links**

21.  Microsoft's Safe Links is a security feature that uses "URL scanning and rewriting of inbound email messages in mail flow, and time-of-click verification of URLs and links in

---

and-office-365, viewed on November 20, 2020.)  *See also*, "Find The Right Solution For You." (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020.))

[35] I understand Advanced Protection also is referred to as "Advanced Security" or "Advanced security for email and files" in certain Microsoft marketing and support materials.  For purposes of this report, I will refer to the Microsoft 365 consumer security solution as Advanced Protection.  ("Microsoft 365 Advanced Protection." (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020).  *See also*, "Find The Right Solution For You." (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020).)

[36] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, viewed on November 6, 2020.)

[37] I understand Microsoft recently updated its product name "Office 365 Advanced Threat Protection" to "Microsoft Defender 365."  Microsoft's webpage states, "welcome to Microsoft Defender for Office 365, the new name for Office 365 Advanced Threat Protection."  For the purposes of this report, Microsoft's security product associated with Microsoft 365 and Office 365 is referred to by its prior name, Advanced Threat Protection or ATP.  ("Microsoft Defender For Office 365."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/office-365-atp?view=o365-worldwide#microsoft-defender-for-office-365-plan-1-and-plan-2, viewed on November 6, 2020.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

email messages and other locations."[38]  Microsoft's Safe Links' protection is integrated

into various Microsoft products including email messages, Microsoft Teams, and Office

365 Apps.[39]

22.    It is my understanding that the Safe Links feature never is sold as a standalone product,[40]

and is included in (a) Advanced Protection which is included with all Microsoft 365

consumer licenses and (b) Microsoft ATP which is included with some, but not all,

commercial Microsoft 365 and Office 365 licenses.[41]

## B. <u>Microsoft 365 Advanced Protection For Consumers</u>

23.    Advanced Protection, Microsoft's security product included with Microsoft 365 consumer

licenses, provides personal and family customers with (a) protection from viruses and

cybercrime, (b) tools to keep information secure and private, and (c) methods to recover

files from malicious attacks.[42]  I understand Advanced Protection cannot be purchased as

---

[38] "Set Up Safe Links Policies In Office 365 ATP."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/set-up-atp-safe-links-policies?view=o365-worldwide, viewed on November 6, 2020).

[39] "Safe Links In Microsoft Defender For Office 365."   (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/atp-safe-links?view=o365-worldwide#how-atp-safe-links-works-with-urls-in-office-documents, viewed on November 6, 2020.)

[40] Based upon a discussion with Ms. Kathryn Griffith.

[41] "Set Up Safe Links Policies In Office 365 ATP."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/set-up-atp-safe-links-policies?view=o365-worldwide, viewed on November 6, 2020.)  *See also*, "Microsoft 365 Advanced Protection."   (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020).  *See also*, "Find The Right Solution For You."   (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020.)

[42] "Microsoft 365 Advanced Protection."   (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

a standalone product and is included with all Microsoft consumer subscriptions.[43, 44]

Advanced Protection includes the following products and services.

a. <u>Advanced Attachment Scanning</u>.  Outlook.com scans email attachments for viruses and malware and will remove dangerous files so that users are prevented from opening them.[45]

b. <u>Safe Links</u>.  Safe Links redirects users to a warning page after it checks and confirms that a shared message link is related to a phishing scam and/or other potential viruses.[46]

c. <u>Email Encryption</u>.  Email encryption allows users to share confidential and personal information while ensuring that a user's message stays encrypted and does not leave Microsoft 365.[47]

d. <u>Prevent Forwarding</u>.  Prevent Forwarding allows users to encrypt messages within Microsoft 365 that cannot be copied or forwarded. I understand Microsoft Office attachments such as Word, Excel, or PowerPoint files are able to remain encrypted after they are downloaded.[48]

e. <u>Protect Files In Personal Vault</u>.  This feature serves as an extra security measure to allow users to protect sensitive or high importance files.  In the event someone gains

_____

[43] "Microsoft 365 Advanced Protection."   (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020).

[44] I understand Microsoft previously offered an Outlook Premium standalone subscription for consumers that included features such as Advanced Protection.  The Outlook Premium subscription was discontinued as of October 2017, but is still available to current subscribers.   ("Outlook.com Premium Closed To New Subscribers." (https://support.microsoft.com/en-us/office/outlook-com-premium-closed-to-new-subscribers-93934667-4db8-40bd-84b3-fc4823026ddd, viewed on November 6, 2020.)  *See also,* "Microsoft 365 Advanced Protection." (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020.))

[45] "Advanced Outlook.com Security For Office 365 Subscribers."  (https://support.microsoft.com/en-us/office/advanced-outlook-com-security-for-office-365-subscribers-882d2243-eab9-4545-a58a-b36fee4a46e2,   viewed   on November 10, 2020.)

[46] "Advanced Outlook.com Security For Office 365 Subscribers."  (https://support.microsoft.com/en-us/office/advanced-outlook-com-security-for-office-365-subscribers-882d2243-eab9-4545-a58a-b36fee4a46e2,   viewed   on November 10, 2020.)

[47] "Learn About Encrypted Messages In Outlook.com."   (https://support.microsoft.com/en-us/office/learn-about-encrypted-messages-in-outlook-com-3521aa01-77e3-4cfd-8a13-299eb60b1957, viewed on November 10, 2020.)

[48] "Learn About Encrypted Messages In Outlook.com."   (https://support.microsoft.com/en-us/office/learn-about-encrypted-messages-in-outlook-com-3521aa01-77e3-4cfd-8a13-299eb60b1957, viewed on November 10, 2020.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

access to a user's account, these files would require an extra security step to access such files.[49]

    f.  <u>Password-Protected Links</u>.  Users are able to use OneDrive to share photos, Office documents, and other non-OneDrive users.  This feature allows users to share OneDrive files in the form of password-protected links to anyone.[50]

    g.  <u>Ransomware Detection And Recovery</u>.  Ransomware detection notifies a user when his or her OneDrive files have been attacked.  The feature guides users through the process of restoring any lost or deleted files.[51]

    h.  <u>Restore OneDrive</u>.  With this feature the user has the ability to restore files that may have been deleted, overwritten, corrupted, or infected by malware.  The user is able to undo all actions to files and folders for the previous 30 days.[52]

### C. **Microsoft Advanced Threat Protection ("ATP")**

24.    ATP is a collection of cloud-based security features to help customers protect against unknown malware and viruses using numerous safeguarding features.[53]  Microsoft currently offers two different ATP "plans" or products, each of which is sold (a) with certain Microsoft 365 and Office 365 subscriptions, and (b) as a standalone product.

    a.  <u>ATP Plan 1</u>.  ATP Plan 1 is included with Microsoft's 365 Business Premium license for a price of $20 per user per month.[54]  As a standalone plan, a customer can currently

---

[49] "Protect Your OneDrive Files In Personal Vault."   (https://support.microsoft.com/en-us/office/protect-your-onedrive-files-in-personal-vault-6540ef37-e9bf-4121-a773-56f98dce78c4, viewed on November 10, 2020.)

[50] "Share OneDrive Files And Folders."  (https://support.microsoft.com/en-us/office/share-onedrive-files-and-folders-9fcc2f7d-de0c-4cec-93b0-a82024800c07, viewed on November 10, 2020.)

[51] "Ransomware Detection And Recovering Your Files."   (https://support.microsoft.com/en-us/office/ransomware-detection-and-recovering-your-files-0d90ec50-6bfd-40f4-acc7-b8c12c73637f, viewed on November 10, 2020.)

[52] "Restore Your OneDrive."   (https://support.microsoft.com/en-us/office/restore-your-onedrive-fa231298-759d-41cf-bcd0-25ac53eb8a15, viewed on November 20, 2020.)

[53] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[54] "Office 365 Advanced Threat Protection (ATP)."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/office-365-atp?view=o365-worldwide, viewed on October 30, 2020.) *See also*, "Reimagine productivity

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

___

purchase ATP Plan 1 for $3 per user per month.[55]  ATP Plan 1 includes the following services and features.

i. <u>Safe Links</u>.  As detailed above, Safe Links protects users from malicious URLs.[56]

ii. <u>Safe Attachments</u>.  Safe Attachments protects against unknown malware and viruses from messages and attachments.  In the event that messages or attachments do not have a known virus/malware signature, they are routed to special environment where ATP uses certain machine learning techniques to detect malicious content.[57]

iii. <u>ATP Anti-Phishing</u>.  ATP Anti-Phishing checks incoming messages for indicators that a message might be a phishing attempt.[58]

iv. <u>Real-time Detectors</u>.  Real-time Detectors is a monitoring feature that helps compliance administrators identify high-priority issues with respect to security attacks and increased suspicious activity.[59]

b. <u>ATP Plan 2</u>.  ATP Plan 2 is included with the following subscription options: (i) Office 365 E5 (priced at $35 per user per month),[60] (ii) Office 365 A5 (priced at $6 per user

___

with Microsoft 365 and Microsoft Teams."  (https://www.microsoft.com/en-us/microsoft-365/business/compare-all-microsoft-365-business-products?&activetab=tab:primaryr2, viewed on November 6, 2020.)

[55] The current pricing for ATP plans was confirmed by a member of my staff, at my direction, who received that information from a Microsoft service representative on November 3, 2020.  Office 365 ATP was priced at $2 per user per month when the product was released in Summer 2015.  ("Introducing Office 365 Advanced Threat Protection." (https://www.microsoft.com/en-us/microsoft-365/blog/2015/04/08/introducing-exchange-online-advanced-threat-protection/, viewed on November 2, 2020.)

[56] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[57] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[58] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[59] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[60] "Powerful Tools To Support Your Enterprise."  (https://www.microsoft.com/en-us/microsoft-365/enterprise/compare-office-365-plans, viewed on November 6, 2020.)  Microsoft offers an identical version of Office 365 E5 to qualified large nonprofit organizations for $14 per user per month.  ("Compare Microsoft 365 and Office 365 offers

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

per month),[61] (iii) Microsoft 365 E5 Compliance (priced at $10 per user per month),[62] and (iv) Microsoft 365 E5 (priced at $57 per user per month).[63, 64]  As a standalone plan, a customer can purchase ATP Plan 2 for $5 per user per month and receive each of the features included in Plan 1, and each of these additional automation, investigation, or education capabilities.[65]

  i.   <u>Threat Trackers</u>.  Threat trackers are informational widgets that deliver intelligence to users on cybersecurity issues.[66]

  ii.  <u>Threat Explorer</u>. Similar to Real-time Detectors in ATP Plan 1, Threat Explorer is an enhanced real-time report that allows authorized users to identify and analyze recent threats.[67]

  iii. <u>Automated Incident Response ("AIR")</u>.  AIR is an automated investigation process designed to identify well-known threats.[68]

_____

for nonprofits."        (https://www.microsoft.com/en-us/microsoft-365/nonprofit/office-365-nonprofit-plans-and-pricing?activetab=tab:primaryr2, viewed on November 11, 2020.))

[61] "Get Office 365 Free For Your Entire School."   (https://www.microsoft.com/en-us/microsoft-365/academic /compare-office-365-education-plans?activetab=tab%3aprimaryr1, viewed on November 6, 2020.)

[62] "Microsoft 365 E5 Compliance."  (https://www.microsoft.com/en-us/microsoft-365/business/e5-compliance?activ etab=pivot%3aoverviewtab, viewed on November 11, 2020.)

[63] "Transform Your Enterprise With Microsoft 365."   (https://www.microsoft.com/en-us/microsoft-365/compare-microsoft-365-enterprise-plans, viewed on November 6, 2020.)

[64] "Office 365 Advanced Threat Protection (ATP)."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/office-365-atp?view=o365-worldwide, viewed on October 30, 2020.)

[65] The current pricing for ATP plans was confirmed by a member of my staff, at my direction, who received that information from a Microsoft service representative on November 3, 2020.  Office 365 ATP was priced at $2 per user per month when the product was initially released.  ("Introducing Office 365 Advanced Threat Protection." (https://www.microsoft.com/en-us/microsoft-365/blog/2015/04/08/introducing-exchange-online-advanced-threat-protection/, viewed on November 2, 2020.)

[66] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/ servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)  *See also*, "Office 365 Advanced Threat Protection (ATP)." (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/office-365-atp?view=o365-worldwide, viewed on October 30, 2020.)

[67] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/ servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[68] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

      iv.  <u>Attack Simulator</u>.  Attack simulator allows users to run realistic attack scenarios in an organization.[69]

### D.  <u>Microsoft Products With ATP Or Advanced Protection Included</u>

25.    As discussed above, Advanced Protection (which includes Safe Links) is included with all Microsoft 365 consumer subscriptions,[70] and ATP (which includes Safe Links) is included with certain Microsoft 365 and Office 365 commercial subscriptions.  Microsoft's commercial subscriptions for Microsoft 365 and Office 365 have categories for (a) business, (b) education, (c) enterprise, and (d) government users.[71]  A summary of the Microsoft 365 and Office 365 subscriptions containing Advanced Protection or ATP is provided below.  (A detailed summary of Microsoft 365 and Office 365 subscription options and the products included in those subscriptions also is included in **Exhibit 4**.)

    a.  <u>Consumer</u>. Microsoft 365 Personal (formerly named Office 365 Personal) and Microsoft 365 Family (formerly named Office 365 Home) subscriptions include online storage and cloud-connected products such as Word, Excel, and Outlook.[72]  The

---

servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[69] "Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[70] "Microsoft 365 Advanced Protection."  (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020). [70] I understand Advanced Protection also is referred to as "Advanced Security" or "Advanced security for email and files" in certain Microsoft marketing and support materials.  For purposes of this report, I will refer to the Microsoft 365 consumer security solution as Advanced Protection.  ("Find The Right Solution For You."  (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020.))

[71] "Microsoft 365 And Office 365 Plan Options."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-plan-options, viewed on November 20, 2020.)

[72] "Find The Right Solution For You."  (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

Personal and Family plans are $6.99 and $9.99 per month respectively.[73]  Both Personal and Family Microsoft 365 subscriptions include Advanced Protection security that come with the Safe Links feature.[74]

b.  <u>Business</u>.   Microsoft 365 Business subscriptions generally include a range of applications and collaborative tools including Office, Teams, and SharePoint.[75]  Of the available subscription options, the Microsoft 365 Business Premium product, priced at $20.00 per user per month, is the only subscription which includes ATP.[76]  The other Microsoft 365 Business subscription plans, which range in price from $5 per user per month to $12.50 per user per month, do not include ATP.[77]

c.  <u>Education</u>.  Microsoft 365 and Office 365 Education subscriptions generally include cloud-based Office products (e.g., Word, Excel) along with learning and classroom tools such as Classroom Experiences and/or OneNote.[78]  Microsoft provides a wide range of customizable subscription plans for Microsoft 365 and Office 365 Education, with the lowest priced subscription without ATP priced at $2.50 per user per month and the lowest priced subscription with ATP priced at $6 per user per month.[79]

---

[73] The primary distinction is that the Family Plan allows for between two and six users.  Both plans offer a discounted annual subscription price at $69.99 per year (Personal) and $99.99 per year (Family).  ("Find The Right Solution For You."   (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020.))

[74] "Microsoft 365 Advanced Protection."   (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020).

[75] "Reimagine Productivity With Microsoft 365 And Microsoft Teams."   (https://www.microsoft.com/en-us/microsoft-365/business/compare-all-microsoft-365-business-products/?&activetab=tab:primaryr2, viewed on November 6, 2020.)

[76] "Microsoft 365 And Office 365 Platform Service Description."   (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 6, 2020.)  *See also,* "Reimagine Productivity With Microsoft 365 And Microsoft Teams."  (https://www.microsoft.com/en-us/microsoft-365/business/compare-all-microsoft-365-business-products/?&activetab=tab:primaryr2, viewed on November 6, 2020.)

[77] "Reimagine Productivity With Microsoft 365 And Microsoft Teams."   (https://www.microsoft.com/en-us/microsoft-365/business/compare-all-microsoft-365-business-products/?&activetab=tab:primaryr2, viewed on November 6, 2020.)  *See also,* "Microsoft 365 And Office 365 Platform Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 20, 2020.)

[78] "Microsoft 365 Education."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/microsoft-365-education, viewed on November 6, 2020.)

[79] Microsoft offers its Office 365 A1 license to schools free.  I understand the A1 subscription does not have ATP security features.  ("Get Office 365 Free For Your Entire School."  (https://www.microsoft.com/en-us/microsoft-365/academic/compare-office-365-education-plans?activetab=tab%3aprimaryr1, viewed on November 6, 2020.))

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

    d.  <u>Enterprise</u>.  Microsoft Enterprise subscriptions generally include cloud-based Office features (e.g., Word, Excel) along with applications designed to assist organizations with security and user productivity needs (e.g., Skype for Business, Yammer Enterprise).[80] Microsoft provides a wide range of customizable subscription plans for Microsoft 365 and Office 365 Enterprise, subscriptions that are included with ATP range in price from $35.00 per user per month to $57.00 per user per month.[81, 82] Microsoft 365 and Office 365 Enterprise subscriptions without ATP range in price from $4.00 per user per month to $32.00 per user per month.[83]

    e.  <u>Government</u>.   Microsoft 365 and Office 365 Government subscriptions generally include cloud-based Office features (e.g., Word, Excel, etc.) along with a segmented government cloud community that enables organizations to meet U.S. compliance and security standards.[84]  According to Microsoft's website, Government subscriptions do not have monthly per user cost information available.[85]

---

[80] "Microsoft 365 And Office 365 Plan Options."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/ office-365-platform-service-description/office-365-plan-options, viewed on November 20, 2020.)

[81] "Transform Your Enterprise With Microsoft 365."   (https://www.microsoft.com/en-us/microsoft-365/compare-microsoft-365-enterprise-plans, viewed on November 6, 2020.)  *See also,* "Powerful tools to support your enterprise." (https://www.microsoft.com/en-us/microsoft-365/enterprise/compare-office-365-plans,  viewed on November 6, 2020.)  *See also,* "Microsoft 365 And Office 365 Platform Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 20, 2020.)

[82] Microsoft offers certain Microsoft 365 Enterprise subscriptions to nonprofit organizations at reduced monthly per user prices.  For nonprofit organizations, Microsoft 365 Enterprise subscriptions with ATP are priced at $14.00 per user per month and subscriptions without ATP range in price from free to $4.50 per user per month.  ("Compare Microsoft 365 and Office 365 offers for nonprofits; large nonprofits."  (https://www.microsoft.com/en-us/microsoft-365/nonprofit/office-365-nonprofit-plans-and-pricing?%20activetab=tab%3aprimaryr2&activetab=tab:primaryr2, dated  November 6,  2020.))    *See also,*  "Microsoft  365  And  Office  365  Platform  Service  Description." (https://docs.microsoft.com/en-us/office365 /servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 20, 2020.)

[83] "Transform Your Enterprise With Microsoft 365."   (https://www.microsoft.com/en-us/microsoft-365/compare-microsoft-365-enterprise-plans, viewed on November 6, 2020.)  *See also*, "Office F3."  (https://www.microsoft.com /en-us/microsoft-365/enterprise/office-365-f3?rtc=1&activetab=pivot%3aoverviewtab,  viewed  on  November  6, 2020.)  *See also,* "Microsoft 365 And Office 365 Platform Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 20, 2020.)

[84] "Compare Office 365 Government Plans."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-us-government/office-365-us-government,  viewed  on  November  6, 2020.)

[85] "Compare Office 365 Government Plans."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-us-government/office-365-us-government,  viewed  on  November  6, 2020.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

---

### E.  Sales Of Microsoft Products That Include The Safe Links Feature

26.     I understand that Microsoft has produced sales and financial information regarding the products that included the Safe Links feature over the July 2015 to June 2020 period.[86] Over this period, Microsoft earned approximately ███████████████ relating to products that included Safe Links.[87]  With respect to consumer products (i.e., licenses) that included Safe Links,[88] Microsoft sold approximately (a) ██████ Microsoft 365 licenses, (b) █████ Microsoft 365 licenses included with Surface, and (c) ██████ Outlook.com standalone licenses over the July 2015 to June 2020 period.[89]  With respect to commercial products (i.e., seats) with Safe Link,[90] Microsoft sold approximately ████ ████ seats over the July 2015 to June 2020 period.[91]  **Table 2** and **Table 3** contain a

---

[86] Microsoft Pivot Tables by category, January 2015 – June 2020.  (MSFT_TOC00001067, MSFT_TOC00001070, and MSFT_TOC00001073.)

[87] **Exhibit 6**.  *See also*, Microsoft Pivot Tables by category, January 2015 – June 2020.  (MSFT_TOC00001067, MSFT_TOC00001070,  and  MSFT_TOC00001073.)  (Calculation: ███████████████████████ ██████.)

[88] Based upon a discussion with Ms. Kathryn Griffith, I understand a "license" is a Microsoft term for access to one of its consumer products (e.g., Microsoft 365 Family).   According to Ms. Griffith, Microsoft tracks its licenses in the produced data using the "MS Sales License" category.  These license units represent a single "billing event" for a user and are placed in a given month.  For example, if a user made an annual payment for a license in January 2019 that granted access for all of 2019, there would be a "MS Sales License" unit shown in January 2019, but no units shown in February to December 2019.

[89] **Exhibit 5**.  *See also*, Microsoft Pivot Tables by category, January 2015 – June 2020.  (MSFT_TOC00001067, MSFT_TOC00001070, and MSFT_TOC00001073.)

[90] Based upon a discussion with Ms. Kathryn Griffith, I understand a "seat" is a Microsoft term for a single user in a given month with an active subscription.   I understand a seat is represented by the "Assigned Units" in Microsoft's data.  For Microsoft's accused products, I have excluded those seats that are "unpaid" with respect to their associated transaction type.  (Microsoft Pivot Tables by category, January 2015 – June 2020.  (MSFT_TOC00001067, MSFT_TOC00001070, and MSFT_TOC00001073.))

[91] **Exhibit 5**.  *See also*, Microsoft Pivot Tables by category, January 2015 – June 2020.  (MSFT_TOC00001067, MSFT_TOC00001070, and MSFT_TOC00001073.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

summary of Microsoft's consumer licenses and commercial seats (**Exhibit 5**) along with

their associated revenues (**Exhibit 6**) for the Accused Products sold from July 2015 to June

2020.  (The revenue figures are associated with the Accused Products but do not isolate the

revenues associated with Safe Links.)

**Table 2**
**Microsoft's Revenues And Licenses Associated With**
**Consumer Products That Included Safe Links**

| Fiscal Year[92] | Microsoft 365 | | Microsoft 365 with Surface | | Outlook.com | |
|---|---|---|---|---|---|---|
| | Licenses | Revenues | Licenses | Revenues | Licenses | Revenues |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ |

---

[92] Microsoft's FY covers the period from July 1 to June 30 of the following year.  For example, FY 2016 began on July 1, 2015 and ended June 30, 2016.  (Microsoft Corporation SEC Form 10-K for the fiscal years ended June 30, 2016 & 2020, p. 1.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

**Table 3**
**Microsoft's Revenues And Seats Associated With**
**Commercial Products That Included Safe Links**

| Fiscal Year[93] | Standalone ATP With Safe Links | | Microsoft Subscription Included with Safe Links | |
|---|---|---|---|---|
| | Seats | Revenues | Seats | Revenues |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ |

## VII.   TOCMAIL'S ASSERTIONS

27.    I understand that TocMail Inc. asserts that Microsoft has falsely advertised the ability of its Safe Links feature (included with the ATP product) to protect cloud-based email users from a security threat called "IP cloaking" of malicious content.[94]  TocMail asserts that Microsoft has conveyed the following allegedly deceiving and/or false messages with respect to its Safe Links security feature.[95]

---

[93] Microsoft's FY covers the period from July 1 to June 30 of the following year.  For example, FY 2016 began on July 1, 2015 and ended June 30, 2016.  (Microsoft Corporation SEC Form 10-K for the fiscal years ended June 30, 2016 & 2020, p. 1.)

[94] Amended Complaint, pp. 4 – 8.  As discussed above, Safe Links also is included in Advanced Protection for Microsoft 365 consumer licenses.  ("Microsoft 365 Advanced Protection."  (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020.)

[95] TocMail also made two other claims with respect to Microsoft marketing and supportive material in its initial complaint.  (Complaint, pp. 16 – 21.)  I understand that the Court dismissed these claims against Microsoft on November 6, 2020, and that TocMail submitted an amended complaint on November 13, 2020 without these additional assertions.  (Order Granting In Part Defendant's Motion To Dismiss in the *TocMail, Inc. v. Microsoft, Inc*. matter filed on November 6, 2020 ("Motion to Dismiss"), pp. 6 – 9.  *See also*, Amended Complaint.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020
_____

      a.  <u>Microsoft's First Allegedly Deceptive Message</u>.  TocMail asserts that Microsoft has made the following allegedly misleading statement in its Office 365 Essentials: Advanced Threat Protection brochure that was posted to Microsoft's official Advanced Threat Protection purchase page.[96]

> Sophisticated attackers will plan to ensure links pass through the first round of security filters.  They do this by making the links benign, only to weaponized them after the message is delivered, altering the destination of the links to a malicious site…With Safe Links, we are able to protect users right at the point of click by checking the link for reputation and triggering detonation if necessary.

      b.  <u>Microsoft's Second Allegedly Deceptive Message</u>.  TocMail asserts that Microsoft has made the following allegedly misleading statement in: (i) 2015 and 2016 ATP Product Guides, (ii) 2017 Office 365: "Everything You Wanted to Know" guide, (iii) 2019 ATP Partner Datasheet, and (iv) on Microsoft's website as accessed on November 12, 2020.[97]

> …attackers sometimes try to hide malicious URLs within seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received.  The ATP Safe Links feature proactively protects your users if they click such a link.  That protection remains every time they click the link, so malicious links are dynamically blocked while good links can be accessed.[98]

      c.  <u>Microsoft's Third Allegedly Deceptive Message</u>.  TocMail asserts the following statement made in Microsoft marketing materials related to Safe Links is misleading: "ensure document hyperlinks are harmless with ATP Safe Links."[99]  TocMail alleges the statement was found in Microsoft's (i) Office 365 ProPlus Pitch Decks and (ii) Exchange Online Business Class Email System brochure (*See* **Figure 1** below).

---

[96] Amended Complaint, pp. 13 – 14.  *See also*, Amended Complaint, Exhibit 2.

[97] Amended Complaint, p. 16.  *See also*, Amended Complaint, Exhibits 3, 4, 5, 6, and 7.

[98] Amended Complaint, p. 15.

[99] Amended Complaint, pp. 17 – 18.  Specifically, TocMail asserts that "Safe Links can be trivially bypassed by IP cloaking" and therefore does not ensure that hyperlinks are harmless.  (Amended Complaint, p. 17.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

**Figure 1**
**Safe Links As Found In The Microsoft Exchange Online**
**Business Class System Brochure[100]**



## VIII.  THE '628 PATENT

28.     The '628 Patent, entitled "Computer Security System and Method Based on User-Intended

Final Destination" was filed on July 10, 2019 and issued on February 25, 2020.[101]  TocMail

describes the teachings of the Patent as follows.

> A system and method is described for protecting applications against
> malicious URL links by identifying a final destination. The system and
> method also includes enabling a user process to directly connect to the final
> destination, bypassing the original URL altogether; thereby bypassing the
> hacker's ability to use that URL to programmatically send the application to
> a malicious site.[102]

_____

[100] Amended Complaint, Exhibit 10.

[101] U.S. 10,574,628 Patent.

[102] U.S. 10,574,628 Patent.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

29.   I understand that TocMail asserts (without support of which I am aware) that its product

embodies the claimed teachings of the '628 Patent and there is allegedly no non-infringing

method to actually incorporate into a security product that addresses IP Cloaking.[103]

However, TocMail does not allege that Microsoft has infringed the '628 Patent.

## IX.   OVERVIEW OF TOCMAIL'S CLAIMED MONETARY REMEDIES AS PRESENTED BY MS. BOUR

### A.   Claimed Lost Profits Damages

30.   Ms. Bour's calculation of lost profits is based on the premise that, "absent Microsoft's

alleged false advertising, TocMail would have provided time of click protection for all

Office 365 users who use ATP services provided by Microsoft."[104]  Ms. Bour assumes that

TocMail would promote its service through a hypothetical press release in November 2019,

and it would take between 30 and 90 days for companies to investigate the claims in that

press release.[105]  Ms. Bour then assumes that TocMail would begin making sales 90 days

later in February 2020, with sales equal to 50% of at-issue Microsoft seats starting in

February 2020, 75% of at-issue Microsoft seats in March 2020, and all at-issue Microsoft

_____

[103] Amended Complaint, pp. 22 – 23.  I understand that TocMail has not provided any support for its assertion that there is no non-infringing alternative method of preventing IP Cloaking.  Ms. Bour has not discussed how her claimed damages would be affected if the trier-of-fact found that there was a non-infringing method for preventing IP Cloaking attacks.

[104] Bour Report, p. 22.

[105] Bour Report, p. 23.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

seats would purchase TocMail by April 2020.[106]  Ms. Bour calculates lost profits for the

lifetime of TocMail's patent, which TocMail asserts runs through May 7, 2035.[107]

31.    Ms. Bour calculates claimed lost profits damages using the following steps.

    a.   <u>Seats For Microsoft Products With ATP And TocMail's Claimed Lost Seats</u>. Ms. Bour identifies the total licenses and seats associated with Microsoft products that include ATP or Safe Links.[108]

        i.   Ms. Bour relied upon Microsoft data which identified the number of consumer licenses and commercial seats associated with Microsoft products that included ATP through June 2020.

        ii.   Ms. Bour assumes Microsoft licenses and seats would grow at a rate of 2% per month from the June 2020 through December 2020, and then assumes the monthly sales would remain constant over the 2021 to May 7, 2035 time period.[109]

_____

[106] Bour Report, p. 23.

[107] Bour Report, p. 6.

[108] Ms. Bour counts a unit that is reported as an "Assigned Unit" or "MS Sales License" in Microsoft's data. (Microsoft Pivot Table by product category, January 2015 – June 2020.  (MSFT_TOC00001067.))

[109] Bour Report, p. 22.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

**Table 4**
**Ms. Bour's Calculation of TocMail's Claimed Lost Units[110]**
**(Thousands Of Units)**

| Year | Microsoft's Consumer Licenses | Microsoft's Commercial Seats [111] | Assumed Percentage of TocMail Lost Seats[112] | Ms. Bour's Claimed Lost Consumer Seats ($5/seat) | Ms. Bour's Claimed Lost Commercial Seats ($3/seat) |
|---|---|---|---|---|---|
| **2020 Actual** | | | | | |
| February | ███ | ███ | ███ | ███ | ███ |
| March | ███ | ███ | ███ | ███ | ███ |
| April | ███ | ███ | | ███ | ███ |
| May | ███ | ███ | | ███ | ███ |
| June | ███ | ███ | | ███ | ███ |
| **2020 Estimated** | | | | | |
| July | ███ | ███ | | ███ | ███ |
| August | ███ | ███ | | ███ | ███ |
| September | ███ | ███ | | ███ | ███ |
| October | ███ | ███ | | ███ | ███ |
| November | ███ | ███ | | ███ | ███ |
| December | ███ | ███ | | ███ | ███ |
| **Jan 2021 – May 2035** | | | | | |
| Monthly Seats | ███ | ███ | ███ | ███ | ███ |

b. <u>TocMail's Claimed Lost Revenue</u>.    Ms. Bour multiplies her projected number of TocMail subscriptions by an initial price of $5 per month for TocMail consumer subscriptions and $3 per month for TocMail commercial subscriptions.[113]

---

[110] Bour Report, pp. 22 – 23.

[111] Given the information provided in the Bour Report, I am unable to replicate Ms. Bour's annual commercial lost revenues based upon the produced data regarding Microsoft's commercial seats.  Monthly commercial seats are estimated to match Ms. Bour's figures by dividing Ms. Bour's annual lost revenues for 2021 (i.e., the first complete year forecasted by Ms. Bour) by (i) TocMail's commercial subscription price (i.e., 3.01) and (ii) 12 months. (Calculation ███████████████████████.)  According to the Bour report, Ms. Bour assumed the number of seats "would continue to grow at 2% a month" for the July through December 2020 time period.  Therefore, monthly commercial seats are estimated by assuming, consistent with Ms. Bour's description, a 2% monthly decline from December 2020 (i.e., ██████████████) to the beginning of the time period (i.e., February 2020).  In the event Ms. Bour provides additional information or backup material sufficient to replicate her analyses, I reserve the ability to supplement my report as appropriate.  (Bour Report, pp. 22 – 23.)

[112] Ms. Bour assumes TocMail would have made sales of its product to 50% of Microsoft seats with ATP in February 2020, 75% in March 2020, and 100% starting in April 2020.

[113] Bour Report, p. 22.  Ms. Bour does not cite to any source supporting her claimed prices.  However, TocMail interrogatory responses state that TocMail currently sells a commercial license for $3 per user per month and plans to

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

        i.   Ms. Bour assumes these prices would increase by 1% per year.[114]

       ii.   Applying the assumed prices to the claimed estimated lost sales results in claimed lost revenues of ███████████ between February and December of 2020 and over ██████████ per year until May 7, 2035.[115]

c.   <u>TocMail Estimated Incremental Costs</u>.  Ms. Bour considers the following incremental costs to provide TocMail.[116]

        i.   <u>Servers</u>.  Ms. Bour includes server expenses of $480 per month for (a) login servers with one server needed for each 1 million customers, and including one server during the start-up months before revenue; (b) three database servers and two e-commerce servers; and (c) a TocMail server for each 10,000 users, with one server online during the start-up months before revenue.  Ms. Bour's estimates of server costs total ███████████ in 2020 and ███████████ in 2021.  These costs are projected to increase at a rate of 2% per year through 2035.[117]

       ii.   <u>Load Balancers</u>.  Ms. Bour includes load balancer expenses of $10 per month for each million customers.  She assumes one load balancer would be online during the start-up month, and five load balancers would be necessary for trials, although the timing of such trials is not specified.  These costs are forecasted to increase by 2% each year.[118]

      iii.   <u>Customer Support</u>.  Ms. Bour assumes TocMail would incur customer support expenses associated with $50,000 per support personnel, and would need one support personal for each 320,000 seats.  Ms. Bour also assumes TocMail would need one customer support supervisor for a cost of $100,000.[119]

      iv.   <u>Salaries</u>.  Ms. Bour assumes TocMail would need to hire: (1) 4.2 full-time equivalent in-hour IT personnel receiving a salary of $150,000 each; (2) a CEO with an annual salary of $1 million; (3) an executive assistant to the CEO, with an

_____

offer personal plans "soon" at $5 per user per month.  (Plaintiff's Answers And Objections To Defendant's First Set Of Interrogatories To Plaintiff, p. 4.)

[114] Bour Report, p. 22.

[115] Bour Report, p. 23.

[116] Bour Report, pp. 25 – 27.

[117] Bour Report, pp. 23 – 25.

[118] Bour Report, p. 24.

[119] Bour Report, pp. 25 – 26.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

annual salary of $60,000; and (4) an in-house accountant with an annual salary of of $75,000. Salary expenses are increased by 40% to account for non-wage benefits, and other payroll related expenses.[120]

    v.   <u>Other Forecasted Expenses</u>. Ms. Bour includes other forecasted expenses including accounting fees, legal fees, marketing expenses, and recruiting expenses.[121]

The total expenses are presented in **Table 5** below.

   d.   <u>TocMail Claimed Lost Profits</u>. Ms. Bour subtracts her estimated expenses from her estimated lost revenues to calculate TocMail's claimed lost profits.[122]

    i.   Ms. Bour's claimed lost gross profits are presented in the table below. These figures are prior to discounting the future claimed lost profits to a present value.

    ii.   Ms. Bour discounts future lost profits assuming an annual 7.5% discount rate.[123]

   iii.   Ms. Bour calculates discounted total claimed lost profits of ███████.[124]

---

[120] Bour Report, pp. 26 – 27.

[121] Bour Report, p. 27.

[122] Bour Report, p. 28.

[123] Bour Report, pp. 29 – 31. Ms. Bour estimates this discount rate starting from Microsoft weighted average cost of capital of 5.52%. Ms. Bour considers that (a) the at-issue Microsoft products only are a portion of Microsoft's product offering and (b) the risk associated with the operations of TocMail to conclude that a 7.5% discount rate is reasonable.

[124] Bour Report, pp. 29 – 31 and Exhibit 4.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

**Table 5**
**Ms. Bour's Estimation of TocMail's Claimed Lost Profits Damages[125]**
**(Thousands Of Dollars)**

| Year | Claimed Lost Revenue | Cost of Sales - Server Related | Other Expenses | Claimed Lost Profits |
|---|---|---|---|---|
| Nov – Dec 2019 | ▮ | ▮ | ▮ | ▮ |
| 2020 | █ | █ | █ | █ |
| 2021 | █ | █ | █ | █ |
| 2022 | █ | █ | █ | █ |
| 2023 | █ | █ | █ | █ |
| 2024 | █ | █ | █ | █ |
| 2025 | █ | █ | █ | █ |
| 2026 | █ | █ | █ | █ |
| 2027 | █ | █ | █ | █ |
| 2028 | █ | █ | █ | █ |
| 2029 | █ | █ | █ | █ |
| 2030 | █ | █ | █ | █ |
| 2031 | █ | █ | █ | █ |
| 2032 | █ | █ | █ | █ |
| 2033 | █ | █ | █ | █ |
| 2034 | █ | █ | █ | █ |
| Jan – May 7, 2035 | █ | █ | █ | █ |

## B.  Claimed Disgorgement

32.  Overview.  TocMail also is seeking disgorgement of "Microsoft's profits from both the direct sale of Microsoft's ATP security service and from the sale of Office 365 derived from purchasers trusting Microsoft's deceptive ATP security claims."[126]  For this purpose, Ms. Bour estimates Microsoft's revenues from the sale of ATP as a standalone product and from the sale of Office 365 products that included ATP.[127]  Ms. Bour does not subtract any

---

[125] Bour Report, Exhibit 4.

[126] Amended Complaint, p. 28.

[127] Bour Report, p. 4.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

costs from these estimated revenues to obtain an estimate of the claimed disgorgement.

Ms. Bour states that:

> The Lanham Act requires a plaintiff to provide the infringing defendant's sale. [sic] The burden then shifts to a defendant to prove 'all elements of cost or deductions claimed.'[128]

33.   <u>Products</u>.  Ms. Bour estimates Microsoft's revenues from the sale of the following products that may include ATP and/or the at-issue Safe Links feature: (a) Office Advanced Threat Protection standalone sales,[129] (b) Office 365 Commercial, (c) Office 365 Home & Personal (H&P), Consumer,[130] (d) Microsoft 365 Security Suite, (e) Surface Tablets with Microsoft 365, and (f) Outlook.com Premium subscriptions.[131, 132]

34.   <u>Revenue</u>.  Ms. Bour uses Microsoft's product breakdown reports to estimate that Microsoft earned ███████ in U.S. revenues from the at-issue products between July 2015 and June 2020.[133]  Ms. Bour then uses the ratio of Microsoft's total annual U.S. revenues to total

---

[128] Bour Report, p. 13.

