# Exhibit 22

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                   CASE NO. 0:20-CV-60416-AMC
 3
 4    TOCMAIL INC., a Florida
      corporation,
 5
                Plaintiff,
 6
      vs.
 7
      MICROSOFT CORPORATION, a
 8    Washington corporation,
 9              Defendant.
10    _____/
11
                                    March 18, 2021
12                                  10:10 a.m. - 4:40 p.m. EDT
13
14
15
16        VIDEOTAPED DEPOSITION OF MICHAEL WOOD
17           TAKEN VIA ZOOM TELECONFERENCE
18
19      Taken on behalf of the Defendant before
20    Alice J. Teslicko, RMR, Notary Public in and for the
21    State of Florida at Large, pursuant to a Rule 30(b)(6)
22    Notice of Taking Deposition in the above cause.
23
24
25
                                               Page 1
```

```
 1   15 percent, somewhere around there, maybe 20 percent.
 2           I tend to give all my money away, which is
 3   why --
 4       Q   A hundred million from your other license?
 5       A   That is correct.
 6       Q   But let's not conflate --
 7       A   It's not conflating.  You asked me basically
 8   would I be sharing the money with the consumer and
 9   yes -- oh, I'm sorry, I misunderstood your question.
10       Q   No, I think you soft-balled the question
11   back to yourself in a way so you could virtue signal,
12   so let me go back.
13           What you said before was, you were asking
14   because of the harm done to many consumers, you were
15   asking Microsoft or you were asking the jury to award
16   damages against Microsoft that were somewhere in the
17   single to double billions; did I get that right?
18       A   Yes, that part is correct.
19       Q   And you're asking that the jury award that
20   to TocMail, correct?
21       A   Yes, because TocMail is the one with
22   standing, that is correct.
23       Q   Let me ask you about your position that
24   TocMail has.  You claim that Microsoft has kept
25   TocMail from entering the market with these allegedly
```

Page 62

```
 1   false statements.  What efforts have you made to
 2   attempt to enter the market?
 3        A    Well, we placed enough advertisements to
 4   have tens of thousands of visitors and so all the
 5   visitors who are coming to the site have an interest
 6   in stopping cloaking -- I'm sorry, in stopping
 7   phishing.
 8             Our advertising is specifically -- excuse
 9   me, my mouth is dry -- is specifically designed to
10   attract those who are interested in stopping phishing,
11   and so the dilemma that I have with this particular
12   company is we have tens of thousands of people highly
13   motivated to stop phishing, highly motivated because
14   it is the thing that keeps security professionals up
15   at night.
16             So they're very motivated to stop phishing,
17   but they don't have any inclination to stop cloaking,
18   which is the reason to stop the phishing.
19        Q    Who is "they"?
20        A    The visitors to the website.
21        Q    The visitors to your website?
22        A    The visitors to my website, yes.
23             Maybe I did not explain well.  We have
24   advertised specifically targeting people who are
25   interested in preventing phishing and stopping it.
```

Page 63

1  distinct, if you can go to that spot.
2          Okay, yep, you got it.  Go right above the
3  whitelisting area.
4          Okay, so now go up a little bit, because I'm
5  sure I'm introducing the topic of those.  Those are
6  the different ways, including ways to use IP cloaking
7  to bypass Safe Links with a hundred percent efficacy.
8          Oh, there we go.  Okay, that's good.
9          "So it's important to note that at present,
10 hackers don't need to use any of the following tricks
11 of the trade to evade Safe Links a hundred percent of
12 the time, given that Safe Links currently uses
13 publicly known IP addresses.  Nevertheless, this
14 section is important because it documents that Safe
15 Links can't solve its IP cloaking simply by trying to
16 use numerous, secret, constantly changing,
17 geographically dispersed IP addresses."
18         Then all the next section, it shows exactly
19 how hackers can still bypass Safe Links a hundred
20 percent of the time without knowing a single IP
21 address of the security service.
22    Q    So in your report and as part of the opinion
23 that you gave us, you were clear that the known IP
24 addresses and the fact that your contention is that
25 Microsoft -- and we were at page 41 of your report,

Page 74

