# Exhibit 27

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                  CASE NO. 0:20-CV-60416-AMC
 3

 4     TOCMAIL INC., a Florida
       corporation,
 5
                   Plaintiff,
 6
       vs.
 7

       MICROSOFT CORPORATION, a
 8     Washington corporation,
 9                 Defendant.
10     _____/
11
                            March 15, 2021
12                          9:08 a.m. - 2 p.m. EST
13

14
            VIDEOTAPED DEPOSITION OF MARCIE BOUR
15
              TAKEN VIA ZOOM TELECONFERENCE
16

17
18        Taken on behalf of the Defendant before
19     Alice J. Teslicko, RMR, Notary Public in and for the
20     State of Florida at Large, pursuant to a Notice of
21     Taking Deposition in the above cause.
22

23

24

25
                                              Page 1
```

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    ███    ████    ██████████████████

██    ███████████████

██    █████████    ████████████

██    █████████

██    ██    ████████████.

6        A    I put forth -- yes, I put forth the revenue.

7    The revenue as indicated in the Microsoft documents is

8    $7,265,467,519.

9            Should the jury deem appropriate a global

10   number, I also provided a global number, an estimate

11   of the global number based on the information

12   available, and that is approximately -- well, it is

13   $14,181,000,000, roughly.

14       Q    Of the revenue based solely on the sale

15   of Safe Links; is that correct?

16       A    On the revenue associated with the products

17   that are sold with Safe Link or Safe Links,

18   Incorporated in the product.

19       Q    So for example, if I bought Microsoft

20   OneNote, which many offices use or if I brought

21   Microsoft OneDrive, which many offices use or Dynamics

22   AX, which many offices use, if I bought any those, you

23   would include the profit that Microsoft made from

24   those entities based solely on one threat function,

25   which is Safe Links, right?

Page 20

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1          MR. MARTIN:  Objection to form.

2      A    If those products were sold with Safe Links,

3  Incorporated in as part of, for lack of a better term,

4  the bundle, then yes.

5      Q    All right.  So you are telling the jury that

6  you think it's fair to attribute the entire value of

7  all those sets of software to the functionality of

8  Safe Links, correct?

9      A    No.  I have calculated the revenue

10  associated with that and it is up to the jury to make

11  that decision.

12      Q    I understand that, but you're an expert and

13  you're guiding the jury.  So they don't have access to

14  all this information.

15          I'm asking you -- I'm looking at your lost

16  profits calculation and it is $15,303,000,000 and

17  change.  That's what you're saying that if the jury

18  accepts the lost profits calculation, Mr. Wood should

19  be awarded $15,303,000,000 and change?

20          MR. MARTIN:  Objection to form.

21      A    Actually, that number was changed.

22      Q    Oh, my goodness, do tell.

23      A    After my report was prepared very early on

24  in the discovery process and based on the information

25  that was able to be obtained through discovery, at

Page 21

```
 1   this point in time I have removed the lost profits
 2   related to the consumer seats included in the TocMail
 3   lost profits.  That has been done for purposes, like I
 4   said, because of the discovery that has been produced
 5   or the discovery that -- what has not been produced in
 6   discovery.
 7           Sufficient information has not been obtained
 8   to quantify the consumer seats, so for purposes right
 9   now of lost profits, that portion has been removed.
10       Q    Okay, I'm confused.  So are you saying --
11   I'm trying to look at your total lost profits damages.
12       A    Yes.
13       Q    Which is behind -- it's at the end of your
14   report.  Is there no lost profits damages or are you
15   telling me I can get rid of that whole chart?
16       A    No, the lost profits damages has been
17   reduced and the portion related to consumer sales has
18   been for purposes of my calculation today not
19   included.
20       Q    Since I don't know your calculation today,
21   would you kindly tell me what you now believe to be
22   the proper number to be in lost profits damages,
23   excluding consumer seats?
24       A    $9,534 -- I mean, $9,534,500 -- I apologize.
25   $9,537,453,935.
```

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1          Q      $9,537,453; is that right?

2          A      $9,537,453,935.

3          Q      Got it, all right.  I just want -- let me

4     get back to that.

5                 Are there any other numbers or calculations

6     that have changed in your report, since that's what I

7     had to prepare for your deposition?

8          A      That calculation changed.

9          Q      Any others?

10         A      No.

11         Q      All right.  So are you aware that -- first

12    of all, are you aware that the Safe Links product may

13    be included in as one of many security features in

14    ATP, in a suite of products that is primarily sold to

15    organizations as opposed to sold to consumers

16    themselves?

17         A      Yes.

18    ████   ████████████████████████████████████████

████  ██████████████████████████████████████

████  ████   ██████

████  ████   ████████████████████████████████████████

████  ██████████████████████████████████

████  ████   ████████████████████████████████

████  ████████████████████████████████████████████

████  ████████████████████   ███████████████████████

                                      Page 23

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS



17    Q    And what did Mr. Wood tell you would be the

18  number of seats that TocMail would be able to capture

19  on the consumer market?

20    A    Initially he believed he would be able to

21  capture seats equivalent to the Microsoft consumer

22  seat count.

23

Page 24

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS



18          Upon further discussion and more discovery,
19   I was unable to -- I didn't feel there was sufficient
20   information available to rely on a hundred percent of
21   the seats being captured and there wasn't enough
22   information at this point in time to allocate how many
23   consumer seats he would have captured.  Mr. Wood --
24

Page 25

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    could happen, yes.

2         Q    Could, that could happen?

3         A    Yes, if you desire -- if you wanted to

4    transition tomorrow, that that could happen.

5         Q    Is it your understanding that as Mr. Wood

6    says in his live complaint, which has not been

7    modified, that 100 million users would have changed to

8    TocMail?

9              Is it your understanding that if they all

10   decided to switch today, that TocMail has the

11   resources, the servers and the personnel to be able to

12   service those accounts and keep everyone's email up

13   and running tomorrow?

14        A    In a single day, no, that was not projected.

15   But over a short period of time, yes, it could be

16   accomplished.

17        Q    What period of time?

18        A    Three months.  Actually, three months to

19   start staging people in and then a period -- so a

20   total of about five months.

21        Q    Mr. Wood told you that he could move,

22   successfully integrate and migrate with any Enterprise

23   server with a hundred million customers within five

24   months; is that what he told you?

25             MR. MARTIN:  Objection to form.

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1          A     Yes.

2          Q     Let's talk about how that actually works.

3   Other features including -- other features including

4   calendar, OneNote Enterprise service systems like

5   Microsoft Dynamics AX, did he discuss with you --

6   well, first of all, who's his team?

7                Other than Josh Martin, his attorney, with

8   whom have you met that is on the TocMail ready-to-go

9   team?

10         A     I have not met with anybody else.

11         Q     Did you visit Mr. Wood at his office for

12  TocMail?

13         A     No, I have not.  I have not visited with

14  anybody in the past year.

15         Q     So fair on the pandemic.  Did Mr. Wood tell

16  you how many employees he currently has?

17         A     No.

18         Q     Do you know if there's any employee of

19  TocMail other than he?

20         A     No, I do not.

21         Q     Okay.  So you're basing his ability to scale

22  and scale this up very quickly and migrate folks based

23  on what he's told you, right?

24         A     Yes.

25         Q     I want to talk about just for a minute the

Page 36

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
1    revenue side, because you understand it's your
2    obligation to calculate revenue in this case, right?
3         A    Yes.
4         Q    But you've not calculated the revenue that
5    Safe Links brings in.  You've just calculated the
6    revenue for all the products into which Safe Links is
7    integrated; is that right?
8         A    Yes.
9         Q    Okay.  So for example, you're attributing
10   all of the value of that revenue to Safe Links,
11   correct?
12        A    I'm not sure I understand exactly what
13   you're asking about.  Are we talking about defendant's
14   profits now?
15        Q    No, I'm talking about the revenue that you
16   can attribute -- you understand the baseline, one of
17   the things on the disgorgement analysis, you have to
18   show what the revenue was attributable to the specific
19   function; the specific function here being what
20   TocMail thinks it can do better than Safe Links.
21             So you have to break this down to what
22   revenue is Microsoft getting just from Safe Links.
23   It's like the windshield wiper and the car.  You can't
24   say okay, you sold, you know, this many Dodge Caravans
25   and Dodge made a profit of about $200 million and it's
```

