# Exhibit 29

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2            CIVIL ACTION NO. 0:20-cv-60416

3

4    TOCMAIL, INC., a Florida corporation,

5              Plaintiff,

6    -vs-

7

     MICROSOFT CORPORATION, a Washington
8    corporation,

9
               Defendant.
10   _____/

11

12

13
                    Zoom Remote Proceedings
14                  Monday, March 22, 2021
                    11:04 a.m. - 5:53 p.m.
15

16      VIDEOTAPED VIDEO TELECONFERENCE DEPOSITION OF
                    KEITH URGONE, Ph.D.
17

18

19

20

21

22

23
               Taken before Robyn Maxwell, RPR, FPR,
24   RSA, and Notary Public in and for the State of Florida at
     Large, pursuant to Notice of Taking Deposition filed in
25   the above-mentioned cause.

Page 25

1  terms of all of the admissions that she made.
2          You know, I'm trying to make sure that I
3  can remember them all.  But she didn't do anything on the
4  cost side.  She's basically assuming that all of the --
5  that on a -- on the disgorgement side, that all -- you
6  know, she just identified all these revenues, but she
7  didn't identify, like I said, Safe Links' associated
8  revenues.  She didn't do anything on a cost reduction
9  there from those revenues.
10         On the lost profit side, she's doing a
11 15-year, you know, projection, but implicit in her
12 analysis is that there would be no competition.  There
13 would be no need for R & D on the part of TocMail.  There
14 would be no change in market conditions that might
15 affect, you know, the sales of these products.
16         She's assuming a, you know, a 98 percent
17 profit margin, but is -- I think she admitted she had
18 never seen a company with a profit margin that high.  She
19 didn't look at comparable companies as a reasonableness
20 test.
21         You know, those are just some of the things
22 off the, you know, off the top of my head.  There's
23 probably -- there's probably more, but I'll -- I'll stop
24 there and more will come to me as we probably go through
25 the -- my report here.

Page 42

1  ████████████████████████████████████████
2  ████████████████████████████████████████████
3  ████████████████████████████████
4  ██  ████████████████
5  ████████████  ██████████  ████
6  ████████████████████████████
7  ████████████

8    A.    Yeah, I'm saying that what's being
9  proffered by TocMail through its experts is inconsistent
10 with, you know, an adjudicated outcome that would lead to
11 a claim for a monetary remedy.  But to make that claim
12 over the period of time that they're claiming doesn't
13 make sense in light of an adjudicated outcome and what
14 could flow from that.
15          I mean, there's a whole bunch of other
16 things.  We're just talking about one piece.  We still
17 have the issue about TocMail has never made a sale.  They
18 don't have any employees.  There doesn't appear to be any
19 interest in its products.  So we're talking about a very
20 narrow aspect.
21          But the point that I don't want to get lost
22 here is, you've got to take everything I'm saying on this
23 one piece of the claimed damages, you know, puzzle, in a
24 sense but also combine it with all of the other
25 considerations that I mention in my report.  So you can't

Page 50

1    But what I'm remarking is, is that devoid
2    from TocMail's lost profits model, is any recognition
3    that the likelihood is after an adjudicated outcome, the
4    offending statements may no longer be in the marketplace
5    which would alter the entire future income stream being
6    projected by Ms. Bour.  That's my opinion.
7    So what my opinion is, is that there's an
8    inconsistency between an adjudicated outcome and a
9    finding of liability and the claim for damages that are
10   being made.  That's what I'm saying.
11   But then what I'm saying is to look at
12   damages to go further, there's a lot of different
13   components.  You can't just then say, well, you need to
14   fix -- you need to have corrective advertising, and
15   there's still going to be a period of lost sales and lost
16   profits, and to really fix things, you know, you need to
17   do all this other stuff.  Well, TocMail's got the issue
18   of they don't have a company.  They don't have any sales.
19   They don't have any employees.  So you can't just -- what
20   I'm trying to say is, I would package it all together for
21   the jury in terms of what the issue is.
22   BY MR. MARTIN:
23       Q.   So if Microsoft were to change its ads
24   tomorrow, would all of a sudden all -- all of the
25   customers that Microsoft has just leave Microsoft the

