UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 20-60416-CIV-CANNON/Hunt

**TOCMAIL INC**,

    Plaintiff,

v.

**MICROSOFT CORPORATION**,

    Microsoft.

_____/

## ORDER DENYING MICROSOFT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

**THIS CAUSE** is before the Court upon the Motion to Dismiss Plaintiff's First Amended Complaint filed by Defendant Microsoft Corporation [ECF No. 44] (the "Motion"). The Court has carefully reviewed the Motion, Plaintiff's Response in Opposition [ECF No. 46], Defendant's Reply [ECF No. 47], the record, and the applicable law. The Court also held a hearing on the Motion [ECF No. 62]. For the reasons set forth herein, Microsoft's Motion to Dismiss [ECF No. 44] is **DENIED**.

    **I.**    **Background**

Plaintiff, TocMail, Inc. ("TocMail"), filed this case under 15 U.S.C. § 1125(a)(1)(B) ("Lanham Act"), seeking to recover for harm allegedly suffered because of Microsoft's allegedly false or misleading advertising of its cybersecurity software, Safe Links [ECF No. 42 ¶ 1]. Safe Links is Microsoft's link scanner cybersecurity software [ECF No. 42 ¶ 3]. In general, link scanner software protects users from harmful websites by scanning the weblinks that users click on and screening those weblinks for malicious sites [ECF No. 42 ¶ 21]. Microsoft's cloud-based link scanner ("Safe Links") competes with TocMail's namesake cloud-based scanner ("TocMail")

[ECF No. 42 ¶ 97]. Microsoft provides its link scanner service, Safe Links, as part of a greater Advanced Threat Protection program that accompanies its cloud-based platform, Office 365 [ECF No. 42 ¶ 57].

The majority of malicious websites use an attack called "cloaking," by which a hacker using a cloaked link sends users to malicious sites but sends security software to benign sites to avoid detection [ECF No. 42 ¶ 12]. For this process to work, the cloaked link first must determine, using various methods, whether a visitor is a user or security software [ECF No. 42 ¶ 17]. Safe Links and other cloud-based link scanners protect against the majority of cloaking methods [ECF No. 42 ¶ 23]. According to TocMail, however, cloud-based scanners have a key weakness—so-called "IP Cloaking"—a method by which the malware discriminates based on the IP address of the user that clicked the link [ECF No. 42 ¶ 99]. The reason for this is that cloud-based link scanners (including Safe Links) cannot mimic a user's IP address—something TocMail notes that on-premise scanners "inherently" mimic [ECF No. 42 ¶¶ 24–27, 31]. TocMail alleges that only its patented product can successfully protect cloud-based servers from IP Cloaking attacks by sending users directly to the benign site to which the link scanner had been redirected [ECF No. 42 ¶ 100].

TocMail alleges that Microsoft falsely promotes its scanner as possessing a security capability that it does not actually possess, and that only TocMail's scanning service has the security capability that Microsoft promotes its scanner as providing [ECF No. 46, pp. 2–3]. Microsoft has claimed that this cloud-based security system can "provide a higher standard of security at lower cost than . . . [is available] with on-premises productivity servers" [ECF No. 42 ¶ 31]. As part of its marketing efforts, Microsoft has made further claims about the efficacy of its Safe Links product, noting, for example, that "with Safe Links, we are able to protect

users right at the point of click by checking the link for reputation and triggering detonation if necessary," and that Safe Links "ensure[s] hyperlinks in documents are harmless" [ECF No. 42 ¶¶ 58, 72]. TocMail cites these claims as evidence of misrepresentation on the part of Microsoft, as Safe Links lacks the capacity to protect its users from IP Cloaking, one of the most common forms of hacking attacks [ECF No. 42 ¶¶ 12, 21–27].

TocMail alleges that, despite being fully aware of the fact that Safe Links was vulnerable to IP Cloaking attacks, Microsoft marketed its Office 365 program as providing "the benefits of cloud computing with . . . enterprise-grade security" [ECF No. 42 ¶ 31]. According to the Complaint, this promotion not only induced reliance from consumers who unwittingly exposed themselves to IP Cloaking attacks, but sidelined the achievements of TocMail when it patented and began marketing a working time-of-click service capable of protecting servers from IP Cloaking [ECF No. 42 ¶¶ 95, 96–103].

