**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-60416-CIV- CANNON/HUNT**

TOCMAIL INC., a Florida corporation,

       Plaintiff,

v.

MICROSOFT CORPORATION, a
Washington corporation,

       Defendant.

_____/

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, TOCMAIL INC ("TocMail"), by and through undersigned counsel, hereby respectfully files its Memorandum of Law in Opposition to Defendant, MICROSOFT CORPORATION'S ("Microsoft"), Motion for Summary Judgment [ECF No. 98], and states:

## I.      INTRODUCTION

TocMail and Microsoft both filed Motions for Summary Judgment in this Lanham Act false advertising case regarding Microsoft's Safe Links – a cybersecurity service that Microsoft has advertised since 2015 as effective against an attack called *IP Cloaking* (also known as *IP Evasion* or *Network Evasion*).  A major difference in the cross-Motions is that TocMail's MSJ relies on Microsoft's own internal documents, which explicitly state how easily attackers use IP evasion to bypass Safe Links, whereas Microsoft's Motion flatly contradicts its own records.

For the last six years, Microsoft has been promoting Safe Links as effective protection against a very specific type of IP evasion – *redirects* that use IP evasion. Specifically, Microsoft promotes protection against hyperlinks, which are "safe links [at the time of delivery] that are **<u>redirected</u>** to unsafe sites by a forwarding service after the message has been received." *Motion*, pp. 14-15. The *only* thing Microsoft's Motion offers that supposedly makes the promised protection true is IP Anonymization (where Safe Links sometimes connects to webpages using a third-party IP address owned by a company called Proxify).  However, an internal April 2019 email explicitly documents that Microsoft's one argument is patently false because "redirected (already resolved) URLs are not going through Proxify."  In other words, Safe Links simply does not use IP Anonymization for *any* of these redirects.  Microsoft's cybersecurity expert Amar Patel testified at deposition that the document is correct that IP Anonymization was not processing any of those redirects.  Moreover, an internal May 2020 document shows that redirects continued to remain a "prominent gap" in "IP Anonymization" contributing to "numerous" instances of Safe

Links failing to detect harmful content. Hence, Microsoft's *one* purported evidence for how Safe Links protects against redirects is a feature that is not even used for redirects.

TocMail's MSJ presents an abundance of Microsoft's own records documenting that the advertisements are literally false. It is well-established that a plaintiff need not present a consumer survey or other evidence for literally false ads. Hence, Microsoft's entire argument on consumer deception is irrelevant. Microsoft attempts to argue that TocMail cannot establish the injury element due to insufficient sales within the *current* marketplace. But, Microsoft's argument is backwards. The injury element considers sales TocMail would likely have made within the market that would have existed had Microsoft's false advertising not occurred – a market in which no company already falsely believes that it has cloud-based protection against IP evasion from one of the biggest tech companies in the world. In such a market, given that TocMail has solved the most common attack used against cloud-based scanners, of course it is likely that at least one company would have purchased TocMail's solution.

Microsoft also seeks summary judgment on all of TocMail's remedies. However, as the movant, it is Microsoft's burden to prove that its advertisements caused **no** damages and will cause **no** damages. TocMail has no burden, and Microsoft did not even attempt to fulfill its burden. Moreover, the Eleventh Circuit is clear that a plaintiff does not need to prove any lost sales to obtain disgorgement of profits under § 35 of the Lanham Act or injunctive relief.

Microsoft's Motion should be denied. Moreover, given that Microsoft's own materials fully establish TocMail's allegations on all of these issues, TocMail's MSJ should be granted.[1]

---

[1] When ruling on the parties' respective motions for summary judgment, the court can consider all of the materials and exhibits filed with any of the parties various memoranda of law. *Aix Specialty Ins. Co. v. Dginguerian*, No. 18-24099-CIV, 2019 WL 4573255, at *3 (S.D. Fla. Sep. 20, 2019).

## II.     BACKGROUND INFORMATION

### A.     The Safe Links Feature.

Office 365 originally had only one email filtering service called Exchange Online Protection (EOP). *Resp. Statement of Facts* ("R. SMF"), ¶ 68.  In April 2015, Microsoft introduced an additional email filtering service called Advanced Threat Protection (ATP), which consisted of Safe Attachments and Safe Links.  *Id.* at ¶¶ 7, 69.

Safe Links cannot be purchased on its own, as it is one of two features in the larger ATP product.  Companies obtain the Safe Links' feature when they purchase versions of Office 365 that include ATP or when they purchase an ATP Standalone product as an add on for versions of Office 365 that do not include ATP.  *Id.* at ¶ 70. Approximately 70% of ATP users actively use the Safe Links feature.  *Id.* at ¶ 11. Importantly, **there are tens of millions of active Safe Links users.** *Id.*

Safe Links primarily consists of two components: reputation and detonation (named *Sonar*). *Id.* at ¶¶ 1, 72. The reputation service merely checks the email URL against a blacklist of previously seen URLs, previously determined bad.  *Id.* at ¶ 1. Jason Rogers ("Rogers"), a Microsoft employee cybersecurity rebuttal expert, testified that IP evasion is "meaningless for those servers. They're simply checking reputation." *Id.*

Detonation (Sonar) attempts to follow links to the webpages to analyze them to determine if the links are good or bad. *Id.* at ¶ 72. Hence, Sonar is the only Safe Links' component responsible for thwarting IP evasion itself.

### B.     Safe Links Does Not Even Use IP Anonymization For Redirects That Use IP Evasion.

Microsoft introduced IP Anonymization (*i.e.* Proxify) in November 2018.  *Id.* at ¶ 74. However, only URLs that matched a specific criteria were sent to Proxify, resulting in IP Anonymization only being used for 4.25% of URLs.  *Id.* at ¶¶ 6, 75.  Significantly, "redirected

4

(already resolved) URLs are not going through Proxify, these URLs [] lie outside of the 4.25% URLs." *Id.*  Hence, **IP Anonymization is not used for *any* of the redirects that Safe Links is promoted as protecting against**.  Amar Patel ("Patel"), Microsoft's other employee cybersecurity rebuttal expert, testified that IP Anonymization was not used for these redirects up through the entirety of 2020 and into 2021. *Id.*

It is patently false for Microsoft to assert that, since the second half of 2018, "hackers will see the third-party's IP addresses, **not** Microsoft's, preventing cyberattacks through IP Cloaking." *Motion*, p. 11 (emphasis in Motion).  Attackers that use the redirects that Safe Links is promoted as protecting against *only* see Microsoft IP addresses, **not** any third-party IP address.

