UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 0:20-cv-60416-CANNON/HUNT

TOCMAIL, INC., a Florida corporation,

      Plaintiff,

v.

MICROSOFT CORPORATION, a Washington
corporation,

      Defendant.

**DEFENDANT MICROSOFT CORPORATION'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................ 1

II.  OPPONENT'S MATERIAL FACTS AND ADDITIONAL FACTS ................................... 2

    A.  The Microsoft Feature At-Issue, Safe Links ........................................................... 2
    B.  The Cyberattack Tactic At Issue, IP Cloaking ........................................................ 4
    C.  Safe Links' Layers Collectively Provide Effective Protection from
        Cyberattacks, Including Those Employing IP Cloaking ......................................... 5
    D.  The Advertisements At Issue .................................................................................... 6
    E.  TocMail's Claim ...................................................................................................... 7

III.  STANDARD OF LAW .................................................................................................... 8

IV.  ARGUMENT ................................................................................................................... 9

    A.  TocMail Has Not Established the At-Issue Advertisements Are Literally
        False. ......................................................................................................................... 9

           i.  None of the Messages Discuss IP Cloaking Nor Do They
                Guarantee 100% Effectiveness. ................................................................. 10
           ii.  TocMail's Reliance on Documents That Do Not Pertain to Safe
                Links Cannot Establish Literal Falsity ...................................................... 11
           iii.  TocMail's Reliance on Documents That Do Not Pertain to IP
                Cloaking Cannot Establish Literal Falsity. ............................................... 12
           iv.  TocMail's Reliance on Documents That Pertain to Only One Layer
                of Safe Links Cannot Establish Literal Falsity. ....................................... 13
           v.  TocMail's Reliance on Documents That Show Microsoft Works to
                Improve the Efficacy of Safe Links Cannot Establish Literal
                Falsity ......................................................................................................... 14
           vi.  Message #1 is Not Literally False. ............................................................ 15
           vii.  Message #2 is Not Literally False. ............................................................ 17
           viii.  Message #3 is Nonactionable Puffery ....................................................... 18

    B.  TocMail Cannot Establish the At-Issue Advertisements Deceived, Or Had
        A Capacity to Deceive Consumers ........................................................................ 20
    C.  TocMail Has Not Established the At-Issue Advertisements Had a Material
        Effect on Consumers' Decisions to Purchase ATP or Office 365 with
        ATP. ....................................................................................................................... 21
    D.  TocMail Has Not Established It Has Been, Or Is Likely to Be, Injured by
        the At-Issue Advertisements. ................................................................................. 24

V.  CONCLUSION ............................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
   997 F.2d 949 (D.C. Cir. 1993) ...................................................................................28

*Anthony v. Anthony*,
   642 F. Supp. 2d 1366 (S.D. Fla. 2009) ........................................................................9

*In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*,
   No. 08 CIV 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .............19

*Belcher Pharms., LLC v. Hospira, Inc.*,
   419 F. Supp. 3d 1292 (M.D. Fla. 2020), *aff'd*, 1 F.4th 1374 (11th Cir. 2021) ........21

*Club Exploria, LLC v. Austin*,
   No. 618CV576ORL28, 2020 WL 6585802 (M.D. Fla. Nov. 10, 2020) ...................22

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*,
   911 F.2d 242 (9th Cir. 1990) ....................................................................................18

*De Simone v. VSL Pharms., Inc.*,
   395 F. Supp. 3d 617 (D. Md. 2019) ..........................................................................25

*Eli Lilly & Co. v. Arla Foods, Inc.*,
   893 F.3d 375 (7th Cir. 2018) ....................................................................................25

*Gibson v. Resort at Paradise Lakes, LLC*,
   No. 8:16-CV-791-T-36AAS, 2018 WL 10373435 (M.D. Fla. Feb. 2, 2018)...............8, 20, 23

*Hickson Corp. v. N. Crossarm Co.*,
   357 F.3d 1256 (11th Cir. 2004) ................................................................................20

*J-B Weld Co., LLC v. Gorilla Glue Co.*,
   978 F.3d 778 (11th Cir. 2020) .............................................................................21, 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014).................................................................................................24

*Miccosukee Tribe of Indians of Fla. v. United States*,
   516 F.3d 1235 (11th Cir. 2008) ..................................................................................9

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
   745 F. Supp. 2d 1359 (S.D. Fla. 2010), *aff'd*, 702 F.3d 1312 (11th Cir. 2012).....................21

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*,
   522 F.3d 1211 (11th Cir. 2008) ................................................................................22

*Natural Answers, Inc. v. SmithKline Beecham Corp.*,
   529 F.3d 1325 (11th Cir. 2008) ....................................................................10, 27, 28

*Oestreicher v. Alienware Corp.*,
   544 F. Supp. 2d 964 (N.D. Cal. 2008), *aff'd*, 322 F. App'x 489 (9th Cir. 2009) ...................19

*Patt v. Antech Diagnostics, Inc.*,
   No. 818CV01689JLSDFM, 2019 WL 6654078 (C.D. Cal. July 30, 2019)...........................18

*Schering Corp. v. Pfizer Inc.*,
   189 F.3d 218 (2d Cir. 1999)........................................................................................................9

*Stiefel Lab., Inc. v. Brookstone Pharm., L.L.C.*,
   535 F. App'x 774 (11th Cir. 2013) .................................................................................10, 24

*United Indus. Corp. v. Clorox Co.*,
   140 F.3d 1175 (8th Cir. 1998) ..............................................................................................9, 18

*Verisign, Inc. v. XYZ.COM LLC*,
   848 F.3d 292 (4th Cir. 2017) .....................................................................................................9

*Weaver v. Champion Petfoods USA Inc.*,
   No. 20-2235, 2021 WL 2678801 (7th Cir. June 30, 2021)........................................................2

*Williams v. Aztar Indiana Gaming Corp.*,
   351 F. 3d 294 (7th Cir. 2003) ..................................................................................................18

## Other Authorities

Fed. R. Civ. P. 56(a) .....................................................................................................................9

## I.  **INTRODUCTION**

Plaintiff TocMail, Inc. ("TocMail") claims Defendant Microsoft Corporation ("Microsoft") violated the Lanham Act because it made three advertising statements about its Safe Links feature that were false because Safe Links purportedly cannot provide protection against a specific type of cyberattack tactic it refers to as IP Cloaking.  In its Motion for Summary Judgment as to Liability (ECF No. 96) (the "Motion"), TocMail failed to alternatively argue that any of the allegedly deceptive messages could be merely misleading, and thus must prove they are literally false.  It does not and cannot do so, and its Motion should be denied.

Per TocMail's claim, only facts pertaining to Safe Links and IP Cloaking can possibly be at issue at summary judgment. Thus, TocMail cannot meet its burden, as it attempts to do, by relying on internal emails showing purported weaknesses of Microsoft products and services other than Safe Links, or purported instances where Safe Links failed to catch a malicious link utilizing a tactic other than IP Cloaking.  Similarly, documents purportedly showing that one of Safe Links' various layers of protection failed to detect a malicious link, or that Microsoft is working to improve Safe Links, cannot prove that Safe Links does not provide the protection advertised, let alone that the advertisements are literally false.

Further, without a consumer survey, market research, or expert opinion, TocMail has no evidence to prove consumers saw the messages, were deceived by them, and that they were material to their decisions to purchase Safe Links over TocMail's product, all of which are essential elements of TocMail's claim. Moreover, under Eleventh Circuit precedent, TocMail cannot establish it was proximately injured by any alleged false advertising occurring when TocMail had no product in the market.  Thus, most of its purported evidence is irrelevant and immaterial.

