UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60416-CIV- CANNON/HUNT

TOCMAIL INC., a Florida corporation,

        Plaintiff,

v.

MICROSOFT CORPORATION, a
Washington corporation,

        Defendant.

_____/

**PLAINTIFF TOCMAIL INC.'S REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AGAINST DEFENDANT**

1

Plaintiff, TOCMAIL INC ("TocMail"), by and through undersigned counsel, hereby respectfully submits its Reply in Support of Its Motion for Summary Judgment as to Liability (ECF No. 96) against Defendant, MICROSOFT CORPORATION ("Microsoft"), and states:

## I.     INTRODUCTION

TocMail's MSJ relies on Microsoft's own documents. Thus, the facts pertaining to the central-most issues of this case are undisputed in Microsoft's Response ("Resp.") (ECF 111). For example, an internal Microsoft September 2020 email discloses "IP-based evasion" as one of the "gaps on the Sonar side." *TocMail SMF* (ECF 97), ¶ 40. Microsoft responded that it is *undisputed*. *MS Resp. SMF* (ECF 112), ¶ 40. Hence, the central-most issue of this case is undisputed – IP evasion continued to be a security gap in Safe Links' Sonar after Microsoft implemented IP Anonymization (in November 2018) and after TocMail entered the market (in December 2019).

Microsoft labeled this undisputed fact as "immaterial." *Id.* But, of course, bypassing Safe Links with IP evasion is not only material, it is *the* central issue in this case. Microsoft does this throughout, rubber-stamping 54 out 60 fact paragraphs as "immaterial" and then arguing the supposed immateriality rather than providing documentary evidence to dispute the actual fact.

Microsoft's Response is not only devoid of documentary evidence, but it is based on self-serving narratives that are flatly contradicted by its own record. For example, despite acknowledging that IP evasion was a gap in Sonar in September 2020, Microsoft spins the narrative that, since late-2018, Sonar has been preventing "95% of attacks through IP Cloaking." Remarkably, the entire basis for this incredible claim is a self-serving statement made by Microsoft employee Abhijeet Hatekar ("Hatekar") during discovery in this case. *MS Addt'l. Facts* (ECF 112), ¶ 24. Hatekar asserted that IP anonymization raised effectiveness against IP evasion from "no solution" in mid-2018 to over 90% effectiveness in late-2018. *TocMail Reply Facts*, ¶ 24. Yet,

Hatekar's self-serving statement regarding IP Anonymization is flatly contradicted by Microsoft's own internal documents. *Id.* For example, the Sonar team measured the effectiveness of IP Anonymization in regards to general IP evasion, finding that it blocked less than one unique URL per one million URLs that Safe Links encountered. *Id.* Regarding redirects that use IP evasion, the Sonar team explicitly stated that IP Anonymization provided **<u>zero</u>** protection. *Id.* Moreover, an internal May 2020 presentation explicitly identified redirects that use "network level evasion (Ex: Evading Microsoft ips …)" as one of the "prominent gaps" in "IP Anonymization." *TocMail SMF* (ECF 97), ¶ 37. Yet, these are the very links that Safe Links is promoted as protecting against.

As for materiality, Microsoft acknowledges that "consumers have asked about Microsoft's evasion approaches," yet spins the narrative that TocMail does not have any "consumer-oriented" evidence showing that evasion is "of importance to the consumer." *Microsoft Resp. SMF*, ¶ 57; *Resp.*, p. 21. Once again, Microsoft offers self-serving narrative that is flatly contradicted by its own record. Nevertheless, the Eleventh Circuit does not require consumer evidence when the misrepresentation is regarding "safety," as the Eleventh Circuit considers safety to be a "self-evident" inherent quality important to purchase decisions.

Finally, for injury, Microsoft acknowledges on one hand that "TocMail has had over 33,000 visitors to its website," yet argues on the other hand that it is not likely a single customer would have withheld trade from TocMail because it "is highly unlikely" any "consumer[s] would be aware of TocMail's existence." *Resp.*, pp. 24-25, 27. Once again, Microsoft's argument fails by its own admission. Microsoft also relies throughout is Response on the *Natural Answers* case, but that case applied the old prudential standing test that was abrogated by the Supreme Court in *Lexmark* and is no longer good law.