[129] According to Ms. Bour, the ATP standalone sales "appear to be related to Office 365 Commercial subscriptions" and included Safe Links "at least after October 2018."  (Bour Report, p. 4.)

[130] Office 365 Home & Personal (H&P), Consumer sales included Safe Links starting in October 2018.  (Bour Report, p. 4.)

[131] Outlook.com premium subscriptions included Safe Links starting in 2018.  (Bour Report, p. 4.)

[132] Bour Report, p. 4.

[133] Bour Report, pp. 4 – 5.  I understand TocMail may claim to be entitled to disgorgement remedies since June 2011, when Office 365 was first available for sale.  (Bour Report, p. 7.  *See also* Amended Complaint, pp. 4, 8.)  In the event Ms. Bour supplements her analysis to include revenues prior to June 2015, I reserve the ability to evaluate her analysis and update my opinions.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

annual global revenues from Microsoft's financial statements to estimate that Microsoft

earned ███████████ global revenues from the at-issue products.[134]

## X.    EVALUATION OF TOCMAIL'S CLAIMED DAMAGES AS PRESENTED BY MS. BOUR

35.    My evaluation of TocMail's claimed monetary remedies as presented by Ms. Bour is based

upon (a) my economics and damages quantification training and experience, (b) my review

of the Bour Report, (c) documentary evidence, (d) standard damage quantification

methodologies, and (e) other important economic and business considerations germane to

an analysis of false advertising damages.

36.    Generally, my opinion is that Ms. Bour's report does not provide the trier-of-fact with any

guidance as to an appropriate monetary remedy for the alleged wrongful conduct.

Ms. Bour's calculations are unreliable and suffer from at least the following flaws.

   a.   Ms. Bour did not consider the possibility Microsoft could remove the allegedly
        misleading statements from its customer-facing materials on a going-forward basis.

   b.   Ms. Bour's proposed monetary remedies represent mathematical calculations without
        economic meaning, rather than a reliable measure of monetary remedies attributable to
        the alleged wrongful conduct.

   c.   Ms. Bour failed to consider that not all consumers were confused by or altered their
        purchase behavior because of Microsoft's allegedly misleading statements.

   d.   Ms. Bour's calculation of lost profits is based upon unreasonable and unsupported
        assumptions (including the assumption that TocMail would have provided the same
        number of licenses and seats as Microsoft in the absence of the alleged false
        advertising).

_____

[134] Bour Report, pp. 4 – 5.  Ms. Bour is not clear what measure of Microsoft's revenues would be an appropriate input into a measure of disgorgement.  Ms. Bour also presents Microsoft Global Office 365 and Outlook.com revenue of ████████ and Microsoft U.S. Office 365 and Outlook.com revenue of ████████.  (Bour Report, p. 5.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

    e. Ms. Bour's calculation of disgorgement is unreliable, overstated, and incomplete.

**A. Ms. Bour Failed To Analyze Or Consider The Possibility Microsoft Could Remove The Allegedly Misleading Statements In The Future**

37. Ms. Bour also failed to consider that Microsoft could update its advertising to remove statements on a going-forward basis that are found by the trier-of-fact to be misleading. From an economic and claimed damages perspective, updating allegedly misleading advertising can be an efficient economic remedy as it effectively eliminates ongoing and future harm, if any, attributable to the allegedly misleading statement. This is particularly true in cases such as this where the Plaintiff's claimed economic harm is primarily (or exclusively) in the future and highly uncertain.

    a. Alleged Harm Is Primarily Future-Based. According to Plaintiff, TocMail did not start selling its product until December 12, 2019, and has yet to make a single sale of its product.[135] Further, Ms. Bour's claimed lost profits damages are calculated beginning in February 2020 and she continues to estimate lost profits damages through May 7, 2035. As TocMail has only recently had an allegedly available product that potentially could have been impacted by Microsoft's allegedly misleading statements, the vast majority, if not all, of the economic harm attributable to the alleged wrongful conduct will occur in the future. From an economic and damage quantification perspective, this set of facts provides an opportunity for updating advertising on a going-forward basis to obviate the claimed harm from the alleged false advertising.

    b. Quantum Of Alleged Harm Is Highly Uncertain. Plaintiff acknowledges that it began allegedly offering for sale its TocMail product on December 12, 2019, but as of October 14, 2020, has not made a single sale of its product.[136] As discussed in detail in **Section X.D.1** below, Ms. Bour's calculation of lost profits damages relies upon unsupported and unreasonable assumptions including that TocMail would make sales to each and every Microsoft seat between April 2020 and May 2035. The actual sales that TocMail

_____

[135] Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories to Plaintiff, p. 4.

[136] Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories to Plaintiff, p. 4.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

will be able to make is highly uncertain, particularly given the newness and lack of observable market acceptance of their product.

38.   In light of the alleged harm to TocMail primarily accruing in the future and being highly uncertain, updating advertising to remove any allegedly misleading statements on a going-forward basis has a stronger nexus to the economic harm, if any, suffered by TocMail, than either the lost profits or disgorgement calculations presented by Ms. Bour.  Updating the at-issue advertising would directly address the alleged wrongful conduct and then allow TocMail to continue to earn the future profits it would be able to earn but-for the alleged wrongful conduct through commercializing its security product.

39.   Plaintiff itself acknowledges the benefit of removing allegedly misleading statements as TocMail is seeking a permanent injunction against Microsoft's alleged false advertising in addition to the monetary remedies presented by Ms. Bour.[137]  Ms. Bour has not justified (or reconciled) her calculation of lost profits damages through May 2035 in light of TocMail's request for a permanent injunction or provided any information as to what portion of her claimed lost profits damages would be applicable should TocMail receive a permanent injunction.  From an economic perspective, the harm (if any) suffered by TocMail from the alleged wrongful conduct would not continue over the entire lifetime of the TocMail patent after Microsoft ceased making the allegedly misleading statements (under Plaintiff's theory of liability).  In light of the economic factors discussed above, updating Microsoft's at-issue advertising to remove any statements that are found to be

_____

[137] Amended Complaint, pp. 1 and 28.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

misleading by the trier-of-fact would have a stronger nexus to the economic harm actually

attributable to the alleged wrongful conduct.

**B.   Ms. Bour's Proposed Monetary Remedies Represent Mathematical Calculations Rather Than Reliable Measures Of Economic Harm Attributable To Alleged Wrongful Conduct**

40.      Each of Ms. Bour's claimed monetary remedies represent straightforward mathematical

calculations using assumptions presented without any support in her report.[138]  While

Ms. Bour acknowledges that she is not expressing an opinion regarding causation or

liability,[139] she fails to provide any evaluation of the inputs into her calculations or whether

her claimed monetary remedies have an economic nexus to the alleged wrongful conduct.

Absent any such analysis, Ms. Bour simply performs a mathematical calculation and not

an economic determination of TocMail's damages (or Microsoft's alleged profits)

attributable to Microsoft's alleged false advertising.

41.      Ms. Bour failure to properly evaluate economic factors inherent in a measure of lost profits

or disgorgement, described throughout this report, include the following.

a.   Failed To Evaluate What Portion Of Lost Sales, If Any, Are Directly Attributable To Microsoft's Allegedly False And Misleading Statements.  As discussed in detail in **Section X.C** below, Ms. Bour's calculation of lost profits fails to show that any claimed lost sales have a direct causal nexus to the alleged wrongful conduct.  In particular, Ms. Bour does not analyze: (i) what portion, if any, of at-issue Microsoft customers saw an allegedly misleading statement, (ii) whether any at-issue Microsoft customers who saw the allegedly misleading statement would have been confused in the manner alleged by Plaintiff, and (iii) whether any such individual with altered perceptions would have purchased the TocMail product but-for exposure to the allegedly misleading statement

_____

[138] Bour Report, pp. 22 – 23.

[139] Bour Report, p. 2.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

(i.e., whether the statement was material).  The failure to account for these factors renders Ms. Bour's claimed lost profits unreliable and overstated.

b.  <u>Failed To Evaluate Reasonableness Or Accuracy Of Lost Profits Inputs Likely Received From TocMail</u>.  As discussed in detail in **Section X.D** below, Ms. Bour fails to provide any independent evaluation of the inputs into her lost profits calculation.  In fact, Ms. Bour often fails to provide relevant citations indicating the source of her assumptions so that those assumptions can be properly evaluated.  In particular, Ms. Bour provides no analysis in her report supporting a conclusion that absent the alleged wrongful conduct TocMail would have been able to make sales to each and every Microsoft seat, nor any independent analysis in her report regarding the costs TocMail likely would incur to make those sales.

c.  <u>Failed To Apportion Revenues Only To Revenues With A Nexus To The Alleged Wrongful Conduct</u>.  As discussed in **Section X.E** below, Ms. Bour's evaluation of disgorgement is flawed and incomplete.  Ms. Bour presents Microsoft's total revenues earned from products within which the Safe Links feature is included.  However, Ms. Bour makes no effort to identify the incremental revenues Microsoft earned that were directly attributable to the allegedly misleading statements, nor does she make any effort to apportion Microsoft's total revenues to the portion solely attributable to Safe Links, the Microsoft feature at issue.  As such, Ms. Bour performs a mathematical calculation to identify Microsoft's total revenues, but does not present a reliable or relevant input into a calculation of the disgorgement.

## C.  **Ms. Bour Failed To Consider That Not All Consumers Were Exposed To, Confused By, Or Altered Their Purchase Behavior Because Of Microsoft's Allegedly Misleading Statements**

42.  From an economic and claimed damages perspective, and given the facts and circumstances of this dispute, the claimed damages resulting from Microsoft's allegedly misleading statements would have to account for the following considerations.[140]

_____

[140] I understand these factors are consistent with the five prongs of a false advertising claim established in the Lanham Act.  Generally, it is my understanding that a plaintiff must establish the following: (a) the advertisement was in fact false and misleading, (b) the advertisement did in fact deceive or had the power to deceive potential customers, (c) the deception had a material effect on customers' purchasing decisions, (d) the product at-issue is traded across states, and (e) the plaintiff has been harmed or is likely to be harmed by the false advertisement.  (*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).  See also*, Cornell Law School, "False Advertising" (https://www.law.cornell.edu/wex/false_advertising, viewed on November 13, 2020.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

a. <u>Consumers Must Be Exposed To The Allegedly False Claim</u>.  As a matter of economic causation (and common sense), only consumers who are exposed to the allegedly false claim can potentially be impacted by that claim.

b. <u>Consumers Must Be "Confused" By The Allegedly False Claim</u>.  Consumers' perceptions of Microsoft's security products and, in particular, the Safe Links feature and its substitutability for the TocMail's product must have been altered as a result of the allegedly false statements.  From an economic perspective, if the allegedly false statements do not alter consumer perceptions, there would be no basis for economic damages.

c. <u>Altered Perceptions Must Impact Consumers' Purchasing Behavior</u>.  Beyond simply altering perceptions, the allegedly false claims must alter a consumer's purchasing behavior.  If the altered perceptions do not lead to changed purchasing behaviors (i.e., lead consumers not purchasing TocMail's product when they otherwise would have), from an economic perspective, there is no basis for claiming economic damages.

43.     Ms. Bour does not account for any of the above economic causation considerations.  Ms. Bour, by not explicitly making adjustments for the above factors, implicitly assumes that all at-issue consumers (a) were exposed to the statements, (b) were confused by the statements in the manner alleged by Plaintiff, and (c) changed their purchasing behaviors as a result of their exposure and confusion arising from the allegedly misleading statements.  The failure to account for these considerations renders Ms. Bour's claimed monetary remedies unreliable and overstated.

44.     Ms. Bour's implicit assumptions are inconsistent with at least the following evidence, which she failed to consider.

**1.  <u>Many Microsoft Customers Likely Were Not Exposed To The Allegedly False Statements</u>**

45.     Plaintiff has not shown any evidence regarding the portion, if any, of Microsoft customers with Safe Links who were exposed to one of the allegedly misleading statements.  Ms.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

Bour fails to analyze in her report the specific allegedly misleading statements made by Microsoft and evaluate whether her implicit assumption that **all** Microsoft customers who purchased a product with the Safe Links feature would have been exposed to the allegedly misleading statements is reasonable.

46.     A review of the actual materials identified by Plaintiff which included an allegedly false statement supports a conclusion that these statements only are included in materials that likely would not be read by many, much less all, Microsoft customers who purchased a product with the Safe Links feature.  I describe each of the materials identified by Plaintiff, my understanding for how a customer could access that material, and how a customer could review an allegedly misleading statement if they did access the relevant material below.

   a.   <u>Microsoft's First Allegedly Deceptive Message</u>.  As discussed in **Section VII** above, TocMail asserts that the following statement allegedly is misleading:

> Sophisticated attackers will plan to ensure links pass through the first round of security filters.  They do this by making the links benign, only to weaponize them after the message is delivered, altering the destination of the links to a malicious site…With Safe Links, we are able to protect users right at the point of click by checking the link for reputation and triggering detonation if necessary.[141]

TocMail identified the *Office 365 Essentials: Advanced Threat Protection* brochure as containing the allegedly misleading statement.  TocMail asserted that the brochure "was posted to Microsoft's official Advanced Threat Protection purchase page" without providing specific details regarding how to access the product.[142]  For consumers that did access the brochure, in order to view the allegedly misleading

_____

[141] Amended Complaint, p. 14.

[142] Amended Complaint, p. 14.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

statement, a customer would have to access this brochure and then read page 7 of the 10-page brochure.[143]

b.  <u>Microsoft's Second Allegedly Deceptive Message</u>.  As discussed in **Section VII** above, TocMail asserts that the following statement allegedly is misleading:

> Attackers sometimes try to hide malicious URLs within seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received.  The ATP Safe Links feature proactively protects your users if they click such a link.  That protection remains every time they click the link, so malicious links are dynamically blocked while good links can be accessed.[144]

TocMail identified the following materials as containing the allegedly misleading statement.

i.  <u>2015 And 2016 ATP Product Guides</u>.  These product guides are documents that a Microsoft customer would have had to navigate to, download, and read carefully in order to be exposed to the allegedly misleading statement.  In particular, in order to view the allegedly misleading statement the customer would have to read page 3 or page 4 of the total 8 pages in the 2015 ATP product guide or page 3 or page 4 of 10 in the 2016 ATP product guide.[145]

ii.  <u>2017 Office 365: "Everything You Wanted to Know" Guide</u>.  This document is a detailed product guide for numerous Office 365 products and is 132 pages long.[146] In order to view the allegedly misleading statement, a Microsoft customer would have to download this product guide and read page 82 of page 132.[147]

iii.  <u>2019 ATP Partner Datasheet</u>.  This is a two-page PDF brochure. In order to view the allegedly misleading statement, a Microsoft customer would have to download this brochure and read the statement on the first page.[148]

iv.  <u>Microsoft Webpage Accessed November 12, 2020</u>.  I understand that Plaintiff identified a Microsoft webpage they accessed on November 12, 2020 as containing

---

[143] Amended Complaint, Exhibit 2.

[144] Amended Complaint, p. 15.

[145] Amended Complaint, Exhibits 3 and 4.

[146] Amended Complaint, Exhibit 5.

[147] Amended Complaint, Exhibit 5.

[148] Amended Complaint, Exhibit 6.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

the allegedly misleading statement.  While Plaintiff has not outlined specifically how a customer potentially would access the identified document, it is my understanding that in order to view the identified webpage, a customer would need to perform the following steps to navigate to the webpage from Microsoft's main website.[149]

1. A customer who viewed the Microsoft.com homepage would need to select the "All Microsoft" icon, and from the pop-up menu with 40 options, select "Docs" below the "Developer & IT" list.[150]

2. The customer would reach the docs.microsoft.com landing page, and would then need to select the "Documentation" icon below the search bar to access the "Technical Documentation" webpage.[151]

3. The customer viewing the "Technical Documentation" webpage would then need to select "Microsoft 365 Enterprise" in the "Product Directory" from 81 total products.[152]

4. The customer would then select the "Learn about Microsoft 365 for Enterprise" icon.[153]

5. This webpage would have a table of contents on the left-hand side of the webpage.  The customer would need to select the "Tenant" drop-down (from 19 options), followed by the "Plan" drop-down (from 7 options), followed by the "Service assurance" drop-down (from 9 options), followed by the "Data Resiliency" drop-down (from 7 options) [154] and select the "Malware and Ransomware Protection" link (from 5 options) to access the webpage identified by Plaintiff.

---

[149] Neither Ms. Bour nor Plaintiff have provided evidence regarding the specific steps needed to navigate to the identified website.  In the event Plaintiff provides additional information regarding how consumers would potential access the identified website, I reserve the ability to evaluate that information and update my opinions as appropriate.

[150] "Microsoft.com."  (https://www.microsoft.com/en-us/, viewed on November 17, 2020.)

[151] "docs.microsoft.com."  (https://docs.microsoft.com/en-us/, viewed on November 17, 2020.)

[152] "Technical Documentation."  (https://docs.microsoft.com/en-us/documentation/, viewed on November 17, 2020.)

[153] "Microsoft 365 For Enterprise Documentation And Resources."  (https://docs.microsoft.com/en-us/microsoft-365/enterprise/?view=o365-worldwide, viewed on November 17, 2020.)

[154] "Microsoft 365 For Enterprise Overview."  (https://docs.microsoft.com/en-us/microsoft-365/enterprise/microsoft-365-overview?view=o365-worldwide, viewed on November 20, 2020.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

This allegedly misleading statement only could be read by customers who navigated to one of five documents or webpages and then read the particular statement in documents that are as large as 115 pages. Additionally, only one of the documents identified by Plaintiff appear to be currently available to consumers and as such many at-issue customers (and future customers) are unlikely to view the at-issue statement. Therefore, the available economic evidence supports a conclusion that many Microsoft customers (including the vast majority, if not all current and future at-issue customers) would not have been exposed to this allegedly misleading statement.

c. <u>Microsoft's Third Allegedly Deceptive Message</u>. As discussed in **Section VII** above, TocMail asserts that the following statement allegedly is misleading: "ensure document hyperlinks are harmless with ATP Safe Links."[155] TocMail alleges the statement was found in Microsoft's (i) internal Office 365 ProPlus Pitch Decks and (ii) Exchange Online Business Class Email System brochure.

   i. I understand that the Office 365 ProPlus Pitch Decks are internal presentations that TocMail asserts are intended to be shown to customers.[156] For any customers that did access these presentations, the customer would have to read either slide 22 out of 27 in the first set of slides identified by Plaintiff, or slide 20 out of 25 in the second set of slides identified by Plaintiff.[157]

   ii. The Exchange Online Business Class Email System brochure promotes Microsoft Exchange. I understand Microsoft Exchange is a product specifically aimed at enterprise users and only is included in commercial Microsoft products. Therefore, potential customers looking for personal Microsoft products are highly unlikely to be exposed to these materials.

In summary, this allegedly deceptive message only could be read by consumers who viewed specific slides in presentations of 24 and 28 slides in length, or appeared in materials that were targeted at a specific group of Microsoft customers (i.e., enterprise customers). Therefore, the available economic evidence supports a conclusion that many at-issue Microsoft customers would not have been exposed to this allegedly misleading statement (in the past or on a going-forward basis).

_____

[155] Amended Complaint, pp. 17 – 18. Specifically, TocMail asserts that "Safe Links can be trivially bypassed by IP cloaking" and therefore does not ensure that hyperlinks are harmless. (Amended Complaint, p. 17.)

[156] Amended Complaint, p. 17.

[157] Amended Complaint, Exhibits 8 and 9.

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

47.   Ms. Bour failed to perform any analysis regarding the allegedly false and misleading
statements to evaluate how consumers potentially would view these statements in practice.
As such, Ms. Bour has failed to support or justify her implied assumption that each and
every Microsoft customer would have been exposed to one of these statements. Ms. Bour's
operative assumption is unreasonable and contrary to the available documentary evidence
which supports a conclusion that many, if not the vast majority, of at-issue Microsoft
customers would not have been exposed to either of the allegedly misleading statements.

**2.   Consumers Who Were Exposed To The Allegedly Misleading Statements May
Not Have Been Confused In The Manner Alleged By Plaintiff**

48.   Ms. Bour fails to evaluate the allegedly misleading statements to determine whether her
assumption that each and every at-issue Microsoft customer necessarily would interpret
those statements as solving IP Cloaking and/or being 100% effective at eliminating unsafe
email links.[158]

a.   Claimed Statements Are Not Directed Toward IP Cloaking.   Ms. Bour failed to
acknowledge or consider that none of the allegedly false and misleading statement
references IP Cloaking or claims that this problem is solved by Microsoft's product.
Plaintiff has not shown that any customer, much less every customer, would interpret
either of the allegedly misleading statements as implying Microsoft's security products
prevent IP Cloaking attacks.

b.   Claimed Statements Do Not Imply No Benefits From Third-Party Products.   Ms. Bour
presents no evidence that any Microsoft customer would read the at-issue statements
and assume that Microsoft's security products would be 100% effective.  Plaintiff has
not presented any evidence that supports a conclusion that consumers would view these

---

[158] The assertions made by Microsoft and accused by TocMail are that: (a) "…attackers sometimes try to hide
malicious URLs within seemingly safe links that are redirected to unsafe sites by a forwarding service after the
message has been received.  The ATP Safe Links feature proactively protects your users if they click such a link.  That
protection remains every time they click the link, so malicious links are dynamically blocked while good links can be
accessed;" and (b) "Safe Links Ensures Hyperlinks in Documents are Harmless."  (Amended Complaint, pp. 15 – 17.)

statements and infer that there would be no incremental benefits from additional third-party security products such as the TocMail product.

c. <u>One Of Three Allegedly Misleading Statements Is Directed Toward A Benefit Not Offered By TocMail</u>.  As discussed in **Section VII** above, one of the allegedly misleading statements is Safe Links "ensures document hyperlinks are harmless."[159] The claimed benefit of this allegedly misleading statement is that Safe Links protects the user from **document** hyperlinks.  TocMail does not advertise this benefit, and instead claims its solution will allow the user to "never fear clicking **email** links again."[160]  Ms. Bour failed to consider that this allegedly misleading statement claims to offer a benefit that is not offered by TocMail.  It is reasonable to expect that at least some customers would not interpret a statement directed toward document hyperlinks to imply the same product is effective at addressing email hyperlinks generally, or against IP Cloaking attacks specifically.

49. Contrary to Ms. Bour's unsupported assumptions, it is reasonable to expect that at least some at-issue consumers who were exposed to the allegedly misleading claims would not be confused in the manner alleged by Plaintiff.  As such, Ms. Bour's analysis is unreliable and leads to an overstated measure of TocMail's lost profits attributable to the alleged wrongful conduct.

3. <u>**Consumers Who Were Exposed To And Confused By The Allegedly Misleading Statements May Not Have Purchased The TocMail Product**</u>

50. Even if Microsoft customers were exposed to the allegedly misleading statements, and were confused in the manner alleged by Plaintiff (which Plaintiff has not shown), Ms. Bour does not provide any analysis supporting her implicit assumption that the statement would be material to each consumer who purchased a product with Safe Links.  That is, Ms. Bour

---

[159] Amended Complaint, pp. 17 – 18.  Specifically, TocMail asserts that "Safe Links can be trivially bypassed by IP cloaking" and therefore does not ensure that hyperlinks are harmless.  (Amended Complaint, p. 17.)

[160] TocMail.  (https://TocMail.net/#instructions, viewed on November 20, 2020.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

___

assumes that each confused consumer would have changed their purchasing decision and purchased the TocMail product but-for their exposure to the allegedly misleading statements. Ms. Bour's assumption is unreasonable and inconsistent with the following evidence.

a. <u>TocMail Has No Sales And Is Not Commercially Successful</u>. TocMail has never made a single sale of its embodying product.[161] Additionally, many Microsoft subscriptions do not include ATP (and so would not be impacted by the alleged wrongful conduct).[162] TocMail claims it had advertised and offered for sale its product since December 12, 2019 (or for nearly a full year).[163] TocMail asserts that (as of October 14, 2020), it has received "over 10,000 visitors" to its website, but TocMail has yet to make a single sale.[164] However, Ms. Bour acknowledges there are Microsoft customers that do not have Safe Links (and as such likely would not be impacted by the alleged wrongful conduct).[165] TocMail's lack of observable commercial success is supportive of a conclusion that few, if any, customers would purchase the TocMail product even in the absence of the alleged wrongful conduct.

b. <u>Microsoft's First-Party Security Offerings Do Not Prevent Other Third-Party Security Products From Achieving Commercial Success</u>. Ms. Bour failed to recognize that it is common for third-party cybersecurity firms to offer, and successfully sell, products that provide similar protections to security features Microsoft advertises in its own security products. TocMail identified other third-party competitors including at least Proofpoint and Mimecast as also offering cloud-based, time-of-click, redirect services.[166] Proofpoint and Mimecast earned revenues of $890 million and $430 million in the last year, respectively.[167] This demonstrates that Microsoft's

___

[161] Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories to Plaintiff, pp. 4 – 5.

[162] *See*, **Exhibit 4.**

[163] Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories to Plaintiff, p. 4. Additionally, TocMail advertised and offered for sale its product for approximately two months prior to the filing of the initial complaint in this matter on February 26, 2020 and had not made any sales prior to the filing of the complaint. (*See* Complaint for source of filing date.)

[164] Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories to Plaintiff, p. 4.

[165] Bour Report, p. 4.

[166] Amended Complaint.

[167] Proofpoint, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 33. *See also*, Mimecast Limited, SEC Form 10-K for the fiscal year ended March 31, 2020, p. 36.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

advertisements regarding its security products do not prevent third-party security software producers from making significant sales of their own products.  This further supports a conclusion that TocMail's inability to make any sales of its product likely is driven by the lack of commercial acceptance of its own product and not by the alleged wrongful conduct.   TocMail's inability to make any sales (even though other cybersecurity firms make billions of dollars in sales competing with Microsoft's first-party security offerings) supports a conclusion that TocMail likely  would make few, if any, sales of its product even in the absence of the alleged wrongful conduct.  As such, Ms. Bour's analysis, which assumes that **_every_** at-issue Microsoft customer would purchase the TocMail product absent the allegedly misleading statements, is unreliable.

c.   <u>Customers With Safe Links May Value Other Products Included In Their Products</u>. Ms. Bour's assumption that 100% of Microsoft customers with ATP or Advanced Protection would purchase the TocMail product but-for the alleged wrongful conduct implicitly assumes that every ATP user valued the Safe Links feature, and in fact valued it so high that the customer would purchase an alternative security product but-for their use of Safe Links.  However, Ms. Bour failed to properly consider how Microsoft commercializes its Safe Links feature.

   i.   As discussed in **Section VI.E** above, the majority of Microsoft seats that include ATP (with the Safe Links feature included in the ATP product) are sold as part of a suite with other non-security Microsoft products and features.[168]  These Microsoft 365 or Office 365 products that include ATP or Advanced Protection generally include a suite of non-security products, such as Word, Excel, PowerPoint, OneDrive, Teams, and SharePoint.[169]  It is likely that at least some Microsoft customers would value other non-security products and place little or no weight on Microsoft's security products that are included with their product.  These customers would be less likely to have purchased the TocMail product but-for the alleged wrongful conduct.

   ii.   As discussed in **Section VI.C** above, ATP has many other features that can be drivers of demand independent of Safe Links including: (1) Safe Attachments, (2) Anti-phishing, (3) Real-Time Detectors, (4) Threat Tracker, (5) Threat Explorer, (6) Automated Incident Response, and (7) Attack Simulator.  It is reasonable to expect that for at least some customers who did value ATP, those customers would

_____

[168] Specifically, ▮▮▮▮▮▮▮▮ are associated with standalone ATP sales while ▮▮▮▮▮▮ commercial seats and ▮▮▮▮▮ consumer licenses are associated with larger Microsoft subscriptions.  (Microsoft Pivot Tables by category, January 2015 – June 2020.  (MSFT_TOC00001067, MSFT_TOC00001070, and MSFT_TOC00001073.) _See also_, **Exhibit 5**.)

[169] _See_, **Exhibit 4**.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

value features other than the Safe Links feature and as such would be less likely to have purchased the TocMail product but-for the alleged wrongful conduct.

Ms. Bour failed to properly consider in her report that the at-issue Microsoft seats were associated with customers who purchased a Microsoft product with many features rather than the Safe Links product in isolation.  There is no evidence that any of these consumers would be willing to purchase a more limited product that only provided certain email security features such as the TocMail product.  As such, there is no evidence to support a conclusion that any Microsoft customer (much less **all** Microsoft customers who purchased a product with Safe Links) would be willing to purchase TocMail's specialized security product.

51.   The available economic evidence supports a conclusion that the allegedly false statements likely were not seen by many consumers, and for those consumers who were exposed to those statements, the statements would not have been material to those consumers and caused them to refrain from purchasing TocMail's product.  Ms. Bour made no attempt to account for the fact the many consumers were not confused or would not have changed purchasing behavior absent the alleged wrongful conduct.

52.   As discussed in detail above, neither Ms. Bour nor Plaintiff has presented any evidence regarding (a) the portion of Microsoft customers who were exposed to the allegedly misleading statements, (b) the portion of Microsoft customers who were confused by the allegedly misleading statements, and (c) the portion of consumers for which the at-issue statements were material (i.e., who would have purchased the TocMail product but-for the allegedly misleading statements).  Absent a reliable measure of these inputs, Ms. Bour's claimed monetary remedies are unreliable, and Plaintiff has failed to provide evidence to support a reliable monetary remedy in this matter.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

53.  The additional errors in Ms. Bour's lost profits and disgorgement analyses are discussed in

detail below.

### D.  Ms. Bour's Calculation Of Claimed Lost Profits Is Based Upon Flawed And Unsupported Assumptions

54.  As discussed in **Section X.B** above, Ms. Bour presents a claimed calculation of lost profits

based upon unreasonable assumptions that she utilizes without proper support or

independent analysis regarding the appropriateness or accuracy of those assumptions.[170]

As such, Ms. Bour has not established within her model that TocMail has suffered lost

profits damages and her mathematical calculations would not serve as a relevant or reliable

input into a measure of economic harm for the trier-of-fact.   Ms. Bour's flawed

assumptions include at least the following.

a.  Ms. Bour assumes an unreasonably large percentage of Microsoft customers would
have purchased TocMail's product.

b.  Ms. Bour utilizes an unreasonable and overstated incremental profit margin for
TocMail's alleged lost sales.

c.  Ms. Bour calculates TocMail's lost profits over an unreasonably long time horizon
without accounting for significant uncertainty or the impact of a liability finding.

d.  Ms. Bour assumes an unreasonably low discount rate when evaluating TocMail's lost
profits.

### 1.  Ms. Bour Assumes An Unreasonably Large Percentage Of Microsoft Customers Would Have Purchased TocMail's Product

55.  In her report, Ms. Bour assumes that, after a hypothetical November 2019 press release, it

would "take 30-90 days for companies to investigate TocMail and the claims in the press

_____

[170] *See, for example*, Bour Report, pp. 22 – 23.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

release."[171]   After that, Ms. Bour assumes that TocMail would make sales to 50% of Microsoft's seats on the accused products in February 2020, 75% of those Microsoft seats in March 2020, and 100% of those Microsoft seats starting in April 2020.[172]   In other words, Ms. Bour assumes, without support, that absent Microsoft's alleged false advertising, each and every Microsoft customer who purchased a product that included the Safe Links feature after April 2020 would purchase TocMail's product.[173]   This assumption is inconsistent with at least the following.

a.   Not All Customers Altered Their Purchase Behavior As A Result Of Alleged Wrongful Conduct.   As discussed in **Section X.C** above, Ms. Bour's assumption regarding the portion of at-issue Microsoft customers who would purchase TocMail's product but-for the alleged wrongful conduct is based upon an implicit assumption that (a) 100% of at-issue Microsoft customers were exposed to the allegedly misleading statements, (b) 100% of at-issue Microsoft customers were confused by those statements in the manner alleged by Plaintiff, and (c) 100% of at-issue Microsoft customers altered their purchase behavior and declined to purchase TocMail's product when they otherwise would have purchased the product.   Each of these assumptions is unsupported and inconsistent with the available economic evidence.   As Ms. Bour does not present a reliable and relevant measure of TocMail's lost sales attributable to the alleged wrongful conduct, her claimed lost profits damages calculations are unreliable and overstated.

b.   Ms. Bour's Assumption Regarding The Effectiveness Of TocMail's Advertising Is Unreasonable And Inconsistent With TocMail's Lack Of Commercial Success.   Ms. Bour asserts that in November 2019 "TocMail would be the subject of a press release, which would generate interest in the product."[174]   Ms. Bour then assumes that this hypothetical press release would generate interest sufficient for TocMail to make sales

_____

[171] Bour Report, p. 23.

[172] Bour Report, p. 23.

[173] Ms. Bour has not analyzed or relied upon information typically analyzed in an evaluation of lost profits damages including, but not limited to, documents generated in the regular course of business such as TocMail pro forma income statements, TocMail business plans, TocMail marketing plans, or TocMail projections of future revenues and profits.

[174] Bour Report, p. 23.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

to 100% of Microsoft customers with Safe Links by April 2020.[175]  Ms. Bour does not describe what information the November 2019 press release would have presented, but it is reasonable to expect that the press release would have directed consumers to TocMail's website where it sells its product.  However, as discussed above, TocMail's website has already received over 10,000 visitors and TocMail has yet to make a single sale of its product.  Ms. Bour's unsupported assumptions regarding the effectiveness of the hypothetical November 2019 press release are inconsistent with TocMail's lack of observable commercial success, particularly given that users already are accessing its website and choosing not to purchase the TocMail product.

c.  <u>Ms. Bour Fails To Consider The Implications Of Her Assumed Effectiveness Of TocMail Advertising</u>.  There is a fatal irreconcilable inconsistency in Ms. Bour's assumption regarding the effectiveness of TocMail's advertising in the absence of the alleged wrongful conduct and her claimed monetary remedies.

i.  Ms. Bour makes certain assumptions regarding the effectiveness and reach of TocMail's advertising: Ms. Bour assumes that, after a hypothetical November 2019 press release, it would "take 30-90 days for companies to investigate TocMail and the claims in the press release." [176]  After that, Ms. Bour assumes that TocMail would make sales to 50% of Microsoft's seats on the accused products in February 2020, 75% of those Microsoft seats in March 2020, and 100% of those Microsoft seats starting in April 2020.[177]

ii.  Ms. Bour claims all of the customers associated with the Accused Products would have been TocMail customers.

iii.  Ms. Bour evaluates claimed monetary remedies through May 7, 2035, TocMail's asserted date of expiration of the '628 Patent, nearly 15 years into the future.

However, after an adjudicated outcome and should liability be found (an assumption I am required to make which would trigger the possibility of a monetary remedy), TocMail could advertise the liability outcome (or provide a press release similar to Ms. Bour's assumed hypothetical November 2019 press release).  In less than six months, TocMail could be acquiring all of the at-issue customers she claims went to (or would have went to) Microsoft - - using her own assumptions regarding the claimed attributes of TocMail's product, the claimed research behavior of customers interested in IP Cloaking protection, and the claimed reach and effectiveness of TocMail's

---

[175] Bour Report, p. 23.

[176] Bour Report, p. 23.

[177] Bour Report, p. 23.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

advertising.[178]  Ms. Bour has not reconciled this inconsistency in her analysis (i.e., claimed damages 15 years into the future but the ability to obtain all of Microsoft's Accused Product customers in less than six months).

d. <u>Ms. Bour Assumes TocMail Could Not Or Would Not Mitigate The Claimed Impact Of The Alleged Wrongful Conduct</u>.  Ms. Bour failed to acknowledge that by assuming TocMail's lost sales included all Microsoft customers who purchased a product with Safe Links over a 15-year future time period, she effectively assumes TocMail will be unable to make any sales as a result of the alleged wrongful conduct through May 2035. Ms. Bour failed to provide any evaluation of what sales TocMail would be able to make (given Microsoft's allegedly misleading statements) to offset her claimed lost profits. As such, her claimed lost profits damages are unreliable and overstated.

e. <u>Ms. Bour Fails To Evaluate Or Consider In Her Report Competitors Other Than Microsoft</u>.  Ms. Bour's analysis assumes that absent the alleged wrongful conduct, each and every Microsoft customer that had Safe Links would represent a lost sale to TocMail.[179]  Ms. Bour effectively assumes that no consumer would have instead purchased a competitor's email security product.  However, there are numerous alternatives available in the marketplace that offer protection against malicious email links.  TocMail itself identified other third-party competitors including at least Proofpoint and Mimecast as offering cloud-based, time-of-click, redirect services.[180] These companies described their products as follows.

i. <u>Proofpoint</u>.  Proofpoint advertises its "Targeted Attack Protection" which "helps you stay ahead of attackers with an innovative approach that detects, analyzes and blocks advanced threats before they reach your inbox.  This includes ransomware and other advanced email threats delivered through **malicious attachments and URLs**."[181]

---

[178] I understand that trial in this matter is currently scheduled for August 16, 2021.  As such, within Ms. Bour's framework and within her assumptions regarding the effectiveness of a TocMail press release, there would be no accrued lost profits six months after a liability finding, or approximately March 2022.

[179] Bour Report, p. 23.

[180] Amended Complaint, p. 23.

[181] "Targeted Attack Protection."  (https://www.proofpoint.com/us/products/advanced-threat-protection/targeted-attack-protection, viewed on November 25, 2020.)  (Emphasis Added.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020
_____

ii.  <u>Mimecast</u>.   Mimecast advertises its cloud-based email protection product as "offer[ing] protection against **malicious URLs and attachments**."[182]

Given various alternative options and given the existence of third-party competitors (as acknowledged by TocMail), Ms. Bour's assumption that TocMail would capture **all** sales of Microsoft products with Safe Links is flawed.  Ms. Bour fails to consider in her report that:

(a) consumers may reasonably choose an alternative email security product that advertises similar benefits;

(b) Microsoft could retain a large portion of its customer base (if not all) with its same product offering but updating its allegedly misleading advertising on a going-forward basis;

(c) Microsoft potentially would be able to develop an alternative product that would be acceptable to consumers (and would have competed with the TocMail product on a going-forward basis); and

(d) customers may be willing to accept an IP Cloaking solution with different capabilities to those offered by TocMail (as demonstrated by the numerous competitors advertising the ability to protect against malicious links).

**2.  Ms. Bour Utilizes An Unreasonable And Overstated Incremental Profit Margin For TocMail's Alleged Lost Sales**

56.   Ms. Bour fails to perform a reliable independent analysis of the incremental costs TocMail likely would incur if it made its claimed lost sales.  As discussed above, Ms. Bour presents a limited list of incremental costs without any underlying analysis or support or cross checks in her report regarding the derivation of such costs.[183]  Ms. Bour's identified incremental costs include: (a) servers and load balancers, (b) customer support, (c) IT

_____

[182] "Switching From Proofpoint Enterprise Email Protection."  (https://www.mimecast.com/content/ switching-from-proofpoint-enterprise-email-protection/, viewed on November 25, 2020.)  (Emphasis added.)