```
 1   which I was asking you to comment on -- publishes the
 2   IP addresses for EOP, that that automatically left the
 3   EOP and Safe Links, in your words, "defenseless"?
 4        A    As I wrote --
 5        Q    Excuse me, sir.  You say here:  "Hackers
 6   frequently IP cloak links to bypass EOP by knowing the
 7   IP addresses from which it operates," true?
 8        A    For as long as Safe Links use and uses
 9   public IP addresses, that is indeed the way the
10   hackers will bypass it.  The moment it changes, it
11   will be the other methods disclosed in my report.
12        Q    So I want to go to your -- to talk a little
13   more about your background and other things you do.
14             If we could have Tab Seven, please,
15   Ms. Hymel, which is TocMail 5539.
16             (Whereupon a document/item was marked for
17        identification as Defendant's Exhibit 2.)
18             Are you familiar with a website called
19   Freelancer.com?
20        A    I am familiar with that website.
21        Q    Okay.  This is something you've used
22   previously, right?
23        A    Have I ever bid on a job, no.  Have I
24   perused it, yeah.  Yes, I've used it in the sense that
25   I've looked at exactly the type of things that you're
```

Page 75

```
 1    of IP cloaking in 2017.  Cryptron Security tried in
 2    2018, Hector Monsegur, Rhino Security Labs tried to
 3    let the world know in 2019.
 4            I knew from the day we opened our doors the
 5    challenge we were going to have because of three years
 6    worth of efforts from others, and that Hector Monsegur
 7    could not get the world to understand that this is why
 8    they're getting phished.  I knew we were going to have
 9    the exact same issue.
10            So that's where the educated part comes in.
11    I knew -- if you're trying to establish did we know
12    from day one that we're going to have to deal with
13    Microsoft to set the record straight from day one?
14    Yes, a hundred percent, yes.
15       Q    I'm not trying to establish anything.
16    You understand there's such a thing as a consumer
17    survey?  Have you ever heard of that?
18       A    Oh, I've had great success with surveys in
19    the past.  The only time I have an issue is with this
20    false advertising case.  I've done surveys, a hundred
21    percent.
22       Q    I'm going to put this in a context that is
23    a little more of a lay person's context.
24            I have a website, my firm has a website.  It
25    describes our capabilities and our skills.  It
```

Page 90

```
 1   describes my personal capabilities and skills.
 2              I think I'm a decent lawyer.  I do not
 3   automatically assume that if someone doesn't choose me
 4   for a case, it's because they just don't know how
 5   great I am or this other lawyer is saying he or she
 6   can promise things that I can't deliver.  I actually
 7   do research to try to find out what things may or may
 8   not be appealing about me or my practice.
 9              So is it your testimony -- and let me get
10   this cleanly -- in the 10,000 people that you believe
11   visited your website, do you make room for the
12   possibility that even one of them just said, "You
13   know, I don't like the looks of this product and it
14   doesn't have any reputation and I'm not spending my
15   money on it"?
16              Is that possible?
17              MR. MARTIN:  Objection to form.
18   BY MS. LOVETT:
19        Q     You can answer.
20        A     I'd be happy to, because I've never said
21   that the whole 10,000 have that view who visited the
22   site.
23              First of all, the reason that we chose
24   Roundcube is because Roundcube is used by, to the best
25   of my knowledge, over 5 million people and so we knew
```

Page 91

```
 1   that Roundcube has all the features that anyone wants.
 2   It has plug-ins for all the features that anyone
 3   wants.
 4              The only thing that we're providing as far
 5   as the look and feel, the features, the functionality,
 6   all of that is Roundcube, not us, and we know how much
 7   the industry does enjoy using Roundcube.  The only
 8   thing that we provide is the anti-phishing component.
 9              So therefore, if they're rejecting anything
10   en masse -- of course there's going to be people that
11   say "I don't like Roundcube," of course.  But if
12   they're rejecting anything en masse, it's the one
13   thing we are doing.  If we were doing a hundred
14   things, I'd have to do a survey, oh, my goodness,
15   which of the hundred things are you rejecting.
16              If we're doing the one thing, I know the one
17   thing that they're rejecting, which is stopping the
18   cloaking, that they don't see a value in stopping
19   cloaking.
20              If they did -- again, it's not the features.
21   That would be en masse.  Of course there would be some
22   people that say "I don't like the Roundcube
23   implementation," but to say that all 10,000 say it's
24   the Roundcube part of it, that's equally ridiculous.
25         Q    Sir, the word "Roundcube" never came out of
```

1  my mouth.  What I asked you was, is it your testimony
2  to this jury that without talking to a soul, you
3  believe all 10,000 people that came to your website
4  and rejected purchasing TocMail did so and the only
5  reason they did so was because they already have
6  Office 365 and didn't think they needed your plug-in?
7       A    That's absolutely not my testimony.  I'll
8  repeat, were there some people who visited the website
9  and chose for other reasons, yes.  But did all of them
10 choose to reject our cloaking solution, then you go to
11 the opposite, of course not.
12           So of course not, not all of them rejected
13 for that reason, but also of course not, that there
14 would be some people in there who rejected just
15 because they believed that they already have the
16 protection.
17      Q    But sir, there are ways to prove these
18 things.  You understand you have the burden of proof
19 in this case.  You understand as a plaintiff that's
20 your burden, right?
21      A    I do understand that.
22      Q    So we can't sit here and you can't say to
23 the jury "here's why I think the 10,000 people didn't
24 come aboard."  You have to present evidence for that.
25 You have to have spoken to someone.  You have to have

1  gotten somebody on the record.
2          Do you have anybody on the record saying,
3  "Hey, Michael, great product.  I'm not going to buy
4  TocMail because X"?  Do you have a single person that
5  did that?
6          MR. MARTIN:  Objection to form.
7      A   Well, also, I think the law is different
8  than what you said.  At least to my knowledge, which
9  is --
10     Q   I'm going to let me do the law.  But go
11 ahead, tell me the law.
12     A   That if we are going to court for a
13 misleading advertisement, we must have the consumer
14 surveys.  If we are going to court where something is
15 literally false, which is the case with your ads, then
16 it is presumed that people were deceived.
17         So therefore, with that being in mind, that
18 also -- just as the Court recognizes that if you have
19 a widespread advertisement that is literally false,
20 there will be people deceived.  That's not something
21 you need to prove.  That's just a given.
22         You might call that an educated guess, but
23 it's still the law and it's an educated deduction.
24 That literal falsity leads to deception.
25     Q   Sir, are you reading from something right

Page 94