Page 37

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1   all because of my windshield wiper blade, so that's

2   the $200 million in revenue.

3          What have you done to isolate the value of

4   Safe Links itself?  Because that's the competitive

5   product to TocMail, right?

6          MR. MARTIN:  Objection to form.

7   BY MS. LOVETT:

8      Q    You may answer.

9      A    My understanding is that Safe Links is a

10  critical part of establishing the security for the

11  entire system and for the brand, and that would be the

12  reason why I included the revenue associated with the

13  products that have that safety component.

14     Q    What about Safe Attachments?  That's another

15  product.  More or less value than Safe Links?

16         MR. MARTIN:  Objection to form.

17     A    It's not a question of -- again, with regard

18  to causation -- I'm not rendering an opinion with

19  regard to causation.  My understanding is that Safe

20  Links is a critical part in establishing the security

21  of the brands and what is sold and therefore, I

22  calculated the revenue.

23     Q    As the entire brand and what is sold, right?

24     A    The entire brand being sold with Safe Links

25  as a component, yes.

Page 38

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1      Q     What about, do you know any of the other

2  so-called critical safety features of Microsoft?

3      A     Well, I've read a list of the safety

4  features.

5      Q     What are they?

6      A     I've read it.  I didn't memorize it.  There

7  are various features including encryption and other

8  types of detection.

9      Q     And did you do anything to determine whether

10 or not any of those features was more valuable than

11 Safe Links?

12     A     No.

13     Q     So you're basically establishing that but

14 for Safe Links, Microsoft could not sell any of these

15 products, right?

16           MR. MARTIN:  Objection to form.

17 BY MS. LOVETT:

18     Q     You may answer.

19     A     No, I did not establish that.  I am not

20 establishing causation.  I was giving you the reason.

21 There's a difference between understanding it and

22 testifying to it.

23     Q     Yeah, I understand.  Part of what is your

24 job, though, is to calculate the value of the feature

25 in dispute and what you're telling me is you did not

Page 39

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    independently calculate a value for Safe Links,

2    correct?

3         A    Correct, other than fact that it contributes

4    to the security.  It's a critical part of security, as

5    part of the brand of Microsoft 365.

6         Q    Sure.  Well, what is really -- what is part

7    of the brand of security is advanced threat

8    protection, which is made of multiple, multiple

9    components.

10             You did not -- I want you to be clear on

11   this for the jury.  You did not go through and

12   determine relative value for any of those other

13   components, did you, ma'am?

14        A    No.

15        Q    Nor did you assign a particular value to

16   Safe Links for that particular component, did you,

17   ma'am?

18        A    No.

19        Q    So for example, if I was going to say --

20   because I do think windshield wipers are a critical

21   part of keeping your car safe.  But if I were going to

22   say these are my windshield wipers -- and I'm

23   approximating -- these are my windshield wipers and

24   they cost $48 and they're, you know, patented, a

25   better solution than any other windshield wiper you

can put on the car, it's the equivalent to me saying the $35,000 car, I'm going to estimate all the profits Dodge made from that $35,000 car because this is a critical part.

A Well --

MR. MARTIN: Objection to form.

A -- I don't agree with your analogy, because the same -- change the analogy and say that the brake system, which is touted as being better than any other brake system, fails. Now, the ability to sell a car without brakes is very different than the ability to sell a car without windshield wipers.