Page 66

1              In other words, they do the -- they do the
2    modifying of the advertising, if that's required by the
3    Court.  But are they -- is -- is any company, so I'm not
4    just talking about Microsoft, is any company just going
5    to let, you know, millions and millions and millions of,
6    you know, potential customers just go away.  Do they just
7    roll over, or do they find another way to compete?
8              And so she hasn't done a but-for
9    reconstruction to see what the reaction of Microsoft
10   would be in the but-for world, nor does she have any of
11   these customers considering other competitive options in
12   the marketplace.
13             So she's not even taking into account other
14   market dynamics.  So it's all of those things.  I'm
15   taking them one at a time in my description here, so we
16   can all understand them, but don't lose sight of those
17   other dynamics I'm talking about.  There's other
18   competitors.  There's reactions on the part of Microsoft.
19   She just has this mathematical calculation of 100 percent
20   of the customers would have gone to TocMail, not
21   recognizing Microsoft could adjust in the but-for world,
22   and other competitors could adjust, as well, to capture
23   some of that business rather than having 100 percent of
24   those millions and millions and millions of customers
25   going to a company that has never made a profit and

1  ████████████████████████████████████
   █  ████  ████████████████████████████
   █      ████████████████████████████
   █          ████████  ██████████████████
   █  ████████████████████████████████
6  █  ██████████████████████ there's no evaluation in the
7  marketplace of competing products, as one example.  So,
8  there's Proofpoint out there.  There's Mimecast.  A lot
9  of those products are used in conjunction with the
10 Microsoft products.  I mean, I think even, like, there's
11 at least two of them that brag about -- about how they're
12 used with or at least communicate to customers that, you
13 know, they're the number one, you know, security product
14 kind of used with Microsoft 365.  I think Mimecast even
15 says that.
16              But the point is, that on this thing about
17 altering their purchase decisions, you know, that can go
18 a couple of different ways, that her assumption is they
19 all would have been for TocMail.  Because of the alleged
20 misleading ads, they all went to Microsoft, and, hence,
21 they all represent claimed lost customers when, in fact,
22 she doesn't do a proper reconstruction, a but-for
23 reconstruction, of what would have happened in the
24 absence of the alleged wrongful conduct.
25              In other words, would the ads have changed

Page 90

1   and would Microsoft kept some of the customers?  Could
2   Microsoft have had a slightly different product?  Would
3   some of these customers have gone to these other
4   competing firms?  But she doesn't do any of that.  She
5   just has them all go to TocMail.
6           Now whether you just want to call that as
7   proper damage quantification technique being violated in
8   a sense, or whether you also want to put that in the
9   causation bucket, I can go either way, but it's a -- it's
10  a deficiency in her analysis, that she doesn't do any of
11  those things, or evaluate any of those things.
12       Q.   Do you know whether the competitors that
13  you're referencing promote that they have a cog-based
14  solution to cloaking?
15       A.   Yeah, I've actually seen, for sure, in some
16  of them references to URL analyses or investigations.
17       Q.   Okay.  Specifically cloaking or evasion?
18       A.   I -- again, I don't want to be the
19  technical person, but that's how I was personally kind of
20  interpreting some of those statements when they said that
21  they evaluate the URL.
22       Q.   Do you know if any of the competitors
23  actually offer a solution to cloaking?
24       A.   The -- I know that the competitors offer a
25  URL-based solution or a linkage solution.  That doesn't