## II.  Procedural History

TocMail filed its complaint on January 10, 2020 [ECF No. 1]. The initial complaint raised two counts arising under 15 U.S.C. § 1125(a)(1)(B) of the Lanham Act: False Advertising (Count One) and Contributory False Advertising (Count Two) [ECF No. 1 ¶¶ 189, 205]. Microsoft then moved to dismiss both counts on the basis that TocMail lacked standing and failed to state a claim for which relief could be granted [ECF No. 14]. The Court denied the motion as to Count One and dismissed Count Two, giving TocMail leave to file an Amended Complaint [ECF No. 41]. TocMail then filed the operative First Amended Complaint, which contains a single count for False and Misleading Advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) [ECF No. 42 ¶ 106].

Microsoft now moves to dismiss the single count in the First Amended Complaint on the view that it fails sufficiently to allege two of the five required elements required to sustain a claim

of False or Misleading Advertising under the Lanham Act [ECF No. 44, pp. 2–3]. Specifically, Microsoft argues that (1) its alleged misrepresentations were not material to consumers' purchasing behavior because they do not pertain to a key characteristic of Office 365, and (2) TocMail cannot show that it has been or is likely to be injured as a result of Microsoft's conduct because its theory of damages is too speculative [ECF No. 44, pp. 10–19]. This Motion is ripe for adjudication [ECF Nos. 46, 47].

### III.   Legal Standard

#### A.   Rule 12(b)(6) Standard

To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the Microsoft is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

### IV.   Discussion

The Lanham Act provides a civil cause of action for false advertising as set forth below:

> (a) Civil action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

To state a claim under 15 U.S.C. § 1125(a), a plaintiff must establish the following elements:

> (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising.

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).

Microsoft contends that TocMail has failed to plead the third and fifth elements of its false advertising claim [ECF No. 44, pp. 2–3]. The Court therefore limits its discussion to whether Microsoft's misrepresentations, as alleged, were material to the purchasing behaving of its consumers, and whether those misrepresentations caused or are likely to cause injury to TocMail.

### A. Materiality

A representation in advertising is "material" when it is "likely to influence the purchasing decision." *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 796 (11th Cir. 2020) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002)). Materiality may be established by a showing that "the defendants misrepresented an inherent quality or characteristic of the product." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (internal quotations omitted). "The materiality requirement is based on the premise that not all deceptions affect consumer decisions." *Johnson & Johnson*, 299 F.3d at 1250;

5

*see also Motorola*, 105 F.3d at 841 (holding that, despite being literally false, an advertisement was not subject to the Lanham Act because its falsity was irrelevant to consumer decisions). Although the Eleventh Circuit appears not to have characterized the materiality standard specifically in Lanham Act cases, it has noted in related contexts that materiality is a mixed question of law and fact that "'requires delicate assessments of the inferences'" that a reasonable person would draw from a given set of facts, and therefore, that such assessments are "'peculiarly ones for the trier of fact.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019) (quoting *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976)).

Microsoft argues that, even assuming for the sake of argument that it misrepresented its ability to protect servers against IP Cloaking, any such statements do not satisfy the materiality standard because Safe Links represents only one of the many services included in Office 365 and is not, by itself, an "inherent quality or characteristic of the product" [ECF No. 44, pp. 10–12]. TocMail disagrees, contending that IP Cloaking is a very common form of hacking, and that Microsoft has misrepresented the efficacy of its Office 365 Advance Threat Protection, which TocMail describes as an "inherent quality" of the product affecting purchase decisions [ECF No. 42 ¶ 108, 110–111; ECF No. 46, p. 17]. TocMail supports this point by emphasizing the degree to which security is one of Office 365's major selling points [ECF No. 42 ¶¶ 32, 76–84]. Moreover, TocMail adds, citing *Johnson & Johnson*, that even if Safe Links is not found to be an "inherent quality" of Office 365, these representations still meet the materiality threshold because they influenced consumer behavior [ECF No. 46, p. 17].

Here, construing TocMail's allegations in a light most favorable to TocMail, the Court finds Microsoft's argument to be without merit. TocMail has sufficiently pleaded that Microsoft's misrepresentations were material to the purchasing behavior of their consumers. In its complaint,

6

TocMail asserts that "[s]ecurity is material to the purchase of Office 365 as it is an important feature consumers consider when purchasing software" [ECF No. 42 ¶ 76]. TocMail also references several instances of Microsoft using security as a marketing point for Office 365 and acknowledging the important role that considerations of security play in the decision to adopt a cloud-based service [ECF No. 42 ¶¶ 77–84]. For example, TocMail states that, over the last five years, Microsoft has actively marketed the narrative that Safe Links solves the cloud security problem; that Microsoft has admitted that "organizations must consider security" when deciding on whether to accept cloud-based services; and that "[b]usinesses and users are going to embrace technology only if they can trust it" [ECF No. 42 ¶¶ 55, 77, 78]. Additionally, TocMail quotes Microsoft's 2020 Form 10-K, which stated that "[t]he security of our product and services is important in our customers' decisions to purchase or use our products or services" [ECF No. 42 ¶ 80]. Based on the foregoing allegations, TocMail has sufficiently pleaded that Microsoft's marketing of that security system was material to the commercial successes of the Office 365 program. The ultimate determination about whether these alleged false and misleading statements materially influenced consumers' purchasing decisions is not appropriate at the motion dismiss stage.