**C.     Microsoft Personally Deceives Companies Even After They Test ATP.**

Microsoft asserts that it cannot be held liable for false advertising because companies "usually test Safe Links before purchasing it," tacitly blaming its customers for not discovering Microsoft's deceit.  *Id.* at p. 6.  Yet, Microsoft's internal records show that even when companies do test ATP, Microsoft personally intervenes to hide the IP evasion flaw from them *after* the test. For example, in December 2020, Visa tested ATP using a combination of hacking techniques: "custom Swift code," "app was signed and notarized," "obfuscate[d] [the] payload," "payload stored in encrypted blob," implemented IP evasion to "bypass Safelinks," and more.  *R. SMF*, ¶ 79. Microsoft internally concluded that IP evasion was "key" to bypassing the Safe Links' feature. *Id.*  However, Microsoft employees decided beforehand that their meeting with Visa is "not meant to be a forum for us to disclose answers." *Id.*  Instead, Microsoft's Abhishek Agrawal told Visa during the meeting that the attack's success was due to a "MacOS gap"; hiding Safe Links' failure to block IP evasion from Visa.  *Id.*

From April 2020 through June 2020, Bosch engaged with Microsoft regarding its tests of ATP. *Id.* at ¶ 80. Bosch explicitly asked: "Why is an IP-address range used which is easily attributable to Microsoft?" *Id.* Microsoft assured Bosch: "We monitor network evasion … to ensure effectiveness." *Id.* Yet, at the very same time, in May 2020, the Sonar team *internally reported* that Sonar is missing **"numerous"** phishing pages because redirects that use "**Network level evasion** (Ex: **Evading Microsoft IPs** …)" are a **"prominent gap"** in Sonar. *Id.* Bosch became a $300 million account for Microsoft. *Id.*

Microsoft has been telling companies that it solved IP evasion long before IP Anonymization. For example, in June 2017, VirtUSA engaged in "an email dialogue on Evasion" with Patel. *Id.* at ¶ 81. Patel told VirtUSA that ATP sees and protects against "GEO-IP" evasion. *Id.* Yet an internal November 2016 email written by Patel documents that he already knew that this was not true: "Currently our network traffic is attributed to Microsoft's network space. Malware Authors can use this info to avoid detection during detonation." *Id.*

Remarkably, companies were perfectly safe from IP evasion before they moved to Microsoft's cloud. *Id.* at ¶ 82. Microsoft deceived companies into moving from perfect safety to being easily attacked. *Id.* at ¶ 77. As a result, **a recent analysis of 4 million Office 365 accounts revealed that 96% of companies using Office 365 show signs of active hacker movement within their company network.** *Id.* at ¶ 83. Microsoft personally intervenes to hide the cause.

**D.      TocMail.**

TocMail sells a full, cloud-hosted implementation of RoundCube with TocMail's patented security embedded inside via a custom plugin. *Id.* at ¶ 25. TocMail has cloud-hosting accounts with Amazon, Digital Ocean, and Linode. *Id.* at ¶ 25. Hence, TocMail's service is designed to scale on demand to facilitate tens of millions of users. *Id.*

Companies can use TocMail to consistently thwart email phishing links imitating the topmost brands even when the links use IP evasion to redirect TocMail to a good site. *Id.* at ¶ 27. Companies can use TocMail to block these links with 100% efficacy, eliminating the approximately 95% of data breaches that rely on such links.[2] *Id.* at ¶¶ 26-27.

### III.    MEMORANDUM OF LAW

For summary judgment "[a] court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hickson Corp. v. N. Crossarm Co. Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citations omitted).  When there is a genuine dispute regarding material facts, the court must view the facts "in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 1776 (2007).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

The material undisputed facts support a finding of Summary Judgment in favor of TocMail, as set forth in TocMail's MSJ.  At a minimum, Microsoft's Motion should be denied.

**A.    The Record Evidence Establishes that Microsoft is Liable for False Advertising.**

The parties do not dispute that a plaintiff prevails on a claim for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by establishing that "(1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the

---

[2] TocMail's patented methodology sends users straight to whatever final site that TocMail is sent to. *R. SMF*, ¶ 84. Hence, when attackers use IP evasion to send TocMail's servers to a good site, TocMail sends the user straight to that good site.  Hence, TocMail is a demonstrable, by-design, *solution*.  TocMail's efficacy is undisputed.  *Id.* at ¶ 13.

misrepresented product or service affects interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false advertising." *Matonis v. Care Holdings Group, L.L.C.*, 423 F. Supp. 3d 1304, 1313 (S.D. Fla. 2019).

**1.    Microsoft's Promotions were Literally False.**

The first element of the Lanham Act is satisfied if the "statements were false or misleading." *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015). For an advertisement to be classified as misleading rather than false, the court must find that the message conveyed, *in its full context*, is indeterminate because it is "ambiguous" or "literally true" while possibly conveying something different (*i.e.* using innuendo and doublespeak to say one thing while perhaps meaning another). *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018).   None of the promotions in this case use confusing innuendo or doublespeak.   In stark contrast, they explicitly promise protection against a very specific (*i.e.* unambiguous) type of link.   Hence, the deceptive messages are literally false not misleading.

Even promotions that clearly *imply* a false message are still literally false; they are literally false by necessary implication.  *See N. Trust Corp. v. Carl Domino, Inc.*, 2006 WL 8433639, *18 FN 19 (S.D. Fla. 2006) ("A literally false 'claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'"); *Green Bullion Financial Servs., LLC v. Money4Gold Holdings, Inc.*, 639 F. Supp. 2d 1356, 1366 (S.D. Fla. 2009) (affirming that "[t]he Court must first analyze what message is conveyed by the advertisement, *even implicitly*, and *then* determine whether that message is false"; and, thus, finding that the subject ads "*imply*" something that is "literally false.") (emphasis added); *N. Am. Med. Corp. v. Axiom*, 522 F.3d 1211, 1225 (11th Cir. 2008); *Tambrands, Inc. v. Warner-Lambert Co.*, 673 F. Supp. 1190, 1194 (S.D.N.Y. 1987); *Church & Dwight Co. v.*

*SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (an ad is literally false if it "is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message.'"); *see also Ameritox, Ltd. v. Millennium Labs., Inc.*, 889 F. Supp. 2d 1304, 1315 (M.D. Fla. 2012).

Moreover, promoting a product as having a capability that it does not have is literally false advertising. *See Abbott Laboratories v. Mead Johnson Co.*, 971 F.2d 6, 13-14 (7th Cir. 1992) (holding that defendant's claims "falsely represent that [Defendant's product] has certain qualities that it in fact does not actually have, and hence are literally false in violation of § 43(a)(2).").
Furthermore, even when a promotion *implies* that a product was made for a specific purpose, or has a specific capability, that promotion is literally false. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Cons. Pharms. Co.*, 290 F.3d 578, 589 (3d Cir. 2002) ('the product name Mylanta 'Night Time Strength' necessarily implies a false message ... that it possesses a quality that is particularly efficacious for those suffering from heartburn at night.'"); *Johnson & Johnson-Merck v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 391 (S.D.N.Y. 2003) ("the claim advanced by P&G's advertising – essentially, that 24 hours heartburn relief can be achieved with one pill of Prilosec OTC – is literally false. 'One pill. 24 Hours. Zero Heartburn' simply does not equal 'One pill. Wait 5 hours. Only then Zero Heartburn for the next 24 hours.'"); *see also Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1367 (Fed. Cir. 2013).

"The test for literally false advertisements is quite simple: '[I]f a defendant's claim is untrue, it must be deemed literally false.'" *Church Dwight v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 903 (D.N.J. 1994).

Here, Microsoft promotes Safe Links as having a specific (unambiguous) capability that it does not actually have. This is clear-cut literally false advertising, *not* misleading advertising.