Importantly, none of the three alleged false advertising messages at issue mention IP Cloaking or guarantee 100% effectiveness against any cyberattack. They merely state, without qualification or quantification, that Safe Links provides protection from bad links when users click on them. Therefore, despite TocMail's characterization of the messages, it must establish that Safe Links provides *no protection* from malicious links to prove its literal falsity claim. Yet it cannot do so because Safe Links does provide the general protection from malicious links as advertised, through its various features and capabilities, and these layers of protection are effective at preventing various types of cyberattacks, including 95% of attacks through IP Cloaking.

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, No. 20-2235, 2021 WL 2678801, at *7 (7th Cir. June 30, 2021). TocMail "has failed to offer sufficient evidence to support [its] claim[]," *id.* at *8, and thus, the Motion should be denied in its entirety.

## II.   OPPONENT'S MATERIAL FACTS AND ADDITIONAL FACTS

### A.  The Microsoft Feature At-Issue, Safe Links

TocMail alleges Microsoft has engaged in the false advertising of Safe Links, a cybersecurity feature integrated within a larger cloud-based security suite originally named "Advanced Threat Protection" ("ATP") but recently renamed "Microsoft Defender for Office 365" ("Defender") (referred to herein as either "ATP" or "Defender," interchangeably). *See* ECF No. 95, Parties' Joint Statement of Undisputed Facts ("JSUF") ¶ 1. The Safe Links feature was developed in 2015 and protects users from malicious URLs in emails and their attachments, at the time of delivery (*i.e.*, when an email containing a URL is delivered to a user inbox) and at the time-of-click (*i.e.*, when a URL is clicked by a user). *Id.* ¶ 2; ECF No. 100, Microsoft's L.R. 56.1(a) Statement of Material Facts ("SMF") ¶ 1. Safe Links provides protection, in part, by identifying

2

and blocking known malicious links by checking the URL against Microsoft's most current data on URL reputation when a user clicks on a URL, which is often done without Safe Links having to visit the URL itself. SMF ¶ 2; Microsoft's Additional Facts in Opposition to TocMail's Motion ("Add'l Facts") ¶¶ 10, 14. This "reputation block" feature identifies and remembers threats (malicious URLs) and applies that knowledge to determine the reputation of a URL at the time a user clicks on the URL. Add'l Facts ¶ 11. Safe Links also protects users from malicious links that were not known to have a malicious reputation by warning users of malicious links it detects after opening the link in a sandbox environment (detonation). SMF ¶¶ 1, 3; Add'l Facts ¶¶ 10, 13. This detonation service is internally known as "Sonar," and automatically updates Safe Link's URL reputation data with bad verdicts it receives from detonated URLs. Add'l Facts ¶ 12.  In this way, both features work together to protect users from malicious links that were unknown at the time of delivery but were discovered to be malicious post-delivery. *Id*. ¶ 13. TocMail refers to these two steps as Safe Link's reputation service and detonation server (Sonar). *See* Mot. at 3-4.

Microsoft does not guarantee that Safe Links can block every single type of cyberattack every single time, as hackers are constantly evolving their techniques in the ever-changing threat landscape. SMF ¶ 12. Sometimes, Safe Links obtains "false negatives" ("FN"), a determination that a URL is clean, when it is, in fact, malicious; however, Safe Links can correct this and still protect users from malicious links by updating or clearing the reputation server's memory and using a time travel mechanism to remove a bad email from a user's inbox, as well as other overrides. Add'l Facts ¶ 15. Importantly, Microsoft does not advertise that Safe Links is 100% effective or that it protects users 100% of the time from cyberattacks. SMF ¶ 13. Microsoft's ATP FAQs document dispels any notion to the contrary with the following Q&A: "Will ATP catch 100% of malicious attacks? No. In fact, no advanced threat protection product can catch 100% of

malicious attacks." *Id*. ¶¶ 13, 21.  Likewise, its product brochure anticipates that its consumers will experience malicious content getting through to their system, stating: "Even if the message passes through detonations, the content is analyzed further … and we take actions based on what you have configured as policy." *Id*. ¶ 13.  This is also made known to customer-facing Microsoft professionals. *Id*. ¶ 22.  Still, Safe Links effectively protects users from malicious links. *Id*. ¶ 6.

Safe Links is a feature that cannot be purchased on its own; consumers can only access Safe Links when they purchase Defender or an Office 365 suite that includes Defender. JSUF ¶ 3; SMF ¶ 7. Defender is a robust cloud-based email filtering service with various features, one of which is Safe Links, that together help protect against malware, viruses, and harmful links, and offers rich reporting and URL trace capabilities. SMF ¶ 8. Many consumers purchase Defender and Office 365 suites with Defender for reasons that have nothing to do with protection from malicious links: for example, on March 15, 2021, only 2.7% of commercial tenants (*i.e.* companies) worldwide even had the Safe Links feature turned on. *Id.* ¶ 11.  Indeed, Office 365 with Defender includes other services such as, Skype, Yammer, SharePoint, Microsoft Teams, and applications such as Word, PowerPoint, Excel, and Safe Attachments, for example, but none of these products or services are at-issue in this case. *Id.* ¶ 10.

**B.  The Cyberattack Tactic At Issue, IP Cloaking**

"Phishing" is a broad term that describes a scam in which electronic communication is used to dupe the target into revealing personal or confidential information which the scammer can use illicitly.  Add'l Facts ¶ 2.  "Redirection" is a technique for moving visitors to a different Web page than the one they request. *Id.* ¶ 4.  A redirection can be done for a variety of reasons, including legitimate ones. *Id.* ¶¶ 4-5. "Evasion" refers to a method an attacker uses to prevent malicious content from being analyzed by an automated detection system. *Id.* ¶ 6.

"IP Cloaking" is a hacking technique that occurs when an attacker shows malicious content to a visitor depending on that visitor's IP address. *See* ECF No. 46 ("Am. Compl.") ¶ 20. When a website detects that the visitor's IP address is not a security scanner, the link redirects the visitor to a malicious site, but when it detects the visitor's IP address to be a security scanner, it hides the site's malicious content and shows benign content to evade the security scanner's detection. *Id*. Microsoft refers to this type of cyberattack more generally as "network evasion" or "IP evasion." SMF ¶ 1, n.2. There are many types of evasion techniques, and IP Cloaking is just one. Add'l Facts ¶ 7. Importantly, the fact that an attack uses a redirection or evasion does not necessarily mean that HTTP traffic was redirected due to an IP range, or that the evasion was accomplished via IP evasion. *See id.* ¶¶ 4, 7. Therefore, all types of redirects and evasions are not at issue in this case. Further, not all phishing attacks use IP Cloaking techniques to target their victims, and thus all types of phishing attacks are also not at issue here. *Id.* ¶ 3.

TocMail claims that, because it allegedly holds a patent for the technology behind its product, which utilizes "IP Cloaking avoidance" to "always" prevent IP Cloaking, only its product can provide protection against IP Cloaking.  Am. Compl. ¶¶ 88-89, 92.

### C. Safe Links' Layers Collectively Provide Effective Protection from Cyberattacks, Including Those Employing IP Cloaking.