3

Microsoft's defenses are all based on self-serving narrative from employee deposition testimony and interrogatory responses during this case rather than actual documentary evidence, despite hundreds of thousands of pages of documents produced in discovery. Moreover, Microsoft's narratives are flatly contradicted by Microsoft's own documents. When a party's self-serving statements are "blatantly contradicted by the record … a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Looking beyond Microsoft's red herrings and attempted confusion, the undisputed facts demonstrate that summary judgment should be granted in favor of TocMail.

## II.      ARGUMENT

**A.      Microsoft's Ads Are Literally False.**

    **1.      Microsoft's Self-Serving Narrative of IP Anonymization's 95% Effectiveness Is Flatly Contradicted By Its Own Record.**

During deposition, Microsoft employee Hatekar invented a statistic, independent of any evidence, that Sonar's IP Anonymization is 95% effective against IP evasion. *MS Addt'l. Facts* (ECF 112), ¶ 24. In its Response SMF, Microsoft did not submit even a shred of evidence to support this remarkable claim; nor can it, because the record documents the mirror opposite.

As discussed previously (ECF 109 and 110), an internal IP anonymization "Effectiveness" report from April 2019 showed that IP Anonymization caught less than one unique bad URL out of every one million URLs that Safe Links encountered (64 bad URLs out of 89,479,001 URLs). *TocMail Reply Facts*, ¶ 24. Thus, IP Anonymization has had a negligible impact on general IP evasion, which is why "IP-based evasion" was still "one of the gaps on the Sonar side" in September 2020, and why Microsoft wrote in December 2020 that "preventing IP evasion" is something Microsoft must be "investing in very heavily" in 2021. *TocMail SMF* (ECF 97), ¶¶ 40, 42.

In fact, IP Anonymization's utter lack of defense is highlighted in a February 2019 email disclosing Sonar failing to detect a phishing campaign **200,000 times** because the link was using IP evasion. ECF 97, ¶ 32. Hatekar himself wrote that this a "gap" and that "we are currently missing 100% on them." *Id.*

Importantly, in April 2019, the Sonar team explicitly stated that IP Anonymization was not used for any webpages that redirect Sonar to a good site (such as google.com): "the redirected (already resolved) URLs are not going through Proxify." *TocMail Reply Facts*, ¶ 24. This continued after TocMail entered the market, as documented in an internal May 2020 presentation that explicitly identifies **redirects that use "network level evasion** (Ex: Evading Microsoft ips …)" as one of the "**prominent gaps" in "IP Anonymization."** ECF No. 97-53 at 44029 (emphasis added). Hence, it is indisputable that IP anonymization provided **zero** protection against IP evasion redirects at the time that TocMail entered the market. Thus, TocMail should have been the first company to promote a solution. Even if Microsoft somehow solves the problem in the future, that goes to the issue of damages, not liability.

Moreover, Microsoft's narrative that it uses "hundreds of IP addresses belonging to third-parties, so hackers will not see Microsoft IP addresses" is patently untrue (*Resp.*, p. 6), as further documented by a professor from the University of New Orleans in the first half of 2020. *TocMail Resp. Facts*, ¶ 24. Specifically, the professor sent a cloaked link to a Safe Links' enabled Outlook account, causing the site to be visited by "277 different IPs." *Id.* The professor personally observed that "**all these IP addresses belong to Microsoft's IP space**" – *i.e.*, not one was an anonymous IP address contrary to what Microsoft has argued throughout its current Response and other filings as well. *Id.* (emphasis added). He informed Microsoft: "just IP-based evasion is sufficient to evade 100% of all Microsoft's crawler visits." *Id.* He sent his observations to Microsoft in the first half

of 2020, after TocMail was on the market, and nearly two years after supposed IP anonymization allegedly solved IP evasion according to Hatekar. *Id.*

        2.        **Microsoft's Self-Serving Narrative Of Multiple Layers Of Protection Is Flatly Contradicted By Its Own Record And Is A Red Herring.**

To be clear, Amar Patel has repeatedly testified that Safe Links has only two components: "So Safe Links was originally created as a reputation service ... and it became a combination of reputation and sandbox detonation." *TocMail Reply Facts*, ¶ 17. Because attackers use IP evasion to easily bypass these two components, Microsoft asserts: "In December 2019, Safe Links had many features, redundancies, and layers of protection to combat IP network evasion." *MS Resp. Addt'l. Facts*, ¶ 17. Yet, this is just another example of self-serving narrative devoid of any documentary evidence (*i.e.* Microsoft presents no documents showing Safe Links as consisting of anything more than reputation and detonation).[1]

Moreover, the narrative contradicts Microsoft's own record, including Microsoft's own ads. For example, Deceptive Message #1 states that attackers "ensure [cloaked] links pass through the first round of security filters" (*i.e.* cloaked links bypass all email security layers during delivery). ECF No. 97-66, p. 8. The ad then states: "with Safe Links, we're able to protect users right at the point of click by checking the link for *reputation* and triggering *detonation.*" *Id.* (emphasis added). Thus, Microsoft's own ad at issue here explicitly promotes these two components as responsible for protecting against cloaked links, not other layers.