[183] Ms. Bour's report does not contain a single citation to support her assumptions regarding the specific costs she considers in her analysis.  In the event Ms. Bour identifies any evidence that supports her cost assumptions, I reserve the ability to fully evaluate that evidence and update my criticisms of her analysis.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

personnel, (d) CEO, executive assistant, and accountant salary expenses, (e) payroll expenses, and (f) other expenses.[184]

57.    More specifically, Ms. Bour failed to perform a reliable independent analysis of the costs that likely would be incurred by TocMail to earn over ███████ in annual revenues.[185]  A comparison of the costs incurred by Microsoft show that Ms. Bour's assumed costs are grossly understated.

    a.    Marketing Expenses.  Ms. Bour projects TocMail spending an annual $2.2 million in marketing and sales.[186]  This is equivalent to ██████ of TocMail's projected revenues in 2020, and ██████ of TocMail's projected revenues in 2021, the first year where Ms. Bour projects sales across the entire year.  In contrast, Microsoft has spent a substantially larger portion of its revenues, between 14% and 16%, in sales and marketing between 2018 and 2020.[187]

    b.    Research And Development Expenses.  Ms. Bour assumed that TocMail would continue to make sales and maintain a commercially successful cybersecurity product with no ongoing research and development costs over the entire 15-year claimed damages period.  In contrast, Microsoft spends 13% of its revenues on research and development.[188]

58.    In total, Ms. Bour's identified incremental costs imply TocMail would operate at a profit rate of over ██████ from 2020 to May 2035.[189]  Ms. Bour's assumed profitability is unreasonably high, particularly when compared to other cybersecurity companies in the

---

[184] Bour Report, pp. 23 – 28.

[185] Bour Report, Exhibit 4.

[186] Bour Report, p. 27.

[187] Microsoft Corporation SEC Form 10-K for the fiscal year ended June 30, 2020, p. 43.

[188] Microsoft Corporation SEC Form 10-K for the fiscal year ended June 30, 2020, p. 43.

[189] Bour Report, Exhibit 4.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

___

email security sector.[190]   Other cybersecurity companies had gross margins ranging from 63% to 78% and net margins ranging from -39.1% to 0.8%, each well below the 98% profit margin assumed by Ms. Bour.[191]   (*See* **Table 6**.)   Ms. Bour has not addressed this inconsistency in her report.

___

[190] TocMail identifies two additional cloud-based, time-of-click, redirect services in addition to Microsoft: Proofpoint and Mimecast.  (Amended Complaint, p. 23.)  Additionally, I analyze companies that are included in CyberCrime Magazine's list of top cybersecurity companies in the industry.  CyberCrime Magazine provides a description of the security sector associated with each company.  I evaluated each company on the list that (a) contained "email" in its security sector description and (b) had publicly available financial information.  I understand CyberCrime Magazine's "Cybersecurity 500" list recently was replaced by its "Hot 150" list.  It is noted that all companies below can be found on either CyberCrime Magazine's "Hot 150" or "Cybersecurity 500" list.  Those companies that contain "email" in their cybersecurity sector description but do not have publicly available financial information include Agari Data, Inc., Avanan Inc., GreatHorn Inc., and Vali Mail Inc.  ("Cybersecurity 500." (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020.) *See also,* ("The Hot 150 Cybersecurity Companies To Watch In 2020."  (https://cybersecurityventures.com /cybersecurity-500-list/, viewed on November 16, 2020.))

[191] *See,* **Exhibit 7**.  See **Appendix A** for a description of these companies and their available products.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

**Table 6**
**Evaluation Of Cybersecurity Companies**
**In The Email Security Sector**
**Gross And Net Profit Margin[192]**

| Company | Cyber Security Sector[193] | Annual Revenues (Most Recent) | Gross Margin (5 years) | Net Margin (5 Years) |
|---|---|---|---|---|
| Proofpoint, Inc. | Security-as-a-Service | $888,190,000 | *74.9%* | *-18.0%* |
| Mimecast, Limited | Email Security | $426,963,000 | *73.3%* | *-2.1%* |
| Barracuda Networks, Inc.[194] | Email, App, Data & Cloud Security | $352,649,000 | *77.5%* | *-5.4%* |
| Cyren, Inc. | Web, Email & Mobile Security | $38,391,000 | *62.8%* | *-39.1%* |
| Zix Corporation | Email Encryption & Security Solutions | $173,428,000 | *70.6%* | *0.8%* |

59.     The available economic evidence supports a conclusion that Ms. Bour's assumptions regarding incremental costs, for which she fails to provide any support or independent analysis or cross-checks in her report, fail to capture the costs TocMail likely would incur if it made its claimed lost sales.  As a result, Ms. Bour's claimed lost profits calculations are unreliable and overstated.

### 3.  Ms. Bour Projects Lost Profits Over An Unreasonably Long Time Horizon

60.     Ms. Bour projects TocMail's claimed lost profits through May 7, 2035, TocMail's asserted date of expiration of the '628 Patent, nearly 15 years into the future.  As discussed above,

---

[192] *See,* **Exhibit 7**.

[193] I understand Microsoft also was listed on CyberCrime Magazine's Cybersecurity 500 list.  "Cybersecurity 500." (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020.)

[194] I understand Barracuda Networks was acquired by Thoma Bravo, LLC on February 13, 2018.  Given the acquisition, I evaluated publicly available financial information for Barracuda Networks prior to this date.  (Barracuda Networks, Inc. SEC Form Ex 99.1 "Thoma Bravo Completes Acquisition of Barracuda," dated February 13, 2018.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

Ms. Bour's assumptions underlying her calculation of lost profits are unsupported and
unreasonable, and her attempts to project those same inputs 15 years into the future are
highly speculative.  There are at least two significant issues with the lost profits damages
horizon used by Ms. Bour.

a.  <u>Future Technological Improvements Are Highly Uncertain</u>.  Ms. Bour does not
consider in her report or incorporate into her analysis the likelihood that future
technological improvements, or changing security concerns, or a change in the
competitive environment over a period of nearly 15 years.  Ms. Bour assumes that for
the next 15 years (i) Microsoft would continue to sell an equal number of licenses, (ii)
TocMail's product would continue to be valued highly enough by consumers to make
sales to each and every Microsoft customer, and (iii) TocMail's would be able to sell
its products at the same price (adjusted upwards for inflation).  Ms. Bour's assumptions
regarding the lack of future technological innovations related to TocMail's product are
unsupported and unreasonable.  Ms. Bour does not consider the possibility of either
Microsoft or a third-party competitor entering the Accused Product space with an
alternative product to compete with TocMail, even over a 15-year future period.  Such
entry would inhibit TocMail's ability to make sales to each and every Microsoft
customer, as Ms. Bour assumes.

b.  <u>Ongoing Future Harm From Alleged Misleading Statements Is Unlikely If Microsoft's
Statements Are Found To Be Misleading</u>.  Ms. Bour's projections of lost profits nearly
15 years into the future is inconsistent with TocMail's request for a permanent
injunction.[195]  Ms. Bour's claimed lost profits damages only would be awarded under
a liability finding.  However, if TocMail were to receive a permanent injunction as it
has requested, Microsoft would cease making the allegedly misleading statements on a
going-forward basis.  Ms. Bour's projections effectively assume that Microsoft's
allegedly misleading claims would continue to confuse consumers and prevent all
consumers from purchasing the TocMail product through May 2035, potentially as
many  as 15 years after such claims had been made (and ended because of an
adjudicated liability finding).  Ms. Bour provides no basis that consumers would
continue to be confused by the allegedly misleading statements and alter their purchase
behavior as a result of that confusion for as many as 15 years after the consumers'
exposure to those allegedly misleading statements.

---

[195] Amended Complaint, p. 29.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

### 4.   <u>Ms. Bour Assumes An Unreasonably Low Discount Rate</u>

61.   Ms. Bour failed to appropriately evaluate the discount rate that would be applicable to a
start-up company like TocMail when calculating her lost profits figures.  As discussed in
detail in **Section X.D.3** above, the vast majority of Ms. Bour's claimed lost profits damages
occur in the future, and as many as 15 years in the future.[196]  As such, Ms. Bour's failure
to appropriately identify a discount rate that would be applicable to TocMail would lead
her to significantly overstate the present value of TocMail's claimed future lost profits.

62.   Ms. Bour utilized a discount rate of 7.5% based in part on Microsoft's weighted average
cost of capital ("WACC") of 5.52% with an upward adjustment to account for "the
diversification of Microsoft as a whole."[197]  Ms. Bour's discount rate of 7.5% is flawed
and unreliable for at least the following reasons.

   a.   <u>Increase Above Microsoft WACC Is Arbitrary And Unsupported</u>.  Ms. Bour notes that
she increased the discount rate she used to 7.5% to account for differences between
Microsoft, as a large diversified company, and TocMail, a company with a single email
security product.[198]  However, Ms. Bour provides no support or justification for the
magnitude of this arbitrary increase.

   b.   <u>Inconsistent With WACC Of Other Email Security Firms</u>.  Ms. Bour failed to compare
the reasonableness of her claimed discount rate to firms other than Microsoft.
Microsoft, as one of the largest and most successful firms in the world, is not an
appropriate benchmark of comparison for a new firm launching a new niche product
that has not made any sales.  As I discuss in **Section X.D.2** above, there are numerous
firms that sell email security products that could be used for comparison purposes to
evaluate the reasonableness of Ms. Bour's claimed discount rate.  Of the four firms
discussed above with available WACC information, three of the four have WACC's
that exceed Ms. Bour's 7.5% figure, with: (i) Proofpoint having a WACC of 7.3%; (ii)

_____

[196] Bour Report, p. 28 and Exhibit 4.

[197] Bour Report, pp. 30 – 31.

[198] Bour Report, p. 31.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

Mimecast having a WACC of 8.5%; (iii) Cyren having a WACC of 8.8%; (iv) Zix having a WACC of 11.3%.[199, 200]  As TocMail is a new firm that began offering its first product for sale on or around December 12, 2019,[201] an appropriate discount rate for TocMail would exceed the WACC figures associated with the established email security firms presented above.

   c.  <u>Fails To Account For The Increased Risk Associated With A New Company Without A Commercially Accepted Product</u>.  Ms. Bour claims that she accounted for "risk associated with the operations of TocMail" by "forecast[ing a] revenue stream [] assuming no net growth in licensed seats."[202]  However, Ms. Bour's assumption is inappropriate that because "Microsoft has historically reported steady growth in both the number of Office 365 seats and the number of users of ATP" that this implies she has appropriately "factored risk into the revenue stream."[203]  To the extent Ms. Bour considers any risk, Ms. Bour only considers the risks associated with the future success of Microsoft's Office 365 product.  Ms. Bour fails to account for the risks specific to TocMail, which has yet to make a single sale of its product.  Ms. Bour does not fully account for the risk associated with the assumption that TocMail would be able to make the same level of sales as that made by Microsoft.

   **E.  Ms. Bour's Calculation Of Disgorgement Of Microsoft's Profits**

63.   TocMail also is seeking disgorgement of "Microsoft's profits from both the direct sale of Microsoft's ATP security service and from the sale of Office 365 derived from purchasers trusting Microsoft's deceptive ATP security claims."[204]  For this purpose, Ms. Bour

---

[199] Bloomberg, L.P.  Barracuda was purchased by Thoma Bravo and became private in early 2018 and as such, Bloomberg does not have available WACC information for Barracuda after that period.  (Barracuda Networks, Inc. SEC Form Ex 99.1 "Thoma Bravo Completes Acquisition of Barracuda," dated February 13, 2018.))

[200] For illustrative purposes, Ms. Bour's claimed lost profits would decrease significantly if she had used a higher discount rate consistent with that observed with three of the four identified email security firms.  If Ms. Bour had utilized a discount rate of 8.5% instead of 7.5%, her claimed lost profits would decrease ███████. If Ms. Bour had utilized a discount rate of 8.8%, her claimed lost profits would decrease by ███████. If Ms. Bour had utilized a discount rate of 11.3%, her claimed lost profits would decrease by ███████ (See **Exhibit 8**.)

[201] Plaintiff's Answers And Objections To Defendant's First Set Of Interrogatories To Plaintiff, p. 4.

[202] Bour Report, p. 30.

[203] Bour Report, p. 30.

[204] Amended Complaint, p. 28.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

identifies Microsoft's revenues from the sale of ATP as a standalone product and

Microsoft's revenues from the sale of Office 365 and Microsoft 365 products that are

included with ATP.[205]

64.     While Ms. Bour performs a mathematical calculation of Microsoft's revenues, she does

not provide a relevant or reliable measure of Microsoft's profits attributable to the alleged

wrongful conduct (or even a relevant input into such a calculation).  Ms. Bour presented

revenue figures that are flawed for at least the following reasons.

    a.  Ms. Bour assumes that all Microsoft revenues from products included with Safe Links
        represent revenues that should be disgorged.

    b.  Ms. Bour does not meet her burden of identifying revenues attributable to Safe Links.

    c.  Ms. Bour fails to apportion Microsoft's revenues to those revenues attributable to Safe
        Links.

    d.  Ms. Bour's calculation is incomplete as she presents no estimate of Microsoft's
        incremental costs.

Additional issues discussed earlier in my report that make Ms. Bour's claimed lost profits

analysis unreliable and that also are relevant to a disgorgement analysis are incorporated

here by reference.[206]

### 1.  Ms. Bour Assumes That All Microsoft Revenues From Products That Include The Safe Links Feature Represent Revenues With An Economic Nexus To The Alleged Wrongful Conduct

65.     From an economic perspective, the benefit to Microsoft, if any, from the alleged wrongful

conduct would not be equal to **all** revenues and profits attributable to the Safe Links feature.

---

[205] Bour Report, p. 4.

[206] *See, for example*, **Section X.B**, **Section X.C**, **Section X.D.1**, and **Section X.D.3**.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

Rather, Microsoft's alleged additional profits would be equal to the incremental profits of its products sold to consumers who were exposed to an allegedly false statement, confused by that statement, and purchased a Microsoft product when they otherwise would not have purchased as a result of the allegedly misleading statements - - adjusted for other appropriate considerations.  Plaintiff has not shown evidence that any Microsoft consumers altered their behavior as a result of exposure to the allegedly misleading statements (i.e., purchased a Microsoft product because of the allegedly false statements), much less that **all** Microsoft customers who purchased a product with Safe Links altered their purchasing behavior as assumed by Ms. Bour.  As discussed in detail in **Section X.C** above, this assumption is unreasonable and inconsistent with the available economic evidence. Further, Ms. Bour failed to present any evidence that the at-issue feature (i.e., protection from "IP Cloaking") was a driver of sales for any of her identified revenues.  That is, Ms. Bour does not show that any consumer purchased the entirety any Microsoft products whose revenue she identifies (e.g., Microsoft 365, Office 365, ATP standalone sales) because of believed the product would include and provide protection from "IP Cloaking." Ms. Bour also has failed to consider in her report that TocMail's product that allegedly competes with Safe Links was not available over the entire July 2015 to June 2020 period for which she calculates disgorgement, and instead has only been allegedly available for sale since December 2019.[207]  Ms. Bour's failure to properly evaluate the incremental

_____

[207] Plaintiff's Answers And Objections To Defendant's First Set Of Interrogatories To Plaintiff, p. 4

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

Microsoft revenues or profits earned as a result of the alleged wrongful conduct (or make the appropriate deductions from such figures) renders the figures she presents irrelevant and unreliable.

### 2. Ms. Bour Fails To Meet Her Burden Of Identifying Revenues *Attributable To Safe Links*

66. As discussed in **Section X.E.1** above, Ms. Bour's identified revenues are not a reliable input into a calculation of disgorgement as she fails to properly calculate Microsoft's incremental revenues earned as a result of the alleged wrongful conduct.  However, in the event the trier-of-fact agrees with Ms. Bour's assumption that **all** at-issue Microsoft customers saw an allegedly misleading statement and purchased a Microsoft product because of that statement, Ms. Bour's identified revenues still would be unreliable and overstated as she failed to appropriately apportion her identified revenues to those revenues attributable to Microsoft's Safe Links feature.

67. Ms. Bour asserts that under the Lanham Act, plaintiff's burden only is "to provide the infringing defendant's sale" [sic] and leaves to defendant the burden to show "all elements of cost or deductions claimed."[208]  However, even though Ms. Bour limits her calculation only to identifying revenues and not relevant costs, Ms. Bour still fails to properly meet her burden as she described it.  Rather than identify only the revenues attributable to Safe Links, Ms. Bour presents **all** revenues associated with any Microsoft product that included

_____

[208] Bour Report, p. 13.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

the accused feature.  Specifically, Ms. Bour identified ███████ in revenues earned from

the following products.

    a.   ATP as a standalone product.

    b.   Office 365 Commercial licenses.

    c.   Office 365 Home & Personal (H&P), Consumer licenses.

    d.   Microsoft 365 Security Suite sales.

    e.   Surface Tablets with Microsoft 365 sales.

    f.   Outlook.com Premium subscriptions.

68.    Ms. Bour failed to acknowledge in her report or account for the fact that **all** of the products

included numerous other products and features in addition to Safe Links.  As discussed in

detail in **Section VI** above, each of these Microsoft products represents a suite of products

which include features that provide benefits unrelated to the alleged wrongful conduct.  In

other words, Ms. Bour's identified revenues include significant revenues attributable to

products and features with no nexus to the alleged wrongful conduct.[209]  As such, Ms. Bour

has failed to meet her burden (as she describes it) of identifying the revenues associated

with the at-issue products and does not present a relevant or reliable input into a calculation

of disgorgement.

_____

[209] Ms. Bour also presents a summary of Microsoft's revenues from all sales of Office 365, Microsoft 365, and
Outlook.com products (including those products that do not include the at-issue Safe Links feature) based on
Microsoft's Product Breakdown Reports.  According to Ms. Bour's estimation, U.S. revenues for these products equal
███████. (Bour Report, p. 21.)   As these additional identified revenues capture Microsoft's sales of products that
are unrelated to the alleged wrongful conduct, these additional revenues would have no relevance for a calculation of
disgorgement.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

### 3.  Ms. Bour Fails To Apportion Microsoft's Revenues Only To Those Revenues Associated With The *At-Issue Safe Links Feature*

69.     As discussed in detail above, Ms. Bour presents the Microsoft revenues from each product that includes the Safe Links feature, and has failed to apportion those revenues to the revenues attributable to Safe Links.  Specifically, Ms. Bour failed to:

a.  apportion revenues from Microsoft Products to the revenues attributable to ATP or Advanced Protection; and

b.  apportion revenues attributable to ATP or Advanced Protection to those revenues attributable to Safe Links.

### i.  Ms. Bour Failed To Apportion Microsoft Revenues To Revenues Attributable To ATP And Advanced Protection

70.     As discussed in **Section VI** above, Microsoft offers Safe Links in a wide variety of suites that include various combinations of products and features.  Of the suites offered by Microsoft, I understand the suite with the smallest number of additional features that are sold by Microsoft are the security-focused products including ATP.  Ms. Bour's identified revenues include the total revenues from Microsoft 365 and Office 365, which are products with numerous features unrelated to security including Word, Excel, and Outlook.[210]

71.     The additional value provided by the full Microsoft 365 and Office 365 products are shown in the prices charged by Microsoft for those products (which can cost as much as $57 per user per month).[211]  On average over the July 2015 to June 2020 period, Microsoft's larger

---

[210] "Find The Right Solution For You."  (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020.)

[211] "Transform Your Enterprise With Microsoft 365."  (https://www.microsoft.com/en-us/microsoft-365/compare-microsoft-365-enterprise-plans, viewed on November 6, 2020.)

CONFIDENTIAL – COUNSEL ONLY

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

_____

products had an overall average price of ████ per seat per month for commercial products

and ████ per license for consumer products.[212]  In comparison, Microsoft currently offers

its lowest priced ATP Plan that includes Safe Links, ATP Plan 1, for a price of $3 per user

per month.[213]  On average over the July 2015 to June 2020 period, Microsoft's lowest-

priced standalone product that included Safe Links (i.e., ATP Plan 1) was priced at ████

per seat per month.[214]  The substantial difference in average price between the larger

Microsoft 365 and Office 365 products and the narrower ATP Plan 1 product show that as

a result of failing to properly apportion her identified revenues, Ms. Bour inappropriately

attributes significant revenues from products unrelated to the alleged wrongful conduct.

### ii.  Ms. Bour Failed To Apportion Revenues Attributable To ATP To Those Revenues Attributable To Safe Links

72.  Even if Ms. Bour had attempted to calculate Microsoft's revenue solely attributable to ATP

(which she did not), such an analysis would fail to properly apportion Microsoft's revenues

to those revenues with a nexus to the alleged wrongful conduct.  As discussed in **Section

VII** above, Safe Links is a single feature out of numerous features included in ATP.  Even

the product with the fewest number of marketed features (i.e., ATP Plan 1) includes three

features other than Safe Links (i.e., Safe Attachments, ATP Anti-Phishing, and Real-Time

---

[212] *See* **Exhibits 5** and **6**.  Calculations: ████████████████████████████████
████████.

[213] The current pricing for ATP plans was confirmed by a member of my staff, at my direction, who received that information from a Microsoft service representative on November 3, 2020.

[214] Calculation: ████████████████████████   (See **Exhibits 5** and **6**.)

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

Detectors)[215] that likely drive the value of ATP Plan 1.  As such, any revenues attributable to ATP would need to be further apportioned to the revenue, if any, Microsoft generated as a result of its inclusion of the Safe Links feature within ATP.  By failing to properly apportion Microsoft's revenues only to those revenues with a nexus to the alleged wrongful conduct, Ms. Bour has failed to meet her burden (as she described it) and provide the revenues that would represent a reliable input into a measure of disgorgement.

### 4.  Ms. Bour Presents Only Microsoft Revenues Without Accounting For Any Costs

73.   Ms. Bour acknowledges that a proper measure of disgorgement would be limited to Microsoft's profits even though she only provides revenue estimates.[216]  Even if Ms. Bour had properly identified Microsoft's revenues, which as discussed above she has not, a proper calculation of disgorgement also would incorporate a deduction for Microsoft's costs (in addition to other appropriate deductions).

74.   I understand that Microsoft does not track the costs directly attributable to individual features like Safe Links.[217]  Within the Product Breakdown Reports, the costs specific to

[215] "Microsoft Defender For Office 365."   (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/office-365-atp?view=o365-worldwide#microsoft-defender-for-office-365-plan-1-and-plan-2,   viewed   on November 6, 2020.)  *See also,* "Introducing Office 365 Advanced Threat Protection."  (https://www.microsoft.com/en-us/microsoft-365/blog/2015/04/08/introducing-exchange-online-advanced-threat-protection/,   viewed   on November 2, 2020.)

[216] Bour Report, p. 13.

[217] Based upon a discussion with Ms. Kathryn Griffith.

Rebuttal Expert Report of Keith R. Ugone, Ph.D.
December 7, 2020

Safe Links are included in the ███████████████████████.[218]  For each month over the July 2015 to June 2020 period, Microsoft's gross margin ████████ ██████████████████████████████ (*See* **Exhibit 9**.)  In the event Plaintiff provides a reliable measure of Microsoft's incremental revenues earned as a result of the alleged wrongful conduct, which as discussed in detail above it has not, the monthly gross margin percentages presented in **Exhibit 9** could be applied to appropriately defined revenues to estimate Microsoft's gross margins - - an amount from which other deductions would also apply.

* * * * * *

75.   My analyses and opinions contained in this report are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.

Keith R. Ugone, Ph.D.
December 7, 2020

---

[218] Gross margins for ████████████████████ are reported in Microsoft's monthly Product Break Down reports.  (**Exhibit 9**.)  I understand the ████████████████████████ ████████████████ (Based upon a discussion with Ms. Kathryn Griffith.)

CONFIDENTIAL – COUNSEL ONLY

# Appendix A

CONFIDENTIAL – COUNSEL ONLY

Appendix A
Overview of Email Security Companies

**Appendix A**

**OVERVIEW OF EMAIL SECURITY COMPANIES**

1.    TocMail identifies two additional cloud-based, time-of-click, redirect services in addition to Microsoft: Proofpoint and Mimecast.[1]  Additionally, CyberCrime Magazine provides a list of top cybersecurity companies called the "Cyber Security 500"[2] with a description of each companies' security sector.[3]  Each company on the list that (a) contained "email" in its security sector description and (b) had publicly available financial information was reviewed.[4]  In addition to Mimecast, CyberCrime Magazine identified (a) Barracuda Networks, inc., (b) Cyren, Inc., and (c) Zix Corporation.  Background information for each of the five companies identified above is provided in this Appendix A.

## I.   COMPANY OVERVIEW

### A.  Proofpoint ("Proofpoint")

2.    Proofpoint is a cybersecurity company that enables large and mid-sized organizations to protect the way their people work from advanced threats and compliance risks.[5]  Proofpoint's suite of products is designed to help organizations build "people-centric

---

[1] Amended Complaint, p. 23.

[2] "Cybersecurity 500."  (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020.)  I understand CyberCrime Magazine's "Cybersecurity 500" list recently was replaced by its "Hot 150" list.  ("The Hot 150 Cybersecurity Companies To Watch In 2020."  (https://cybersecurityventures.com/cybersecurity-500-list/, viewed on November 16, 2020.))

[3] "Cybersecurity 500."  (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020.)  *See also*, "The Hot 150 Cybersecurity Companies To Watch In 2020."  (https://cybersecurityventures.com/cybersecurity-500-list/, viewed on November 16, 2020.)

[4] The companies that contain "email" in their cybersecurity sector description but do not have publicly available financial information include Agari Data, Inc., Avanan Inc., GreatHorn Inc., and Vali Mail Inc.  ("Cybersecurity 500." (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020.)  *See also,* ("The Hot 150 Cybersecurity Companies To Watch In 2020."  (https://cybersecurityventures.com /cybersecurity-500-list/, viewed on November 16, 2020.))

[5] Proofpoint, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 4.

1

Appendix A
Overview of Email Security Companies

security" and compliance programs.[6]  Proofpoint's focus areas of business include threat

protection, information protection, user protection, business ecosystem protection, and

compliance solutions.[7]  Proofpoint was founded in 2002 and is headquartered in Sunnyvale,

California.[8]   In its most recent annual filing, Proofpoint reported approximately $890

million in gross revenue for the year ending December 31, 2019.[9]

3.     Proofpoint's products' web page lists "Email Security" as the first product category

(among 8 security categories).[10]  With respect to Proofpoint's core email security products,

the company advertises its (a) Email Security Protection, (b) Email Fraud Defense, and (c)

Threat Response Auto-Pull products (among others).

   a.   <u>Email Security and Protection</u>.  Proofpoint Email Protection is advertised to provide
        multiple layers of security to stop malware and non-malware threats.[11]  The solution
        can control all aspects of inbound and outbound email to detect and block threats, and
        protect confidential information.[12]

   b.   <u>Email Fraud Defense</u>.  Proofpoint Email Fraud provides customers with visibility,
        tools, and services to authorize legitimate email and block fraudulent messages before
        they reach the user's inbox.[13]

   c.   <u>Threat Response Auto-Pull</u>.  Proofpoint's Threat Response Auto-Pull product enables
        security administrators to analyze emails and move malicious emails to quarantine,

---

[6] Proofpoint, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 4.

[7] Proofpoint, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 4.

[8] Proofpoint, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, pp. 31 and 36.

[9] Proofpoint, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 33.

[10] "Proofpoint Products."  (https://www.proofpoint.com/us, viewed on December 5, 2020.)

[11] "Email Security and Protection."  (https://www.proofpoint.com/us/products/email-protection/email-security-and-protection, viewed on December 5, 2020.)

[12] "Email Security and Protection."  (https://www.proofpoint.com/us/products/email-protection/email-security-and-protection, viewed on December 5, 2020.)

[13] "Email Fraud Defense."  (https://www.proofpoint.com/us/products/email-protection/email-fraud-defense, viewed on December 5, 2020.)

CONFIDENTIAL – COUNSEL ONLY

Appendix A
Overview of Email Security Companies

after delivery.[14]  Threat Response tracks forwarded mail and distribution lists to create an auditable activity trail.[15]

### B.  Mimecast, Limited ("Mimecast")

4.      Mimecast is a provider of cloud security and risk management services for email and corporate information.[16]  Mimecast advertises that customers can "[b]e more confident and secure with [Mimecast,] the #1 companion to Microsoft 365."[17]  The company's cloud services protect customers from business and data security risks to which their email and other corporate systems expose them.[18]  Mimecast was founded in London, England in 2003 with its North American headquarters located in Boston, Massachusetts.[19]  In its most recent annual filing, Mimecast reported approximately $430 million in gross revenue for the year ending March 31, 2020.[20]

5.      With respect to Mimecast's core email security products and solutions, Mimecast offers its "Email Security with Targeted Threat Detection" as part of its Email Security 3.0 Service.[21]

---

[14] "Threat Response Auto-Pull."   (https://www.proofpoint.com/us/products/email-protection/threat-response-auto-pull, viewed on December 5, 2020.)

[15] "Threat Response Auto-Pull."   (https://www.proofpoint.com/us/products/email-protection/threat-response-auto-pull, viewed on December 5, 2020.)

[16] "The Hot 150 Cybersecurity Companies To Watch In 2020."  (https://cybersecurityventures.com/cybersecurity-500-list/, viewed on November 16, 2020.)  *See also*, Mimecast Limited, SEC Form 10-K for the fiscal year ended March 31, 2020, p. 3.

[17] "Cloud Cybersecurity Services for Email, Data & Web."  (https://www.mimecast.com/, viewed on December 1, 2020.)  (Bracketed text added for clarification.)

[18] Mimecast Limited, SEC Form 10-K for the fiscal year ended March 31, 2020, p. 3.

[19] "Our Company."  (https://www.mimecast.com/company/, viewed on December 1, 2020.)  *See also*, "Mimecast Opens New North American Headquarters."  (https://www.mimecast.com/resources/press-releases/dates/2013/6/mimecast-opens-new-north-american-headquarters/, viewed on December 1, 2020.)

[20] Mimecast Limited, SEC Form 10-K for the fiscal year ended March 31, 2020, p. 36.

[21] "Cloud Cybersecurity Services for Email, Data & Web."  (https://www.mimecast.com/, viewed on December 1, 2020.)  *See also,* "Email Security, Archiving and Continuity Products."   (https://www.mimecast.com/products/, viewed on December 1, 2020.)   *See also*, "Email Security with Targeted Threat Protection." (https://www.mimecast.com/products/email-security-with-targeted-threat-protection/, viewed on December 1, 2020.)  *See also*, Mimecast Limited, SEC Form 10-K for the fiscal year ended March 31, 2020, p. 5.

CONFIDENTIAL – COUNSEL ONLY

Appendix A
Overview of Email Security Companies

Listed as the first product (among fourteen others) on Mimecast's products web page, the Email Security with Targeted Threat Detection solution is advertised to employ a "URL Protect" feature, which checks websites for threats at the time of click.[22]  Other features of this email security product include Attachment Protect (an analytical sandboxing tool to protect from malicious email attachments), Impersonation Protect (a functionality that protects against domain spoofing), and Browser Isolation (a feature that allows users to safely click any embedded URL and safely surf the web) among others.[23]

### C.  Barracuda Networks, Inc ("Barracuda")

6.       CyberCrime Magazine categorizes Barracuda as providing products in the Email, App, Data & Cloud Security sector.[24]  According to its annual report, Barracuda offers cloud-enabled solutions that allow customers to address security threats, improve network performance, and protect and store data.[25]  Barracuda was founded in 2003 and currently is headquartered in Campbell, California.[26]  In the fiscal year ending February 28, 2017, Barracuda Networks reported approximately $350 million in gross revenue.[27]

---

[22] "Email Security, Archiving and Continuity Products." (https://www.mimecast.com/products/, viewed on December 1, 2020.) *See also*, "Email Security with Targeted Threat Protection." (https://www.mimecast.com/products/email-security-with-targeted-threat-protection/, viewed on December 1, 2020.)

[23] "Email Security with Targeted Threat Protection." (https://www.mimecast.com/products/email-security-with-targeted-threat-protection/, viewed on December 1, 2020.)

[24] "The Hot 150 Cybersecurity Companies To Watch In 2020." (https://cybersecurityventures.com/cybersecurity-500-list/, viewed on November 16, 2020.)

[25] Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017, p. 3

[26] "Security business Barracuda Networks acquired for $1.6 billion." (https://techcrunch.com/2017/11/27/security-business-barracuda-networks-acquired-for-1-6-billion/, viewed on December 1, 2020.)

[27] I understand Barracuda Networks was acquired by Thoma Bravo, LLC on February 13, 2018.  Given the acquisition, I evaluated publicly available financial information for Barracuda Networks prior to this date.  (Barracuda Networks, Inc. SEC Form Ex 99.1 "Thoma Bravo Completes Acquisition of Barracuda," dated February 13, 2018.)  *See also*, Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017, p. 42.

CONFIDENTIAL – COUNSEL ONLY

Appendix A
Overview of Email Security Companies

7.     With respect to Barracuda's core email security products, the company advertises its Barracuda Essentials for Email Security (formerly Barracuda Email Security Service) and Barracuda Email Security Gateway (formerly Barracuda Spam Firewall) solutions.[28]

   a.  Barracuda Essentials for Email Security.  Barracuda Essentials for Email Security offers multi-layer cloud-based protection against email-based attacks, data loss and business disruption.[29]  As an included service, Barracuda Email Threat Scan examines Office 365 mailboxes using advanced protection techniques including sandboxing to identify latent threats.[30]  On its website, Barracuda Networks advertises a "Link Protection" as an available option included in the Barracuda Essentials product.[31]

   b.  Barracuda Email Security Gateway.  The Barracuda Email Security Gateway manages and filters all inbound and outbound email traffic to protect organizations from email borne threats and data leaks.[32]  Barracuda Networks advertises that customers with this product are able to route emails through the Barracuda cloud performing advanced malware detection and pre-filtering to keep threats off their premises.[33]

**D.  Cyren, Inc. ("Cyren")**

8.     CyberCrime Magazine categorizes Cyren as providing products in the Web, Email & Mobile Security sector.[34]  Cyren is a cloud-based Software-as-a-Service (SaaS) security solutions company that protects businesses, their employees, and customers against email and web-based threats.[35]  According to Cyren, the company's business focus areas include security data flow, comprehensive detection technologies, and advanced cyber intelligence.[36]  Cyren was founded in 1991 in Israel and is regionally headquartered in

---

[28] Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017, p. 7.

[29] Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017, p. 7.

[30] Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017, p. 7.

[31] "Barracuda Essentials – MSP."  (https://barracudamsp.com/essentials-plans/, viewed on December 1, 2020.)

[32] Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017

[33] Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017, p. 7.

[34] "Cybersecurity 500."  (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020.)

[35] Cyren Ltd., Inc., SEC Form 10-K for the fiscal year ended December 31, 2019, p. 1.

[36] Cyren Ltd., Inc., SEC Form 10-K for the fiscal year ended December 31, 2019, p. 2.

CONFIDENTIAL – COUNSEL ONLY

Appendix A
Overview of Email Security Companies

Mclean, Virginia.[37]  In its most recent annual filing, Cyren reported approximately $40 million in gross revenue for the year ending December 31, 2019.[38]

9.    With respect to Cyren's core email security products, the company advertises its (a) Inbox Security for Office 365, (b) Threat InDepth, and (c) Email Security Engine products.

  a.    <u>Inbox Security for Office 365</u>.  Designed for enterprise customers, the Inbox Security for Office 365 product is a cloud-based solution that establishes a continuous, adaptive and automated security layer in the user mailbox.[39]

  b.    <u>Threat InDepth</u>.  Cyren's Threat InDepth cloud solution is designed to provide organizations the ability to monitor and detect dynamic threat characteristics.[40] Features of this subscription-based product include Phishing & Fraud URL intelligence, Malware URL intelligence, Malware File intelligence, and IP Reputation intelligence.[41]

  c.    <u>Email Security Engine</u>.  Cyren advertises its Email Security Engine product as an email security solution for organizations to detect threats at vendor endpoints.[42]  According to its website, the Email Security Engine (i) classifies inbound/outbound email traffic, (ii) detects threats from highly organized cybercriminals, and (iii) bans emails (network wide) based on destination IPs.[43]

   **E.  Zix Corporation ("ZixCorp")**

10.    CyberCrime Magazine categorizes ZixCorp as providing products in the Email Encryption & Security Solutions sector.  ZixCorp is a provider of cloud email security, productivity and compliance solutions including specifically solutions for email encryption and data loss prevention, advanced threat protection, and archiving.[44]  ZixCorp focuses on the

---

[37] "Cyren."  (https://www.crunchbase.com/organization/cyren, viewed on December 1, 2020.)

[38] Cyren Ltd., Inc., SEC Form 10-K for the fiscal year ended December 31, 2019, p. 38.

[39] "Cyren Inbox Security for Office 365."  (https://www.cyren.com/products/cyren-inbox-security, viewed on December 1, 2020.)

[40] "Threat InDepth."  (https://www.cyren.com/products/threat-indepth, viewed on December 1, 2020.)

[41] "Threat InDepth."  (https://www.cyren.com/products/threat-indepth, viewed on December 1, 2020.)

[42] "Email Security Engine."  (https://www.cyren.com/products/email-security-engine, viewed on December 1, 2020.)

[43] "Email Security Engine."  (https://www.cyren.com/products/email-security-engine, viewed on December 1, 2020.)

[44] Zix Corporation, SEC Form 10-K for the fiscal year ended December 31, 2019, p. 3.

CONFIDENTIAL – COUNSEL ONLY

Appendix A
Overview of Email Security Companies

protection of business communication to enable customers to secure data and meet compliance needs.[45]  ZixCorp was founded in 1988 with its principal place of business in Dallas, Texas.[46]  In its most recent annual filing, ZixCorp reported approximately $170 million in gross revenue for fiscal year ending December 31, 2019.[47]

11.   With respect to ZixCorp's core email security products, the company advertises its Email Encryption and Email Threat Protection products.

   a.  <u>Email Encryption</u>.  Email Encryption is a cloud-based product that automatically protects messages via policy filters and removes extra authentication steps for senders and receivers.[48]  If emails contain sensitive information, this solution will encrypt or quarantine them.[49]

   b.  <u>Email Threat Protection</u>.  Email Threat Protection is designed to prevent malware, ransomware, and other advanced threats from compromising user emails in an organization.[50]  According to ZixCorp's website, advanced link protection (among other features) assists customers with inbox security and prevents network vulnerability.[51]

---

[45] Zix Corporation, SEC Form 10-K for the fiscal year ended December 31, 2019, p. 3.