```
 1   now?
 2        A    No, I am not.
 3        Q    Do you have any documents, notes, paperwork
 4   in front of you?
 5        A    No, I'd be happy to move my camera around if
 6   you'd like to see.
 7        Q    I trust your word.  What I'm asking you
 8   is --
 9        A    I do move my eyes around when I speak.  My
10   friends get so angry with me about that.  They say
11   "look at me when I speak."  I think I am.
12             So no, that's just me.
13        Q    You understand that the question of literal
14   falsity is a question for the jury to determine?
15        A    I do.
16        Q    You understand the question of damages is a
17   question for the jury to determine?
18        A    I do.
19        Q    And you have taken the position in this case
20   that based on your placement and press release, that
21   all the people that came to your website were simply
22   "not interested" in preventing IP cloaking?
23        A    I have repeatedly said that I am not saying
24   everyone who visited the website, and you keep
25   repeatedly saying that I'm saying the opposite, when
```

Page 95

```
 1   I'm not.
 2        Q    I'm just saying -- but you can't quantify
 3   the number of people that came there and did one thing
 4   or the other, right?
 5        A    Well, that is correct, sure.
 6        Q    You didn't have any interaction with anyone?
 7        A    I haven't had any interaction --
 8        Q    You haven't had any interaction with any of
 9   the people who you claim came to your website and then
10   chose not to buy TocMail?
11        A    That is correct.
12        Q    So do you advertise your product on your
13   website?
14        A    Do I advertise my product -- yes, I present
15   the product in a way that I hope that someone will
16   buy, if that's what you mean, sure.
17             MS. LOVETT:  Can we go to, Rachel, 9685.
18        Just down at the bottom of the first page, I
19        think.  This will be Exhibit 2 (sic).
20             (Whereupon a document/item was marked for
21        identification as Defendant's Exhibit 6.)
22        Q    You recognize this logo and this face page?
23   We can blow it up if you need us to.
24        A    That's fine.  I don't know if that's the
25   current version, but that was the website at one
```

Page 96

```
 1   examples from you.
 2           But that's your testimony, is your work is
 3   done in terms of you don't need to adjust anything to
 4   TocMail based on what criminal hackers may be doing a
 5   hundred years from now?
 6       A    For email phishing links, that is correct,
 7   which is the subject of this litigation.
 8           MS. LOVETT:  Okay.  So let's go to -- sorry,
 9       this last exhibit would have been Exhibit 9, I
10       believe.  Is that correct, Ms. Teslicko?
11           THE COURT REPORTER:  I believe so.
12           MS. LOVETT:  So we're going to go to TocMail
13       6484, which will be -- actually, sorry, Rachel,
14       6367, which will be Exhibit 9 (sic) and if you
15       can blow that up for me, please.
16           (Whereupon a document/item was marked for
17       identification as Defendant's Exhibit 15.)
18   BY MS. LOVETT:
19       Q    So this is an email from you to Mr. Serrano,
20   who you mentioned before.
21       A    That is correct.
22       Q    You say:  "Here's the sample email that we
23   will send to investors tomorrow.  Please give me your
24   feedback by end of today."
25           Do you see that?
```

Page 140