So I'm not sure that I agree with your analogy, and I'm not testifying as to causation.

Q You just said the brakes fail. Is it your testimony that Safe Links fails?

A It's my -- again, I'm not testifying as to causation. It's my understanding that Safe Links doesn't do -- and that's the reason of this -- my understanding of the reason of the lawsuit is Safe Links doesn't do what it said it does.

Q Now, even if the brakes failed, so I'm going to stay right there, any understanding you have about -- excuse me, any understanding that you have about Safe Links not doing what it says it does comes

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1  from Mr. Wood, right?

2          MR. MARTIN:  Objection to form.

3  BY MS. LOVETT:

4      Q    You may answer.

5      A    No, my understanding is that there is --

6  there has been discovery to that effect.  I have not

7  seen all the discovery.  I understand that a very

8  large amount of discovery has been produced.

9          My understanding is that there are documents

10  which support that.  I have read some studies which

11  say that Safe Links does not protect against certain

12  types of attacks with cloaking IP.  So I don't agree

13  with your characterization that I completely relied on

14  Mr. Wood.

15      Q    Okay, so let me go back.  You said it's your

16  understanding, but you haven't read the discovery.

17          Who gave you the understanding?

18      A    No, no, I said I hadn't read all of the

19  discovery.  I read the studies, I have read the

20  exhibits to the complaint, and it is my understanding

21  from counsel that there has been more discovery that

22  has been produced that I have not yet had time to

23  review.

24          Again, I'm not testifying as to causation,

25  I'm testifying as to the revenue.

Page 42

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1      Q     Yes, and you told us -- and I just want to

2   make sure that we have this cleanly on the record, you

3   told us that in calculating the revenue, you did not

4   attempt to assign a value to Safe Links individually,

5   but relied on the total value of the products that

6   were sold that contain Safe Links, correct?

7      A     Under the theory that it is -- that the

8   safety offered by-- allegedly offered by Safe Links is

9   a critical part of the brand and its image as being a

10   safe product.

11      Q     Do you know whether or not Safe Links -- for

12   example, if I purchase Office 365 with advanced threat

13   protection, do you know whether my IT professional can

14   go in and disable or turn off Safe Links?

15      A     It is my understanding that it can be

16   disabled.

17      Q     So in other words --

18      A     I have not personally attempted to do that,

19   but it is my understanding it can be disabled.

20      Q     Yeah, you understand that some users may

21   choose to not even use Safe Links and they have to

22   specifically enable it for use on their systems?

23      A     I don't have specific knowledge of that, but

24   I'm aware it can be disabled or that it may need to be

25   enabled on the commercial products.

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1   be reasonable for them.
 2           So for example, accounting fees, we
 3   discussed what appropriate accounting fees would be
 4   for the firm, for TocMail.
 5       Q    Okay.  Are you basing this on TocMail being
 6   a billion dollar a year company?
 7       A    Yes, I'm -- yes, I am.
 8       Q    And were you the expert that contributed
 9   that $60,000 fee or was that -- since that is your
10   area of expertise?
11       A    We discussed accounting fees and what would
12   be necessary as far as the record-keeping for the
13   company and that number is -- the company has a
14   relatively simple operating model and that number was
15   appropriate and reasonable.
16       Q    Okay.  So you believe that for a company
17   with a billion to a billion and a half dollars in
18   revenue, $60,000 in legal fees would be sufficient?
19           MR. MARTIN:  Objection to form.
20   BY MS. LOVETT:
21       Q    You may answer.
22       A    Based the operating model and what would be
23   involved with the company, yes.
24       Q    And then we've got -- for example, if I look
25   down here at your rent and utilities, that seems to be
```

Page 47

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    mean by that, that you're relying on Mr. Wood for

2    causation, right?

3         A    Yes.

4              MR. MARTIN:  Objection.

5         Q    And causation is an integral, you

6    understand -- I assume you would not say that to me

7    under oath if you didn't have some idea of what

8    causation means, right?

9         A    Yes.

10        Q    Okay.  So you're relying on Mr. Wood to

11   establish, to build that bridge between the alleged

12   deceptive statements and any damages, right?

13             MR. MARTIN:  Just objection to the extent

14        that you keep referring to Mr. Wood.  The actual

15        plaintiff is TocMail.

16             MS. LOVETT:  I should say TocMail.  I think

17        your witness said Mr. Wood, so I'm trying to be

18        clear.  But I think we can refer to those two

19        entities interchangeably.

20   BY MS. LOVETT:

21        Q    Ms. Bour, you understand that Mr. Wood is

22   TocMail, TocMail is Mr. Wood, right?

23        A    Yes, and to be clear, I am not going to be

24   providing testimony with regard to causation, whether

25   Mr. Wood or TocMail or some other party that I'm not

Page 56

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    aware of is providing that testimony.  I'm relying on

2    somebody else establishing that.

3              (The following portion is marked as

4         CONFIDENTIAL - COUNSEL ONLY):



Page 57

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1          But I'm looking at, for example, security
2    software which is on my phone -- and this is just by
3    way of example.  They're telling me you need to update
4    your software.  It needs to be updated.  Okay, I think
5    I updated it last week.
6          So I'm just making sure that you are
7    comfortable, because I'm going to ask you about this
8    in front of a jury and I want to be able to tell them
9    you were comfortable with accepting that this piece of
10   technology, TocMail's piece of technology, is just
11   fine the way it is and it will work the same way
12   15 years from now, irrespective of any technological
13   developments that occur.
14          MR. MARTIN:  Objection to form.
15      A    Yes.
16      Q    And that's the assumption that you have
17   made?
18      A    Yes.
19      Q    So have you seen the report given by my
20   expert, and by that I mean Microsoft's expert,
21   Dr. Keith Ugone?
22      A    Yes.
23      Q    I want to take a look -- do you have a copy
24   of that report in front of you?
25      A    No, I don't.

Page 77



17      Q     Then it says "Research and Development
18   Expenses" and that's what we were talking about
19   earlier.  You know, anti-hacking, all of those things.
20            You told us your assumption was that TocMail
21   is going to continue to make sales and maintain a
22   commercially successful project with no ongoing
23   research and development over the entire 15 years,
24   right?  That's what we were just talking about.
25      A     Right.  Any modifications or updates needed

Page 79

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1    would be minor and could be programmed in without

 2    requiring TocMail to spend 13 percent of its revenues.

 3         Q    Right.  And the market would take care of

 4    itself with the press release and sales without

 5    requiring TocMail to spend somewhere between 14 and

 6    16 percent of its revenues to get the word out about

 7    TocMail?

 8         A    Correct.

 9    ██  ███████

 ██   ██  ██████  ████████████████

 ██   █████████████████████████████████

 ██   ███████████████████████████████████████

 ██   ███████████████████████████

 ██   ██  ████  ████████████████████████████████

 ██   █████████████████████████████████

 ██   █████████████████████████

 ██   ██  ███████████████████  ███████████████

 ██   ███████████████████████████  ██████████

 ██   ████████████████████████████████████████

 ██   ██████████████  ███████████████

 ██   ██  ███████████████████████  ███████████

 ██   ████████████████████████████

 ██   ███████████████████████████████████

 ██   ████████████████████████████

 ██   ████████████████████████████████████████,
```