Page 216

1  BY MS. LOVETT:
2     Q.   So Dr. Ugone, have you ever been in the
3  position of having to assess sales?  In other words, been
4  in Ms. Bour's position where you have to be able to prove
5  in your report the sales of a product without knowing at
6  the specific level or the specific value that's
7  apportioned to the disputed technology?
8     A.   Yes.  I believe I have been in that
9  position, yes.
10    Q.   And how do you do that?  What is the proper
11 standard for a damages expert in doing that?
12    A.   Well, instead of just kind of giving
13 irrelevant revenues, you try to come up with an analytic
14 approach, whether it's economically based or whether it's
15 technically based or whether it's based on a survey
16 approach.  There's a number of different methodologies
17 that can be used to take a larger revenue base or even
18 the revenues associated with a multifeatured or
19 multifunctionality product and, in a sense, parse that
20 down to what's in dispute.  A lot of times that might be
21 called an apportionment analysis, but that would be the
22 type of analyses to undertake.
23    Q.   So, for example, a lot -- and we've heard
24 this talked about; a lot of people use customer surveys
25 to determine if a consumer has been confused, and you

Page 217

1  talk about that a little bit in your report.
2          The plaintiffs here, apparently, are
3  abandoning that -- abandoning that theory of the case,
4  and they're going to go with a literal falsity case,
5  which means they're claiming no consumer surveys are
6  necessary on the liability side.  But I want to ask you
7  about, is it still -- is it still -- let me give you an
8  example.
9          I'm building a new, great car.  It's going
10 to be the latest and greatest.  Everybody's going to want
11 to buy this car.  It's -- and -- and I have an inventor
12 who claims that the technology on the car that's really
13 driving the sales of that car are windshield wiper
14 blades, which are very important to safety and which,
15 obviously, you want to have on your car, but it's a
16 special kind of windshield wiper blade.  And I've got the
17 only one in the market.
18         Let's just assume that there was literally
19 a false statement made, and now we've gotten to your
20 part.  What would you do if you were the plaintiff's
21 expert or Ms. Bour in that case, what could you do to
22 determine what the value was of that one part, the
23 windshield wiper blade, as opposed to the entire value of
24 the car itself?
25      A.   Well, I mean, there's a couple --

Page 218

1           MR. MARTIN:  Objection to form.
2    BY MS. LOVETT:
3        Q.   You may answer.
4        A.   There's a couple of things that you could
5    do, but -- but first of all, you wouldn't take the value
6    of the whole car as a base for some damages number.  You
7    try to apportion down to what's the value of the -- of
8    the windshield wipers.
9            If there was some alleged, let's say,
10   misrepresentation, you try to figure out what's the
11   incremental gain from whatever the misstatement is or
12   alleged misstatement related to the windshield wipers.
13   But there's different methodologies that you could use.
14   You could use, like I said, a surveying technique.
15   Although you need to make sure you figure out, you know,
16   sort of market prices as opposed to just a willingness to
17   pay.
18           If anybody on the call here is familiar
19   with conjoint analysis, you'd understand what I'm saying
20   about the difference between willingness to pay versus
21   what the market price is.  Or you could even do a
22   before-and-after analysis; what was the price of the car
23   before it had these, you know, special windshield wipers
24   versus after the special windshield wipers and look for a
25   differential in terms of revenues associated with that

```
 1   new feature, and then figure out the costs and then
 2   figure out the profits on them.  So those are -- those
 3   are just two examples of what you could do.
 4          Q.   So does Microsoft have to have Safe Links'
 5   sales broken down -- product sales broken down
 6   individually, the line items for Safe Links in order for
 7   Ms. Bour to do a correct analysis?
 8          A.   No.  I think if one thought about it
 9   analytically, they could try to come up with, clearly,
10   closer approximations to Safe Links' associated revenue
11   than just taking, you know, Microsoft 365 or Office 365.
12   That includes -- that includes much, much more.
13          Q.   Yeah.  Do you think it was appropriate for
14   Ms. Bour to include in her analysis the Microsoft Surface
15   computer that happens to have O 365 and Safe Links on it?
16          A.   No.  That -- that's an example of way
17   overstating the revenues.  And what I feel -- what I was
18   trying to say is that doesn't meet the burden as I, as an
19   economist, understand the statute in terms of identifying
20   the appropriate revenues or sales.
21   [REDACTED]
```