### B. Injury

A plaintiff sufficiently pleads injury under the Lanham Act if it plausibly alleges any "economic or reputational harm" caused by defendant's misrepresentations which led consumers to "withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014); *see also Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (applying same standard to Rule 12(b)(6) analysis of injury under Lanham Act).

Microsoft argues that TocMail could not have suffered injury caused by Microsoft's marketing strategy because TocMail did not have its product readily available until 2019 and was therefore not a competitor of Microsoft [ECF No. 44, p. 13]. Furthermore, Microsoft asserts that TocMail's claim "that but for Microsoft's deceptive messaging . . . all 100 million [Microsoft] subscriptions would have subscribed to TocMail" is speculative and implausible [ECF No. 44, pp. 15–17]. Microsoft contends that TocMail, which markets only one service and has little brand recognition, is too small to plausibly allege it has been reputationally harmed by Microsoft's marketing campaign [ECF No. 44, pp. 15–19 ("Indeed, without alleging it ever had a reputation, TocMail cannot allege reputational injury.")].

TocMail responds that it has in fact entered the market by actively marketing and selling their competing product through their website [ECF No. 46, pp. 7–8]. TocMail further argues that, while the *actual harm* suffered by TocMail may be less than alleged, that question is not appropriate for resolution at the motion to dismiss stage [ECF No. 46, pp. 18–19]. To buttress this argument, TocMail contends that damages under the Lanham Act do not require a showing of actual harm because the Act allows for relief in the form of disgorgement of Microsoft's fraudulently obtained profits [ECF No. 46, p. 20]. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019); *see also Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir. 1988) (holding that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under the Lanham Act, because "an accounting for profits has been determined . . . to further the congressional purpose by making infringement unprofitable, and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future.").

At the current Motion to Dismiss stage, the Court is tasked with determining whether the

claim as stated would give TocMail a right to any relief—not the particular calculation of damages allegedly suffered by TocMail. *See Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'rs*, 197 F. Supp. 3d 1334, 1341 (N.D. Fla. 2016) (quoting *Dotshay v. Nat. Mut. Ins. Co.*, 246 F.2d 221, 223 (5th Cir. 1957) ("[A] complaint . . . is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, regardless of whether it asks for the proper relief.")); *Doe v. Royal Caribbean Cruises, Ltd.*, No. 11-23323, 2012 WL 920675, at *2 (S.D. Fla. Mar. 19, 2012) (emphasis added) (citing *Hawkins v. Frick-Reid Supply Corp.*, 154 F.2d 88, 89 (5th Cir. 1946)).

Under that prism, TocMail sufficiently has pleaded injury sufficient to withstand a Rule 12(b)(6) motion. As alleged, TocMail and Microsoft compete for the same customers [ECF No. 42 ¶ 97]. TocMail alleges that it owns a patent for its TocMail product [ECF No. 42 ¶ 98]; operates a website aimed at marketing that product [ECF No. 42 ¶ 90]; and has made its product available for purchase [ECF No. 42 ¶ 96; ECF No. 62]. TocMail also alleges that it "is hindered from selling its patented solution because Microsoft has convinced companies that is has already solved this issue" [ECF No. 42 ¶ 3]. Based on these allegations, the Court finds that TocMail has sufficiently alleged injury as a result of Microsoft's alleged misrepresentations. *See Incarcerated Entm't, LLC v. Warner Bros. Pictures*, 261 F. Supp. 3d 1220, 1223 (M.D. Fla. 2017) (finding that plaintiff sufficiently pled injury by contending that customers drawn to defendant's product would have less demand for plaintiff's).[1]

### V.     Conclusion

For the following reasons, it is **ORDERED AND ADJUDGED** that Microsoft's Motion

---

[1] It is also worth noting that Judge Smith previously ruled that TocMail's Initial Complaint had sufficiently pleaded its False Advertising claim under the Lanham Act [ECF No. 41, p. 5]. TocMail's First Amended Complaint retained the elements of the False Advertising claim sustained in Judge Smith's ruling and was amended consistent with the reasoning in that Order [ECF No. 46, p. 15].

to Dismiss [ECF No. 44] is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 16th day of July 2021.

_____
**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: Counsel of record.