9

Microsoft argues that its ads cannot be promising protection against IP cloaking/evasion because they do not use that term. *Motion*, p. 11. But, as shown above, falsity is based on the message necessarily implied by the context, not based on dissecting individual words.   *See also Incarcerated Entm't, LLC v. Warner Bros. Pictures*, 261 F. Supp. 3d 1220, 1230-31 (M.D. Fla. 2017) ("The Eleventh Circuit is clear that 'the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.'"); *Am. Home Products v. Procter & Gamble Co.*, 871 F. Supp. 739, 758 (D.N.J. 1994) ("An advertisement may be literally or 'facially false' based on the message it conveys by 'necessary implication,' despite the fact that the false statement was not made 'in *haec verba*.'").

Second, Microsoft argues that the ads are true because "hackers will see the third-party's IP addresses, **not** Microsoft's, preventing cyberattacks through IP Cloaking." (emphasis in Motion). *Id.*  As documented above, for the redirects that Safe Links is promoted as protecting against, it is literally the opposite.  Such hackers *only* see Microsoft IP addresses, **not** any third-party IP address.  Even with recent changes in IP Anonymization, both Rogers and Patel testified that attackers can still redirect Sonar to benign content with 100% efficacy *today*. *R. SMF*, ¶ 1.

a.      **Deceptive Message #1 Is Literally False.**

In April 2020, Safe Links failed to detect a "phishing" site **801 times** simply because the link was **redirecting Sonar to *google.com***. *Id.* at ¶ 85. TocMail's MSJ discloses numerous Microsoft records documenting the same: attackers use IP evasion to redirect scanners to a good site and redirect users to a malicious site when they click the link after delivery.  Microsoft produced a video that visually depicts this exact behavior while the narrator simultaneously speaks Deceptive Message #1. *Id.* ¶ 86.  (See *https://youtu.be/idqTS6-_2t8?t=420*.). The video shows "the first round of security filters" being redirected to *benignlink.com* and the user being redirected to

*malwarelink.com* when clicking the link. *Id.*  Hence, the video clearly depicts the very behavior that Safe Links fails to detect while promoting Safe Links as effective protection against it.

Specifically, the video narration is as follows:

Sophisticated attackers will plan to ensure links pass through the first round of security filters by making the links benign only to weaponize them once the message is delivered, meaning that the destination of that link is altered later to point to a malicious site. … **with safe links we're able to protect users right at the point of click by checking the link for <u>reputation</u> and triggering <u>detonation</u> if necessary**.

(emphasis added). *Id.* Attackers ubiquitously use IP evasion to implement this behavior. *Id.* at ¶ 29. Yet, Rogers has testified that *reputation* is "meaningless" in regards to IP evasion, and Microsoft's own documents show that these redirects that use IP evasion are a "prominent gap" in *detonation. Id.* at ¶ 1. In fact, detonation literally does not contain *any* mechanism to thwart such redirects, as documented in detail above.  Hence, this promotion is literally false.

The video also promotes ATP as blocking 99.9% of malware (video at 02:49). *Id.* ¶ 86. However, "most attacks today use links in the body" and Microsoft's internal documents show that ATP stops as little as 84% of links to malware. *Id.* ¶¶ 88, 96.  Significantly, **Microsoft's documents also show that *all* of these failures are caused by one attack vector – IP evasion – 100%.** *Id.* ¶ 88.  Hence, the purported 99.9% malware protection independently makes the video literally false, with IP evasion being the reason why.

Microsoft also produced an ebook that promotes Safe Links' reputation and detonation as the solution to these very same redirects that change to a malicious destination after delivery. *Id.* ¶ 86. The ebook also promotes the false 99.9% claim of malware protection. *Id.* Hence, the ebook is literally false on both accounts as well.

**b.    Deceptive Message #2 Is Literally False.**

For Deceptive Message #2, Microsoft starts by correctly quoting the ad as follows:

Real-time, time-of-click protection against malicious URLs—EOP scans each message in transit in Office 365 and provides time of delivery protection, blocking malicious hyperlinks in a message. But, **attackers sometimes try to hide malicious URLs with seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received.** ATP's Safe Links feature proactively protects your users if they click **such a link.** That protection remains ***every time*** they click the link, as malicious links are dynamically blocked while good links can be accessed. (emphasis added).

(emphasis added) *Motion*, pp. 14-15.

The ad discusses two features: EOP and Safe Links.  EOP attempts to block malicious URLs at the time of delivery.  However, attackers use one specific type of hyperlink to bypass EOP: "links that are redirected to unsafe sites by a forwarding service after the message has been received."  The ad promises that Safe Links "proactively protects your users if they click **such a link,**" and that protection remains "***every time* they click the link.**"  The ad unambiguously promises that Safe Links protects against one very specific type of link, and the protection remains *every time* this specific type of link is clicked.  However, in order to argue its point, Microsoft goes so far as to rewrite its own ad, stating: "every time the user **clicks on a link,** as Message #2 states." *Id*, p. 15.  But Message #2 states "click **the** link" not "clicks on **a** link." Message #2 explicitly refers to *the specific type* of link that bypasses EOP, not links *in general*. Microsoft misquotes the ad to mischaracterize Message #2 as vague protection against links in general in order to argue that the words following "*every time* the user clicks the link" somehow means that "*in some cases*, ... we can protect against [] known threats." *Motion,* p. 15. The fact that Microsoft had to rewrite "every time they click the link" shows that Microsoft knows that Safe Links does not provide the protection promised in the actual ad.

As documented above, when TocMail entered the market, Safe Links provided zero protection against *redirects* that use IP evasion to change destination when clicked after delivery. Safe Links contained no mechanism for doing so.  Nevertheless, Deceptive Message #2 promises

to keep users safe from these very redirects every time they click such a link. The ad promotes a capability that Safe Links simply does not have. Deceptive Message #2 is literally false.[3]

### c.    Deceptive Message #3 Is Literally False.

Microsoft promotes Safe Links as *ensuring* protection: "Ensure document hyperlinks are harmless with ATP Safe Links" and "ensure hyperlinks in documents are harmless with ATP Safe Links." *Motion*, pp. 15-16. However, given that attackers easily use IP evasion to bypass Safe Links, those ads are literally false.

Microsoft initially argues "ensure" is non-actionable puffery. *Id.* at p. 16 However, none of the cases cited by Microsoft actually find that the word "ensure" renders a promotion as puffery. Contrary to Microsoft's position, courts have found the word "ensure" to be actionable and non-puffery. *See Process Controls Intl. v. Emerson Process Mgmt*, 753 F. Supp. 2d 912, 930 (E.D. Mo. 2010) (finding ad that included the word "ensures" – *i.e.*, "a quality control checklist ensures that the unit complies with industry and regulatory standards" – to be actionable because it is "capable of being proved false" and, thus, non-puffery).