IP Cloaking is not the most critical and common form of cyberattack affecting Microsoft's customers. SMF ¶ 4; Add'l Facts ¶ 1. In 2021, phishing was the most common type of cyberattack facing Microsoft consumers, but this does not necessarily mean the phishing was done through IP Cloaking, which is not as common. Add'l Facts ¶¶ 2-3. Microsoft is effective at preventing phishing attacks, and it has the lowest miss rate of phishing emails for Office 365. *Id.* ¶ 9.  Safe Links scans a high volume of emails to protect users from potential attacks. For example, a Microsoft Sept. 2020 presentation states that, "in the past year," ATP scanned "6 trillion" emails and blocked

5

approximately "13 billion malicious emails" and "1.6 billion URL-based email phishing threats." *Id.* ¶ 8.   Thus, of the trillion of emails, only a small percentage are malicious; of the malicious emails, only some are phishing threats (others could be ransomware or malware, for example); and, of those phishing threats, an even smaller amount uses an IP evasion technique. *See id.*

Despite the fact that IP Cloaking is not the most common cyber tactic, Safe Links is 95% effective at protecting users from IP evasion.  *Id.* ¶¶ 1, 24. This is largely because Safe Links utilizes a multi-layered approach to prevent attacks from impacting consumers. *Id.* ¶ 16.   In December 2019, Safe Links had many features, redundancies, and layers of protection to protect users from cyberattacks including IP evasion. For example, Reputation Block, Time Travel capability to recall mail, Dynamic Email Delivery, Linked Content Detonation in a Sandbox, Time-of-Click Detonation, IP Anonymization to route detonation traffic out of non-Microsoft IP ranges, Heuristic Clustering to analyze similar groups of mail, and customizable Tenant Allow/Block lists, among others. *Id.* ¶ 17. Each of these layers is an effective tool to protect against malicious links and IP Cloaking. *Id.* ¶¶ 18-23, 25-26. For example, IP Anonymization combats IP evasion and Geo evasion by "masking" known IP addresses with one of hundreds of IP addresses belonging to third-parties, so hackers will not see Microsoft IP addresses and route detonation traffic out of non-Microsoft IP ranges, helping avoid cyberattacks through evasion of known Microsoft IP addresses (*i.e.*, IP Cloaking). *Id.* ¶¶ 25-27; SMF ¶ 5. Microsoft knows that no one layer will be perfect, and for this reason, Safe Links relies on all its features to work together to detect malicious links and avoid cyberattacks, including IP Cloaking tactics. Add'l Facts ¶ 16.

### D.  The Advertisements At Issue

Safe Links advertising is truthful. SMF ¶ 24. TocMail claims that three different advertising messages about Safe Links are literally false: (1) "Safe Links Protects Users Right at the Point of Click," (2) "Attackers Redirect to Unsafe Sites via a Forwarding Service After the Message Has

6

Been Received; But with Safe Links, Malicious Links are Dynamically Blocked while Good Links Remain Accessible," and (3) "ATP Safe Links ensures hyperlinks are harmless." Am. Compl. ¶¶ 58, 63, 72. None of the messages refer to "TocMail" or promote Safe Links as the "solution to IP Cloaking," or even mention the words "IP Cloaking," "IP Evasion," or "network evasion." *Id.* ¶¶ 58, 63, 72, Ex. 2-10. Further, the majority of these messages were created and disseminated between 2015 and 2019, before TocMail even existed. SMF ¶ 15.

TocMail claims consumers do not purchase its product because Microsoft's alleged false advertising has made them believe they are already receiving the very service TocMail purports to offer. SMF ¶ 36. Yet, it admits that it never conducted a survey to determine why consumers elected not to purchase the TocMail service. *Id.* ¶¶ 37, 40. TocMail never reached out to individual consumers to determine why they did not purchase its service, and indeed admits that it does not know why any individual consumer made any particular purchasing decision. *Id.* ¶ 38. It has not heard from a single business consumer. *Id.* ¶ 39.

### E.  TocMail's Claim

Just two months after its product became available and the day after its CEO allegedly obtained a patent on its product's technology, on February 26, 2020, TocMail filed this lawsuit alleging it was economically and reputationally harmed by Microsoft, and claiming that it would have sold its product to all Microsoft ATP/Defender customers but for Microsoft falsely advertising Safe Links as the "solution to IP Cloaking."  Am. Compl. ¶¶ 95, 102, 115; SMF ¶ 34. In other words, TocMail implausibly contends that *all of Microsoft's 100 million ATP subscribers would have been TocMail's customers but for Microsoft's alleged false advertising. Id*. And based on TocMail's assumption that it is destined to be the only provider of IP Cloaking protection until its patent expires in 2035, TocMail claims over $15 Billion in future lost profits through 2035 and disgorgement of Microsoft's profits for its sale of all products that include the Safe Links feature,

despite the facts that (i) TocMail's product is not comparable to Safe Links, let alone to ATP/Defender or Office 365 with ATP/Defender, (ii) TocMail did little to market its newly-created product that was made available in December 2019, and (iii) other third-parties offer similar services. Am. Compl. ¶¶ 102-103; *See* Microsoft's Opponent's Statement of Material Facts ("Opp. to Facts") ¶ 22; SMF ¶¶ 31, 32, 54. In fact, TocMail acknowledges that third parties "Mimecast, Proofpoint, **and other** cloud-based, time-of-click, redirect services" are available in the marketplace. Am. Compl. ¶ 99; *see also id.* ¶ 39; SMF ¶ 54.

TocMail admits that despite having over 33,000 visitors to its website, it has not made a single sale and it has no revenue. SMF ¶ 30. TocMail also admits its advertising efforts consisted of only one agreement with Google AdWords for which it spent less than $4,500 in its first 8 months of advertising, and then suspending the service (thus having no advertising whatsoever) between July 2020 and December 17, 2020. *Id.* ¶ 31. Beyond a press release and few emails to potential investors, TocMail has not engaged in other marketing. *Id.* ¶ 32. TocMail further admits it has no documents that reflect its and/or its product's reputation in the marketplace. *Id.* ¶ 33.

### III.   STANDARD OF LAW

On July 9, 2021, Microsoft moved this Court for summary judgment in its favor [ECF No. 98]. "The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Gibson v. Resort at Paradise Lakes, LLC*, No. 8:16-CV-791-T-36AAS, 2018 WL 10373435, at *5 (M.D. Fla. Feb. 2, 2018) (granting summary judgment for defendant and denying summary judgment for plaintiff in false advertising Lanham Act case).

Where, as here, "the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim [] in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009). Thus, TocMail must establish "there is no genuine dispute as to any material fact [to be] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "'genuine' if a reasonable trier of fact could return judgment for the non-moving party," Microsoft, and a fact is "'material' if it would affect the outcome of the suit." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). "In addition, in considering [TocMail's Motion], the Court is required to view the evidence in the light most favorable to the non-moving party," Microsoft.  *Anthony*, 642 F. Supp. 2d at 1371.

## IV.   ARGUMENT

### A.  TocMail Has Not Established the At-Issue Advertisements Are Literally False.

A "plaintiff[] alleging a literal falsehood [is] claiming that a statement, on its face, conflicts with reality, [which] is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999).  Indeed, "literal falsity [requires] a statement that is 'false on its face.'" *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 302 (4th Cir. 2017). "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported. Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998).

The three messages at issue are not literally false because they do not mention IP Cloaking and do not guarantee 100% protection or effectiveness. TocMail relies on disputed and immaterial internal communications and documents in an attempt to support its claim, but this attempt fails

both because the documents are irrelevant and because they cannot be construed in any way to establish literal falsity when the language of the ads themselves is not false on its face.