---

[1] For example, Microsoft names "heuristic clustering" as a so-called separate, redundant layer of protection. *MS Addt'l. Facts*, ¶ 17. Yet, Patel testified that this is an aspect of the detonation component: "you know, today Sonar actually does clustering analysis." *TocMail Reply Facts*, ¶ 17. He testified to this in the context of reiterating that Safe Links has only two components: "Safe Links as we defined earlier is a reputation service plus the time-of-click detonation service." *Id.*

Nevertheless, it does not matter whether Safe Links or even ATP has 1,000 layers or more. At the end of the day, Microsoft's documents undisputedly establish that IP evasion is bypassing all layers and harming customers, rendering the entire "layers" narrative nothing more than a smokescreen. For example, an internal January 2021 email was requesting "New/Additional FY21 Budget ask for IP Evasion prevention" because customer escalations are *increasing*, not decreasing. ECF No. 97-60 at 111781. Additionally, in May 2020, Microsoft explicitly wrote that *redirects* that use network evasion are causing "numerous" instances of phishing pages to not be detected by "Sonar," and, importantly, that these redirects cause Microsoft to "miss to protect the customers from the actual phishing page."[2] ECF No. 97-53 at 44029. Indeed, the lack of protection afforded by the entire email security service is shown in Microsoft's December 2020 acknowledgement that "preventing IP evasion is a large bucket of work that we are investing in very heavily over the next 6 months." *TocMail SMF*, ¶ 42 (ECF 97). Thus, Safe Links' layers, whether two or 1000, are not working as promoted.

### 3. Microsoft's Ads Undisputedly Promote Protection against Evasion.

Microsoft additionally argues that even if Safe Links is ineffective at stopping redirects that use IP evasion, it cannot be held liable because the ads do not use any of the following phrases: "solution to IP Cloaking," "IP Cloaking," "IP Evasion," or "network evasion." *Resp.*, p. 7. However, deceptive message #1 and #2 both refer to redirects that change destination when clicked

---

[2] Remarkably, Microsoft asserts that this May 2020 document is "immaterial" because the document proposes that Microsoft use an on-premise solution ("SmartScreen") to address this "prominent gap" in "IP Anonymization" causing "numerous" failures in "Sonar." *MS Resp. SMF*, ¶ 37. Yet the fact that Microsoft could not develop any cloud-based technology to fix Safe Links makes this document even more material, not less.

after delivery. That *is cloaking*, as the target audience is well aware.[3] Microsoft acknowledges that the target audience of its ads are "IT Pros (Primary) and Developers (Secondary) in Organizations." *Microsoft MSJ*, p.18 (ECF 98). These professionals "ask[] about Microsoft's evasion approaches." *Microsoft's Resp. SMF*, ¶ 57.[4]

### 4. Microsoft's Self-Serving Narrative that It Does Not Promote 100% Protection Is Flatly Contradicted By Its Own Record And Is A Red Herring.

Microsoft repeatedly asserts that Microsoft does not promise 100% protection. *MS Resp. SMF*, ¶¶ 26, 27, 32, 37, 40, 49, 51; *Resp.*, pp. 2, 3, 9, 10, 11, 14, 16, 17, 19. However, this self-serving narrative is contradicted by the subject ads themselves. Deceptive Message #2 promises to protect users from "seemingly safe links that are redirected to unsafe sites by a forwarding service after the message has been received" "**every time** they clink the link." *Resp.*, p. 17 (emphasis added). "Every time" is 100%.