[46] "Company Profile & Executives."  (https://www.wsj.com/market-data/quotes/ZIXI/company-people, viewed on December 1, 2020.)

[47] Zix Corporation, SEC Form 10-K for the fiscal year ended December 31, 2019, p. 29.

[48] "Email Encryption."  (https://zix.com/products/email-encryption, viewed on December 1, 2020.)

[49] "Email Encryption."  (https://zix.com/products/email-encryption, viewed on December 1, 2020.)

[50] "Email Threat Protection."  (https://zix.com/products/email-threat-protection, viewed on December 1, 2020.)

[51] "Email Threat Protection."  (https://zix.com/products/email-threat-protection, viewed on December 1, 2020.)

CONFIDENTIAL – COUNSEL ONLY

**Exhibit 1**

**ANALYSIS GROUP**
ECONOMIC, FINANCIAL and STRATEGY CONSULTANTS

Main 1 214 523 1400    Fax 1 214 523 1401    www.analysisgroup.com
2911 Turtle Creek Boulevard    Suite 600    Dallas, TX   75219

### KEITH R. UGONE, PH.D.
**Senior Advisor (Managing Principal - Retired)**
Phone: (214) 523-1405
keith.ugone@analysisgroup.com

Dr. Keith R. Ugone has provided economic and damages consulting services in antitrust cases, breach of contract cases, business interruption cases, class action certification matters, employment / loss of earnings cases, intellectual property cases, lender liability cases, professional negligence cases, and securities-related cases, among others.  He specializes in the application of economic principles to complex business disputes and generally is retained in cases requiring economic analyses and/or damages-related analyses.  Damage models constructed or evaluated by Dr. Ugone have had as components revenue analyses, lost sales analyses, cost analyses, assessments of the capacity to produce additional units, assessments of profitability, the competitive business environment in which the damages claim was being made, claimed lost profits, claimed lost business value, and claimed reasonable royalties.  During the course of Dr. Ugone's career, he has frequently evaluated lost profits and valuation-related damages using large databases of information and complex computer models.  Dr. Ugone also has performed economic liability analyses in antitrust matters including defining relevant markets, assessing market power, and evaluating alleged anticompetitive behavior.  Dr. Ugone has testified at trial and in deposition over 500 times since 1990.

Dr. Ugone has a PhD in Economics from Arizona State University, an MA in Economics from the University of Southern California, and a BA in Economics from the University of Notre Dame.  Subject areas of expertise include microeconomics, macroeconomics, industrial organization, antitrust/regulation, and econometrics.  He is a member of the American Economic Association, the American Statistical Association, the National Association of Forensic Economists, and the Western Economics Association.

## EDUCATION

| | |
|---|---|
| 1983 | Ph.D., Economics, Arizona State University. |
| 1979 | M.A., Economics, University of Southern California. |
| 1977 | B.A., Economics, University of Notre Dame. |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 - Present | Analysis Group, Dallas, Texas – Senior Advisor (June 2020 - present); Managing Principal (2004 - May 2020; retired). |
| 1985 – 2003 | PricewaterhouseCoopers LLP (and legacy firms) – Partner (Principal) 1992 – 2003; Senior Manager 1989 – 1992; Manager 1987 – 1989; Senior Consultant 1985 – 1987.  Member of United States Admissions Committee (2003).   Chairman of PricewaterhouseCoopers Intellectual Property Leadership Forum (2000 – 2003). |
| 1983 – 1985 | California State University, Northridge - Assistant Professor/Lecturer in Department of Economics, Full-time:  1983 – 1985, Part-time:  1986 – 1992. |
| 1979 – 1983 | Arizona State University - Faculty Associate/Teaching Assistant in Department of Economics. |
| 1977 – 1979 | Jet Propulsion Laboratory - Economic/Energy Analyst. |

**PROFESSIONAL AND BUSINESS AFFILIATIONS**

American Economic Association
American Statistical Association
National Association of Forensic Economics
Western Economics Association

**SELECTED LITIGATION CONSULTING EXPERIENCE (by Nature of Suit)**

<u>**Securities: 10b-5 / Section 11 Cases**</u>

- Evaluated the economic damages being asserted by shareholders and debt holders of a bankrupt energy trading company against a brokerage firm. Plaintiffs alleged the brokerage firm recommended the stock and debt securities associated with the company even though it knew or should have known the deteriorating pre-bankruptcy financial condition of the company. Analyzed the trading patterns of the brokerage account customers and the stock price movements of the company upon issuance of analyst reports, and researched confounding events contributing to investors' trading of the securities-in-question. Demonstrated an economic causal link did not exist between the alleged wrongful conduct and the claimed trading patterns. Also evaluated the event study conducted by Plaintiffs' damages expert and the claimed inflation component embedded in the company's stock price. Demonstrated Plaintiffs' damages expert failed to remove the economic impact of confounding events. Performed an alternative damages evaluation.

- Evaluated shareholder and debt holder claimed damages against a major accounting firm relating to the issuance of allegedly false and misleading financial statements that did not identify certain assets of a communications company as impaired. Researched industry reports and analyst reports regarding the company's common stock and debt securities, evaluated an event study conducted by Plaintiff's damages expert, analyzed loss causation in accordance with *Dura*, studied the company's stock price movements before and during the claimed class period, and analyzed the company's stock price movement on the day of the alleged corrective disclosure. Demonstrated Plaintiffs' event study did not appropriately isolate the stock price movement associated solely with the alleged corrective disclosure as confounding events were not removed from the analysis. Performed an alternative damages calculation.

- Evaluated Plaintiffs' damages claim in a shareholder suit relating to the manufacturer of decoding equipment used in the wireless cable industry. Analysis demonstrated Plaintiffs' financial expert did not consider market speculation related to the wireless cable industry or Defendant's higher-than-expected earnings when calculating claimed damages. Additional errors included aggregating into claimed damages stock price increases unrelated to Plaintiffs' allegations and on "no announcement days".

- Evaluated damages claim against a major investment banking/underwriting firm relating to an aborted initial public offering in the temporary staffing industry. Analysis demonstrated methodological and conceptual errors in Plaintiff's econometrically-based claim that the projected post-IPO stock price of the company justified proceeding with the IPO. Also evaluated various components of Plaintiff's damages claim, including the profitability of Plaintiff's business, projected use of funds raised, ownership percentages in the company, and the funds that would have inured to the original owners of the company.

- Evaluated Plaintiffs' damages claim in a shareholder suit involving an international airline carrier. At issue were alleged misrepresentations concerning the airline's ability to reduce its maintenance costs. Demonstrated that the fifty percent decline in the company's stock price over a one-month period was for reasons unrelated to corrective disclosures concerning maintenance costs. Also reconstructed Plaintiffs' trading history, comparing the trading pattern to public announcements concerning the airline, and demonstrating a trading pattern inconsistent with Plaintiffs' theory of reliance on the alleged misrepresentations.

*Keith R. Ugone, page 3*

- <u>General Overview</u>.  Performed an "event study" and/or evaluated claimed damages in various securities litigation cases involving firms in industries such as:  airlines, biotechnology, computer software, commodities, banking, real estate development, life insurance, entertainment, communications, energy trading, investment banking, computer printers, health care, medical equipment, hotels, non-traditional automotive insurance, information technology services, workmen's compensation insurance, computer hardware, camera and photo finishing, intelligent disk drives, market research, trucking, temporary staffing, real estate investment trusts, computer networking, specialty stores, skilled nursing facilities, wireless cable encoding devices, the provision of software computer services to insurance companies, and the provision of professional services to power plants and large scale industrial facilities.  Analyses included development of an appropriate peer group and isolation of economy-wide, industry-specific, and company-specific factors impacting the particular firm's stock price.  Company-specific events often included unfavorable news announcements unrelated to the alleged misrepresentations and the ending of potential takeover bids.  Also involved was a comparison of the firm's actual stock price to its "true value" line, the construction of a matrix to track ins-and-outs traders and retention shareholders, and an evaluation of damages under Section 10b-5 and Section 11 claims.

**Securities:  Merger/Takeover Related Cases**

- Evaluated claimed damages against a major accounting firm by a transportation company that acquired another transportation company in alleged reliance upon the audited financial statements of the acquired company and its Mexican subsidiary.  Plaintiff wrote down its investment in the Mexican subsidiary after the acquisition and based its damages claim on a subsequent decline in its stock price.  Analyses included researching competing transportation companies, considerations associated with consummating the merger, analyst reports regarding the merger announcement and the investment write-down announcement, and earnings announcements from comparable companies.  Demonstrated Plaintiff's damages expert did not establish an economic causal link between the alleged wrongful conduct of the Defendant and the claimed economic damages suffered by the Plaintiff and that confounding events were not taken into account appropriately.

- Evaluated Plaintiffs' damages claim relating to a merger in the banking industry.  At issue was whether material adverse changes regarding loan loss reserves had occurred but were not disclosed.  Analyzed whether the complained of events were related to conditions and circumstances in the banking industry.  Also analyzed the value of alternative offers for the target bank and the pre-merger volatility in the acquiring bank's stock price.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the aborted sale of assisted living facilities.  Analyzed current trends in the assisted living industry, the financial condition of the target company, the projected financial results of certain to-be-constructed properties, and the target company's performance relative to projections.  Also at issue was whether a material adverse change had occurred in the target company's operations and business.  Lost profit damages, interest-related damages, lost contract fees, and diminution-in-value damages were evaluated.

- Evaluated Plaintiffs' damages claim in a merger/acquisition-for-stock litigation in the information technology services industry.  At issue was whether material adverse changes had occurred in the business condition of the acquiring company prior to the closing of the merger.  Damages issues included investigating the nature of the agreed upon warranties and representations contained in the merger agreement, the stock price performance of similarly-situated firms, the length of the alleged damages period, the appropriate length of certain event windows, industry downturns, and the failure to account for the proper mitigation of damages.

- Analyzed a major entertainment company's stock price movement to determine the takeover premium paid by an acquiring company.  Involved was quantifying the impact of takeover rumors prior to the takeover announcement to isolate that portion of the company's pre-acquisition increase in stock price due to takeover speculation as opposed to general industry trends.

- Served as financial advisor to a Special Litigation Committee ("SLC") investigating a shareholder approved merger vote in the telecommunications industry. The merger was not consummated, but the vote triggered the acceleration of vesting of options owned by the officers and directors of the target company. Assisted the SLC in analyzing the acceleration of options and various alternative settlement strategies.

## Securities/Commodities:  Other Cases

- Evaluated Plaintiff's claimed lost enterprise value damages relating to Defendants' allegedly fraudulent conduct resulting in an artificial acceleration of income, restatement of income, and ultimate bankruptcy of a food distribution company. Analyses included isolating the dollar magnitude of the alleged artificial acceleration of income allegedly created by Defendant's actions compared to other artificial accelerations of income, an assessment of alternative reasons for Plaintiff's business decline and ultimate bankruptcy, and evaluation of Plaintiff's valuation approaches.

- Evaluated the spot price of a base metal in a major commodities-related market manipulation matter. Developed an econometric model to explain the spot price movements of the base metal in an un-impacted period. Used the econometric model to evaluate what the spot price of the base metal would have been in the absence of the alleged manipulation.

- Calculated short-swing trading profits under Section 16(b) of the Securities Exchange Act of 1934 relating to the stock trading activities of an officer of a long distance telecommunications company. Issues analyzed included allocating stock purchases to stock sales of differing numbers of shares and accounting for a 3-for-1 reverse stock split during the period under consideration.

- Evaluated damages in an alleged lack of suitability, lack of supervision, and failure to execute matter in the securities industry. At issue was an investment strategy of selling short the same stock in which a restricted long position was also held. Demonstrated errors in Plaintiff's damages claim, including the failure to recognize that the financial objectives stated at the time of the development of the investment strategy were in fact met.

- Evaluated the stock price performance of a major distiller over a forty-year period. At issue was whether a portion of the increase in the stock price could be attributed to the efforts of one senior official in the corporation. Company-specific, industry-specific, and economy-wide factors were investigated to determine the reasons for the stock price performance of the distilling company.

## Antitrust:  Monopolization/Attempted Monopolization Cases

- Evaluated claimed antitrust damages asserted by a major airline company against a global distribution system ("GDS") operator for alleged anticompetitive behavior relating to the provision of booking services to travel agencies. Evaluated Plaintiff's claimed damages relating to claimed lost profits resulting from the Defendant's alleged actions to impede the rollout of a competing technology for booking services, contractual restrictions allegedly preventing the airline from offering targeted discounts to price-sensitive customers, allegedly imposing retaliatory booking fee increases, and allegedly biasing fare search results displayed to travel agencies.

- Analyzed Plaintiff's allegations that Defendant monopolized or attempted to monopolize the market for magnetic brakes for amusement park rides. Evaluated Plaintiff's assessment of the relevant product market, allegations of market power, and the impact of Defendant's alleged anti-competitive conduct. Also evaluated claimed damages, including assumptions underlying Plaintiff's claimed damages model and economic causal connection between the alleged wrongful conduct and claimed losses. Determined that Plaintiff's expert failed to account for alternative explanations for Plaintiff's claimed losses. Also demonstrated that Plaintiff's expert made inappropriate assumptions regarding growth in the claimed relevant product market and whether Plaintiff was damaged in perpetuity.

- Evaluated Plaintiff's economic liability arguments in an antitrust matter relating to a restriction on the registration of cloned American Quarter Horses with the American Quarter Horse Association. Evaluated Plaintiff's expert's theoretical economic model. Demonstrated that there was no economic harm to the market as a result of the at-issue registration restriction. Also identified numerous flaws in Plaintiff's expert's assumptions regarding the supply and demand of high quality American Quarter horses (including excess breeding capacity). Evaluated Plaintiff's damages claim relating to lost sales of cloned American Quarter horses and lost breeding opportunities.

- Evaluated the claimed anticompetitive impact of an alleged conspiracy by a major oil and gas exploration company to monopolize the market for Helicopter Underwater Egress Training ("HUET"). Evaluated the relevant product and geographic markets and the alleged market power of the Defendant. Demonstrated that the Defendant lacked the market power necessary to monopolize the relevant market. Also demonstrated the flaws in Plaintiffs' damages claim, including but not limited to, loss of Plaintiffs' market share for reasons other than the alleged anticompetitive acts (e.g., self-imposed price increases and the loss of a large customer unrelated to the alleged wrongful conduct), failure to take into account the general economic downturn in the U.S. economy during the relevant period, the use of an inappropriate discount rate for quantifying claimed future damages, and the use of an inappropriate assumption relating to future claimed market shares in the absence of the alleged wrongful conduct.

- Evaluated the competitive impact of certain covenants not to compete associated with restricted stock unit awards issued to operations management employees by a major dairy processor. Evaluated the relevant product and geographic markets. Concluded that the covenants not to compete were overly broad and restrictive, outweighing any precompetitive benefits associated with the covenants. Concluded that the covenants did not contain reasonable limitations as to time frame and scope of activity. The covenants effectively restricted competition and raised rivals' costs in the relevant market.

- Evaluated Plaintiff's damages claim associated with the assertion that certain freight forwarders engaged in bid rigging, price fixing, group boycott, and illegal tying arrangements in a traffic channel for transporting military household goods. Demonstrated the flaws in Plaintiff's damages claim, including but not limited to, declines in revenues and profits prior to the alleged conspiracy period, alternative reasons for the Plaintiff's poor performance during the claimed damages period (e.g., the closing of military bases and increased competition in one leg of the channel), and the use of an inappropriate benchmark period for quantifying claimed damages.

- Evaluated the anticompetitive impact of an alleged conspiracy between a distributor and manufacturer whereby the manufacturer refused to ship certain aftermarket automotive exhaust systems and catalytic converters to a competing distributor in Washington and Oregon. Analyses included evaluating the relevant product and geographic markets for aftermarket automotive exhaust products and the damages suffered by the competing distributor. Also evaluated the competing distributor's direct and indirect price discrimination claims (including differential discounts in areas where shipments did occur) and associated claimed damages.

- Analyzed various monopolization allegations in an antitrust counterclaim to a patent infringement matter in the home lighting control systems industry. Analyzed the trade practices of the home lighting control system manufacturers (e.g., sales channels, advertising and promotion, etc.), product and geographical markets, and the potential substitutes to the products at issue. Analyses demonstrated counterclaim Defendant did not possess the ability to monopolize the relevant market for home lighting control products given the channels through which manufacturers made sales and the availability of close substitute products.

- Evaluated Plaintiff's economic liability arguments in an antitrust counterclaim relating to a supply agreement for an ingredient (i.e., larch arabinogalactan) contained in certain patented dietary and nutritional supplements for the promotion and maintenance of good health.  Concluded that (a) the sales agreement in question did not constitute an unreasonable restraint on trade, (b) the Defendant did not possess monopoly power, and (c) the Defendant did not engaged in anticompetitive behavior in any properly defined relevant market.   Observed that the prices of dietary supplements containing arabinogalactan did not increase since the signing of the sales agreement, the output of dietary supplements containing arabinogalactan did not decline since the signing of the sales agreement, (c) the capacity to produce additional arabinogalactan had been increasing, and (d) Plaintiff did not face a dangerous probability of being harmed by the supply agreement.

- Evaluated claimed antitrust damages asserted by the holder of certain common packet channel ("CPCH") technology patents against a group of handheld mobile device hardware and infrastructure manufacturers for an alleged conspiracy to deprive the patent holder of the value of its patented technology in the third generation partnership project ("3GPP").   The patent holder's technology had been removed as an optional standard.    Damages-related analyses included conducting a *Georgia-Pacific* analysis and analyzing the licenses identified by Plaintiff's expert as comparable to the patents at issue.   Also determined that Plaintiff's expert had not established an economic causal link between the alleged wrongful conduct and the damages being claimed.

- Evaluated the claimed anticompetitive activities of Defendant hospital's alleged exclusionary arrangements and practices relating to managed care contracts.  Evaluated the relevant antitrust markets (product and geographic) for primary care services provided by physicians to managed care-covered patients in Smith County, Texas.  Also evaluated the volume of commerce impacted by the claimed exclusionary practices and the impact of these claimed exclusionary practices on competition in the relevant markets.  In addition, evaluated the economic damages suffered by the Plaintiff hospital as a result of Defendant's alleged anticompetitive activities.

- Evaluated Plaintiff's claim of antitrust injury in the markets for orthodontic brackets and orthodontic services allegedly due to the advertising guidelines promulgated by a national orthodontic trade association.  Analysis demonstrated the advertising guidelines were efficiency enhancing (by lowering consumer search costs), promoted competition, and did not stifle innovation in the relevant markets.  Also empirically demonstrated that legitimate advertising through a variety of media was not impacted by the advertising guidelines.

- Evaluated distributors' claims of past lost profits, future lost profits, and reductions in franchise values in a carbonated soft drink antitrust litigation.  Defendants allegedly entered into a series of anti-competitive marketing agreements with retailers relative to the promotion and sale of national brand carbonated beverages.  Analysis demonstrated Plaintiffs' expert did not take into account the brand composition of Plaintiffs' case sales, underestimated variable costs of distribution, did not adjust for increased competition from private-label brands and other drinks, and failed to account for the lack of advertising and other promotional support from the distributors' parent company.

- Analyzed the impact of a proposed merger of two insurance companies on the long term care and medicare supplement insurance markets in the state of Oklahoma.  Evaluated whether the merger would substantially lessen competition or have a tendency to create a monopoly.  Evaluated the number of competitors, the reasonable interchangeability of the insurance products offered, insurance company sizes, ease of entry, the impact of regulation, and the ability of consumers to acquire price information in a low-cost manner.

- Analyzed the alleged anticompetitive impact of an exclusive provider arrangement between a hospital and a group of anesthesiologists on the market for anesthesia services.  Analyses included determining inpatient services market shares, anesthesia procedures market shares, and recent entry into the hospital service area.  Also evaluated the damages claims being alleged by a group of Certified Registered Nurse Anesthetists.

- Conducted an economic analysis in a vertical non-price (advertising) restraint antitrust case dealing with tennis ball throwing machines. Analysis demonstrated the pro-competitive nature of the advertising restraint and that the termination of a non-complying dealer did not substantially reduce competition in the relevant market.

- <u>General Overview</u>. Provided economic analyses and developed damages models and/or critiqued the opposition's damages models in various antitrust cases involving the following industries and/or markets: anesthesia services, printed circuit boards, nutritional supplements, carbonated soft drinks, aftermarket automotive exhaust systems, telecommunications switching equipment, dairy processing, radio control model airplanes, local area networks, entertainment lighting, integrated casino bonusing software, home lighting control systems, medicare supplement/long term care insurance, commercial air conditioning units, disposable dust/mist respirators, immunodiagnostic tests, in-patient hospital services and managed care contracts, PBX systems, military freight forwarding, underground storage tanks, long distance telephone lines, tennis ball throwing machines, check processing readers/sorters, local television advertising, personal watercraft, automobile refinishing paint, Christian music, subsea horizontal extraction wells, orthodontic braces, DRAM microcomputer chips, women's designer clothes, single point of contact telecommunication services, non-prescription reading glasses, and the provision of temporary electrical services to convention centers. Damages models were constructed or critiqued that involved lost sales analyses, incremental cost analyses, and assessments of capacity increases. Also investigated were economic forces external to the company that may have impacted the company's performance. Economic analyses included defining the relevant market, assessing the presence or absence of market power, evaluating whether a business activity was pro-competitive or anti-competitive, and/or evaluating the level of competition in a particular market.

## Antitrust: Price Fixing Cases

- Evaluated Plaintiffs' claimed damages relating to allegations of an industry-wide price fixing conspiracy among the defendant manufacturers of polyether polyol products. At issue were the alleged overcharges relating to sales of TDI, MDI, and polyether polyols during the alleged conspiracy period. Analyses included evaluating Direct Action Plaintiffs' and Class Plaintiffs' econometric pricing models which purported to show alleged overcharges (and the unreasonableness of the claimed overcharges in light of existing profitability levels). Also assessed indicators of competition in the relevant market, including evidence of supplier switching by Plaintiffs, changes in defendants' market shares, and pricing patterns of the at-issue products.

- Evaluated allegations of price-fixing among freight companies relating to bids to ship the household goods of U.S. Armed Forces' members and civilian employees of the U.S. Department of Defense between Germany and the U.S. Analyses included an investigation of the efficiency-enhancing economic benefits provided by the at-issue "landed rate" pricing system. Also evaluated Plaintiff's claimed damages allegedly associated with elevated rates and alternative factors contributing to claimed elevated rates unrelated to claimed conspiracy. Evaluated Plaintiff's econometric model used to purportedly identify claimed overcharges.

## Antitrust: Predatory Pricing/Price Discrimination Cases

- Evaluated differences in prices paid by a plaintiff distributor relative to those paid by a competitor in a price discrimination case involving the distribution of aftermarket exhaust systems. Analyses included an evaluation of the relevant product and geographic market for the at-issue products as well as damages caused by the alleged anticompetitive behavior.

- Evaluated the relevant product and geographic markets and impact on competition in a price discrimination case involving a manufacturer of lighting products and the prices charged to various distributors. Analyses included an investigation of the primary-line market (i.e., competition among manufacturers of lighting products) and the secondary-line market (i.e., competition among distributors). The impact on competition among the distributors of lighting products was investigated (and whether a substantial lessening of competition occurred) given the pricing policies of the manufacturer.

*Keith R. Ugone, page 8*

- Reviewed the newly proposed pricing structure of a major magazine distributor to identify the efficiency enhancing attributes of the proposed pricing structure as well as potential discriminatory effects.  The proposed pricing structure was a major change from industry practices and included per copy distribution fees and excess return fees.

- Evaluated the economic and damages-related claims made in a major price discrimination case in the pharmaceutical industry.  At issue were the additional sales and profits that would have been made by grocery drug stores and retail drug chains in the absence of the alleged price discrimination.

- Conducted various industry and firm-specific analyses in a major wholesale bread predatory pricing case.  Bread industry studies included analyses of industry profitability rates, the changing size distribution of firms in the industry, and general trends in wholesale bread prices.  Firm-specific studies included analyses of advertising rates, "cripple" (i.e., reject) rates, and "stale" (i.e., return) rates.  Also involved was a critique of Plaintiff's calculation of Defendant's average variable cost of producing and distributing a loaf of bread.

- Calculated the average cost of servicing a three-yard bin of trash in a solid waste disposal predatory pricing case.  Also included was an analysis of number of routes and bin pickups per route.

### Antitrust:  Tying Cases

- Evaluated certain economic and damages claims made by a local television station against a television program syndicator.  At issue was an alleged unlawful tying arrangement relating to the claimed requirement to license *Becker* in order to license *Judge Judy* and *Judge Joe Brown*.  Demonstrated the syndicator did not possess market power in a properly defined market since substitution existed between different genre of television programs, between different syndicators, between different demographic groups, and between different types of syndicated programming (i.e., first-run, off-network, and evergreen programming).  Also demonstrated that the pricing patterns of the syndicator were inconsistent with the antitrust claims being made.

- Evaluated an unlawful tying claim brought by a pizza franchisee against its franchisor.  Franchisees were required to purchase equipment and supplies from an approved supplier owned by the pizza franchisor.  Plaintiff alleged the claimed unlawful tying arrangement was enforced through threats of termination of the franchise agreement.  Demonstrated that the pizza franchisor did not possess market power in the consumer market for pizza, in the provision of equipment and supplies to franchisees, or in the market for pizza franchises.  Also demonstrated the economic justifications for the requirement (i.e., maintaining quality standards, uniformity of operations, and protection of brand name).

- Critiqued Plaintiff's damage model in an alleged tying case dealing with automotive CAD/CAM design software (the "tying" good) and mainframe timesharing (the "tied" good).  At issue was the total size of the market, the likelihood of entry, and the market share of the Plaintiff in the absence of the alleged tie.  Also investigated was the likelihood that design vendors would place the software on their own mainframes rather than timeshare.

- Analyzed the fast food point-of-sale ("POS") equipment and software industry in an alleged tying case.  Demonstrated that a particular POS product was not a relevant market based on the reasonable interchangeability of various brands of fast food POS equipment from the perspective of the consumer (fast food restaurants).  Also analyzed the degree of price competition, non-price competition, ease of entry, and relative market shares of fast food POS equipment manufacturers.

### Business Interruption/Interference Cases

- Evaluated Plaintiffs' claimed damages in a tortious interference, business disparagement, and breach of contract matter dealing with the licensing of testing equipment in the petrochemical piping inspection industry.  Demonstrated Plaintiff's expert committed errors relating to the duration of the contracts in dispute, system license fees, cost of replacement systems, pricing of services, utilization of the test systems, and mitigation of future damages.

*Keith R. Ugone, page 9*

- Evaluated Plaintiff's claimed damages from a lost bid to retrofit a refinery in Pakistan.  Analyzed Plaintiff's allegations that Defendants made untrue statements to the bid evaluation team concerning Plaintiff's net worth, working capital, and profitability trends.  Evaluated Plaintiff's claimed damages using as a benchmark prior engineering projects completed by Plaintiff.

- Calculated damages suffered by the owner of numerous mobile home parks due to the actions of a Defendant in a case involving alleged intentional interference with contractual relations.  Involved was an analysis of occupancy rates, a projection of park revenues in the absence of the alleged interference, and an analysis of mobile home park incremental profitability rates.

- Evaluated the damages sustained by a cosmetic company as a result of defective decorated glass containers being furnished for its new therapy products.  Evaluated and/or verified product retrieval costs, retrieval program administration costs, customer goodwill replacement gift costs, waste disposal costs, and lost profits on the therapy products.  The lost profits analysis included assessing the life cycle sales pattern of new cosmetic products introduced by the company.

- Evaluated damages relating to the introduction of a new popcorn product line in a business interruption dispute.  The introduction of the new popcorn product line was aborted due to defective containers.  Analyses undertaken included determining the cost of popcorn, the cost of popcorn bags, freight costs, as well as the projected revenues associated with popcorn sales.  An assessment was also made of the supermarket outlets and territories in which the popcorn would have been sold.

- Evaluated Plaintiffs' damages claim relating to the installation of an allegedly defective computer software system at an automobile dealership.  Plaintiffs contended the software had defects adversely affecting the accounting system and day-to-day operations of the dealership, and submitted an "increased cost" damages claim.  Analysis demonstrated Plaintiffs' expert used an inappropriate methodology for measuring damages and submitted cost increases unrelated to the allegedly defective software.

- <u>Other Matters</u>.   Provided deposition questions, economic analyses, and a critique of opposing economists' damage models in various business interruption cases resulting from (e.g.) fires, "lockouts", electrical outages, defective products, and/or injuries to key personnel.  Businesses evaluated included a workout facility (gym), a pediatric practice, a balloon manufacturing plant, a radiology practice, and a packaging machine manufacturer.

## Intellectual Property:  Patent Infringement and Patent-Related Cases

- Evaluated the claimed royalty damages the owners of a patent related to the processing of documents with arbitrary XML elements were asserting against a major software manufacturer for allegedly incorporating the patented technology into its software applications.  Based upon an evaluation of the historical financial performance of the Plaintiffs before and after the time of the hypothetical negotiation, market demand for and supply of products similar to the allegedly embodying products, the respective economic contributions of the Parties to the successful commercialization of the accused products, and the *Georgia-Pacific* factors, opined to an alternative royalty damages estimate.  Also evaluated the four factors outlined in *eBay Inc. v. Mercexchange L.L.C.* and opined that based upon economic considerations an injunction against the accused products was not warranted.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to scanning, counting, and counterfeit detection technologies in currency discriminators.  In both matters, analyzed the *Panduit* and *Georgia-Pacific* factors, constructed a hypothetical negotiation framework, conducted market and industry research, and compiled an accused product sales database.  With respect to Plaintiff's lost profits-related damages, performed incremental profit analyses on lost unit sales and ancillary sales.  Evaluated Plaintiff's reasonable royalty-related damages taking into account the economics associated with currency discriminator sales.  Evaluated damages under a variety of scenarios based upon potential findings of infringement on patents and claims contained in these patents.

- Evaluated the claimed damages of a foam ear sleeve manufacturer who brought suit against a high-performance professional and personal audio earphone manufacturer alleging patent infringement relating to ear pieces having disposable compressible polymeric foam sleeves. Evaluated Plaintiff claimed royalty damages using market and industry data, a *Georgia-Pacific* factor analysis, and the changing licensing policies of the patent holder over time. Provided an alternative royalty damages analysis. Also analyzed from an economic perspective Defendant's countersuit of alleged patent misuse. Reviewed the patent holder's licensing strategy and certain provisions contained in the licenses into which the patent holder entered. Analyses demonstrated the patent holder's licensing strategy and the provisions contained in its licenses were consistent with the allegation of patent misuse.

- Evaluated Plaintiffs' claimed royalty damages in two separate patent infringement matters relating to video game controllers. The first matter related to six degrees of freedom video controller technology; the second matter related to controller-to-processor voltage technology. In both matters, conducted market and industry research, performed a *Georgia-Pacific* analysis, and evaluated company-specific and controller-related licenses. Also evaluated the key drivers of Defendant's sales including its brand name, innovative products and games, and installed base of gaming console owners. Provided an alternative royalty damages figure.

- Evaluated Plaintiff's lost profits and price erosion damages in a patent infringement matter relating to a method for delivering internet content from a network of content delivery network ("CDN") servers. The suit was brought by a CDN services provider. Evaluated Plaintiff's lost profits-related damages using market share data, adjusting for customer and market segment differences and the likelihood of supplemental sales. Evaluated Plaintiff's price erosion-related damages for selected customers for whom Plaintiff was required to lower rates and/or renegotiate contracts based upon the alleged unlawful competition of the Defendant.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to status feedback in home lighting control systems. Performed analyses on a large database of invoices relating to sales of the accused products, analyzed end-user surveys, and identified ancillary sales based upon consumer purchasing patterns. Conducted *Panduit* and *Georgia-Pacific* analyses. Calculated Plaintiff's lost sales based upon market share data reflected in industry surveys. Calculated Plaintiff's royalty damages based upon comparable license analyses.

- In a patent infringement matter relating to the air interface protocol of UMTS/WCDMA cellular phone technology, evaluated whether the Plaintiff had offered Defendant a license to the patents-in-suit on fair, reasonable, and non-discriminatory ("FRAND") terms (as required by the European Telecommunications Standards Institute's intellectual property rights policy). Analyzed the economic benefits associated with patents, the economic benefits associated with standard setting organizations, and the economic evidence related to the FRAND principles. Concluded that none of Plaintiff's licensing offers comported with FRAND principles.

- Evaluated Plaintiff's claimed lost profits in a patent infringement suit against a medical device manufacturer producing trocars with floating septum seals. Analyzed market data relating to trocar products, competitors, and market share information. Also analyzed hospital data with respect to product use and conversion between different manufacturers. Demonstrated that Plaintiff had not demonstrated Defendant would have lost sales and Plaintiff would have gained sales in the absence of the alleged infringement. Concluded a claim for lost profits was not warranted.

- Evaluated Plaintiff's claimed royalty damages asserted against a major software manufacturer in a patent infringement matter relating to a pre-fetch concept allowing for the faster loading of operating systems and software applications. Analyzed the financial performance of the patent holder at the time of the hypothetical negotiation, the drivers of demand for the products allegedly embodying the patent-in-suit, the Parties' respective contributions to the successful commercialization of the accused products, the Parties patent licensing approaches, and the relevant *Georgia-Pacific* factors. Opined to an alternative royalty damages estimate.

- Evaluated the joint venture lost profits and reasonable royalty damages in a patent infringement suit brought by a natural gas producer against an energy producer relating to a system for producing natural gas from unconventional reservoirs. Constructed an economic model incorporating complex technical and economic relationships to determine the value of the natural gas likely to be captured from the reservoirs in question. Conducted a *Panduit* factor and a *Georgia-Pacific* factor analysis.

- Evaluated claimed royalty damages in a patent infringement suit against a nutritional supplement manufacturer and distributor for the alleged infringement of two patents relating to hydrosoluble organic salts and certain compositions and methods for enhancing muscle performance and recovery from fatigue in humans. Concluded Plaintiff's expert inappropriately constructed the hypothetical negotiation framework, failed to consider non-infringing alternative compositions, and overstated the claimed reasonable royalty rate in light of licensing evidence.

- Evaluated claimed damages in a patent infringement matter relating to course management system ("CSM") products and services using the Internet to facilitate the interaction of students and instructors. Conducted a *Panduit* and a *Georgia-Pacific* factor analysis. Calculated lost profits and reasonable royalty damages. Also analyzed Plaintiff's business model and revenue types, Defendant's infringing sales based upon customer licensing agreements and contracts, Plaintiff's prior relationship with Defendant's customers, and Plaintiff's incremental profitability.

- Evaluated Plaintiff's royalty damages claim in a suit brought by a patent holding company against a major software manufacturer relating to certain pivot table functionalities in software. Opined to an alternative royalty damages figure based upon an analysis of the *Georgia-Pacific* factors, the demand for the products allegedly embodying the patent-in-suit, the failed licensing attempts by the former owners of the patent-in-suit, and the relative contributions of the Parties to the commercialization of the accused products.

- Evaluated the royalty damages allegedly suffered by a patent holder against a major internet services provider relating to a method for streaming media over the internet (which facilitated the transmission of real-time, high-quality audio information over a communications network to multiple users simultaneously). Demonstrated that the patent holder's economic expert overstated the claimed reasonable royalty rate, overstated the claimed royalty base, and reached conclusions that failed numerous reliability tests. Also demonstrated that the patent holder's economic expert failed to properly recognize the economics associated with internet radio, leading to an incorrect conclusion as to the proper royalty base that would have been agreed upon at the hypothetical negotiation.

- Evaluated claimed damages in a patent infringement matter filed by an operator of a web-based market place against a competing company relating to the submission of automobile purchase requests over the internet. Analyzed market and industry data relating to Plaintiff's line of business, Plaintiff's and Defendant's financial performance, and Plaintiff's and Defendant's respective market shares. Estimated Plaintiff's lost profits damages.

- Evaluated claimed reasonable royalty damages in a patent infringement matter involving 5 defendants relating to congestion management in ATM networks. Analysis included an assessment of sales of ATM network products allegedly containing the patented feature, an analysis of the price of the integrated circuits embodying the accused functionality relative to the price of the entire ATM product, and a review of industry license agreements. Provided alternative reasonable royalty damages based upon the *Georgia-Pacific* factors in addition to a determining the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated claimed reasonable royalty damages in a patent infringement matter relating to implantable rate responsive pacemakers and implantable cardioverter devices ("ICDs"). Analysis included an assessment of alleged infringing sales of pacemakers and ICDs, a review of license agreements, and an analysis of the defendant's cost savings associated with the allegedly infringing technology as compared to its next best alternative. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors, and the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated Plaintiff's lost profits and reasonable royalty damages in a patent infringement matter relating to DVR technology. Analysis included an assessment of Plaintiff's sales of DVR products and monthly subscriptions in the absence of the alleged infringement and an incremental revenue and cost analysis. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated lost profit damages in a patent infringement matter involving blasting hole drilling rigs. At issue were the lost profits stemming from lost rig sales and lost replacement part sales. With respect to lost rig sales, evaluated the model types, geographic sales coverage, and model prices of the entities involved. Also evaluated the capacity of the Plaintiff to make the additional claimed sales. With respect to lost replacement part damages, evaluated the likely stream of replacement part sales over the life of the drilling rig. Royalty calculations were performed on sales not subject to lost profit calculations.

**Intellectual Property:  Theft of Trade Secrets Cases**

- Evaluated Plaintiff's claimed damages in a trade secret theft case in the golf equipment industry. Plaintiff claimed disgorgement of global profits and other unjust enrichment due to the alleged misappropriation of certain golf club design trade secrets through the Defendant's sale of the company and assets to a large sporting goods company. Analysis included calculating net profits from the sale of the accused golf clubs and evaluating claimed reasonable royalty damages.

- Evaluated Defendant's assessment of the incremental costs associated with a contract to provide integrated bonusing software to a casino. The contract allegedly was won through the use of misappropriated trade secrets from the Plaintiff. At issue was the allocation of development and common costs to the contract in dispute. Also evaluated Plaintiff's antitrust counterclaim to Defendant's patent infringement suit relating to the technology used as a foundation for the integrated bonusing software.

- Evaluated damages in a theft of trade secrets matter dealing with next generation switching equipment in the telecommunications industry. At issue was the alleged theft of trade secrets when the Defendant firm hired nine employees of the Plaintiff firm. Analyzed Plaintiff's claimed inability to maintain its projected market share, the alleged accelerated entry of the Defendant firm into the next generation switching equipment market, disgorgement measures of damages, and reasonable royalty measures of damages.

- Evaluated damages suffered by a Plaintiff in the business of installing systems delivering ultra-high purity air, water, gas and chemicals to companies manufacturing integrated circuits. Plaintiff alleged a former managerial employee breached his fiduciary duty by engaging in wrongful use of trade secrets, wrongful solicitation of employees and customers, and unfair competition with the original employer. Analysis involved estimating the lost sales and lost profits to the original employer by estimating the number of bid opportunities missed because of the alleged actions of the former employee, adjusting for changing industry conditions.