```
 1       A    Yes, and I remember the email.
 2       Q    So this was an email that you sent that was
 3  focused on data breaches and cost companies
 4  $1.2 trillion.  Do you see that?
 5       A    I do, and that was linking to the pitch deck
 6  that I referred to earlier.
 7            MS. LOVETT:  Okay.  So give me one second,
 8       because I have a seemingly child and he doesn't
 9       appear to know that I am on -- I don't know if
10       you guys can hear him, but I can hear him.  So
11       give me one second, because I need to get him to
12       be quiet.  One second.
13            (Discussion off the record.)
14  BY MS. LOVETT:
15       Q    So looking at this email, Mr. Serrano was
16  your friend of many years and your business partner in
17  certain issues, correct?
18       A    He's a shareholder.  I wouldn't call him a
19  business partner.  He doesn't understand technologies.
20  So I want to be careful of that word.  He's not a very
21  technical person.
22       Q    Okay.  Well, and I guess that's why the
23  pitch deck, what you tell folks is important.
24            You asked for his feedback here.  As part of
25  what you sent with the pitch deck you say:
```

```
 1              So my question for you is, if corrective
 2    advertising works and you say you can be a dominant
 3    player in three years, then you don't have 15 years of
 4    go-forward damages, would you?
 5              MR. MARTIN:  Objection to form.  I'm sorry,
 6         objection to form.
 7         A    And that's why we have decided
 8    internally that we are only going to be seeking --
 9    prior to us determining -- first of all, the
10    corrective advertising will be different than the way
11    you described, so let me quickly get that.
12              Corrective advertising for us isn't a
13    cessation of the current advertising.  It's coming
14    clean as to what the real situation is.  We put on
15    notice that the $15 billion -- and we told Ms. Bour to
16    make sure she includes annual numbers so that if we
17    come up after ESI, after -- if we can come up with a
18    way that there can be corrective advertising, meaning
19    that there's language that we can all agree, not
20    something that can be wiggled out of, but corrective
21    advertising that says we acknowledge that Safe Links
22    does not provide this capability, hasn't provided this
23    capability, etc., that we would not pursue 15 years of
24    damages, but three years of damages, plus the
25    corrective advertising.
```

Page 145

```
 1        A    The test users for personal accounts, no
 2   test user from a business account.
 3        Q    So did you feel as though -- let me ask you
 4   this.  Did you use any service to place your Google
 5   ads or did you rely on your own expertise to target
 6   the Google ads?
 7        A    I used my own -- well, neither.  The Google
 8   bot automatically --
 9        Q    Right.
10        A    So I wrote the ad and then the bot decided
11   where.  I didn't get very -- I chose the key words,
12   the key themes I think they do now.  They're not so
13   much the ad words.
14        Q    And despite that, you haven't had a single
15   business consumer subscribe to the TocMail service?
16        A    That's correct.  We know the business
17   consumer wants to stop phishing and they have not seen
18   cloaking as an issue.
19        Q    You are assuming the reason that no business
20   consumers have signed up for your service, as you
21   testified earlier -- no business consumer has reached
22   out to you and said, "Gee, I would really like to
23   subscribe to your service, but I just don't think we
24   need it."  You have not had one interaction like that?
25        A    That is exactly my point, is that there
```

Page 183

```
 1   isn't even enough interest to say "hey, if you add in
 2   this feature, we'd love to go," which has happened in
 3   all the other businesses I've been in.
 4           There's just no -- I mean, just a complete
 5   radio silence regarding the issue of cloaking.  It's
 6   remarkable.
 7       Q   Mr. Wood, do you make room for the
 8   possibility that there are folks who simply aren't
 9   interested in your product?
10       A   I do make room that there are folks who
11   would not be interested in our product, but not those
12   who are desperately looking for a solution to phishing
13   links, because the product does indeed solve that
14   problem.
15       Q   So let's go ahead and pull up -- Rachel, you
16   may have to blow this up a little bit.
17           I'll represent for you, sir, this is the
18   impressions page.  That's something, as you mentioned,
19   that you gave us.  That tells us whether or not
20   anybody saw or interacted with your press release.
21           Rach, can we blow that chart up a little
22   bit.  I want the witness to be able to see it.  I have
23   a hard copy, but that's not really fair.
24           Can you read that all right, Mr. Wood, or do
25   we need to make it a little bit bigger?
```