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS



15          What I'm asking you and what I asked you

16     before is whether or not you derived this chart, the

17     Microsoft revenue, from the sales of products that

18     include ATP, Office 365, and/or Safe Links.

19          A    It includes products which include Safe

20     Links, yes.

21          Q    Okay.  And that was the purpose of you

22     including them in this chart, in which you are

23     determining revenue, correct?

24          A    The purpose of the chart is to identify

25     revenue, which includes the sale of Safe Links.

Page 82

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1        Q    Okay.  So it is not a mischaracterization to

2    say that the Microsoft revenue that you summarized

3    includes the Security Suite, which includes the

4    product at issue, Safe Links, is it?

5        A    No, it isn't.

6    ████  ████████  ██████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████  ████████████████

████████████████████████

████████████████  ████████

████████████████████

████████████████████████

██████████████

████  ████████████████

██████  ████████████████

████  ████████  ████████████

████████████████████

████████████████████

████████████████████████

██████████████████████

████████████████████████████

████████████████

████  ██████

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS



```
23        Your assumed profitability, based on your

24  table, is 98 percent for TocMail; is that correct?

25        A    Yes.
```

Page 84

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1        Q    So you believe for the next 15 years TocMail

2    would have a 98 percent profitability rate, right?

3        A    Yes.

4        Q    I know you've done a number of these cases.

5    This is the highest profitability rate I've ever seen.

6    Is that a rather high profitability rate, in your

7    experience?

8        A    Yes.

9    ████ ████████████████████████████████████████████████
████  ██████████
████      ████████████████████████████████████████████████
████  ██████████████████████████████████████████████████
████  ██████████████████████████████████████████████████
████  ████████████████████████████████████████████████
████  ████████████████████████████████████████████████████
████  ██████████████████████████████████████████████
████  ██████████████████████████████████████████████
████  ████████████████████
████      ██████████████████████████████████████████
████  ████████████████████████████████████████████████████
████  ██████████████████████████████████████████████
████  ██████████████████████████████████████████████████
████  ███████████████  ██████████████████████████
████  ██████████████████████████████████████████████
████  ████████████████  ██████████████████████████

Page 85

```
 1          it before.  I don't want her to see things out of
 2          context.
 3               (Whereupon a document/item was marked for
 4          identification as Defendant's Exhibit 1.)
 5     BY MS. LOVETT:
 6          Q    Have you seen this document before?
 7          A    No, I don't believe I have.
 8          Q    Okay.  I'll represent to you that this is a
 9     PowerPoint that Mr. Wood presented to investors which
10     we've recently received.
11               Let's go to the next page, Rachel, and if
12     you could go to -- now let's go to the pin cite,
13     page 482.
14               It says here:  "TocMail is seeking a
15     $1 million investment for 10 percent stock.  The funds
16     will be used as follows:  50 percent for marketing,
17     25 percent for lawsuit expenses, 25 percent for
18     salaries and office."
19               Do you see that?
20          A    Yes.
21          Q    Okay.  We do not have a business valuation
22     of TocMail, correct?
23          A    I'm sorry?
24          Q    We do not have a business valuation of
25     TocMail, to your knowledge, true?
```

Page 92

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1        A     Not that I'm aware of.

 2        Q     And you're capable of doing that, but

 3   TocMail hasn't asked you to do one, true?

 4        A     Correct.

 5        Q     Here, at least as far as the investors go,

 6   TocMail is seeking a $1 million investment in exchange

 7   for 10 percent stock, and it breaks out how they were

 8   going to do that.  So effectively, the value of the

 9   company right now based on investments, if you believe

10   what Mr. Wood is presenting, is $10 million, do you

11   see that?

12             MR. MARTIN:  Objection to form.

13   BY MS. LOVETT:

14        Q     You can answer.

15        A     It is not necessarily a pro rata when you're

16   selling a minority interest.  Very often it is less

17   than a provided value of the company.  So I'm applying

18   valuation principles and looking at the page you have

19   in front of me.  Would I reach a conclusion that a

20   $1 million investment means the company is worth

21   $10 million?  No, I would not.