Moreover, Microsoft also argues that the context supposedly conveys that an organization can ensure protection by enabling Safe Links' policy (*i.e.* turning Safe Links on) and by "creat[ing] a custom blocked URL list." *Id.* at p. 17. Remarkably, Microsoft says that it is the customer's responsibility to tell Safe Links the URLs to block if they want to ensure safety. Nevertheless, Microsoft's Brian Wilcox recently wrote: "any attacker can easily create new email addresses and

---

[3] It is also literally false to portray Safe Links as protecting users against redirects that use IP evasion when Safe Links is actually stripping companies from the protection they already had. *R. SMF*, ¶ 82. Companies were previously safe from this attack when using on-premise scanners, and Safe Links *removes* this protection while promising to provide it. *Id.* This is an independent reason why all three messages are literally false, in that Safe Links removes the very protection that the messages promise to provide.

domains to get past block lists." *R. SMF*, ¶ 89.  Hence, Microsoft's own materials document that companies *cannot* use these block lists to *ensure* protection.

Microsoft further argues: "'ensure' is not synonymous with 'guarantee.'"  Yet, not only is "ensure" a synonym for "guarantee," but the Merriam Webster dictionary even includes guarantee as a definition of the word "ensure." *Id.* at ¶ 20.

Lastly, Microsoft argues that it cannot be held liable because other materials it produces do not promise to ensure protection. *Motion*, p. 17. Microsoft fails to provide any legal support for the notion that a company can only be held liable for false advertising if every promotion that it ever creates is false.  Such argument is baseless.

It is literally false for Microsoft to promote that Safe Links ensures hyperlinks are harmless based on the abundance of evidence that Safe Links is easily bypassed.

## 2.   Microsoft's False Ads Deceived or Had the Capacity to Deceive Consumers.

"If the court deems an advertisement to be literally false, then the movant is not required to present evidence of consumer deception." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010) (*citing Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).  Microsoft does not dispute this.

As explained at length in TocMail's MSJ, as well as above, the subject false advertisements are undisputedly literally false.  Thus, evidence of consumer deception is not required here, and Microsoft's MSJ fails on this element.

While TocMail has presented an abundance of evidence demonstrating literally falsity, were the Court to find literal falsity to be a matter to be determined at trial, then summary judgment on consumer deception is still improper. *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1108  FN 15 (M.D. Fla. 2019) (finding insufficient consumer deception evidence "would

not entitle Defendants to summary judgment on the false advertisement claim at this stage because a reasonable jury could still find that the Subject Advertisements are literally false, eliminating the need for [Plaintiff] to present evidence of deception."; *see also Ecore Int'l, Inc. v. Downey*, No. 11-6843, 2020 WL 5501206, *3 (E.D. Pa. Sep. 10, 2020).

### 3. The Deception Had a Material Effect on Purchasing Decisions.

The parties agree that the materiality element for false advertising inquires as to whether "'the defendant's deception is likely to influence the purchasing decision' and can be established by showing that 'the defendants misrepresented an inherent quality or characteristic of the product.'" *Johnson & Johnson*, 299 F.3d at 1250; s*ee also N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (affirming finding that false statements "represent[ing] the quality of the device" "**logically would influence**" purchase decisions and satisfied the materiality element) (emphasis added).

Safety and efficacy are inherent qualities and characteristics of a product. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010) (finding it "**self-evident**" that the **"safety and efficacy"** of the products at issue was material to purchase decisions in that "they misrepresent [an] "inherent quality or characteristic") (emphasis added); *see also Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190, 203 n.11 (N.D.N.Y. 2016). ("Product safety is clearly an 'inherent quality or characteristic' sufficient to meet the materiality requirement.").

Microsoft's false advertisements at issue are all regarding Safe Links, a *cybersecurity* service for Office 365, and the false messages themselves all pertain directly to the *security capability* of Safe Links (*i.e.,* safety of users from cyberattacks). Clearly, the security capability of a cybersecurity product is an inherent quality/characteristic of the product. Microsoft seeks to distract from the logical, self-evident materiality in this case by creating false standards for

materiality and then claiming that TocMail does not meet Microsoft's false standards.[4]
Nevertheless, TocMail's MSJ provides an abundance of undisputed evidence documenting
materiality, including Microsoft's own explicit acknowledgements that security is an inherent
quality of its products, and that it is important to purchase decisions. *R. SMF*, ¶ 90. TocMail's
MSJ further documents that companies specifically inquire as to evasion itself (demonstrating that
it specifically is important to purchase decisions). *Id.* at ¶ 91.  Additionally, some organizations
purchase ATP specifically for the Safe Links' feature.  In fact, Rogers' superior, Girish Chander,
wrote that some organizations "want safe links and phish protection and care less about safe
attachments." *Id.* at ¶ 92. Amar Patel also testified that Safe Links' Detonation "is an essential
component" against phishing attacks because it does "analysis" that no other Microsoft feature
does. *Id.* at ¶ 7.  These statements are additional evidence of materiality.

Finally, Microsoft's purported statistic that claims that 97.3% of commercial tenants have
Safe Links turned off is misleading at best.  70% of ATP users actively use Safe Links.   *Id. at* ¶
11.  Moreover, Safe Links already had acquired tens of millions of active users by May, 2019.[5] *Id.*

---

[4] Microsoft wrongly asserts: "Without having conducted a survey to determine if the three
statements … were material to consumers' decisions … TocMail cannot meet its burden of proof
and summary judgment is appropriate." *Motion*, p. 22. It is clear that in the Eleventh Circuit a
survey is not required.  For example, a survey was not needed to establish materiality in *Osmose*,
612 F.3d at 1319 because the misrepresentation was about the inherent qualities of safety and
efficacy, as is the case here.  Nor was it required in *N. Am. Med. Corp.*, 522 F.3d at 1226 due to a
misrepresentation of an inherent quality.  In fact, the first case Microsoft cites for its proposition
does not even mention the word 'survey' in the entire opinion, let alone suggest that a survey is
required for materiality. *Stiefel Lab, Inc.*, 535 F. App'x 774. Also, the Court in *JB-Weld* merely
pointed out that the consumer survey plaintiff conducted for other purposes was not probative for
the issue of materiality. 978 F.3d 778. It did not state that a survey is required for materiality.
Moreover, the Court noted that JB-Weld did not identify a misrepresented inherent quality or
characteristic because not all ads regarding ingredients involve inherent characteristics. *Id.* FN 11.
[5] Microsoft incredulously asserts that it is "unlikely that any … Microsoft consumers ever viewed"
the false messages because they were purportedly too difficult to even find. *Motion*, p. 6. Yet, for
six years, all three messages have been featured in ATP's most prominent promotional materials,

4.    **The Misrepresented Service Affects Interstate Commerce.**

Microsoft does not seek summary judgment on this element.

5.    **TocMail Is Likely To Be Injured as a Result of the False Advertising.**

a.    **Neither Injury Nor Disgorgement Require Proof Of Damage.**

To confuse the issue, Microsoft repeatedly conflates injury with actual damages. For example, Microsoft references several dates such as 2011 and 2035 and claims that TocMail cannot establish damages during those entire time periods (*e.g.*, "Nor can TocMail prove it is likely to be injured by Microsoft through the year 2035."). *Motion*, p. 25. But, this argument, as well as many others in Microsoft's Motion, speak to the amount of damages, not injury.