The documents on which TocMail purports to rely can be grouped into four broad categories: (1) documents that do not pertain to Safe Links; (2) documents that do not pertain to IP Cloaking; (3) documents that pertain to only one of Safe Link's layers of protection (out of many); and (4) documents that illustrate how Microsoft is constantly working to improve Safe Links' efficacy.  In addition, many of these documents predate December 19, 2020, when TocMail's product became available, and cannot be relied on to prove TocMail's claim. *See* Mot. at 7-10. This is because Safe Links advertising, its capabilities, and any alleged wrongdoing that occurred during this time period could not have proximately caused TocMail any injury since TocMail's product was not for sale at that time. *See Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1331 (11th Cir. 2008).

Where, as here, "there is no evidence from which a reasonable jury could conclude that [the defendant's] marketing statements … were literally false, there is an absence of evidence to support [the plaintiff's] case, and summary judgment is appropriate." *Stiefel Lab., Inc. v. Brookstone Pharm., L.L.C.*, 535 F. App'x 774, 778 (11th Cir. 2013) (quotation omitted).

### i.     None of the Messages Discuss IP Cloaking Nor Do They Guarantee 100% Effectiveness.

TocMail claims Microsoft advertises that "Safe Links provides effective protection against a very specific type of link—links that redirect spam filters to a good site and then redirect the user to a bad site when clicked after delivery," and concludes, without support, that the three advertising messages at issue are literally false because "[w]hen an attacker *easily* harms customers using the very attack that the customer has been promised protection against, that promise of protection is literally false." Mot. at 22. The fact that an attack uses a redirection does not necessarily mean that

10

the redirection was accomplished via IP Cloaking. Add'l Facts ¶¶ 4-5. IP Cloaking, the very specific type of attack tactic at issue, is a redirect of HTTP traffic due to an IP range. SMF ¶ 1, n.2. Critically, none of the three messages at issue mention the words "IP Cloaking," "IP evasion," "network evasion," or another synonym; nor do they mention redirects based on an IP address or an IP range. Am. Compl. ¶¶ 58, 63, 72, Ex. 2-10. Further, the messages do not guarantee 100% protection or effectiveness. SMF ¶ 13. Thus, on their face, the messages do not promise absolute protection from IP Cloaking. And any alleged "gap" in Safe Links' IP Cloaking protection, or instance where a malicious link was not detected and an attack was successful, does not render the messages literally false. Indeed, Safe Links' combined layers provide protection that is effective, and is 95% effective against IP Cloaking. Add'l Facts ¶¶ 16-26. TocMail has no statistics to the contrary and cannot show that Safe Links never works or provides no protection at all.

>    ii.    **TocMail's Reliance on Documents That Do Not Pertain to Safe Links Cannot Establish Literal Falsity.**

To begin, many of TocMail's "internal records" are irrelevant and immaterial because they do not pertain to Safe Links, the feature at issue. For example, TocMail cannot rely upon Facts ¶¶ 33 and 35 to say Safe Links' "misses were due to network evasion" and "it is trivial to hide content from us" (Mot. at 10), when TocMail's Fact ¶ 33 relies on an email explaining that Microsoft's client's customized policy settings created the weaknesses in its security protection, not Safe Links, and Fact ¶ 35 misinterprets an email discussing how to increase Safe Links' performance and speed after a user clicks on a shareable link to a SharePoint Online ("SPO") site—an online file share service that is irrelevant to Safe Links.  Opp. to Facts ¶¶ 33, 35. The same fallacy appears in additional "facts" put forth by TocMail. *See, e.g.,* Opp. to Facts ¶ 18 (discussing an internal tool (not used by consumers) called Cloud Browse, unrelated to Safe Links); ¶ 21 (pertaining to a bad URL inside a PDF attached to an email, which pertains to Safe Attachments, not Safe Links); ¶ 37

(pertaining to Smart Screen, which provides protection in the Microsoft Edge web browser, and is not at issue); ¶ 56 (relying on documents and marketing studies that do not pertain to Safe Links or the ads at issue); ¶ 60 (relying on a document seeking investments for a product not at issue).

### iii. TocMail's Reliance on Documents That Do Not Pertain to IP Cloaking Cannot Establish Literal Falsity.

Other emails relied on by TocMail that are not tied to IP Cloaking are irrelevant and cannot establish TocMail's theory that Microsoft's purported advertising about Safe Links' IP Cloaking protection is allegedly false. For example, TocMail quotes portions of a conversation between Microsoft employees. Mot. at 7-8. But, the employees were discussing a technique described as "brand impersonation" (omitted from excerpt), where a user was asked to select an item from a menu and then reached a "DocuSign login" page where an attacker would steal the user's credentials. Opp. to Facts ¶ 25. This is not IP Cloaking and is irrelevant to this case. *Id.* Similarly, Microsoft's engineer reviewed the email cited in TocMail's Fact ¶ 36 (Mot. at 10) and testified "there is no root cause information in this [e]mail that I can see. There are different reasons why we could miss something. There could be a bug in the software, there could be inherent detection … a different number of reasons." Opp. to Facts ¶ 36. Without the root cause information, it is not certain IP Cloaking caused the evasion. Add'l Facts ¶¶ 6-7. Similarly, in TocMail's Fact ¶ 38, "the fact that there is a redirect doesn't necessarily mean it's IP evasion." *Id.* ¶ 38; Add'l Facts ¶¶ 4-5.

For this reason, documents such as those relied upon by TocMail in its Fact ¶ 10, which at best, pertain to advertising of Safe Links' ability to protect against "credential phishing" and "spear phishing," create genuine issues of fact (albeit immaterial facts) precluding summary judgment for TocMail because those types of phishing attacks are not necessarily done via IP Cloaking. Add'l Facts ¶¶ 2-3; *see also* Opp. to Facts ¶ 13 (discussing *possible* evasion, with no proof otherwise); ¶ 19 (presentation notes describe only one type of redirect, and there is no evidence this redirect is

due to a particular IP range); ¶ 20 (the "customer impacting issue" was Microsoft's ability to "detect Urls using any form of static analysis," which does not pertain to IP Cloaking); ¶ 24 (presentation listing various reasons why a false negative could occur and does not state that every or all Geo IP evasion tactics result in false negatives, and thus there is Geo IP evasion protection); ¶ 30 (testimony about an attack that is the inverse of IP Cloaking, and is thus irrelevant); ¶ 34 (discussing potential evasion based on a mobile internet browser, but it is not IP evasion).

### iv.    TocMail's Reliance on Documents That Pertain to Only One Layer of Safe Links Cannot Establish Literal Falsity.

Safe Links has many features, redundancies, and layers to protect users from cyberattacks, including IP evasion. Add'l Facts ¶ 17; *see also* Opp. to Facts ¶ 37 (explaining Microsoft also shares its knowledge about URLs across all its platforms and products to improve protections for consumers). Thus, TocMail's reliance on emails that may demonstrate that ***one*** of Safe Links' layers of protection was penetrated but fail to conclusively establish that all of its layers were penetrated, causing harm to an end-user, are unhelpful. Without this conclusive proof, these emails cannot meet TocMail's burden at summary judgment.

For example, TocMail relies upon its Fact ¶ 23 to show that an IP Cloaking tactic may get past Safe Links' reputation servers if it were not previously aware an IP Cloaked link had a bad reputation. Mot. at 7. But even so, Safe Links has layers of additional protection to protect a user from malicious links, including IP Cloaked links, and thus one layer's failure is not necessarily indicative of an attack harming the consumer, that Safe Links failed, or that Safe Links does not provide protection. Opp. to Facts ¶ 23; *id.* ¶ 5 (explaining ATP has additional "enhanced phish detection solutions" "to catch phish URLs outside of reputation."); Add'l Facts ¶¶ 13, 16-17.