Additionally, Deceptive Message #3 promises to "ensure" all hyperlinks are "harmless." *Id.* at p. 19. According to the Merriam Webster dictionary, to "ensure" something is to "guarantee" it and "to make sure, certain" that it shall occur." ECF No. 110-11, p. 2. That again is a promise of 100% protection. Not only is Microsoft's narrative contradicted by the subject ads, Microsoft

---

[3] Deceptive message #1 promises protection from links that "*alter[] the destination* of the links to a malicious site" when the user clicks on them after delivery. *Resp.*, p. 15. Deceptive message #2 promises protection against hyperlinks that are "safe links [at the time of delivery] that are *redirected to unsafe sites* by a forwarding service *after the message has been received.*" *Id.* at p. 17. A redirect that changes destination to take the user where it wants is the definition of cloaking. As Patel has testified in the context of redirecting users to the website of the URL's choosing: "IP evasion employs redirection." ECF 97-6, 132:9-19. In practice, attackers use the visitor's IP address to implement cloaking, which is why "most" of Sonar's failures to detect phishing URLs were due to "network evasion" (*i.e.* IP evasion) and why 100% of Sonar's failures to detect links to malware are due to IP evasion. *TocMail SMF*, ¶ 13 (ECF 97); *TocMail R. SMF*, ¶ 88 (ECF 110).
[4] Regardless, even if the ads do not specifically refer to cloaking (which they do), the ads are false *because of* IP cloaking (*i.e.* the ads do not fulfill their unambiguous promise of protection because of the ubiquitous use of IP cloaking/evasion). Hence, even if Microsoft's argument is true, its ads are still literally false and such argument does not create a genuine issue of material fact.

itself internally acknowledges that its customers "commonly" purchase Safe Links with the expectation that it will block 100% of "phishing emails." ECF 110, ¶ 21.

Even if the subject ads did not promise 100% protection, which they do, they are still literally false. Microsoft argues, without any legal support, that if the ads do not promise 100% protection, then TocMail must prove that Safe Links does not provide any protection at all ("show that Safe Links *never* works or provides *no* protection at all."). *Resp.*, p. 11 (emphasis added). According to Microsoft's position, it is not false advertising to promote a car as being designed to keep passengers safe from 50 mph collisions where the crash-test dummy got obliterated in 9,999 out of 10,000 collisions at 50 mph. Microsoft's argument is contrary to both logic and law. As discussed in TocMail's Response to Microsoft's MSJ (ECF 109), even when a promotion merely implies that a product was made for a specific purpose, that promotion is literally false. *See e.g., Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Cons. Pharms. Co.*, 290 F.3d 578, 589 (3d Cir. 2002) ("'the product name Mylanta 'Night Time Strength' necessarily implies a false message ... that it possesses a quality that is particularly efficacious for those suffering from heartburn at night.'"). Mylanta did not have to provide zero heartburn protection for its ad to be found literally false. It was literally false because it is not "particularly efficacious" for its implied use, just as Safe Links is not "particularly efficacious" for its promoted use, as documented all throughout TocMail's summary judgment briefs and statements of fact.[5]

---

[5] The test of falsity is simply whether or not the product fulfills the expectation created by the ad. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics*, 836 F.3d 153, 169 (2d Cir. 2016) ("If an advertising message means something different from what reasonable consumers would understand it to mean, that message can be considered false."). This is known as the doctrine of falsity by necessary implication. *See N. Trust Corp. v. Carl Domino, Inc.*, 2006 WL 8433639, *18 FN 19 (S.D. Fla. 2006) ("A literally false 'claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'"); *Green Bullion Financial Servs., LLC v. Money4Gold Holdings,*

9

**B.      The Ads Deceived or Had the Capacity to Deceive.**

As discussed in the TocMail's MSJ on pp. 14-15, it is undisputed that consumer deception evidence is not necessary for literally false ads.

**C.      Microsoft's False Messages Are Material To Purchase Decisions.**

Microsoft argues, similarly as it argued in its MSJ, that a survey or other consumer evidence is required to establish materiality. *Resp.*, pp. 21-22. However, it is clear that in the Eleventh Circuit a survey is not required. For example, a survey was not needed to establish materiality in *Osmose* because the misrepresentation was about the inherent qualities of safety and efficacy, as is the case here. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010); *see also N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (affirming finding that false statements "represent[ing] the quality of the device" "logically would influence" purchase decisions and satisfied the materiality element).