- Critiqued Plaintiff's damage model in a trade secrets case in the printed circuit board industry. Plaintiff was claiming lost profits due to the misappropriation of trade secrets through Defendant's hiring of four key management personnel from the Plaintiff's company. Issues evaluated included the appropriateness of the "proxy/yardstick" approach undertaken to estimate lost revenues, and the incremental profit rates used to translate lost revenues into lost profits.

**Intellectual Property:  Copyright/Trademark/Trade Dress Infringement/False Advertising Cases**

- Evaluated Plaintiff's claimed damages relating to the alleged failure of a TV station to deliver contracted gross rating points over a 6-year period. Plaintiff was claiming lost sales and lost profits based upon a regression analysis used to isolate a relationship between sales revenues and advertising. Demonstrated Plaintiff's regression omitted important explanatory variables (e.g., consumer income, promotions, discounts, competitors' prices, and other print and TV advertising conducted by the Plaintiff). Also demonstrated a failure to account for diminishing returns to advertising. Each of these errors served to increase the magnitude of the claimed relationship between sales revenues and advertising.

- Evaluated Plaintiff's unjust enrichment damages claims in a copyright infringement matter brought against a hospital and a construction company relating to a medical building design. Compared budgeted construction costs to actual construction costs and analyzed the revenues received by the construction company associated with the copyrighted attributes of the building design as opposed to unrelated construction costs. Also analyzed the likely demand-related reasons for revenues that would accrue to the hospital unrelated to the design of the hospital.

- Evaluated claimed damages in a false advertising matter involving tooth-whitening products between two large consumer product companies. At issue were allegedly false, misleading, and disparaging statements about Plaintiff's tooth-whitening products in comparative advertisements shown on television. Plaintiff sought to recover lost profits damages associated with reduced sales resulting from the alleged false advertising. Analyses included an evaluation and critique of Plaintiff's expert's claimed damages model including analysis of A.C. Nielsen scanner data and CMR media data. Analysis demonstrated that Plaintiff's expert did not measure properly the impact of the alleged misleading content, failed to account for alternative reasons for Plaintiff's sales declines, and implemented an incorrectly specified econometric model.

- Provided economic analysis relating to claims of unfair competition and misleading advertising in the pizza industry. Using economic indicia such as dollar sales revenue, trends in market share, growth in number of stores opened, same-store sales data, and store closure rates, evaluated whether the commercial success of a particular pizza company was due to customer acceptance of its pizza product or allegedly deceptive advertising. Also investigated the buying patterns of pizza consumers with respect to cross-chain patronage.

- Critiqued Plaintiff's damage claim in a matter involving alleged tortious interference with business relations and allegations of trade dress infringement. At issue was the projected sales and profitability of Plaintiff's tape dispensing machines during a period of alleged tortious interference by the Defendant and Plaintiff's simultaneous alleged trade dress infringement.

- Analyzed the lost profits of a Plaintiff in a trademark infringement case involving a law enforcement product sold through a mail-order catalog. Also analyzed the profits of the alleged infringer and the cost of remedial advertising.

- Assessed damages resulting from the alleged infringement of copyrighted training manuals. Analysis included identifying the corporate clients of the Plaintiff and Defendant firms and the reasons for customer switching unrelated to the use of the proprietary training manuals.

**Intellectual Property: Commercial Success Cases**

- Evaluated indicators of commercial success relating to a surgical hernia mesh fixation device employing a patented helical tacker design. Demonstrated that the patented device had achieved significant and sustained sales and sales growth. Also demonstrated that the sales of the patented device had grown faster than the sales of other hernia mesh fixation devices and achieved a majority share of sales when compared to staplers and other hernia mesh fixation products.

- Submitted a rebuttal declaration to the U.S. Patent and Trademark Office relating to the claimed commercial success of intrusion prevention system ("IPS") products asserted to practice a patent undergoing an *Inter Partes* reexamination. Opined that an economic nexus had not been established between the claimed teachings of the patent and the commercial success of stand-alone IPS products. The patent holder had not demonstrated that the claimed teachings of the patent were commercially successful separate and apart from (a) features not claimed by the patent, (b) economic factors extraneous to the claimed invention, or (c) features covered by other patents present in the IPS products.

- Evaluated Plaintiff's analysis regarding the claimed nexus between a patented technology and the commercial success of the accused devices in this patent infringement matter relating to text messaging using a limited keypad such as those found on cell phones. Analyses demonstrated Plaintiff's failed to consider many factors that lead to the commercial success of the accused devices unrelated to the patent in dispute.

## Breach of Contract / Breach of Fiduciary Duty Cases

- Evaluated Counter-Plaintiff's claimed damages arising from Counter-Defendant's failure to honor a most-favored licensee provision in a licensing agreement relating to a semiconductor patent portfolio. Opined as to the economic interpretation of certain licensing terms and the differences and similarities between lump sum, per unit, and percentage of revenue royalty payments. Compared the licensing terms between the Counter-Defendant and another party with the licensing terms between Counter-Defendant and Counter-Plaintiff.

- Evaluated Plaintiffs' claimed damages arising from an alleged breach of contract related to the sale of a community club house and other recreational facilities in an age-restricted residential neighborhood. Plaintiffs' claimed that since they were not given the opportunity to exercise their right-of-first refusal to purchase the contested real estate assets, they lost the value of the equity associated with the real estate assets and they were required to make excessive operating expense payments. Determined that Plaintiffs' expert failed to properly consider the economic factors driving the value of the real estate assets in question.

- Evaluated Plaintiff's breach of contract damages claim relating to the use of a national brand name and other support for the development of a time share resort. Concluded Plaintiff had not demonstrated an economic causal link between Plaintiff's allegations and the quantum of damages being claimed. Adjusted Plaintiff's claimed damages for various conceptual and computational errors, including alternative actions that might have been undertaken by the Plaintiff in the absence of the alleged wrongful conduct.

- Evaluated claimed damages in an alleged breach of fiduciary duty matter between a franchisee and a major fast food franchisor relating to the development and managing of fast-food franchises. Plaintiff claimed economic harm due to franchisor's refusal to grant certain additional franchisees to Plaintiff that Plaintiff claimed would otherwise be in competition with the Plaintiff's existing franchises. Concluded Plaintiff's impact analysis failed to take into account many factors affecting the performance of the Plaintiff's existing franchises that were unrelated to the alleged wrongful conduct.

- Evaluated claimed breach of contract and misrepresentation damages in a suit brought by a global information technology company against a global professional services company relating to a joint venture agreement under which a human resources outsourcing company was formed. Analysis included conducting a client-by-client analysis regarding the specific wrongful conduct associated with each client of the joint venture and estimated the associated economic damages. Based upon certain parameters contained in the contract, also calculated the purchase price overpayment had certain performance issues come to light prior to the closing of the joint venture agreement.

- Evaluated a developer's/franchisee's damages claim against a major sandwich franchisor for the alleged breach of a five-state area development agreement. Reviewed the area development agreement, analyzed the revenues, costs, and profitability associated with franchised outlets, and estimated the Plaintiff's lost franchise fees and lost royalty income based upon various alternative scenarios discussed by the Parties.

- Evaluated the claimed damages of a calling card distribution company due to Defendant's alleged breach of a contract relating to the servicing of the calling cards. Conducted market research on the calling card industry, analyzed alternative reasons for the alleged decline in calling card sales, and evaluated Plaintiff's damages expert's report.

- Evaluated Plaintiff's damages claim concerning the alleged failure of a call center to properly process inquiries relating to the newspaper and television marketing of a collectible doll in the likeness of a recently deceased public figure.  Analyzed advertising expenditures, response rates across cities, major news announcements related to the marketing of such merchandise, and contributing problems caused by Plaintiff's actions.  Estimated damages by comparing sales in an unimpacted period with sales in the alleged impacted period.

- Evaluated Plaintiffs' damages claim relating to the underwriting and loan servicing of subprime automobile loans.  Plaintiffs' contended the servicing company did not properly administer the portfolio of subprime automobile loans thereby causing excessive loan losses.  Analysis demonstrated that Plaintiffs' financial experts failed to take into account alternative reasons for Plaintiffs' performance.  Analysis of Plaintiffs' loan volume, interest income, loan loss rate, and deteriorating industry conditions also demonstrated that Plaintiffs' business plan did not provide a reasonable basis from which to calculate claimed damages.

- Evaluated Plaintiff's claim of lost profits relating to the collection of ballots for a Mexican telecommunication company in Mexico's Equal Access program.  Analyzed a database of telephone customers, including statistics such as the length of service, average monthly consumption patterns, current billing status, and differences between residential and commercial customers.  Developed an alternative claimed damages model taking into account consumption patterns and the turnover rate of customers, among other factors.

- Evaluated Plaintiffs' claim of lost success fees, lost closing fees, and underpayment of value relating to Defendant's acquisition of an oncology laboratory and the alleged failure to consummate additional acquisitions.  Analysis demonstrated Plaintiffs' projections regarding the profitability of the proposed acquisitions were not reasonable given the historical financial performance of the targets.  Also demonstrated Plaintiffs were not underpaid for the assets of the acquired laboratory since no investor or buyer was willing to provide funds to Plaintiffs pre-acquisition and since Plaintiffs in their valuation approach inappropriately assigned all post-acquisition synergies and gains to the Plaintiffs.

- Evaluated Plaintiff's damage claim arising from an alleged misappropriated opportunity to develop a computer superstore franchise in Mexico based on the equivalent U. S. concept.  Demonstrated Plaintiffs overstated per store revenue, understated store-level costs, and used inappropriate financial and strategic assumptions regarding the number of stores opened, the amount of capital required, outside investor contribution, equity shares, and strategic acquisitions.  Plaintiffs also conducted a valuation based on companies bearing little or no resemblance to a computer superstore.

- Evaluated Plaintiff's claim of lost profits arising from an alleged breach of contract involving two tubular inspection equipment manufacturing companies.  Analyses demonstrated that Plaintiff's expert overstated the projected utilization rate of the company's equipment and associated revenue and understated the projected incremental costs that would have been incurred by Plaintiff.  Analyses demonstrated market demand would not support the equipment utilization rate projected by Plaintiff's expert.

- Evaluated Plaintiff's claim of damages in a breach of contract matter in the magazine publishing and distribution industry.  Plaintiff claimed Defendants breached a distribution agreement by suspending distribution pending the resolution of a trademark infringement dispute.  Plaintiff abandoned the magazine, claiming lost profits and the estimated lost value of the magazine had it been sold after its fourth year of publication.  Analysis demonstrated Plaintiff's expert overstated subscription-based revenues, distorted the cost/revenue structure that would have existed for the magazine, and overstated the likelihood of success by ignoring the failure of similar genre magazines.

- Evaluated the damages sustained by the public safety division of an information technology services firm due to the early termination a ten-year services agreement to provide enhanced 9-1-1 services to a governmental agency. One-time up-front implementation costs in setting up the 9-1-1 system and ongoing operational costs were compiled in constructing a cost reimbursement damage claim. Also evaluated the reasonableness of an early termination charge schedule designed to represent the one-time buyout total if the governmental entity opted to terminate the contract before the ten-year term expired.

- Evaluated the damage claim of a bank arising from an allegedly defective conversion of the bank's data processing system. Areas investigated included the softening macroeconomic environment surrounding the bank during the relevant time period, the changing financial services market, internal bank ratios, and technical flaws contained in Plaintiff's damage calculations.

- Estimated lost sales and lost royalty payments to a "thick" potato chip producer due to a breach of contract. Involved was the construction of a damage model, analyses of the market for potato chips and per capita potato chip consumption, and projecting the rate of introduction of a new potato chip into regional markets.

- Calculated damages and provided other economic analyses in a "lack of best efforts" breach of contract case in the carbonated soft drink industry. At issue was the impact on sales due to the "lack of best efforts" vs. the impact on sales from contemporaneous new entrants into the market.

- Calculated damages in a breach of contract matter involving an association of nephrologists and a management company operating 12 kidney dialysis clinics. Areas of investigation included the "profitability available for distribution" from the clinics, the projected rate of growth in patients, the rate of introduction of new clinics, and the costs associated with running the clinics. A damage model was developed which projected the profits that would have been distributed to the management company over the life of the contract in the absence of the breach.

- Evaluated claimed damages against a hospital for allegedly breaching a contract allowing hyperbaric oxygen services on hospital premises. Investigations included assessing the local market for hyperbaric services, evaluating Plaintiff's business growth potential given the physical space constraints at the hospital, and demonstrating Plaintiff had fully mitigated claimed future damages through the establishment of an alter ego firm at a nearby local hospital.

## Class Certification Engagements

- Evaluated Plaintiff's position that the claimed economic injury suffered by putative Class members could be quantified on a Class-wide basis in a class action matter relating to anti-aging skin care products marketed as preventing and repairing signs of aging "in just one week." Demonstrated that the approaches proposed by the opposing expert to calculate Class-wide damages would not yield reliable or relevant estimates of the alleged harm suffered by individual Class members. Arguments presented included that the large number of repeat buyers, the wide variations in the retail prices associated with the accused products, and the wide variations in the retail price differences relative to other anti-aging products would prevent a reliable calculation of putative Class members' damages on a Class-wide basis.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter brought by an institutional investor against a bank associated with the bank's securities lending program. Demonstrated that a class-wide approach would obfuscate important differences among putative Class members' individual investment expectations and tolerances. Differences requiring individualized inquiry included the variability in maturity guidelines, credit-quality guidelines, prohibited investments, and diversification requirements.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter where a beverages company marketed certain beverages as containing beneficial vitamins and allegedly failed to disclose the sugar content of the beverages.  Evaluated the wide variations in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered.  A comparison of the average retail prices of the at-issue beverages relative to identified benchmark products did not support the allegation that the at-issue beverages possessed a systematic price premium as a result of the company's allegedly misleading marketing campaign.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter where an automobile company allegedly did not inform purchasers that actual vehicle miles per gallon performance could vary from the 40 miles per gallon EPA estimated fuel efficiency.  Demonstrated that individualized inquiry would be required to ascertain consumers' valuation of vehicle characteristics (including their expected fuel economy) when purchasing an accused vehicle, actual prices paid, driving patterns, driving conditions, and whether putative Class members' expectations were influenced by the company's alleged wrongful conduct.  Evaluated Plaintiffs' class certification expert's opinion that alleged damages could be evaluated on a class-wide basis using a hedonic regression methodology.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter relating to the issuance of a special assessment fee by a timeshare vacation club.  Demonstrated that potential damages-related conflicts were likely to arise among putative Class members (including among the Named Plaintiffs) – making Class-wide proof an unreliable measure of economic injury for each putative Class member.  Also demonstrated that evaluating claimed damages on a Class-wide basis would result in potentially awarding damages to putative Class members who suffered no injury.

- Evaluated Plaintiffs' position that the economic injury allegedly suffered by putative class members could be quantified on a class-wide basis in a matter where a beverages company marketed certain beverages as "All Natural" when they contained high fructose corn syrup ("HFCS").  Demonstrated that wide variations existed in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered.  Also demonstrated that wide variations existed in the beverages' retail prices because of promotional discounts and coupons and because the company did not sell directly to consumers.  Consequently, whether consumers paid a price premium because of the "All Natural" labeling (and how much, if any) could not be determined by proof common to the proposed class.  A comparison of the average retail prices of the "All Natural" beverages in dispute to identified benchmark products did not support the allegation that the "All Natural" beverages possessed a systematic price premium as a result of the "All Natural" labeling.

- Evaluated the commonality of purchasing circumstances of proposed Class members in a class action matter against a national quick service restaurant ("QSR") chain.  Plaintiffs alleged the QSR misrepresented the trans fat levels contained in the QSR's french fries.  Plaintiffs also alleged the proposed Class paid a price premium for certain food products based upon the alleged misrepresentations.  After reviewing survey data, marketing materials, and pricing data, concluded that individual inquiries were required to establish different customer's awareness of the alleged misrepresentations, different customer's reliance upon the alleged misrepresentations in their purchasing decisions, and other important economic factors impacting each customer's purchase decision.

- Evaluated Plaintiffs' claim that Class members' alleged damages could be "mechanically calculated" in a class action matter against a payphone company's auditor.  The payphone company had filed bankruptcy and the Class members alleged the auditor misrepresented the company's financial statements, upon which the Class members allegedly relied.  Conducted economic and market research and identified factors that caused a general decline in the payphone industry which contributed to the bankruptcy of the company.  Analyzed the claimholders' database and identified issues relating to the database that precluded Plaintiffs' expert from mechanically calculating the damages allegedly suffered by class members.

## Lender Liability Cases

- Evaluated Plaintiff's allegations that it was capital constrained and consequently economically damaged as a result of its loans being placed into the special assets department of its lender.  Analyzed the Plaintiff's unused cash, credit, and other available funds.  Also analyzed Plaintiff's successful access to the capital markets, acquisition spending, R & D spending, sales performance, and profitability relative to peer companies.

- Analyzed Plaintiffs' damage claim in a lender liability suit relating to Defendant's alleged failure to fund certain residential housing development and construction loans.  Evaluated Plaintiffs' changing five-year business plan projections, including revenue growth, geographic expansion, market share, salesmen coverage, cost structure, and profitability assumptions.  Also evaluated Plaintiffs' strategy for "exiting" the business and the alleged value of their ownership at that time.

- Evaluated damages in a lender liability case involving the bankruptcy of a gear manufacturing company.  The bankruptcy was allegedly due to the failure of a bank to fully fund a previously committed loan.  Investigations included researching alternative market-related reasons for the decline in the gear manufacturer's business as well as evidence of internal mismanagement on the part of the company's owners.

- Other Matters.  Evaluated damages, causation issues, and liability issues in various lender liability cases involving the calling in of loans, the failure to fund previously committed loans, the failure to release collateral, and the misappropriation of loan payments.  Cases involved firms in the wire and cable, drywall/construction, PVC piping, and auto dealership industries, among others.

## Professional Negligence (Non-Securities / Non-Merger) Cases

- In an alleged professional negligence matter, a lender to distressed companies sought $40 million in damages from an auditor in connection with a $130 million credit facility extended to an HDTV company.  The lender failed to collect when the borrower filed for bankruptcy.  The auditor was alleged to have made negligent misrepresentations associated with the borrower's financial statements; the lender asserted it had relied upon the borrower's financial statements when entering into the credit facility.  Performed economic causation and damages-related analyses.  Identified the known or knowable risks associated with providing a credit facility to the borrower, including certain accounts receivable collection risks and market softness risks.  Opined that it was the materialization of these known and knowable risks that caused the lender's claimed losses.

- Evaluated claimed damages against a major law firm for alleged professional negligence when filing a patent for the treatment of septic shock.  Researched (among other things) the FDA approval process, associated statistics regarding the product category allegedly covered by Plaintiff's patent, and various industry projections regarding the category growth.  Performed a discounted cash flow analysis, an incremental profitability analysis, a licensing analysis, and provided an alternative calculation of claimed damages.

- Evaluated Plaintiffs' claimed damages relating to an alleged failure by a law firm to properly file certain patent applications relating to a video processor recorder. Plaintiffs' business opportunities and licensing fees in the United States and Europe were allegedly lost due to the ensuing delays. Analyzed Plaintiffs' causation linkages to claimed damages, length of the claimed damages period, forecasted units sold, forecasted market share, forecasted costs of production, and claimed licensing rate.

- Evaluated claims by a Department of Insurance appointed liquidator that alleged the auditor of a bankrupt insurance company breached its fiduciary duty, resulting in a $100 million deficit on the insurance company's books. Conducted various analyses of a claims register database, including a comparison of indemnity payments and reserves per claim before and after the appointed liquidator took control of the liquidation process. Analyses demonstrated both the indemnity payments and reserves per claim were higher after the appointed liquidator took over the liquidation process, implying the liquidator over-paid and over-reserved claims.

**Entertainment/Sports-Related Engagements**

- Evaluated the claimed damages of a movie production company against a major home video rental company. At issue was the claim that the refusal of the home video rental company to commit to carry a particular movie in its stores caused the movie production company to suffer lost profits when its distributor then refused to release the movie theatrically. Demonstrated that Plaintiff's methodology for estimating lost box office revenues was inappropriate and failed to account for important determinants of movie attendance.

- Analyzed Plaintiffs' lost profits and reasonable royalty damages in a patent infringement matter relating to offset head lacrosse sticks. Analysis included an assessment of Plaintiffs' sales in the absence of the infringement, the distribution of the lost sales to the models that would have been sold in the absence of the infringement, and an incremental revenue and cost analysis. Also analyzed Plaintiffs' competitors, pricing patterns, productive capacity, and geographic coverage in support of the lost profits claim. Reasonable royalty damages were assessed using the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Estimated the diminished box office revenues suffered by a theatrical release due to the breach of a quick service restaurant promotional tie-in arrangement with a major pizza chain. Developed a database of recently released films and related film characteristics such as genre, rating, critics review, box office revenues, media spending, production budget, season of release, and talent. A regression model was then developed to quantify the relationship between media spending and box office revenue. An industry review of quick service restaurant promotional tie-in arrangements was also conducted.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the sale of certain minority interests in a National Basketball Association team. At issue were Plaintiffs' tag-along rights whereby limited partnership interests could be included in any sale by the general partner on the same terms and conditions. Damages were calculated as the difference between the formulaic value of the minority interests versus the market value of the minority interests when sold separately. Discounts for lack of control and reduced marketability were analyzed.

- Evaluated Plaintiff's damages claim relating to a NASCAR racing team sponsorship agreement. Plaintiff contended the Internet service provider sponsor interfered with the racing team's ability to sell advertising banners that were part of the sponsorship agreement. Analyses included assessing the appropriate methodology for valuing a NASCAR race team and assessing comparable transactions. Also analyzed the financial performance of the race team, the economic terms of the sponsorship agreement, and the risks associated with a barter arrangement.

- Estimated damages arising from a breach of contract claim between an electronic retailer and a local television station. At issue was the lost profits to the electronic retailer when the local television station discontinued broadcasting the electronic retailer's programming.

*Keith R. Ugone, page 20*

- Analyzed the market and evaluated damages on behalf of a television station denied access to a cable system. At issue was whether the cable operator was attempting to monopolize the market for local television advertising. Analysis included an estimation of the advertising revenues that would have been received by the local television station had it been allocated a channel on the cable system.

- Estimated damages arising from a breach of contract claim between a video-cassette manufacture/distributor and a theatrical motion picture producer/distributor. At issue was whether the motion picture distributor manipulated the theatrical release of certain titles distorting the films the video-cassette producer could distribute under the terms of the agreement.

## Tax-Related Engagements

- Participated in an analysis of the impact on tax revenues to the State of Texas from a change in tax laws relating to pension fund managers. Helped demonstrate that changing the apportionment rule from "location in which the investment services were performed" to "residence of the investment beneficiaries" would not result in a negative fiscal impact.

- Served as consulting partner on an engagement estimating qualifying research and expenditure costs in response to certain expenses disallowed by the IRS. Analysis included developing a methodology to estimate qualifying hours and qualifying costs for groupings of employees with missing data.

- Analyzed whether the salaries paid to the owners/managers of a heavy and highway construction company were reasonable in a matter before the IRS. Areas investigated included the cyclical nature of the construction industry, the resulting cyclical nature of compensation paid to construction industry executives, and the 50th and 75th percentile salaries paid to various types of executives in the construction industry.

- Participated in an analysis of the tax benefit versus detriment to a Plaintiff as a result of ownership in certain partnership interests over the 1982-1998 time period. Also involved was an analysis of cumulative suspended tax losses, partnership income available for distribution, and changing tax rates over time.

- Quantified the net out-of-pocket cash position of investors who purchased limited partnership interests in nine real estate partnerships in an alleged non-disclosure matter. Also quantified the impact caused by changes in the Federal income tax laws. Supporting analyses included comparing the actual and projected performance of the partnerships taking into account restructurings, re-financings, and dissolutions.

## Personal Injury and Wrongful Death Cases

- <u>General Overview (Personal Injury)</u>. Assessed damages and lost earnings in various personal injury cases involving movie production workers, management consultants, financial consultants, nurses, medical doctors, chiropractors, secretaries, truck drivers, airline stewardesses, mechanics, engineers, maintenance personnel, carpenters, masonry workers, crane operators, machine operators, actresses, military aircraft production workers, tankermen, teachers, film editors, portfolio managers, hair stylists, automobile assemblers, landscape architects, sole proprietors, and real estate agents (among others). In each case, issues investigated included an assessment of the projected undamaged income, damaged income, expected work life of the individual, and appropriate discount rate to use. Assistance to the attorney included the preparation of deposition questions, economic analyses, and a critique of the opposing economist's damage model.

- <u>General Overview (Wrongful Death)</u>. Developed numerous damage models in wrongful death cases. Issues investigated included the projection of lost earnings, the projected personal consumption expenditures of the decedent, and projected lost pension benefits. Professions of the decedents included various types of entrepreneurs (e.g., boat store owners, etc.), white-collar workers (e.g. attorneys, architects, etc.), and blue-collar workers (e.g., demolition contractors, grocery store clerks, etc.). Ages of the decedents ranged from adults to teenagers to children.

*Keith R. Ugone, page 21*

- Evaluated claims of damages submitted by the family members of 88 decedents from an airplane crash. Family members were seeking damages in state and federal courts against the airline and certain parts manufacturers. Most of the decedents resided and worked in Asian countries. Researched various data sources for information regarding social security benefits, interest rates, and the relevant economic statistics for workers in these countries. Evaluated four Plaintiff damages experts' reports and testimonies, summarized our evaluation of these damage models, and calculated alternative damages figures. Analysis included evaluating lost earnings, lost business value, lost non-salary benefits, lost retirement funds, and lost savings.

**Wrongful Termination Cases**

- Evaluated Plaintiff's alleged lost earnings and lost future earnings capacity in a matter against a major shipping company in which the Plaintiff claimed to have resigned his legal counsel position due to the Defendant's alleged criminal conduct and its refusal to conduct an independent investigation. Analyzed various employee benefits offered by the Defendant including but not limited to the salaries of similarly-situated employees, long term incentive plans, 401(k) plan, paid vacation, stock options, and retirement benefits. Also analyzed promotion criteria, similar benefits received by the Plaintiff at alternative employment, and the lower cost of living associated with the geographical location of the alternative employment.

- Evaluated Plaintiff's claimed economic harm in a wrongful termination / negligent misrepresentation matter. Plaintiff claimed that pre-termination certain representations by the company dissuaded him from resigning and selling his stock holdings, thereby causing economic harm from the subsequent decline in the company's stock price. Analysis included quantifying the salary, bonuses, pension benefits, and severance pay the Plaintiff received during the additional time spent with the company as compared to the stock price declines that formed the basis of Plaintiff's damages claim.

- Evaluated Plaintiff's loss of earnings claim in an alleged wrongful termination matter in the long distance telecommunications industry. Plaintiff was an independent representative with a "downline" working for a company using a multilevel marketing sales approach. Analyzed the Plaintiff's historical earnings, business expenses, and the earnings of Plaintiff's peers to evaluate Plaintiff's net earnings in the absence of the alleged wrongful termination.

- Evaluated Plaintiff's damage claim in a wrongful termination matter involving an insurance broker/branch manager. Evaluated Plaintiff's alleged damage period, earnings in the absence of the termination, fringe benefits, business expenses, and offsetting earnings. The sales patterns of the relevant insurance products at the state and national level were incorporated into the analysis. Also analyzed trends within the company with respect to branch manager positions.

- Evaluated the damages suffered by the manager of an over-the-counter trading department in an alleged wrongful termination action. Since the compensation of the manager was based on the profitability of the department, one issue investigated was the reason for the decline in the post-termination performance of the department.

- <u>Other Matters</u>. Assessed damages and lost earnings in other wrongful termination cases involving internal medicine specialists, neurosurgeons, anesthesiologists, entertainment company executives, brokers/traders, secretaries, accountants, attorneys, quality assurance managers, company presidents, real estate brokers, property managers, insurance brokers/managers, and military aircraft production workers. Areas investigated include many of the same items as described in personal injury cases.

**Other Economic Engagements**

- Conducted an economic analysis of historical and projected lost revenues due to SEC-related independence constraints for an information technology consulting entity.  The analysis demonstrated that SEC rules requiring SEC registrants to disclose the amount of non-audit fees paid to its auditor, as well as constraints on the consulting entity's ability to perform outsourcing or managed application services for audit clients significantly impacted business growth relative to the market and its closest competitors.  The analysis also demonstrated that certain revenue projections assuming independence relief were appropriate in light of market conditions and the independence constraints.

- Conducted an economic cost/benefit analysis of the SEC's proposed rule changes relating to non-audit services performed by auditing firms for audit clients.  Analyses demonstrated that public accounting firms have an incentive to protect their brand name capital and that purchasers of non-audit services have an incentive to maintain investor confidence in the reliability of the audited financial statements.

- Performed an economic impact analysis on behalf of a major pipeline corporation seeking to gain regulatory approval for the construction of an oil pipeline in the Pacific Northwest.  Evaluated the net economic impact of the project on employment, income, and consumer expenditures in the region.  New employment opportunities resulting from construction and maintenance of the pipeline were compared to the potential lost jobs associated with the alternative means of transporting the petroleum.

- Participated in a major antitrust risk assessment exercise for a large industrial corporation.  Work performed included evaluating the major litigation risks in the areas of monopolization, price discrimination, price fixing, illegal tying, and exclusive dealing.  A detailed questionnaire designed to collect relevant economic data and identify potential risks was constructed and sent to the corporation's division managers.

- Evaluated revenue projections relating to an electronic toll collection system.  The system was designed to recover lost toll revenue and other administrative fees from toll violators traveling along a consortium of tollways in New York, New Jersey, and Delaware.  Analyzed four critical revenue drivers in the projections (number of transactions, violation rates, citation rates, and collections rates) and the potential variability of certain components of the projections by compiling comparative data through interviews with industry participants.  Analysis was used in assisting lenders evaluating the economic viability of the project.

- In a bankruptcy matter, analyzed the expected rate of return that could be earned on a portfolio of assets.  Included in the analysis was determining the investment portfolio of a prudent pension fund manager and the historical risk premiums earned on each category of assets in the portfolio.  The assets were being held to meet future pension plan liabilities.

- Conducted an analysis of low-cost housing in Los Angeles County (CA) to determine whether sufficient housing was available to house the County's general relief recipient population.  In separate engagements, conducted similar studies for San Bernardino County (CA) and Alameda County (CA).  The Alameda County study also analyzed earned income incentives and food stamp allotments as a source of income in addition to the County's monthly general relief assistance.  An affordable housing analysis was also conducted for the State of New Jersey's Department of Health relating to the state's child exclusion policy and AFDC recipients.

- Conducted an economic analysis on behalf of the California Public Utilities Commission.  Tasks included incorporating elasticities into alternative rate design and pricing models, analyzing subsidies accruing to various residential consumer groups under alternative rate designs, and estimating the relative welfare loss associated with each alternative rate design.

**Fraud/Criminal-Related Engagements**

- Evaluated claimed damages in a suit brought by Plaintiff relators against a major information technology company for allegedly submitting false and fraudulent claims to the U.S. government under a Medicaid program providing health-cost reimbursements to school districts.  Conducted various benchmarking analyses including analyzing a "claimed amount" versus "paid" pattern analysis and a reimbursement rate analysis across Defendant-administered school districts and non-Defendant-administered school districts.  Also conducted a reimbursement rate benchmarking analysis associated with school districts before and after administration by the Defendant.  Concluded there was no economic evidence of a systematic effort to defraud the U.S. government.

- Evaluated Plaintiff's claim of damages stemming from the alleged embezzlement of funds and falsification of income statements by a bank official relating to a mortgage lending division of a bank.  Analysis identified errors made by the bank in specifying the length of the damage period and not properly accounting for accounts receivable collections made post-discovery of the alleged illegal acts.

- Analyzed skilled nursing facility nursing ratios in a criminal health care fraud matter relating to Medicare reimbursements.  At issue was Defendant's ratio of skilled nursing costs to unskilled nursing costs alleged to be outside of governmental guidelines.  Analyzed facility-level ratios by establishing peer groups of facilities based upon size of facility, number of participating beds, skilled utilization percentage, state location, average length of stay, and facilities with similar levels of acuteness.

- Estimated freight overcharge damages on behalf of a major multinational information technology services firm.  Analysis required the utilization of a database of all freight shipments made over a five-year period, including incorporating subsequent credit memos, discounts, and dimensional weight charges.  Analysis compared actual freight charges to rates charged by alternative carriers for shipments of identical ship method (e.g., ground, next day, two day), weight, and destination.

- Performed economic analysis relating to a health care criminal matter in which a group of doctors and a hospital were alleged to have conspired to receive remuneration in return for the referral of Medicare-eligible patients.  Analyze included evaluating the savings from reduced admissions rates and from reduced average length of stays.  Also analyzed the profitability of certain laboratory-related work.

## TEACHING EXPERIENCE

**Macroeconomic Principles and Intermediate Macroeconomics**

Topics covered included unemployment/full employment, inflation/price stability, economic growth/gross domestic product, determination of national income, and monetary and fiscal policies.

**Microeconomic Principles and Intermediate Price Theory**

Topics covered included functioning of markets (demand and supply analysis), elasticities, theory of the firm (profit maximization), industry performance, allocation of resources, and government regulation.

**Companies In Crisis**

Topics covered included companies, markets, and industries in contemporary crisis situations from external or internal changes in the operating environment or significant conflict. Topics included case studies focusing on solutions for companies facing competitive issues, management issues, or litigation-related issues.

## PUBLICATIONS

"An Economic Framework for Analyzing Covenants Not to Compete" (with Elaine Fleming and Steven Herscovici), Expert Witnesses, ABA Section of Litigation, Spring/Summer 2011, Vol. 7 No. 1.

"Financial Expert Witness Challenges and Exclusions:  Results and Trends in Federal and State Cases Since Kumho Tire" (with Lawrence F. Ranallo), Accountants' Handbook, Tenth Edition 2004 Supplement, edited by D.R. Carmichael, New York: John Wiley & Jones, Inc., 2004.

"Accounting for Damages in Intellectual Property Litigation" (with Tony Samuel and John Davis), Building and Enforcing Intellectual Property Value – an International Guide for the Boardroom 2003.

"Challenges to the Admissibility of Financial Expert Witness Testimony" (with Lawrence F. Ranallo), Litigation Services Handbook, 2002 Supplement, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 2A.1 – 2A.17, New York:  John Wiley & Sons, Inc., 2001.

"Calculation of Lost Earnings" (with Carlyn R. Taylor and Randi L. Firus), Litigation Services Handbook, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 11.1 – 11.16, New York:  John Wiley & Sons, Inc., 2001.

"Preparing the Financial Expert or Economist" (with George G. Strong, Jr.), Witness Preparation, V. Hale Starr, 13.4 – 13.4.1, New York: Aspen Law & Business, A Division of Aspen Publishers, Inc., 1998.

"The Effect of Institutional Setting on Behavior in Public Enterprises:  Irrigation Districts in the Western States" (with John M. McDowell), Arizona State Law Journal, Vol. 1982, No. 2, 453 – 496.

## SELECTED RECENT CLIENTS

Selected recent clients include but are not limited to: Amazon.com, Inc.; AT&T Mobility, Inc.; AstraZeneca Pharmaceuticals LP; B/E Aerospace, Inc.; Best Buy Co., Inc.; Bombardier Recreational Products Inc.; Brother International Corporation; CBS Corporation; Clear Channel Outdoor Holdings, Inc.; CommScope Technologies LLC; ConAgra Foods, Inc.; Costco Wholesale Corporation; Covidien LP; The Dial Corporation; Dollar General Corp; Dropbox, Inc.; FCA US LLC; The Gillette Company LLC; Google Inc.; Johnson & Johnson Consumer Companies, Inc.; KAYAK Software Corporation; Kimberly-Clark Corporation; Knauf Insulation, LLC; Juniper Networks, Inc.; L'Oreal USA, Inc. and Matrix Essentials, LLC; LG Electronics, USA, Inc.; Living Essentials, LLC (5-Hour Energy); Maybelline, LLC; Medtronic, Inc.; Microsoft Corporation; Music Choice; Nature's Bounty, Inc.; NBCUniversal Media, LLC; Neutrogena Corporation; Nestlé Purina PetCare Company; Nissan North America, Inc.; OpenTable, Inc.; Orix USA Corporation; Papa John's USA, Inc.; Pharmavite LLC; The Priceline Group Inc.; Research in Motion, Ltd; Sabre Holdings Corporation; Samsung Electronics Co., Ltd.; Sirius XM Radio Inc.; SPD Swiss Precision Diagnostics Gmbh; Sprint Communications Company, LP; St. Jude Medical S.C., Inc.; Sunoco Partners Marketing & Terminal L.P.; TicketNetwork, Inc.; Toshiba Corporation; Toyota Motor Corporation; Tropicana Products, Inc.; TrueCar, Inc.; Universal Alloy Corporation; Valero Marketing and Supply; Verizon Wireless; Whirlpool Corporation.

## HONORS

IAM Patent 1000 2014 – The World's Leading Patent Practitioners.  (Pages 648 and 666.)
IAM Patent 1000 2015 – The World's Leading Patent Practitioners.  (Pages 727 and 759.)
IAM Patent 1000 2016 – The World's Leading Patent Practitioners.  (Pages 740 and 762.)
IAM Patent 1000 2017 – The World's Leading Patent Practitioners.  (Pages 791, 795, and 822.)
IAM Patent 1000 2018 – The World's Leading Patent Practitioners.  (Pages 832 and 862.)
IAM Patent 1000 2019 – The World's Leading Patent Practitioners.  (Pages 892 and 941.)

GCR Global Competition Review Who's Who Legal: Competition 2016 (Economists). (Page 176.)

D CEO: The Most Powerful 500 Business Leaders In Dallas – Fort Worth, 2017 Edition. (Page 152.)
D CEO: The Most Powerful 500 Business Leaders In Dallas – Fort Worth, 2018 Edition. (Page 160.)