22        Q     Right, but you don't have any other -- you

23   don't have any other information in terms of

24   valuation, nor have you been asked to do a different

25   kind of valuation, true?
```

Veritext Legal Solutions
346-293-7000

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
1              All right.  Do you have documents supporting

2    the spending of other companies on $125 or -- or of

3    consumer companies spending $125 billion annually?

4         A    Not that I recall.

5         Q    Have you seen or been presented with any

6    documents that the highest spending priority for those

7    companies is cloaking?

8         A    No, not that I recall.

9         Q    Let's go on up, Rachel.

10             "Underlying Magic.  Over 95 percent of

11   professional phishing sites use cloaking to

12   successfully evade scanners."

13             It describes how cloaking is simple and then

14   says that:  "TocMail has solved the design flaw that

15   makes other email services defenseless against

16   cloaking."

17             It goes on to talk about the breadth of the

18   patent and says that:  "It will likely be the sole

19   provider for over 15 years."

20             Did you as part of your assumptions make the

21   assumption that TocMail, despite the highly

22   competitive environment and companies spending

23   $125 billion annually on security, did you make the

24   assumption that there would be no competitors to the

25   TocMail patent for over 15 years?
```

Page 99

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1      A    Yes.

2      Q    Let's go upstairs one more -- upstream, I

3    should say, and I think this is the second-to-last

4    slide.

5           "Solution", and here Mr. Wood is saying:

6    "Almost all data breaches begin with a phishing email.

7    95 percent of these phishing sites use a specific

8    hacking technique and TocMail can block that technique

9    every single time."  Do you see that?

10     A    Yes.

11     Q    I believe the prior email is going to be the

12   one that lays out the problem.  Go ahead, Rachel.

13          "95 percent of breaches, guaranteed."  So I

14   want to stop here for a second.  TocMail is not --

15   based on this document produced by them, TocMail

16   cannot prevent a hundred percent of breaches a hundred

17   percent of the time, can it --

18          MR. MARTIN:  Objection to form.

19     Q    -- based on what this says?

20          MR. MARTIN:  Same objection.

21     A    Excuse me, I am not an expert on

22   cybersecurity.  It says what it says and I have no

23   opinion with regard to that.

24          But the next page goes ahead and says that

25   they can stop 95 percent -- I believe if you go back,

Page 100

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1   level overview of the lost profits figure, can you

 2   give us a high level overview of your claimed

 3   disgorgement figure?

 4       A    With regard to disgorgement, my

 5   understanding is that the code provides that the

 6   plaintiff sets forth the revenue related to the false

 7   claim.

 8       Q    Which code, sorry?

 9       A    Let's see.  Okay, that would be

10   15 U.S.C. 1117.

11       Q    Okay.

12       A    I'd have to go look at the chapter.  I think

13   it's subsection A.

14       Q    Right.  And as we've established, you have

15   provided the revenue for disgorgement overall from

16   Microsoft products, but not a specific revenue

17   garnered from the standalone sale of Safe Links

18   itself, nor have you calculated what percentage or

19   value Safe Links in and of itself has in that revenue,

20   correct?

21       A    Correct.  My understanding is that Safe

22   Links is a critical part of establishing that

23   Microsoft brand as it relates to those products, and I

24   calculated the revenue for the products that are

25   bundled with -- which include Safe Links.
```

Page 114

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    an accommodation to consumer users.

2        Q    All right.  But that would be something that

3    would be facilitated via TocMail?

4        A    I don't recall all the specifics of whether

5    TocMail would -- I don't recall whether TocMail in its

6    landing page had a way to sign up or whether you were

7    provided information on how to do it separately.  So

8    logistically, I can't answer that.

9        Q    Okay.  We talked about the review of the

10   initial complaint.  Do you recall how many deceptive

11   messages were alleged in that complaint?

12       A    No.

13       Q    And so you don't know whether or not that

14   number has diminished by the amended complaint, which

15   was filed in November, to three deceptive messages?

16       A    I mean, the complaints have what they have

17   in them.  I know that there were certain messages.  I

18   do know that there was a reduction.  I do not know

19   what the reduction was.

20       Q    Okay.  Do you have any data on how many

21   users, for example, saw deceptive message number one

22   as contained in the amended complaint and would have

23   made a change to TocMail based on that deceptive

24   message?

25       A    No.

Page 118

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
1         Q      Do you have any information regarding how

2    many users were exposed to deceptive message number

3    two in the amended complaint and whether or not they

4    would have switched to TocMail based on that allegedly

5    deceptive message?

6         A      No.

7         Q      Do you have any information related to

8    alleged deceptive message number three in the amended

9    complaint and how many TocMail users would have -- how

10   many Microsoft users would have switched to TocMail

11   based on the contents of that alleged deceptive

12   message?

13        A      No.

14        Q      So I want to talk about sort of the

15   going-forward piece of this case.  You have assumed

16   for the purpose of the case the life of the patent,

17   which is another 15 years or so, to 2035.

18             Do you have -- when you keep saying the

19   causation, the causal link would be, this is not a

20   patent infringement case.  This is not any sort of

21   theft of trade secrets case.  This is a case about

22   whether or not alleged deceptive messages by my

23   client, Microsoft, caused consumers to make a choice

24   that excluded TocMail from the market.

25             You understand that that's the crux of the
```

Page 119

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    case?

2         A     Yes.

3         Q     So if, for example, Microsoft were to stop

4    using any of the three allegedly deceptive messages,

5    how would that affect the damage model going forward

6    for the next 15 years?

7         A     It would depend upon how they were to stop

8    using it and what they were to do to correct the

9    public perception.

10        Q     All right.  Well, can you put a monetary

11   amount on that either way, no matter what I tell you?

12        A     No, because it's not known if they will

13   voluntarily or when they will.

14        Q     No, I'm asking you to assume in a

15   hypothetical.  If Microsoft were to, for example,

16   simply withdraw those three allegedly deceptive

17   messages from the marketing materials they have --

18   assume that that is the case, assume they do that

19   tomorrow -- does that change the damage model going

20   forward through 2035?