Significantly, damages is not relevant to injury nor disgorgement as "the Eleventh Circuit has made clear that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under § 35 of the Lanham Act." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, No. 16-21203-CIV, 2018 WL 10322164, *4 (S.D. Fla. Jan. 13, 2018); *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019) ("[T]he plaintiff is not required to present any evidence of particular financial harm that it suffered so as to justify legal redress" because the entire focus is on the defendant's gain.); *Monsanto Comp. v. Campuzana*, 206 F. Supp. 2d 1252, 1267 (S.D. Fla. 2002) ("The law in the Eleventh Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under 15 U.S.C. § 1117."). Thus, any argument by Microsoft that TocMail cannot establish damages is irrelevant to the injury analysis.

---

and Microsoft continues to disseminate all three deceptive messages *today*. *R. SMF*, ¶¶ 14-15. Not to mention that the intended audience that Microsoft specifies are "highly knowledgeable IT professionals in the cybersecurity industry" — the very type of people who seek out and review such materials. *Motion*, p. 18.

**b.      Only a Likelihood of Injury is Required.**

Injury "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).  The injury element is fully established when the Plaintiff "likely will be[] injured." *Hi-Tech Pharms., Inc. v. HBS Int'l. Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018). "This element of the Lanham Act only requires the Plaintiff to prove that she has been or is *likely* to be injured as a result of the false advertising  . . . ." *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1314 (S.D. Fla. 2019) (emphasis added); *see also U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, No. 19-62225-CIV, 2021 WL 810279, *3 (S.D. Fla. Mar. 3, 2021) ("'Any person who believes that he or she is *likely to be damaged* by' a false or misleading representation of fact . . .") (citing 15 U.S.C. § 1125(a)) (emphasis added); *Church & Dwight Co. v. SPD Swiss Precision Diagnostics*, 843 F.3d 48, 72 (2d Cir. 2016) ("At the liability stage, the Lanham Act 'demands only proof providing a *reasonable basis* for the belief that the plaintiff *is likely to be damaged* as a result of the false advertising.'") (emphasis in original). "Courts have found that causation just requires that the false advertising proximately cause the claimed injury—**it need not be the only cause or even the predominant cause of the injury**." *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1110 (M.D. Fla. 2019) (citations omitted) (emphasis added).

Thus, to establish injury, it merely needs to be *likely* that Microsoft's false advertisements influenced *a* company to withhold trade from TocMail, or that it is likely that Microsoft's false advertisements *will* influence *a* company to withhold trade from TocMail. TocMail already established likelihood of injury in its MSJ.  For example, TocMail and Microsoft are the only cybersecurity vendors that promote their cloud-based, time-of-click services as effective protection against IP evasion. *R. SMF*, ¶ 54.  Thus, it is undisputed that TocMail and Microsoft compete in a

two-player niche in the much broader cybersecurity market, similarly to the facts in the *Merck* case where the plaintiff and defendant competed in a two-player niche within the much broader folic acid market. *See Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 260-61 (2d Cir. 2014) ("Because its only competitor for such a pure product at the time was [plaintiff], it follows that [plaintiff] was damaged by [defendant's] false advertising . . . [and] in the context of a two-player market, . . . the district court's utilization of a presumption of injury carries no risk of speculative injury to [plaintiff]."); *Insurent Agency Corp. v. Hanover Ins. Co.*, 16 Civ. 3076 (LGS) (S.D.N.Y. Aug. 20, 2018). Because the two-player niche is undisputed, the court can grant Summary Judgment to TocMail on the issue of injury. However, should the court deem the existence of a two-player niche to be a matter for the jury to determine, then Summary Judgment should at least be denied to Microsoft on this basis alone. *Robroy Indus. Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512, 2017 WL 1370545, *5 (E.D. Tex. Apr. 10, 2017) ("Robroy, however, cites evidence that during the period at issue in this case, the PVC-coated electrical conduct market has been effectively a two-competitor market. … Accordingly, the Court holds that summary judgment must be denied.").

Moreover, Summary Judgment should be granted to TocMail on the injury element given that Microsoft is falsely claiming to offer something that only TocMail provides. *De Simone v. VSL Pharm., Inc.*, 395 F. Supp. 3d 617 (D. Md. 2019) ("where 'the plaintiff has a monopoly of the kind of wares concerned, and if to secure a customer the defendant must represent his own as of that kind, it is a fair inference that the customer wants those and those only. Had he not supposed that the defendant could supply him, presumably he would have gone to the plaintiff who alone

could.'" Finding that Plaintiff's position as the sole provider "was sufficient to establish proximate causation of injury or likely injury.").[6]

As the sole provider, TocMail was entitled to reap the many benefits of being first to market.  It is beyond dispute that Microsoft's advertisements prevented TocMail from being the first company to promote cloud-based protection against redirects that change destination after delivery; thereby, directly harming TocMail's ability to attract investors, TocMail's ability to obtain press coverage, TocMail's ability to license its patent and, of course, directly affecting companies' perception of the value of that which TocMail offers.

    **c.**    **Microsoft's Arguments Fail as Matter of Law.**

Microsoft argues that TocMail cannot establish injury due to lack of sales.  However, TocMail's lack of sales **is** the injury.  TocMail has solved the most common attack used against cloud-based scanners yet is shutout of the market that it alone has the solution for. *R. SMF*, ¶¶ 29, 84. That is the very basis of this lawsuit.  *See Obesity Research Institute, LLC v. Fiber Research Int'l., LLC*, 310 F. Supp. 3d 1089, 1116-17 (S.D. Cal. 2018) ("**[A] lack of sales is consistent with FRI's alleged economic injury that it was shut out of the glucomannan supplement market** because of ORI's false advertisements. . . Based on the evidence presented, a reasonable juror could find that FRI sought to enter the glucomannan supplement market, but found it was blocked from doing so.") (emphasis added); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949, 954 (D.C. Cir. 1993) (finding lost profits are proper when a Plaintiff is prevented from entering the market due to being "stymied by [defendant's] false advertisements." The defendant argued that

---

[6] TocMail also presented evidence in its MSJ of at least one customer – Bosch – that specifically inquired with Microsoft about Safe Links' protection against IP evasion, and Microsoft provided false information in response. ECF No. 96, p. 29. Had Microsoft not continued its false promotion campaign, Bosch would have had only one company to look to for the cloud-based, time-of-click implementation that it was seeking to use – TocMail. *Id.*

lost profits for a company not entering the market "is purely speculative." The court stated that 'the wrongdoer shall bear the risk of uncertainty which his own wrong has created.'""); *see also Nebula Glass Intern., Inc. v. Reichhold*, 454 F.3d 1203, 1214 (11th Cir. 2006) ("A business can recover lost prospective profits regardless of whether it is established or has any 'track record.'").

Thus, Microsoft's argument regarding TocMail's lack sales is not only contradictory to applicable law, but TocMail's lack of sales is entirely consistent with its alleged economic injury that it was shut out of the market that it alone has the solution for.

Moreover, because the Lanham Act allows for recovery of *future sales*, a lack of past sales cannot be dispositive. *Par Sterile Prods., LLC v. Fresenius Kabi USA LLC*, 14 C 3349, 2015 WL 1263041, *2-3 (N.D. Ill. March 17, 2015) (finding false advertising claim under Lanham Act appropriate even when plaintiff had not yet begun to sell its product) (*citing Lexmark*, 134 S.Ct. at 1389-90 ("Lanham Act false advertising cause of action protects against 'unfair competition,' which is 'concerned with injuries to … present *and future sales*.'")) (emphasis original).