Other facts relied upon by TocMail are similarly inconclusive and thus generate genuine issues of fact (albeit immaterial facts), preventing an award of summary judgment to TocMail.

*See, e.g.*, Opp. to Facts ¶ 9; Add'l Facts ¶ 15 (both explaining how when a false negative occurs, Safe Links' features take a number of additional steps to protect the user); Opp. to Facts ¶ 41 (explaining how every other consumer who clicks that URL thereafter will be protected at the time of click because Safe Links' reputation service will have been updated). Equally inconclusive is TocMail's Fact ¶ 54, where an individual named Mr. Gonzalez, who is not an engineer and therefore cannot comment on Safe Link's performance with accuracy, stated Safe Links "is certainly not performing as advertised." Mot at 22; Opp. to Fact ¶ 54. Again, there is no indication that the attack at issue in that email was enacted through IP Cloaking, and therefore, it is immaterial and irrelevant to the claims at issue. *Id.*

TocMail goes so far as to assert that "attackers can easily bypass Sonar with ***100% efficacy*** just by redirecting traffic from Microsoft/[proxies] to a known good site." Mot. at 18. Sonar, Safe Links' detonation server, is one of the many layers of protection described above. Add'l Facts ¶ 12. In support of its incorrect conclusion, TocMail relies on the testimony of a Microsoft engineer who states, hypothetically, an attacker "could choose to do" a type of attack. Mot. at 18; Opp. to Fact ¶ 31. Nowhere does he, or other evidence, support the notion that Safe Links' Sonar detonation server "will *always* be redirected" and bypassed 100% of the time by IP Cloaking. Mot. at 18, 19. Regardless, Microsoft does not guarantee 100% protection (SMF ¶ 13), and thus any "gap" in Sonar is immaterial. Mot. at 12 (citing TocMail's Fact ¶ 40); *see supra* at IV(A)(i).

### v. TocMail's Reliance on Documents That Show Microsoft Works to Improve the Efficacy of Safe Links Cannot Establish Literal Falsity.

Finally, that Microsoft engineers are "reviewing a long term plan for all evasion types," (Mot. at 10 (citing TocMail Fact ¶ 36)), does not mean that Safe Links fails to provide such protections. Instead, this final category of evidence relied on by TocMail shows how Microsoft is constantly innovating and improving Safe Links' capabilities as the threat landscape continues to

change, thereby providing protection to consumers. *See* Opp. to Facts ¶¶ 15, 40, 59 (each showing Microsoft addresses issues as they arise and works to protect its consumers); ¶ 26 (an example of Microsoft "improv[ing] our effectiveness from URL detonation."); ¶ 32 (an example of Microsoft reaching a solution to one type of attack); ¶ 37 (Microsoft working on a "proposed solution" to provide "additional protection to customers from network or time-based evasion.").

Still, TocMail's Fact ¶ 36 is immaterial as the underlying exhibit also states that "ToC [(Time of Click)] already benefits from IP evasion protection," thus showing Safe Links provides this type of protection. Opp. to Fact ¶ 36. Similarly, TocMail's Fact ¶ 39 is immaterial because the phrase "adding fixes for evasion" necessarily means that a method to combat evasion already existed at the time of this email. Mot. at 12. In addition, TocMail's Fact ¶ 42 uses exhibits which show that Safe Links "already utilizes proxies in limited circumstances where we believe evasion took place," and these proxies protect consumers from IP evasion. Opp. to Facts ¶ 42. These exhibits also show Microsoft is working to "greatly expand[] the scope," and "accelerate the effectiveness," of Safe Links' protections against IP evasion. *Id.* Microsoft's continued investment into thwarting IP Cloaking tactics does not negate its current protection against IP Cloaking – as TocMail admits, Safe Links enacted IP Anonymization, utilizing third-parties' anonymous proxy servers, as early as 2018. *See* TocMail Fact ¶ 28; Add'l Facts ¶¶ 25-27.

### vi.    Message #1 is Not Literally False.

Message #1 does not promote Safe Links as the "solution" to IP Cloaking, as TocMail contends. Mot. at 14, 15. It states, in full:

> Sophisticated attackers will plan to ensure links pass through the first round of security filters. They do this by making the links benign, only to weaponize them after the message is delivered, altering the destination of the links to a malicious site. With Safe Links, we are able to protect users right at the point of click by checking the link for reputation and triggering detonation if necessary.

Am. Compl. Ex. 2. at 7; Mot. at 14, 15.

Undisputedly, Message #1 is not literally false, as admitted by TocMail's own facts, stating "The Two Components of Safe Links [are] Reputation and Detonation." Mot. at 3. "When a user clicks a link in an email, Safe Links' reputation service checks the link's URL against a list of URLs already seen in the past that have previously been determined to be malicious." *Id.* (citing TocMail's Facts at ¶ 2). "If the URL is in the previously seen bad list, then the user is prevented from visiting the URL." *Id.* Thus, TocMail agrees that Safe Links works "at the point click by checking the link for reputation." *See* Message #1, *supra*. TocMail goes on to explain, "URLs that pass through the reputation check are sent to the detonation service for analysis." Mot. at 4 (citing TocMail's Facts at ¶ 8). Stated differently, TocMail also agrees that Safe Links "trigger[s] detonation if necessary." *See* Message #1, *supra*.

As for protection, this is also undisputed. Safe Links can, and does, offer protection against malicious links to its consumers through its features, including reputation block and detonation. SMF ¶¶ 1-3; Add'l Facts ¶¶ 10-14, 18, 22. Microsoft does not advertise that it is 100% effective against any type of attack, let alone IP Cloaking. SMF ¶¶ 6, 13. Indeed, the brochure where Message #1 appears explains that Safe Links cannot catch all cyberattacks: "Even if the message passes through detonations, the content is analyzed further by multiple machine learning models. These examine the full message and we take actions based on what you have configured as policy." Am Compl. Ex. 2 at 6. In context, Message #1 states Safe Links is a service to "mitigate" (*i.e.* lessen or reduce) malicious content, not block them every single time. *Id.* at 10. Further, the video exhibit in TocMail's Fact ¶ 63, like the written materials, does not mention IP Cloaking, and even if it did, as TocMail suggests, Mot. at 15, it is irrelevant as Safe Links is 95% effective against IP Cloaking, and thus provides protection from this type of threat. Add'l Facts ¶ 24. TocMail's reference to purportedly successful cyberattacks not detected by Safe Links, enacted via a variety

of techniques (not necessarily by IP Cloaking), Mot. at 15, are isolated incidents that are not indicative of Safe Links' efficacy overall, and do not prove that Safe Links does not provide *any* protection against malicious links at the point of click. Accordingly, Message #1 is not literally false, and TocMail cannot prove otherwise.

### vii.      Message #2 is Not Literally False.

Message #2 is not literally false. It states in full:

> Real-time, time-of-click protection against malicious URLs—EOP scans each message in transit in Office 365 and provides time of delivery protection, blocking malicious hyperlinks in a message. But, attackers sometimes try to hide malicious URLs with seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received. ATP's Safe Links feature proactively protects your users if they click such a link. That protection remains every time they click the link, as malicious links are dynamically blocked while good links can be accessed.

Am. Compl. Ex. 3 at 5, Ex. 4 at 5, Ex. 5 at 85; Mot. at 16.