Safety and efficacy are inherent qualities and characteristics of a product, and any misrepresentation of such is sufficient to establish materiality. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010) (finding it "self-evident" that the "safety and efficacy" of the products at issue was material to purchase decisions in that "they misrepresent [an] "inherent quality or characteristic"") (emphasis added); *see also Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190, 203 n.11 (N.D.N.Y. 2016). ("Product safety is clearly an 'inherent quality or characteristic'

---

*Inc.*, 639 F. Supp. 2d 1356, 1366 (S.D. Fla. 2009); *N. Am. Med. Corp. v. Axiom*, 522 F.3d 1211, 1225 (11th Cir. 2008). Safe Links does not fulfill the expectation of safety created by its ads, and thus the ads are literally false.

sufficient to meet the materiality requirement."). Here, Microsoft's false advertisements all pertain directly to the security capability of Safe Links (*i.e.,* safety of users from cyberattacks).[6]

Regardless, TocMail has submitted an abundance of evidence regarding materiality. *TocMail SMF* (ECF 97), ¶¶ 55-60. Remarkably, Microsoft admits that "consumers have asked about Microsoft's evasion approaches," yet Microsoft simply dismisses this as "immaterial." *Microsoft's Resp. SMF*, ¶ 57. Consumers asking about evasion, which Microsoft does not dispute, is not only relevant, it is the very type of consumer evidence Microsoft claims is needed to establish the materiality element.

TocMail has fully established the materiality element on multiple, independent grounds.

**D.     Microsoft's False Messages Have Injured TocMail.**

Microsoft's Response acknowledges "the well-known point that actual damages are not required for TocMail to prove the final element of its Lanham Act claim." *Response*, p. 24. Indeed, Microsoft is correct that TocMail does not need to prove a single lost sale to fully satisfy the fifth element – which is based on a *likelihood* of injury – whether past or future. *See Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1314 (S.D. Fla. 2019).

---

[6] The cases cited by Microsoft do not support that a consumer survey is required for materiality. The *Stiefel Lab, Inc.*, 535 F. App'x 774 case does not even mention the word "survey" in the entire opinion, let alone suggest that a survey is required for materiality. Also, the Court in *JB-Weld*, merely pointed out that the consumer survey plaintiff conducted for other purposes was not probative for the issue of materiality. 978 F.3d 778. It did not state that a survey is required for materiality. Moreover, the Court noted that JB-Weld did not identify a misrepresented inherent quality or characteristic because JB-Weld misunderstood the term, wrongly believing that any and all ingredients of a product constitute inherent characteristics. *Id.* at FN 11. Moreover, *Belcher Pharmaceuticals, LLC v. Hospira, Inc.*, involved a product availability report, not an actual advertisement. 419 F. Supp.3d 1292, 1297 (M.D. Fla. 2020). The plaintiff merely conclusively declared that the subject report had a material effect on purchase decisions. *Id.* That case did not concern ads that misrepresented an inherent quality or characteristic of the product and did not even discuss whether the ads could constitute an inherent quality or characteristic. *Id.* Thus, that case is not even remotely comparable to the case here.

Microsoft's argument that TocMail cannot show a likelihood of injury is self-contradictory. On one hand Microsoft acknowledges that "TocMail has had over 33,000 visitors to its website," while on the other hand Microsoft argues that it is not likely a single customer would have withheld trade from TocMail because it "is highly unlikely" any "consumer[s] would be aware of TocMail's existence." *Resp.*, pp. 24-25, 27. Microsoft's argument fails by its own admission.

Microsoft's argument that TocMail cannot establish injury due to lack of sales is backwards because TocMail's lack of sales demonstrates injury. *See Obesity Research Institute, LLC v. Fiber Research Int'l., LLC*, 310 F. Supp. 3d 1089, 1116-17 (S.D. Cal. 2018) ("[A] lack of sales is consistent with FRI's alleged economic injury that it was shut out of the glucomannan supplement market because of ORI's false advertisements."). It is also backwards for Microsoft to argue that TocMail cannot establish the injury element due to a lack of sales in the *current marketplace*. The injury element considers whether it is *likely* that TocMail would have made at least *one* additional sale within the market that would have existed had Microsoft's false advertising not occurred – a market in which no company already believes it has cloud-based protection against IP evasion. In such a market, given that TocMail solved the most-common attack used against cloud-based scanners, clearly it is likely that at least one company would purchase TocMail's solution. In the current market, companies who believe that Microsoft is providing them the same protection unsurprisingly choose to stay with one of the largest tech companies in the world rather than adding a product from a no-name start-up, all to the direct injury of the startup.