**Exhibit 2**

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

# KEITH R. UGONE, PH.D.
## TRIAL, HEARING, AND ARBITRATION TESTIMONY[1]

Innovation Sciences, LLC vs. **Amazon.com, Inc., Amazon Digital Services, Inc., Amazon Digital Services, LLC, Amazon Web Services, Inc., and Amazon Fulfillment Services, Inc.** (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:18-cv-00474-ALM) (2020)

**Admiral Beverage Corporation; Wyoming Beverages, Inc.; Blue Rock Products Co.; Fremont Beverages, Inc.; General Beverages, Inc.; Harrington Bottling Company; Mike D. Dimich Sons, Inc.; Missoula Bottling Company, Inc.; Park Bottling Company; Western Wyoming Beverages, Inc.; Larsen Beverage Co., Inc.; Old Faithful Beverage Company of Idaho Falls, Inc.; and Birrell Bottling Company, Inc.** vs. PepsiCo, Inc. (In The United States District Court For The District Of Wyoming, Case Number: No. 20-cv-00122-ABJ) (2020) (TRO Hearing)

**Implicit, LLC** vs. NetScout Systems, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:18-cv-53-JRG) (2019)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien LP, Covidien Sales LLC, and Covidien AG** (United States District Court, District Of Massachusetts, Civil Action No. 1:16-cv-12556-LTS) (2019)

**Facet Technologies, LLC** vs. Cilag GmbH International and LifeScan, Inc. (In The Arbitration Before JAMS, Ref. No. 14252028986) (2019)

**PPS Data, LLC** vs. Jack Henry & Associates, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:18-cv-00007-JRG) (2019)

D. Joseph Kurtz, Individually and on Behalf of All Others Similarly Situated vs. **Kimberly-Clark Corporation** and Costco Wholesale Corporation (United States District Court, Eastern District Of New York, Civil Action No.: 1:14-cv-01142) (2019) (class certification hearing)

Huawei Technologies Co., Ltd and Futurewei Technologies, Inc. vs. **Yiren "Ronnie" Huang and CNEX Labs, Inc.** (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:17-cv-00893-ALM) (2019)

**CommScope Technologies LLC** vs. Dali Wireless, Inc. vs. **CommScope Connectivity LLC** (United States District Court For The Northern District Of Texas, Dallas Division, No. 3:16-cv-477) (2019) (two trial testimonies: affirmative case and counterclaim)

**Sunoco Partners Marketing & Terminal L.P.** vs. U.S. Venture, Inc., U.S. Oil, and Technics, Inc. (In The United States District Court For The Northern District Of Illinois, Eastern Division, Civil Action No. 1:15-CV-8178) (2019) (two trial testimonies: affirmative case and rebuttal)

---

[1] Trial, hearing, and arbitration testimony over the 1990-2020 time period.  Case citations and dates subject to verification.  **Clients are bolded.**  <u>Deposition testimony begins on page 13.</u>

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Oil-Dri Corporation of America vs. **Nestlé Purina PetCare Company** (In The United States District Court, For The Northern District Of Illinois, Eastern Division, Case No. 1:15-cv-01067) (2019)

Finjan, Inc. vs. **Juniper Networks, Inc.** (United States District Court, Northern District Of California, Case No. 3:17-cv-05659-WHA) (2018)

Brendan C. Haney, individually and on behalf of all others similarly situated vs. **Costa Del Mar, Inc.** (In The Circuit Court, Fourth Judicial Circuit, In And For Duval County, Florida, Case No: 16-2017-CA-004794-XXXX-MA Division: CV-E) (Class certification hearing; 2018)

Lumileds LLC vs. **Elec-Tech International Co. Ltd.**, Donglei Wang, Eva Chan, Gangyi Chen, and Does 1 through 100 (Superior Court Of The State Of California For The County Of Santa Clara, Civil Action No. 115:cv-278566) (2018)

Dependable Sales, et al. vs. **TrueCar, Inc.** (In The United States District Court For The Southern District Of New York, Case No. 1:15-CV-01742-PKC) (Daubert Hearing; 2018)

**Title Source, Inc.** vs. HouseCanary, Inc. f/k/a Canary Analytics, Inc. (In The District Court Of Bexar County, Texas, 73rd Judicial District, Cause No. 2016-CI-06300) (2018) (two trial testimonies: affirmative case and counterclaim)

**TicketNetwork, Inc. and Ticket Software LLC** vs. CEATS, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:15-CV-1470) (2018)

Church & Dwight Co., Inc. vs. **SPD Swiss Precision Diagnostics Gmbh** (In The United States District Court For The Southern District Of New York, Civil Action No. 1:14 CV 585 (AJN)) (2017)

**Bombardier Recreational Products Inc. and BRP U.S. Inc.** vs. Arctic Cat Inc. and Arctic Cat Sales Inc. (United States District Court, District Of Minnesota, Case 0:12-CV-02706 (ADM/LIB) (2017)

Johns Manville Corporation and Johns Manville vs. **Knauf Insulation, LLC**, Walter A. Johnson, and **Knauf Insulation GMBH** (In The United States District Court For The District Of Colorado, Civil Action No. 1:15-cv-00531) (2017)

**Tech Pharmacy Services, LLC** vs. Alixa RX LLC, Golden Gate National Senior Care LLC d/b/a Golden LivingCenters, Fillmore Capital Partners, LLC, Fillmore Strategic Investors, LLC, and Fillmore Strategic Management, LLC (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:15-cv-00766-ALM) (2017)

Eidos Display, LLC and Eidos III, LLC vs. AU Optronics Corporation; AU Optronics Corporation America; **Chi Mei Innolux Corporation; Chi Mei Optoeletronics USA, Inc.**; Chunghwa Picture Tubes, LTC.; Hannstar Display Corporation; and Hannspree North America, Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-201) (2017)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**B/E Aerospace, Inc.** vs. Zodiac Aerospace, Zodiac US Corporation, Zodiac Seats US LLC (a/k/a Weber Aircraft LLC), Heath Tecna, Inc. (a/k/a Heath Tecna, a/k/a Zodiac Airline Cabin Interiors, a/k/a Zodiac Airline Interior Integration), C&D Zodiac, Inc. (a/k/a C&D Aerospace, Inc., a/k/a Zodiac Business Aircraft Interiors), and Zodia Northwest Aerospace Technologies (a/k/a Northwest Aerospace Technologies, Inc.) (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:16-cv-1417) (Preliminary Injunction Hearing; 2017)

**SurgiQuest, Inc.** vs. Lexion Medical, LLC (In The United States District Court, District Of Delaware, Civil Action No. 14-382-GMS) (2017)

In Re **Dial Complete** Marketing and Sales Litigation (MDL No. 2263) (United States District Court, District Of New Hampshire, MDL Docket No. 11-md-2263-SM ALL CASES) (Class Certification Hearing; 2016)

Cornerstone Healthcare Group Holdings, Inc. vs. **Reliant Hospital Partners, LLC, Nautic Partners LLC**, Michael Brohm, Patrick Ryan, Kenneth McGee, Jerry Huggler, Chad Deardorff, et al. (In The District Court Of Dallas County, Texas, 68th Judicial District, Cause No. 11-04339) (2016)

Arctic Cat Inc. vs. **Bombardier Recreational Products Inc. and BRP U.S. Inc.** (United States District Court, Southern District Of Florida, Case No. 0:14-cv-62369-BB) (2016)

**Equistar Chemicals, LP and MSI Technology L.L.C.** vs. Westlake Chemical Corp. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No: 6:14-cv-68) (2016)

Arctic Cat Inc. and Arctic Cat Sales, Inc. vs. **Bombardier Recreational Products Inc.** (Federal Court, Ottawa, Canada, Court File No.: T-1353-13) (2016)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. **The Dow Chemical Company** (United States District Court, District Of New Jersey, Civil Action No. 08-5169 (WJM) (MF)) (Daubert Hearing Testimony; 2016)

Promethean Insulation Technology LLC vs. Sealed Air Corporation; **Reflectix, Inc.**; The Home Depot, Inc.; and Home Depot U.S.A., Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Cas4e No. 2:13-CV-1113) (2015)

**Merial, Inc. and Merial S.A.S** vs. Ceva Sante Animale S.A., Valley Generics, Inc., True Science Holdings, LLC, and TruRX LLC (In The Middle District Of Georgia, Athens Division, Civil Action No. 3:15-cv-00040-CDL) (injunction hearing: 2015)

**Georgetown Rail Equipment Company** vs. Holland L.P. (United States District Court, Eastern District Of Texas, Tyler Division, Case No. 6:13-cv-366-MHS-JDL) (2015)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Bombardier Recreational Products Inc.** vs. Arctic Cat, Inc. and Arctic Cat Sales, Inc. (Federal Court, Montreal, Canada, Court File No.: T-2025-11) (2015)

Masakazu Ushijima vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.** (In The United States District Court For The Western District Of Texas, Austin Division, Civil Action No. 1:12-CV00318-LY) (2015)

Jean Melchior vs. **Hilite International, Inc.** (United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No.: 3:11-CV-03094-M) (2015)

Kawasaki Heavy Industries, Ltd., a/k/a Kawasaki Jukogyo Kabushiki Kaisha and Kawasaki Motors Manufacturing Corp., U.S.A. vs. **Bombardier Recreational Products, Inc., BRP U.S., Inc., and BRP-Rotax GmbH & Co. KG a/k/a BRP-Powertrain GmbH & Co.** (Private Arbitration, Case No. 26220 CAMG) (2015)

**Texas Advanced Optoelectronic Solutions, Inc.** vs. Intersil Corporation (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:08-cv-451) (2015)

Ultratec, Inc. and CapTel, Inc. vs. **Sorenson Communications, Inc. and CaptionCall, LLC** (United States District Court, Western District Of Wisconsin, Case No.:3:13-cv-00346) (2014)

Personal Audio, LLC vs. **CBS Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:13-cv-00270-JRG-RSP) (2014)

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2014)

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (2014: preliminary injunction hearing)

NXP B.V. vs. **Research In Motion, Ltd. and Research In Motion, Corp.** (United States District Court For The Middle District Of Florida, Orlando Division, Case 6:12-cv-498-ORL-22GJK) (2014)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung**

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2014)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (two testimonies: trial (2014) and evidentiary hearing on on-going royalties (2014))

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (two trials; 2014)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013)

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

*e***Plus Inc.**, vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2013)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-CV-362-RSP) (2013)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. **The Dow Chemical Company** (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2013)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District Of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012) (two trial testimonies: affirmative case and counterclaim)

5

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

I/P Engine, Inc. vs. **AOL, Inc., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation** (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

DDR Holdings, LLC vs. **Hotels.com, L.P.**; **Expedia, Inc.**; **Travelocity.com, L.P.**; Site59.com, LLC; Internetwork Publishing Corporation d/b/a Lodging.com; Neat Group Corporation; Orbitz Worldwide, LLC; **International Cruise & Excursion Gallery, Inc.**; **OurVacationStore.com, Inc.**; **National Leisure Group, Inc. / World Travel Holdings, Inc.**; and **Digital River, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:06-CV-42-JRG) (2012)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Merial Limited and Merial SAS** vs. Cipla Limited, Velcera, Inc., and FidoPharm, Inc. (In The United States District Court For The Middle District Of Georgia, Athens Division, Case No. 3:07-CV-125 (CDL)) (2012; injunction hearing)

Geoffrey L. Berman, Trustee of the SB Liquidation Trust vs. **Ernst & Young LLP** (International Institute For Conflict Prevention & Resolution, New York, NY) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2012)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc. (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Bedrock Computer Technologies LLC vs. **Yahoo! Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Bedrock Computer Technologies LLC vs. **Google Inc**. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-420-TJW) (2011)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2011)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc.  (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple, Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

VirnetX Inc. and Science Applications International Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 607CV80 (LED)) (2010)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. **Electronic Data Systems, LLC**  (JAMS Arbitration, Washington, D.C., No. 1410005118) (2010)

**Cummins-Allison Corp.** vs. Shinwoo Information & Telecommunications Co., Ltd., n/k/a SBM Co., Ltd., and Amro-Asian Trade, Inc. (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:07cv196 and Civil Action No. 9:07cv228, Consolidated) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2009)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**Abbott Laboratories and TheraSense, Inc.** vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 WHA) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008; trial and injunction hearing)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2008)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:06-CV-140-RHC) (2007)

YC Partners, LTD. d/b/a Yantis Company vs. Zach Hall; **Rodman Excavation, Inc. d/b/a Rodman Companies, San Antonio Division; Rodman Utilities, L.P.; Rodman Power & Communications, LLC; Rodman Natural Resources, Inc.; Rodman Paving, Inc.** (In The District Court, Bexar County, Texas, 285th Judicial District, No. 2007-CI-03027). (2007; hearing regarding Motion to Compel Plaintiff's Documents)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

QPSX Developments 5 Pty Ltd vs. **Nortel Networks Inc.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:05CV-268) (2007)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2006)

William Ziegler and DenLou, Inc. vs. **Synergistic International, LLC** (American Arbitration Association, Dallas, Case No.: 71 114 E 00733 04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

**Aviall Services, Inc.** vs. Honeywell International, Inc. and Kelly Aerospace, Inc.   (American Arbitration Association, Los Angeles, Arbitration No. 71 Y 181 00717 03) (2005)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2005)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2005)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2004)

**PK Ventures, Inc. and Subsidiaries, PK Ventures Limited Partnership, and Robert M. Rose and Alice N. Rose** vs. Commissioner of Internal Revenue (United States Tax Court, Jacksonville, Florida, Docket Nos. 005836-99, 006395-99, and 10154-99) (2004)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2003)

Teleplus, Inc., vs. **Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2003)

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V., TPC Acquisition Corp., Carlos Slim Helu and James Halpin** (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2001)

United States of America vs. **Dan Anderson** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (2000)

Scott K. Ginsburg vs. **Goldman, Sachs & Co.** (Before the National Association of Securities Dealers, Inc., Dallas) (2000)

**TCP Holdings, LLC, Robert Neely, and David Thomas** vs. Tim Kirk (Before the American Arbitration Association, Dallas, Case No. 71 18000564 98) (2000)

United States of America vs. **Dan Anderson and Baptist Medical Center** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (1999; Sentencing Hearing)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998; Daubert/Robinson Hearing Testimony and Trial Testimony)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1998)

Sledge W. Killion vs. **Metropolitan Life Insurance Company**, et al. (Before the National Association of Securities Dealers, Inc., Dallas, NASD Arbitration No. 95-05997) (1997)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1997)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Exar Corporation vs. **SGS-Thomson Microelectronics Srl** (Court of International Arbitration of the International Chamber of Commerce, New York) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

**Rauscher, Pierce, Refsnes, Inc.** vs. Alfred W. Anderson, Jr. (Before the National Association of Securities Dealers, Inc., Dallas) (1995)

**Ivy Goth** vs. City of Los Angeles and Department of Water and Power (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1995)

**Bio-Medical Applications Management Company, Inc.** vs. Dallas Nephrology Associates (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:94CV37) (1995)

Cybor Corporation vs. **FAS Technologies, Inc.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1995)

Phillips Petroleum Company vs. **Rexene Corporation** (U.S. District Court for the District of Delaware, Civil Action No. 1:90CV208) (1994)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Donald J. Dougher**, et al. vs. Gerard J. Dougher, Sr., et al. (Superior Court of the State of California for the County of Orange, Case No. 677451) (1994)

Texas State Bank, et al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994)

**Union Oil Company of California** vs. International Insurance Company, et al. (Superior Court of the State of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Villarreal** vs. East Union High School District (Superior Court of the State of California) (1993)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc. vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

**Southwest Tank Liners** vs. Joor Manufacturing, Inc. (U.S. District Court for the Central District of California) (1990)

Deposition Testimony of Keith R. Ugone, Ph.D.

# KEITH R. UGONE, PH.D.
## DEPOSITION TESTIMONY[2]

**AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc.** vs. Renesas Electronics America Inc. f/k/a Intersil Corporation (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:08-cv-451) (2020; see also trial testimony 2015)

**Contour IP Holding, LLC** vs. GoPro, Inc. (In The United States District Court For The Northern District Of California, San Francisco Division, Case Number: 17-cv-04738-WHO) (2020: two depositions)

Kieran O'Hara, on behalf of himself and all other similarly situated individuals vs. **Diageo Beer Company USA and Diageo North America, Inc.** (United States District Court, District of Massachusetts, Case No. 15-14139) (2020)

**Dentsply Sirona Inc. and Tulsa Dental Products LLC d/b/a Dentsply Sirona Endodontics** vs. Edge Endo, LLC and US Endodontics, LLC (In The United States District Court For The District Of New Mexico, Case No.: 1:17-CV-01041-WJ-SCY) (2020)

**Covidien Sales LLC, Covidien LP, and Covidien Inc.** vs. Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC (In The United States District Court For The Southern District Of Ohio, Western Division, Civil Case No.: 1:11-cv-871) (2020)

Coit Capital Securities, LLC vs. **Turbine Asset Holdings, LLC, Turbine Asset Holdings Group, LLC, Turbine Inventory Holdings CC1, LLC, Turbine Inventory Holdings CC2, LLC, Turbine Inventory Holdings CC3, LLC, JSS Holdings Group, LLC,** Credit Suisse Asset Management, LLC, Credit Suisse Securitized Products Fund L.P., Wilmington Savings Fund Society, FSB, D/B/A Christiana Trust, and United Technologies Corporation, Pratt & Whitney Division (In The Superior Court Of The State Of Delaware, In And For New Castle County, C.A. No. N17C-05-020 PRW CCLD) (2020)

**Glaukos Corporation** vs. Ivantis, Inc. (United States District Court, Central District Of California, Southern Division, Case No. 8:18-cv-00620-JVS-JDE) (2020)

Innovation Sciences, LLC vs. **Amazon.com, Inc., Amazon Digital Services, Inc., Amazon Digital Services, LLC, Amazon Web Services, Inc., and Amazon Fulfillment Services, Inc.** (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:18-cv-00474-ALM) (2020)

NuVasive, Inc. vs. **Alphatec Holdings, Inc. and Alphatech Spine, Inc.** (United States District Court, Southern District Of California, San Diego Division, Case No. 18-cv-00347-CAB-MDD) (2019)

---

[2] Deposition testimony over the 1990-2020 time period.  Case citations and dates are subject to verification.  **Clients are bolded.**

Deposition Testimony of Keith R. Ugone, Ph.D.

Thomas Allegra, Yesenia Ariza, Mariana Elise Emmert, Stuart Rogoff, Gracelynn Tenaglia, and Melissa Verrastro, individually and on behalf of others similarly situated vs. **Luxottica Retail North America**, an Ohio corporation d/b/a **LensCrafters** (United States District Court, Eastern District Of New York, Brooklyn Division, Case No. 1:17-cv-05216-PKC-RLM) (2019)

**iRobot Corporation** vs. SharkNinja Operating LLC (In The United States District Court For The District Of Massachusetts, Civil Action No. 1:19-cv-12125-ADB) (preliminary injunction deposition; 2019)

Luminati Networks Ltd. vs. **UAB Tesonet and UAB Metacluster LT** (United States District Court, Eastern District Of Texas, Marshall Division, Case No. 2:18-cv-299-JRG) (2019)

Brian Flynn, George and Kelly Brown, and Michael Keith, on behalf of themselves and all others similarly situated vs. **FCA US LLC f/k/a Chrysler Group LLC and Harmon International Industries, Incorporated** (In The United States District Court For The Southern District Of Illinois, Case No. 3:15-CV-855-NJR-DGW) (merits phase; 2019)

**Implicit, LLC** vs. Sandvine Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:18-cv-00054-JRG) (2019)

**Implicit, LLC** vs. NetScout Systems, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:18-cv-53-JRG) (2019: two depositions)

**Sunoco Partners Marketing & Terminals L.P.** v. Powder Springs Logistics, LLC, and Magellan Midstream Partners, L.P. (In The United States District Court For The District Of Delaware, Case No. 17–1390) (2019)

Penn Investment Funds, LLC (Plaintiff) and Antero Resources Corporation (Intervenor) vs. Braxton Energy, LLC, Braxton Acquisitions, LLC, Braxton Minerals II, LLC, Robert Scott Bauer, John Bradley Ashburn, Michael Fisher, Maegan Fisher, M&M Consulting, Lelly O'Connor, Austin Fix, Joe F. Penn, Jr., **Braxton Minerals III, LLC**, Venture Strong II, LLC, Post Oak Appalachia, LLC, Turn 2 Energy, LLC, Braxton-Minerals Appalachia, LLC, Energy Corporation of America, and Enerquest Oil & Gas, LLC (In The District Court Of Tarrant County, Texas, 141st Judicial District, Cause No. 141-290089-17) (2019)

**Tortilla Factory, LLC** vs. GT's Living Foods, LLC and Does 1 through 10 (In The United States District Court, Central District Of California, Case No. 2:17-cv-007539-FMO-GJS) (2019)

Yan Mei Zheng-Lawson, Yuanteng Pei, and Joanne E. Ferrara, on behalf of themselves and all others similarly situated vs. **Toyota Motor Corporation, Toyota North America, Inc., and Toyota Motor Sales U.S.A., Inc.** (United States District Court, Southern District Of California, Case No. 5:17-cv-06591-BLF) (2019)

Brandi Price and Christine Chadwick, on behalf of themselves and all others similarly situated vs. **L'Oreal USA, Inc. and Matrix Essentials, LLC** (United States District Court, Southern District Of New York, No. 1:17-cv-00614-LGS) (merits; 2019)

Deposition Testimony of Keith R. Ugone, Ph.D.

Traxcell Technologies, LLC vs. **Verizon Wireless Personal Communications, LP** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:17-cv-721) (2019)

Traxcell Technologies, LLC vs. **Sprint Communications Company, LP; Sprint Corporation; Sprint Spectrum, LP; and Sprint Solutions, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:17-cv-00719) (2019)

**WaveForm Technologies, Inc.** vs. Dexcom, Inc. (In The United States District Court For The District of Oregon, Civil Action No. 3:16-cv-00536) (2019)

Shaya Eidelman, on behalf of themselves and all others similarly situated vs. **The Sun Products Corporation and Costco Wholesale Corporation** (United States District Court For The Southern District Of New York, Case No. 7:16-cv-03914-NSR) (2019)

Benjamin Hudock, et al., individually and on behalf of all others similarly situated vs. **LG Electronics U.S.A., Inc.; Best Buy Co., Inc.; Best Buy Stores, L.P.; and Bestbuy.com, LLC** (United States District Court, District of Minnesota, Lead Case No. 1:16-CV-01220) (2019)

Richard Belliveau vs. **Barco, Inc. and Barco NV** (United States District Court, Western District Of Texas, Austin Division, Civil No. 1:17-CV-00379-SS) (2019)

**PPS Data, LLC** vs. Jack Henry & Associates, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:18-cv-00007-JRG) (2019)

Fractus, S.A. vs. **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:18-cv-00135-JRG Lead Case, Civil Action No. 2:18-cv-00138-JRG) (2019)

Erin Allen, Tyoka Brumfield, Ofelia Frechette, Shelley Harder, Deana Marr, Tammie Shawley, Brian Smith, and Betty Vazquez, on behalf of themselves and all others similarly situated vs. **ConAgra Foods, Inc. (Parkay Spray)** (United States District Court, Northern District Of California, San Francisco Division, Case No. 3:13-CV-01279-WHO) (2019)

**Music Choice** vs. Stingray Digital Group Inc. and Stingray Music USA, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2:16-CV-0586-JRG-RSP) (2019)

T-Rex Property AB vs. **Clear Channel Outdoor Holdings, Inc., Clear TV Media USA, Inc.** and Monster Vision, LLC d/b/a Monster Media (United States District Court For the Eastern District Of Texas, Tyler Division, Civil Action No. 6:16-cv-974) (2019)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien LP, Covidien Sales LLC, and Covidien AG** (United States District Court, District Of Massachusetts, Civil Action No. 1:16-cv-12556-LTS) (2019)

Deposition Testimony of Keith R. Ugone, Ph.D.

**RMail Limited, RPost Communications Limited, and RPost Holdings, Inc.** vs. Right Signature, LLC, Farmers Group, Inc., and Farmers Insurance Company, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-cv-00300-JRG) (2019: two depositions)

**RMail Limited, RPost Communications Limited, and RPost Holdings, Inc.** vs. DocuSign, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-cv-00299-JRG) (2019: two depositions)

**RMail Limited, RPost Communications Limited, and RPost Holdings, Inc.** vs. Adobe Systems Incorporated and EchoSigh, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-cv-00325-JRG) (2019: two depositions)

Sychronoss Technologies, Inc. vs. **Dropbox, Inc.** (In The United States District Court For The Northern District Of California, Oakland Division, Case No. 4:16-cv-00119-HSG-KAW) (2019)

Huawei Technologies Co., Ltd and Futurewei Technologies, Inc. vs. **Yiren "Ronnie" Huang and CNEX Labs, Inc.** (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:17-cv-00893-ALM) (2019)

Oil-Dri Corporation of America vs. **Nestle Purina PetCare Company** (In The United States District Court For The Northern District of Illinois, Eastern Division, Case No. 1:15-cv-01067) (2019)

Digital Assurance Certification, LLC vs. Alex Pendolino, Jr. and **Lumesis, Inc.** (United States District Court, Middle District Of Florida, Orlando Division, Case No. 6:17-CV-72-ORL-41TBS) (2019)

**The Gillette Company LLC** vs. Dollar Shave Club, Inc., Dorco Company Ltd., Pace Shave, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 15-1158 (LPS)) (2019)

Julie Hamilton, Lyle McLean, Sam Flowers, Nestor Diaz, and George Armstrong, individually and on behalf of all others similarly situated vs. TBC Corporation, **Dynamic Tire Corporation**, and Does 1-10 (United States District Court, Central District Of California, Case No. 2:17-cv-01060-DMG-JEM) (2018)

Brendan C. Haney, individually and on behalf of all others similarly situated vs. **Costa Del Mar, Inc.** (In The Circuit Court, Fourth Judicial Circuit, In And For Duval County, Florida, Case No: 16-2017-CA-004794-XXXX-MA Division: CV-E) (2018)

**CommScope Technologies LLC** vs. Dali Wireless, Inc. vs. **CommScope Connectivity LLC** (United States District Court For The Northern District Of Texas, Dallas Division, No. 3:16-cv-477) (2018)

Finjan, Inc. vs. **Juniper Networks, Inc.** (United States District Court, Northern District Of California, Case No. 3:17-cv-05659-WHA) (2018)

Deposition Testimony of Keith R. Ugone, Ph.D.

Red Rock Analytics, LLC vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, LLC.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:17-cv-00101-RWS-RSP) (2018)

SEVEN Networks, LLC vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America**, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:17-CV-441) (2018)

Faith Bautista, Individually and on Behalf of All Others Similarly Situated vs. **Valero Marketing and Supply** (United States District Court, Northern District Of California, Western Division, Case No. 3:15-cv-0557-RS) (2018)

**Tinnus Enterprises, LLC, Zuru Ltd., Zuru Inc., Zuru LLC, Zuru Pty Ltd., and Zuru UK Ltd.** vs. Telebrands Corp., Bulbhead.com, LLC, and Bed Bath & Beyond Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civ. Action No. 6:17-cv-170) (2018)

Mahaska Bottling Company, Inc. vs. **McLane FoodService, Inc.** (In The District Court, 44th Judicial District, Dallas County, Texas, Cause No. DC-16-13762) (2018)

Joshua Wasser, Ila Gold, and Roberto J. Israel Barajas-Ramos, on behalf of themselves and all others similarly situated vs. **All Market, Inc.** (United States District Court, Southern District Of Florida, Case No. 1:16-cv-21238) (2018: two depositions)

**Implicit, LLC** vs. Palo Alto Networks, Inc. (United States District Court, Eastern District Of Texas, Tyler Division, Civil Action No. 6:17-cv-336) (2018)

Fundamental Innovation Systems International LLC vs. **LG Electronics, Inc., LG Electronics U.S.A., Inc., LG Electronics Mobilecomm U.S.A., Inc., LG Electronics Mobile Research U.S.A. LLC and LG Electronics Alabama, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 16-CV-1425) (2018)

**Rail Solutions of Louisiana, LLC** vs. Genesis Rail Services, LLC, Genesis Energy, L.P., and Genesis Energy, LLC (In The District Court Of Harris County, Texas, 190th Judicial District, Cause No. 2017-23480) (2018)

In Re: **Dollar General Corp** Motor Oil Marketing And Sales Practices Litigation (United States District Court, Western District Of Missouri, Western Division, MDL No. 2709, Master Case No. 6-02709-MD-W-GAF) (2018)

Arconic Inc. (f/k/a Alcoa Inc.) vs. **Universal Alloy Corporation** (In The United States District Court For The Northern District Of Georgia, Case No. 1:15-cv-01466-ELR) (2018)

Toby Schechner, Barbara Barnes, Laura Bliss, Kathleen Jordan, Kathryn Limpede, Louise Miljenovic, Candace Oliarny, Beverly Simmons, Richard Thome and Mary Ellen Thome, individually and on behalf of all others similarly situated vs. **Whirlpool Corporation** (United States District Court, Eastern District Of Michigan, Case No. 2:16-cv-12409-SJM-RSW) (2018: two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

In Re: Ameranth Patent Litigation Cases (United States District Court, Southern District Of California, Lead Case No. 3:11-cv-01810-DMS-WVG) (Ameranth, Inc. vs. **Papa John's USA, Inc.** (Case No. 3:12-cv-00729)) (2018)

Jackie Fitzhenry-Russell, Robin Dale, and Gegham Margaryan, as individuals, on behalf of themselves, the general public and those similarly situated vs. **Dr. Pepper Snapple Group, Inc., Dr. Pepper/Seven Up, Inc.**, and Does 1-50 (United States District Court For The Northern District Of California, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated); 5:17-cv-04435-NC (consolidated)) (2018: two depositions)

Lumileds LLC vs. **Elec-Tech International Co. Ltd.**, Donglei Wang, Eva Chan, Gangyi Chen, and Does 1 through 100 (Superior Court Of The State Of California For The County Of Santa Clara, Civil Action No. 115:cv-278566) (2018)

Jennifer Beardsall, et al., individually and on behalf of all others similarly situated vs. **CVS Pharmacy, Inc., Target Corporation, Walgreen Co., Wal-Mart Stores, Inc., and Fruit of the Earth, Inc.** (United States District Court, Northern District Of Illinois, Case No. 1:16-cv-06103) (2018)

Jim and Becky McGaffin; Rachale and Nathan LaVoie; and Daniel and Stefanie Nunn vs. **Cementos Argos S.A.; Argos USA Corp.; Argos Cement, LLC; and Argos Ready Mix LLC** (In The United States District Court For The Southern District Of Georgia, Savannah Division, Case No. 4:16-cv-00104-LGW-GRS) (2018)

Archer and White Sales, Inc. vs. **Henry Schein, Inc., Danaher Corporation, Instrumentarium Dental, Inc., Dental Equipment, LLC, KaVo Dental Technologies, LLC, and Dental Imaging Technologies Corporation** (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:12-CV-00572-JRG) (2018)

Brandi Price and Christine Chadwick, on behalf of themselves and all others similarly situated vs. **L'Oreal USA, Inc. and Matrix Essentials, LLC** (United States District Court, Southern District Of New York, No. 1:17-cv-00614-LGS) (class certification; 2018)

Amdocs (Israel) Limited, an Israeli Corporation vs. **Openet Telecom, Inc., a Delaware Corporation, and Openet Telecom Ltd., an Irish Corporation** (United States District Court, Eastern District Of Virginia, Alexandria Division, Case No. 1:10cv910 (LMB/TRJ)) (2017)

**Title Source, Inc.** vs. HouseCanary, Inc. f/k/a Canary Analytics, Inc. (In The District Court Of Bexar County, Texas, 73rd Judicial District, Cause No. 2016-CI-06300) (2017)

**TicketNetwork, Inc. and Ticket Software LLC** vs. CEATS, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:15-CV-1470) (2017)

Team Express Distributing LLC vs. **Junction Solutions, Inc., Microsoft Corp., et al.** (In The United States District Court For The Western District Of Texas, San Antonio Division, Civil Action No. 5:15-cv-00994-DAE) (2017)

Post Consumer Brands, LLC vs. **General Mills, Inc. and General Mills Sales, Inc.** (United States District Court, District Of Minnesota, Civil Action No. 17-cv-04915 (JNE-TNL)) (2017)

Deposition Testimony of Keith R. Ugone, Ph.D.

Dependable Sales, et al. vs. **TrueCar, Inc.** (In The United States District Court For The Southern District Of New York, Case No. 1:15-CV-01742-PKC) (2017)

Lianna Kabbash, on behalf of herself and all others similarly situated vs. **The Jewelry Channel, Inc. USA d/b/a Liquidation Channel** (United States District Court For The Western District Of Texas, Austin Division, Case No. 1-16-CV-212-SS) (2017)

Brian Flynn, George and Kelly Brown, and Michael Keith, on behalf of themselves and all others similarly situated vs. **FCA US LLC f/k/a Chrysler Group LLC and Harmon International Industries, Incorporated** (In The United States District Court For The Southern District Of Illinois, Case No. 3:15-CV-855-NJR-DGW) (class certification phase; 2017)

Sycamore IP Holdings LLC vs. **Verizon Business Global, LLC and Verizon Services Corporation** (In The United States District Court, Eastern District Of Texas, Marshall Division, Case No. 2:16-cv-591) (2017)

**Sunoco Partners Marketing & Terminal L.P.** vs. U.S. Venture, Inc., U.S. Oil, and Technics, Inc. (In The United States District Court For The Northern District Of Illinois, Eastern Division, Civil Action No. 1:15-CV-8178) (2017)

Virginia Innovation Sciences, Inc. vs. **Amazon.com, Inc.** (In The United States District Court For The Eastern District Of Virginia, Civil Action No. 1:16-cv-00861 (LO-MSN)) (2017)

**Covidien Sales LLC, Covidien LP, and Covidien Inc.** vs. Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC (In The United States District Court For The Southern District Of Ohio, Western Division, Civil Case No.: 1:11-cv-871) (2017)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien LP, Covidien Sales LLC, and Covidien AG** (United States District Court, District Of Massachusetts, Civil Action No. 1:16-cv-12556-LTS) (2017)

The State Of Texas, ex rel. Allison Zayas and Tracy Miksell-Branch vs. **AstraZeneca LP and AstraZeneca Pharmaceuticals LP** (In The District Court, 353rd Judicial District, Travis County, Texas, Cause No. D-1-GN-13-003530) (2017)

**YKK Corporation and YKK (U.S.A.) Inc.** vs. Velcro USA Inc. and Velcro Canada Inc. (In The United States District Court For The Middle District Of Georgia, Macon Division, Case No. 5:13-CV-306-LJA) (2017)

Church & Dwight Co., Inc. vs. **SPD Swiss Precision Diagnostics Gmbh** (In The United States District Court For The Southern District Of New York, Civil Action No. 1:14 CV 585 (AJN)) (2017)

**Clarke C. Coll, Trustee of the Bankruptcy Estate of Wayne Kenneth Auge, II, M.D.** vs. Stryker Corporation and Howmedica Osteonics Corp. (In The United States District Court For The District of New Mexico, Santa Fe Division, Case No. 1:14-CV-01089-KG-SMV) (2017)

Deposition Testimony of Keith R. Ugone, Ph.D.

Johns Manville Corporation and Johns Manville vs. **Knauf Insulation, LLC**, Walter A. Johnson, and **Knauf Insulation GMBH** (In The United States District Court For The District Of Colorado, Civil Action No. 1:15-cv-00531) (2017)

James P. Brickman, et al., individually and as a representative of all persons similarly situated vs. **Fitbit, Inc.** (United States District Court, Northern District Of California, Case No. 3:15-cv-02077-JD) (2017)

Scott Koller, an individual, on behalf of himself, the general public and those similarly situated vs. **Deoleo USA, Inc. and Med Foods, Inc.** (United States District Court, Northern District Of California, Case No. 3:14-cv-02400-RS) (2017)

**B/E Aerospace, Inc.** vs. Zodiac Aerospace, Zodiac US Corporation, Zodiac Seats US LLC (a/k/a Weber Aircraft LLC), Heath Tecna, Inc. (a/k/a Heath Tecna, a/k/a Zodiac Airline Cabin Interiors, a/k/a Zodiac Airline Interior Integration), C&D Zodiac, Inc. (a/k/a C&D Aerospace, Inc., a/k/a Zodiac Business Aircraft Interiors), and Zodia Northwest Aerospace Technologies (a/k/a Northwest Aerospace Technologies, Inc.) (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:16-cv-1417) (2017)

**Tech Pharmacy Services, LLC** vs. Alixa RX LLC, Golden Gate National Senior Care LLC d/b/a Golden LivingCenters, Fillmore Capital Partners, LLC, Fillmore Strategic Investors, LLC, and Fillmore Strategic Management, LLC (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:15-cv-00766-ALM) (2017)

Eidos Display, LLC and Eidos III, LLC vs. AU Optronics Corporation; AU Optronics Corporation America; **Chi Mei Innolux Corporation; Chi Mei Optoeletronics USA, Inc.**; Chunghwa Picture Tubes, LTC.; Hannstar Display Corporation; and Hannspree North America, Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-201) (2017)

International Business Machines Corporation vs. **The Priceline Group Inc.; KAYAK Software Corporation; OpenTable, Inc.; and priceline.com LLC** (In The United States District Court For The District Of Delaware, Case No. 1:15cv-00137) (2017)

511 Innovations vs. **Samsung Telecommunications America, LLC; Samsung Electronics America, Inc.; Samsung Electronics Co., Ltd.**; Huawei Technologies USA Inc.; Huawei Device USE Inc.; Huawei Technologies Co., Ltd; ZTE (USA) Inc.; ZTE Corporation; **AMSA-TAOS USA Inc.; and AMS AG** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:15-cv-1526) (2017)

Tatiana Korolshteyn, et al. vs. **Costco Wholesale Corporation and NBTY, Inc.** (United States District Court, Southern District Of California, Case No. 3:15-cv-0709-CAB-RBB) and Paige Petkevicius, et al. vs. **NBTY, Inc., Nature's Bounty, Inc., and Rexall Sundown, Inc.** (United States District Court, Southern District Of California, Case No. 14-cv-02616-CAB-RBB) (2016)

In re: **5-Hour Energy** Marketing And Sales Practices Litigation (United States District Court, Central District Of California, Case No. 2:13-ml-02438 PSG (PLAx)) (2016)

Deposition Testimony of Keith R. Ugone, Ph.D.