21        A     Probably not.

22        Q     Probably not, because you don't have any

23   data that there were ever any damages caused by any

24   users switching, that would have switched to TocMail,

25   correct?

Page 120

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1        A     No.
 2              MR. MARTIN:  Objection to form.
 3        Q     So you can't tell the jury, even if we stop
 4   right now -- today is March 15th, 2021.  If we stopped
 5   on March 16th, 2021 and just pulled all those out
 6   of -- pulled out all of those three alleged
 7   misstatements or deceptive statements out of the
 8   marketplace, you still think Mr. Wood would be
 9   entitled to going-forward damages on the order of
10   $9 million -- $9 billion?
11              Let me get that straight for the jury,
12   $9 billion, with a "B"?
13        A     Again, I'm not testifying as to causation,
14   but my understanding is that unless something is
15   done -- and I'm going to use a lay term -- to
16   remediate, to correct the false benefits that have
17   accrued to the Microsoft brand from the years of
18   marketing, I don't know if it would change anything.
19        Q     And your assumption is based on -- your
20   understanding is from whom?
21        A     Again, I just said I'm not testifying to
22   that.  That is just my general understanding.
23   Somebody else is going to provide testimony as far as
24   causation.
25        Q     No, I understand, but where did you get your
```

Page 121

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    understanding that someone else is going to provide

2    testimony as to causation?

3         A    My conversation with Mr. Wood and

4    Mr. Martin.

5         Q    Okay.  And other than Mr. Wood himself, did

6    Mr. Wood or Mr. Martin tell you who would be the other

7    party that would be providing that testimony?

8         A    No.  Other than Mr. Wood, no.

9         Q    Okay.  So I want to take a look at -- have

10   you been reviewing documents as they've been updated?

11            For example, have you been reviewing new

12   discovery responses as they come in as part of your

13   job as an expert witness?

14        A    I have not been provided with new discovery

15   at this point.

16            MS. LOVETT:  Rachel, let's look at TocMail

17        5762 and we can blow this up so everybody can

18        read the first half.

19        Q    Can you read that, Ms. Bour?

20        A    Yes, it's large enough so I can read it.

21   Thank you.

22        Q    This is December 21st of 2020 and it's from

23   2Checkout Merchant Review.  Have you seen this

24   document before?

25        A    No, I have not.

Veritext Legal Solutions
346-293-7000

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1            MR. MARTIN:  Objection to form.
 2   BY MS. LOVETT:
 3       Q    Go ahead.
 4       A    It would have been helpful.
 5       Q    Okay.  So I want to talk just a little bit
 6   more about the statements that are made.  You've made
 7   no attempt to determine what is allegedly misleading
 8   about the three statements that remain in this case,
 9   correct?
10       A    Correct.
11       Q    And you have not seen any analysis
12   confirming or regarding how customers -- how consumers
13   might interpret any of these allegedly deceptive
14   statements in a misleading manner, have you?
15       A    No, I did not.
16       Q    You did not request any analysis from
17   TocMail about how the claims, any of the three
18   allegedly deceptive claims might be misconstrued by
19   customers?
20       A    Correct.
21       Q    And your assumption for your lost profits
22   claim is that the consumers would only buy the
23   disputed Microsoft product because of this statement,
24   right?
25       A    Again, from a causation perspective, the
```

Page 138

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1   assumption is that the false statements contributed

2   towards the image of Microsoft and Microsoft being

3   safe from IP cloaking and that enabling it to promote

4   the brand and promote Cloud-based products.

5       Q    So you have not made the assumption for your

6   lost profits claim that consumers would only have

7   bought the disputed Microsoft products because of the

8   inclusion of the allegedly deceptive statements?

9       A    Again, I stated my assumption.  I have not

10  made an assumption with regard to the sale of each of

11  the products as a result of this, and that's beyond

12  the scope of what I'm doing.

13      Q    Okay.  Well, I want to be clear for the jury

14  and for you.  There are three allegedly deceptive

15  statements here.  To carry its burden, TocMail has to

16  show that the statements led to the consumer's

17  choosing Microsoft, not anything else but those

18  particular deceptive statements.

19           Have you made that assumption?

20           MR. MARTIN:  Objection to form.

21  BY MS. LOVETT:

22      Q    You may answer.

23      A    I have made the assumption that the

24  plaintiff will be able to -- the plaintiff will

25  prevail on liability and causation and whatever is

Page 139

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    necessary to reach that conclusion.

2            So I have not specifically made the

3    assumption that you're stating.  If that is a

4    necessary assumption for the plaintiff to prove its

5    case, then that is incorporated in my assumption.

6        Q    Can you think of any other reason, just you

7    as a professional, can you think of any other reason

8    outside the statements that a consumer may buy the

9    disputed Microsoft products?

10           Other than these three deceptive statements,

11   allegedly deceptive statements.

12       A    I have not made -- I've made no such

13   determination.

14       Q    So you haven't even thought about other

15   reasons that people might buy Office 365, ATP, a

16   Microsoft service enabled with ATP, other than the

17   allegedly three deceptive statements?

18           MR. MARTIN:  Objection to form.

19       A    No, I haven't.

20       Q    Let's see.  Would you agree that your

21   analysis assumed that every purchaser of an at-issue

22   seat, an at-issue Microsoft seat from February 2020 to

23   May 2035 was exposed to an allegedly misleading

24   statement and was influenced enough by the allegedly

25   misleading statement to buy the disputed product?