Furthermore, Microsoft continues to generate new false advertisements; thereby increasing the potential for future harm. *R. SMF*, ¶ 95. *See Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) ("So long as www.audisport.com stayed online, there was potential for future harm"); *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 882 (S.D. Ohio 2007) ("Here, there is potential for future harm from infringement because Defendant has continued its infringing activities after notice from Microsoft and the filing of this lawsuit.").

Regardless, it is backwards for Microsoft to argue that TocMail cannot establish the injury element due to a lack of sales in the *current marketplace*. The injury element considers whether it is *likely* that TocMail would have made at least *one* additional sale within the market that would have existed had Microsoft's false advertising not occurred – a market in which no company

already believes it has cloud-based protection against IP evasion.  In such a market, given that TocMail solved the most-common attack used against cloud-based scanners, clearly it is likely that at least one company would purchase TocMail's solution. *R. SMF,* ¶¶ 29, 84.  Instead, Microsoft had already used false advertising to pull tens of millions of users out of the market before TocMail entered.  *Id* at*,* ¶ 11. In the current market, companies that believe that Microsoft is providing them the same protection unsurprisingly choose to stay with one of the largest tech companies in the world rather than switching to a no-name start-up — to the direct injury of the startup.

Moreover, Microsoft's argument that TocMail "has not even tried to make any" sales is blatantly false.  *Motion*, p. 25.  It is equally false to assert that "TocMail has not engaged in other marketing" beyond a press release, some investor letters, and $4,500 in advertising. *Id.* at p. 5.  As noted in TocMail's response to Microsoft's Interrogatory No. 13, the initial $4,500 was invested to drive the first 10,000 visitors to TocMail's website (as 10,000 visitors is representative of the behavior of 1 million visitors with a 95% confidence level). *R. SMF,* ¶ 31. TocMail has engaged in *additional advertising* to drive more than 33,000 visitors to its website. *Id*. TocMail has undergone three stages of trying various marketing messages, as well as releasing TocMail 2.0 which includes *TocDocs*, which add TocMail's patented protection to links found in PDFs, Word, and Excel documents. *Id*.  Each messaging/product change was tested with a 10,000 visitor sample. *Id*.  TocMail is currently designing yet another offering, and will again test with a 10,000 visitor sample; and continue sample testing every future change as well. *Id*.  Hence, TocMail has been taking substantial efforts in its attempts to break into the market, and will continue to do so.

Microsoft cites *Lexmark* to support its assertion: "By failing to survey consumers, let alone speak to a single consumer, TocMail cannot establish Microsoft's advertising of Safe Links proximately caused its alleged injury."  Yet, *Lexmark* states "Even when a plaintiff cannot quantify

its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief under §1116(a) (assuming it can prove a *likelihood* of future injury) or disgorgement of the defendant's ill-gotten profits under §1117(a)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135-36 (2014). Hence, injury can be established based on a likelihood of future injury alone, fully negating Microsoft's premise that proof of past damages is required. Moreover, the court in *CareDx* found: "For one thing, the law does not support Natera's narrow view that a plaintiff cannot demonstrate proximate cause if it has not alleged past harm due to lost sales. After all, the language of the Lanham Act itself, as set out above, demonstrates that it is meant to protect any person 'who believes that he or she is *or is likely to be damaged*' by the defendant's false advertising." *CareDx, Inc. v. Natera, Inc*., No. 19-662, 2019 WL 7037799, *5 (D. Del. Dec. 20, 2019) (emphasis in original) (adopted in full by 2020 WL 401773). The court went on to find that "the fact that [plaintiff] has not pointed to a specific, already-lost sale is not dispositive of CareDx's false advertising claim." *Id.* at *7.

Microsoft improperly cites *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325 (11th Cir. 2008) for the proposition that a plaintiff cannot establish injury when the plaintiff's product was not for sale at the time of the advertisement. Initially, the court in *Natural Answers* found that the plaintiff "lack[ed] prudential standing to bring its separate *Lanham Act* false advertising claim." *Id.* at 1330. However, the prudential standing test was abrogated by the Supreme Court in *Lexmark* and, thus, **Natural Answers is not even good law**. *Id.* Regardless, in *Natural Answers*, the plaintiff had already *exited* the market, with no ability to reenter, months before the defendant entered in. *Id.* at 1327. The defendant's advertising could not cause plaintiff damage because the plaintiff was no longer selling its product, nor was the plaintiff going to reenter the market. *Id.* This present case is the mirror opposite. Here, Microsoft (defendant) entered the

market first and used false advertising to acquire customers before TocMail (plaintiff) entered. Moreover, Microsoft continued the false advertising campaign after TocMail entered the market.

Microsoft next incorrectly claims that TocMail abandoned reputational injury. *Motion*, p. 26. Yet, TocMail did oppose Microsoft on this issue in the very section Microsoft cited.  *See* ECF No. 46, p. 21.  Microsoft inappropriately cites *St. Charles Mfg. Co. v. Mercer*, a case about evidence at *trial* to wrongly propose that TocMail is required to present evidence regarding this remedy at *Summary Judgment*.

Finally, Microsoft argues that TocMail cannot establish injury because "TocMail did not engage any expert to conduct any *damages* causation analysis." *Motion*, p. 26 (emphasis added). Not only is Microsoft once again conflating injury with damages, but an expert is not even required to support an award of damages. *See ADT v. Alarm Prot. LLC*, No. 9:15-CV-80073, 2017 WL 2212541, *9 (S.D. Fla. May 17, 2017) ("'[The Lanham Act] demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable jury may calculate damages.'"). (brackets in original).

Microsoft has been trying, and failing, for fifteen years to solve this customer impacting issue. *R. SMF*, ¶ 73.  Then, when TocMail solved the problem, it could not sell it on the marketplace. That is significant injury.  Summary Judgment on the issue of injury should be denied as to Microsoft,[7] and granted as to TocMail.

---

[7] Should the court find "a genuine issue of fact exists as to whether an advertisement is literally false, '[a] domino effect occurs ... [and a] presumption is created in the plaintiff's favor with respect to the remaining elements that are typically contested in Lanham Act false advertising cases, thereby precluding the grant of summary judgment in favor of the defendant.'" *Fortress Secure Sols. LLC v. AlarmSIM LLC*, No. 4:17-CV-5058, 2019 WL 7816820, *9 (E.D. Wash. Dec. 5, 2019).

**B.      TocMail Is Entitled To Disgorgement, Damages, And Injunctive Relief.**

In a false advertising Lanham Act case, a plaintiff may seek both disgorgement of the defendant's profits and actual damages sustained by the plaintiff.  15 U.S.C. § 1117.  "This recovery is cumulative, that is, the Court may award [the plaintiff] both its damages and [the defendant's] profit[]." *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir. 1994).  Moreover, as discussed above, it is well-established in the Eleventh Circuit that disgorgement of profits is not tethered to the amount of actual damages.  *See e.g., Hard Candy, LLC*, 2018 WL 10322164 at *4.  Unlike other circuits, the Eleventh Circuit does not view disgorgement as synonymous with a monetary award.  *Mycoskie, LLC v. 2013toms.com*, No. 14-61551-CIV, 2014 WL 12531313, at *4 (S.D. Fla. July 22, 2014) ("An accounting of profits under § 1117(a) is not synonymous with an award of monetary damages" as it is based solely on the principles of equity) (citations omitted).