Message #2, like Message #1, states that Safe Links offers a "time of click" protection, as discussed *supra*, by having its reputation service check the link's URL against a list of URLs known to be malicious every time the link is clicked. SMF ¶ 19; Add'l Facts ¶¶ 10-11. TocMail admits that "The reputation service acts as a 'memory' of links already seen and deemed malicious in the past." Mot. at 3 (citing TocMail's Fact ¶ 3). Thus, it is true when Message #2 states that based on the reputation service's memory, Safe Links blocks (previously determined) malicious hyperlinks in an email, and it stays blocked each time it is clicked, while good links, that do not have a bad reputation and are not found to be bad following detonation, are accessible. *Id.*; Add'l Facts ¶¶ 10-14, 18, 22. The brochure where Message #2 appears provides further context, explaining "Safe Links is a feature *that helps* prevent users from going to malicious websites when they click them in email." Am Compl. Ex. 4 at 9 (emphasis added). In other words, Safe Links is a tool to helps provide protection but does not guarantee it 100%. Therefore, Message #2 is not

literally false, as it "proactively protects" against malicious links, as described above, and TocMail has not presented any evidence to the contrary. Mot. at 16.

### viii.    Message #3 is Nonactionable Puffery.

Message #3 is nonactionable and cannot form the basis of TocMail's Lanham Act claim. A Lanham Act claim generally falls into one of two categories: (1) commercial claims that are literally false, and (2) claims that may be literally true or ambiguous but are misleading in context. *United Indus. Corp.*, 140 F.3d at 1180. However, "many claims will actually fall into a third category, generally known as 'puffery' or 'puffing.'" *Id.* "[P]uffing immunizes an advertisement from liability under the Lanham Act." *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990). Statements using general assertions of superiority or opinion, as opposed to specific or absolute characteristics of a product, constitute puffery. *Id.*

TocMail states, through Message #3, Microsoft "ensures protection" "against IP evasion implemented using redirects." Mot. at 17. Message #3 states in full in an Office 365 ProPlus Pitch Deck: "ensure hyperlinks in documents are harmless with ATP Safe Links," and in a 2019 Exchange Online Business Class Email System brochure: "Ensure document hyperlinks are harmless with ATP Safe Links." Am. Compl. ¶¶ 72, 75. TocMail references similar iterations of the "ensure" message in its Motion. *See* Mot. at 17. Each version, however, is nonactionable.

Message #3, describing a general opinion that Safe Links ensures protections and that hyperlinks are harmless, is nonactionable puffery, and many courts across the country have expressly found the word "ensure" to be nothing more than mere puffery. *See, e.g., Williams v. Aztar Indiana Gaming Corp.*, 351 F. 3d 294, 299 (7th Cir. 2003) (holding statement "As always, our top priority is simply this: to ensure your complete, 100 satisfaction" amounts to sales puffery); *Patt v. Antech Diagnostics, Inc.*, No. 818CV01689JLSDFM, 2019 WL 6654078, at *6 (C.D. Cal. July 30, 2019) (finding "protocols designed to 'ensure accurate results' are

nonactionable puffery and therefore cannot be said to deceive a reasonable consumer as a matter of law"); *In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, No. 08 CIV 11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (finding "a robust process for ensuring prompt resolution of audit issues .... to ensure that any remedial action is undertaken promptly" was puffery); *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973–74 (N.D. Cal. 2008), *aff'd*, 322 F. App'x 489 (9th Cir. 2009) (laptop was a "powerful machine … packed full of fans and exhaust units to ensure optimum performance" was puffery).

Even if this statement were not puffery, Message #3 is not literally false. TocMail argues Microsoft advertises Safe Links "ensures protection against IP evasion" yet "never enabled Safe Links to fulfill its promoted purpose of protecting against IP evasion implemented using redirects and certainly not against *all* evasion tactics and *all* hyperlinks." Mot. at 17-18. However, Message #3 does not state that Safe Links' purpose is to protect, or ensure protection, against IP evasion or IP Cloaking, nor does it promise 100% effectiveness against all evasion tactics and all hyperlinks, and thus cannot be false on its face. *Id.*; SMF ¶ 20.  This "no-guarantee" concept is made clear through customer-facing documents and talking points, *Id.* ¶ 21, (quoting ATP FAQs, stating, "*no advanced threat protection product can catch 100% of malicious attacks*[.]") as well as made known to customer-facing marketing professionals within Microsoft. *Id.* ¶ 22 ("You need to explain we filter to prevent [false positives] and that Nobody detonates 100% of all links.").

In context, Message #3 is not literally false.  For example, the "talk track" to a pitch deck where Message #3 appears states, "Ensure hyperlinks in documents are harmless with ATP Safe Links: • Protect your organization from harmful hyperlinks through ATP Safe Links policies; • Create a custom blocked URL list for more advanced protection; • View ATP reports in the Office 365 Security and Compliance Center dashboard." Am. Compl. Ex. 9 at 21. As explained,

an organization's ability to ensure it is protected is dependent on the policies and customizations it chooses to enact. In other words, Safe Links is a tool to help organizations achieve their security goals. Regardless, Safe Links provides layers of protection that effectively protect against cyberattacks including IP evasion. Add'l Facts ¶¶ 16-26. Therefore, Message #3 is a nonspecific opinion regarding Safe Links' protection against malicious links that is not actionable and otherwise not literally false. *See Stiefel Lab'ys, Inc.*, 535 F. App'x at 777–78 (granting summary judgment for defendant on literal falsity claim after analyzing message in full context).

### B. TocMail Cannot Establish the At-Issue Advertisements Deceived, Or Had A Capacity to Deceive Consumers

For the reasons set forth above, TocMail has not provided sufficient evidence to establish that the three advertisements are literally false, and therefore to succeed on a Lanham Act claim based on misleading statements, it is required to prove the advertisements deceived or had a capacity to deceive consumers. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256 (11th Cir. 2004) (noting the plaintiff "must present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence. Consumer survey research often is a key part of the Lanham Act claim alleging that an advertisement is misleading or deceptive."). However, TocMail hung its hat on literal falsity and failed to address this element at all. Mot. at 23. TocMail did not bother to conduct a consumer survey or any market research whatsoever, and assumed the ads caused deception. SMF ¶¶ 37-41. It also has not determined whether Microsoft customers saw the messages at issue and whether they were misled or confused by them. *Id*. Thus, TocMail cannot establish, and has not put forth any evidence to establish, the element of deception, and therefore, the Motion should be denied. *See Gibson*, 2018 WL 10373435, at *14 (where a plaintiff "ha[s] not submitted sufficient consumer or market research showing 'that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged

advertisement'" then it "ha[s] not produced sufficient evidence … that Defendants' advertisements are misleading."); *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 745 F. Supp. 2d 1359, 1377 (S.D. Fla. 2010), *aff'd*, 702 F.3d 1312 (11th Cir. 2012) (same).

### C. TocMail Has Not Established the At-Issue Advertisements Had a Material Effect on Consumers' Decisions to Purchase ATP or Office 365 with ATP.

Even if the messages were literally false, which they are not, TocMail has failed to present evidence to support its materiality element. TocMail has attempted to "establish that [Microsoft's alleged] deception is likely to influence the [consumers'] purchasing decisions," by having misrepresented an "inherent quality or characteristic," of Safe Links, but cannot do so. *Johnson & Johnson Vision Care*, 299 F.3d at 1250; Mot. at 23-24. Whether a false advertising claim touches an "inherent quality or characteristic" of a product requires a "consumer-oriented" inquiry to determine whether that quality or characteristic is of importance to the consumer. *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 796, 798 (11th Cir. 2020) (finding plaintiff failed to "present[] evidence indicating  that either [characteristic] 'steel bond' or 'epoxy' is material to purchasing decision" because "the survey did not ask respondents whether their conclusions about the presence of steel would have affected their decision to purchase").