TocMail has put forth additional independent evidence of injury, including the fact that only TocMail and Microsoft promote their cloud-based time-of-click services as effective protection against cloaking/evasion. *TocMail SMF*, ¶ 43. While Microsoft argues that there are other time-of-click providers in the marketplace, Microsoft has not (and cannot) identify any other

company promoting its cloud-based, time-of-click service as protection *against cloaking*. *Resp.*, p. 26. Microsoft attempts to place the burden on TocMail to prove a negative (*i.e.* prove that no such competitive ads exist). *Id.* Of course, TocMail cannot present evidence of ads that do not exist. No such competitive ads exist – *that is the point*. TocMail's evidence shows that both TocMail and Microsoft promote protection against cloaking. Thus, TocMail has met its evidentiary burden. If evidence exists of other competitors promoting such protection, Microsoft could have pointed to them but did not do so (and cannot do so because none exist). Hence, there is no genuine issue of fact that TocMail and Microsoft are the only two competitors that promote such protection, resulting in the very type of two-player, niche market that courts have recognized as creating inherent injury. *See Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 260-61 (2d Cir. 2014) ("Because its only competitor for such a pure product at the time was [plaintiff], it follows that [plaintiff] was damaged by [defendant's] false advertising . . . [and] in the context of a two-player market, . . . the district court's utilization of a presumption of injury carries no risk of speculative injury to [plaintiff]."); *Insurent Agency Corp. v. Hanover Ins. Co.*, 16 Civ. 3076 (LGS) (S.D.N.Y. Aug. 20, 2018).[7]

Microsoft has not provided any evidence disputing TocMail as the sole provider, but rather argues that Microsoft does not promote protection against cloaking because the ads do not use the word "cloaking." *Resp.*, p. 7. As discussed above, that argument is a red herring and fails.

---

[7] Microsoft argues that TocMail is not even a competitor because Safe Links is part of the ATP product, and TocMail supposedly only sells protection against IP Cloaking. *Response*, p. 26. First, there are organizations that purchase ATP solely for Safe Links. ECF No. 110, ¶ 92. Second, while TocMail blocks IP cloaking with 100% efficacy, "TocMail does indeed block other types of malicious links." *Id.* at ¶ 27. TocMail and Microsoft directly compete. Not to mention that the Supreme Court in *Lexmark* found that being a competitor is not required for standing, but rather the standard is whether the false message "causes [consumers] to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Hence, the competitor argument is nothing more than another false red herring.

13

Microsoft also attempts to distinguish TocMail's cases, including *De Simone*, but misses the point. The court in *De Simone* did not state that the plaintiff had to have a sales monopoly. *De Simone v. VSL Pharm., Inc.*, 395 F. Supp. 3d 617, 631 (D. Md. 2019). Rather, the court found that, when the defendant falsely advertises to offer a product that only the plaintiff offers, there is direct path to proximate causation because, presumably consumers seeking such a product would have gone to plaintiff but for the defendant's false advertising – the plaintiff is the only other option. *Id.* This is a logical presumption. It is not about the amount of sales by the plaintiff as Microsoft argues, but rather that the plaintiff is the only party that offers that product for consumers to choose. Here, TocMail is the only party that offers time-of-click, cloud-based protection against cloaking. Thus, Microsoft's false advertising that it offers such protection creates a direct path to proximate causation because presumably consumers (or at least likely that one consumer) would have sought that protection from TocMail but for Microsoft's false advertising – TocMail was the only option for consumers.

Bosch is one concrete example. Upon purchasing ATP, Bosch asked if it needed to "implement additional [third-party] email security controls" during its "cut over to ATP" specifically in regards to IP evasion (*i.e.,* Bosch asked: "Why is an IP-address range used which is easily attributable to Microsoft?"). ECF No. 97-18 at 118747 - 118749. Microsoft seeks to deflect from Bosch's questions regarding the cut over by stating "Microsoft had already secured the client's account." *Microsoft Resp. SMF* ¶ 28. Yet, Amar Patel testified that Bosch "completed their cutover" "after we went through this process" of addressing Bosch's "key questions" because "we did address this customer's concerns, and -- successfully." *TocMail Reply Facts*, ¶ 25. Thus, Bosch only "completed their cutover" because of Microsoft's deception.