**SurgiQuest, Inc.** vs. Lexion Medical, LLC (In The United States District Court, District Of Delaware, Civil Action No. 14-382-GMS) (2016)

Flo & Eddie, Inc., a California corporation, individually and on behalf of all others similarly situated vs. **Sirius XM Radio Inc.** (United States District Court, Central District Of California, Case No. 13-CV-5693 PSG-GJS) (2016; *see also* 2015 citation)

Rudolph Technologies, Inc. vs. **Camtek Ltd.** (United States District Court, District Of Minnesota, Case No.: 0:15-cv-01246) (2016)

In Re **Dial Complete** Marketing and Sales Litigation (MDL No. 2263) (United States District Court, District Of New Hampshire, MDL Docket No. 11-md-2263-SM ALL CASES) (2016; *see also* 2013 citation)

Cornerstone Healthcare Group Holdings, Inc. vs. **Reliant Hospital Partners, LLC, Nautic Partners LLC**, Michael Brohm, Patrick Ryan, Kenneth McGee, Jerry Huggler, Chad Deardorff, et al. (In The District Court Of Dallas County, Texas, 68th Judicial District, Cause No. 11-04339) (2016)

James R. Thompson vs. **Orix USA Corporation and Orix Capital Markets, LLC** (Cause No. DC-14-12769) and Clifford Weiner vs. **Orix USA Corporation and Orix Capital Markets, LLC** (Cause No. DC-15-08989) (In The District Court Dallas County, Texas, 298th Judicial District) (2016)

Odyssey Wireless, Inc. vs. **LG Electronics U.S.A., Inc. and LG Electronics MobileComm U.S.A., Inc.** (United States District Court, Southern District Of California, San Diego Division, Civil Action No. 3:15-CV-01743) (2016)

Cellular Communications Equipment LLC vs. HTC Corporation, HTC America, Inc., Exedea, Inc., **AT&T Mobility, Inc.**, Cellco Partnership Inc. D/B/A Verizon Wireless, Sprint Solutions, Inc., Sprint Spectrum L.P., Boost Mobile LLC, T-Mobile USA, Inc., and T-Mobile US, Inc. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-507) (2016) [3]

Kenneth Hobbs, on behalf of himself and all others similarly situated vs. **Brother International Corporation** (United States District Court, Central District Of California, Case No. 2:15-cv-01866-PSG-VBK) (2016)

In Re Petrobras Securities Litigation: Universities Superannuation Scheme Limited vs. Petrobras, **Maria das Gracas Silver Foster, Jose Sergio Gabrielli, Almir Guilherme Barbassa**, et al. and Discovery Global Citizens Master Fund, LTD., et al. vs. Petrobras, **Maria das Gracas Silver Foster**, et al. (United States District Court For The Southern District Of New York, Case No. 14-cv-9662 (JSR) and Case No. 15-cv-9126 (JSR)) (2016)

---

[3] Three lawsuits: (a) *Cellular Communications Equipment LLC v. HTC Corporation, AT&T Mobility LLC, et al.*; (b) *Cellular Communications Equipment LLC v. ZTE Corporation, AT&T Mobility LLC, et al.*; and (c) *Cellular Communications Equipment LLC v. Apple Inc, **AT&T Mobility LLC**, et al.*  Deposition was with respect to the CCE vs. Apple / **ATT** matter.

Deposition Testimony of Keith R. Ugone, Ph.D.

Vehicle IP, LLC vs. AT&T Mobility LLC, **Cellco Partnership d/b/a Verizon Wireless, Networks In Motion, Inc., Telecommunications Systems, Inc.**, and TeleNav, Inc. (In The United States District Court For The District Of Delaware, Case No. 09-1007-LPS) (2016)

**Distributional International Southwest, Inc.** vs. John Bertsch, Todd George, Bay Insulation of Texas, Inc., and Bay Industries, Inc. (In The District Court Of Tarrant County, Texas 236th Judicial District, Cause No. 236-276832-15) (2016)

Stacy Pierce-Nunes and Aurelio Diaz, on behalf of themselves and all others similarly situated vs. **Toshiba America Information Systems, Inc.; Toshiba Corporation; Toshiba Lifestyle Products & Services Corporation** (United States District Court For The Central District Of California, Case No. 2:14-cv-07242-DMG-KSx) (2016)

Rohini Kumar, an individual, on behalf of herself, the general public and those similarly situated vs. **SALOV North America Corp.** (United States District Court, Northern District Of California, Oakland Division, Case No. 4:14-cv-02411) (2016)

In Re **Bayer Phillips Colon Health** Probiotic Sales Practice Litigation (United States District Court, District Of New Jersey, Civil Action No. 11-3017 (JLL) (JAD)) (2016)

In re: **Tropicana** Orange Juice Marketing And Sales Practices Litigation (United States District Court, District Of New Jersey, No. 12-cv-7382-WJM-JBC) (2016)

**Bombardier Recreational Products Inc. and BRP U.S. Inc.** vs. Arctic Cat Inc. and Arctic Cat Sales Inc. (United States District Court, District Of Minnesota, Case 0:12-CV-02706 (ADM/LIB) (2016)

Thought, Inc. vs. **Oracle Corporation, Oracle America, Inc., and Oracle International Corporation** (In The United States District Court For The Northern District Of California, Civil Action No. 3:12-cv-05601-WHO) (2016)

Arctic Cat Inc. vs. **Bombardier Recreational Products Inc. and BRP U.S. Inc.** (United States District Court, Southern District Of Florida, Case No. 0:14-cv-62369-BB) (2016)

Hitachi Maxell, Ltd. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and TPV Display Technology (Xiamen) Co., Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:14-cv-01121) (2016)

Signal IP, Inc. vs. **Nissan North America, Inc.** (In The United States District Court For The Central District Of California, Western Division, Civil Action No. 2:14-cv-02962 JAK (JEM)) (2016)

Michael Goldemberg, Annie Le, and Howard Petlack, on behalf of themselves and all others similarly situated vs. **Johnson & Johnson Consumer Companies, Inc.** (United States District Court, Southern District Of New York, No. 7:13-cv-03073-NSR-LMS) (2015)

Deposition Testimony of Keith R. Ugone, Ph.D.

Lorean Barrera, On Behalf Of Herself And All Others Similarly Situated And The General Public vs. **Pharmavite LLC** (United States District Court, Central District Of California, Case No. CV-11-4153 (AGRx) (2015)

Scott Miller, An Individual, On Behalf Of Himself, The General Public And Those Similarly Situated vs. **Fuhu, Inc. And Fuhu Holdings, Inc.** (United States District Court, Central District Of California, Western Division, Case No. 14-cv-6119 CAS (ASx)) (2015)

Heidi Langan, On Behalf Of Herself And All Others Similarly Situated vs. **Johnson & Johnson Consumer Companies, Inc.** (United States District Court, District Of Connecticut, Case No. 3:13-cv-01471-cv-RNC) (2015)

Mary Haley and Michael Haley, Leslie Banks and James Hal Banks, Annie Buinewicz and Brian Buinewicz, Terrence McIver and Jean Ann McIver, Susan Senyk and Christian Senyk, Mathew Deller and Renee Deller, Patricia Groome, Gary Samuels, and Marie Lohr On Behalf Of Themselves And All Others Similarly Situated vs. **Kolbe & Kolbe Millwork Co., Inc.** (United States District Court, Western District Of Wisconsin, Case Number: 14:-CV-99) (2015)

**Equistar Chemicals, LP and MSI Technology L.L.C.** vs. Westlake Chemical Corp. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No: 6:14-cv-68) (2015)

ZiiLabs Inc., Ltd vs. **Samsung Electronics Co. Ltd., Samsung Electronics America, LLC, Samsung Telecommunications America, LLC, Samsung Austin Semiconductor, LLC**, and Apple Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:14-cv-00203) (2015)

Martin D. Schussel, Individually And On Behalf Of All Others Similarly Situated vs. **Lincoln Wood Products, Inc.** (In The United States District Court, District Of South Carolina, Charleston Division, Case No. 2:14-cv-01788-SB) (2015)

Noah Bradach, On Behalf Of Himself And All Others Similarly Situated vs. **Pharmavite LLC** (United States District Court, Central District Of California, Case No. 2:14-cv-03218-GHK (AGRx)) (2015)

ContentGuard Holdings, Inc. vs. **Amazon.com, Inc.**; Apple Inc.; Blackberry Limited (fka Research In Motion Corporation); Blackberry Corporation (fka Research In Motion Corporation); HTC Corporation; HTC America, Inc.; Huawei Technologies Co., Ltd.; Huawei Devices USA, Inc.; Motorola Mobility LLC; Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Samsung Telecommunications America, LLC (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:13-cv-01112-JRG) (2015)

Nathan Dapeer, on Behalf of Himself and All Others Similarly Situated vs. **Neutrogena Corporation** (United States District Court, Southern District Of Florida, No. 1:14-cv-22113-MGC) (2015)

Deposition Testimony of Keith R. Ugone, Ph.D.

Promethean Insulation Technology LLC vs. Sealed Air Corporation; **Reflectix, Inc.**; The Home Depot, Inc.; and Home Depot U.S.A., Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Cas4e No. 2:13-CV-1113) (2015)

Cardone Industries, Inc. vs. Joel Farina and **BBB Industries, LLC** (In The District Court Of Tarrant County, Texas, 17th Judicial District, Cause No. 017-271617-14) (2015)

Flo & Eddie, Inc. vs. **Sirius XM Radio Inc.** (United States District Court, Central District Of California, Case No. CV 13-05693 PSG (RZx)) (2015; *see also* 2016 citation)

Commonwealth Scientific and Industrial Research Organisation vs. Mediatek, Inc.; Mediatek USA Inc.; Ralink Technology Corp. (USA); Ralink Technology Corp. (Taiwan); Realtek Semiconductor Corp.; Texas Instruments Inc.; Amazon.com, Inc.; **Barnes & Noble, Inc.**; Nokia Corp.; Nokia, Inc.; Samsung Electronics Co. Ltd.; Samsung Electronics America, LLC; Samsung Telecommunications America, LLC (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:12-cv-00578) (2015)

Audatex North America, Inc. vs. **Mitchell International, Inc.** (In The United States District Court For The Southern District Of California, Civil Action No. 3:13-cv-01523) (2015)

Invensys Systems, Inc. vs. **Emerson Electric Co. and Micro Motion, Inc.** (United States District Court, Eastern District Of Texas, Tyler Division, Case No.: 6:12-cv-00799-LED) (2015)

National Oilwell Varco, L.P. vs. **Omron Oilfield and Marine, Inc.** (In The United States District Court For The Western District Of Texas, Austin Division, Civil Action No. 1:12-cv-00773) (2014)

Kawasaki Heavy Industries, Ltd., a/k/a Kawasaki Jukogyo Kabushiki Kaisha and Kawasaki Motors Manufacturing Corp., U.S.A. vs. **Bombardier Recreational Products, Inc., BRP U.S., Inc., and BRP-Rotax GmbH & Co. KG a/k/a BRP-Powertrain GmbH & Co.** (Private Arbitration, Case No. 26220 CAMG) (2014)

Spherix Incorporated vs. **Verizon Services Corp.; Verizon South Inc.; Verizon Virginia LLC; Verizon Communications Inc.; Verizon Federal Inc.; Verizon Business Network Services Inc.; and MCI Communications Services, Inc.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, Civil Action No. 1:14-cv-721-GBL-TCB) (2014)

Invue Security Products, Inc. vs. **Hangzhou Langhong Technology Co., Ltd. and Langhong Technology USA, Inc.** (In The United States District Court For The Northern District Of Texas, Fort Worth Division, Civil Action No.: 4:13-cv-457) (2014)

Deposition Testimony of Keith R. Ugone, Ph.D.

Smartflash LLC and Smartflash Technologies Limited vs. Apple Inc., Robot Entertainment, Inc., KingsIsle Entertainment, Inc., HTC Corporation, and **Game Circus LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-CV-447); Smartflash LLC and Smartflash Technologies Limited vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC**, HTC Corporation, HTC America, Inc., Exedea, Inc., and **Game Circus LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-CV-448) (2014)

Adaptix, Inc. vs, Alcatel-Lucent USA, Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:12-cv-00122) (2014)

Adaptix, Inc. vs, Apple Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Northern District Of California, San Jose Division, Civil Action No. 5:13-cv-01776-PSG); Adaptix, Inc. vs, HTC Corporation, HTC America, Inc., and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Northern District Of California, San Jose Division, Civil Action No. 5:13-cv-01844-(PSG)); Adaptix, Inc. vs, LG Electronics, Inc., LG Electronics USA, Inc., and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00120); Adaptix, Inc. vs, Pantech Wireless, Inc. and **Cellco Partnership d/b/a Verizon Wireless** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00020) (2014)

Transcenic, Inc. vs. **Google Inc.,** Microsoft Corporation, America Online, Inc., MapQuest, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 11-582-LPS) (2014)

**Georgetown Rail Equipment Company** vs. Holland L.P. (United States District Court, Eastern District Of Texas, Tyler Division, Case No. 6:13-cv-366-MHS-JDL) (2014)

Uniloc USA, Inc. and Uniloc Luxembourg S.A. vs. **Activision Blizzard, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00256) (2014)

Ultratec, Inc. and CapTel, Inc. vs. **Sorenson Communications, Inc. and CaptionCall, LLC** (United States District Court, Western District Of Wisconsin, Case No.:3:13-cv-00346) (2014)

Personal Audio, LLC vs. **CBS Corporation, NBCUniversal Media, LLC, FOX Broadcasting Company, FOX Networks Group, Inc., Lotzi Digital, Inc. et al.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:13-cv-00270-JRG-RSP, 2:13-cv-00271-JRG-RSP, 2:13-cv-577-JRG-RSP, 2:13-cv-00014-JRG-RSP) (2014)

In Re **ConAgra Foods, Inc.** (Wesson Oil) (United States District Court, Central District Of California, Western District, Case No. CV 11-05379-MMM, MDL No. 2291) (2014: two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

Optimize Technology Solutions, LLC vs. Staples, Inc., Dillard's, Inc., HSN, Inc., J.C.Penney Corporation, Inc., and **Recreational Equipment, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-CV-00419-JRG) (2014)

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

Connecticut Ironworkers Employers Association, Inc., et al. vs. **New England Regional Council of Carpenters** (United States District Court, District Of Connecticut, Docket No. 3:10-CV-165-SRU) (2014)

**United Services Automobile Association** vs. Mitek Systems, Inc. (In The United States District Court For The Western District Of Texas, San Antonio Division, Case No. 5:12-cv-00282-FB) (2014)

Florida Atlantic University Research Corporation and Domaine Associates, LLC vs. **Acer Inc., ASUS Computer International, and TPV Technology Limited**, et al. (United States District Court, Southern District Of Florida, Case No.: 9:12-cv-80694-PAS, Case No.: 9:12-cv-80697, and Case No.: 9:12-cv-80701-PAS, respectively) (2014)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company**, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2014)

Brightstar Corp. and Brightstar, US, Inc. vs. **e-Recycling, LLC** (In The Circuit Of The 11th Judicial Circuit In And For Miami-Date County, Florida, Case No. 12-08985 CA 40) (2014)

US Airways, Inc. vs. **Sabre Holdings Corporation, Sabre Inc., and Sabre Travel International Limited** (United States District Court, Southern District Of New York, Civil Action No. 1:11-cv-02725-MGC) (2014)

**ASUS Computer International** vs. Round Rock Research, LLC (United States District Court, Northern District Of California, Civil Action No. 3:12-CV-02099-JST) (2014)

Yanira Algarin and Patsy Murdock, on behalf of themselves and all others similarly situated vs. **Maybelline, LLC d/b/a Maybelline New York** (United States District Court, Southern District of California, Case No. 12CV3000 AJB DHB) (2014)

Jean Melchior vs. **Hilite International, Inc.** (United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No.: 3:11-CV-03094-M) (2014)

Becton, Dickinson and Company vs. **Insulet Corporation** (In The United States District Court For The District Of New Jersey, Case No. 2:10-cv-04371-PGS-ES) (2014)

NuVasive, Inc. vs. **Globus Medical, Inc.** (In The District Court Of Travis County, Texas, Cause No. D-1-GN-11-002134) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (2013)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien, Inc. and Covidien, LP** (In The United States District Court For The Southern District Of Ohio, Western Division, Civil Case No.: 1:11-cv-871) (2013)

Applied Medical Resources Corporation vs. **Tyco Healthcare Group LP d/b/a Covidien** (In The United States District Court For The Central District of California, Southern Division, Civil Action No.: SACV11-01406JVS (ANx)) (2013)

**Microsoft Corporation** vs. LBS Innovations LLC and LBS Innovations LLC, a Texas LLC (In the United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:12-cv-759-JRG) (2013)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (2013: two damages depositions; 2014: preliminary injunction deposition and damages deposition)

NeuStar, Inc. and Quova, Inc. vs. **F5 Networks, Inc.** (In The United States District Court For The Northern District Of California, San Jose Division, Case No. CV12-02574) (2013)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (2013)

**Swivelpole Group Pty Ltd. and Swivelpole Patent Pty Ltd** vs. Swivelpole USA, Ltd., Swivelpole Holdings, LLC, Swivelpole Canada Holdings, Inc., ILS Products, LLC, ILS Products Holdings, LLC, ILS Manufacturing, LLC, and Andrew Grant (In The District Court Of Harris County, Texas, 164th Judicial District, Cause No. 2012-42402) (2013)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2013)

Lodsys, LLC, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No.: 2:11-CV-90) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

**One Technologies, L.P.** vs. Profinity, LLC and Chad D. Ertel (In The District Court Dallas County, Texas, 14th Judicial District, Cause No. 12-03980-A) (2013)

Eidos Display, LLC and Eidos III, LLC vs. AuOptronics Corporation, AU Optronics Corporation America, **Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc.**, Chunghwa Picture Tubes, Ltd., Hannstar Display Corporation, and Hannspree North America, Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-201) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013; three depositions)

SFA Systems, LLC vs. **Amazon.com, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-00052) (2013)

Palomar Medical Technologies, Inc. and The General Hospital Corporation vs. **TRIA Beauty, Inc.** (In The United States District Court, District Of Massachusetts, Civil Action No. 09-CV-11081-RWZ) (2013)

Maureen Stewart, Kelly Lamicella, and Nicole Bello vs. **Beam Global Spirits & Wine, Inc., Jim Beam Brands Co., SGC Global, L.L.C., Skinny Girl Cocktails, L.L.C., and Bethenny Frankel** (United States District Court For The District Of New Jersey, Civil Action No. 1:11-cv-05149 (NLH) (KMW) (2013)

Securities and Exchange Commission vs. **Life Partners Holdings, Inc.**, Brian Pardo, R. Scott Peden, and David M. Martin (The United States District Court For The Western District of Texas, Austin Division, Civil Action No.: 1-12-cv-00033-JRN) (2013)

**St. Jude Medical, Cardiology Division, Inc., St. Jude Medical Systems AB, and St. Jude Medical S.C., Inc.** vs. Volcano Corporation (In The United States District Court For The District Of Delaware, C.A. No. 10-631-RGA) (2013)

In Re **Dial Complete** Marketing and Sales Litigation (MDL No. 2263) (United States District Court, District of New Hampshire, MDL Docket No. 11-md-2263-SM ALL CASES) (2013; *see also* 2016 citation)

**Sound Design Technologies, Ltd.** vs. Oticon, Inc., SeboTech Hearing Systems, LLC, and Gennum Corp. (The United States District Court For The District Of Arizona, No. CV11-1375-PHX-SRB) (2013)

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

SmartPhone Technologies, LLC vs. Research In Motion, Corp., **Apple, Inc.**, et al. (The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-CV-74-LED) (2013)

**Lutron Electronics Co., Inc.** vs. Crestron Electronics, Inc., Face Group, Inc. d/b/a Lifestyle Electronics, Lava Corp., Audio Vision Systems, LLC (In The United States District Court, District Of Utah, Central Division, Case: 2:09-cv-707) (2012)

Oasis Research, LLC vs. AT&T Corp., **Carbonite, Inc., EMC Corp., Decho Corp., IOMEGA Corp., GoDaddy.com, Inc., Iron Mountain Incorporated, Iron Mountain Information Management, Inc., Pro Softnet Corp.**, et al. (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:10-cv-00435-MHS-ALM) (two depositions: 2012 and 2015)

Secure Axcess, LLC vs. Bank of America Corp., **Arvest Bank, Bank of the Ozarks, Inc., Compass Bancshares, Inc., First National Bank Texas, First National Bank of Omaha, Zions Bancorporation**, et al. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-00670) (2012)

Kehlie R. Espinosa, Lillian E. Levoff, Thomas Ganin, and Daniel Baldeschi vs. **Hyundai Motor America** (United States District Court, Central District Of California, Case No. 2:12-cv-00800 GW (FFMx)) (2012)

Axcess International, Inc. vs. **Savi Technology, Inc.** (In The United States District Court For The Northern District Of Texas, Dallas Division, Case No. 3:10-cv-01033-F) (2012)

American Airlines, Inc. vs. **Sabre Inc.**, et al. (In The Judicial District Of Tarrant County, Texas, 67th Judicial District, No. 067-249214-10) (2012)

I/P Engine, Inc. vs. AOL, Inc.; **Google Inc.**; IAC Search & Media, Inc.; Gannett Company, Inc.; and Target Corporation (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; **Cellco Partnership d/b/a Verizon Wireless International, Inc.**; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and T-Mobile USA, Inc. (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (2012)

Deposition Testimony of Keith R. Ugone, Ph.D.

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; Cellco Partnership d/b/a Verizon Wireless International, Inc.; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and **T-Mobile USA, Inc.** (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (two depositions: 2012 and 2013)

Technical Resource Services, Inc., et al. vs. **Shell Exploration & Production, Company** (In The United States District Court For The Eastern District Of Louisiana, Civil Action No. 09-7339) (2012)

U.S. Bank National Association, Litigation Trustee of the Idearc Inc. et al. Litigation Trust vs. **Verizon Communications Inc., Verizon Financial Services, LLC, GTE Corporation**, and John W. Diercksen (In The United States District Court For The Northern District Of Texas, No. 3:10-CV-1842-G) (2012)

Eon Corp. IP Holdings, LLC vs. T-Mobile USA, Inc., Research In Motion Corporation, **Cellco Partnership d/b/a Verizon Wireless**, et al. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-cv-00379-LED) (2012)

My485, Inc. vs. **Riverside Partners, LLC, d/b/a The Riverside Company and HealthcareFirst, Inc.** (In The District Court, 67th Judicial District, Tarrant County, Texas, Cause No. 067 251767 11) (2012)

In Re Glaceau Vitamin Water Marketing and Sales Practice Litigation (No. II): **The Coca Cola Company and Energy Brands, Inc.** (In The United States District Court, Eastern District Of New York, Case No. 1:11-md-02215-DLI-RML) (2012)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012; two depositions)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2012)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2012)

LSQ Funding Group, L.C. vs. **EDS Field Services n/k/a HP Enterprise Services, LLC** (United States District Court, Middle District Of Florida, Orlando Division, Case No.: 6:10-CV-1246-ORL-ACC-DAB) (2012)

Deposition Testimony of Keith R. Ugone, Ph.D.

*e***Plus Inc.**, vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Mitsubishi Heavy Industries, Ltd.** vs. General Electric Co. (In The United States District Court, Middle District Of Florida, Orlando Division, Civil Action No. 6:10-cv-812) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

W.L. Gore & Associates, Inc. vs. **GI Dynamics, Inc.** (United States District Court, District Of Arizona, No. CV 10-8088 PCT GMS) (2011)

LML Patent Corp. vs. JPMorgan Chase & Co.; **Wells Fargo Bank, N.A.; Wachovia Bank, N.A.**; Citigroup, Inc.; HSBC Bank USA, N.A.; Capital One National Association; Northern Trust Company; Deutsche Bank Trust Company; PayPal, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:08-cv-448 DF) (2011)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2011; two depositions)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2011 and 2012; two depositions)

Curtis Berrien; Rose Huerta; Tina Musharbash; Fern Prosnitz; Michael Andler; Marcus Boness; Timothy Bonnell; Richard Buford; Elaine Cefola; Kenneth Davis; Jerome Garoutte vs. **New Raintree Resorts International, LLC; RVC Members, LLC; Douglas Y. Bech** (In The United States District Court For The Northern District Of California, Oakland Division, Case No. CV10-3125 CW) (2011)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2011)

Deposition Testimony of Keith R. Ugone, Ph.D.

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Eon Corp. IP Holdings, LLC vs. **Sensus USA Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-00116) (2011)

Bedrock Computer Technologies LLC vs. **SoftLayer Technologies, Inc.; CitiWare Technology Solutions, LLC; Google Inc.; Yahoo! Inc.; MySpace Inc.; Amazon.com Inc.; PayPal Inc.; Match.com, LLC; and AOL Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc.  (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Beneficial Innovations, Inc. vs. Blockdot, Inc.; CareerBuilder, LLC; CNET Networks, Inc.; Digg, Inc.; Ebaums's World, Inc.; Jabez Network, Inc.; **The New York Times Company**; The Washington Post Company; and The Weather Channel Interactive, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-263-TJW-CE) (2010)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc.  (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Eon Corp. IP Holdings, LLC vs. **Verizon Clinton Center Drive Corp.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-cv-00385) (2010)

**Tyco Healthcare Group LP** vs. C.R. Bard, Inc. and Davol, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 09-264 (SLR)(MPT)) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; and **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

SP Syntax LLC and SP3 Syntax LLC vs. James Ching Hua Li, Man Kit (Thomas) Chow, Michael K. Chan, Vincent F. Sollitto, Jr, Wayne A. Pratt, John S. Hodgson, David P. Chavoustie, Christopher C. L. Liu, Alice Phang, **Ernst & Young LLP**, and Grobstein, Horwath & Company LLP (Superior Court Of The State Of California, County Of Los Angeles, Case No. BC402910) (2010)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Gorlick Distribution Centers, LLC** vs. Car Sound Exhaust System, Inc. and Allied Exhaust Systems, Inc. (United States District Court, Western District of Washington at Seattle, Case No. C07-1076 RAJ) (2010)

Stacy Holk, on behalf of Herself and all others similarly situated vs. **Snapple Beverage Corporation** (United States District Court, District of New Jersey, Civil Action No. 3:07-cv-03018-MJC-JJH) and Evan Weiner and Timothy McCausland on behalf of themselves and all others similarly situated vs. Snapple Beverage Corporation (United States District Court For The Southern District Of New York, Civil Action No. 07-cv-08742) (2010)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2010; two depositions)

Good Sportsman Marketing, LLC and IP Holdings, Inc. vs. **Non Typical, Inc., Mark Cuddeback, and Richard Scales Advertising Associates, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 06:07-cv-00177-LED) (2010)

DataTreasury Corporation vs. **Wachovia Corporation, Wachovia Bank National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

DataTreasury Corporation vs. **Wells Fargo & Company, Wells Fargo Bank, National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. Brookshire Enterprises, LLC, Custom Computer Cable, Inc., Jackson Browne, LLC, Courtney Matthews, and **Electronic Data Systems, LLC** (Virginia: In The Circuit Court For Loudoun County, Civil Case No. CL 46964) (2009)

MHL Tek, LLC vs. Nissan Motor Co., Nissan North America, Inc., Nissan Technical Center North America, Inc., Hyundai Motor Co., Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC, Kia Motors Corporation, Kia Motors America, Inc., Dr. Ing. H.C.F. Porsche AG, Porsche Cars North America, Inc., Bayerische Motoren Werke AG, BMW of North America LLC, BMW Manufacturing Co., LLC, Isuzu Motors Ltd., Isuzu Motors America, Inc., Subaru of America, Inc., Subaru of Indiana Automotive, Inc., **Audi AG, Volkswagen AG, and Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-289-TJW) (2009)

**Crane Co. and Dixie-Narco Inc.** vs. SandenVendo America, Inc. and Royal Vendors, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-42) (2009)

Deposition Testimony of Keith R. Ugone, Ph.D.

**LG Electronics Inc.** vs. Hitachi, Ltd., Hitachi Automotive Products (USA), Inc., Clarion Co. Ltd., Clarion Corporation of America and Xanavi Informatics Corporation. (In The United States District Court, Eastern District Of Texas, Texarkana Division, Civil Action No. 5:07-CV-90) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**The Compliance Source, Inc. and Digital Docs, Inc.** vs. GreenPoint Mortgage Funding, Inc. (In The United States District Court, Northern District Of Texas, Dallas Division, Civil Action No. 3-06-cv1057-L (ECF)) (2008)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2008)

**Lutron Electronics Co. Inc.** vs. Control4 Corporation (In The United States District Court For The District Of Utah, Central Division, Civil Action No. 2-03-CV-00401 DAK) (2008)

ELB Enterprises of Dallas, L.P. and Bai-Mac, Inc. vs. **McDonald's Corporation, McDonald's USA, LLC, and Golden Arch of Texas, Inc., and Ricardo Colon** (In The Court At Law, Court No. 4, Dallas County, Texas, Cause No. CC-06-17226-D) (2008)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2008)

Iovate Health Sciences, Inc., University of Florida Research Foundation, Inc. and Flamma SpA vs. **Bio-Engineered Supplements & Nutrition, Inc., d/b/a BSN, Inc.** and Medical Research Institute (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Case No. 9:07-cv-46) (2008)

Ronald A. Katz Technology Licensing, L.P. vs. **The DIRECTV Group, Inc., DIRECTV, Inc., DIRECTV Holdings, LLC, DIRECTV Enterprises, LLC, and DIRECTV Customer Services, Inc.** (In The United States District Court, Central District of California, Case No. 2:07-CV2322 RGK (FFMx) and Case No. 2:07-ML-1816-B RGK (FFMx), originally filed in the Eastern District of Texas as Case No. 9:06-CV-00193-RHC) (2008)

Deposition Testimony of Keith R. Ugone, Ph.D.

Quantum Unlimited, LLC, Quantum of Troon North, LLC, and Redsky Resorts of Troon North, LLC n/k/a Redsky Resorts, LLC vs. **Wyndham International, Inc.**, Tempus Resorts International, Ltd, **The Blackstone Group L.P.**, et al. (In The District Court Of Dallas County, Texas, 298th Judicial District) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008; two depositions)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

O₂Micro International Limited vs. **Rohm Co. Ltd.**, Sony Corporation, Sony EMCS Corporation, Sony Corporation of America, and Sony Electronics Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2-05-CV-00211-TJW) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008)

**Abbott Laboratories and Abbott Diabetes Care Inc.** vs. Roche Diagnostics Corporation, Roche Diagnostics Operations, Inc., and Bayer Healthcare LLC; Abbott Laboratories and TheraSense, Inc. vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 MJJ, Civil Action No. C04-3327 MJJ, Civil Action No. C04-3732 MJJ, and Civil Action No. C05-3117 MJJ) (2008; two depositions)

United States of America, ex rel Toni R. Barron and Vicky J. Scheel vs. Deloitte & Touche, LLP, Deloitte Touche Consulting Group, LLC, Deloitte & Touche Consulting Group Holding, LLC, Medicaid Solutions of Texas, and **National Heritage Insurance Company** (In The United States District Court, Western District of Texas, Civil Action No. SA-99-CV-1093FB) (2007)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2007)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:06CV140-RHC) (2007)

**Tinkers & Chance** vs. LeapFrog Enterprises, Inc. (In The United States District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-349-TJW) (2007)

Deposition Testimony of Keith R. Ugone, Ph.D.

**DEJ Productions, Inc., Blockbuster Inc., and First Look Studios, Inc.** vs. Media 8 Entertainment and MDP Distribution, Inc. (In The District Court of Dallas County, Texas, M-298[th] Judicial District, Cause No. 06-01887) (2007)

Art International Forwarding, Inc. vs. **The Pasha Group and Gosselin Worldwide Moving, N.V.** (In The United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:05-CV-01410-RWS) (2007)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2007)

**Nike, Inc.** vs. adidas Salomon North America, Inc., adidas America Inc. d/b/a adidas International, and adidas Promotional Retail Operations Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-43-RHC) (2007)

**BIAX Corporation** vs. Intel Corporation and Analog Devices, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-184-TJW) (2007)

Two-Way Media, LLC vs. **America Online, Inc.** (In The United States District Court For The Southern District of Texas, Corpus Christi Division, Civil Action No. C-04-089) (2007)

In re Enron Corporation Securities Litigation; Kevin Lamkin, Janice Schuette, Robert Ferrell and Stephen Miller vs. **UBS Financial Services, Inc. and UBS Securities LLC** (Civil Action No. H:02-CV-0851; Consolidated MDL) and Samuel Giancarlo vs. **UBS Financial Services, Inc., UBS Securities LLC., and UBS AG** (Civil Action No. H-03-4359; Consolidated MDL) (In The United States District Court For The Southern District of Texas, Houston Division) (2007)

O$_2$Micro International Limited vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-323 (Ward)) (2007)

CNX Gas Corporation and CNX Gas Company LLC vs. **CDX Gas Company LLC** vs. CONSOL Energy, Inc. (In The United States District Court For The Western District of Pennsylvania, Civil Action No. 05-CV-1574) (2007)

**Parkade Center, Inc.** vs. Simon Property Group (Texas), L.P. and Simon Property Group (Delaware), Inc. (In The District Court 398th Judicial District of Hildalgo County, Texas, Cause No. C-2584-06-1) (2007)

The Post Confirmation Trust (The Fleming Companies) vs. **Digital Exchange Systems, Inc.** (In The United States District Court for the Eastern District of Texas, Texarkana Division, No. 5:05-CV-165(TJW)) (2007)

36

Deposition Testimony of Keith R. Ugone, Ph.D.

Golden Bridge Technology, Inc. vs. **Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., Qualcomm Incorporated, and Lucent Technologies, Inc.** (In The United States District Court for the Eastern District of Texas, Tyler Division, Civil Action No: 6:06-cv-00163-LED) (2006)

John P. Rochon, Nick G. Bouras, Nu-Kote International, Inc., J.R. Investment Corporation, Richmont Corporation and Nu-Kote Acquisition Corporation vs. **Akin Gump Strauss Hauer & Feld, LLP and Alan Feld** (In The District Court of Dallas County, Texas, 192nd Judicial District, Cause No. 04-03311-K) (2006)

**Autobytel Inc.** vs. Dealix Corporation (United States District Court Eastern District of Texas, Marshall Division, Case No. 2:04-cv-338-LED) (2006)

**Electronic Data Systems Corporation and EDS Information Systems, L.L.C.** vs. MCI Communications Services, Inc. (Before the American Arbitration Association, Arbitration No. 13 181 00976 06) (2006)

Jeffrey A. Kozak vs. **Medtronic Sofamor Danek** (In The United States District Court for the Southern District of Texas, Houston Division, Civil Action Number H-03-4400) (2006)

Alcon Manufacturing, Ltd. and Alcon Laboratories, Inc. v. **Advanced Medical Optics, Inc.** (In The United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4-05CV-496-A) (2006)

Eckhard U. Alt, MD vs. **Medtronic, Inc.** (In The United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:04CV370) (2006)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

In re: **Williams** Securities Litigation (WCG Subclass) (In The United States District Court for the Northern District of Oklahoma, Case No. 02-CV-72H(M)) (2006)

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson vs. **Fulbright & Jaworski, LLP** (United States District Court Western District of Texas, Austin Division, Cause No. A 05 CA 334 SS) (2006)

Children's Medical Center of Dallas vs. **Columbia Hospital at Medical Center Dallas Subsidiary L.P.** (In The United States District Court Northern District Of Texas, Dallas Division, Civil Action No. 3:04-CV-2436-BD) (2006)

Vantage Controls, Inc. vs. **Lutron Electronics Co., Inc.** (In The United States District Court for the District of Utah, Central Division, Case No. 2:03-CV-00488TC) (2006)

Blueberry Sales, L.P., f/k/a Blueberry Confections, Inc. vs. **ED&F Man Sugar, Inc.** (United States District Court for the Western District of Texas, El Paso Division, EP-04-CA0193) (2005)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Cummins-Allison Corp.** vs. Glory LTD., Glory Shoji Co., LTD., and Glory (U.S.A.), Inc. (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2-03-CV-358 (TJW) (2005)

Gilbert R. Sada and Victor L. Hernandez vs. **Jack In The Box Inc.** (United States District Court for the Western District of Texas, San Antonio Division. Civil Action No. SA04CA0541 (OG)) (2005)

Trinity Mother Frances Health System and Mother Frances Hospital vs. **East Texas Medical Center Regional Healthcare System and East Texas Medical Center** (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:03CV464) (2005)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2005; two depositions)

William Rutledge Scott, Individually and as Independent Executor of the Estate of Mozelle Rutledge Scott, Deceased vs. **Hughes & Luce, L.L.P., Kathryn G. Henkel, and Laurel Stephenson** (In the County Court of Tom Green County, Texas, Cause No. 02P211-L) (2005)

Junitha Bee, et al. vs. Kavilico Corporation, ITT Neodyne, **Parker Hannifin**, and the Boeing Company (Superior Court of the State of California, County of Los Angeles, Case No. C99-589C) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

MOSAID Technologies Incorporated vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (In the United States District Court for the District of New Jersey, Civil Action No. 01-4340 (WJM)) (2004)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2004)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Deposition Testimony of Keith R. Ugone, Ph.D.

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

Airbel Wireless, Inc. and JAVS Telecom, Inc. vs. **AT&T Wireless Services, Inc.** (American Arbitration Association, New York, Case No. 13 Y 199 00709 03) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2003 and 2004; two depositions)

Anthony Stella and Mary S. Stella, Individually and on Behalf of all Persons Similarly Situated in the State of Texas vs. **Grant Thorton, L.L.P.** (In the District Court of Galveston County, 212th Judicial District) (2003)

Administaff, Inc. and Administaff of Texas, Inc. vs. **Aetna Life Insurance Company** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:01CV3802) (2003)

GATT Trading, Inc. vs. **Sears, Roebuck and Co.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:01CV260) (2003)

**IEX Corporation** vs. Blue Pumpkin Software, Inc. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:01CV16) (2003 and 2005; two depositions)

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

Teleplus, Inc., vs. **MCI Telecommunications Corporation, MCI International Telecommunications Corporation, MCI International Inc., MCI Communications Corporation, MCI Worldcom, Inc., MCI Global Support Corporation, MCI Global Access Corporation, and Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2002)

Customedia Technologies, LLC and William H. Lewis vs. Joby Hughes, Felsman, Bradley, Gunter & Dillon, Stephen Perkins, **Sidley & Austin**, Litigation Risk Management, Inc., and Granite Ventures, Inc. (In the District Court of Harris County, Texas, 125th Judicial District, Case No. 2000-26667) (2002 and 2003; two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

Edward Ahearn vs. **Ernst & Young, L.L.P.** (Before the American Arbitration Association, Case No. 13-107-00136-01) (2002)

John H. Houser and Frederick A. Raffa vs. **Wachovia Corporation** (In the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV1041-T-17MSS) (2002)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2002 and 2003; two depositions)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

Tyler Jet, L.L.C., TeamXtreme Racing, L.L.C., and Burl Outlaw vs. **Lycos, Inc.** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:00CV-179) (2001)

EPI Environmental Products, Inc. vs. **In-Line Plastics, L.C.** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:98CV4209) (2001)

Health Laboratories of North America, Inc., et al. vs. **Neodata Services, Inc.** (In the Superior Court of the State of Arizona In and For the County of Maricopa, Civil Action No. CV1998-008143) (2001)

Acres Gaming Inc. vs. Mikohn Gaming Corporation and **Casino Data Systems** (In the United States District Court District of Nevada, Civil Action No. CV-S-01462-PMP (RJJ)) (2000)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V.**, et. al. (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2000)

Healthtech Diagnostics, Corporation and Oncogenetics, Inc. vs. **Impath, Inc. and Impath-HDC, Inc.** (In the District Court of Dallas County, Texas, L-193rd Judicial District, Case No. 97-08552) (2000)

Pacific Southwest Bank and NAFCO Holding Company, LLC vs. **Electronic Data Systems Corporation** (In the District Court of Dallas County, Texas, 191st Judicial District, Cause No. 98-5954) (2000)

Deposition Testimony of Keith R. Ugone, Ph.D.