                                          Page 140

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1        A     I'm sorry, could you please repeat that
 2   a little bit slower for me?  It was a long statement.
 3        Q     Sure.  No, I get it.  Let me break it down.
 4              Would you agree that your analysis assumes
 5   that each and every purchaser of an at-issue Microsoft
 6   seat from February 2020 to May of 2035 -- which is the
 7   life of your damage model going forward -- was exposed
 8   to an allegedly misleading statement?
 9              Would you agree with that?
10        A     I don't have knowledge to that.
11        Q     Okay.  But you're assuming that for your
12   damages model?
13        A     No, I'm assuming that TocMail will provide
14   sufficient evidence to establish causation.  I have
15   not made a determination as to what that evidence will
16   be, nor what is required, because that would be a
17   legal determination.
18        Q     Okay.  But I'm asking for the assumptions
19   that are built into your report, which I'm entitled to
20   explore.
21              In other words, you made the assumption here
22   that every purchaser going forward from February '20
23   to May of '35 was exposed to an allegedly misleading
24   statement, true?
25        A     No.
```

Page 141

1    Q    Okay.  Because what you're taking in the
2  go-forward analysis is effectively all of the revenue
3  that would have gone to Microsoft, but now is going to
4  go to TocMail.  So you're assuming that those
5  individuals saw a deceptive statement and that it
6  caused them to change their behavior, right?
7          MR. MARTIN:  Objection to form.
8  BY MS. LOVETT:
9    Q    Go ahead.
10   A    No.
11   Q    Okay.  So I just want to get it straight,
12 that you're -- in the going-forward, do you think that
13 the allegedly deceptive statements have anything to do
14 with consumer choice in this case?
15   A    Again, I am not -- the way I'm interpreting
16 your questions, you're conflating the disgorgement of
17 profits and the lost profits analysis.  So I don't
18 agree with the way -- I don't agree with your
19 statements and I said repeatedly that the assumptions
20 for the lost profits are that TocMail would be able to
21 provided add-on services based on the number of seats,
22 the number of licenses that are currently being sold
23 to different -- in different products.
24          So it's not a changing decision, a consumer
25 decision.  I forget how you phrased it.  But that is

Page 142

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    my assumption.

2         Q    Okay.  These are Microsoft -- we were

3    talking about Microsoft licenses and Microsoft

4    products, right, in your analysis?

5         A    No.  My analysis is talking about the sale

6    of an add-on product and an add-on license to

7    Microsoft.

8         Q    Right.  So we're talking about adding on to

9    Microsoft products and Microsoft users and seats,

10   correct?

11        A    Yes.

12        Q    Okay.  And the assumption under which you

13   are working is that those users were exposed to a

14   deceptive statement and because of that, if the

15   plaintiff prevails on the liability piece, what you

16   are saying is all of those customers who have the

17   Microsoft license for those products would add on the

18   TocMail product, correct?

19        A    Again, that they would -- that the Microsoft

20   users, commercial users, would elect to purchase the

21   safety that TocMail will provide.

22        Q    Did you do the analysis on -- I guess you

23   didn't know how many statements were made.  But let's

24   say, did you do anything -- for example, the jury is

25   going to be asked to evaluate each of these allegedly

                                        Page 143

1   misleading statements in context separately and will

2   be asked whether or not statement one is deceptive,

3   statement two is deceptive, statement three is

4   deceptive.

5          Did you incorporate into your analysis, for

6   example, how your damages model changes if, for

7   example, the jury finds that statement one was

8   deceptive, but statements two and three were not?

9        A    No.

10       Q    And really any permutation of that.  Of

11  course, if the jury finds that none of the statements

12  are deceptive, then your analysis is irrelevant.  But

13  what if it's one and three, did you do anything to

14  parse out what the damage model would be if the only

15  deceptive statements were one and three?

16       A    No.

17       Q    So you are conflating all of the allegedly

18  misleading statements in your report to come up with

19  your damage model, correct?

20          MR. MARTIN:  Objection to form.

21  BY MS. LOVETT:

22       Q    You may answer.

23       A    Again, my report assumes causation.  I have

24  not annualized the statements, nor made a

25  determination as to how many of the statements need to

Page 144

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    be proven for the damages to be awarded.

2        Q    Did you do an analysis as to the source of

3    the allegedly deceptive statements, as to whether or

4    not those product guides are still widely available?

5        A    No.

6        Q    Or what level of consumers they might reach

7    if they still contain the statements that plaintiff

8    contends are allegedly deceptive?

9        A    No.

10       Q    I'm looking at my notes, because I may be

11   close to finished.

12            So your lost profits damages assumed that

13   within two months after first selling its product in

14   April of 2020, TocMail would be able to make sales to

15   each and every at-issue Microsoft seat, correct?

16       A    No.

17       Q    All right.  Tell me where it says

18   differently in your report.

19       A    In paragraph 82 on page 23.

20       Q    Okay.

21       A    The first month it would -- it's projected

22   they'd be able to capture 50 percent of available

23   seats and then in the second month they'd be able to

24   capture 75 percent of the projected seats.

25       Q    Right, but your position is that by April of

                                              Page 145

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    2020 all of the remaining customers, meaning all the

2    remaining Microsoft customers, would switch to TocMail

3    in April of 2020; is that right?

4         A    Yes.

5         Q    So in other words, you say:  "During

6    December -- November of '19 I have assumed that

7    TocMail would be the subject of a press release which

8    would generate interest in the product," right?

9         A    Yes.

10        Q    And then you say:  "It would take 30 to 90

11   days for companies to investigate TocMail and the

12   claims in the press release," right?

13        A    Yes.

14        Q    Then the revenue goes to 50 percent of the

15   projected Microsoft seats, but by February of 2020,

16   right?

17        A    Yes.

18        Q    75 percent of the projected Microsoft seats

19   in March of 2020, correct?

20        A    Yes.

21        Q    And all of the customers would switch to

22   TocMail by April of 2020, correct?

23        A    Yes.

24        Q    And those are the assumptions that you made

25   based on the issuance -- I didn't see any other

                                        Page 146

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    marketing plans or any of the other things you and

2    Mr. Wood talked about.  This is just based on this

3    press release, correct?

4        A    No, it would be based on a press release and

5    the start of actual marketing and sales reps being in

6    place and specifically target marketing specific

7    companies.

8        Q    Well, what this specifically says, ma'am, is

9    that you assume that the press release would generate

10   interest and then companies would investigate TocMail

11   for 30 to 90 days and then by April -- basically, from

12   November of '19 there would be a press release and in

13   five months all 100 million Microsoft seats at issue

14   would have migrated to TocMail, correct?

15       A    I don't know that the number was a hundred

16   million seats.  I would have to check the number as to

17   the number of seats that -- the number of seats that

18   were produced in the Microsoft documentation as

19   relative to these products.

20            So it is not -- I don't believe it's a

21   hundred million seats.

22       Q    Do you know how many seats it is?  Do you

23   have any ballpark?

24       A    Well, I know exactly what the number is.  I

25   just don't recall exactly what the number is.

Veritext Legal Solutions
346-293-7000

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1        Q    Okay.  It's certainly a number in the tens
 2   of millions, isn't it, ma'am?
 3        A    If you want, I'd be happy to look at it.  I
 4   don't recall the number of seats.
 5        Q    I'm happy for you to look at it.  My point
 6   is, in order to make this analysis of how long and how
 7   feasible it would be to shift all of the at-issue
 8   seats, you would certainly have to have logistically
 9   some idea of how many additional seats there were,
10   true?
11        A    Yes.
12        Q    And you factored that into your analysis,
13   true?
14        A    Yes.
15        Q    So let's talk about the particular
16   assumption -- are you aware of any third-party product
17   of any kind that is purchased by each and every
18   Microsoft user?
19             In other words, a plug-in that a Microsoft
20   user would buy in addition to what Microsoft already
21   has.  Are you aware of any third-party product that
22   every Microsoft user purchases?
23        A    No.
24        Q    So you're assuming -- by assuming that
25   TocMail would go to each of these individual
```