**1.      TocMail Is Entitled To Disgorgement Of Microsoft's Gross Profits.**

"An accounting of a defendant's profits is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019). "[T]he factors warranting profit awards are stated in the disjunctive . . . Therefore, a court could base a profit award upon a finding of any one of these factors." *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990).

"An accounting for profits has been determined by this Court to further the congressional purpose by making [the wrongdoing] unprofitable, and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future." *Burger King Corporation v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999); *see also Neva, Inc. v. Christian*

25

*Duplications Intern'l, Inc.*, 743 F. Supp. 1533, 1552 (M.D. Fla. 1990); *Monsanto Comp. v. Campuzana*, 206 F. Supp. 2d 1252, 1267 (S.D. Fla. 2002) (same).

TocMail's MSJ documents that Microsoft has known about IP evasion for *fifteen years*, and has internally acknowledged how "easy" – even "trivial" – it is for attackers to bypass Safe Links using it.[8] Yet Microsoft *willfully* persisted in promoting Safe Links as protection against it. Moreover, Microsoft repeatedly directly engaged with customers to personally hide this flaw from them. Microsoft's false advertising was certainly willful and deliberate. Microsoft continues to falsely promote such protection even today, which also establishes willfulness. *R. SMF*, ¶ 15. *Drew Estate Holding Co. v. Fantasia Distrib., Inc.*, No. 11-21900, 2014 WL 1319328, *5 (S.D. Fla. Apr. 1, 2014) ("Once a defendant is on notice of the alleged infringement, willfulness can be inferred from the defendant's deliberate conduct.").[9]

Moreover, despite Microsoft's argument that it has not been unjustly enriched by its false advertising, Microsoft has certainly profited substantially from the sale of Safe Links, as shown by its own revenue data as set forth in the parties' respective expert reports. (ECF Nos. 99-1, 99-2). Finally, it is hard to imagine a better basis for deterring future conduct of one of the largest, most-trusted tech companies in the world who has been deceiving customers by promoting a

---

[8] In fact, in 2006, Microsoft researchers wrote, in three separate reports, that cloaking is "popular," "well-known," and "commonly used." *R. SMF*, ¶ 94. Also, in 2006, Microsoft researchers wrote about the following "cloaking behavior": "Redirecting [scanners] to known-good sites such as google.com." *Id.* This is the same exact attack that continues to evade Safe Links today – the very attack that Safe Links is promoted as protecting against. Microsoft's actions are clearly willful.

[9] Even after September 2020, a Microsoft powerpoint presentation stated: "Safe Links wraps the URL to *ensure* it's not malicious at the time-of-click." *R. SMF*, ¶ 95 (emphasis added). In February 2021, Microsoft released a promotion promising that Safe Links *ensures* protection against *every* evasion tactic: "Safe links ensure[s] real-time, dynamic protection against email campaigns *no matter the ... e*vasion tactic." *Id.* Remarkably, even in July 2021, after TocMail's MSJ was filed, Microsoft launched *three* new Safe Links' promotions regarding the specific *redirects* at the center of this case. For example: "attackers now send benign links. *Once the link has been delivered*, the attacker *redirects* the link to a malicious site." *Id.* (emphasis added).

security capability that it does not actually provide.  While only one of these three grounds for disgorgement is necessary, all three grounds necessitate disgorgement.

Microsoft's primary argument for seeking summary judgment on disgorgement is that Plaintiff's damages expert, Marcie D. Bour ("Bour"), did not apportion revenue of Safe Links from ATP and Office 365. *Motion*, pp. 27-28.  Such argument is directly contradictory to all applicable law, as explained in depth in TocMail's Response to Microsoft's *Daubert* Motion (ECF No. 73). "'[T]he plaintiff need only prove gross sales and then it is up to the infringer to prove which, if any, of those sales were not attributable to the wrongful act, and deductible costs and expenses to arrive at net profits.'" *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1315-16 (S.D. Fla. 1998) (citation omitted).[10] *Axiom Worldwide, Inc. v. Excited Med. Corp.*, 591 Fed.Appx. 767, 777 (11th Cir. 2014) (affirming district court's award of defendant's profits where plaintiff "met its burden to prove gross sales revenue," but the defendant "failed to meet 'its burden of proving that any portion of its sales were not attributable to its wrongful acts or that its sales included deductible costs and expenses.'"); *Ameritox*, 2014 WL 1456347 at *9-10 ("[The defendant] argued that, under §1117(a), [the plaintiff] bore the burden of establishing what portion of [the defendant's] profits were due to the allegedly false [advertising], as opposed to other aspects of the packaging and promotion of the [defendant's] products. [The plaintiff] disagreed and argued that it was only required to prove [the defendant's] sales and that [the defendant] had to establish any apportionment.... [T]he Court agrees with [the plaintiff]") (citation omitted); *Axiom Worldwide, Inc. v. HTRD Group Hong Kong Ltd.*, 2013 WL 3975675 *11 (M.D. Fla. July 31,

---

[10] The Lanham Act "covers claims for both trademark infringement and false advertising" and thus neither "the calculation of damages or appropriate awards to a plaintiff should be altered based upon the nature of the violation under the Act." *Hard Candy*, 2018 WL 10322164 *8 FN 10 (S.D. Fla. Jan. 13, 2018).

2013); *Nutrivida*, 46 F. Supp. 2d at 1316 ("Any doubts about the actual amount of gross sales or profits will be resolved against the infringing party.").

The parties' Joint Statement of Material Facts says: "Safe Links is not a stand-alone product and therefore cannot be purchased on its own. Customers obtain access to Safe Links when they purchase ATP as a separate add-on service to Office 365 or purchase an Office 365 suite that includes ATP." *See* ¶ 3.  Thus, it is undisputed under well-settled law that TocMail only has to show sales of ATP and Office 365 for purpose of disgorgement, which it admittedly did, and then the burden shifts to Microsoft to provide any portion of its sales that were not allegedly attributable to the false advertising.

Under well-established law, if the defendant does not apportion which profits are unattributable to the wrongdoing, then the plaintiff receives the full amount of gross sales, even it if that represents a windfall. *See Tiramisu Intern. LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1290 (S.D. Fla. 2010) ("**The Supreme Court explained that '[t]here may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.'**") (*quoting Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207 (1942)) (emphasis added); *Wyndham Vac. Ownership, Inc. v. Am. Consumer Credit, LLC*, No. 18-CIV-80095, 2019 WL 11025869 *3 (S.D. Fla. Oct. 20, 2019) (same quote); *Ameritox*, 2014 WL 1456347 at *10 (citations omitted) ("[I]f the defendant can apportion its profits, then the plaintiff is given the appropriate amount and not a windfall. If the defendant cannot apportion its profits, equity supports the view that, **having already been held liable for [violating the Lanham Act], it is the defendant who should suffer the consequences of its own failure to apportion its profits.**"); *Hard Candy*, 2018 WL 10322164 at *6 ("There may well be a windfall to the

[Plaintiff] where it is impossible to isolate the profits which are attributed to the [wrongdoing]. But to hold otherwise would give the windfall to the wrongdoer.").[11]

Indeed, "Numerous courts have held that 'when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales." *Tiramisu*, 741 F. Supp. 2d at 1291; *see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490, 2011 WL 2295269 *4 (S.D. Fla. June 8, 2011) (finding that when a defendant fails to carry its "statutory burden" under 15 U.S.C. § 1117, "the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales.").