Instead of relying on what consumers believe to be an inherent quality of Safe Links that is important to them, TocMail relies on its own baseless conclusion that "[t]here simply cannot be a more inherent quality than the email security capability of an email security service." Mot. at 23. Not only is this circular, but courts routinely hold that the plaintiff cannot make such an unsubstantiated generalization, relying on its own *ipse dixit*, that the defendant has misrepresented an inherent quality of the product. *See Belcher Pharms., LLC v. Hospira, Inc.*, 419 F. Supp. 3d 1292, 1297–98 (M.D. Fla. 2020), *aff'd*, 1 F.4th 1374 (11th Cir. 2021) (holding plaintiff "wrongly relies on [an] *ipse dixit* argument to … satisif[y] the third element of a Lanham Act claim—the

deception had a material effect on purchasing decisions… [T]here is no evidence that the [] alleged commercial advertisements … were even viewed by consumers much less influenced by them… So the Court concludes Belcher failed to present evidence to supports its claims and Hospira is entitled to summary judgment in its favor."); *Club Exploria, LLC v. Austin*, No. 618CV576ORL28, 2020 WL 6585802, at *11 (M.D. Fla. Nov. 10, 2020) ("Here, Exploria has not presented any expert testimony or other evidence to support its contention that the website advertisements were likely to be material to consumer purchasing decisions. Exploria simply asserts in a single, conclusory sentence that it would be difficult to argue that the alleged falsities would not influence the purchasing decisions of Exploria customers. … But even assuming this would be evidence of materiality, Exploria has not presented such evidence."). Moreover, TocMail's conclusion that "security is an inherent quality of all Microsoft products," (which says nothing of Safe Links), Mot. at 24, is controverted by TocMail's own exhibit, explaining "Microsoft is the only organization that acknowledges that security is not the end goal, but simply a support to ensure organizations can remain productive to achieve more." *See* Opp. to Fact ¶ 55. (emphasis added). Arguably, "productivity" is a more inherent quality than security.

Further, the standard requires that the at-issue advertisements themselves be material to consumers' purchasing decision. This is succinctly explained by an Eleventh Circuit case relied upon by TocMail. *See N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224–25 (11th Cir. 2008) (framing the issue on appeal as "whether the **statements** have a material effect on purchasing decisions" and affirming the "false **statements** are material to consumers' purchasing decisions.") (emphasis added). This necessarily requires speaking to consumers, conducting a survey, or obtaining other evidence showing whether the three messages influenced consumers' decisions to purchase ATP or Office 365 with ATP, which TocMail failed to do here. SMF ¶¶ 37-

40. *Gibson*, 2018 WL 10373435, at *16 (plaintiff "offer[ed] no evidence showing what consumers thought of the advertisements in this case…, *i.e.* whether the statements expressed in the advertisements were material to any consumers' decision…[to] make a purchase[.]"). Indeed, without speaking to a single consumer about the ads, there is no way for TocMail to establish that consumers saw the ads, that any of the ads misrepresented a material quality of Safe Links, and the ads were the reason consumers purchased Microsoft products over TocMail's. Therefore, TocMail cannot meet its burden of proof and summary judgment is appropriate. *See J-B Weld Co., LLC*, 978 F.3d at 797 (rejecting plaintiff's materiality argument because it "has not presented any evidence that consumers are so scrupulous about the chemicals in their adhesives" and "speculation cannot sustain [a] claim of materiality.").

Because TocMail has no consumer-based evidence to prove the three messages were material to consumer purchase decisions, it relies on irrelevant documents that do not discuss the ads or Safe Links in a failed attempt to support its assumption of materiality. For example, Microsoft's Form 10-Q, in discussing how "security [is in] the fabric of our products and solutions," was not referring to Safe Links and was not interpreting any of the three advertising messages. *See* Mot. at 24; Opp. to Facts ¶ 56. Likewise, TocMail relies on an individual blogger's opinion of "the core value propositions of the new Exchange – Keeping your organization safe," but one individual's opinion about "Exchange," a product not at issue in this case, cannot assist TocMail in meeting its burden. *See* Mot. at 24; Opp. to Facts ¶ 55. Nor can purported "marketing studies" from November 2015 and May 2018 because these studies explored messaging to be used in future marketing campaigns, did not involve any of the messages at issue in this case, and did not concern Safe Links specifically. *See* Mot. at 24; Opp. to Facts ¶ 56.

Similarly, TocMail's anecdotal evidence that two customers inquired about ATP's evasion approaches is insufficient to establish the materiality element because it did not pertain to the ads at issue or consumer purchase decisions. Mot. at 24. At the time the first client made the inquiry, Microsoft had already secured its account after it "passed with flying colors in pre-sales," and the fact that Microsoft was planning a client call to help it "further understand ATP capabilities," which "may include" "how we approach evasion," is irrelevant. Opp. to Facts ¶¶ 28, 57, 58. The second referenced email was from June 2017, which is irrelevant since TocMail's product became available in December 2019 and that client could not choose to purchase TocMail's product. JSUF ¶ 4; Opp. to Facts ¶ 59. Further, TocMail has not asked either client if the reason they purchased ATP or Office 365 with ATP was because of Safe Links' "IP evasion approaches," or if they saw the ads at issue and the ads influenced their purchase decisions. Even if they saw the ads, as discussed *supra* at II.D., they do not discuss "IP evasion approaches," and therefore TocMail is left without sufficient evidence to establish the materiality element of its claim. *See Stiefel Lab.*, 535 F. App'x at 778 ("Because [plaintiff] did not show that [defendant's literally] false statements …influenced consumer choices, the district court properly granted summary judgment").

### D.  TocMail Has Not Established It Has Been, Or Is Likely to Be, Injured by the At-Issue Advertisements.

While TocMail belabors the well-known point that actual damages are not required for TocMail to prove the final element of its Lanham Act claim, Mot. at 26, much more is required than the conclusory statements and speculative evidence it relies upon in an attempt to establish injury. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014).  In this case, TocMail has had over 33,000 visitors

24

to its website, but it has not made a single sale and it has no revenue. SMF ¶ 30. TocMail has not

spoken to a single consumer to determine why it did not purchase its service, has not conducted a

survey, or obtained other evidence showing the reasons for consumer purchase decisions. *Id.* ¶¶

37-41. Thus, the conclusion that its inability to make a sale or even break into the market was

caused by the three messages at issue is nothing but speculation and TocMail cannot establish any

purported commercial injury was proximately caused by Microsoft's three alleged false messages.

Mot at 13. TocMail does not argue in its Motion that the advertisements at issue have proximately

caused injury to its reputation. Nor could it, as TocMail admits it has no documents that reflect its

and/or its product's reputation in the marketplace. SMF ¶ 33.

TocMail argues that its injury element is "straightforward," and met, for three reasons.

First, TocMail asserts it can prove injury because Microsoft "falsely claims to offer a product that

[TocMail] alone provides." Mot. at 27. But as discussed, none of the three messages use the words

"IP Cloaking," "IP evasion," or "network evasion," *see supra* at II.D., and therefore none of the

ads advertised Safe Links as offering what TocMail claims it "is the sole provider" of. Am. Compl.

¶ 4. TocMail's out of Circuit cases are unavailing. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d

375, 382 (7th Cir. 2018) is inapposite, as the court found the statements were literally true, but

misleading, at the preliminary injunction stage, where "full-blown consumer surveys" "are not

required" "in the truncated timeframe between filing suit and seeking a preliminary injunction."