Microsoft successfully assuaged Bosch's concern in June 2020 by promising: "We monitor network evasion ... to ensure effectiveness." ECF No. 97-18 at 118749. Incredibly, a couple weeks prior to this meeting, the Sonar team internally disseminated a report documenting that Sonar is missing "numerous" phishing pages because redirects that use "Network level evasion (Ex: Evading Microsoft IPs ...)" are a "prominent gap" in "IP anonymization." ECF No. 97-53 at 44029. Importantly, the Sonar team was looking outside of Safe Links to address this "prominent gap" (*i.e.* no potential fix for Safe Links was even in sight). *Id.* Hence, Microsoft deliberately deceived Bosch regarding its need for a third-party IP evasion solution to add to its ATP purchase, all to the injury of the only such provider – TocMail.

Finally, Microsoft repeatedly argues that its advertisements prior to TocMail's existence are somehow irrelevant to this case. *Resp.*, pp. 27-28. Not even considering the fact that such argument is baseless because the ads continued well past TocMail's entry into the market and even to the present day, the fact that Microsoft's false advertising started prior to TocMail's existence makes them much more injurious, not less. Microsoft's ads prevented TocMail from reaping all the benefits of being the first to promote a time-of-click, cloud based solution to cloaking. That is indisputable injury in and of itself, independent of all other injury grounds. Microsoft used false advertising to pull millions of consumers out of the market before TocMail even opened its doors. In this situation, injury is not just likely — it is inevitable.

Microsoft relies heavily and repeatedly throughout its Response and Response SMF on the *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325 (11th Cir. 2008) case to suggest that any evidence of false advertising prior to TocMail's entry into the market is irrelevant. However, the court in *Natural Answers* analyzed whether the plaintiff had standing to bring a false advertising claim under the old prudential standing test. *Id.* at 1331-32. The prudential standing

15

test was abrogated by the Supreme Court in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) and, thus, the entire holding in *Natural Answers* regarding injury, which is what Microsoft relies on, is not even good law. *See also Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1274 n.6 (11th Cir. 2018). All arguments made by Microsoft relying on *Natural Answers* should be rejected outright.

Regardless, the facts in *Natural Answers* are opposite to the facts here anyway. In *Natural Answers*, the plaintiff entered the market first, not the defendant as is the case here. Significantly, the plaintiff had also already exited the market, with no ability to reenter, prior to the false advertising. *Id.* at 1327. Thus, logically, the defendant's advertising could not cause plaintiff damage because the plaintiff was never going to be selling its product concurrently with defendant's sale of its product, as the court noted that the products were "never marketed or sold contemporaneously." *Id.* at 1328. That is the mirror opposite of here, where TocMail started selling its product after Microsoft already pulled consumers from the market, and while all the ads continued to run along with new ones created, and where TocMail and Microsoft concurrently offer their products for sale as well. There is no applicability here.[8]

### III. CONCLUSION

TocMail's MSJ relies on Microsoft's own materials, whereas Microsoft's Response relies on self-serving narrative that is directly contradicted by its own record. TocMail respectfully requests that the Court grant its MSJ and deny Microsoft's MSJ.

---

[8] Microsoft also cites *CareerFairs.com*, which also applied prudential standing and thus is not good law; not to mention that the case involved nothing more than a business idea, not a product on the market. 838 F. Supp. 2d 1316, 1321-23 (S.D. Fla. 2011).

Dated:  September 3, 2021             Respectfully submitted,

By:   /s/Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
Email: josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd.
Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorneys for Plaintiff, TocMail Inc.*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of September, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   /s/ Joshua D. Martin
Joshua D. Martin

## SERVICE LIST

*TOCMAIL INC. v. MICROSOFT CORPORATION*
20-60416-CIV- CANNON/HUNT

**Joshua D. Martin**
E-Mail: josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd.
Suite 430
Fort Lauderdale, Florida 33309
Telephone: (954) 790-6699
Facsimile: (954) 206-0017

**Francisco O. Sanchez**
E-Mail: sanchezo@gtlaw.com
      orizondol@gtlaw.com
**Evelyn A. Cobos**
E-Mail: cobose@gtlaw.com
      MiaLitDock@gtlaw.com
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

**Mary-Olga Lovett** *(admitted pro hac vice)*
E-Mail: lovettm@gtlaw.com
**Rene Trevino** *(admitted pro hac vice)*
E-Mail: trevinor@gtlaw.com
GREENBERG TRAURIG LLC
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3541
Facsimile: (713) 374-3505