Anthony D. Viazis, et. al. vs. **American Association of Orthodontists**, et. al. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:98-CV-245) (2000)

**Kvaerner Oilfield Products, Inc.** vs. Cooper Cameron Corp. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-98-3369) (2000)

J.V. Smith, et al. vs. Randyl Louis Harrell, **Enterprise Products Company**, et. al. (In the District Court of Liberty County, Texas, 75th Judicial District) (2000)

Norman Yourish, et. al. vs. **California Amplifier**, et. al. (Superior Court of the State of California for the County of Ventura, Civil Action No. CIV173569) (2000)

David Kimberly Hackett, individually and Samuel G. Swope, individually and as Assignees of Courtesy Auto Group, Inc. vs. **Electronic Data Systems, Inc.** (In the United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 98-1065-CIV-19-A) (2000)

County Council of Northampton County vs. **SHL Systemhouse Corp.** vs. Northampton County (In the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 98-CV-0088) (1999)

**Natural Reserves Group, Inc.** vs. Baker Hughes, Inc., et. al. (In the United States District Court for the Southern District of Texas, Harris County Division, Civil Action No. 96-31380) (1999)

**BeautiControl, Inc.** vs. Ryco Packaging Corp. vs. Arrowpak, Inc. and Custom Decorative Systems, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-98CV1775-H) (1999)

Peoples National Bank, Peoples National Mortgage Corp., and Texas Peoples National Bancshares, Inc. vs. Russell A. McClendon, **St. Paul Mercury Insurance Company**, Smith-Reagan Life and Health Insurance Agency, Inc. and Gary Robertson (In the District Court Lamar County, Texas, 62nd Judicial District) (1999)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Petrofac, Inc. and Petrofac International, Ltd. vs. **Howe-Baker Engineers, Inc. and Omar J. Ghalayini** (In the County Court at Law; Smith County, Texas, Cause No. 39,839) (1998)

L & S Concrete Company, Inc., Gilliam Brothers, Inc., Webco, Inc., Charles T. Weaver, Gus Blass, III, Bob Townsell, Alex Lieblong, and Dr. Thomas Robinson vs. **Trans World Airlines, Inc.** (In the United States District Court for the Eastern District of Arkansas Western Division, Case No. Civ-97-378) (1998)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998)

Deposition Testimony of Keith R. Ugone, Ph.D.

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1997)

**Excel Telecommunications, Inc., Excel Communications, Inc., Steve Smith, and Kenny Troutt** vs. Linden Wood, Brad Campbell, Candy Campbell, Jerry Szeszulski, and Team Excel of Independent Representatives (American Arbitration Association, Dallas, Texas Region) (1997)

**Gourmet Award Foods** vs. Continental Extrusion, Genpak Corporation, and Heartland Packaging Corporation (Judicial District Court of Dallas County, Texas, D-95th Judicial District) (1997)

L. Anne H. Frazier vs. **Owsley Brown Frazier** (Jefferson Family Court, Division Eight; Louisville, Kentucky, Case No. 94-FD-01957) (1997)

Dodee Frost Crockett vs. **Randy Miller and Gina Kaiser** (In the District Court of Dallas County, Texas; 192nd Judicial District) (1996)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1996)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

James Hylsky and Terri Hylsky vs. **Fruehauf Trailer Corporation**, et. al. (In the Circuit Court Twentieth Judicial Circuit St. Clair County, Illinois) (1996)

In Re: **CSC Industries, Inc.** and In Re: **Copperweld Steel Company** (In the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, Civil Case No. 4:93bk41898) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

Lacerta Enterprises, Inc. dba Frontline Systems, Inc. vs. **Geac Computers, Inc. and Fasfax Corporation** (U.S. District Court for the District of Arizona, Case No. CIV 95-0649 PHX (ROS)) (1995)

Deposition Testimony of Keith R. Ugone, Ph.D.

Bluebonnet Savings Bank, et. al. vs. **Federal Deposit Insurance Corporation**, et. al. (U.S. District Court for the Northern District of Texas, Dallas, Civil Action No. 3:91CV1066) (1995)

Circo Craft Company, Inc. vs. **AMP-AKZO Corporation**, et. al. (Superior Court of the State of California for the County of San Diego, North County District) (1995)

BancTec USA, Inc. vs. **Advanced Financial Solutions**, et. al. (U.S. District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:93CV1277) (1994)

**Ivy Goth** vs. Datsun-Nissan Motor Company, Ltd., et. al. (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1994)

Cybor Corporation vs. **FAS Technologies and FAStar Ltd.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1994)

Texas State Bank, et. al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994; two depositions)

Auto Color Specialists, Inc. and Polly Chen vs. **BASF** (Superior Court of the State of California for the County of Orange, Case No. 677861) (1994)

**Tactical Edge, Inc.** vs. Gall's, Inc. (District Court of the Fourth Judicial District of the State of Idaho in and for the County of Ada) (1994)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

Dominquez vs. **Holy Cross Hospital** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Union Oil Company of California** vs. International Insurance Company, et. al. (Superior Court of the State of California) (1993)

Maranatha Music! vs. **Capital Cities, Inc./ABC, Inc., and Word, Inc.** (U.S. District Court for the Western District of Texas, Waco Division) (1993)

**Villarreal** vs. East Side Union High School District (Superior Court of the State of California) (1993)

Official Committee of Creditors Holding Unsecured Claims on behalf of First Capital Holdings Corporation vs. **Shearson Lehman Brothers Holdings Inc.**, et. al. (U.S. District Court for the Central District of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993; three depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

Holabird Sports Discounters vs. **Tennis Tutor, Inc.** (U.S. District Court for the District of Maryland, Civil Action No. 1:91CV2208) (1992)

Expo-Tech Electrical & Plumbing Services vs. **Greyhound Exposition Services** (1992)

**De Laurentiis Entertainment Group, Inc.** Securities Litigation; **De Laurentiis Film Partners** Securities Litigation (U.S. District Court for the Central District of California) (1991; two depositions)

James T. Ryan vs. **Crowley Towing and Transportation and Shell Oil Company** (Superior Court of the State of California for the County of Los Angeles) (1991)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc., vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

Frank V. and Gloria Lumbert vs. **Robert C. Skinner and Lillian R. Skinner**, et. al. (Superior Court of the State of California for the County of Los Angeles) (1990)

Plaintiff vs. **Valley Hunt Club**, Tournament of Roses, et. al. (Superior Court of the State of California) (1990)

Kippy Thomas vs. **Mary Lendo and Circle K** (Superior Court of the State of California for the County of Riverside) (1990)

**Exhibit 3**

CONFIDENTIAL – COUNSEL ONLY

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| **Legal Documents** | | | |
| Complaint dated February 26, 2020 | | | |
| Microsoft Corporation's Motion to Dismiss Complaint and Incorporated Memorandum of Law dated April 30, 2020 | | | |
| Order Granting in Part Defendant's Motion to Dismiss dated November 23, 2020 | | | |
| Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories to Plaintiff dated October 14, 2020 | | | |
| Plaintiff's First Amended Complaint dated November 13, 2020 | | | |
| Plaintiff's Responses and Objections to Defendant's First Request for Production to Plaintiff dated October 14, 2020 | | | |
| **Patents** | | | |
| U.S. Patent 10,574,628 B2 "Computer Security System and Method Based on User-Intended Final Destination" dated February 25, 2020 | | | |
| **Expert Reports and Associated Documentation** | | | |
| Expert Report of Marcie D. Bour, CPA/ABV, CVA, CFE, MAFF, ABAR, CDBV dated October 1, 2020 | | | |
| **Documents Produced by Microsoft** | | | |
| Footnotes to TocMail Revenue and Unit Pivots, August 2020 | MFST_TOC | 00000001 | 00000002 |
| Product Breakdown Reports | MFST_TOC | 00000003 | 00001066 |
| Microsoft Pivot Tables by Category, January 2015 - June 2020 (MSFT_TOC00001067_CONFIDENTIAL - COUNSEL ONLY.xlsx) | MFST_TOC | 00001067 | 00001067 |
| Microsoft Corporation O365/M365 Commercial Products That Include OATP, US Assigned Units Pivot, June 2020 | MFST_TOC | 00001068 | 00001068 |
| Microsoft Corporation O365/M365 Commercial Products That Include OATP and/or Safe Links, US Adjusted Revenue Pivot, January 2015 - June 2020 | MFST_TOC | 00001069 | 00001069 |
| Microsoft Pivot Table for Revenues, January 2015 – June 2020 (MSFT_TOC00001070_CONFIDENTIAL - COUNSEL ONLY.xlsx) | MFST_TOC | 00001070 | 00001070 |
| Microsoft Summary of Surface with Consumer Licenses, January 2015 – June 2020 | MFST_TOC | 00001071 | 00001071 |
| Microsoft Summary of Consumer Licenses, January 2015 – June 2020 | MFST_TOC | 00001072 | 00001072 |
| Microsoft Pivot Table for Outlook.com, January 2015 – June 2020 (MSFT_TOC00001073_CONFIDENTIAL - COUNSEL ONLY.xlsx) | MFST_TOC | 00001073 | 00001073 |
| Microsoft Pivot Table for Outlook.com, January 2015 – June 2020 | MFST_TOC | 00001074 | 00001074 |
| Microsoft Commercial Seats Safe Links Usage, September 2019 – June 2020 | MFST_TOC | 00001075 | 00001075 |
| **Documents Independently Obtained** | | | |
| "Advanced Outlook.com Security For Office 365 Subscribers."  (https://support.microsoft.com/en-us/office/advanced-outlook-com-security-for-office-365-subscribers-882d2243-eab9-4545-a58a-b36fee4a46e2, viewed on November 10, 2020.) | | | |

CONFIDENTIAL – COUNSEL ONLY

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| "Barracuda Essentials - MSP." (https://baracudamsp.com/essentials-plans/, viewd on December 1, 2020). | | | |
| "Cloud Cybersecurity Services for Email, Data & Web."  (https://www.mimecast.com/, viewed on December 1, 2020). | | | |
| "Company Profile & Executives."  (https://www.wsj.com/market-data/quotes/ZIXI/company-people, viewed on December 1, 2020). | | | |
| "Compare Microsoft 365 and Office 365 offers for nonprofits."  (https://www.microsoft.com/en-us/microsoft-365/nonprofit/office-365-nonprofit-plans-and-pricing?activetab=tab:primaryr2, viewed on November 11, 2020). | | | |
| "Compare Microsoft 365 and Office 365 offers for nonprofits: Small & mid-sized." (https://www.microsoft.com/en-us/microsoft-365/nonprofit/office-365-nonprofit-plansand-pricing?activetab=tab:primaryr1, viewed on November 19, 2020. | | | |
| "Compare Microsoft 365 and Office 365 offers for nonprofits; large non profits." (https://www.microsoft.com/en-us/microsoft-365/nonprofit/office-365-nonprofit-plans-and-pricing? activetab=tab:primaryr2, dated November 6, 2020.) | | | |
| "Compare Office 365 Education Plans." (https://www.microsoft.com/en-us/microsoft-365/academic/compare-office-365-education-plans?activetab=tab:primaryr2, viewed on November 27, 2020.) | | | |
| "Compare Office 365 Government Plans."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-us-government/office-365-us-government, viewed on November 6, 2020.) | | | |
| "Compare Office 365 to Microsoft 365"."  (https://www.microsoft.com/en-us/microsoft-365/enterprise/compare-microsoft-365-and-office-365, viewed on November 20, 2020. | | | |
| "Cybersecurity 500."  (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020). | | | |
| "Cyren Inbox Security for Office 365."  (https://www.cyren.com/products/cyren-inbox-security, viewed on December 1, 2020). | | | |
| "Cyren."  (https://www.crunchbase.com/organization/cyren, viewed on December 1, 2020). | | | |
| "docs.microsoft.com."  (https://docs.microsoft.com/en-us/, viewed on November 17, 2020). | | | |
| "Email Encryption."  (https://zix.com/products/email-encryption, viewed on December 1, 2020). | | | |
| "Email Fraud Defense."  (https://www.proofpoint.com/us/products/email-protection/email-fraud-defense, viewed on December 5, 2020.) | | | |
| "Email Security and Protection."  (https://www.proofpoint.com/us/products/email-protection/email-security-and-protection, viewed on December 5, 2020.) | | | |
| "Email Security Engine."  (https://www.cyren.com/products/email-security-engine, viewed on December 1, 2020.) | | | |
| "Email Security with Targeted Threat Protection."  (https://www.mimecast.com/products/email-security-with-targeted-threat-protection/, viewed on December 1, 2020.) | | | |
| "Email Security, Archiving and Continuity Products."  (https://www.mimecast.com/products/, viewed on December 1, 2020.) | | | |
| "Email Threat Protection."  (https://zix.com/products/email-threat-protection, viewed on December 1, 2020.) | | | |
| "Facts, About Microsoft."  (https://news.microsoft.com/facts-about-microsoft/, viewed on October 19, 2020.) | | | |
| "Find The Right Solution For You."  (https://www.microsoft.com/en-us/microsoft-365/buy/compare-all-microsoft-365-products, viewed on November 6, 2020.) | | | |

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| "Firstline Workers are the backbone of your organization." (https://www.microsoft.com/en-us/microsoft-365/enterprise/firstline#office-SKUChooser-0dbn8nt, viewed on November 27, 2020.) | | | |
| "Get Office 365 Free For Your Entire School."  (https://www.microsoft.com/en-us/microsoft-365/academic/compare-office-365-education-plans?activetab=tab%3aprimaryr1, viewed on November 6, 2020.) | | | |
| "Introducing Office 365 Advanced Threat Protection."  (https://www.microsoft.com/en-us/microsoft-365/blog/2015/04/08/introducing-exchange-online-advanced-threat-protection/, viewed on November 2, 2020.) | | | |
| "Learn About Encrypted Messages In Outlook.com."  (https://support.microsoft.com/en-us/office/learn-about-encrypted-messages-in-outlook-com-3521aa01-77e3-4cfd-8a13-299eb60b1957, viewed on November 10, 2020.) | | | |
| "Microsoft 365 Advanced Protection."(https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7-8efd-740fb289123a, viewed on November 6, 2020) | | | |
| "Microsoft 365 And Office 365 Plan Options."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-plan-options, viewed on November 3, 2020.) | | | |
| "Microsoft 365 And Office 365 Platform Service Description."  (https://docs.microsoft.com/en us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 3, 2020.) | | | |
| "Microsoft 365 E5 Compliance." (https://www.microsoft.com/en-us/microsoft-365/business/e5-compliance?activetab=pivot%3aoverviewtab, viewed on November 11, 2020.) | | | |
| "Microsoft 365 Education."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/microsoft-365-education, viewed on November 6, 2020.) | | | |
| "Microsoft 365 Family." (https://www.microsoft.com/en-us/microsoft-365/p/microsoft-365personal/cfq7ttc0k5bf?activetab=pivot%3aoverviewtab, viewed on November 27, 2020.) | | | |
| "Microsoft 365 For Enterprise Documentation And Resources." (https://docs.microsoft.com/en-us/microsoft-365/enterprise/?view=o365-worldwide, viewed on November 17, 2020.) | | | |
| "Microsoft 365 For Enterprise Overview." (https://docs.microsoft.com/en-us/microsoft-365/enterprise/microsoft-365-overview?view=o365-worldwide, viewed on November 17, 2020.) | | | |
| "Microsoft 365 Personal." (https://www.microsoft.com/en-us/microsoft-365/p/microsoft-365 personal/cfq7ttc0k5bf?activetab=pivot%3aoverviewtab, viewed on November 27, 2020.) | | | |
| "Microsoft Defender For Office 365."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/office-365-atp?view=o365-worldwide#microsoft-defender-for-office-365-plan-1-and-plan-2, viewed on November 6, 2020.) | | | |
| "Microsoft.com."  (https://www.microsoft.com/en-us/, viewed on November 17, 2020.) | | | |
| "Mimecast Opens New North American Headquarters."  (https://www.mimecast.com/resources/press-releases/dates/2013/6/mimecast-opens-new-north-american-headquarters/, viewed on December 1, 2020.) | | | |
| "Mimecast, Switching From Proofpoint Enterprise Email Protection."  (https://www.mimecast.com/content/ switching-from-proofpoint-enterprise-email-protection/, viewed on November 25, 2020.) | | | |
| "Office 365 Advanced Threat Protection (ATP)." (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/office-365-atp?view=o365-worldwide, viewed on November 3, 2020.) | | | |

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|

"Office 365 Advanced Threat Protection Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, viewed on November 6, 2020.)

"Office 365 Government." (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-us-government/office-365-us-government, viewed on November 30, 2020.)

"Office F3."  (https://www.microsoft.com/en-us/microsoft-365/enterprise/office-365-f3?rtc=1&activetab=pivot%3aoverviewtab, viewed on November 6, 2020.)

"Our Company."  (https://www.mimecast.com/company/, viewed on December 1, 2020.)

"Outlook.com Premium Closed To New Subscribers." (https://support.microsoft.com/en-us/office/outlook-com-premium-closed-to-new-subscribers-93934667-4db8-40bd-84b3-fc4823026ddd, viewed on November 6, 2020.

"Powerful Tools To Support Your Enterprise."  (https://www.microsoft.com/en-us/microsoft-365/enterprise/compare-office-365-plans, viewed on November 6, 2020.)

"Proofpoint Products."  (https://www.proofpoint.com/us, viewed on December 5, 2020.)

"Proofpoint Targeted Attack Protection."  (https://www.proofpoint.com/us/products/advanced-threat-protection/targeted-attack-protection, viewed on November 25, 2020.)

"Protect Your OneDrive Files In Personal Vault."  (https://support.microsoft.com/en-us/office/protect-your-onedrive-files-in-personal-vault-6540ef37-e9bf-4121-a773-56f98dce78c4, viewed on November 10, 2020.)

"Ransomware Detection And Recovering Your Files."  (https://support.microsoft.com/en-us/office/ransomware-detection-and-recovering-your-files-0d90ec50-6bfd-40f4-acc7-b8c12c73637f, viewed on November 10, 2020.)

"Reimagine productivity with Microsoft 365 and Microsoft Teams."  (https://www.microsoft.com/en-us/microsoft-365/business/compare-all-microsoft-365-business-products?&activetab=tab:primaryr2, viewed on November 6, 2020.)

"Restore Your OneDrive."  (https://support.microsoft.com/en-us/office/restore-your-onedrive-fa231298-759d-41cf-bcd0-25ac53eb8a15, viewed on November 10, 2020.)

"Safe Links In Microsoft Defender For Office 365."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/atp-safe-links?view=o365-worldwide#how-atp-safe-links-works-with-urls-in-office-documents, viewed on November 6, 2020.)

"Set Up Safe Links Policies In Office 365 ATP."  (https://docs.microsoft.com/en-us/microsoft-365/security/office-365-security/set-up-atp-safe-links-policies?view=o365-worldwide, viewed on November 6, 2020).

"Share OneDrive Files And Folders."  (https://support.microsoft.com/en-us/office/share-onedrive-files-and-folders-9fcc2f7d-de0c-4cec-93b0-a82024800c07, viewed on November 10, 2020.)

"Technical Documentation."  (https://docs.microsoft.com/en-us/documentation/, viewed on November 17, 2020.)

"The Hot 150 Cybersecurity Companies To Watch In 2020."  (https://cybersecurityventures.com/cybersecurity-500-list/, viewed on November 16, 2020.)

"Threat InDepth."  (https://www.cyren.com/products/threat-indepth, viewed on December 1, 2020.)

"Threat Response Auto-Pull."  (https://www.proofpoint.com/us/products/email-protection/threat-response-auto-pull, viewed on December 5, 2020.)

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|

"TocMail."  (https://TocMail.net/#instructions, viewed on November 20, 2020.)

"Transform Your Enterprise With Microsoft 365."  (https://www.microsoft.com/en-us/microsoft-365/compare-microsoft-365-enterprise-plans, viewed on November 6, 2020.)

Barracuda Networks, Inc. SEC Form Ex 99.1 "Thoma Bravo Completes Acquisition of Barracuda," dated February 13, 2018.)

Cornell Law School, "False Advertising" (https://www.law.cornell.edu/wex/false_advertising, viewed on November 13, 2020.)

Cyren Ltd., Inc., SEC Form 20-F for the Fiscal Year Ended December 31, 2017

Cyren Ltd., SEC Form 10-K for the Fiscal Year Ended December 31, 2019

Cyren, Ltd. Weighted Average Cost of Capital, 2020 Q3 by Bloomberg

Johnson and Johnson Vision Care v. 1-800 Contacts Decided July 29, 2002

Microsoft Corporation SEC Form 10-K for the Fiscal Year Ended June 30, 2016

Microsoft Corporation SEC Form 10-K for the Fiscal Year Ended June 30, 2020

Mimecast Limited, SEC Form 10-K for the Fiscal Year Ended March 31, 2020

Mimecast Ltd., Weighted Average Cost of Capital, 2021 Q2 by Bloomberg

Proofpoint, Inc. SEC For 10-K for the Fiscal Year Ended December 31, 2019

Proofpoint, Inc., Weighted Average Cost of Capital, 2020 Q3 by Bloomberg

Zix Corporation, SEC Form 10-K for the Fiscal Year Ended December 31, 2019

# Exhibit 4

CONFIDENTIAL – COUNSEL ONLY

## Summary Of Microsoft Consumer Subscription Products

| | Microsoft 365 Personal | Microsoft 365 Family | Outlook.com Standalone[a] |
|---|---|---|---|
| Former Product Name | Office 365 Personal | Office 365 Home | Outlook Premium |
| Monthly Subscription Price | $6.99 | $9.99 | N/A |
| Advanced Protection (includes Safe Links) ("X") | X | X | X |
| Usage | 1 User | 2 - 6 Users | 1 User |
| Number of Office Applications[b] | 7 | 7 | N/A |
| Number of Application Services[c] | 2 | 3 | N/A |

Notes:

(a) Based upon a discussion with Ms. Kathryn Griffith, I understand Microsoft no longer offers this subscription, but current subscribers are able to renew their Outlook Premium licenses.  All new Outlook.com subscribers from October 2017 to present  are connected with a Microsoft 365 plan.

(b) Mircrosoft Office applications include Word, Excel, PowerPoint, OneNote, Outlook, Access (PC only), and Publisher (PC only).

(c) Microsoft Service applications include OneDrive, Skype, and Family Safety (Family only).

Sources:

[1] "Microsoft 365 Personal."  (https://www.microsoft.com/en-us/microsoft-365/p/microsoft-365-personal/cfq7ttc0k5bf?activetab=pivot%3 aoverviewtab, viewed on November 27, 2020.)

[2] "Microsoft 365 Family."  (https://www.microsoft.com/en-us/microsoft-365/p/microsoft-365-personal/cfq7ttc0k5bf?activetab=pivot %3aoverviewtab, viewed on November 27, 2020.)

[3] "Microsoft 365 Advanced Protection."  (https://support.microsoft.com/en-gb/office/microsoft-365-advanced-protection-82e72640-39be-4dc7 8efd-740fb289123a, viewed on November 6, 2020.)

CONFIDENTIAL – COUNSEL ONLY

## Summary Of Microsoft Commercial Subscription Products

| Product Category | Source | Price Per User Per Month | Included with ATP[a] ("Plan 1" or "Plan 2") | ATP Available as an Add-on ("X") |
|---|---|---|---|---|
| **Business Service Family (Up to 300 Users)** | | | | |
| Microsoft 365 Business Basic (formerly Office 365 Business Essentials | [1], [2], [3] | $5.00 | - | X |
| Microsoft 365 Business Basic (nonprofit)[b] | [4] | Donation | - | X |
| Microsoft 365 Business Standard (formerly Office 365 Business Premium | [1], [2], [3] | $12.50 | - | X |
| Microsoft 365 Business Standard (nonprofit)[b] | | $3.00 | - | X |
| Microsoft 365 Business Premium (Microsoft 365 Business | [1], [2], [3] | $20.00 | Plan 1 | - |
| Microsoft 365 Apps for Business (formerly Office 365 Business | [1], [2], [5] | $8.25 | - | - |
| **Education Service Family (Unlimited Users)** | | | | |
| Office 365 Education A1 (Students) | [3], [6], [7] | Free | - | X |
| Office 365 Education A3 (Students) | [3], [6], [7] | $2.50 | - | X |
| Office 365 Education A5 (Students) | [3], [6], [7] | $6.00 | Plan 2 | - |
| Office 365 Education A1 (teachers/faculty/staff) | [3], [7], [8] | Free | - | X |
| Office 365 Education A3 (teachers/faculty/staff) | [3], [7], [8] | $3.25 | - | X |
| Office 365 Education A5 (teachers/faculty/staff) | [3], [7], [8] | $8.00 | Plan 2 | - |
| Microsoft 365 Education A1 | [7] | N/A | - | X |
| Microsoft 365 Education A3 | [7] | N/A | - | X |
| Microsoft 365 Education A5 | [7] | N/A | Plan 2 | - |
| Microsoft 365 Enterprise A5 Compliance | [13], [14] | N/A | Plan 2 | - |
| **Enterprise Service Family (Unlimited Users)** | | | | |
| Office 365 Enterprise F3 | [3], [9] | $4.00 | - | X |
| Office 365 Enterprise E1 | [3], [10] | $8.00 | - | X |
| Office 365 Enterprise E1 (nonprofit)[b] | [11] | Donation | - | X |
| Office 365 Enterprise E3 | [3], [10] | $20.00 | - | X |
| Office 365 Enterprise E3 (nonprofit)[b] | [11] | $4.50 | - | X |
| Office 365 Enterprise E5 | [3], [10] | $35.00 | Plan 2 | - |
| Office 365 Enterprise E5 (nonprofit)[b] | [11] | $14.00 | Plan 2 | - |
| Microsoft 365 Apps for Enterprise (formerly Office 365 ProPlus) | [1], [3], [5] | $12.00 | - | - |
| Microsoft 365 Enterprise F1 | [9] | $4.00 | - | X |
| Microsoft 365 Enterprise F3 | [12] | $10.00 | - | X |

## Summary Of Microsoft Commercial Subscription Products

| Product Category | Source | Price Per User Per Month | Included with ATP[a] ("Plan 1" or "Plan 2") | ATP Available as an Add-on ("X") |
|---|---|---|---|---|
| Microsoft 365 Enterprise E3 | [12] | $32.00 | - | X |
| Microsoft 365 Enterprise E5 | [12] | $57.00 | Plan 2 | - |
| Microsoft 365 Enterprise E5 Compliance | [13]. [14] | $10.00 | Plan 2 | - |
| **Government Service Family (Unlimited Users)** | | | | |
| Office 365 Government G1 | [15] | N/A | - | X |
| Office 365 Government G3 | [15] | N/A | - | X |
| Office 365 Government F3 | [15] | N/A | - | X |
| Office 365 Government G5 | [15] | N/A | Plan 2 | - |

Notes:

(a) According to Microsoft and based upon a discussion with Ms. Kathryn Griffith, the Microsoft 365 Business Premium plan is the only subscription included with ATP Plan 1.  I understand all other subscriptions included with ATP correspond with ATP Plan 2.  ("Office 365 Advanced Threat Protection Service Description." (https://docs.microsoft.com/enus/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.))

(b) According to Microsoft, organizations that qualify for Microsoft 365 and Office 365 plans for nonprofits include exactly the same features as the corresponding business plans.  ("Microsoft 365 And Office 365 Platform Service Description."  (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 6, 2020.))

CONFIDENTIAL – COUNSEL ONLY

## Summary Of Microsoft Commercial Subscription Products

Sources:

[1] "Microsoft 365 And Office 365 Plan Options." (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-plan-options, viewed on November 20, 2020.)

[2] "Reimagine Productivity With Microsoft 365 And Microsoft Teams." (https://www.microsoft.com/en-us/ microsoft-365/business/compare-all-microsoft-365-business-products?&activetab=tab:primaryr2, viewed on November 6, 2020.)

[3] "Office 365 Advanced Threat Protection Service Description." (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-advanced-threat-protection-service-description#feature-availability-across-advanced-threat-protection-atp-plans, November 6, 2020.)

[4] "Compare Microsoft 365 and Office 365 offers for nonprofits: Small & mid-sized." (https://www.microsoft.com/en-us/microsoft-365/nonprofit/office-365-nonprofit-plans-and-pricing?activetab=tab:primaryr1, viewed on November 19, 2020.)

[5] "Microsoft 365 And Office 365 Platform Service Description." (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-platform-service-description, viewed on November 6, 2020.)

[6] "Get Office 365 Free For Your Entire School." (https://www.microsoft.com/en-us/microsoft-365/academic/compare-office-365-education-plans?active tab=tab%3aprimaryr1, viewed on November 6, 2020.)

[7] "Microsoft 365 Education." (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/microsoft-365-education, viewed on November 6, 2020.)

[8] "Compare Office 365 Education Plans." (https://www.microsoft.com/en-us/microsoft-365/academic/compare-office-365-education-plans?activetab=tab:primaryr2, viewed on November 27, 2020.)

[9] "Firstline Workers are the backbone of your organization." (https://www.microsoft.com/en-us/microsoft-365/enterprise/firstline#office-SKUChooser-0dbn8nt, viewed on November 27, 2020.)

[10]   "Powerful tools to support your enterprise." (https://www.microsoft.com/en-us/microsoft-365/enterprise/compare-office-365-plans, viewed on November 6, 2020.)

[11]   "Compare Microsoft 365 and Office 365 offers for nonprofits; large non profits." (https://www.microsoft.com/en-us/microsoft-365/nonprofit/office-365-nonprofit-plans-and-pricing?%20activetab=tab%3aprimaryr2&activetab=tab:primaryr2, viewed on November 6, 2020.)

[12]   "Transform Your Enterprise With Microsoft 365." (https://www.microsoft.com/en-us/microsoft-365/compare-microsoft-365-enterprise-plans, viewed on November 6, 2020.)

[13]   "Microsoft 365 E5 Compliance." (https://www.microsoft.com/en-us/microsoft-365/business/e5-compliance?activetab=pivot%3aoverviewtab, viewed on November 11, 2020.)

[14]   Based upon a discussion with Ms. Kathryn Griffith.

[15]   "Office 365 Government." (https://docs.microsoft.com/en-us/office365/servicedescriptions/office-365-platform-service-description/office-365-us-government/office-365-us-government, viewed on November 30, 2020.)

# Exhibit 5

CONFIDENTIAL – COUNSEL ONLY

**[REDACTED]**

# Exhibit 6

CONFIDENTIAL – COUNSEL ONLY

**[REDACTED]**

# Exhibit 7

CONFIDENTIAL – COUNSEL ONLY

**Companies In the Email Security Sector**
**With Publicly Available Financial Information[a]**

| | Company | Cyber Security Sector[b] | Annual Earnings (Most Recent) | Most Recent Year | | 5 Previous Years | |
|---|---|---|---|---|---|---|---|
| | | | | Gross Margin | Net Margin | Gross Margin | Net Margin |
| 1 | ProofPoint, Inc. | Security-as-a-Service | $888,190,000 | *76.3%* | *-14.7%* | *74.9%* | *-18.0%* |
| 2 | Mimecast, Limited ("Mimecast") | Email Security | $426,963,000 | *74.4%* | *0.0%* | *73.3%* | *-2.1%* |
| 3 | Barracuda Networks, Inc. ("Barracuda") | Email, App, Data & Cloud Security | $352,649,000 | *76.2%* | *2.9%* | *77.5%* | *-5.4%* |
| 4 | Cyren, Inc. ("Cyren") | Web, Email & Mobile Security | $38,391,000 | *59.5%* | *-46.9%* | *62.8%* | *-39.1%* |
| 5 | Zix Corporation ("ZixCorp") | Email Encryption & Security Solutions | $173,428,000 | *55.7%* | *-8.4%* | *70.6%* | *0.8%* |

Notes:

(a) Barracuda, Cyren, Mimecast, and ZixCorp are included in CyberCrime Magazine's list of top cybersecurity companies in the industry.  CyberCrime Magazine provides a description of the security sector associated with each company.  I evaluated each company on the list that (a) contained "email" in its security sector description and (b) had publicly available financial information.  I understand CyberCrime Magazine's "Cybersecurity 500" list was recently replaced by its "Hot 150" list.  It is noted that all companies above can be found on either CyberCrime Magazine's "Hot 150" or "Cybersecurity 500" list. Those companies that contain "email" in their cybersecurity sector description but do not have publicly available financial information include Agari Data, Inc., Avanan Inc., GreatHorn Inc., and Vali Mail Inc.

(b) I understand Proofpoint does not contain "email"  in its cybersecurity sector desciption as identified in CyberMagazine's 500 and Hot 150 lists.  In the Amended Complaint dated November 13, 2020, TocMail identified Proofpoint (as well as Mimecast) as a seller of cloud-based, time-of-click, redirect services.  As such, Proofpoint's profitability is evaluated above.

Sources:

[1] *See*  supporting schedule: "Email Security Sector Company Financials: Most Recent 5 Years."
[2] "Cybersecurity 500." (https://cybersecurityventures.com/cybersecurity-500/, viewed on November 9, 2020.)
[3] "The Hot 150 Cybersecurity Companies To Watch In 2020."  (https://cybersecurityventures.com/cybersecurity-500-list/, viewed on November 16, 2020.)
[4] Amended Complaint, p. 23.

CONFIDENTIAL – COUNSEL ONLY

| Email Security Sector Company Financials<br>Most Recent 5 Years | | | | | |
|---|---|---|---|---|---|

| Fiscal Year | Proofpoint | Mimecast | Barracuda Networks[a] | Cyren | ZixCorp |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| 5th Most Recent | $265,397,000 | $141,841,000 | $198,931,000 | $27,762,000 | $54,713,000 |
| 4th Most Recent | $378,337,000 | $186,563,000 | $233,787,000 | $30,983,000 | $60,144,000 |
| 3rd Most Recent | $519,681,000 | $261,897,000 | $277,446,000 | $30,799,000 | $65,663,000 |
| 2nd Most Recent | $716,994,000 | $340,377,000 | $320,158,000 | $35,900,000 | $70,478,000 |
| Most Recent | $888,190,000 | $426,963,000 | $352,649,000 | $38,391,000 | $173,428,000 |
| **Total** | **$2,768,599,000** | **$1,357,641,000** | **$1,382,971,000** | **$163,835,000** | **$424,426,000** |
| | | | | | |
| **Cost of Revenues** | | | | | |
| 5th Most Recent | $84,058,000 | $41,809,000 | $45,088,000 | $8,866,000 | $9,593,000 |
| 4th Most Recent | $108,593,000 | $50,314,000 | $53,768,000 | $10,042,000 | $10,533,000 |
| 3rd Most Recent | $143,378,000 | $69,699,000 | $58,667,000 | $11,899,000 | $12,602,000 |
| 2nd Most Recent | $201,761,000 | $90,874,000 | $70,132,000 | $14,540,000 | $15,186,000 |
| Most Recent | $236,214,000 | $109,382,000 | $83,772,000 | $15,557,000 | $76,908,000 |
| **Total** | **$774,004,000** | **$362,078,000** | **$311,427,000** | **$60,904,000** | **$124,822,000** |
| | | | | | |
| **Gross Margin** | | | | | |
| 5th Most Recent | *72.1%* | *70.5%* | *77.3%* | *68.1%* | *82.5%* |
| 4th Most Recent | *74.2%* | *73.0%* | *77.0%* | *67.6%* | *82.5%* |
| 3rd Most Recent | *75.1%* | *73.4%* | *78.9%* | *61.4%* | *80.8%* |
| 2nd Most Recent | *74.4%* | *73.3%* | *78.1%* | *59.5%* | *78.5%* |
| Most Recent | *76.3%* | *74.4%* | *76.2%* | *59.5%* | *55.7%* |
| **Wgt. Avg.** | ***74.9%*** | ***73.3%*** | ***77.5%*** | ***62.8%*** | ***70.6%*** |

CONFIDENTIAL – COUNSEL ONLY

**Email Security Sector Company Financials**
**Most Recent 5 Years**

| Fiscal Year | Proofpoint | Mimecast | Barracuda Networks[a] | Cyren | ZixCorp |
|---|---|---|---|---|---|
| **Net Profit / Loss** | | | | | |
| 5th Most Recent | $(98,712,000) | $(3,244,000) | $(8,185,000) | $(4,799,000) | $5,016,000 |
| 4th Most Recent | $(96,487,000) | $(5,441,000) | $(4,387,000) | $(6,213,000) | $5,837,000 |
| 3rd Most Recent | $(69,802,000) | $(12,386,000) | $(67,498,000) | $(15,648,000) | $(8,057,000) |
| 2nd Most Recent | $(103,749,000) | $(7,001,000) | $(4,422,000) | $(19,414,000) | $15,444,000 |
| Most Recent | $(130,265,000) | $(2,200) | $10,235,000 | $(18,018,000) | $(14,647,000) |
| **Total** | **$(499,015,000)** | **$(28,074,200)** | **$(74,257,000)** | **$(64,092,000)** | **$3,593,000** |
| | | | | | |
| **Net Margin** | | | | | |
| 5th Most Recent | *-37.2%* | *-2.3%* | *-4.1%* | *-17.3%* | *9.2%* |
| 4th Most Recent | *-25.5%* | *-2.9%* | *-1.9%* | *-20.1%* | *9.7%* |
| 3rd Most Recent | *-13.4%* | *-4.7%* | *-24.3%* | *-50.8%* | *-12.3%* |
| 2nd Most Recent | *-14.5%* | *-2.1%* | *-1.4%* | *-54.1%* | *21.9%* |
| Most Recent | *-14.7%* | *0.0%* | *2.9%* | *-46.9%* | *-8.4%* |
| **Total** | ***-18.0%*** | ***-2.1%*** | ***-5.4%*** | ***-39.1%*** | ***0.8%*** |

Note:

(a) I understand Barracuda Networks was acquired by Thoma Bravo, LLC on February 13, 2018.  Given the acquisition, I evaluated publicly available financial information for Barracuda Networks during the March 1, 2012 - February 28, 2017 time period (i.e., FY 2013 - FY 2017). (Barracuda Networks, Inc. SEC Form Ex 99.1 "Thoma Brava Completes Acquisition of Barracuda," dated February 13, 2018.)

Sources:

[1] Proofpoint, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 33.

[2] Mimecast Limited, SEC Form 10-K for the fiscal year ended March 31, 2020, p. 36.

[3] Barracuda Networks, Inc., SEC Form 10-K for the fiscal year ended February 28, 2017, p. 42.

[4] Cyren Ltd., Inc., SEC Form 10-K for the fiscal year ended December 31, 2019, p. 38.

[5] Cyren Ltd., Inc., SEC Form 20-F for the fiscal year ended December 31, 2017, p. 37.

[6] Zix Corporation, SEC Form 10-K for the fiscal year ended December 31, 2019, p. 29.

# Exhibit 8

CONFIDENTIAL – COUNSEL ONLY

**[REDACTED]**

# Exhibit 9

CONFIDENTIAL – COUNSEL ONLY

**[REDACTED]**