Page 148

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1    companies, you're assuming that TocMail would be more

2    successful than any other third-party product of which

3    you know?

4         A    Yes.

5         Q    To your knowledge, has TocMail made a single

6    sale of its product?

7         A    No.

8         Q    And so effectively, the only factor right

9    now in your opinion preventing TocMail from making a

10   billion dollars a year in sales, when it can't

11   currently make sales, is these allegedly misleading

12   statements.  Is that your position?

13            MR. MARTIN:  Objection to form.

14   BY MS. LOVETT:

15        Q    You may answer.

16        A    My position is not with regard to causation,

17   as I've said repeatedly.  I am not providing an

18   opinion with regard to causation.  I have an

19   assumption in there.  My assumption is that the false

20   advertising resulted in TocMail being unable to market

21   its product and absent that, I have forecasted the

22   lost profits.

23        Q    So again, the lost profits you're claiming

24   are for about 14 years into the future for a company

25   that has never had a sale, right?

Page 149

1      Q      You presented revenues, I just want to make

2   it clear, for all Office 365 and Microsoft 365,

3   correct?

4      A      For disgorgement of profits, okay, I

5   presented in a number of different ways.  So one of

6   the calculations has the Microsoft products.  The

7   other calculation has those products that had Safe

8   Links bundled with them.

9      Q      Right.  In the case where those products

10   might be something like Microsoft Outlook, Microsoft

11   Word or Microsoft Excel, you did not attempt to assign

12   a different value to whether the driver was Safe Links

13   or whether it was Microsoft Excel, for example?

14      A      Okay.  So again, if the product was bundled

15   and I'm using that generically, but if Microsoft 365

16   was sold including Safe Links, no, I did not segregate

17   out revenue attributing it to the various components

18   of what was included in the bundle.

19      Q      You understand there are certain features

20   that drive sales, correct, in various products?

21      A      Yes, I understand that as a general concept.

22      Q      You made no effort to include any analysis

23   in your report that Microsoft sales of Office 365, of

24   Microsoft 365, of Surface tablets or the Outlook.com

25   premium subscriptions, you made no -- there's no

Page 165

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

1  analysis in your report that Safe Links actually drove

2  the sales of all of those products rather than just

3  being something that was bundled in with those already

4  desirable and highly selling products, correct?

5      A    Correct.  That was outside the scope of my

6  engagement.

7      Q    Right.  Your engagement was set by

8  Mr. Martin and his client, correct?

9      A    My engagement was with Mr. Martin.  I

10  presume that he consulted with his client with regard

11  to the scope of my assignment.

12      Q    Okay.  And do you know the other features

13  unrelated to the Safe Links feature that make up the

14  Advanced Threat Protection for Microsoft products?

15      A    I'm aware that there are other features.

16  I've read them.  I cannot name them all.

17          MS. LOVETT:  Mr. Dugan, can we have -- have

18      you sent the one page over to Ms. Hymel so she

19      can display it?

20  BY MS. LOVETT:

21      Q    So in addition to -- this is Office ATP

22  Advanced Threat Protection built into Office 365.

23  This is a Microsoft document and this will be

24  Exhibit 2.

25          (Whereupon a document/item was marked for

Page 166

TRANSCRIPT CONTAINS CONFIDENTIAL PORTIONS

```
 1              identification as Defendant's Exhibit 2.)

 2                   The documents here -- Edge Block,

 3       AV Scanners, Reputation Blocking, Heuristic

 4       Clustering, ATP Safe Links, Anti-Spam Phish Spoof

 5       Impersonation, ATP Phish ML Models and Link

 6       Detonation, and ATP Safe Links -- you didn't make an

 7       effort to assignment a specific value or a value as a

 8       driver for the Office 365 products into your analysis,

 9       true?

10           A     True.

11                 (The following portion is marked as

12           CONFIDENTIAL - COUNSEL ONLY):

13
```

Page 167