Here, the Court should not only deny Microsoft's request for summary judgment on the issue of disgorgement but should also enter summary judgment on disgorgement in TocMail's favor based on the gross sales presented in Bour's Report.  It is undisputed that Bour provided accurate sales of ATP and Office 365 in her Report, as confirmed by Microsoft's expert, Keith Ugone, at his deposition.  *R. SMF*, ¶ 93.  It is undisputed that Microsoft's financial expert has not attempted to apportion profits of those sales. *Ugone Report* (ECF No. 99-1). Moreover, Microsoft, through its 30(b)(6) corporate representative, confirmed that Microsoft does not maintain financial information at the Safe Links level. *TocMail Daubert Resp.*, p. 9 (ECF No. 73). Hence, it is no longer possible for Microsoft to fulfill its statutory burden.  Thus, it is undisputed that TocMail's entitlement to profits is equal to those sales of ATP and Office 365.[12]

---

[11] In fact, disgorgement is proper for any product reasonably related to the improper conduct, even if it does not contain the misrepresented feature. *See Superior Consulting Servs., Inc. v. Shaklee Corp.*, Case No: 6:16-cv-2001, 2018 WL 2182303, *2 (M.D. Fla. May 9, 2018).

[12] The Court can grant TocMail Summary Judgment on disgorgement of Microsoft's gross profits even as the non-moving party on this issue. *Aix Specialty Ins.*, 2019 WL 4573255, at *3 (S.D. Fla. Sep. 20, 2019). Moreover, the Court can grant TocMail summary judgment on disgorgement even without a finding of willfulness. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S.Ct. 1492 (2020).

### 2.      Summary Judgment To Microsoft On Damages Is Not Proper.

Because damages is not an element of the case, an absence of evidence from TocMail is not grounds for granting Microsoft Summary Judgement.  "Defendants, as the movants here, have the burden to prove that Defendants' conduct caused [Plaintiff] *no* damages." *Georgian v. Zodiac Group, Inc.*, No. 10-CIV-60037, 2011 WL 3349573, *9 n.15 (S.D. Fla. Aug. 3, 2011); *see also Am. Fireglass v. Moderustic, Inc.*, 365 F. Supp. 3d 1062, 1083 (S.D. Cal. 2019); *LegalForce RAPC Worldwide P.C. v. DeMassa*, No. 18-cv-00043, 2020 WL 4747909, *3-4 (N.D. Cal. Aug. 17, 2020) ("Although, as defendant points out, plaintiff has not, in support of its motion for summary judgment or in any subsequent filing, offered evidence establishing a loss of money or property attributable to defendant's advertising, **the absence of any such evidence in the current record is not, as discussed above, a ground upon which summary judgment may be granted**.") (emphasis added).

Microsoft's burden is to prove that it is impossible that its ads have caused TocMail to lose a single sale, and impossible for them to cause TocMail to lose a single future sale. Yet, Microsoft's entire damages argument is based on the contention that TocMail has failed to submit sufficient evidence to support damages, including claiming that TocMail relied on improper assumptions in calculating damages.[13]  Rather than presenting evidence of no damages, as Microsoft was required

---

[13]Moreover, Microsoft blatantly mischaracterizes TocMail's damages' model. For example, TocMail's lost profits is not based on a single customer leaving Microsoft, let alone 100 million of them. *R. SMF*, ¶¶ 25, 51, 53. Moreover, Bour's Report provides an upper-bound based on one-to-one sales over the maximum duration of time, and provides granular detail for the jury to calculate its damages based on its own determination of the percentage of customers and duration of damages. *Id.* at ¶ 53.  *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 526 (10th Cir. 1987) ("Brunswick bases its claim for damages on the theory that Zebco lost one sale of a Model 33 as a result of each Spinit SR 210 reel sold. While this court does not necessarily believe that each Spinit sale resulted in a corresponding loss of sale by Zebco, **the theory provides an upper range for an award of damages**.") (emphasis added).

to do, it simply prematurely attacks TocMail as if TocMail were the moving party.  TocMail has

not yet presented its full evidence of damages. Moreover, even if Bour's report is stricken, TocMail

would still be entitled to proceed to trial on the issue of actual damages.[14] Microsoft has not even

attempted to meet its burden and summary judgment on the issue of damages must be denied.

### 3.    Microsoft Has Not Met Its Burden of Proving No Injunctive Relief.

Finally, Microsoft argues that TocMail is also not entitled to injunctive relief because it

cannot show irreparable harm, and Microsoft cites an inapplicable case stating that the plaintiff's

harm had already occurred.  *Motion*, p. 30.  However, here, as discussed above, Microsoft is still

to this day promoting the subject false ads. *R. SMF,* ¶¶ 14-15. Thus, if TocMail prevails on its

claim, injunctive relief is the necessary remedy to require Microsoft to cease its false advertising.

### IV.    CONCLUSION

TocMail respectfully requests that the Court deny Microsoft's Motion for Summary

Judgment.  TocMail also requests that the Court enter Summary Judgment in favor of TocMail.

---

[14] The only case Microsoft cites is *BASF Corp. v. Nu- Vision, LLC*, a case unrelated to the Lanham Act.  In stark contrast, "'[The Lanham Act] demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable jury may calculate damages.'" *ADT*, 2017 WL 2212541 at *9; *see also Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) ("Lanham Act damages may be awarded even when they are not susceptible to precise calculations: … '[a] plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference.'"); *Pods Enters., LLC v. U-Haul International, Inc.*, 126 F. Supp. 3d 1263, 1282 (M.D. Fla. 2015) ("contrary to [defendant's] argument … that [plaintiff] was required to prove damages 'with specificity,' a Lanham Act plaintiff may recover damages 'even when they are not susceptible to precise calculations.'").

Dated:  August 13, 2021

Respectfully submitted,

By:   /s/Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
Email: josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd.
Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorneys for Plaintiff, TocMail Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of August, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   /s/ Joshua D. Martin
Joshua D. Martin

## SERVICE LIST

### *TOCMAIL INC. v. MICROSOFT CORPORATION*
### 20-60416-CIV- CANNON/HUNT

**Joshua D. Martin**
E-Mail: josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd.
Suite 430
Fort Lauderdale, Florida 33309
Telephone: (954) 790-6699
Facsimile: (954) 206-0017

**Francisco O. Sanchez**
E-Mail: sanchezo@gtlaw.com
         orizondol@gtlaw.com
**Evelyn A. Cobos**
E-Mail: cobose@gtlaw.com
         MiaLitDock@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

**Mary-Olga Lovett** *(admitted pro hac vice)*
E-Mail: lovettm@gtlaw.com
**Rene Trevino** *(admitted pro hac vice)*
E-Mail: trevinor@gtlaw.com
GREENBERG TRAURIG LLC
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile: (713) 374-3505