In *De Simone v. VSL Pharms., Inc.*, 395 F. Supp. 3d 617, 631 (D. Md. 2019), as explained by

TocMail, the plaintiff had a monopoly in the market such that in order for the defendant to secure

a customer, it had to represent its product was of the kind sold by plaintiff. Mot. at 27. The opposite

is true here. TocMail does not have a monopoly in the market; it does not even have one sale. SMF

¶ 30. Thus, it does not follow that Microsoft had to falsely represent to offer the specific kind of

product TocMail offers (for years before TocMail even existed) in order to become marketable, and it cannot be presumed that its customers would have otherwise gone to TocMail.

Second, TocMail argues injury can be "established in a two-player market when the other player uses false advertising to gain a competitive advantage." Mot. at 27. This argument directly contradicts TocMail's own allegations, where it acknowledges that in 2014, Proofpoint, Inc., which wrote a report on IP Cloaking, was depicted as a leading cloud-based email system, Am. Compl. ¶¶ 39-42, and its own exhibit, TocMail Ex. 69, stating "Proofpoint appears to be going after [Microsoft] dedicated customers very hard." ECF No. 97-69 at -388.   TocMail also acknowledged that "Mimecast, Proofpoint, **and other** cloud-based, time-of-click, redirect services have the exact same design flaw [that it alleges Microsoft's Safe Links has]." Am. Compl. ¶ 99. Thus, the market for "cloud-based, time-of-click, redirect services" is not a mere two-player market. TocMail cannot prove that "TocMail and Microsoft are the only cybersecurity vendors that promote their cloud-based, time-of-click services as effective protection against IP evasion," because (1) none of the three alleged false messages explicitly states IP evasion protection is provided and (2) Microsoft and TocMail are not even competitors, as Safe Links provides protection from a host of cyberattacks through various layers of protection and is a feature that is part of a larger suite of services and programs, while TocMail is a single-purpose product that purportedly protects against a specific cyberattack tactic, IP Cloaking. JSUF ¶ 3; SMF ¶¶ 7-10; TocMail Fact ¶ 43. Thus, TocMail's argument should be disregarded outright. Mot. at 28.

Third, TocMail argues that "when a defendant enters the market first, and pervasively engages in false advertising, the plaintiff is injured by effectively being shut out of that market." Mot. at 28. TocMail assumes that because Microsoft allegedly falsely advertised its product for six years, "it is inconceivable that not a single consumer believed Microsoft over a startup, causing

26

them to withhold trade from TocMail." *Id.* at 28-29. This requires the assumption that a consumer would be aware of TocMail's existence, which is highly unlikely because it is undisputed that TocMail engaged in minimal advertising, entering into one agreement with Google AdWords for 8 months, and did no advertising whatsoever between July 2020 and December 17, 2020. SMF ¶ 31. Beyond a single press release and few emails to potential investors, TocMail has not engaged in other marketing. *Id.* ¶ 32. Not only has TocMail not proven that Microsoft falsely advertised Safe Links as providing a service only TocMail provides, but it has not proven that even a single consumer purchased Safe Links over TocMail because of the three messages, and cannot. TocMail has not asked any customers whether he or she read the at-issue advertisements, and whether they influenced his or her purchase decision. *Id.* ¶¶ 37-41. It is possible that, for example, customers purchase Microsoft products for reasons other than Safe Links advertising, including to obtain access to services and programs included in Microsoft Office suites, such as Outlook, Word, Excel, and PowerPoint, or the availability of IT support). *Id.* ¶ 10. Without any evidence to support the assumption that even one customer would otherwise have purchased its product, TocMail's assertion that it would have landed three of Microsoft's large clients is baseless. Mot. at 29.

Even assuming TocMail could prove injury, which it cannot, the majority of the messages were created and disseminated between 2015 and 2019, and therefore predate the creation of TocMail's product in December 2019. SMF ¶ 15. Moreover, much of the evidence TocMail relies on also predates its product. JSUF ¶ 4; *see* Mot. at 7-10 (timeline of TocMail's evidence from 2015 through 2019). These ads and evidence cannot be used to prove TocMail was injured. The Eleventh Circuit established that a plaintiff cannot prove it was proximately injured by an ad when the plaintiff's product was not for sale at the time of that advertisement. *See Natural Answers*, 529 F.3d at 1331 (affirming summary judgment because plaintiff "was not selling or promoting [its

product] at the time of the allegedly false advertising, it cannot claim to have suffered lost sales, lost market share, or increased promotional costs." As a result, "the amount of [plaintiff's] claimed damages is entirely speculative."). In *CareerFairs.com v. United Bus. Media LLC*, the plaintiff, like the plaintiff in *Natural Answers*, "did not have the ability or resources to market its product [but] [n]evertheless … took issue with the defendant's advertising that claimed the defendant was selling the 'first and only' product like it on the market." 838 F. Supp. 2d 1316, 1323 (S.D. Fla. 2011). Following *Natural Answers*, the court dismissed the plaintiff's Lanham Act claim because it did not have a product in the market at the same time as the defendant. *Id.*

Further, TocMail's reliance on *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949 (D.C. Cir. 1993) is misplaced. ALPO sued Ralston under the Lanham Act and Ralston countersued on ALPO's responsive advertising that veterinarians prefer ALPO to "'the leading brand' (*i.e.*, Ralston)." *Id.* The court found that "ALPO … spent some or all of the money on a responsive advertising campaign, [which] constituted, in effect, an alternative investment, the return on which is the prejudgment interest to which ALPO is entitled." *Id.* at 954. Here, Microsoft has not made any claims specifically targeting or referring to TocMail, and TocMail has not spent money on responsive advertising. TocMail engaged in little-to-no advertising and has had no responsive advertising campaigns to dispel the three allegedly harmful messages at issue. SMF ¶¶ 31-32.

As with the other elements of its claim, TocMail cannot prove injury. TocMail's lack of evidence and continued reliance on speculation allows this case to be resolved as a matter of law in favor of Microsoft, not TocMail, and accordingly, this Court should deny the Motion outright.

## V.    CONCLUSION

For the forgoing reasons, this Court should deny TocMail's Motion and grant such further relief it deems necessary and proper.

Dated:  August 13, 2021

Respectfully submitted,

By */s/ Evelyn A. Cobos*
EVELYN A. COBOS

**GREENBERG TRAURIG, LLP**
Mary-Olga Lovett (*admitted pro hac vice*)
Texas Bar No. 00789289
1000 Louisiana, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile: (713) 754-7541
Email: lovettm@gtlaw.com

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
FRANCISCO O. SANCHEZ
Florida Bar No. 598445
Email: sanchezo@gtlaw.com
        orizondol@gtlaw.com
EVELYN A. COBOS
Florida Bar No. 092310
Email: cobose@gtlaw.com
        FLService@gtlaw.com

***Attorneys for Defendant,***
**MICROSOFT CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of August, I served for foregoing document on

all counsel of record identified on the below Service List in the manner specified.

*/s/ Evelyn A. Cobos*
EVELYN A. COBOS

## <u>SERVICE LIST</u>

JOHNSON & MARTIN, P.A.
Joshua D. Martin
500 W. Cypress Creek Rd., Suite 430
Ft. Lauderdale, FL 33602
Tel: (954) 790-6699
Fax: (954) 206-0017
Email: josh.martin@johnsonmartinlaw.com

*Attorneys for Plaintiff*